**UNITED STATES of America, Plaintiff,**

and

**Yonkers Branch-National Association For the Advancement of Colored People, et al., Plaintiffs-Intervenors,**

**v.**

**YONKERS BOARD OF EDUCATION; City of Yonkers; and Yonkers Community Development Agency, Defendants.**

**No. 80 Civ. 6761 (LBS).**

United States District Court, S.D. New York.

Nov. 20, 1985.

U.S. Dept. of Justice, Civ. Div., Joshua P. Bogin, Kenneth Barnes, Michael L. Barrett, Sarah Vanderwicken, Washington, D.C., for plaintiff U.S.

Michael H. Sussman, Brooklyn, N.Y., for plaintiffs-intervenors N.A.A.C.P.

Vedder, Price, Kaufman, Kammholz & Day, Michael W. Sculnick, Gerald S. Hartman, Nicholas J. D'Ambrosio, Jr., New York City, for defendants City of Yonkers and Yonkers Community Development Agency.

Butzel, Long, Gust, Klein & Van Zile, John B. Weaver, John H. Dudley, Mark T. Nelson, Detroit, Mich., Hall, Dickler, Lawler, Kent & Howley, Paul Whitby, New York City, for defendant Yonkers Bd. of Educ.

U.S. Dept. of Justice, Civ. Div., Raymond M. Larizza, Calvin E. Davis, Kirk Victor, John W. Herold, Office of Litigation, U.S. Dept. of Housing & Urban Renewal, Washington, D.C., for third-party defendant Dept. of Housing & Urban Development.

## OPINION

SAND, District Judge.

## TABLE OF CONTENTS

INTRODUCTION

HOUSING:

I. BACKGROUND ...................................................... 1289
II. STATEMENT OF CLAIMS AND LEGAL STANDARDS ................... 1291
III. THE CITY'S EARLY ACTIVITIES UNDER THE NATIONAL HOUSING
 ACT OF 1949 ...................................................... 1294
 A. The Procedure for the Selection and Approval of Sites for Public Hous-
 ing ................................................................ 1294
 B. Site Selection for the City's 1949 Allocation of Public Housing Units .. 1295
 C. Site Selection for Senior Citizen Housing ............................ 1300
 D. The City's Campaign to Produce Sites for Relocation Housing ........ 1302
 E. The Nature and Effect of the Recurring Pattern of Public Opposition . 1306

IV. THE RIVERVIEW PERIOD ............................................. 1313
 A. Overview of Projects Approved ...................................... 1313
 B. The Continuing Opposition to Subsidized Housing in the City's Heavily
 White Neighborhoods ................................................ 1314
 C. The Pattern of Opposition and Apparent Acquiescence ................ 1316
 1. The City's Campaign to Produce Privately Sponsored Projects ..... 1316
 2. The Candeub & Fleissig Survey and the City's 1970 Memorandum
 of Understanding with the UDC ................................. 1317
 3. The Glenwood/Ridge Avenue Project and Rockledge Heights ...... 1320
 4. Seven Pines .................................................... 1322
 5. Parkledge ...................................................... 1323
 D. The City's Explanations for its Confinement of Subsidized Housing to
 the Southwest ...................................................... 1327
 1. Reliance on HUD's Express Directions .......................... 1328
 2. The Absence of Private Developer Proposals In the East ........ 1330
 3. Support for the Projects Among the Minority Community ......... 1331
 4. The Unsuitability of East Side Sites ............................ 1333
 5. The Pursuit of a Legitimate Planning Strategy to Use Subsidized
 Housing to Rebuild the Southwest .............................. 1337

V. THE CITY'S ACTIVITIES UNDER THE HOUSING AND COMMUNITY
 DEVELOPMENT ACT OF 1974 ......................................... 1342
 A. Subsidized Housing Under the Housing and Community Development
 Act of 1974 ........................................................ 1342
 B. The Section 8 Existing Program ..................................... 1342
 C. Section 8 New Construction Housing for Senior Citizens .............. 1348
 1. The City's Actions ............................................. 1348
 2. The Effect of the City's Actions ............................... 1351
 D. Subsidized Housing for Families Under the HAPs for Years I through
 IV ................................................................. 1352
 E. The Palmer Road Site .............................................. 1353
 F. Actions Subsequent to the 1980 Contract Conditions ................. 1356
 1. Salisbury Gardens ............................................. 1356
 2. The Neustadter Site ........................................... 1358
 3. School 4 ...................................................... 1358

VI. THE EFFECT OF THE CITY'S ACTIONS ON THE RACIAL CONFIGUR-
 ATION OF YONKERS ................................................. 1358
VII. CONCLUSIONS OF LAW ............................................. 1369

SCHOOLS:

I. THE CLAIMS OF UNLAWFUL SCHOOL SEGREGATION ............... 1376
II. LEGAL STANDARDS ................................................ 1378
III. THE YONKERS PUBLIC SCHOOL SYSTEM ........................... 1382
IV. THE BOARD OF EDUCATION ........................................ 1388
 A. School Openings, Closings, and Attendance Zone Changes ............. 1388
 1. Introduction ................................................ 1388
 2. School Openings ............................................. 1395
 a. Martin Luther King, Jr. Elementary School ................ 1395
 b. School 10 .............................................. 1403
 c. Commerce Middle School ................................. 1410
 3. School Closings ............................................. 1410
 a. School 1 .............................................. 1410
 b. 1976 School Closings ................................... 1413
 c. Longfellow Middle School ............................... 1422
 4. Attendance Zone Changes ..................................... 1428
 a. Schools 16 and 25 ...................................... 1428
 B. Equal Educational Opportunity ....................................... 1430
 1. Physical Characteristics ..................................... 1431
 2. Staff ....................................................... 1433
 3. Students .................................................... 1437
 4. Educational Programs and Resources .......................... 1439
 5. Integration and Educational Opportunity ..................... 1443
 C. Vocational Education: Steering and Screening of Minority Students ... 1444
 D. Special Education ................................................... 1453
 E. Teacher and Administrative Staff Assignments ....................... 1462
 F. Refusal to Implement Desegregative Reorganization Plans ............ 1467
 1. Introduction ................................................ 1467
 2. NYU Report ................................................. 1469
 3. Phase II .................................................... 1483
V. THE CITY ........................................................ 1500
 A. Interrelationship Between Housing Practices and School Segregation .. 1500
 B. Budgetary Control .................................................. 1503
 C. Mayoral Appointment of School Board Members .................... 1506
 D. School Site Selection ............................................... 1513
 1. Yonkers High School ......................................... 1513
 2. Saunders Trades and Technical High School ................... 1514
 E. Other City Involvement in School Affairs ........................... 1516
 1. Attendance Zone Changes ..................................... 1516
 2. City Council Resolutions .................................... 1517
 3. School 4 .................................................... 1518
VI. CONCLUSIONS OF LAW ........................................... 1521
 A. Jurisdiction ....................................................... 1521
 1. The Board of Education ...................................... 1522
 2. The City .................................................... 1522
 B. Liability .......................................................... 1526
 1. The Board of Education ...................................... 1526
 a. Independent Conduct of School Authorities .................. 1526
 b. Denial of Equal Educational Opportunity ................... 1530
 c. Subsidized Housing Discrimination ......................... 1531
 2. The City .................................................... 1537
VII. CONCLUSION ................................................... 1545

## INTRODUCTION

After nearly one hundred days of trial, during which eighty-four witnesses testified and thirty-eight depositions, as well as thousands of exhibits, were received in evidence, this Court is called upon to decide whether the City of Yonkers and the Yonkers Board of Education have intentionally created or maintained racial segregation in the City's housing and schools. Before embarking on that task, we pause to make clear why that is the issue, and why it falls upon this Court to resolve it.

First, the primary issue in this case is whether the City of Yonkers and the Yonkers Board of Education *intentionally* segregated its housing and schools, since it is clear that by all relevant standards, Yonk-

ers and its public school system are, in fact, racially segregated. The principal question in controversy is whether the segregated condition of the City's housing and schools resulted from the force of circumstances unintended by those who made the decisions which shaped the housing and schools of the community, or whether this condition resulted from an intent to segregate by race.

This Court is called upon to resolve this controversy because the United States Department of Justice has commenced and has maintained, through two administrations, an action alleging that the housing and schools in Yonkers have been intentionally segregated by race, and the Yonkers NAACP has intervened in that action.[1]

**1.** The procedural history of this litigation is set forth below.

On June 24, 1980, the Yonkers Board of Education ("the Board") was notified that the United States Department of Education had determined that the racial segregation of the Yonkers school system was caused by actions and omissions of the Board and the City of Yonkers which violated Titles IV and VI of the Civil Rights Act of 1964, the fourteenth amendment, and contractual assurances made by the Board in consideration of its continuing receipt of federal financial assistance. GX 96.3, 96.4. The Board also was invited to engage in efforts to bring the system into voluntary compliance. GX 96.3. By a letter dated November 4, 1980, the Department of Education notified the Board that its efforts to obtain adequate voluntary compliance with Title VI had been unsuccessful and that the determination of noncompliance would be referred to the United States Department of Justice unless the Board submitted an acceptable desegregation plan within ten days. GX 96.2. On November 17, 1980, the Department of Education, having determined that voluntary compliance could not be obtained, referred the matter to the Department of Justice. GX 96.1.

On November 24, 1980, the Board filed a complaint seeking to enjoin the United States Departments of Education and Justice from instituting an action against it based on alleged violations of Title VI and seeking an order directing these departments to resume negotiations designed to achieve the Board's voluntary compliance with Title VI. On December 1, 1980, the Board's application for a temporary restraining order and preliminary injunction was denied. *Yonkers Board of Education v. United States Department of Education, supra.*

On December 1, 1980, the Attorney General of the United States filed suit against the Board of

Education, the City of Yonkers, and the Yonkers Community Development Agency ("the CDA"), alleging that the defendants had engaged in racial discrimination in the administration of the City's public schools and subsidized housing programs. The defendants named in the housing portion of the suit are the City of Yonkers and the CDA (collectively "the City"). The complaint charges that those defendants "have intentionally followed a systematic pattern of selecting sites for public and subsidized housing projects that has effectively perpetuated and seriously aggravated residential racial segregation in the City of Yonkers, in violation of the Constitution, and of Title VIII of the Civil Rights Act of 1968." Complaint, ¶ 24. The defendants named in the school portion of the suit are the Yonkers Board of Education and the City of Yonkers. The complaint charges that the "segregated condition of the public schools operated by the School Board has been caused, in substantial part, by intentional, racially discriminatory actions and omissions" of the Board and the City. Complaint, ¶ 16.

On March 4, 1981, the Yonkers branch of the National Association for the Advancement of Colored People ("NAACP") and Regina Ryer, a minor by her next friend, Charlotte Ryer ("plaintiff-intervenors"), moved to intervene in this suit as party-plaintiffs on behalf of themselves and all others similarly situated. On June 29, 1981, this Court granted Plaintiff-intervenors leave to intervene, *United States v. Yonkers Board of Education*, 518 F.Supp. 191, 201–03 (S.D.N.Y.1981), and subsequently certified the action as a class action on behalf of all black residents of Yonkers who are currently residents of, or eligible to reside in, publicly assisted housing in Yonkers, or who are parents of students currently attending public school in Yonkers.

The action was brought after efforts at conciliation of the "schools" portion of this litigation failed but with the assurances (made to Yonkers and to this Court by the plaintiffs and the Board of Education) that the initiation of this suit would not end efforts to resolve this controversy consensually.[2] Mindful of the cost which this litigation has entailed,[3] the divisiveness which it has engendered, the need for community support for voluntary remedial action to be successful—in short, the overall desirability of a resolution which originated with the parties themselves—more than the usual efforts at settlement were made. This included appointment of a Special Master, whose sole function was to attempt to bring the parties to a consensual resolution. *See* separate Opinion filed this date. By the closest of margins, the fruits of these efforts, an agreement among the Board of Education, the United States and the NAACP, conditional upon funding by the City Council, was rejected by that body. Hence, all efforts to consensually resolve this matter having failed, the task is ours and we shall proceed to discharge it.

We set forth below, in detail commensurate with the voluminous and complex nature of the record, the findings of fact and conclusions of law which lead to our determination that the plaintiffs have sustained their burden of proving that Yonkers' housing and schools have been intentionally segregated by race. In performing this inquiry, we have examined the actions of many officials who we are certain were entirely well-meaning public servants acting in accordance with their perception of what was feasible in the political and socioeconomic circumstances of Yonkers and in the best interests of that community. In many instances, acts were taken by elected officials in response to strong constituent pressures and perceptions of political reality. Members of the Board of Education also acted under similar circumstances. We are not passing moral judgments with respect to the actions of those who steered the destiny of Yonkers; nor do we suggest that the implementation of measures contrary to the political climate of the times would have been an easy task. Our inquiry is whether, under applicable legal standards, actions taken by the City of Yonkers and the Board of Education, with respect to housing and public schools, were in whole or in part intentionally segregative. We find that they were, for the reasons set forth below.

## HOUSING

### I. BACKGROUND

The City of Yonkers is one of the five largest cities in the State of New York. Its population, according to 1980 census figures, is 195,331. Yonkers is located in Westchester County and is bounded on the west by the Hudson River, on the east by the Bronx River, on the south by the City of New York, and on the north by the Village of Hastings-on-Hudson and the Town of Greenburgh. The City is approximately three to three and one-half miles wide, four to six miles long, and encompasses some eighteen to twenty square miles. It is divided lengthwise by a series of ridges and valleys which run north to south, roughly parallel to the Hudson River. The Saw Mill and Nepperhan Rivers flow through the more western valleys.

Over the course of the nineteenth century, Yonkers evolved from what was primar-

The City's answering papers asserted a counterclaim against the United States and a third-party complaint against the United States Department of Housing and Urban Development ("HUD"). Plaintiff-intervenors amended their complaint to add a claim against HUD. Plaintiff-intervenors' claim against HUD was settled by a Consent Decree approved by this Court on March 19, 1984. The City's counterclaim and third-party complaint were dismissed on September 18, 1984 on the grounds that they were barred by soverign immunity and that they failed to state a claim upon which relief could be granted. *United States v. Yonkers Board of Education,* 594 F.Supp. 466 (S.D.N.Y.1984).

**2.** *See Yonkers Board of Education v. United States Department of Education,* 80 Civ. 6658 (LBS), slip op. at 4–5 (S.D.N.Y. Dec. 1, 1980).

**3.** *See* Transcript of Proceedings May 15, 1984, at 13, 19.

ily a farming village into a significant industrial and commercial center. This development was concentrated in the Southwest section of the City in the areas along and between the Nepperhan, Saw Mill and Hudson Rivers, and along the Hudson River Railroad, which opened in 1849. Factories were built along the rivers, and a central commercial district, known as Getty Square, developed between the factories and along the railroad. From the latter portion of the nineteenth century up to World War II, Getty Square was the hub of commerce for Westchester cities along the Hudson as far north as Peekskill. With the factories, came large amounts of worker housing—generally poor in quality and heavily clustered in the valleys of the Southwest section of the City. The Northwest and East sections of Yonkers remained largely rural until the early 1920s when the Saw Mill River Parkway opened and a pattern of low density suburban housing development began. The pattern continued and accelerated with the construction of the Harlem Division Railroad, the Bronx River Parkway, the New York State Thruway, and the Sprain Brook Parkway—all of which run in a north-south direction and provide commuters with easy access to New York City.

The three decades following World War II were the time of greatest housing development in Northwest and East Yonkers. Initially, the primary form of development was the single family housing subdivision. Somewhat later, in the 1960s and 1970s, multi-family apartment buildings were built in increasing numbers along the major arterial routes and the commuter rail lines.

As the Northwest and East sections of the City expanded, however, the Southwest entered a period of decline. The housing stock deteriorated, and was not replaced or renovated on any significant scale. In 1954, with the closing of the Alexander Smith Carpet Mills, the Southwest's largest employer, the area began to lose its industrial base. In addition, the Getty Square central business district began to stagnate, a phenomenon attributed primarily to lack of adequate highway access and parking, and to increased competition from shopping malls such as the Cross County Shopping Center.

In 1949, with the passage of the National Housing Act of 1949, the City embarked upon a series of urban renewal and subsidized housing programs that have continued to the present day. Both programs have been largely confined to the Southwest section of the City. As of 1949, the City had two subsidized housing projects (the 550-unit Mulford Gardens and the 250-unit Cottage Place Gardens), both of which were located in Southwest Yonkers. Between 1949 and 1982, thirty-six more subsidized housing projects were developed, thirty-four of which are also located in Southwest Yonkers.[4] The two exceptions are Curran Court, a 186-unit project for senior citizens on Martin Ray Place in East Yonkers, and Hall Court, a 48-unit project for families in an East Yonkers neighborhood known as Runyon Heights. In all, the Southwest contains 6,644 or 97.7% of the City's 6,800 existing units of subsidized housing.[5]

---

**4.** A list of the subsidized housing projects and a map depicting their location appear as Appendix A to this Opinion. It should be noted that one of the projects, Seven Pines, is located across the street from the group of census tracts that are generally acknowledged to constitute Southwest Yonkers—namely, census tracts 1–6 and 10–13, or (for the years from 1960 on) their subdivided equivalents. Thus, strictly speaking, Seven Pines is just across the northern border of Southwest Yonkers. However, as acknowledged by the City's own expert witness in urban planning, the project is, as a matter of urban topography, "as much or more related to the area to the south," Tr. 10,815–16 (Portman), and it accordingly is included in this Opinion as one of the thirty-six projects located in Southwest Yonkers. See also Tr. 402 (Davidoff).

**5.** Since 1982, at least three additional projects have been approved and put into development in Yonkers. Two are in Southwest Yonkers: the conversion of a closed school on Hamilton Avenue into an 88-unit subsidized housing complex, and the construction of a 55-unit project on Willow Street. The remaining 45-unit project is on Palmer Road in East Yonkers (the first East side project approved since 1963). All three projects are senior citizen projects.

The extreme concentration of subsidized housing that exists in Southwest Yonkers today is matched by an extreme concentration of the City's 18.8% minority population.[6] According to 1980 census figures, Southwest Yonkers accounts for 37.5% of the City's total population, but contains 80.7% of the City's minority population. Seven of the Southwest's seventeen census tracts have a minority population greater than 50%. Six more have a minority population ranging between 25% and 50%. None has a minority population that is less than 9%.

In contrast, only two of the thirty-two census tracts outside the Southwest have a minority population greater than 6%. One is census tract 7, whose 28.6% minority population is clustered in the southern end of the tract, where it abuts Southwest Yonkers and along the Hudson Division Railroad on the western edge of the tract.[7]

The second is census tract 18 in East Yonkers, which contains Runyon Heights, a longstanding enclave of black home owners, and the site of Hall Court, the only subsidized housing project for families that is located outside Southwest Yonkers. The minority population of census tract 18 is 79.8%. The remaining thirty census tracts have minority populations ranging from 1.5% to 6.0%, with half having less than 3%. GX 1225.1, 1225.6.[8]

## II. STATEMENT OF CLAIMS AND LEGAL STANDARDS

Plaintiffs contend that the existing concentration of subsidized housing in Southwest Yonkers reflects a pattern and practice of housing discrimination by the City in violation of Title VIII of the Civil Rights Act of 1968 (also known as the Fair Housing Act)[9] and the equal protection

---

When those units are added to the existing total, the Southwest will contain 6,787, or 97.1%, of the City's 6,988 subsidized housing units.

**6.** The term "minority," as defined in plaintiffs' respective complaints and in current census data, means those who are black or hispanic. Prior to 1970, the term "minority" as used in census data also included Asians and Indian-Americans and excluded "white hispanics," Tr. 122–24 (Davidoff); 11,947 (Armor), but at least with respect to the case before us, the discrepancy appears to have little or no significance. *See* fn. 63 *infra*.

**7.** Census tract 7 is also the tract which contains Seven Pines, a 300-unit project for families on the northern border of Southwest Yonkers. *See* fn. 4 *supra*.

**8.** The City contends that Yonkers cannot be characterized as highly segregated since, according to one commonly used index of segregation, Yonkers compares favorably to most other major urban cities. The index in question, however, measures only the level of integration within individual census blocks and thus is a highly misleading measure when, as in Yonkers, the percentage of minorities among the general population is relatively low, but most of the blocks in which a significant number of minorities live are heavily clustered in one or two areas of the city. *See* Tr. 416–19; 422 (Davidoff). The figures described above preclude any serious argument about the extreme degree of segregation that exists in Yonkers today.

**9.** Section 804(a) of the Fair Housing Act prohibits practices which "make unavailable or deny ... a dwelling to any person because of race, color, religion, sex, or national origin." 42 U.S.C. § 3604(a). In keeping with the broad purposes of the Fair Housing Act, § 804(a) has been construed to reach "every practice which has the effect of making housing more difficult to obtain on prohibited grounds." *United States v. City of Parma, supra,* 494 F.Supp. at 1053 (citing cases).

Section 813 of the Act authorizes the Attorney General to file suit when he has

reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by [the Act], or that any group of persons has been denied any of the rights granted by [the Act] and such denial raises an issue of general public importance....

42 U.S.C. § 3613. The Attorney General's determinations of reasonable cause and general public importance are not reviewable. *See United States v. City of Parma, supra,* 494 F.Supp. at 1095 n. 64. In addition, both the City of Yonkers and the CDA are "persons" within the meaning of 42 U.S.C. § 3613. *See United States v. City of Black Jack, Missouri,* 508 F.2d 1179, 1183–84 (8th Cir.1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975). Thus, jurisdiction is proper under 42 U.S.C. § 3613.

Suits by private persons are authorized by § 812 of the Act. 42 U.S.C. § 3612; *see also Havens Realty Corp. v. Coleman,* 455 U.S. 363,

clause of the fourteenth amendment to the United States Constitution.[10]

Specifically, plaintiffs contend that City officials, in response to constituent pressures, have made the preservation of existing patterns of racial segregation a controlling factor in site selection for subsidized housing. According to the plaintiffs, subsidized housing for families has been equated with minority housing, and for that reason, has been confined to the disproportionately minority areas of the City—most often, the downtown area of Southwest Yonkers. Subsidized housing for senior citizens is alleged to have been less consistently identified with minority housing, and therefore less consistently confined to minority areas. Nonetheless, according to plaintiffs, it, too, has met racially influenced resistance from area residents, often based on the concern that it might be converted to housing for families. Plaintiffs contend that the Saw Mill River Parkway has been viewed as the barrier separating overwhelmingly white East Yonkers from the racially mixed (and, since the mid-1960s, increasingly minority) population of Southwest Yonkers, and that City officials have been consistently unwilling, even when strongly pressed by federal authorities, to breach that racial barrier by placing subsidized housing for families east of the Saw Mill River Parkway.

The City, in turn, contends that its selection of sites for subsidized housing has been in no respect discriminatory, and that any segregative effect which the site selections may have had was entirely unintended. In particular, the City insists that the extreme concentration of subsidized housing in Southwest Yonkers reflects only a consistent strategy, adopted for reasons unrelated to race, to use subsidized housing to help rebuild Southwest Yonkers. In defense of that strategy, the City argues that it was recommended by outside consultants as well as by its own planning staff, and that it was consistent with, and indeed even encouraged by, federal housing and urban renewal policy.

■■■ As the contentions of the parties suggest, the primary focus of the inquiry now before us is whether the actions challenged by plaintiffs were undertaken with discriminatory *intent*—specifically, the intent to create or maintain racial segregation. An action which merely has the unintended *effect* of creating or maintaining racial segregation violates neither the Constitution, *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 264–65, 97 S.Ct. 555, 562–63, 50 L.Ed.2d 450 (1977) (*Arlington Heights I*) (citing *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)), nor, except in certain limited circumstances, the Fair Housing Act.[11]

381 n. 23, 102 S.Ct. 1114, 1125 n. 23, 71 L.Ed.2d 214 (1982).

**10.** Although both the United States and Plaintiff-Intervenors allege in their respective complaints that the housing practices of the City violate the Constitution as well as the Fair Housing Act, subsequent filings by the United States, including its proposed conclusions of law, refer only to violations of the Fair Housing Act. In light of the government's apparent abandonment of its constitutional claim with respect to the housing portion of the case, and the apparent lack of any significant distinction (at least on the facts of this case) between the constitutional and statutory claims, *see* fn. 71 *infra,* we need not reach the complex question of whether the government in fact has standing to raise a claim of housing discrimination that is based upon the fourteenth amendment to the Constitution. *Cf.* SCHOOLS VI.A.2 *infra* (discussing the issue as it relates to a claim of segregation in schools).

Plaintiff-intervenors' equal protection claim is cognizable as an alleged violation of 42 U.S.C. § 1983, *Turpin v. Mailet,* 591 F.2d 426, 427 (2d Cir.1979) (en banc) (per curiam), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980), and jurisdiction is proper under 28 U.S.C. § 1343(3) and (4). Plaintiff-intervenors' identical claim under the thirteenth amendment is dismissed, however, since the practices challenged do not involve actual conditions of slavery or involuntary servitude. *See The Alma Society, Inc. v. Mellon,* 601 F.2d 1225, 1236–38 (2d Cir.) *cert. denied,* 444 U.S. 995, 100 S.Ct. 531, 62 L.Ed.2d 426 (1979).

**11.** While a showing of discriminatory effect can establish a *prima facie* case of a Fair Housing Act violation, it is not sufficient to entitle the plaintiff to relief unless the defendant has offered no race-neutral justification for its action. *See Robinson v. 12 Lofts Realty,* 610 F.2d 1032, 1036–40 (2d Cir.1979). Once, as here, a justifi-

█ A plaintiff is not required to prove, however, that segregative intent was the sole or even primary motive underlying the defendant's actions. Indeed, as the Supreme Court noted in *Arlington Heights I,*

[r]arely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the "dominant" or "primary" one. In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified.

429 U.S. at 265–66, 97 S.Ct. at 563 (footnotes omitted).

█ A policy of racial segregation, in other words, is impermissible even as a secondary motive for action, and "cannot be justified by the good intentions with which other laudable goals are pursued." *Gautreaux v. Chicago Housing Authority,* 296 F.Supp. 907, 914 (N.D.Ill.1969), (citing *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) ); *see also Cooper v. Aaron,* 358 U.S. 1, 16, 78 S.Ct. 1401, 1408, 3 L.Ed.2d 5 (1958) (quoting *Buchanan v. Warley,* 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917) ); *United States v. City of Parma,* 494 F.Supp. 1049, 1054 (N.D.Ohio 1980), *aff'd in relevant part,* 661 F.2d 562 (6th Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982).

█ The factors that are to be considered in determining whether actions were taken with discriminatory intent include the degree of any discriminatory effect; the historical background of the actions; the specific sequence of events leading up to the actions; the presence or absence of departures from normal procedures or substantive criteria; and the legislative history of the actions. *Arlington Heights I, supra,* 429 U.S. at 266–68, 97 S.Ct. at 563–65.[12]

█ To prove a *pattern and practice* of discrimination, a plaintiff must prove that it was a regular (although not necessarily uniform) practice of the defendant to act with discriminatory intent. *See United States v. City of Parma, supra,* 494 F.Supp. at 1095. And in determining whether the plaintiff has carried that bur-

---

cation has been offered, at least some level of inquiry into the defendant's intent is always required. *See* fn. 12 *infra.*

**12.** With respect to claims brought under the Constitution, the Court's inquiry is ended if it finds that the plaintiff has failed to sustain its burden of proving discriminatory intent. *Arlington Heights I, supra,* 429 U.S. at 270–71, 97 S.Ct. at 566. With respect to the Fair Housing Act, however, most courts that have considered the question have held that in view of the broad purposes of the Act, and the difficulty of proving intent, relief may be appropriate in some cases even when discriminatory intent has not been positively established. *See Robinson v. 12 Lofts Realty, supra,* 610 F.2d at 1036–38 (citing cases).

The leading case in this regard is *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978) (*"Arlington Heights II "*), in which the Seventh Circuit identified four factors to be considered in determining whether the relief requested is warranted under the Fair Housing Act. Those factors are: (1) the degree of discriminatory effect; (2) whether there is at least some evidence of discriminatory intent; (3) the defendant's interest in taking the challenged action; and (4) whether the remedy sought would compel the defendant to affirmatively provide housing for minorities or merely restrain the defendant from interfering with the efforts of others to do so. 558 F.2d at 1290–93. Clearly, the first three factors are merely a "relaxed" version of the *Arlington Heights I* intent inquiry, *cf. Stingley v. City of Lincoln Park,* 429 F.Supp. 1379, 1389 (E.D.Mich.1977), that is justified by the fourth factor—the limited nature of the remedy sought.

In light of the strength of the evidence of intent in the case before us, it is unnecessary to reach the question whether entitlement to the broad remedial measures sought by plaintiffs here could be established under the relaxed "effects" standard set forth in *Arlington Heights II.*

den of proof, the court must view the evidence as a whole. *Id.* at 1055 (citing cases). As the District Court for the Northern District of Ohio explained in *United States v. City of Parma:*

> The character and effect of a general policy is to be judged in its entirety, and not by dismembering it as if it consisted of unrelated parts ... Even intrinsically lawful acts may lose that character when they are constituent elements of an unlawful scheme.

*Id.* (citations omitted). In large part, this rule is no more than a reminder of the general rule of evidence that when actions having a particular effect are repeated, the inference is stronger that the effect of the actions was intended. *See* 2 Wigmore, *Evidence* § 312 (3d ed. 1940).

### III. THE CITY'S EARLY ACTIVITIES UNDER THE NATIONAL HOUSING ACT OF 1949

Upon passage of the National Housing Act of 1949, the City of Yonkers quickly applied for the federal housing assistance made available under Title III of the Act, and just as quickly encountered a serious obstacle to its ability to make use of the assistance. The City's announcement of the first proposed site for a public housing project to be funded under the Act (a site in Northwest Yonkers) prompted immediate and strong opposition from area residents and civic associations. The phenomenon was one which would repeat itself with respect to most of the other sites subsequently proposed, and would strongly influence the willingness of the Planning Board and the City Council to approve the sites. The result was the loss of available and badly needed federal housing assistance, the repeated compromise of stated planning objectives, and, eventually, endangerment of the City's entire urban renewal program due to the City's consequent ina-

bility to provide relocation housing for those displaced by urban renewal. The sites that prompted community opposition almost invariably were those in overwhelmingly white East and Northwest Yonkers or the overwhelmingly white areas of Southwest Yonkers. The few sites that appear to have prompted little or no community opposition, and that successfully emerged from the site selection process, tended to be in the more heavily minority areas of the City—and in particular, in and around the downtown area of Southwest Yonkers.[13]

### A. *The Procedure for the Selection and Approval of Sites for Public Housing*

Title III of the National Housing Act provides funds for the construction of public housing—that is, low-income housing owned and operated by a local housing authority.[14] Under the Act, the housing authority applies for a "reservation" of funds sufficient to build a certain number of housing units. Sites are then selected by the housing authority, submitted for any necessary local approvals, and once locally approved, submitted to the federal authorities.

The agency authorized to proposed, construct, and operate public housing in Yonkers is the Yonkers Municipal Housing Authority ("MHA"), a public corporation organized in the 1930s pursuant to New York's Public Housing Law. Under that law, any projects undertaken by the MHA must be approved by a majority vote of both the City's Planning Board and the City Council, or (if the Planning Board disapproves), by a three-quarters majority of the City Council.

The City Council consists of twelve members plus the Mayor, all of whom are elected for two-year terms. Throughout the years in question, each of the City's twelve

---

**13.** Prior to 1969, the City Council was called the Common Council. For the sake of simplicity, however, it is identified throughout this Opinion as the City Council.

**14.** "Public housing" is one form of "subsidized housing"—that is, housing in which federal,

state, or local funds are used in some fashion to reduce the rental rate (or, less frequently, the purchase price) of housing units for qualified families or individuals. Public housing was the predominant form of subsidized housing in Yonkers until the mid to late 1960's.

wards held a separate election to choose a representative on the Council. The only member chosen in a city-wide election was the Mayor, who serves on the Council as a Councilmember-at-large.

The Planning Board and the MHA Board each consists of seven members. Planning Board members are appointed by the Mayor; MHA Board members are appointed by the City Manager, who, under the City Charter, is the chief executive and administrative officer of the City, and who, in turn, is appointed by the City Council.

B. *Site Selection for the City's 1949 Allocation of Public Housing Units*

City officials were eager to take advantage of the housing assistance made available under Title III of the 1949 Housing Act. Due to the rapidly deteriorating condition of the housing stock in the Southwest, there was, in general, a serious need for decent low-cost housing in Yonkers. In addition, the construction of public housing was perceived to be important to the urban renewal plans which the City had begun to formulate in response to the urban renewal assistance made available by Title I of the 1949 Act.

Title I established a program of loans and capital grants for slum clearance and redevelopment; the program contemplated that cities would acquire and clear blighted land, prepare the site, and then sell or lease it to private enterprises for redevelopment. Title I also required, however, that the cities provide "decent, safe and sanitary" housing for persons displaced from urban renewal areas, and city officials considered public housing to be the only likely source of relocation housing for families living in urban renewal areas. GX 1058.16.

In August of 1949, a few months after the passage of the 1949 Act, the City applied for a reservation of 1,000 units of public housing, and received an allocation of 750 units. The deadline for site submission was August of 1950. It took the City nine years, however, to approve a sufficient number of sites to make use of that first year's allocation of public housing

units, and the chief reason for the delay was recurring community opposition to the various sites proposed.

The MHA announced its first proposed site in February of 1950. The site was a vacant parcel of land on Nepperhan and Roberts Avenue, an overwhelmingly white area in Northwest Yonkers. GX 1225.41. Among the stated reasons for the selection of the site was that the use of vacant land (as opposed to a site which required clearance of existing structures) was less costly and would eliminate the need for relocating those displaced by the clearance of the site—a task that had proven to be a major obstacle to the timely completion of Cottage Place Gardens, the second of the City's two existing public housing projects. GX 1058.5; 1053.27.

Within a week of the MHA's announcement of the Nepperhan/Roberts site, however, a neighborhood group called the Rose Hill Community Association adopted a resolution opposing the choice. Copies of the resolution were sent to the MHA, the City Planning Board and the City Council. GX 1058.6, 1058.9. A few days later, the Yonkers Council of Civic & Taxpayers Associations joined the opposition. GX 1058.-8. The Rose Hill resolution urged that public housing be used to clear slums, and it maintained that the Nepperhan/Roberts site was, in any case, inappropriate for public housing due to inadequate school, transportation, and shopping facilities. "Locating this project in a present slum area," the resolution added, "would not have a school problem as the school probably already exists." GX 1058.9. The Nepperhan/Roberts site was subsequently disapproved by the Planning Board, GX 1058.-17, an action which prompted a letter of commendation from the Yonkers Council of Civic & Taxpayers Associations. GX 1058.-22.

At least two other sites formally proposed by the MHA soon thereafter likewise prompted strong community opposition. Indeed, the volume of complaints received by the Mayor's office with respect to the various sites being considered for public

housing was so great that two members of the City Council were appointed to attend MHA meetings, consult with the MHA Board, and in general "let the public know that the [City] Council [had] an interest" in site selection. GX 1204.4.

The two sites in question—Park Hill Avenue at Van Cortlandt Park Avenue and Lake Avenue—were both in heavily white areas of Southwest Yonkers. GX 1225.41. In addition, both were originally supported by the councilmen representing the wards in which the sites were located (the seventh and sixth wards respectively), and then subsequently opposed by those councilmen, after local residents had made their own opposition known. Seventh ward residents appeared at a Planning Board meeting held to consider the Park Hill Avenue site and submitted a petition in opposition. A resident identifying himself as a spokesman for the group stated that "it was not in the best interests of the City of Yonkers and certainly not to the best interests of adjacent property owners, to place this project on this site." GX 1058.24. The resident contended that the "terrain [was] irregular" and that the project "would have a tendency to harm property values in the neighborhood...." Id. A few days later, a news article reported that the councilman for the seventh ward, who had previously asked that his ward be surveyed for possible sites, had written to the Chairman of the City Planning Board (with a copy to press), asking that the Park Hill Avenue site be excluded from consideration and expressing his disappointment that the Nepperhan/Roberts site in Northwest Yonkers had been rejected. GX 1058.25. No further action was taken on the seventh ward site.

Similarly, a site on Lake Avenue in the sixth ward was originally recommended by the ward councilman and approved by the Planning Board and City Council. GX 1058.31, 1058.37, 1058.43, 1058.47. A subsequent attempt to expand the site, however, resulted in strong public opposition to both the expansion and the site itself. Representatives of an ad hoc committee of sixth ward residents appeared at a Plan-

ning Board meeting to present a petition in opposition and to speak against the site. GX 1058.47. The committee's objections were repeated at two additional Planning Board meetings held several weeks later, at which time the ward councilman announced that he, too, was now opposed to the site. GX 1058.48; GX 1058.51. The Planning Board voted unanimously to disapprove the requested extension, and the following week the MHA voted to abandon the site. GX 1204.6. Area residents appeared at the MHA meeting with a petition bearing 1,000 signatures which, they maintained, "barely scratch[ed] the surface of those who object to the site." Id. A spokesman for the protesters mentioned in passing the inadequacy of school and transportation facilities, but then characterized those as "minor objections," and stated that the "real objection" to a housing project on the site was the effect that it would have on property values in the area. He predicted that it would cause "financial ruin" to neighboring property owners. Id.

By December of 1950, three months had passed since the deadline for submitting sites for the City's 1949 allocation of 750 public housing units, yet the City had approved and put into development only one site. The site was on Palisade Avenue, in one of the more heavily minority areas of Southwest Yonkers, slightly to the south of, and halfway between, the City's two existing public housing projects. GX 1225.-41. The site had apparently prompted no public opposition, and although the City's Planning Director had suggested that the site was better suited for industrial use, it had been approved and was scheduled for 274 units of public housing. GX 1058.37; 1058.38.

In December, a federal official appeared at a meeting of the MHA and told the City that it faced imminent loss of the nearly 500 units remaining in its reservation unless additional units were put into development immediately. GX 1204.7. The official also cautioned that funding decisions for future years would take into account whether the City had been able to make

use of previous allocations. *Id.* The City responded by voting to increase the number of units scheduled for the Palisade Avenue site to 415, despite a prior recommendation by the Planning Board that the size of public housing be limited to 250 units so as "to reduce their impact on the neighborhoods where they are located" and so that they might "be better integrated with other types of housing existing or to be built in the project areas." GX 1058.16 at 11767. When the 413-unit Schlobohm Houses opened on Palisade Avenue, all of the City's 1,213 units of public housing were concentrated within several blocks of each other in Southwest Yonkers.

In 1951 through 1953, efforts continued to find approvable sites for the more than 300 public housing units remaining in the City's 1949 allocation. Eleven sites were formally proposed by the MHA (six in the Southwest, two in the Northwest, and three in East Yonkers), but none was approved and submitted to the federal authorities, and the remaining units of public housing were lost by the City when the funding legislation expired in 1953.[15]

Once again, the period was characterized by pervasive community opposition to the various sites proposed. City officials were heard to observe during these years that there seemed to be opposition to every site proposed, GX 1058.65, that "[s]ome civic organizations are in favor of public housing as long as you don't put it in their neighborhood," GX 1059.4, and that the more time that was given to the consideration of a site, the more objections there were. GX 1204.13. The Yonkers Council of Civic & Taxpayers Associations meanwhile continued to urge that public housing be used solely to clear slums, GX 1058.102; 1059.6, and it was joined in that position by other residents, GX 1059.1; 1058.86, and even, on occasion, by some councilmen. GX 1204.-13.

At least eight of the eleven sites formally considered during these years (including all three east side sites) prompted opposition from area residents, local civic associations, and ward councilmen.[16] And once again, a dominant concern—particularly in connection with the sites proposed in East Yonkers—was the effect that a public housing project would have on surrounding property values.

With respect to one East Yonkers site, for example, a letter sent to the Planning Board and quoted by the press objected to the prospect of being "uprooted" from the neighborhood and stated that it was "a well-known fact that slum-clearance projects often lead to the eventual deterioration of the surrounding community by the element which they attract." GX 1059.5. Various neighborhood associations likewise contended that selecting one of the East side sites proposed "would be seriously detrimental to [the] well-being ... and interest" of area residents and indeed of the City as a whole. GX 1059.7; *see also* GX 1059.6; 1059.8; 1059.9. The president of one of those associations suggested to the City Planning Board that the East side sites under consideration should be reserved for the same "class of people now there," GX 1059.9, and argued that the "people a public housing project would serve" would in any case find it burdensome to travel to East Yonkers. *Id.*

Edward O'Neill, the councilman for the East side ward in which the proposed sites were located, likewise argued strongly against their appropriateness for public housing. Soon after the sites were announced, O'Neill publicly declared that he was "not opposed to low-rent housing, but it was inconceivable to [him] that it should

---

15. The eleven sites were: Hawthorne Avenue, Prescott Street, Prescott Field, Sullivan Oval, the Waring site, and the Jefferson-Riverdale (or "Stage I") urban renewal area (all in Southwest Yonkers); Boyce-Thompson and Frederic Street (in Northeast Yonkers); and Raybrook Road, Midland Avenue, and Coyne Park (in East Yonkers). GX 1058; 1059.

16. The other five were the two sites in Northwest Yonkers and three of the Southwest Yonkers sites: Hawthorne Avenue, Prescott Field, and Sullivan Oval. *See generally* GX 1058; 1059.

be located in areas where there is no possible need for it and where those areas cannot possibly handle it." GX 1059.6. O'Neill noted that "practically every civic and social group in [his own and a neighboring East side] ward has gone on record strongly opposing the location of low rent housing on premium land," and that since the East side schools were already overcrowded, the addition of 335 families "would cause irreparable harm." *Id.* In addition, O'Neill appeared at a Planning Board meeting held to consider the sites and argued that putting public housing in "fine, residential" communities would be "a body blow to [the City's] finances." GX 1059.9; GX 1059.10. O'Neill appealed to the Board "as property owners," suggesting that they surely knew

> what public housing does to the surrounding areas. If you put housing in an area not desirable for it you do a disservice to the people in that neighborhood. Many people have sunk their last cent into their homes.

GX 1059.10.

Like the sites opposed by area residents in 1950, the eight sites opposed in 1951 through 1953 all were in areas of the City that were overwhelmingly white. GX 1225.41. Two of the three sites for which there is little or no evidence of opposition—including one (the Waring site) which was strongly supported by some civic associations and councilmen as "ideal" for public housing—were in the downtown (and more heavily minority) portion of Southwest Yonkers. *Id.*[17] MHA members characterized the Waring site as a "realistic" choice that had the "greatest chance" of winning City Council approval and proposed it twice as the final deadline for site submission drew near in 1953. GX 1059.4; 1204.18. The Planning Board, however, rejected the site each time, explaining that it was poorly situated for residential use and in an area that was already overcongested. GX 1059.-11; 1059.17.

In 1956, under new funding legislation, the City was able to renew its reservation of the 335 public housing units remaining in its 1949 allocation. However, when site selection efforts resumed in 1956, the pattern of community opposition resumed as well. Despite formal consideration of at least eight sites in 1956 and 1957, and despite repeated expressions of concern by City officials that readily available housing assistance might once again be lost, and that the City's urban renewal plans might be delayed for lack of relocation housing, *see e.g.,* GX 1060.16; 1060.23; 1060.25; 1060.41; 1062.2; 1062.19, the City did not approve a single site for public housing.

Four sites (two in Southwest Yonkers and two in East Yonkers) were formally proposed by the MHA in 1956. Three prompted vigorous community opposition; the fourth (Western Avenue in Southwest Yonkers) was opposed by the Planning Board on the ground that it was in the path of a proposed arterial route. None was approved by the City Council.

With respect to two of the three sites that prompted community opposition—St. Nick's Oval in East Yonkers and a site on Fillmore and Garfield Streets in Southwest Yonkers (commonly known as the Russian American Memorial Park or RAMP site)—the pattern was the same as in previous years. The sites were in overwhelmingly white neighborhoods, GX 1225.41, and were vigorously opposed by area residents and neighborhood associations at rallies and in petitions and letters. *See generally* GX 1060.

The third site, however, presented a variation on the theme. The site (Ridgeview Avenue) was in Runyon Heights, a longstanding and self-contained enclave of black homeowners in East Yonkers, and its proposal produced the first apparent evidence of open discussion of the racial implications of site selection for public housing. An attorney for one of the Runyon Heights neighborhood associations told the City

---

**17.** The third site (Prescott Street) was withdrawn almost immediately after its proposal by the MHA and replaced with nearby Prescott Field, which, as noted above, was among the eight sites that prompted community opposition.

Council that the trend had moved "away from putting housing sites in minority areas, as it has a tendency to create slums" and argued that the City "must give this area a chance to break its bounds," saying that "if we drop a housing project in there, it will never have a chance." P–I 105–17. A spokesman for the Yonkers branch of the NAACP similarly declared that the organization was "disturbed" to find a project being proposed for an area that was so heavily minority, warning that the project could become a "Negro project" and the school that served it a "Negro school." *Id.* A representative of the Urban League of Westchester County also appeared before the City Council and opposed the project, arguing that studies had shown that when a housing project was put in a predominantly black area, it became "difficult to obtain [a] nonsegregated occupancy." *Id.*

At two City Council sessions attended by some 400 to 1,000 area residents, the Council voted to disapprove all three sites—actions which reportedly prompted applause and cheers from the audience. GX 1060.23; 1060.40; P–I 105–42. Although the votes were unanimous, there were expressions of concern by some council members about the effect of the votes since the new deadline for site submission was only a few days away. *Id.* As the last site (St. Nick's Oval) was disapproved, one councilman observed that he felt the vote was "signing the death knell" for the city's reservation of housing units, and that the City could not hope to obtain urban renewal funds unless it had a place to relocate displacees. P–I 105–42.

However, the City was able to obtain yet another extension of the deadline, and site selection efforts continued. In 1957 and 1958, community opposition was a frequent topic of discussion in site selection meetings and press reports. *See generally* GX 1062, 1063. In January of 1957, for example, the councilman for the fourth ward proposed a tenth ward site, saying that its relatively isolated location made it "a natural" for public housing since "no indignant citizens could come and protest." GX

1062.1. Protests *were* reported, however, by the tenth ward councilman, who promised to defeat the proposal. GX 1062.3, and the MHA voted unanimously to reject the site. GX 1062.5.

Meanwhile, two Southwest Yonkers sites were proposed by private developers for Mitchell-Lama projects, a state-funded subsidized housing program for middle-income (and, therefore, usually white) residents. The proposals prompted no opposition, and the City Council readily approved the tax abatements needed to enable the two projects—Sunset Green (a 70-unit cooperative on Hawthorne Avenue) and Sunnyside Manor (a 121-unit rental building on Sunnyside Drive)—to go forward. GX 1061; 1066.

In the spring of 1958, the MHA tried again and proposed five more sites for public housing. Three were in Southwest Yonkers (Stanley Avenue; School Street; and Western Avenue); and two were in East Yonkers (the old School 1 site and Smart Avenue). GX 1063.2. Emmett Burke, the Secretary-Director of the MHA, described the sites to the Planning Board as "the least objectionable" of those surveyed but nonetheless that there would be "a lot of objections on the grounds of race or age in certain sites." GX 1063.8. Burke went on to observe that "[m]any people simply do not want public housing." *Id.* The Planning Board approved the Stanley Avenue, Smart Avenue, and School 1 sites, and disapproved the School Street and Western Avenue sites (the latter for the second time) on the ground that lay in the path of a proposed arterial route. *Id.* Two of the sites approved by the Planning Board were in overwhelmingly white neighborhoods; the third (the School 1 site) was in Runyon Heights. GX 1225.41.

In April, as the City Council was preparing to consider the proposed sites, a letter was sent to the council members from a committee claiming to have been delegated by twelve taxpayer and civic associations "to acquaint each and every member of the [City] Council with the fact that there is

tremendous opposition to additional low rent public housing in Yonkers." P–I 106.-26 (GX 1063.13). The letter went on to state that:

> We personally prefer a public referendum with time to acquaint each and every citizen with the full facts on public housing. Where will these tenants come from? How will we provide schools? How much will it cost us over the years? What safeguards do we have against our having to absorb the overflow from Puerto Rico or Harlem? Where will the people go that will have to vacate their private homes?

*Id.* The letter closed by saying that "each and every one of your constituents is looking to you to again knock down this latest attempt on the part of the public housing group to shove off on the citizens of Yonkers something that the majority does not want." *Id.* A week later, the City Council voted to refer the proposed sites to its committee on housing. GX 1065.15.

The following month, as the Council again prepared to vote on the sites, Mayor Kristensen publicly observed that "we're running into the same situation we customarily do and have done over the past nine years or so, that is, everyone wants housing, but no one wants it in his neighborhood.... The time is coming when we are going to get those 335 units one way or another." GX 1063.17.

On May 27, 1958, nearly nine years after the City received its 1949 allocation of public housing units, the City Council finally approved two sites for the last of the units in the allocation. In addition, a third site was approved for 108 units of senior citizen housing (a newly authorized form of public housing). The three sites approved were School Street and the School 1 site for family housing and the Western Avenue

site for senior citizen housing. GX 1063.-18.

In making its choices, the Council appears to have given little weight to the views of its Planning Board. The School Street and Western Avenue sites were strenuously lobbied against by the Planning Board on the ground that they would interfere with construction of an arterial system that was critical to the future health of the downtown area. GX 1063.8; 1063.17; *see also* Tr. 9621–24 (Pistone). Yet, both sites were approved by the Council.[18] In addition, the Planning Board recommended the Stanley Avenue and Smart Avenue sites—and indeed the City's Planning Director, Philip Pistone, had characterized the latter as "ideal." GX 1063.8; Tr. 9616–17 (Pistone). Yet, the Smart Avenue site was strongly opposed by area residents and the ward councilwoman, and both sites were rejected by the Council. GX 1063.8; 1063.18; 1063.19.

Following a by-now familiar pattern, the sites rejected were in overwhelmingly white areas of the City, and both sites approved for family housing were in heavily minority areas. GX 1225.41. Only the Western Avenue site which was to be used for senior citizen housing was in a heavily white area, and even that site was not far from blocks with a significant minority population. *Id.*[19]

C. *Site Selection for Senior Citizen Housing*

For the next few years, the City focused primarily on public housing for senior citizens—an activity that proved somewhat less controversial but not entirely problem-free. In 1961, a proposal to put 300 units of predominantly senior citizen housing on Garden Street just north of Schlobohm Houses (the 413-unit project built on Pali-

---

18. While it is true, as the City notes, that the Council had previously indicated some disfavor with the State's proposed arterial plan, the fact remains that its own planners still strongly supported the plan and strongly urged the City not to foreclose it by constructing housing on the Western Avenue and School Street sites. C–50; GX 1063.8; 1063.17; Tr. 9621–24 (Pistone).

19. The 48-unit Hall Court opened on the old School 1 site in 1962; the 108-unit Loehr Court opened that same year on Western Avenue; and the 278-unit Calgano Homes opened on School Street in 1964. C–1700.

sade Avenue in the early 1950s) was approved with no apparent community or official opposition, GX 1064.1–.5, despite the fact that with Schlobohm Houses in place, the area already contained an amount of public housing that was far in excess of what the Planning Board had recommended. *See,* HOUSING III.B *supra.* A subsequent attempt to expand the site in 1962, however, *did* prompt opposition on the ground that it would result in an over-concentration of public housing units in the area. GX 1064.14, 1064.15, 1064.19. The Planning Board initially disapproved the expansion, then three months later voted 3–2 (with *two* members absent) *to* reverse itself. GX 1064.16; GX 1064.19; 1064.20. A colloquy that immediately preceded the second vote suggests that little had changed from the preceding years. Planning Director Philip Pistone stated that he would prefer to have senior citizen housing "dispersed," and that there was "no reason why it should all be concentrated in one area … one ward." GX 1064.20. In response, a Board member stated simply that, "what you say is interesting, but when you come up before the [City] Council, every councilman objects to it." *Id.* The Planning Board's vote was subsequently challenged and held invalid on the ground that the full Board had not been present. GX 1064.21; GX 1064.23. The City Council then deferred consideration of the expansion, and it was apparently pursued no further. GX 1064.24.[20]

Instead, a new round of efforts was undertaken to find sites for senior citizen housing. In February of 1963, the MHA proposed eight sites—four in Southwest Yonkers and four in East Yonkers. GX 1069.7.[21] The sites were announced as proposed sites for senior citizen housing, but the Secretary-Director of the MHA was quoted by the press as saying that the sites might also be considered for family hous-

ing. GX 1069.7. Protests quickly arose with respect to three of the East side sites, and these sites were largely dismissed by the MHA's Secretary-Director at a subsequent Planning Board meeting. GX 1069.-10; 1069.11; 1069.13; 1069.15. The Lincoln Park Taxpayers Association, writing in opposition to the sites, raised familiar concerns about decreasing property values and adverse effects on the "character of the community." GX 1069.11. The Association urged, as other groups had in the past, that public housing be used solely to clear slums. *Id.* No distinction was drawn between public housing for senior citizens and public housing for families. Concern was simply expressed that the placement of any public housing in the area would be "at the sacrifice of real estate values in the community, and [that] declining real estate values would be followed by neglect and deterioration of the neighborhood." *Id.*

The following month, in early March of 1963, the Housing Committee of the City Council recommended approval of two of the other sites for senior citizen housing—Martin Ray Place in East Yonkers (where temporary veterans housing had been located) and a site on Ashburton Avenue and Seymour Street in Southwest Yonkers—and the Council scheduled a site selection hearing for March 26th. GX 1069.20. The next day, the MHA withdrew the remaining six sites from consideration. GX 1069.-21.

In the weeks before the hearing, the Board of Education and the PTA opposed selection of the Martin Ray Place site on the ground that it had been promised to the Board for a much needed expansion of School 31. GX 1069.22; 1069.25. In addition, the Pastor of St. Joseph's Church opposed the selection of the Ashburton/Seymour site on the ground that there was already a serious overconcentration of public housing in the downtown Southwest

**20.** The original plans for the Garden Street site went forward, however, and the 300-unit Walsh Houses opened in 1967. C–1700.

**21.** The East Yonkers sites were Martin Ray Place, Kingston Avenue, Boyd Place/Bronxville

Road, and Midland at Yonkers Avenue. The Southwest Yonkers sites were Center Place, Orchard Street, Ashburton Avenue at Seymour Street, and Riverdale Avenue at Highland. *Id.*

Yonkers area. GX 1069.24. Both protests were reiterated at the City Council hearing. GX 1069.26; 1069.28. No neighborhood or civic associations appear to have joined the opposition, however, and faced with a firm site selection deadline of April 1 (the deadline having already once been extended), and with a reported 1,800 to 2,000 applications for senior citizen housing, the Council voted to approve both sites. GX 1069.27; 1069.28. The thirty-two unit Kristensen Houses (on Seymour Street) and the 186-unit Curran Court (on Martin Ray Place) opened in 1967. C–1700.

## D. *The City's Campaign to Produce Sites for Relocation Housing*

From 1958 (when the last of the City's 1949 allocation of public housing units for families was finally put into development) through 1965, no apparent efforts were made to increase the City's stock of public housing for families. The only additional family housing approved during this time came with the decision to devote the City's Jefferson-Riverdale (or "Stage I") urban renewal area (an area just southwest of City Hall in downtown Yonkers) to middle-income housing. In the spring of 1962, the City Council approved, without apparent objection, a tax abatement for a 544-unit Mitchell-Lama project to be called Phillipse Towers, GX 1067.5; 1067.11, and the project opened in September of 1964. GX 1067.13.

The City's long period of inactivity with respect to the development of low-income family housing does not appear to have been based on any perception that what had been characterized as a "desperate" need for such housing—both in general and as a relocation resource—had been met. A strong indication that the need had not been met came in 1965, when HUD notified

the City that its preliminary application for its Stage II (or "Riverview") urban renewal project had been rejected. The project would have involved the relocation of 1,300 families, and was rejected on the ground that the City's relocation track record for the Stage I project had been poor. HUD set a maximum relocation workload of 300 families for the Stage II project. GX 1071.13; 1078.4. In response, the City embarked on a vigorous campaign to find and approve sites for family housing. Joining in the effort was the newly formed Yonkers Urban Renewal Agency ("YURA").[22] As in previous years, however, community opposition proved to be a major stumbling block.

In the months after HUD rejected the City's initial Stage II urban renewal application, the need for more public housing as a source of relocation housing, and the problem of persistent community opposition to sites proposed for such housing, were frequent topics of discussion in meetings held among City agencies and with the federal authorities. *See generally* GX 1078. In one meeting, the Mayor was asked to explain the nature of the City Council's objections to two Southwest Yonkers sites (one between Stanley and Riverdale Avenues and another on Culver Street). GX 1078.3. The Mayor replied that the two ward councilmen involved "feel that their wards are being declared 'blighted areas' and they are not too happy about it because it will affect the voting." *Id.*

A subsequent meeting in April of 1965 among George Piantadosi (the acting director of YURA), Philip Pistone (the City's Planning Director), and Emmett Burke (Secretary-Director of the MHA) yielded a list of twelve possible sites for public hous-

---

**22.** YURA was organized in 1964 as a semiautonomous agency with the power to plan, undertake, and effectuate urban renewal projects, subject to the approval of the City Council, and it remained in operation until 1971. YURA was governed by a five-member board, which, pursuant to statutory requirement, consisted of the City Manager, the Mayor, the Corporation Coun-

sel, the City Comptroller, and the City Planning Director.

In 1971, YURA was redesignated the Community Development Agency (CDA), and its governing board was expanded to include two City residents appointed by the Mayor with the advice and consent of the City Council.

ing. GX 1078.8.[23] In an apparent attempt to deflect potential opposition to the sites, it was agreed that a press release would be issued listing the sites but identifying them merely as "sites under discussion," and that no individual would be identified on record as supporting specific sites. *Id.*

The anticipated opposition came to pass the following month. The MHA submitted eleven sites (nine from the joint list plus two others) to the Planning Board and the City Council. GX 1078.12; 1078.21.[24] The three East Yonkers sites on the list as well as two sites in the overwhelmingly white Nodine Hill area of Southwest Yonkers prompted letters and petitions in opposition from area residents, civic associations, and (in the case of the two East side sites in the twelfth ward) from the ward councilman, Nicholas Benyo. GX 1078.15; 1078.17–19; 1078.23; 1078.26–28. Councilman Benyo protested to the Planning Board that the areas "still [had] not recovered from the heavy invasion of apartment buildings" there and that "[a]ny further concentration of population would lead to a rapid deterioration of the entire area." GX 1078.15.

As the Planning Board and City Council were preparing to act on the sites, *The New York Times* published a story on the controversy, describing at some length "the split between suburban conscious East Yonkers and urban conscious West Yonkers." GX 1078.16. The article reported that previous projects had been "built in slum areas, reinforcing what planners call socio-economic ghettos," and quoted one resident of East Yonkers as saying that her family had "saved for years to move out of the city," and that "now they want to put right next door everything we tried to get away from." *Id.* Another East Yonkers resident was reported to have explained that "it wasn't that she didn't be-

lieve in racial or social or economic integration ... but [that] those people from Yonkers would feel so out of place here ... it would not be fair to them." *Id.*

The *Times* article was cited to City officials in a letter from the pastor of a Southwest Yonkers church, who said that its reference to reinforcing socio-economic ghettoes "sums up our argument" against the placement of more subsidized housing in the downtown area of Southwest Yonkers. GX 1078.22. "Basically," the letter declared, "this is out and out discrimination not only against negroes, but against lower-income whites as well." *Id.; see also* GX 1078.14.

In May of 1965, the Planning Board voted to disapprove all of the sites except four in Southwest Yonkers. GX 1078.28. The only comment recorded in the Planning Board minutes with respect to the two twelfth ward sites in East Yonkers was that Councilman Benyo and his constituents were opposed to the site. *Id.* One week later, the City Council referred all eleven sites to its committee on housing, where they remained until April of the following year. GX 1078.32.

In December of 1965, with the matter still in committee, Emmett Burke, the Secretary-Director of the MHA, sent a memo to the City Council asking for a decision on the sites. The Council, in turn, referred Burke's memo to YURA, which replied merely that public housing was indeed needed for relocation housing, but that it would "not presume to recommend for or against any of the sites selected." GX 1078.43. Nevertheless, at a meeting held the same day with a citizen's advisory committee, George Piantadosi, the acting director of YURA, criticized the City Council for "doing nothing" about public housing,

---

**23.** Four of the sites were in East Yonkers: Bronx River Road/Crescent Place; Bronx River Road/Louisiana Avenue (the Steuber's Florist site); Texas/Georgia Avenues; and Sweetfield Circle. The remaining eight were in Southwest Yonkers: Palisade/Carlisle; Stanley/Riverdale; Culver Street; the Old Car Barn; Garfield/Fillmore (Prescott Street); Hawthorne/Riverdale; Croton Terrace; and Orchard Street.

**24.** The three sites not submitted from the joint list were two in Southwest Yonkers (Culver Street and Orchard Street) and one in East Yonkers (Bronx River Road/Louisiana Avenue). Added to the list were two additional sites on Croton Terrace and Garfield/Fillmore Streets in Southwest Yonkers.

and one of the committee members suggested that the committee undertake its own site investigation. GX 1078.44.

In February of 1966, Burke wrote to the City Manager, asking again "for serious and immediate consideration" of the eleven possible housing sites. GX 1078.48. He explained that there were eighty-seven unused housing units from a previous reservation that might still be available to the City, but that he could not justify attempting to retain or expand the reservation (as would be necessary if future relocation needs were to be met) unless housing sites were approved and ready for development. *Id.*

Two months later, the Council's Housing and Urban Renewal Committee finally acted, recommending the same four sites that the Planning Board had approved eleven months earlier. GX 1078.51. Recalling the pattern of previous years, the sites not recommended by the committee were in areas of the City that were overwhelmingly white, and the four sites recommended were in areas of the Southwest that were, or were rapidly becoming, heavily minority. GX 1225.42; 1225.44.

The committee's recommendation was strongly criticized by the Yonkers Council of Churches, the NAACP, CORE, and a member of the Yonkers Human Rights Commission. The groups noted that all four sites were located in the "core" or "ghetto" area of the City, and they suggested that the selection represented acquiescence on the part of the Council to the "phenomenal pressure" put on it by the residents of other areas of Yonkers and "portend[ed]" a greater ghettoization of those neighborhoods whose 'powerless' and 'voiceless' residents could not generate the same kinds of 'pressures' as could the other residential neighborhoods where" sites had been proposed. GX 1078.58, 1078.60, 1078.62, 1078.64.

In addition, the groups noted that three of the sites were densely occupied and presented serious relocation problems, GX 1078.58, 1078.60, 1078.64, an assessment with which YURA concurred. GX 1078.66.

The groups gave qualified support to the fourth site (on Hawthorne Avenue) as representing the "lesser of evils," but urged the City to adopt a policy of "scattering" its public housing throughout the City. GX 1078.58, 1078.60, 1078.62, 1078.64.

The following month, in May of 1966, the City Council voted to approve the Hawthorne Avenue site and to refer the other three back to committee. GX 1078.62; GX 1078.63. However, due to an apparent breakdown of communication between the Council and YURA on one side and the MHA on the other, the site was not submitted to HUD for another several months.

When the site finally was submitted, HUD declared it to be unacceptable. The City was advised by the Regional Administrator in HUD's New York office that the Hawthorne/Riverdale site was "marginally feasible" and presented problems with respect to the "potential concentration of minority groups." GX 1078.94. The HUD official urged consideration of alternate sites, especially "scattered sites." *Id.;* 1078.106. In reply, YURA wrote that an "evaluation of family incomes, size, and other criteria indicate that a very well balanced racial mix will result from relocating just our urban renewal relocatees" and that "the fears you express about the creation of a 'racial ghetto' will depend largely on the admission practices of the [MHA]." GX 1078.98. Two months later, in November of 1966, HUD formally notified the City that it would take no immediate action on the Hawthorne/Riverdale site and asked for the submission of alternate sites. *See* GX 1078.111.

Later that month, amid public calls by the Chamber of Commerce and the Yonkers Economic Development Corporation for the approval of sites for relocation housing so that the City's urban renewal plans would not be delayed any further, GX 1078.113, 1078.115, 1078.116, 1078.120, the City Manager, as Chairman of YURA, wrote to the City Council stressing the importance of public housing to the future of urban renewal in the City and "urgently request[ing]" immediate reexamination of

all the sites in committee as well as consideration of expanding the Hawthorne/Riverdale site. GX 1078.118.

At one YURA meeting, City Manager Adler expressed the hope that at least one more site—namely, the Bronx River Road site in East Yonkers—could be approved, but noted that "[e]verytime a site comes up a councilman will say 'not in my ward.'" GX 1078.117. Later in the meeting, it was announced that YURA would undertake its own search for sites. The task was to be handled by a subcommittee of YURA's Citizens Advisory Committee ("CAC"), who, according to Piantadosi, were "going to war to get sites for us." *Id.*

The CAC Subcommittee's efforts resulted in a list of nineteen sites scattered throughout the City. GX 1078.124. None, however, was developed for public housing, nor does it appear from the record that any serious study was given to the list. The only effect the list appears to have had was to further publicize the degree of opposition that existed to the placement of public housing in any heavily white area of Yonkers.

The existence of the CAC list first came to public attention after a joint meeting among the MHA, YURA, the Yonkers Commission on Human Rights, and the YURA–CAC, at which City officials debated whether the list should be released to the press. GX 1078.125; 1078.39. According to press accounts, which dubbed the list the "secret renewal sites," two councilmen, Alfred Del Bello and Jesse Eisen, expressed concern about the pressure that would be brought to bear on councilmen unless the public was educated about the need for site selection on a city-wide basis. GX 1078.125; 1078.126; 1078.128. "[C]ouncilmen," Eisen warned, "will have to have a great deal of intestinal fortitude." GX 1078.125. Del Bello added that he did not think the City's councilmen had "sufficiently strong shoulders to consider sites no matter what time of year" it was. Fear was reportedly expressed by several speakers that "the public is not yet ready to accept the federal government's plan for racial and economic integration on a city-wide basis." Nonetheless, Councilmen Eisen and Chema expressed support for the concept of scattered sites, with Eisen quoted as saying "Let's not scatter them in Southwest Yonkers." *Id.*

The CAC list was obtained and published by the press a few weeks later, causing, in the words of YURA members, "a great deal of alarm in the community." GX 1078.133.

The Taxpayers Organization of North East Yonkers invited George Piantadosi, the acting director of YURA, to speak to the group about the CAC list. Instead, Piantadosi wrote to the group, reassuring them that CAC's role was solely an advisory one, that the consideration of any of the sites was still in early stages, and that a "thorough study" of each was called for and would include consideration of the "attitude of the local community toward accepting public housing." GX 1078.138. The list of nineteen sites was passed on to the City Manager in January of 1967 with the CAC's recommendation that five be given further study. GX 1078.135; 1078.136. There is no indication in the record that the CAC's recommendation was followed or that the list was put to any other use.

On the same day that the CAC list was published, the City Council's housing committee referred seven sites to the Council—all but three of the remaining ten from the MHA's original list. GX 1078.129. Two of the sites not referred were East side sites (one on Texas Avenue and another on Sweetfield Circle) that had since been acquired in whole or in part by private developers. GX 1078.130. Six of the sites referred to the Council were in Southwest Yonkers; one (a site on Bronx River Road) was in East Yonkers.

As in previous years, announcement of the sites prompted opposition from civic associations and, with respect to two sites on Garfield and Fillmore Streets (essentially the same RAMP area proposed in 1956), a mass protest rally. GX 1078.144; 1078.145. The opposition was noted at a YURA meeting, with Planning Director Pistone

observing that people "all adopt the same attitude: don't put public housing in my backyard," and that they were "not too receptive to explanations." GX 1078.144.

In February of 1967, the City Council held a meeting to vote on the seven sites. As the debate preceding the vote made clear, the Council faced a choice between continued placement of public housing in and around downtown Yonkers, in some of the City's most heavily minority areas, or acceptance of the concept of scattering public housing throughout the City so as not to reinforce economic and racial segregation. In its votes, the Council chose the former. The worst of the sites in terms of immediate proximity to other projects (a site on Palisade Avenue and Carlisle Place) was rejected, but so too were the two RAMP sites in the overwhelmingly white Nodine Hill area of Southwest Yonkers as well as the only site left on the list that was in East Yonkers (the site on Bronx River Road). Another Southwest site (between Stanley and Riverdale Avenues) was deferred to a future meeting, and two sites on Croton Terrace—a heavily minority area in the Southwest neighborhood known as the Hollow—were approved. GX 1078.151; 1078.152. Two weeks later, the remaining Southwest site (also in an area with a high minority population) was also approved. GX 1078.155. The three sites approved were the same ones that had been recommended ten months earlier by the Council's housing committee but vigorously opposed on the grounds that they presented serious relocation problems and would lead to a further overconcentration of public housing in one area of the City.

During the debate preceding the Council's vote, it was noted that the federal authorities were urging "scattered site" housing, and that the City's urban renewal funds depended upon producing acceptable sites for relocation housing. GX 1078.152. Several councilmen, as well as the newly elected Mayor, James O'Rourke, spoke in favor of scattered site housing generally and the Bronx River Road site in particular. *Id.;* Tr. 790–91 (Wilson); Tr. 7227–30 (King). One councilman stated that the

site "does seem to fit what everyone has been looking for," while another declared "we have an obligation to take advantage of it." GX 1078.152. The ward councilmen for both the Bronx River Road and RAMP sites strongly opposed their selection, however, and the final vote on the sites (taken after a recess during which the Council went into closed session) was eight to five against the Bronx River Road site and eleven to two against the RAMP. *Id.;* Tr. 7229–30 (King).

A few weeks after the February vote, the City's Congressional Representative, Richard Ottinger, publicly attacked the sites that had been approved, contending that they would "promote racial and social segregation." GX 1078.158. In May of 1967, HUD notified the City that it would not approve the sites that had been submitted, GX 1078.163, with that notification, the City's Stage II urban renewal project officially came to a halt.

E. *The Nature and Effect of the Recurring Pattern of Public Opposition*

There is little room for doubt that the pattern of community opposition described above significantly affected the City's site selection for public housing. Despite repeated statements by City officials about the urgency of the City's need for public housing, nine years passed before the City approved a sufficient number of sites to make use of a single year's allocation of public housing units. During that time, the City more than once risked the loss of its funding allocation, and in any event, forfeited the opportunity to apply for additional allocations of federal assistance. Nor did the pattern of delays and disapprovals cease even when HUD made clear that the City's urban renewal programs would not go forward unless acceptable sites were approved and submitted.

In addition, it is clear that the delays were not occasioned by a lack of suitable sites. The minutes of agency meetings repeatedly quote city officials and other on-the-scene observers as stating that the

chief source of the City's site selection difficulties was community opposition—a view that is corroborated by the record of approvals and disapprovals for the years in question.

City Council approval was rarely given in the face of organized opposition to a proposed site by area residents or civic associations. Indeed, over the course of eighteen years and the consideration of dozens of sites, it was given only twice. The first such approval (a site on Frederic Street in 1951) took fourteen months to obtain, carried by a single vote, and became a campaign issue in the next election. For reasons unspecified in the record, the site was subsequently abandoned. *See* GX 1058.

The second and only other site which the record shows to have been approved despite organized community opposition is the site of Loehr Court, a 108-unit senior citizen housing project on Western Avenue in Southwest Yonkers (one of the three sites approved by the Council in 1958). The Park Hill Residents Association sent a letter to the City Council announcing its unanimous opposition to the Western Avenue site, and according to the testimony of former ward councilman William Tully, some 300 residents of his ward attended the site selection meeting. Former councilman Tully testified that he had been "irritated" to have been "put on the spot" in front of his constituents, and he suggested that at least part of the reason for his failure to persuade the Council to reject the site was the fact that he was a Republican on a heavily Democratic Council. Tully Dep. 14–15, 17, 25–26.

Whatever the reason, the Western Avenue site clearly was the exception rather than the rule. With respect to nine of the twelve other sites approved by the Council for public housing during the eighteen years in question, there is no evidence

whatever of organized opposition by area residents or civic associations.[25] With respect to two (Stanley/Riverdale and Hawthorne/Riverdale), there is some indication that the sites may have been opposed in the past, but no evidence of current opposition. With respect to the last (Lake Avenue), opposition arose only after the site had been approved, and the site was subsequently abandoned. In contrast, the numerous sites that *were* the subject of organized community opposition were either disapproved by the Council, referred to and left in Committee, or for other reasons, never the subject of formal action by the Council.

Plaintiffs suggest that the reason for the City Council's extreme responsiveness to community opposition was the ward system under which the City Council operated, and in particular what plaintiffs contend was an unofficial "councilmatic veto power" held by ward councilmen over matters of importance affecting their wards. While a description of the phenomenon as a "veto power" suggests a greater formality and certainty than appears to have obtained, it is indeed clear from the evidence for these, as well as subsequent years, that the support of the ward councilman generally was, and was perceived to be, critical to a site's prospects for approval by the City Council. Numerous past and present City officials, including councilmen themselves, testified to the existence of a strong tendency to defer to the views of the ward councilman. Alfred Del Bello, for example, who was a councilman for 1966 to 1969 and Mayor of Yonkers from 1970 to 1973, testified that the ward councilman was "normally allowed to lead the issue" in matters affecting his ward, and that as a result City officials tended to consult the ward councilman to determine whether or not his support could be obtained for a project. Tr.

---

**25.** The nine sites are: Palisade Avenue (now the site of Schlobohm Houses); the Jefferson-Riverdale urban renewal area (approved for public housing in 1953 but later withdrawn from consideration by the MHA and now the site of the Mitchell-Lama project Phillipse Towers); School Street (now the site of Calgano Homes); the old School 1 site (now the site of Hall Court); Martin Ray Place (now the site of Curran Court); Ashburton/Seymour (now the site of the Kristensen Houses); Garden Street (now the site of Walsh Houses); and the two sites on Croton Terrace (rejected by HUD in 1967).

1178–79. Without that support, according to Del Bello, "it was usually much more difficult to get approvals out of the Council." *Id.; see also* Tr. 1180–86; 1192–93. Walter Webdale, the Director of YURA from 1967 to 1971, likewise acknowledged that it was "difficult to conceive" of getting Council approval for a subsidized housing site without having the support of the ward councilman, and Morton Yulish, the City's Director of Development from 1971 to 1974, characterized that fact as an "unwritten rule" which was "very clear to all who worked with the City Council." Webdale Dep. 186; Tr. 858–60 (Yulish); *see also* Tr. 987–88 (Iannacone); 1666–70 (O'Rourke); 1869 (Schneider); 2813–14 (Arcaro).

In addition, numerous councilmembers acknowledged that their own position with respect to sites proposed for subsidized housing in their wards was, in turn, strongly influenced by the views of their constituents. Some explained it on the basis of a belief that people had a "fairly good right to determine" what they would see when they looked out their windows. *See, e.g.,* Tr. 1676–78 (O'Rourke). Others suggested, more pragmatically, that they viewed their prospects for re-election as depending upon it. *See, e.g.,* Cola Dep. 80–81; Tr. 992–93 (Iannacone); *cf.* Tr. 1874–77 (Schneider); Webdale Dep. 484. And there is abundant evidence that their constituents encourage that view. *See, e.g.,* Tr. 1197–98 (Del Bello); P–I 106–26 (GX 1063.13).

It is true, as the City has emphasized, that a number of the sites rejected during these years were disapproved by the Planning Board as well as the City Council, or were never presented to the Council after their disapproval by the Planning Board. But even with respect to those sites, there is reason to conclude that community opposition, and its effect on the City Council, played a major role in their rejection. With respect to the influence of a Planning Board disapproval on a subsequent City Council vote, the record suggests that the Council's reliance on the views of its Planning Board was selective. When a Planning Board disapproval was accompanied by community opposition (as it was, for example, in the case of sites on St. Nick's Oval and Bronx River Road), the City Council tended to likewise disapprove the site. When a Planning Board disapproval was not accompanied by community opposition, however, (as in the case of the School Street site in 1958), the City Council was willing to override even a strong vote of disapproval by the Planning Board.

Moreover, the Planning Board itself was not immune from lobbying by area residents or their representatives. At the first sign of community opposition, a council committee was formed to meet with site selection agencies and to "let the public know that the Council [had] an interest" in site selection. GX 1204.4. Ward councilmen also regularly appeared at site discussion sessions of the MHA and the City Planning Board or wrote to the agencies to report on the reaction of the neighboring community to a proposed site. *See, e.g.,* GX 1058.36; 1204.4; 1204.13; 1059.6; 1063.8; 1078.15. In addition, area residents and civic associations also contacted the Planning Board and other site selection agencies directly. Copies of resolutions and petitions in opposition were routinely sent to the Planning Board, and groups also appeared in person to speak against particular sites. *See, e.g.,* GX 1058.6; 1059.1; 1059.7–1059.9; 1060.14; 1060.38; 1069.10; 1078.17–1078.19.

To be sure, the record contains evidence that planning criteria—that is, factors such as cost, zoning, the physical suitability of the site, future plans for the area in general or the site in particular, availability and adequacy of public facilities such as schools, shopping, transportation, etc.—were regularly discussed by the MHA and the Planning Board and sometimes stated as the basis for their decisions. The record also contains abundant evidence, however, that these agencies were acutely aware of the requirement of Council approval, and of the unlikeliness that the approval would be forthcoming if there was significant community opposition to a site. *See, e.g.,* GX 1059.2; 1059.4; 1059.14; 1062.1; 1062.4;

1063.4; 1063.8; 1063.10; 1063.17; 1064.19; 1064.20; 1078.110; 1078.117; 1204.7; 1204.-18. Moreover, with respect to some sites (for example, the Bronx River Road and Texas/Georgia Avenue sites proposed in 1965) no reasons apart from community opposition were offered at the time of their disapproval by the Planning Board. GX 1078.28.

In addition, the *pattern* of Planning Board approvals and disapprovals further suggests that the presence or absence of community opposition was an important factor in the decisionmaking process. With respect to East side sites, most notably, the Planning Board's decisions (like the City Council's) follow a general pattern in which the sites that were disapproved were ones that prompted opposition from area residents and civic associations, *see* GX 1059 (Coyne Park, Raybrook Road, Midland Avenue); GX 1060 (St. Nick's Oval, Ridgeview Avenue); GX 1078 (Bronx River Road, Sweetfield Circle, Texas/Georgia Avenues), and those that were approved were ones for which there is no evidence of such opposition. *See* GX 1063 (old School 1 site, Martin Ray Place). The single exception to the pattern was the Smart Avenue site, which Planning Director Pistone characterized as "ideal," and which the Planning Board approved notwithstanding the objections of the ward councilwoman. But the site ceased to be an exception when it came up before the Council itself, where it was rejected.

The sites that generally escaped community opposition, and thus successfully emerged from the site selection process, are heavily concentrated in the downtown area of Southwest Yonkers. *See* Appendix A. Indeed, more than half of the total public housing units built during those eighteen years (713 units out of a total of 1,365) were concentrated in two adjacent Southwest projects (Schlobohm Houses and Walsh Gardens) which in turn were only a few blocks away in one direction from the 800 units of public housing contained in Mulford Gardens and Cottage Place Gardens (the two projects built in the 1940's), and a few blocks away in the other di-rection from the 278 public housing units contained in Calgano Homes (the School Street project approved in 1958). Thus, by 1963, more than 80% of the City's existing or planned public housing was located within a several-block area of Southwest Yonkers. Yet, despite this extreme concentration of public housing units in one area of the City, the additional sites that were approved in 1966 and 1967 (but rejected by HUD) were all located near that same area.

The City has sought to explain this extreme concentration as the result of a plan to use public housing to rebuild the Southwest Yonkers. In this regard, the City places chief reliance upon a series of Master Plan Reports published by its Planning Department in the late 1950's and 1960's. C–1504; C–1505; C–1506. Those reports, however, do little more than confirm an undisputed fact: that Southwest Yonkers was the area in greatest need of urban renewal. The reports in no respect recommend concentrating the City's public housing in and around the downtown area of Southwest Yonkers. In fact, the Yonkers Central Business District (CBD) Study, published in June of 1959, expressed concern about the "lower family income concentrations in the immediate periphery of the CBD." C–1503. And the Land Use and Community Facilities Plan, published in June of 1961, specifically called for a mix of income levels to be represented in the residential portion of the Southwest's redevelopment. C–1505.

The City has suggested that its planners viewed public housing as the only mechanism available to the City to initiate redevelopment on slum clearance sites and thus pursued a plan of using public housing as the "seed investment" to attract the other development contemplated by the Master Plan. But that argument is not supported by the record.

Neither the Planning Department's recommendations, nor its approvals, were limited to sites in Southwest Yonkers. Indeed, the first and only consistent proponents of the view that public housing

should be restricted to the "blighted areas" of Southwest Yonkers were not City officials at all, but civic associations protesting sites that had been proposed in their own neighborhoods. *See, e.g.,* GX 1058.6; 1058.102; 1069.11. In contrast, the Planning Department's first, and apparently only, detailed position paper on public housing for this period—a "proposed methodology for site selection" issued in May of 1950—targeted neither the Southwest nor areas of blight as the only appropriate sites for public housing. GX 1058.16. In fact, one of the specific sites recommended in the report—a site at Palmer Road and Stratton Street—was in an unblighted (and overwhelmingly white) area of Central Yonkers just west of the Saw Mill River Parkway. *Id.; see also* GX 1225.41; C-1805A. For reasons that are not apparent from the record, the site was never pursued.[26]

Nor were many other of the Planning Department's initial or subsequent recommendations adopted. As noted earlier, for example, the 1950 report recommended that public housing projects be limited to 250 units so as to "reduce their impact" on the surrounding area—a recommendation that was abandoned by City officials when it became apparent that the City was suffering from a shortage of "politically suitable" sites which was at least as serious as its need for public housing. *Cf., e.g.,* GX 1062.4. Likewise disregarded was the Planning Board's strong opposition to the selection of sites that would prevent construction of a proposed arterial route which the planners considered to be critical to the eventual revitalization of the City's CBD.

Nor, certainly, can the sites selected in 1965 and 1966 be explained on the basis of any plan to use public housing to revitalize the Southwest. The chief criterion for sites during those years was "universally accepted" to be that the sites be vacant so as to add to the City's supply of relocation housing and avoid any further reduction or loss of federal urban renewal assistance. GX 1078.67; *see also, e.g.,* GX 1078.8. Yet, vacant and properly zoned sites in East Yonkers were rejected in favor of four Southwest sites which posed significant relocation problems of their own and which were rejected on that ground (among others) by HUD. Far from contributing to efforts to revitalize Southwest Yonkers, the City's choice of sites brought those efforts to a halt.

It is, in short, difficult to discern any plan at work in the City's site selection process during these years, except for an apparent determination to avoid, at virtually any cost, a confrontation with community opponents of public housing.

There is also considerable evidence to suggest that this community opposition was based, at least in part, upon the race of the potential occupants of public housing. Indeed, with respect to the years from 1965 to 1967 (as will be the case with respect to future years as well) there is scarcely any basis for doubt that race was a factor in the opposition. City officials themselves publicly identified the issue before them as being whether the residents of Yonkers were "ready" for the economic and racial integration being urged upon the City by HUD, by groups such as the NAACP and the Council of Churches, and

**26.** The other two sites proposed in the report (Park Hill/Van Cortlandt Park Avenues and Sullivan Oval) were likewise in overwhelmingly white and unblighted areas and likewise were never developed with public housing. Both sites encountered strong community opposition, and they advanced no farther than the Planning Board's recommendation. *See* GX 1058; 1059; *see also* HOUSING II.B *supra.*

The 1950 report speaks generally of the desirability of "coordinating" public housing construction with slum clearance and urban renewal but clearly does not equate such coordination with building only in or around downtown Southwest Yonkers. Nor does the evidence suggest that further study of planning principles or federal policy led the Planning Department to subsequently adopt that view. Indeed, as noted earlier, the minutes of a 1962 Planning Board meeting quote Planning Director Pistone as advocating dispersion of subsidized housing and being told that his view was "interesting" but politically impractical—following which exchange, the Planning Board voted to reverse a prior disapproval of a further addition of subsidized housing to the downtown area. GX 1064.-19; *see also* HOUSING III.C *supra.*

by one of YURA's own citizen's committees—the Relocation and Minority Housing Subcommittee of the Citizens' Advisory Committee. *See generally* GX 1078; *see also* HOUSING III.D *supra*.[27] Moreover, Alfred Del Bello, one of the City officials closely involved in those events, acknowledged at trial (as did other City officials involved in the events of subsequent years) that his constituents equated public housing with minorities, and that race was "definitely" a factor in much of the opposition that arose during the site selection process. Tr. 1194–97 (Del Bello); *see also* Tr. 7237–38 (King).

The evidence for the years preceding 1965 is decidedly less dramatic. But even with respect to those years, there is considerable evidence suggesting that race was at work in the sustained community opposition that existed to the placement of public housing in any but a few areas of the City. As an initial matter, the pattern of opposition itself strongly suggests a racial influence. Sites proposed in East or Northwest Yonkers, or the heavily white areas of Southwest Yonkers, almost invariably prompted strong community opposition. Sites proposed in the more heavily minority areas generally did not.[28] In addition, the exceptions to the pattern tend to reinforce, rather than weaken, the inference to be drawn. The few sites in white areas that prompted little or no opposition were for senior-citizen or middle-income (Mitchell-Lama) housing, whose occupants were more likely to be heavily white. *See, e.g.,*

Tr. 878–80 (Yulish); 994–95 (Iannacone). Indeed, the distinction between low-income and middle-income housing is particularly well illustrated by the remark of a City official recorded in the minutes of a YURA meeting in 1966. Amid a discussion of the need to prompt the City Council to take action on the public housing sites that were still buried in committee, George Piantadosi observed that it was now possible to place public housing tenants in Mitchell-Lama units, and that the way to get the Council to produce sites for public housing was to tell it that they planned to do so. GX 1078.44; *see also* GX 1078.23; 1078.66.

To be sure, there is little evidence of overtly racial statements by opponents of public housing. And former councilman Edward O'Neill, who strongly and successfully opposed three sites proposed in his east side ward in 1953, testified that he believed race played no role in site selections because "nothing was ever expressed for the record to indicate that it did play a role." O'Neill Dep. 102. The former councilman went on to acknowledge, however, that racial opposition was "certainly ... nothing anybody would put into words." *Id.* at 189.

Nor is direct evidence of a racial influence wholly lacking. At least one group of citizens expressed concern in 1958 about having to "absorb the overflow from Harlem or Puerto Rico." P–I 106–26 (GX 1063.13). And during at least one Planning Board meeting that same year the Secre-

---

**27.** The City has noted that the grounds specified in HUD's final letter rejecting the 1967 sites did not mention (as did its preliminary letter on the Hawthorne/Riverdale site) the problem of "potential concentration of minority groups." *Compare* GX 1078.163 *with* 1078.94. Instead, the grounds specified by HUD for the rejection were merely that acquisition costs were too high (causing the projects to be either economically infeasible or unacceptably dense), and that the sites (all of which were occupied) promised to exacerbate rather than alleviate relocation problems. GX 1078.163.

However, the City has cited no evidence which suggests that City officials interpreted the omission as a retreat from HUD's previous indication that at least some dispersion of subsidized housing was called for in order to avoid concentrating minorities in one area of the City.

**28.** The City has repeatedly emphasized with respect to various sites that they were not in areas that were "predominantly minority." That observation means little, however, with respect to a City in which, as late as 1960, the citywide minority population was only 4.5% and only a handful of census blocks outside of Runyon Heights were "predominantly" (*i.e.,* more than 50%) minority. GX 1225.1.

A series of maps introduced by plaintiffs, which show minority concentration on a block by block basis, vividly illustrates the extreme degree to which the sites selected for subsidized housing tended to be in the more heavily minority areas of the City. *See* GX 1225.41; 1225.42; 1225.44; 1225.45.

tary-Director of the MHA expressly stated that some of the sites under discussion could be expected to prompt objections on grounds of race. GX 1063.8.

Moreover, beginning with the very first sites proposed, a common theme in the objections has been concern about declining property values, the "deterioration" of the neighborhood, the undesirable "element" attracted by public housing, and insistence that public housing properly belonged in "blighted areas," not "residential communities." *See* HOUSING III.B through III.D *supra.* Such objections in and of themselves may not be sufficient to indicate that a racial influence was at work. However, when those objections are combined with a pattern of opposition that also suggests a racial influence, it becomes significantly harder to accept the argument that the concerns were purely economic.

It becomes harder still when, as here, there is also evidence that although Yonkers had, until the mid-1960's, a relatively small and stable minority population, GX 1225.1, it was very much a racially divided city. In this regard, it is noteworthy that Runyon Heights was not created or maintained as a black enclave merely by chance or "associational preferences" that were unrelated to racial discrimination. According to the City's long-time Planning Director, Philip Pistone, the neighborhood was founded on a large tract of land owned by a state senator who regularly brought busloads of residents from Harlem there for weekend picnics, during which he would auction off parcels of the land. Tr. 9508–09 (Pistone). As the neighborhood developed, any contact with the overwhelmingly white Homefield area immediately to the north was severely discouraged when the Homefield Neighborhood Association purchased and maintained a four-foot strip of land as a barrier between the streets of the two neighborhoods. Tr. 2740–42 (Downes); *see also* SCHOOLS IV.A.3.a *infra.* And the objections raised by Runyon Heights residents to the first site proposed there for public housing in 1956 make clear that the area was perceived to be the only one open to blacks in East Yonkers. *See* GX 1060.12, 1060.16. While this history does

not, of course, warrant any general presumptions about the subsequent acts of City officials, it does markedly increase the significance of the fact that the only site selected for family public housing which is not in Southwest Yonkers is in Runyon Heights.

Similarly noteworthy are the circumstances surrounding the construction of Cottage Place Gardens, the City's second public housing project. In apparent response to concerns expressed in the late 1930's by community leaders about the difficulties blacks were encountering in obtaining decent and affordable housing in the private market, the City resolved to build a public housing project "for Negroes" and set about finding a suitable site on which to do so. *See* GX 1053. Various sites were rejected on the ground that the level of minority concentration there was not sufficiently high, and the site eventually selected in 1940 was in one of the most heavily minority areas of Southwest Yonkers. GX 1225.41; P–I 360.

The significance of Cottage Place Gardens is twofold. First, the circumstances surrounding its construction suggest that private market discrimination played a major role in maintaining the pockets of minority concentration which existed in Southwest Yonkers through the mid-1960's (when those pockets of concentration began to expand significantly), and that City officials were well aware of that discrimination. And in this regard, what is suggested by Cottage Place Gardens is decisively confirmed by the credible testimony of various Yonkers residents, as well as that of the City's former Director of Relocation, and by contemporaneous City documents describing the extreme difficulty that minorities had in finding relocation housing when they were displaced by urban renewal. *See, e.g.,* Tr. 428–56 (Smith); 527–29 (Gibson); 2333–43 (Stores); 1933–95 (Trommer); GX 1068.1; 1068.3–1068.4; 1068.11; *see also* GX 1068.5.

In addition, with respect to the actions of City officials, the history of Cottage Place Gardens illustrates what would otherwise

be merely a matter of common sense: that City officials were fully capable of comparing the relative minority concentration of various parts of the City, and of the Southwest, and then choosing a site that would best preserve existing patterns of segregation.

Once again, it bears emphasis that the history of Cottage Place Gardens does not, of course, automatically taint any subsequent actions taken by the City. However, with respect to the extreme degree to which the City's subsequent site selections in fact conformed to community pressures, and the extreme degree to which those pressures in fact followed a racially identifiable pattern, the history of Cottage Place Gardens—together with the other evidence presented regarding private market discrimination and its acknowledged effect on minority relocation opportunities—strongly diminishes any likelihood that those phenomena were merely coincidental and unrelated to an intent to preserve existing patterns of segregation.[29]

## IV. THE RIVERVIEW PERIOD

In sharp contrast to the preceding eighteen years, the period from 1968 to 1972 was a highly productive one for the development of subsidized housing in Yonkers. Sites were approved for fifteen subsidized housing projects for families (totalling 2,647 housing units) and two subsidized housing projects for senior citizens (totalling 290 housing units). Most of the sites were approved during the years of 1970 and 1971. All seventeen sites were in Southwest Yonkers.

It is clear from the record that this productivity was attributable in large part to a series of conscious decisions on the part of City officials to concentrate, at least for the present, on sites which were "politically feasible." It is equally clear that sites outside of Southwest Yonkers remained politically infeasible because of continuing opposition to subsidized housing on the part of area residents and civic associations—an opposition based, at least in significant part, upon fear of an influx of minorities into what were (and remain today) overwhelmingly white neighborhoods.

### A. *Overview of Projects Approved*

During the years in question, City officials largely abandoned reliance on the construction of public housing as a relocation resource, and turned instead to the subsidized housing programs known as § 221(d)(3) B.M.I.R. and § 236 housing. Under these programs the housing was constructed, owned, and operated by not-for-profit sponsors rather than a local housing agency. The sponsors received a low-interest mortgage that was subsidized and

**29.** The plaintiffs have included Cottage Place Gardens, as well as Mulford Gardens, the City's first public housing project (the site for which was selected in 1939) as part of their allegations of a pattern and practice of racial discrimination by the City in the siting of subsidized housing in Yonkers. With respect to Mulford Gardens, however, there is virtually no evidence before us regarding the circumstances of its site selection, and thus the City's actions in that regard do not form part of the basis upon which we find the City to be liable for racial discrimination.

Nor, although we consider the question to be a closer one, do we believe it proper to view Cottage Place Gardens as the starting point of the pattern of discriminatory actions that so clearly followed. The City's actions concerning Cottage Place Gardens are significantly isolated in time, and distinguishable in circumstances, from the pattern that later arose. Indeed, with respect to the former point, it bears particular emphasis that the City appears to have abandoned the overt designation of "Negro housing" as early as 1941 and, so far as the record before us indicates, made no attempt to maintain a segregated occupancy in either Mulford Gardens or Cottage Place Gardens. *See generally* GX 1052; 1053. The initial circumstances surrounding the construction of Cottage Place Gardens seem to us to be more an isolated vestige of an earlier and discredited era, than a part of the pattern and practice of actions for which the City may today be held liable.

Nonetheless, as we have noted, the circumstances surrounding the construction of Cottage Place Gardens remain relevant for the light they shed on subsequent actions taken by the City. And the location of Cottage Place Gardens remains relevant to any calculation of the effect of the City's subsequent actions. Indeed, in view of that fact, the question of whether Cottage Place Gardens can be properly included in the basis of the City's liability may be chiefly an academic one. *See* fn. 71 *infra*.

often insured by HUD, and were required, in return, to observe rental and income-limit schedules established by HUD. The guidelines were targeted for moderate-income households, but additional rental subsidies were available to make some or all of the units accessible to low-income households as well. Since the projects were required to be self-sustaining, tax abatements from the local government were generally needed in order to make the projects financially feasible.

All fifteen of the projects for families approved during this period were § 221(d)(3) B.M.I.R. or § 236 projects. Eight were sponsored by private non-profit or limited-profit groups; the remaining seven were sponsored by the New York State Urban Development Corporation ("UDC"), a public benefit corporation created by the New York State legislature in 1968 to participate in housing, commercial, and industrial development throughout the state.

The seven UDC projects were constructed pursuant to written agreements ("Memoranda of Understanding") between the City and the UDC, which were authorized by the City Council and executed on behalf of the City by the City Manager. Five of the seven projects (totalling 1,201 units of housing) were constructed pursuant to a single Memorandum of Understanding authorized and executed in July of 1970. The five projects are Frazier Homes (21 units) at the intersection of Warburton and Lamartine Avenues; the Dorado (188 units) at the intersection of Warburton and Ashburton Avenues; Whitney Young Manor (195 units) near the intersection of Nepperhan and Ashburton Avenues; and Riverview I (454 units) and II (343 units) on Riverdale Avenue in the City's Stage II urban renewal area. The sixth UDC project, the 300-unit Seven Pines, was constructed pursuant to a Memorandum of Understanding approved in June of 1971 and is located on Glenwood Avenue at the foot of Trevor Park. The seventh and final UDC project, the 310-unit Parkledge Apartments, was constructed pursuant to a Memorandum of Understanding approved in June of 1972 and is located on Yonkers Avenue, immediately west of the Saw Mill River Parkway.

The eight privately sponsored § 221(d)(3) and § 236 projects for families, which were largely the result of recruiting efforts by the director and staff of YURA, see HOUSING IV.C.1 *infra*, were constructed pursuant to City Council resolutions which granted the sponsor a substantial tax abatement in return for an agreement to give preference in both initial and subsequent rentals to persons displaced by urban renewal projects. The first such resolution was passed in January of 1968 for Jefferson Terrace, a 64–unit project between Highland Avenue and Jefferson Street. GX 1079.25. The next was Highland Terrace (96 units), a few blocks to the south, approved in July of 1968, C–453, followed by 10 Orchard Street (an 8–unit rehabilitation) in April of 1970, GX 1147.10; Messiah Baptist (130 units) on Highland Terrace in May of 1970, C–552; Waverly Arms (28 units) on Waverly Street in October of 1970, C–561; 164–170 Buena Vista Avenue (a 12–unit rehabilitation) in March of 1971, C–534; Cromwell Towers (317 units) at Locust Hill Avenue and Cromwell Place in July of 1971, C–747; and Jackson Terrace (181 units) on Riverdale Avenue south of Vark Street in November of 1971, C–509.

The remaining two projects approved during this period were senior citizen projects. Flynn Manor, a 140–unit public housing project on Riverdale Avenue at Post Street, was approved by the City Council in June of 1970, C–102; and Father Finian Sullivan Towers, a 150–unit Mitchell-Lama project, received preliminary approval in November of 1970, GX 1099.11, and final approval in October of 1973. GX 1099.19.

B. *The Continuing Opposition to Subsidized Housing in the City's Heavily White Neighborhoods*

For sixteen of these seventeen projects, there is little or no evidence of community opposition prior to the project's approval by the City Council. Only Parkledge—the final UDC project—appears to have encountered any significant community resistance. There is, however, abundant evidence of

continuing community opposition to subsidized housing in certain areas of Yonkers. The opposition is, as before, evident in the heavily white areas of the City, particularly those east of the Saw Mill River Parkway. The sites approved by the City are, without exception, west of the Saw Mill River Parkway, and with three exceptions, in the more heavily minority areas of the Southwest. GX 1225.44. The exceptions are the two senior citizens projects (both of which appear to have been heavily white since opening, C–1650), and Parkledge, which is located immediately west of the Saw Mill River Parkway, and which was chosen in response to insistence by HUD that the City select a site outside of areas of minority concentration.

As before, there is relatively little evidence that the residents of the City's heavily white areas expressly mentioned race as a reason for opposing subsidized housing in those areas. *But see* HOUSING IV.C.3 *infra*. Nonetheless, there can be no serious doubt that the opposition was, on the whole, racially influenced. Numerous former city officials—including those directly involved in the selection of sites for subsidized housing during this period—acknowledged at trial that they themselves believed the opposition they encountered was indeed based, at least in part, upon race. *See* Tr. 1193–97, 1378–79 (Del Bello); 875–80; 1066–67 (Yulish); Webdale Dep. 487–88; 497–98; Tr. 983–86, 994–95 (Iannacone); 2792–94, (Arcaro); 1861–67 (Schneider).

As noted earlier, former East side councilman and Mayor Alfred Del Bello, testified that his constituents equated subsidized housing with minorities, Tr. 1197, and that "race was definitely a consideration in many of the demonstrations and visible opposition we had." Tr. 1194.

Walter Webdale, the Director of YURA from the spring of 1967 through the fall of 1971, testified more guardedly but to the same effect. Webdale acknowledged that the high level of emotion which prevailed at public meetings on subsidized housing was characteristic of issues that are "racially tinged." Webdale Dep. 487–88; 497–98. "At many meetings, there was no logic left to the meeting," Webdale explained, "and

so one would have to assume there was something more than the size of the street, the water, the sewer, etc." *Id.* at 498. Webdale also testified that there was "tremendous fear" about subsidized housing in Yonkers, which was overcome in "some areas" but not in others, *id.* at 336–37; 562, and he cited the approval of the Parkledge project in 1972 as an example of one case in which that fear was overcome. *Id.* at 338.

Morton Yulish, who was the Administrator of the City's Department of Development from the fall of 1971 to early 1974, and who in 1971 and 1972 led the efforts to obtain City approval for a site outside areas of minority concentration, testified that he encountered intense opposition to subsidized housing in East Yonkers; that he believed the opposition to be based, at least in part, upon race; and that he shared his views on the subject with Mayor Del Bello and City Manager Seymour Scher. Tr. 1066–67. Yulish testified that the issues raised "on the surface" were generally whether tax abatements should be granted outside of urban renewal areas; whether the "residential character" of single-family neighborhoods should be changed; and whether the federal government should be permitted to control what would happen in the City's neighborhoods. *Id.* at 875. However, Yulish considered those issues often to be "smokescreens" for underlying racial fears, *id.* at 875–80, and he testified that at many meetings, the issue of race was "very thick in the air." *Id.* at 1066–67. "The bottom line," according to Yulish was that "there was no way that you could ... get public support, and then after the fact get councilman support, to build large-family, predominantly black assisted housing on the other side of the [Saw Mill River] Parkway." Tr. 879–80.

Both Yulish and Gregory Arcaro, a planner with the City from 1968 to 1970 and from 1972 to 1980, further testified that many of those who lived in East Yonkers had moved there from the Bronx and other areas of New York City, and had expressed strong fears that subsidized housing would lead to the same "deterioration" which they had sought to escape. Tr. 2792–93 (Arca-

ro); 1064–67 (Yulish); *see also* McLaughlin Dep. 77–78. In addition, there is evidence of a widespread belief that part of the reason for the sharp rise in the City's minority population from the mid-1960's on was an influx of minorities displaced by the urban renewal that had taken place in White Plains. *See, e.g.,* Tr. 841–45 (Yulish); 1728–33 (O'Rourke). As a result, according to Yulish, some people in Yonkers equated urban renewal with "large infusions of minorities into a city ill-equipped to cope with them," Tr. 843, and they were uninterested in pursuing urban renewal unless they could "get even" by sending the people displaced by urban renewal back to White Plains. *Id.*

David Bogdanoff, a builder who worked closely with City officials on a number of subsidized housing projects during these years, characterized racially influenced opposition to subsidized housing as simply a "fact of life at that time" in most predominantly white communities. Tr. 10,224. Bogdanoff testified that there was a "tremendous fear" in East Yonkers (as in most predominantly white communities) that placing subsidized housing there would result in an invasion of minorities, and that "of course" it influenced where he could build. Tr. 10,224–25; *see also* 10,197–99; Logue Dep. 112. In fact, Bogdanoff volunteered that if he had attempted to tell the residents of any heavily white community that construction of subsidized housing need not result in an invasion of minorities, he "would have been howled down with laughter." Tr. 10,197.

## C. *The Pattern of Opposition and Apparent Acquiescence*

The pattern of sites selected during this period, and the circumstances under which they were selected, taken together with the testimony described above, strongly suggests that City officials likewise came to view racially influenced opposition to subsidized housing in East Yonkers as a "fact of life," and came to view acquiescence in that

fact of life as the price of urban renewal in Yonkers.

### 1. *The City's Campaign to Produce Privately Sponsored Projects*

When Walter Webdale arrived in Yonkers in April of 1967 as the first permanent director of the Yonkers Urban Renewal Agency, he found the City's Stage II urban renewal project at a standstill due to an inability to provide relocation housing. For the past eighteen years, community opposition to public housing had seriously hindered site selection and had effectively ruled out sites in all but the most heavily minority areas of the City. Two months before Webdale's arrival, amid typically strong community opposition to several sites proposed in East Yonkers, the City Council had rejected all proposed sites except for several located in the heavily minority downtown area of Southwest Yonkers. Those sites, in turn, were rejected by HUD one month after Webdale's arrival. *See,* HOUSING III.D *supra.*

Webdale's first task thus became the removal of the "road block" that the lack of relocation housing presented to the Stage II urban renewal project, GX 1079.4, and he responded by undertaking an extensive campaign to bring about the construction of § 221(d)(3) and § 236 projects. *See, e.g.,* GX 1079.8; 1079.17; 1079.26; 1080.14; 1081.8; 1082.1; 1086.6; 1207.3; Webdale Dep. 72, 89–90; Tr. 10,182–83 (Bogdanoff). Webdale and his staff at YURA located sites, solicited sponsors, and provided the sponsors with a broad range of technical and political support, including assistance in preparing applications to HUD, *see, e.g.,* GX 1079.18; 1082.2; 1083.9; and submissions to the City Council, *see, e.g.,* GX 1079.34; 1079.53; 1083.32; planning and construction design, *see, e.g.,* GX 1079.52; 1083.11; 1084.5; and meeting with federal, city and school officials, *see, e.g.,* GX 1079.-45; 1083.31; 1083.32; 1084.1.[30] Although Webdale looked at sites outside of South-

---

**30.** Indeed, with respect to the design and management of the projects, the City's involvement can be characterized not merely as lending a significant degree of assistance, but also as

exercising a significant degree of control. *See, e.g.,* GX 1079.24; 1079.30; 1079.52; 1082.32; 1083.11; 1083.32; 1084.5; Webdale Dept. 186–88.

west Yonkers, and although his office publicly stated that projects were expected to be built "on scattered sites in various parts of the city," GX 1079.61a, Webdale limited his efforts at recruiting sponsors for § 221(d)(3) and § 236 projects to Southwest Yonkers. *See, e.g.,* Webdale Dep. 56–58, 137–38, 243–44.

So limited, site selection and approval proved far less difficult than in previous years. Although the minority and other community groups continued to press for scattered-site housing, *see* HOUSING IV.D.3 *infra,* and although concerns continued to be raised about the increasing concentration of subsidized housing in the Southwest, *see* HOUSING IV.D.4 and 5 *supra,* the sites designated for the § 221(d)(3) and § 236 projects prompted little apparent opposition from area residents (indeed, some were actively supported by area residents, *see* HOUSING IV.D.3 *infra*), and they were approved without incident by the City Council.

### 2. The Candeub & Fleissig Survey and the City's 1970 Memorandum of Understanding with the UDC

In 1969, while the campaign to produce privately sponsored projects was underway in the Southwest, a citywide vacant land survey, jointly commissioned by the City, the Yonkers Chamber of Commerce, and the UDC, was made public. The result, as in previous years, was immediate and apparently effective opposition from the residents of East and Northwest Yonkers. The survey was summarily abandoned, and sites in the downtown area of Southwest Yonkers were designated soon thereafter for five subsidized housing projects (totalling 1,200 units) to be sponsored by the UDC.

The survey in question arose as part of the City's efforts to persuade the Otis Elevator Company, one of the City's largest employers, to remain in Yonkers. Otis had indicated that it needed either to expand its existing facilities or relocate elsewhere, and in 1968 the City asked the newly created UDC for assistance in its efforts to retain Otis. C–579.

Among the areas in which the City sought assistance was in the relocation of some 1,000 predominantly minority families from the riverfront area designated for the Otis expansion. *Id.;* GX 1096.47. To that end, the UDC, the City, and the Yonkers Chamber of Commerce hired the consulting firm of Candeub & Fleissig to identify "available sites within the City for the construction of low and moderate income housing ... [with] special attention ... to the potential development of open land sites." C–592.

In May of 1969, Candeub & Fleissig produced a list of ninety-eight vacant sites in Yonkers, and a ranking of those sites according to their feasibility for the construction of subsidized housing. GX 1096.50; P–I 150–80. Twenty-two of the ninety-eight sites were in Southwest Yonkers; the remaining seventy-six were scattered throughout East and Northwest Yonkers. GX 1225.43. With the assistance of Planning Director Philip Pistone, eleven sites were designated for further study. Tr. 9768, 9872 (Pistone); GX 1096.60.

Word of the Candeub & Fleissig survey quickly reached the City Council. Alfred Del Bello, who was at that time the Democratic candidate for Mayor as well as the tenth ward councilman, called upon Walter Webdale "to supply our local news media with a map of all proposed sites or an explanation of why they are being kept secret." GX 1096.56.

On June 5, the local press published a description of eleven sites, and reported that the list had been obtained from a map in YURA's offices which bore the legend "Sites architecturally feasible for low and middle income housing." GX 1096.60. Four of the sites were in, or on the border of, Southwest Yonkers; the remaining seven were spread across Northern Yonkers. GX 1225.43; 1096.60.

Publication of the list created an uproar in Yonkers. *See, e.g.,* Tr. 9870 (Pistone); 1703 (O'Rourke), GX 1096.98. Adding to the concern was the knowledge that the UDC's state charter gave it the power to condemn land and override local zoning or-

dinances, thus potentially removing control over site selection from local bodies such as the City Council. Tr. 1703 (O'Rourke).

On June 10, Mayor James O'Rourke issued a statement in response to "recent articles in the press relating to 'scattered site housing,' stimulated by public officials for unworthy political reasons and calculated to pander to public fear and agitation." GX 1096.63. The Mayor emphasized the importance of the Otis expansion project to Yonkers, and explained that "[a]s in all projects such as these, to break the bottleneck of initial relocation, several sites of decent housing will be required outside the project areas." *Id.*

The Mayor added, however, that no site proposals had, as yet, been made, and indicated that in determining site feasibility, "profound consideration" would be given to "maintaining the integrity and character of neighborhoods"; "maintaining the integrity of property values"; and "preserving the integrity of needed parks and recreation lands." *Id.* The Mayor closed his statement with the assurance that public hearings and discussions would be held before any sites were selected. *Id.*

A petition in opposition to the sites located in Northeast Yonkers was sent to the Mayor, the City Council, and the Planning Board. GX 1096.65. The grounds for opposition listed in the petition were that subsidized housing projects would have a detrimental effect on property values and "could blight the areas"; would violate existing zoning laws; would take away needed park and recreational lands; and would overtax school and transportation facilities. *Id.* The petition called for "public hearings ... on notice" before any action was taken on the sites, and declared in closing that:

It is reliably reported that these sites and the others mentioned in The Herald Statesman of June 5, 1969, are part of a proposed program for use of state funds to transfer N.Y. City residents into suburbs. If that is advisable it could be accomplished better by not creating con-

flict with or downgrading existing established residential areas. *Id.*

A meeting was held on June 12 between City officials and the UDC. The following day, the press reported that according to Mayor O'Rourke, the UDC had said that it would refrain from imposing specific sites on Yonkers but would "pull out" of the renewal project unless "scattered sites" were selected. GX 1096.66.

Two days later, some 500 residents of the fifth ward in East Yonkers appeared at a meeting with City officials to protest the sites identified in their area. GX 1096.71; Tr. 1711 (O'Rourke). According to press accounts, the City officials in attendance included fifth ward councilman Andrew O'Rourke; Mayor O'Rourke; and Mayoral candidate Del Bello. All three sought to reassure the audience that the matter of site selection would be given careful study by the City Council, and that use of the UDC's power to override zoning laws would be resisted. *Id.* Del Bello, in particular, called upon the UDC to leave the selection of sites to the City Council in order to "put the citizens' minds at ease." *Id.* The meeting also resulted in the formation of a Citizens Committee, led by Councilman O'Rourke, to study the sites identified in the Candeub & Fleissig study.

On June 17, the UDC sent a telegram denying that it had threatened to pull out of the renewal project if scattered housing sites were not selected and emphasizing that "only upon the City's recommendation and request" would UDC become involved in construction housing anywhere within the City of Yonkers. GX 1096.74.

Several days later, Mayoral candidate Del Bello also publicly disputed the Mayor's version of the June 12th meeting, saying that in fact the UDC had offered to conform to the City's wishes. GX 1096.78. Del Bello further criticized the Mayor's "divisive attitude," and suggested that to move the City forward, "we must stop threatening the people and start understanding and implementing their wishes." *Id.*

Del Bello offered as alternatives to scattered site housing the acquisition of surplus land along the arterials then being constructed; leased relocation housing in existing structures; acquisition of parcels made vacant by fire and demolitions of substandard buildings; and the use of the "checkerboard strategy" to relocate individuals within an urban renewal area. GX 1096.100.

On July 10, a meeting was held among the City Council, representatives of the UDC, the Yonkers Economic Development Corporation ("YEDC") (a local business group), and the UDC's Citizens Advisory Committee ("CAC") to discuss sites for relocation housing. GX 1096.89. According to press accounts, twelve sites were proposed by the YEDC as possible sites for relocation housing, "touching off a passionate debate over racism." *Id.* Three of the five "primary" sites were reported to be located "deep in Yonkers' ghetto areas" and were criticized as such by the CAC Chairman, the Rev. William Gallagher; Vice Chairman Kenneth Skinner; and CAC member Msgr. John Harrington. *Id.* At the same meeting, a representative of the UDC reportedly reiterated that the agency "will not do anything the City does not want us to do" with respect to housing sites, and that it would not intervene in the City's internal disputes. *Id.*

In September, the Westchester County Board of Supervisors adopted a resolution, introduced by the Yonkers supervisors, calling for representatives of the county to introduce and lobby for state legislation to curb the UDC's power to override local zoning laws. GX 1096.103. The resolution recited that the UDC had proposed subsidized housing for sites in Yonkers where it would "completely destroy the residential character of the adjacent neighborhoods" and violate the City's zoning laws. *Id.*

Internal UDC memoranda circulated in September of 1969 indicate that Mayor O'Rourke asked the UDC to "ease off" on the issue of scattered site housing until after the November elections, and that the UDC CAC was eager to issue a statement in support of scattered site housing but had, to date, been dissuaded by UDC offi-

cials from doing so. GX 1096.101; 1096.-105; 1096.106.

On September 29, the UDC sent Mayor O'Rourke a letter which notified him that the Otis Elevator Company had rejected the UDC's expansion proposal (thus largely ending the UDC's involvement with Otis), but which offered to go forward with the housing component of the proposed riverfront renewal area. GX 1096.107. The letter added that:

> The Citizens Advisory Committee is presently examining low and moderate income housing sites, and could be in a position to recommend a number of sites throughout the city shortly.
>
> I understand also that the City Council has been seriously reviewing scattered site housing locations throughout Yonkers. We are available to discuss the housing solutions with you and other city officials at any time.

*Id.*

No further action appears to have been taken on the Candeub & Fleissig sites in the months preceding the election. In November, Councilman Del Bello defeated incumbent Mayor O'Rourke in the mayoral race. Also defeated was incumbent third ward Councilman William Schneider, who ascribed his defeat, in part, to his support of scattered site housing. Tr. 1874–77; 1909.

Del Bello promptly abandoned the Candeub & Fleissig survey. As he explained at trial:

> I thought [the Candeub & Fleissig survey] was the wrong way to go, that it would build far more resistance on the part of the public to any housing whatsoever, and that if I had succumbed to the same position that Mayor O'Rourke had adopted, I could pretty well assure the people of Yonkers we would never produce any housing. I was dedicated to producing housing, and I had to find a political course that would allow us to get it constructed. And the course I chose was to not shotgun the issue, be very site specific, not to tilt at windmills, to use another expression, but to deal

with sites that were realistic, that we could get approved and to get on to the process of building housing. Tr. 1288–89.

By April of 1970, three months after Mayor Del Bello had taken office, Webdale and City Manager Seymour Scher had negotiated a draft agreement with the UDC to build 1,400 units of housing at four locations. GX 1088.8. All four were in Southwest Yonkers, within a several block radius of the Getty Square area. GX 1225.44. Three months later, a final version of the Memorandum of Understanding (calling for 1,200 units at three of the locations) was formally presented to the YURA Board and approved that same day. C–612. The following day, it was approved by the City Council as well. C–613.

One of the sites involved was the City's Stage II (Riverview) urban renewal area, which had originally been planned for commercial re-use, but which (over the strong objection of the City's Planning Director Philip Pistone) had been redesignated for combined commercial and residential re-use shortly after Walter Webdale's arrival in 1967. See HOUSING IV.D.1 infra. Plans had begun soon after for the joint construction of a school and subsidized housing complex on the Riverview site, see SCHOOLS IV.A.2.b infra, with the housing intended to serve the dual function of providing a source of relocation housing for those displaced by urban renewal projects, and encouraging a return of middle-income whites into the area. See, e.g., GX 288; 1088.6. The July 1970 Memorandum of Understanding with the UDC doubled the number of housing units previously scheduled for the site. Compare GX 1088.6 with GX 1088.8 and C–6112.

The other three projects approved in the Memorandum—the Dorado, the Frazier Homes, and Whitney Young Manor—were intended to provide relocation housing for the (predominantly minority) population displaced by the Otis Expansion and by urban renewal in one part of a Southwest neighborhood known as the Hollow. See, e.g., Webdale Dep. 172, 231–32; Lenaz Dep.

73, 232–33, 251; Tr. 10,451–52 (Yost); C–606; GX 1097.14; 1144.4; 1120.16.

Neither the site selection for the three new projects, nor the doubling of the number of units scheduled for the Riverview site, appears to have been put to any public discussion during the rapid negotiation and extraordinarily rapid approval of the Memorandum of Understanding with the UDC. Nor were the matters submitted to the Planning Board for review. Tr. 9771, 9822 (Pistone).

### 3. The Glenwood/Ridge Avenue Project and Rockledge Heights

During the same months in which the July 1970 Memorandum of Understanding was under negotiation, Walter Webdale began meeting with a group known as the Clergy of Yonkers ("COY") and developer David Bogdanoff (both of whom were involved in the construction of other subsidized housing projects in the Southwest) regarding a proposal for the construction of a subsidized housing project for families near Glenwood and Ridge Avenues, at the northern border of Southwest Yonkers. The blocks immediately surrounding the proposed site, as well as those to the north and west, were overwhelmingly white, but there were a number of blocks with a 20–50% minority population to the Southeast. GX 1225.44; Tr. 10,191 (Bogdanoff). The project was intended to be a source of relocation housing for the Nepperhan Arterial extension, federal approval of which had been delayed due to a lack of an adequate relocation plan. GX 1207.3; 1099.8.

A developer, builder, architect, and attorney were hired, and (as he had with respect to previous projects) Bogdanoff absorbed the cost of the preliminary analysis. Tr. 10,190. At least $18,000 worth of work was completed, and COY and Bogdanoff met with Webdale and Scher in the spring of 1970 to present their plans for the project. Id. at 10,191–92.

Bogdanoff testified that soon thereafter, Scher reported to him that there was "strong neighborhood feeling" against the project, led by the pastor of a large Catho-

lic church in the area. *Id.* at 10,192. The church group announced that it planned to use the site for senior citizens housing, and Scher asked Bogdanoff to "help him out" in the matter. *Id.* Bogdanoff testified that he suggested to COY that it "withdraw graciously," and that he be allowed to absorb the loss "rather than to develop a principle fight which would get no place and would just tremendously increase the serious racial antagonisms that existed within the City." *Id.* Webdale likewise had reason to believe the church group's opposition to the family project was racially based. He testified that he had been told that members of the group had said that they "feared an influx of blacks into the neighborhood" would result if the project were built. Webdale Dep. 184–85; 579–581.

COY acceded to Bogdanoff's request to withdraw, GX 1099.11; 1099.12, and with the assistance of MHA Secretary-Director Emmett Burke, the church group received Planning Board and City Council approval for its proposed senior citizens project within a matter of months. GX 1099.9; 1099.-11. The project was named in honor of the pastor of the church, Father Finian Sullivan, and opened in 1973. Charles Cola, who in 1971 was elected councilman of the sixth ward (in which the project was located) testified that he supported the project, and that if he had not, he "wouldn't have been elected." Cola Dep. 81. The occupancy data in evidence for the project describes it as 100% white. C–1650.

Fear about an influx of minorities was also expressed by area residents (and reported in the press) with respect to a proposed subsidized housing project known as Rockledge Heights. The site in question was in a predominantly white area of far Southwest Yonkers, on the bed of the old Putnam Railroad line near Wolfe Street.

In the spring of 1970, the site was proposed for an 85-unit § 236 project to be used for relocation housing. GX 1105.1; 1105.2; 1105.5. Webdale kept the ward councilman, Dominick Iannacone, informed of the progress of the plans, GX 1105.2; GX 1105.3; noted the likelihood of "objections by the community concerning the usual public facilities, schools, etc." GX 1105.3, and asked that if the councilman had any comments, to please let him know "during these early phases." *Id.*

Councilman Iannacone initially supported the project, Tr. 990 (Iannacone), but then, as he explained at trial, he "got some flak on it." *Id.* at 991. Some area residents complained to him about the loss of the railroad bed as a parking facility. *Id.* Others who knew him better approached him privately and said they didn't want the housing because they didn't want any blacks there. *Id.* at 991–92. Iannacone testified that he was, at the time, a new councilman, and wouldn't have been elected the next time "with all those people against me," *id.* at 992–93, and that he accordingly told the City Manager he was opposed to the project, citing his constituents' concern about the loss of their parking facility. *Id.* at 992. Iannacone then attempted, unsuccessfully, to change the zoning for the site from multi-family to S–100, a highly restrictive single-family zoning classification. GX 1105.10.

In late summer of 1971, the City Council voted seven to six to approve the project but then immediately voted unanimously to reconsider the vote and referred the matter to the Real Estate Committee, which was chaired by Iannacone. GX 1105.14. A press account, the accuracy of which was confirmed by Iannacone at trial, reported that the site had been "buried" in Iannacone's committee, and that he had "vowed not to let the project out of his committee until he had the council votes to kill it." GX 1105.16; *see also* Tr. 933 (Iannacone). The article also reported that the project had "created opposition among area residents, mostly white, who are fearful that black and Puerto Rican families would move in." GX 1105.15. Iannacone's position was reported to be that "he was now in favor of senior citizen housing for the site but against housing for families because parking, traffic, and local services would be strained." *Id.* No further vote was taken on the site by the City Council, *id.*, and Iannacone again tried (but again without success) to have the zoning of the site

reclassified from multi-family to single-family. GX 1105.21; 1105.23.

Iannacone acknowledged that his publicly stated reasons for opposing the project were pretextual, and that his opposition in fact was in response to his constituents' racially influenced opposition. Tr. 991–993, 1526–29. The words "low-income," Iannacone explained, connoted "poverty, minorities, blacks, Puerto Ricans or Hispanics." *Id.* at 994. Senior citizen housing created less opposition, according to Iannacone, so long as the words "low income" were avoided. *Id.*

#### 4. *Seven Pines*

During that same summer, HUD notified the City that its continued receipt of urban renewal funds would be conditioned on the approval of a site for subsidized housing that was outside the City's areas of minority concentration. *See* HOUSING IV.C.5 *infra.* As a result, scattered site housing once more became (as it had been during the time of the Candeub & Fleissig survey) a highly public issue.

The site of the Seven Pines project, located in the third ward on the northern border of Southwest Yonkers, was not considered by City officials to be a "scattered site," but in January of 1972, James Walsh, the newly elected councilman for the third ward, sought to rescind the City's agreement with the UDC to build the project, arguing that it could lead to scattered site housing.

The Seven Pines site was among those listed in the original April 1970 draft agreement with the UDC but was dropped from the first round of UDC projects apparently out of concern on the part of City officials that too much tax abatement not be granted at once. The site was considered again by the UDC in April of 1971 along with two east side sites (the Robin Hill Day Camp site and a site at Mile Square and Tuckahoe Roads), GX 1098.15, and in June of 1971 the City Council authorized a memorandum of understanding with the UDC for the construction of 300 units of subsidized housing on the Seven Pines site. C–753.

The Seven Pines site was considered by City officials to be in a deteriorating neighborhood. A "mass exodus" of whites was believed to have occurred over the preceding decade, GX 1119.85, and City officials expressed the hope (as they had with respect to Riverview as well) that the Seven Pines project would "stabilize" the area and bring middle-income whites back to Southwest Yonkers. *Id.;* GX 1119.44; GX Tr. 901, 903–04 (Yulish); Webdale Dep. 434. The City Council's approval of the proposed project was unanimous. C–753.

A number of months later, however, in January of 1972, the project came before the City Council again to obtain a waiver of several aspects of the City's Building Code and local zoning requirements with respect to height. Public hearings were held, and the newly elected ward councilman, James Walsh, vigorously opposed the project, seeking first (unsuccessfully) to rescind the UDC agreement and then seeking to defeat the zoning and building waivers that were required for the project to go forward. *See, e.g.,* GX 1119.8; 1119.19; 1119.62.

Walsh's campaign against the project lasted some three months during which time he assailed the height of the building, its likely effect on area schools and traffic, the "windfall" the developer had received in selling the property to the UDC, and the loss of tax revenue created by an "unnecessary" tax abatement for a middle income building. *Id.* The arguments were characterized by Webdale as "the typical litany of issues." Webdale Dep. 432–33.

Walsh also argued, however, that Seven Pines represented a threat that a site on the east side of the City would be developed next, GX 1119.8, 1119.20, and, in the words of a UDC memorandum summarizing the situation, that the "defeat of this project by a unified front would guarantee that no scattered site developments would occur." GX 1119.20.

In response, City and UDC officials discussed the usefulness of meeting with Walsh to assure him that no additional sites would be chosen without consulting the ward councilman, GX 1119.21. In addi-

tion they publicly made statements to that effect, GX 1119.8, and privately considered whether the UDC should, if necessary, invoke its override powers. GX 1119.10.

When Walsh's efforts to stop the project failed, he introduced a resolution addressed to "the majority of councilmembers" who supported Seven Pines and who, "in opposition to the objections of community organizations throughout the City," have "expressed the concept of supporting subsidized housing ... throughout the City." GX 1119.62. The resolution called on those councilmembers to

> submit to the agenda of the City Council, at the next regularly stated Council meeting, a firm Resolution giving one site, located within the confines of the Ward they represent, on which they confirm their support for subsidized housing, through either URA or UDC auspices, allowing them to build with complete impunity of zoning laws, confirming their willingness to give tax abatement on such structures and re-confirming their support of the Seven Pines concept as being the proper housing concept for the future of the City of Yonkers.

*Id.* The Council voted 8 to 5 to refer the resolution to the Real Estate Committee, from which it appears never to have emerged.[31]

### 5. *Parkledge*

Three months after the end of Walsh's campaign against Seven Pines, and in response to a year of steady pressure from HUD to approve a site for subsidized housing that was outside the City's areas of minority concentration, the City Council approved a site on Yonkers Avenue immediately west of the Saw Mill River Parkway.

Since at least mid-1970, HUD had been actively encouraging the City to adopt a "balanced housing program." [32] In July of 1971, it determined that stronger action was required. During that month, Grace Malone, the Director of the Fair Housing and Equal Opportunity Division of HUD's New York Area Office, wrote a memorandum concluding that the City of Yonkers' relocation housing programs were in violation of the civil rights laws and recommended disapproval of the City's Year II NDP application (the major source of federal urban renewal funds for the City). P-I 180-249. The basis of Malone's conclusion and recommendation was the City's failure to provide relocation housing opportunities for minorities outside of areas of minority concentration. *Id.*

As a result of Malone's memo, Malone and other HUD representatives held a series of meetings with City officials in July through November of 1971. The City was advised to submit substantiation of its "alleged efforts to achieve balanced site selection in Yonkers"; a submission was made; and HUD officials concluded at an internal meeting that the "program management staff should immediately impress upon the applicant the urgency for presenting sites for development outside Southwest Yonkers." P-I 180-256.

On September 3, 1971, Walter Webdale and City Manager Seymour Scher met with HUD officials and identified eight sites outside of areas of minority concentration that "could be pursued." *Id.* Four were in East Yonkers (including the Robin Hill Day Camp and Mile Square/Tuckahoe Road sites which had appeared in the April 1971 draft agreement prepared by the UDC);

---

**31.** The City has sought to dismiss Walsh's campaign against Seven Pines as merely partisan politics—the efforts of a newly elected Republican to embarrass the Democratic administration. However, to suggest that party affiliation played a role in the controversy in no way diminishes the significance of Walsh's choice of political capital.

**32.** That encouragement began with the rejection of a site proposed by the MHA for public housing in a heavily minority area of downtown

Southwest Yonkers. The ground for rejection was publicly reported to be that the project would add to the area's racial imbalance; it was also reported that HUD had told the City to look for sites in Northern and Eastern Yonkers. GX 1094.36; *see generally* GX 1094. One month later, the City Council approved the first-round Memorandum of Understanding with the UDC for the construction of 1,200 units of subsidized housing in and around the downtown area. *See* HOUSING IV.C.2 *supra.*

two sites were in Northwest Yonkers; one was just north of the Seven Pines site; and the remaining site was in far Southwest Yonkers. *Id.*

In November, Malone revised her recommendation regarding the City's NDP application to conditional approval, with the condition being that the next housing site selected by the City be one of the eight sites identified by Scher and Webdale. *Id.* This specific condition apparently was never communicated to City officials, but it *was* made clear that HUD would require a site outside the City's areas of minority concentration, and that the HUD officials involved preferred a site East of the Saw Mill River Parkway. Tr. 840–411, 863–65; 1128–33 (Yulish); *see also, e.g.,* Cola Dep. 147–51; Tr. 1004–06 (Iannacone).

The task of finding an acceptable site fell principally to Morton Yulish, who had come to Yonkers in October of 1971 as the first Administrator of the City's newly created Department of Development.[33] Yulish testified that he had frequent discussions with Mayor Del Bello and City Manager Scher about scattered site housing, and that they told him, in essence, that they had been unsuccessful in achieving it, and that it was his turn now. Tr. 845–46. In addition, Yulish testified that Del Bello and Scher explained that City Council approval would be required for any site, and that it would be hardest to obtain for sites East of the Saw Mill River Parkway "given the lack of support for such housing from those constituencies and the Council's historic lack of … guts … in dealing with these kinds of unpopular matters." *Id.* at 849–50.

Former Mayor Del Bello testified more diplomatically, but to the same effect. He explained that East side councilmen were subject to a "terrible amount of pressure" from their constituents to oppose subsidized housing proposals, and that "in al-

most every case the councilman was forced to respond to that pressure." Tr. 1197–98. Del Bello also confirmed that the opposition of the East side councilman had been effective. All of the City's subsidized housing projects were located in the Southwest, he testified, because "councilmen wouldn't approve sites in any other areas. These were the only sites we could get approved." *Id.* at 1193.

In describing his efforts to find a scattered site, Yulish testified that "quite honestly we were looking for the most politically doable route. The first way to do that was to find a site outside of racial impaction, but not wholly on the east side, which would have been the preferred route, but we did not limit ourselves to that. We went out and looked at sites all over Yonkers." *Id.* at 865.

Yulish testified that on some of the trips he was alone, "just doing reconnaissance," that on some he was with the field staff to analyze suitability, and that others "were political excursions" in which Yulish, Scher, and on occasion Planning Director Pistone, would go and "test the political waters with the particular councilmen." *Id.* at 866–67. Pistone's testimony with respect to his dealings with Yulish (and indeed his testimony with respect to all "political" matters) was characterized by a professed inability to recollect, and an obvious unwillingness to discuss, the subject. Pistone testified that he "vaguely" recalled being asked by Yulish whether the political obstacles with respect to certain East side sites were surmountable, and that he "might have said" that they weren't surmountable. Tr. 9897–98 (Pistone).

Yulish testified that from the fall of 1971 to the spring of 1972 he spoke, at least in general terms, with all of the East side councilmen, and attended a dozen or more

---

**33.** The Administrator of the Department of Development has responsibility for coordinating and administering community planning and development functions, and for overseeing the operations of the three offices within the Department—the Planning Bureau (formerly the Planning Department), the CDA, and the Bureau of Housing and Buildings.

Prior to joining the City's Department of Development, Yulish was Deputy Director of Operations in HUD's New York Area Office. In function, he replaced Walter Webdale, who, in turn, moved to the UDC in 1971.

meetings with neighborhood associations that he described as unforgettable because of the hostility he encountered. *Id.* at 865–67; 1060–64. In addition, he testified that his efforts to secure support for an East side site were particularly hampered by the activities of what he termed the "hit squads" or "truth squads," whose active members included third ward Councilman James Walsh and Angelo Martinelli, the Republican candidate in the 1971 mayoral campaign. Tr. 899–901. According to Yulish, these groups would visit the neighborhood associations, sometimes at the same time that Yulish and other City officials did, other times separately, and vocally oppose the administration's housing program, arguing, for example, that allowing the UDC to build in Yonkers was a violation of home rule, or that the City should be trying to attract industry, not building housing. *Id.* Also involved in what Yulish characterized as the "constant attack" and attempts to keep the issue of subsidized housing "at a boiling point" was the *Yonkers Home News and Times,* a weekly paper published by Mayoral candidate Martinelli's brother. *Id.*

Soon after the November election, *The Herald Statesman,* the City's daily newspaper, published the results of a poll among new councilmembers on the issue of scattered site housing. GX 1098.70. Five were opposed; two were in favor (Councilmen Eisen and Chema from Southwest Yonkers); and six declared themselves undecided (among them newly re-elected Mayor Del Bello). Councilman Mancusi was quoted as saying he would support scattered site housing only if there were one new project in each ward. Councilman Iannacone stated that he would vote against any new housing proposal unless it had the support of the community. Councilman O'Rourke declared himself "irrevocably against scattered housing," stating that "[a]s a social proposition it is found lacking. Most of these developments will be filled with people from outside Yonkers." *Id.; see also* Tr. 1728–29 (O'Rourke).

In December of 1971, Yulish reported to HUD that he would continue his efforts to obtain approval for a subsidized housing site outside of areas of minority concentration but candidly warned that it would have to be "in an area with surmountable political obstacles outside of the areas of concentration." GX 1098.81.

Yulish testified that particular efforts were made to persuade twelfth ward Councilman James McLaughlin to support a site on Texas Avenue. McLaughlin, Yulish explained, was someone willing to talk to them, who wouldn't "immediately go to the press ... saying they are conniving in my ward to build housing and I stopped it ...," Tr. 869, and that he was also "probably the gutsiest one of all who might be willing to take the heat." *Id.* at 871.

Yulish testified that he, City Manager Scher, and McLaughlin visited the site at dusk to avoid attracting attention, and that he and Scher basically "pleaded" with McLaughlin to consider how critical the Otis expansion project was to the City, and to see that "there were larger issues here than just the political heat of a group of neighborhood people screaming and yelling for their narrow self-interest." *Id.* at 869–70. City Manager Scher, according to Yulish, "bent over backwards" to offer McLaughlin and other ward councilmen benefits such as street work or a small park that they could use to persuade their constituents to accept a subsidized housing project. Tr. 870–71.

According to Yulish, McLaughlin asked for time to "test the waters," saying he wanted to do it but knew it was "going to be hell." Tr. at 871. McLaughlin acknowledged at trial that his eventual answer to Yulish was that it would be "political suicide" to support the site. McLaughlin Dep. 98–99; *see also* Tr. 871. (Yulish).

Yulish also testified to meetings with eleventh ward Councilman John Hanney, second ward Councilman Peter Mancusi, and fifth ward Councilman Andrew O'Rourke. In each case, according to Yulish, the councilmen set up meetings with neighborhood associations, which invariably proved to be hostile, and following which the councilman deferred to the wishes of his constituents. Tr. 865–66, 871–78, 880–81.

Councilman Hanney, according to Yulish, just "sat back and watched us get crucified." *Id.* at 872.[34] Similarly, Yulish testified, Councilman Mancusi arranged an unforgettably "chaotic" meeting with the Lincoln Park Taxpayers Association regarding possible use of the old Lincoln High School site, and then asked Yulish after the meeting "What do you want me to do? I don't control them. They elect me." Tr. at 881; *see also* Tr. 865.

Yulish's encounter with Councilman O'Rourke concerned the Robin Hill Day Camp site in far Northeast Yonkers, which had been mentioned several times in recent years as a possible site for subsidized housing.[35] Yulish testified that like the other east side councilmembers, O'Rourke suggested that they "take it to the neighborhood," and that he would go by what his constituency told him. Tr. 877. Yulish testified that the meetings were "hostile" and "highly emotionally charged," and that afterwards O'Rourke simply told him that he "didn't think it would work." Tr. 877.

Former councilman O'Rourke disclaimed any recollection of the meetings with Yulish, and testified that he believed he would have remembered such meetings if they had occurred. Tr. 1688–90. He did, however, acknowledge that not long after the time during which the Robin Hill site repeatedly arose as a possible site for subsidized housing, he changed his position on the use of the site for conventional multifamily apartments, and subsequently supported (for the first and only time in his eight years on the Council) the zone change needed to permit such a use. Tr. 1680–84; 1690–93; 1726–27. O'Rourke also acknowledged that the developer's proposal contained a restrictive convenant limiting the

use of the property to luxury low-rise condominiums. Tr. 1690–93.

In the spring of 1972, Yulish invited the Regional Director of HUD's New York Area Office, S. William Green, to visit Yonkers. Yulish testified that he hoped Green would "jar the Council" into taking seriously its obligation to build housing outside of areas of racial concentration. Tr. 1139–41.

Green came to Yonkers in early April and told City officials that if the City did not build subsidized housing outside of its inner city areas, it would in effect be disqualifying itself from millions of dollars in federal redevelopment funds. Tr. 1140–50 (Yulish); GX 1207.10; 1119.132. The clear substance of Green's message, according to Yulish, was that "enough is enough in this particular area." Tr. 1147–50. Yulish asked HUD to confirm in writing that the Otis expansion NDP grant was conditioned upon approving a scattered housing site, GX 1119.130, and HUD replied that *all* of the City's urban renewal funds would be cut off unless a scattered site was approved. GX 1119.32.

Shortly after Green's visit to Yonkers in early April, City officials and the UDC took action on plans for a 324-unit subsidized housing project that had been proposed by a developer several months earlier. C–778; C–780; C–781; C–783; C–784. The site of the proposed project was the so-called RAMP site on Yonkers Avenue next to the Saw Mill River Parkway. The site was on the border of the predominantly white neighborhood known as Nodine Hill, and had been proposed for public housing a number of times in the preceding decade but strongly opposed by area residents and Ward Councilman Moczydlowski. *See* HOUSING III.B and III.D.

---

**34.** Former Councilman Hanney testified that he could not recall meeting with Yulish to discuss subsidized housing sites. Tr. 10,073–74, 10,115–16.

**35.** The Robin Hill Day Camp site was considered at least three other times between 1970 and 1972 as a site for subsidized housing—twice by the UDC (in June of 1970 and April of 1971) and once by the MHA in December of 1970 (in response to a HUD directive to consider scat-

tered sites). The MHA proposed the site to the City Council and then withdrew it without explanation a few days later. The UDC prepared a draft memorandum of understanding for the Robin Hill site, but the proposal failed to go forward for reasons that are unclear from the record. Former UDC official Gerald Lenaz had a vague recollection of the site as "developable" but presenting acquisition problems. Lenaz Dep. 29, 34, 153–155; GX 1090.55; 1090.56; 1090.58; 1097.22; 1097.25; 1098.15

Unlike previous years, however, City officials were able to win Moczydlowski's support. A major reason for their success in doing so appears to have been the fact that many of Moczydlowski's constituents were employed by Otis Elevator Company and faced the loss of their jobs if the City forfeited its federal urban renewal funds for the Otis expansion. Tr. 885–86; 1013–14 (Yulish).

Nonetheless, Moczydlowski expected, and in fact received, pressure to oppose the project from his constituents. Tr. 1018 (Yulish). Councilman Cola described the public hearings on the project as so "volatile" that you were lucky "if you remembered your name after you left there." Cola Dep. 149. Yulish testified that the crowd "filled out into the hallways" at the hearings, with action on the site deferred at least once in part because of the Council's reluctance to act "in the midst of this fury." Tr. 1022.

City officials met with Moczydlowski numerous times during the course of neighborhood and City Council meetings to "bolster his support for the project." *Id.* at 1019. Design changes were made to respond to community concerns that the access route to the project not run through a single-family area, *id.* and the councilman was not discouraged from telling his predominantly white constituents that they would be given preference in the rental of the project. Tr. 1015, 2142–45, 2148–49.

The project was unanimously approved by the City Council in June of 1972. GX 1119.100. A short time later, Councilman Moczydlowski resigned his seat on the Council and accepted an appointment as City Clerk. Councilman Cola testified that it was commonly accepted that Moczydlowski's prospects for re-election were "not too great," and that his appointment as City Clerk was no coincidence. Cola Dep. 97–98.

The Parkledge project was offered to HUD as the City's "precedent toward creating greater mobility to minority families and individuals." P–I 180–281. In fact, however, Parkledge proved to be the City's last new construction subsidized housing project for families. Although the UDC continued for a time to have access to a sizable supply of § 236 funds (despite a nationwide moratorium imposed on the program in January of 1972), and encouraged the City to "take advantage" of those available funds, no new family projects were pursued. GX 1120.59. In January of 1974, Angelo Martinelli took office as Mayor, having strongly advocated during his campaign that the City impose its own moratorium on subsidized housing, Tr. 7432–33 (Martinelli), and no additional projects were approved for a number of years. When subsidized housing development for families resumed, it was initially limited to the rehabilitation of existing structures in Southwest Yonkers. Subsequently, the City agreed, at least in theory, to support the construction of subsidized housing for families in East Yonkers, but as late as 1982, the City Council had yet to support a specific site. *See* HOUSING V *infra*.

D. *The City's Explanations for its Confinement of Subsidized Housing to the Southwest*

The City contends that its confinement of nearly 3,000 units of new subsidized housing to Southwest Yonkers during this period occurred for reasons unrelated to any racially influenced community opposition to the placement of the housing elsewhere; and it has offered a number of arguments in support of that contention.[36] Viewed in

---

[36] The City also challenges the characterization of the opposition to subsidized housing in East and Northwest Yonkers as racially influenced, contending that the opposition in fact reflected nothing more than legitimate race-neutral concerns about density, traffic, overcrowding, and zoning. As indicated earlier, however, testimony of the City's own former officials and one who worked closely with them clearly suggests otherwise. *See* HOUSING IV.B. *supra*.

In addition, we note that former Mayor Del Bello specifically addressed whether the opposition to subsidized housing that existed in certain parts of Yonkers could be characterized as simply opposition to high density, and he testified that it could not. Tr. 1421–22. Del Bello acknowledged that arguments against high density construction arose in "just about every zoning case ... dealing with residential development" whether subsidized or nonsubsidized. *Id.* at

the context of the record as a whole, the arguments are not persuasive. Some are not supported by the record. Others are of marginal relevance. Still others suggest only that many of the City officials involved with subsidized housing during this period were otherwise well-intentioned individuals who accepted the constraints imposed by the racially influenced opposition to subsidized housing in East and Northwest Yonkers, but within those constraints, attempted to do as much good as possible. Whether taken singly or collectively, the City's arguments fail to alter the conclusion compelled by the record as a whole that the confinement of subsidized housing to Southwest Yonkers was, as Mayor Del Bello himself suggested, due to the fact that Southwest sites were the only ones that the City Council would approve. Tr. 1192–93.

### 1. *Reliance on HUD's Express Directions*

The City first suggests that the decision to confine subsidized housing to the Southwest was largely HUD's. In support of that suggestion, the City points to the testimony of Walter Webdale, the City's Director of Urban Renewal from 1967 to 1971, who stated that the City's exclusive focus on the Southwest for subsidized housing was due, at least in part, to express instructions from HUD officials to build relocation housing in or near the

City's urban renewal areas. Webdale Dep. 154, 156, 165–66.

However, there is little evidence to support Webdale's suggestion that HUD instructed the City to concentrate exclusively on sites in the Southwest, and considerable evidence to the contrary. No other City official testified to having received, or heard of, such an instruction. No HUD official testified to having given such an instruction. Indeed, at least one HUD official expressly testified that the location of subsidized housing was for the locality to determine. Tr. 5612–13 (Lapadula). Nor has the City pointed to any written instruction from HUD either requiring or suggesting that only sites in and around urban renewal areas be considered.[37]

To be sure, there was a very real economic advantage to be gained from choosing urban renewal land as the site for a subsidized housing project: the land could be sold to the developer at a greatly reduced price with the federal government subsidizing much of the price reduction. Tr. 5860–63 (Lapadula). That economic advantage falls short of a formal restriction of subsidized housing to urban renewal areas. Nor could it even be argued to have operated as a *de facto* restriction since most of the City's subsidized housing projects were in fact not located within urban renewal areas.

Similarly, there is little dispute that HUD's policies over the years reflected

1422. He went on to observe, however, that there were often modifications that could be made with respect to nonsubsidized housing to make it acceptable to area residents, while with respect to subsidized housing "it was far more difficult"—a difference he ascribed to the "other factors that pertain, such as low income and minorities." *Id.*

Del Bello's assessment is well supported by the record, which shows that during the 1960's, and through the mid-1970's, there was steady construction of multifamily housing in East Yonkers, GX 1310 (more than 2,800 units in buildings of 50 units or more); that construction often occurred after zoning changes or vacancies had been granted, *see, e.g.,* P–I 185, Tr. 9824–26 (Pistone); and that some of the sites were ones for which subsidized housing had previously been proposed or discussed. *See, e.g.,* Tr. 9681, 9685, 9826 (Pistone); 2773–74

(Arcaro) GX 1225.48; 1225.49. Indeed, in at least one case during this period, consideration of the site for subsidized housing appears to have facilitated the zoning change needed to allow construction of conventional multifamily housing. *See* HOUSING IV.C.5 *supra* (the Robin Hill Day Camp site).

**37.** Instead, the City has introduced evidence tending to show that it was HUD's policy to give priority in funding to housing projects that were connected with another HUD-assisted program. C–1564; C–1565; C–1573. However, since there was no shortage of available funds during these years, this theoretical priority appears to have had no practical significance, Tr. 5805–06 (Lapaula). Nor has the City pointed to any evidence that the priority influenced its site selections.

changing views and emphases, and that at least in the mid-to-late 1960's, there was a general concern about avoiding the charge made in earlier years that urban renewal too often involved "black removal"—that is, the clearance of an area of its largely minority occupants, with no provision made for relocation housing. *See, e.g.,* Tr. 10,-692–95 (Portman). In light of this general concern, it is reasonable to assume that HUD may have encouraged the City to put some of its relocation housing near the major urban renewal areas. *Cf.* Tr. 8698–704 (Kane). There is no basis for concluding, however, that HUD directed the City to locate *all* of its relocation housing in or near urban renewal areas—particularly in light of the concern expressed by HUD as early as 1966, and steadily from mid–1970 on, about the segregative effects of concentrating all subsidized housing in the City's downtown area. *See* HOUSING III.D and IV.C.5, *supra.*

In addition, the contemporaneous actions of Webdale and other City officials further suggest that HUD did not instruct the City to confine subsidized housing to urban renewal areas or their immediate vicinity. Webdale acknowledged that he himself looked at sites that were removed from urban renewal areas, *see* Webdale Dep. 58, 137, 479, and his office at least once publicly stated that after completion of Jefferson Terrace (the first privately sponsored subsidized housing project), other projects would be built on scattered sites throughout the City. GX 1079.66. The City and the UDC also hired the firm of Candeub & Fleissig to survey the City and identify possible sites for relocation housing—a considerable waste of time and money if relocation housing were in fact limited to sites in and around urban renewal areas. Moreover, even assuming the unlikely proposition that Candeub & Fleissig somehow misconstrued its assignment, the furor that erupted when the survey was released could have been easily put to rest by announcing that HUD had directed relocation housing to be placed only in and around urban renewal areas. It seems highly unlikely that City officials would have forgone such an easy means of defusing community opposition if, in fact, it had been available to them. Yet, recalling the pattern of previous years, the only apparent mention of restricting relocation housing to urban renewal areas was made by a representative of a Northeast Yonkers neighborhood group. *See* GX 1096.65.

Finally, we note that Webdale himself appeared to retreat somewhat from his broad statements about HUD's policy on relocation housing by acknowledging later in his testimony that HUD's instructions may have related only to the Stage II urban renewal area. Webdale Dep. 499–500.

However, even if limited to the re-use of the Stage II urban renewal area, Webdale's testimony is still at variance with the record as a whole. Webdale testified that while the re-use of the Riverview urban renewal area may have been a "local determination" in theory, the decision to have at least some residential re-use in fact was made by HUD. Webdale Dep. 29–33, 588–90. According to Webdale, residential re-use was mandated by HUD so that relocation housing would be available for those displaced by the Stage II and other urban renewal projects. *Id.* at 33.

However, the statutory requirement, and HUD's general policy, was merely that relocation housing be provided *somewhere* within the locality. *See, e.g.,* Tr. 6936–37 (Schiffman). Only if it were deemed difficult or impossible to place relocation housing elsewhere would such a requirement become, in effect, a requirement that urban renewal areas be used for relocation housing. There is no question that HUD made the statutory requirement with respect to relocation housing clear to City officials. Any conclusions about the effect of that requirement in Yonkers, however, appears to have been made by City officials themselves rather than HUD.

Webdale's testimony that HUD determined the specific re-use of the Stage II urban renewal area was not supported by any other City or HUD official. Indeed, Planning Director Philip Pistone testified directly to the contrary. Tr. 9865, 10,008 (Pistone).

In addition, the record indicates that the issue of re-use was vigorously debated by City officials. GX 1057.1; C–254; C–259; C–262. The Master Plan called for commercial re-use of the area, and prior to the reduction of the project size by HUD in 1965, commercial re-use indeed had been contemplated. Planning Director Pistone maintained, as he would continue to do well into 1970 that notwithstanding the reduction in size, commercial re-use of the area was both feasible and essential to the future economic health of the City. Tr. 9864–68, 9877–78 (Pistone); 2779–80 (Arcaro).

Pistone held to his position even after wholly commercial re-use was rejected as unfeasible by several consulting reports prepared for the City in 1966 and 1967 (another curious waste of time and money if in fact the re-use had been determined by HUD). C–255; C–261; C–1546. Pistone contended that the reports were merely statistical studies prepared by people who knew little about Yonkers. C–262. Nonetheless, YURA decided in 1967 to recommend a combined commercial and residential re-use, with commercial development to the north, and residential development in the southern portion of the urban renewal area. C–262; GX 1079.

To be sure, there is evidence that the need for relocation housing figured in the re-use determination. *See, e.g.,* Tr. 9866 (Pistone). However, there is little if any indication in the contemporaneous evidence of the re-use debate that any City official (including Webdale himself) believed that as a matter of HUD policy, the urban renewal area could not be put to solely commercial use if an adequate amount of relocation housing were built elsewhere. Instead, the conclusion that appears to have been reached is that other locations were unavailable for such housing. In a June 1967 letter to Congressman Ottinger, most notably, Webdale explained that it was "absolutely imperative that some residential use remain in the Project Area, since the Relocation Program for problem families (*i.e.,* apartment construction under FHA 221(d)(3)) depends on this type of housing." GX 1087.12.

The City's prior history of site rejections suggests why those in need of subsidized housing were considered "problem families" in 1967, and the reaction to the Candeub & Fleissig survey two years later made clear that those families would remain a problem. Thus, it is scarcely surprising that immediately following the public reaction to the Candeub & Fleissig survey, City officials doubled the number of housing units previously designated for the Stage II site.[38]

In sum, there is little evidence to support the City's assertion that the decision to confine subsidized housing to the Southwest was largely HUD's. The evidence suggests, instead, a conclusion by City officials that the opposition to subsidized housing outside of Southwest Yonkers effectively transformed the requirement that adequate relocation housing be provided into a need to build as much subsidized housing as possible in the Southwest. The responsibility for that conclusion, however, clearly rests with the City and not HUD.

2. *Absence of Private Developer Proposals in the East*

The City also argues that the location of all subsidized housing projects in the Southwest during this period can, at least in part, be explained by the absence of proposals by private developers for projects in the East and Northwest—an absence the City attributes to higher land costs and lack of developer interest in East Yonkers for subsidized housing.

Like the last, this argument in essence seeks to shift the responsibility for site

---

**38.** Webdale did not contend that HUD required or encouraged the City to reach an agreement with the UDC to build 800 units of housing on the Riverview site. Indeed, no testimony by him was offered on the decision to double the number of units planned for the site. The only witness who offered any explanation for the change was Planning Director Philip Pistone, who suggested that the increase was brought about by City Manager Scher and Walter Webdale, the latter of whom believed the site should be used for relocation housing. Tr. 9878–79.

selection to another entity, and like the last, the effort is not persuasive.

The City acknowledges as it must, that the development of subsidized housing projects during this period was by no means the result of the City's passive acceptance of sites brought to it by private developers or the UDC. Beginning with Walter Webdale's arrival in the spring of 1967, the City pursued a course of active support and encouragement of privately sponsored subsidized housing projects in the Southwest. *See* HOUSING IV.C.1 *supra.* No comparable outreach was made for the Northwest or East. Indeed, as the City itself points out, its focus on the Southwest was clearly communicated to developers. *See* City's Proposed Findings of Fact at p. 56–57; *see also* Tr. 10,182–83; 10,196–97 (Bogdanoff).

In light of the City's actions, the absence of proposals by private developers for projects in the East or Northwest is unsurprising. David Bogdanoff, the builder of Jefferson Terrace and Jackson Terrace, and a participant in the abandoned proposal for family housing on what is now the site of Father Finian Sullivan Manor, testified that in general developers could build only on sites where the local government would provide assistance in acquiring the land. *Id.* at 10,140–44. Otherwise, according to Bogdanoff, there was no hope of meeting the cost limitations imposed by HUD. *Id.* Thus, the absence of developer proposals seems less a function of high land costs being unique to East and Northwest Yonkers, than the availability of City assistance being unique to the Southwest.

Similarly unpersuasive is the City's suggestion that those interested in subsidized housing were not interested in locations outside of the Southwest. Bogdanoff made clear that his decision to concentrate on Southwest sites was pragmatic. Choosing the same metaphor used by Mayor Del Bello in his testimony, Bogdanoff explained that he had little interest in "tilting at windmills." Tr. 10,144, 10,229. In Northwest and East Yonkers, Bogdanoff indicated, City support was lacking, community support was lacking, racial fears were strong, and so he decided to "build where

we ... could build," produce the housing "now and let the world catch up with this problem," and in the meantime "at least try to set an example in an area where we know the need exists and we know that we have the potential of doing it" as opposed to working on projects "that would never happen." Tr. 10,299; *see also* 10,143–45, 10,179–80, 10,224–25.

In light of Bogdanoff's own experience with the Father Finian Sullivan site, *see* HOUSING IV.C.3 *supra,* his conclusion that a project "would never happen" without community or City support seems particularly sound. And especially after the reaction to the Candeub & Fleissig survey, there could be little reasonable expectation of community or City support of a site in the East or Northwest. Thus, the absence of private developer proposals in the East or Northwest is neither surprising nor at variance with the conclusion suggested by the record as a whole. A builder's understandable reluctance to risk the loss of time and money on projects that are likely to be opposed by the community (and therefore by the City as well) says little about what the builder would have done if either community or City support had been a realistic possibility.

The City cannot participate in the creation of an atmosphere that would strongly discourage proposals for subsidized housing in East or Northwest Yonkers, and then defend the resulting concentration of subsidized housing in the Southwest on the ground that there were no proposals to put it elsewhere.

### 3. *Support for the Projects Among the Minority Community*

The City also argues that the support of the minority community for subsidized housing in Southwest Yonkers during this period precludes a finding that the City acted with segregative intent. In this regard, the City emphasizes that both the privately sponsored and UDC-sponsored projects were supported by, and in three cases even initiated by, the minority community in Southwest Yonkers.

The Messiah Baptist project was proposed and sponsored by the Messiah Baptist Church. C–539; C–5443. Waverly Arms was proposed and sponsored by the Community Memorial CME Church. C–554 through C–557. And Whitney Young Houses, one of the first-round UDC projects, was proposed and co-sponsored by the Yonkers Community Improvement Corporation (YCIC), a predominantly minority community group, and the Westchester Urban League. C–643, C–644; Gunthorpe Dep. 22; Lenaz Dep. 20–25, 66.

In addition, two of the other first-round UDC projects, the Dorado and the Frazier Homes, which were located near the Otis Elevator expansion area and designated as relocation housing for the predominantly minority residents of that area, appear to have been supported by the surrounding community, *see, e.g.,* Tr. 1346–47 (Del Bello), and there is also evidence of support among the minority community for Parkledge, the UDC project located on Yonkers Avenue, immediately west of the Saw Mill River Parkway. *See, e.g.,* Tr. 2269 (Yulish); 578–79 (Gibson); *but see* Tr. 8385–87 (Keith).

██ The City can scarcely maintain, however, that its officials believed that the minority community in Yonkers wanted *all* subsidized housing confined to the Southwest section of the City.[39] As early as 1959, minority groups had begun expressing concern about the segregative effects of locating subsidized housing in heavily minority areas, *see* HOUSING III.B *supra,* and from the mid–1960's on, there is evidence of regular and often public expression by minority and other community groups, and even by some City officials, of support for the concept of scattered-site housing, and concern about the segregative effects of concentrating the City's subsidized housing in one part of the City. In November of 1970, for example, a Southwest Yonkers community group wrote to protest the "oversaturation of low-income housing" in the area, contending that the

continued concentration of such housing there would "inevitably lead [ ] to the creating and perpetuating of ghettoes." GX 1094.50. Similarly, in April of 1972, a petition from the "residents and property owners of the Hollow" urged the City to adopt a policy of scattered-site housing, contending it was "morally right and [would], in the long run, benefit the entire city." GX 1144.11. *See also, e.g.,* GX 1074.5; 1079.7; 1081.7; 1081.8; 1093.8; 1098.86; 1119.67; 1119.81; 1119.86; 1119.136; 1144.8–.10; 1144.13; 1176.16; 1206.2; HOUSING III.D *supra.*

To be sure, there is also evidence of concern among some members of the minority community about preventing the phenomenon of "black removal." Indeed, that concern appears to have figured in the support among the Otis relocatees for the Dorado and Frazier Homes, and in the sponsorship of Whitney Young Manor in the Hollow, where there was considerable racial tension between the older, largely Slavic, millworkers who lived there and the steadily increasing number of black and hispanic residents. *See, e.g.,* Lenaz Dep. 42–43, 250–51; GX 1144.5.

But if the City seeks to characterize its selection of sites for subsidized housing as a response to the concerns of the minority community, then it was, at best, a one-sided response. Concerns about the ability to remain in Southwest Yonkers were accommodated. Concerns about having the opportunity to live elsewhere in Yonkers were not.

Moreover, as the City itself has stressed, the Southwest community, both white and minority, was faced with housing conditions that could fairly be characterized as desperate. *See, e.g.,* 1083.41. The residents of the Northwest and East could comfortably ignore the need for subsidized housing and urban renewal in Yonkers. The residents of the Southwest could not. And given the public reaction to the CAC list in 1967, the Bronx River Road sites

---

**39.** Nor, of course, is consent a justification for acting with segregative intent. We raise the issue solely to assess the City's suggestion that it was responding to legitimate community concerns about the destruction of existing neighborhoods.

that same year, and the Candeub & Fleisig survey in 1969, one could well conclude, as indeed several witnesses suggested they did, that the possibility of obtaining City Council approval for sites outside of Southwest Yonkers in the foreseeable future was remote. *See, e.g.,* Tr. 7252–53 (King); 536–40, 564–66, 573–75 (Gibson). Thus, even if the minority community had not made its support of scattered-site housing clear, there would have been little basis under the circumstances that prevailed in Yonkers for construing minority proposals or support for individual projects as an expression of preference for having all subsidized housing located in Southwest Yonkers.

No City official testified that he believed that the minority community wanted to confine subsidized housing to the Southwest. To the contrary, many City officials—including Mayor Del Bello and Walter Webdale—acknowledged their awareness of that community's desire to disperse the housing throughout the City. Tr. 1313–15 (Del Bello); Webdale Dep. 318, 488; *see also, e.g.,* Tr. 9772, 9992 (Pistone); 845–46 (Yulish). Even Gerald Lenaz, a program manager for the UDC, who met with community groups in connection with most of the first-round UDC projects, and who testified at greatest length about "black removal" concerns, acknowledged that minority groups also expressed considerable frustration at the City's refusal to approve sites outside of Southwest Yonkers. Lenaz Dep. 242–43.

Similarly, no City or UDC official suggested that the site for Parkledge was chosen over East side sites because of a belief that minorities preferred to remain in Southwest Yonkers. Nor could minority support of Parkledge reasonably be construed as such a preference. At HUD's insistence, the City had at last designated a site outside of an identifiable area of minority concentration, and it was a site that had been vigorously and successfully opposed in the past. *See* HOUSING III.B and III.D *supra.* Although the site, like all the others, was in Southwest Yonkers, and although, as CDA employee Herman Keith observed, the site was adjacent to

the heavily minority area of the Hollow, Tr. 8385–87, it unquestionably represented at least some progress. Thus, the existence of minority support is not surprising. As William Gibson, a black resident of Yonkers and member of the UDC–CAC succinctly explained, "at least we could see" the Saw Mill River Parkway from Parkledge, "and the next step might win us over." Tr. 578–79.

Far from negating the suggestion that City officials acted with segregative intent in their selection of sites for subsidized housing, the evidence concerning the position of the minority community makes clear that both the public and City officials were acutely aware of the potentially segregative or integrative effects of site selection.

### 4. *The Unsuitability of East Side Sites*

The City also contends that the various sites considered in East and Northwest Yonkers during this period were, for reasons unrelated to any racially influenced community opposition, generally not suitable for subsidized housing. According to the City, the sites listed in the Candeub & Fleissig survey, as well as the other East side sites that were considered for possible UDC projects during the HUD-mandated search for a "scattered site," presented significant problems relating to cost, zoning, topography, traffic patterns, proximity to public facilities, and various other physical planning considerations.

However, there is little persuasive evidence to suggest that any of the sites proposed outside of Southwest Yonkers were in fact rejected on the basis of planning criteria. With respect to the Candeub & Fleissig sites, for example, Planning Director Pistone testified that he "never had much of an opportunity to do anything with those sites." Tr. 9771. Nor, it would appear, did any other City official. The list was announced, successfully campaigned against by Mayoral candidate Del Bello, and promptly abandoned upon his election. *See* HOUSING IV.C.2 *supra.*

To be sure, the quality of the Candeub & Fleissig survey was roundly criticized by the City and UDC officials who testified. Walter Webdale, for example, discussed it as little more than "a catalogue of vacant land." Webdale Dep. 66; *see also* Logue Dep. 72, 74, 195 ("a buckshot thing"; did not present UDC with "an abundance of easy choices"); Tr. 1284, 1295–97 (Del Bello) (included unrealistic, foolhardy, ludicrous sites). And it may well be the case that some of the sites were in fact "ludicrous" from more than a political perspective. However, even with respect to the eleven sites selected by Pistone and others for further study—at least some of which Pistone characterized at the time as feasible—Tr. 9767–68, 9873, 9942 (Pistone), City officials appear to have simply assumed that the sites were not feasible, rather than determining whether or not they were.[40]

Similarly, although the City contends that the RAMP site "emerged" as the most feasible "scattered site," it is not apparent from the record that this process of emergence was governed by planning criteria. The single east side site formally identified to HUD as an alternative that was considered but rejected was the old Lincoln High School site—a site Planning Director Pistone characterized as suitable, but which was the subject of one of the "unforgettable" neighborhood association meetings testified to by Morton Yulish. C–802; Tr. 9896–98 (Pistone); *see* HOUSING IV.C.5 *supra*. Other east side sites were apparently considered by the UDC but not pursued for reasons unspecified in the record. When asked about various sites, Walter Webdale (who by then had moved to the UDC) stated simply that the sites the UDC pursued were those that got a positive response from the City. Webdale Dep. 661–63. He went on to acknowledge that the only such site was the RAMP site.

*Id.*[41] Thus, here too the evidence suggests a presumption rather than a determination that east side sites were unsuitable.

In the Southwest, by contrast, particularly with respect to the first-round UDC projects, there appears to have been a presumption in favor of suitability. As noted earlier, none of the new sites in the first-round projects (Whitney Young, The Dorado, and Frazier Homes) were submitted to the City Planning Board for review; nor was the decision to double the number of units for the Riverview site. Riverview I and II were approved without a firm indication of the income-mix of housing that would be put there (a curious gap for what was considered the centerpiece of the City's efforts to lure middle and upper income whites back to the Southwest). *See* HOUSING IV.D.5 *infra*. The Dorado and Frazier projects were approved without any financial feasibility study whatsoever; and when one was undertaken several months later, the donation of City-owned land (in addition to the tax abatements contemplated) was required in order to make the projects feasible. C–617. Similar City assistance was also required for Whitney Young (in the form of the donation of City owned land), C–616; for Parkledge (in the form of an after-the-fact declaration of part of the site to be an urban renewal area in order to enable a federally subsidized write-down of land costs), C–787; and for Jefferson Terrace, Messiah Baptist, and Waverly Arms (in the form of a discounted sale of land condemned or otherwise acquired by the City) GX 1079.-61a; 1083.25; 1084.21.

In addition, it is noteworthy that many of the Southwest sites were far from perfect from a physical planning perspective. For example, Jackson Terrace, Messiah Baptist, Parkledge and the Buena Vista projects all

---

**40.** The UDC appears to have been operating under a similar presumption, at least during site selection for the firstround of UDC projects. Gerald Lenaz, a project manager for the UDC at that time, testified that during the extremely small amount of time he had to look at sites before the first Memorandum of Understanding was signed in July of 1970, he basically came to the conclusion that all of East and Northwest

were, as a general proposition, not feasible for subsidized housing for reasons of site configuration and topography. Lenaz Dep. 18, 37, 38, 136, 196.

**41.** Webdale testified that he simply could not recall why the other sites were rejected. *Id.* The record as a whole is equally vague.

required variances for the absence or inadequacy of parking facilities. GX 1081.16a; 1082.32; 1083.25; Tr. 2129 (Yulish). Jackson Terrace, Messiah Baptist, and Seven Pines exceeded height restrictions and required variances on that ground. GX 1083.25; 1120.35; Tr. 10,185 (Bogdanoff). Jefferson Terrace, Jackson Terrace, Messiah Baptist, and Parkledge had topographical problems which added to construction costs. GX 1082.1; Tr. 10,185, 10,208, 10,-213 (Bogdanoff); Tr. 1031 (Yulish); Webdale Dep. 227–28. The Dorado and Frazier Homes were in areas zoned for commercial or industrial use. GX 1120.35; P–I 122–23. Whitney Young was in an area designed in the Master Plan for industrial re-use. Tr. 9822 (Pistone). Riverview I and II were in an area designated in the Master Plan for commercial reuse. Tr. 9515 (Pistone). Parkledge was located on a heavily trafficked street, was relatively far from shopping, and was served by schools considered to be overcrowded. Tr. 1031 (Yulish); 9774 (Pistone); Webdale Dep. 261–63; GX 1098.-85; *see also* GX 1060 (on the objections raised to the site by area residents in 1956). Parkledge also required a choice between routing the project's traffic through a single-family neighborhood or creating a dangerous left-turn onto Yonkers Avenue. (The latter was chosen over the objections of the City's traffic planners). Tr. 1023–26 (Yulish).

Similar and even identical problems have been offered to explain why particular sites outside of Southwest Yonkers were rejected or never seriously pursued. Yet, all of the Southwest sites described above were approved, most with little hesitation, while sites outside of Southwest Yonkers were rejected with little apparent study. Significantly, not a single City official testified that he believed there to be an absence of suitable sites for subsidized housing outside of Southwest Yonkers. Indeed, both Planning Director Philip Pistone and former Deputy Planning Director Gregory Ar-

caro testified that suitable sites were in fact available. Tr. 9749 (Pistone); 2798–800 (Arcaro). Particularly in light of the strong evidence of community opposition to sites proposed outside Southwest Yonkers, there is no basis in the record for concluding that the apparent presumption against East and Northwest sites was motivated solely (or even largely) by planning criteria.

The City has also suggested that because § 236 projects were subject to land acquisition and construction costs calculated on a per unit basis, sites in the Northwest and East were generally not feasible unless legitimate standards of acceptable density were compromised. However, the cost limitations imposed upon § 236 projects were by no means cast in stone. *See, e.g.,* Tr. 6942–46, 7078–87 (Monticciolo). The land acquisition costs for the Messiah Baptist project in Southwest Yonkers, for example, far exceeded the applicable ceiling. C–1706. Similarly, the UDC routinely exceeded § 236 cost limits, and even specifically advised the City that it had the ability to underwrite excess land acquisition costs. Tr. 853–54 (Yulish).

In addition, there is no persuasive evidence to suggest that the same techniques used to reduce land costs in Southwest Yonkers—that is, donation or below-market sale of land owned or acquired by the City, or the designation of pockets of blight as urban renewal areas—could not have been used in East and Northwest Yonkers. In fact, a survey of City-owned land was even urged by the UDC in 1971 and acknowledged to "make sense" by City Manager Seymour Scher. GX 1098.1. The technique of aggregating projects that was used to make the 28-unit Frazier Homes project feasible could also have been considered for sites owned outside of Southwest Yonkers as could the technique of combining subsidized housing with other structures such as commercial facilities or even a school (as was done with respect to Riverview I and II).[42] Moreover, it bears

---

**42.** Former UDC official Gerald Lenaz acknowledged that the technique of combining a small East side project with a larger Southwest project would work financially, but suggested that joint management of the two projects would be diffi-

cult since the proper "community tenant association rapport" could not be achieved. Lenaz Dep. 215–16. The argument is decidedly less than compelling.

emphasis that Northwest and East Yonkers were by no means exclusively single-family areas. Multiple family dwellings were prevalent and steadily increasing, *see* fn. 36 *supra,* thus making generalizations about acceptable density likely to be over-simplifications.[43]

To be sure, serious questions of policy are implicated whenever a tax abatement is granted or City land is donated or sold at a discount, and it is not inconceivable that a locality might conclude, even in the absence of community opposition, that such actions are inappropriate in particular areas of the City. However, these issues of policy appear to have been raised not by City officials, but by area residents in petitions and at emotion-filled meetings. There is no evidence of any reasoned debate of the issues among City officials.

The apparent absence of any serious consideration of East side sites is particularly noteworthy in view of the significant disadvantages of the course being followed by the City. Land that was zoned or designated for commercial or industrial use was given over instead to housing at a time when it was generally agreed that serious efforts should be made to increase the City's industrial and commercial tax base. *See, e.g.,* Tr. 2870 (Arcaro). Subsidized housing was increasingly concentrated in and around the downtown area despite warnings that it could further hinder the prospects for commercial revitalization. *See, e.g.,* Tr. 2779–82, 2865–70 (Arcaro); 9773 (Pistone); GX 1172.1; 1080.8; 1090.5; 1093.8. Yet, there is little evidence that the pros and cons of dispersing at least some of the City's subsidized housing were ever seriously considered by City officials. Not even when the failure to designate a site in East Yonkers risked the loss of the

City's badly needed urban renewal funds is there any apparent evidence that East side sites were considered beyond a preliminary testing of the "political waters."

The apparent absence of any serious consideration of specific East side sites merely reinforces the suggestion of the record as a whole that the option of putting subsidized housing in East Yonkers was not considered politically feasible.

In addition, the history of the City's § 23 Leased Housing Program provides further indication that the total confinement of subsidized housing projects to the Southwest was not the result of the universal unsuitability of East side sites. Under the § 23 program, the City rented apartments in privately owned buildings and then, using federal rent subsidies, sublet them to low-income tenants.

As City officials acknowledged in descriptions of the program, § 23 housing was specifically intended to promote dispersal of low-income housing throughout a community. P–I 160–36, P–I 160–43. Indeed, Walter Webdale expressly represented to HUD in 1971 that the § 23 program was being used to provide relocation housing "throughout the City." P–I 160–31.

Yet, the record indicates that from the inception of the program in 1969 through its phasing out in the mid-1970's, all, or virtually all, of the leased units were located in Southwest Yonkers buildings. P–I 160–26; P–I 180–249; GX 1176.24; 1176.28; Tr. 2895–97 (Arcaro). The record also indicates that the § 23 tenants were overwhelmingly minority, C–405; P–I 161; GX 1114.6; that when the possibility of renting units in buildings in heavily white areas was first raised at a CAC meeting in 1967,

---

**43.** The City has cited a December, 1971 letter from Morton Yulish to HUD as evidence that high land costs in East Yonkers posed a significant obstacle to construction. C–633. However, the letter merely stresses the need for HUD's willingness to provide rapid financial assistance should a site become available since

> it would be embarrassing to all concerned if we had an opportunity to reverse a trend and let it fall by the wayside because the bureaucracy stood in our way or funds were not made available.

*Id.* Such a statement scarcely suggests that high land costs had been the chief obstacle to the development of subsidized housing in East Yonkers. And an earlier part of the letter, which has been quoted above, *see* HOUSING IV.C.5 *supra,* makes clear that it was not. The letter is the same one in which Yulish advised HUD that the site would have to be in "an area with surmountable political obstacles." *Id.*

"it was questioned whether realtors and 'city fathers' would approve," GX 1079.6; and that the City in fact agreed to consult with each councilmember before using § 23 housing in his or her ward. GX 1176.17.

Thus, even with respect to a subsidized housing program which the City claimed to be using for the dispersal of low-income housing, and which created few, if any, of the problems traditionally cited as grounds for opposing subsidized housing in the East (zoning, increased density, traffic congestion, etc.), *see* P–I 160–43, the housing was once again essentially confined to Southwest Yonkers. The result is difficult to explain except by reference to the race of the tenants.[44]

### 5. *Pursuit of a Legitimate Planning Strategy to Use Subsidized Housing to Rebuild the Southwest*

The argument most vigorously pressed by the City is that the confinement of subsidized housing sites to Southwest Yonkers during this period reflected a legitimate planning strategy to use subsidized housing to revitalize that section of the City. Subsidized housing was used, according to the City, as a "seed investment" to encourage private-market residential and commercial development in the Southwest, and to encourage a return of middle and upper income whites to the area.

The overall failure of that strategy cannot seriously be disputed. Seven of the eight privately sponsored subsidized housing projects rented up, and remained, heavily minority, with five of the seven having an initial minority tenancy in excess of 80%. C–1650.[45] Nor did the UDC-sponsored projects fare better. *Id.* Indeed,

when Riverview I and II opened in 1975, large numbers of units were kept vacant, and large numbers of minority applicants kept waiting, while unsuccessful efforts were made to attract whites to the projects. That practice eventually led to a complaint filed by the NAACP and a consent decree altering the rental policies. Although efforts to attract whites continued, Riverview became and remained, predominantly minority. C–1650. In addition, the concentration of subsidized housing in Southwest Yonkers is widely viewed to have seriously hindered, rather than helped, the economic revitalization of the area. *See, e.g.,* Tr. 9773 (Pistone); 7688 (Martinelli).

The City contends, however, that its strategy was both reasonable (if unsuccessful) and unrelated to any racially influenced opposition to the placement of subsidized housing elsewhere. In support of its contention, the City points to the testimony of David Portman, its expert witness on urban planning, and to the existence of the City's Community Renewal Plan, a report issued in June of 1970.

Dr. Portman testified that under then-prevailing planning standards it was reasonable for the City to place relocation housing in or near urban renewal areas and to attempt to use subsidized housing to upgrade the neighborhood and attract commercial and private residential development. Tr. 10,207–10, 10,714–20. Dr. Portman disagreed with the opinion of Paul Davidoff, the government's expert, that the concentration of subsidized housing in the Southwest stigmatized the area (thus discouraging private residential and commercial development), and suggested that in any case, the failure to reinvest would have

---

**44.** The City contends that it made a race-neutral and legitimate decision to use the Section 23 program to enable rehabilitation of buildings in Southeast Yonkers. At minimum, however, such a use represents another example of the City's consistent choice of the segregative alternative in favor of the integrative with respect to subsidized housing. Moreover, in light of the City's representation to HUD about its use of the program, and its recognition of the program's intended purpose of encouraging dispersal of subsidized housing, the City's choice would appear to be a fully conscious one.

**45.** The eighth project is Highland Terrace, a 96-unit cooperative built in 1968 and granted a 90% tax abatement on the condition that ten of its units be leased to the City for relocation housing—a quid pro quo the City apparently never utilized. C–456; GX 1105.11. The racial composition of Highland Terrace cannot be established from the record since the figures offered in evidence appear to relate to a building that is not at issue in this case. C–1650.

been perceived as a public abandonment of the Southwest, which would have had an even greater stigmatizing effect. *Id.*

However, Dr. Portman subsequently acknowledged that avoiding the appearance of abandonment did not require that *all* subsidized housing be built in the Southwest, Tr. 10,727–28, 10,744, and that it also would have been reasonable to pursue a middle ground—that is, to put some subsidized housing in the Southwest and some elsewhere. While Dr. Portman declined to express an opinion on whether that alternative would have been preferable, he did acknowledge that as a planner he "probably" would have presented the alternative to the City as something to consider. *Id.* Dr. Portman also subsequently acknowledged that it *would* have been preferable if the City's "seed investment" in the Southwest had not been largely limited to subsidized housing, but had included more in the way of arterial widening and other physical improvements. Tr. 10,834–37.

Dr. Portman offered no opinion on whether the City's confinement of all subsidized housing to the Southwest was in fact related to the strong opposition to subsidized housing that was evident in Northwest and East Yonkers. Nor, in light of his concessions about the alternatives available to the City, does his testimony offer any significant support for a conclusion that the two were, in fact, unrelated.

The second item emphasized by the City—its Community Renewal Plan ("CRP")—was prepared as part of the City's Community Renewal Program, a federally funded study "to measure the intensity of community problems which affect the quality of life in Yonkers and to set forth a systematic program for their elimination or reduction." C–337 at 26601.

Plans for undertaking a Community Renewal Program in Yonkers began in March of 1966, and the following summer YURA Director Walter Webdale hired Patrick Kane and his consulting firm, KRS Associates, to assist in the project. C–325; C–328; Tr. 8677 (Kane). KRS was made responsible for project coordination, the physical planning aspects of the study, and the preparation of the CRP. C–337.

The CRP set forth in general terms a long-range program for the redevelopment of the Southwest and a more specific short-range program for the years 1970 through 1975. The recommendations in the short-range program included the use of federal funds to construct subsidized housing in Southwest Yonkers, and the use of the "checkerboard strategy" to maintain an adequate supply of relocation housing. *Id.;* Tr. 8707–08 (Kane).[46]

However, the circumstances of the Plan's preparation undermine its significance as support for the contention that the City's activities during these years were unaffected by racially influenced opposition to the placement of subsidized housing outside Southwest Yonkers. Patrick Kane testified that in formulating the plan he met with City officials and Yonkers residents extensively and learned, *inter alia,* of the City's urban renewal and subsidized housing history, of the "stalemate" that had been created by the lack of relocation housing, and most significantly, of the concerns that existed in East Yonkers with respect to potential change of the "character" of the neighborhood—concerns that Kane understood to include the possibility of "racial alterations of the homogeneous composition of the community." Tr. 8680–81,

**46.** The City has emphasized that most of the sites approved during this period are specifically listed in the CRP. This is scarcely surprising, however, since by the time the CRP was published in June of 1970, the City was already involved in the planning of fifteen of the period's seventeen projects. (The remaining two—Parkledge and Cromwell Towers—are not listed in the CRP.)

Clearly, the relevance of the CRP lies not in the fact that it summarized and sought to explain the City's current urban renewal and subsidized housing activities, but rather in whatever role its principal architect, Patrick Kane, had in guiding those activities, and whether that guidance (if any) suggests that the confinement of subsidized housing to Southwest Yonkers during this period occurred for reasons unrelated to racially influenced opposition to the placement of the housing elsewhere.

8689–91, 8709–14, 8734, 8787, 8802–03, 8910 (Kane).

Kane testified that he felt "compelled by law and conscience" to disregard the racially influenced fears of East Yonkers residents. Tr. 8910. However, he also acknowledged that those fears made selection of subsidized housing sites in East Yonkers "all but impossible." Tr. 8803. Kane did not recommend the impossible. Instead, he left the question of the racial homogeneity of East Yonkers to another day, Tr. 8706, 8721–22, and focused instead on Southwest Yonkers. Tr. 8737. As a result, while the CRP may suggest that City officials were not entirely alone in their perception of political realities in Yonkers, it does not suggest that the City's actions with respect to subsidized housing were not based, at least in significant part, upon that perception.

Moreover, it is not apparent from the record that Kane's recommendations carried any significant weight with City officials. While there is evidence showing that Kane was in fact involved in a number of the City's planning activities between 1967 and 1970, the various City officials who testified about site selection for subsidized housing during those years did not suggest that the selections were made in reliance upon Kane's advice. Indeed, Walter Webdale dismissed the entire Community Renewal Program as being of little importance to the City's planning efforts, explaining that "[i]t was formally put together, but there wasn't that much cooperation in the City to make it really function as it was designed to function." Webdale Dep. 381–82; *see also* GX 1088.28.[47]

In general, the testimony of the City officials who were closely involved with subsidized housing and urban renewal during these years contains little to suggest that the total confinement of subsidized housing to the Southwest was the result of an affirmative plan to use subsidized housing to revitalize the area. Walter Webdale

stated flatly that YURA went into the subsidized housing business only because the MHA had failed to provide the necessary relocation housing for the City's urban renewal projects. Webdale Dep. 74–75; 241; 592. And apart from his unsupported suggestion that he was compelled by HUD to limit the agency's housing activities to urban renewal areas, *see* HOUSING IV.D.1 *supra*, Webdale's explanation for the confinement of subsidized housing to the Southwest was simply that he believed a "two for one" approach which combined subsidized housing and redevelopment "was the prudent and wise thing to do." Webdale Dep. 244. The respect in which it was "prudent and wise" is suggested by Webdale's further acknowledgement that the public's attitude toward subsidized housing was a "significant barrier" to the City's ability to provide relocation housing, and that he had heard various councilmen say that they wouldn't survive politically if they supported subsidized housing projects in their wards. Webdale Dep. 484–85, 562.

In the same vein, the testimony of Mayor Del Bello conveys primarily an awareness of the urgency of the need for subsidized housing, and of the limitations imposed by community opposition. Although by the time Del Bello took office in January of 1970 there had been some progress made toward removing the relocation "roadblock" to the City's Stage II urban renewal project, the need for subsidized housing as a relocation resource remained acute. In addition to Stage II, the planned clearance for the Otis expansion was estimated to require the relocation of some 1,000 families, and there were other projects in the works as well. Tr. 1326–30 (Del Bello); 835–37 (Yulish). Moreover, as Mayor Del Bello explained, the City "had people living in desperate, horrible conditions," and he contended that "the best thing [they] could do as public officials was to get them in safe, decent standard housing." Tr. 1214–15; *see also* Tr. 834 (Yulish); 8707 (Kane);

---

**47.** At least on one significant point, the City appears to have rejected the advice of Kane, who testified that Riverview I and II were "not consistent with the objections of the CRP" since they contained only subsidized housing rather than the combination of market rate and subsidized housing that would be required to attract a desirable mix of tenants. Tr. 8773–74, 8863.

Lenaz Dep. 18, 23, 37 (describing "tremendous sense of urgency" communicated by the Del Bello administration to the UDC in early 1970).

Although Del Bello testified that subsidized housing was intended to play a role in the City's redevelopment strategy by stopping the spread of blight in the Southwest, Tr. 1326, he did not suggest that it was for that reason that subsidized housing was confined to the Southwest. To the contrary, as noted earlier, Del Bello acknowledged that the reason sites in the Southwest were the only ones chosen was that "councilmen wouldn't approve sites in any other areas." Tr. 1193.

Also noteworthy, as suggested earlier, is the apparent absence of discussion or debate among City officials about the proper location of relocation housing. Instead, there is only evidence of off-hand remarks which suggest that at least for the time being, discussion was considered unnecessary. At a 1971 CAC meeting, for example, in the course of a discussion about the newly opened Jefferson Terrace, it was suggested that the apparent success of the project be publicized so as to "produce a greater understanding of how the § 236 program works and perhaps help to alleviate some of the opposition to locating these buildings in North and East Yonkers." GX 1079.63. Similarly, at a City Council hearing held that same year, one of the sponsors of Jackson Terrace successfully urged a reluctant City Council to grant the project several variances, arguing that "in light of the announcement of the Federal Authority, in regard to scattered site housing, which, I presume, will tie up this Council for some time in its dilemma, Jackson Terrace may be the only source of housing for some time to come." GX 1082.32; *see also* GX 1090.5; 1108.3; 1189.1.

Particularly conspicuous is the absence of any formal discussion among City officials or with the public about the selection of sites for the 1,200 units of subsidized housing provided for in the City's first Memorandum of Understanding with the UDC. Nor can that absence be explained by a lack of issues worthy of discussion. To be sure, the agreement offered a massive supply of relocation housing, the need for which few would have disputed. However, there was reason to question whether all of that badly needed relocation housing belonged in and around the downtown area. The agreement added 1,200 subsidized units to more than 500 also in progress for an area that was already considered by the City's Planning Director to be overconcentrated with subsidized housing. GX 1090.5; GX 1093.8; Tr. 2779–82, 2865–70 (Arcaro); 9773 (Pistone). In addition, the Whitney Young site was in an area designed in the Master Plan for industrial re-use and was considered by Planning Director Pistone to be an "excellent" industrial site. Tr. 9822. Had he been consulted about the site, Pistone testified, he would have opposed it on that ground. *Id.* Similarly, the sites for the Dorado and Frazier Arms were in areas designated for commercial and industrial re-use, and one of the sites had been rejected by HUD a few years earlier on the ground that it was unsuitable for residential use. C–583.

In addition, while at least some City officials may have considered the rejection of wholly commercial re-use for the Stage II urban renewal area long since settled (although Pistone testified he attempted to persuade newly elected Mayor Del Bello to reconsider the issue, Tr. 9877), it is nonetheless peculiar that the decision to abandon previous plans for a half-commercial re-use, and instead double the amount of housing, was made without any apparent formal or public discussion. The only apparent public debate of the decision came several years later in 1972 when members of the Yonkers Economic Development Corporation attempted to prevent construction of the 343-unit Riverview II, proposing instead a commercial "superblock". Cola Dep. 38, 42. By that time, however, the City was either unwilling or unable to reconsider plans for the area.

Equally deserving of discussion was the reasonableness of expecting Riverview to lure middle-income whites back to the Southwest. The City points to the success of Phillipse Towers, the Mitchell-Lama project just across the street from River-

view, as reason for optimism about Riverview's own chances of success. And in fact, Phillipse Towers was, at that time, widely viewed as a well-integrated and well-managed complex, which had exerted a stabilizing influence on the neighborhood.

However, the circumstances of Riverview's construction were clearly different. It was to be part of a large infusion of subsidized housing in and around the downtown area (500 privately sponsored units and 1,200 UDC-sponsored units), and a substantial minority tenancy for that subsidized housing was virtually certain. See, e.g., Webdale Dep. 54–55. Indeed, a UDC memorandum prepared along with the draft agreement in April of 1970 described the first round UDC projects as helping to provide relocation housing for the nearly 1,000 black families living in substandard housing in the general area. GX 1088.8. Yet, there is no evidence of any formal or public discussion about the possible effect of these circumstances on Riverview's ability to attract white tenants.[48]

Moreover, Phillipse Towers was a middle-income project while Riverview was, at the time of Council approval, partly low-income and mostly undetermined. The July 1970 Memorandum of Understanding called for a mix of 20% low income, 10% low income elderly, and 70% to be "primarily" middle income with subsequent market studies to determine the percentage of moderate income and conventional units, GX 1088.12. However, a UDC marketability study completed in April had already determined conventional units to be "completely unmarketable" and middle-income units unmarketable on any significant scale. C–606. Yet, there is no evidence of any discussions among City officials about the wisdom of approving a project without a firmer indication of the type of housing that would be put there, nor evidence of any studies or discussions about the effect of changes in

income mix on the likely tenancy. Instead, as noted earlier, the UDC agreement was simply presented to the YURA Board and approved without apparent debate, and approved by the City Council the following day. See HOUSING IV.C.2 supra.

We do not find, as plaintiffs have suggested, that these circumstances indicate that the City had no intention of attempting to attract an integrated tenancy to any of the projects, or that it had no genuine hope (however ill-founded) of successfully doing so. There is credible evidence that efforts were made (apart from the practices that gave rise to the NAACP complaint), and that hope did in fact exist for creating something other than an "unsalvageable ghetto." GX 1978.32; see, e.g., Tr. 10,157–59, 10,182–83, 10,196–97 (Bogdanoff).

However, a policy of excluding minorities from all areas of a city except one cannot be justified by attempts to encourage integration in the remaining area, see, e.g., Gautreaux v. Chicago Housing Authority, supra, 296 F.Supp. at 914, and it is clear that the City's actions with respect to subsidized housing during these years were motivated, at least in part, by such a policy. The circumstances under which the City acted, taken together with the testimony of its own former officials, permit little doubt that the role which subsidized housing came to play in Southwest Yonkers during these years was, in significant part, the result of perceived necessity—due to racially influenced community opposition to the placement of the housing elsewhere—rather than nondiscriminatory design.

Our conclusion in this regard is reinforced by the circumstances leading up to the City's approval of the RAMP site in order to satisfy HUD's requirement that a "scattered" housing site be approved. On the record before us, the selection of the RAMP site cannot persuasively be ex-

---

**48.** The only evidence of discussion of these issues among City officials is a conversation vaguely recalled by Planning Director Philip Pistone between himself and City Manager Scher, which occurred at some point before final approval of the Memorandum of Understanding. Tr. 9884–85, 10,022. According to Pistone,

Scher asked him whether he thought Riverview was likely to be successful in attracting middle-income whites back to that area of Yonkers. Pistone replied that once the families left, they were unlikely to return. Scher agreed, but said the City should try nonetheless. Id.

plained as part of a strategy to rebuild the Southwest, nor as the result of the unavailability of East side sites, but only as an indication of the extreme degree to which community support (and therefore City Council support) was lacking for the placement of housing equated with minorities in East Yonkers.

## V. THE CITY'S ACTIVITIES UNDER THE HOUSING AND COMMUNITY DEVELOPMENT ACT OF 1974

In the years following the Riverview period, in response to continuing federal pressure, the City's planners made several attempts to promote at least some dispersion of subsidized housing in Yonkers. The discriminatory pattern of previous years continued, however, and at virtually every turn, their efforts were opposed by the City Council. The result has been the continued concentration of all subsidized housing for families, and virtually all subsidized housing for senior citizens, in Southwest Yonkers.

### A. *Subsidized Housing Under the Housing and Community Development Act of 1974*

With the enactment of the Housing and Community Development Act of 1974 (HCDA), the major federal urban renewal programs were replaced by the Community Development Block Grant (CDBG) program, under which a community may apply for annual block grants to be used for community development activities such as slum clearance and infrastructure improvement. Among the requirements for CDBG eligibility is the development and approval by HUD of a Housing Assistance Plan (HAP) for the community. The HAP surveys the housing conditions in the community; describes the housing needs of lower income households, and specifies the type and location of housing assistance to be provided. One of the goals of the HCDA is to promote dispersal of subsidized housing opportunities (particularly for minorities), and one of the criteria by which a HAP is judged is the extent to which it furthers that goal. *See, e.g.,* Tr. 9802, 9934–35 (Pistone); 10,465–66 (Yost); 6335–36 (Diamond). A grantee's performance under the CDBG program is measured, in part, by the efforts made toward providing the housing assistance specified in the HAP.

The primary program for housing assistance under the HCDA is the Section 8 Program, under which rental subsidies are paid to a landlord on behalf of eligible tenants. The Section 8 program is subdivided into several categories: new construction, substantial rehabilitation, moderate rehabilitation, and existing housing. Under the new construction and rehabilitation programs, development proposals are made directly to HUD in response to the publication of a Notice of Funding Availability (NOFA). The local government is then invited to review the proposal for consistency with its HAP and to offer any other comments it may have. The review is generally known as a § 213(a) review (a reference to the provision of the HCDA which requires it).

Under the Section 8 Existing Program, a local housing agency applies to HUD (again in response to a NOFA) for a certain number of Section 8 Existing Certificates for distribution to eligible families or individuals. Certificate holders can then use the certificates to obtain an apartment from a landlord willing to accept the certificate in lieu of a designated portion of the rent, which is then paid by the local housing authority on behalf of the certificate holder.

### B. *The Section 8 Existing Program*

In March of 1975, the City submitted its first Housing Assistance Plan (HAP). C–1086. The Year I (1975–76) HAP identified—as would all subsequent HAPs in evidence—significant needs for subsidized housing among both the senior citizen and family populations in Yonkers. *Id.;* C–1087 through C–1091. The basic strategy proposed in the Year I HAP to work toward meeting those needs was new construction of subsidized housing for senior citizens in East Yonkers; rehabilitation of existing structures for families primarily in Southwest Yonkers; and the use of Section

8 Existing Certificates by both families and senior citizens. C–1086. With respect to the lattermost, the Year I HAP called for the City to apply for 100 Section 8 Existing Certificates to be split equally among senior citizens and families.

As City officials acknowledged at trial, the fifty Section 8 Existing Certificates represented the sole aspect of the Year I HAP that offered any significant chance of dispersing at least some subsidized housing for families into the overwhelmingly white neighborhoods of East and Northwest Yonkers. Tr. 10,430–36 (Yost); 7348 (Yodice). It was also one of the first aspects of the HAP to be rejected by the City Council. That rejection, together with the City's subsequent actions with respect to the Section 8 Existing Program, provide what may be the single most persuasive indication of the degree to which segregative intent has figured in the City's subsidized housing activities.

In August of 1975, in response to word from HUD that 100 Section 8 Certificates had been set aside for Yonkers, City Manager J. Emmet Casey submitted the City's application for the certificates. GX 1164. Several weeks later, on September 2, 1975, Casey sent a memorandum to the Mayor and the City Council requesting official authorization for the City to participate in the program, and urging the Council to act expeditiously so that HUD would not reallocate the certificates to another community. GX 1104.7. (The Mayor was now Angelo Martinelli, who had defeated Mayor Del Bello in the 1973 election, and who had campaigned as an opponent of any additional construction of subsidized housing in Yonkers. Tr. 7432–33.)

On September 10, 1975, the City Council met, and on the motion of Councilmember Walsh, referred the matter to committee. GX 1104.9. Alphons Yost, who had succeeded Morton Yulish as the Administrator of DOD, and who also headed the Yonkers Community Development Agency (formerly the Yonkers Urban Renewal Agency), testified at trial that it was apparent to him at the September 10th Council meeting that the Council would not authorize the City's participation in the Section 8 Existing Pro-

gram. Tr. 10,521–22. Nonetheless, in the City's § 213(a) review submitted the following month, Casey told HUD that the application for fifty senior citizen and 50 family certificates was consistent with the City's HAP and "fully supported by the City administration." GX 1104.10.

On November 14, 1975, HUD notified Casey that the City's Section 8 Existing application had been conditionally approved subject to the receipt within ten days of a resolution by the "governing body of the Agency authorizing participation in the Section 8 program." GX 1104.15. Yost asked the CDA's attorney whether a resolution from the CDA Board would suffice, but was told that it would not. GX 1104.-16; 1104.17.

Two months later, on January 21, 1976, Yost reported in a memorandum to City Manager Casey that HUD had told him that unless the City Council passed a resolution authorizing the City's participation in the program on or before the first week of February, the 100 certificates would "in all probability" be reallocated to another community. GX 1104.17. Yost also noted that the "Council [had] been agonizing over this aspect of our Housing Assistance Plan for some time and [had] not come to a conclusion as to their dispositional desires." *Id.*

On January 27, 1976, the City Council met and voted seven to six against authorizing the City to participate in the Section 8 Existing Program. Mayor Martinelli who attended the meeting and voted against the program, testified that he had no recollection of any discussion that may have preceded the vote. Tr. 7491–96 (Martinelli). Alphons Yost likewise professed to recall little about the Council's position on the issue. Tr. 10,522–32.

Others, however, testified that the Council's opposition was based on the geographic mobility the program would give to those of low and moderate income. City planner Gregory Arcaro, for example, testified that while there was little public discussion of the program, there were numerous informal discussions with City officials, and that he was asked more than once whether it

was true that the City would have no control over where the certificates were used. Tr. 2848–57. People would ask, Arcaro explained, whether the certificate holders could in fact "go anywhere," including buildings in East Yonkers. *Id.* Arcaro testified that he was told by Yost and the City Manager that some councilmembers opposed the program because of its mobility, but that he could recall little specific discussion as to why, "other than what we probably knew in our heads." Tr. 2855–56; *see also* Tr. 10,325 (Hanney). Herman Keith, a CDA employee who also attended the January 27th meeting, confirmed that the basis of the objections to the program was that the certificate holders could "seek housing anywhere in the City." Tr. 8415–16. Keith also testified that he believed that those who objected to the program were concerned that minorities would move to East Yonkers. *Id.*

Also in attendance at the January 27th meeting was Winston Ross, then president of the Yonkers Branch of the NAACP, who spoke in favor of the program. Tr. 3833–34. Ross testified that in the discussion preceding the vote, a number of councilmembers stated that they were opposed to the use of Section 8 Existing Certificates for families in their wards, and that at least one opposing councilmember likened the program to scattered site housing. Tr. 3834–36. Five of the six councilmembers who joined Mayor Martinelli in voting against the program represented wards that were totally or partly east of the Saw Mill River Parkway. Tr. 3836; GX 1104.3.

Two days after the vote, Ross sent a letter to each of the councilmembers who had voted against the Section 8 Existing Program urging them to reconsider. GX 1104.3. The letter stated that:

> In a time when there is a desperate need for adequate and safe housing for the elderly and low-income families to reject a program that doesn't cost the City of Yonkers and provides some relief for a number of citizens shows an insensitivity to their needs.
>
> Section 8 Existing Housing Program would aid families in finding decent housing without affecting the city's tax base

through tax abatements as in other subsidized programs. To raise the issue of "scatter site housing" when speaking of 100 units equally split between low-income and elderly Yonkers residents shows a lack of understanding of housing concepts and smacks of racism.

*Id.*

A memorandum sent the same day from Alphons Yost to City Manager Casey (with copies to the Mayor and various councilmembers and other City officials) reported that on the day after the Council vote, Yost told Jed Abrams, a HUD official, that he "was having difficulty in getting the administration to go along with" the Section 8 Existing Program as outlined in the Year I HAP. GX 1104.19. Yost told Abrams that since the HAP "placed heavy emphasis on senior citizen domiciles through new construction and since no new construction has been started under Section 8, due to a lack of mortgage monies, we felt that we must therefore change the specified needs" to 100 Section 8 Existing Certificates for senior citizens. *Id.*

Yost reported that Abrams' initial reaction was that the change "might require a major revision to the plan necessitating a long term reviewing process," but that after consultation with his superiors, Abrams suggested an "alternate solution." Yost's memorandum stated that:

> The alternate solution suggested was one in which the City would request, through Council resolution, that the 100 units for existing housing in the first year's application be allocated to senior citizens only and with a back-off alternative being that the 50 units presently specified in the HAP for senior citizens be authorized with no action to be taken on the 50 units earmarked for families.

*Id.* Yost observed that "with these conditions the councilmatic objections should be somewhat abated," and urged that since the issue "turned into a major discussion item" at the last Council meeting, a committee meeting be held "as soon as possible." *Id.*

But despite HUD's apparent willingness to accommodate "councilmatic objections" to the use of the Section 8 Existing Program for families, Yost expressed concern about the possible consequences of the City's actions. The following month, in February of 1976, Yost wrote a memorandum to Deputy City Manager Vincent Castaldo, enclosing a recent national housing newsletter which he described as "clearly indicat[ing] how seriously HUD considers the dictates of the" HCDA and "also reflect[ing] HUD's concern [that] low income housing [not be limited] to sub-standard areas." GX 1104.21. The memorandum then went on to recount the Council's rejection of the Section 8 Existing Program, and warned that "[i]f this matter is not resolved in a way that HUD feels comfortable with we would be putting all subsequent CD monies in jeopardy." *Id.*

Castaldo distributed copies of Yost's memorandum to Mayor Martinelli and City councilmembers. P–I 171–19. Castaldo's covering memorandum stated simply that:

> I am transmitting herewith copy of letter from Department of Development Director, Al Yost, concerning Section 8 Housing and how it may affect the block grant to the Community Development Agency.
>
> As soon as we have received final information from HUD, I will advise you further.

*Id.*

By mid-March of 1976, the Council had not taken any further action with respect to the Section 8 Existing Program, nor, apparently, had HUD acted upon a written request by Yost for "HUD's official response" to the City's plan to alter its Section 8 Existing application from fifty senior citizens and fifty family certificates to 100 senior citizen certificates. GX 1104.20. On March 19, 1976, Yost wrote a memorandum to Castaldo (who had since become City Manager) outlining the results of some thinking he had done about the Sec-

tion 8 Existing Program "and the qualms of certain of the Council relating thereto." GX 1104.23.

Yost's memorandum began by noting that "the Section 8 Existing Program does not require that people be moved from one place to another, so there should be no concern on that score on the part of the Council." *Id.* That fact, Yost suggested, plus HUD's apparent willingness to convert all the Section 8 Existing Certificates called for in the Year I HAP to certificates for senior citizens "should be sufficient for councilmatic approval." *Id.*

Noting, however, that the Council "unfortunately" had yet to give that approval, Yost suggested another means of "sweeten[ing] the pot." *Id.* He suggested that "each councilman be allowed to recommend to the Agency eight worthy individuals in their respective Wards who qualify for the Section 8 Existing Program and the Agency would give those people priority such that each Councilman could get full credit for whatever his involvement turns out to be." *Id.* "With this kind of a program," Yost concluded, "I feel that even the allocation of fifty family and fifty elderly units becomes viable since the apportionment of each would be made by the councilman involved." *Id.*

On April 27, 1976, eight months after the City's original application for Section 8 Existing Certificates, the City Council voted nine to three to authorize the City to apply for 100 Section 8 Existing Certificates for use by senior citizens. GX 1104.26. On May 12, 1976, HUD notified the City that it would be awarded 50 certificates for senior citizens (the amount originally provided for in the Year I HAP). GX 1104.31.

The City's Year II and Year III applications for the Section 8 Existing Program were likewise limited to certificates for senior citizens.[49] Not until 1978 did the City apply for any Section 8 Existing Certifi-

---

**49.** On April 30, 1976 (while the Year I application was still pending), the City submitted its Year II application for an additional 100 certificates for senior citizens, GX 1104.29. The application was approved in September of that year.

C–1299. In April of 1977, the City submitted its Year III application for an additional 45 certificates for senior citizens; none was awarded. C–1307.

cates for families. And even when it finally did so, relatively few were put into use, and fewer still put into use outside of Southwest Yonkers. As of February 1982, only thirty-six certificates for families were in use (out of at least 120 awarded to the City), and only three were in use outside of Southwest Yonkers. GX 1225.38.[50]

In addition, not a single certificate held by a minority member (whether family or senior citizen) was in use outside of Southwest Yonkers. *Id.* All twenty-seven of the minority holders of family certificates lived in Southwest Yonkers, as did all forty-three of the minority holders of certificates for senior citizens. In contrast, twenty-four certificates were in use by whites outside Southwest Yonkers. *Id.*

The City contends, and indeed has represented to HUD, that it has made significant efforts to encourage landlords in non-minority areas to participate in the Section 8 Existing Program. *See, e.g.,* Tr. 6715–17 (Forman). However, there is no evidence in the record of any significant outreach to East Yonkers landlords.[51] Fred Stillman, for example, who owned or managed a number of apartment buildings in East Yonkers and who was well known to City officials because of his involvement in the management of Seven Pines and Riverview II, testified that he has never been approached by City officials about possible participation in the Section 8 Existing Program. Stillman Dep. 6–8, 127. In addition, and more significantly, a City official acknowledged at trial that a list of contacts presented to HUD as evidence of the City's efforts to expand the use of the Section 8 Existing program by minorities in non-minority areas consisted of a list of buildings in Southwest Yonkers. Tr. 7391–93 (Yodice); *see also* Tr. 6715–17 (Forman).

Moreover, the CDA's general record of administering the Section 8 Existing Program was so poor that HUD made repeated efforts from 1979 to 1981 to persuade the City to transfer the program (together with what remained of the Section 23 Leased Housing program) to the MHA, even at one point conditioning an award of Section 8 certificates upon the transfer. GX 1104.70, *see also* GX 1104.68, GX 1104.72; Tr. 7142–43 (Abrams). Yet, the City strenuously and successfully resisted the transfer, arguing to HUD, *inter alia,* that the CDA was "more responsive to the elected officials of the City." GX 1125.8, at 32,234; *see also* GX 1125.4 through GX 1125.7.

City officials were well aware of the possible consequences of failing to comply with HUD's wishes. CDA official Joseph Pacitto warned the City Manager in 1979 that if the transfer was not effected the City was risking the loss of a significant amount of future federal housing assistance, a loss he contended would be

> tragic and unfortunate. When you consider that there is a waiting list of over 800 people requiring Section 8 Existing Housing assistance, we will be denying these people what they deserve and desperately need.

GX 1125.5. Yet, the City Council defeated the legislation necessary to effect the transfer by a vote of ten to two, GX 1125.7, and even subsequently passed a second resolution affirmatively opposing the transfer. GX 1125.8, at 32,222.

In addition, when the MHA itself applied to HUD in 1981 for 105 Section 8 Existing Certificates (fifty-seven for families; forty-eight for senior citizens), the City strongly objected. GX 1125.9 through GX 1125.13. The City Council passed a resolution declaring that the MHA's authority to provide

---

**50.** The number of family certificates awarded but unused may in fact be even higher. *Compare* Tr. 7332–35 (Yodice) *with* C–1334.

**51.** The City has offered evidence of advertising flyers sent to employers and community organizations in various parts of Yonkers. *See* C–1327 through C–1333. However, in light of the testimony of Yvonne Nargi, who served as a

housing specialist for the Yonkers Commission on Human Rights from 1981 to 1983, such efforts can hardly be characterized as an outreach likely to be successful. Nargi testified that East Yonkers landlords were reluctant to accept Section 8 Existing Certificates unless "mandated" to do so—a reluctance she ascribed to their feeling that "the element would be completely different in that community." Tr. 8096–97.

low-income housing assistance was limited to senior citizens, and in its § 213(a) review of the application, City Manager Fox notified HUD that the City "disapprove[d]" the MHA's application based upon the "policy directive" reflected in the City Council's resolution. GX 1125.12.

The City's actions with respect to the Section 8 Existing Program are inexplicable except by reference to the anticipated race of the certificate holders. Throughout the years in question there was a serious (and indeed, in the words of at least one City official, "desperate") need for Section 8 Existing Certificates for families as well as senior citizens. GX 1125.5; *see also, e.g.*, Tr. 10,469–71 (Yost); C–1086 through C–1091. In addition, the certificates were a form of assistance that imposed no financial burden on the City. No tax abatement was required, as in the case of most subsidized housing projects, and included with the grant of the certificates were funds payable to the City for the cost of administering the program. Tr. 2853 (Arcaro). Moreover, like the Section 23 Leased Housing Program, Section 8 Existing Certificates offered a way to disperse low income housing without adding to the density of a neighborhood (as a subsidized housing project might) and without raising any other real or imagined physical planning problems.

Yet, for three years, the City refused entirely to apply for Section 8 Existing Certificates for families; failed to use many of the certificates eventually applied for; failed to make any significant efforts to promote their use outside Southwest Yonkers; sought to conceal from HUD the extremely limited geographic scope of its outreach efforts; resisted efforts by HUD to transfer the program to an agency perceived by the City to be less "responsive to elected City officials"; and opposed the efforts of that agency to obtain certificates on its own.

In pursuing those actions, the City consciously forfeited badly needed federal housing assistance, consciously risked even greater forfeitures of federal assistance, and consciously avoided an opportunity to lessen the severe concentration of subsidized housing and minorities that existed (and exists today) in Southwest Yonkers.

The various attempts the City has made to explain its actions on race-neutral grounds are plainly inadequate and at variance with the record. The City has contended, for example, that the City Council insisted on a Year I application of 100 senior citizen certificates because it had determined the need for senior citizens to be "more compelling." However, there is no evidence that this was the basis of the Council's actions, and considerable evidence to the contrary. Moreover, the City's explanation fails to explain why an application for fifty senior citizen certificates (and none for families) was the acceptable "back-off alternative." GX 1104.19.

Nor can that alternative be explained by a belief among the Council that no need existed for families. There is no evidence that any councilmember held such a belief, and the City's own HAPs, as well as the testimony of its planners and other officials make clear that such a need indeed existed. *See, e.g.*, GX 1125.5; C–1086 through C–1091; Tr. 2844–53 (Arcaro); Tr. 10,469–71 (Yost).

Equally unsupported in the record, and equally implausible, is the City's suggestion that the City Council declined to participate in the Section 8 Existing program for families because it "recognized that HUD's rent guidelines were inadequate to attract" landlords of units large enough for families. The testimony and memorandum of HUD's Area Economist Paul Bannett, upon which the City heavily relies, establishes no more than that Bannett told his colleagues at HUD that the City's failure to apply for Section 8 Existing Certificates for families would be entirely indefensible but for the then-current inadequacies in the program's rent schedule. *See* Tr. 6262 (Bannett); C–1291. Such evidence may explain why HUD did not exert more pressure on the City to apply for the certificates. (Although in that respect it must be evaluated together with HUD's troubling willingness to accommodate "councilmatic qualms" about the mobility which the certificates

gave to recipients of housing assistance. *See* GX 1104.19.) But that evidence in no way suggests that concerns about inadequate rent schedules motivated the City's actions. In addition, it is hard to believe that such a concern would have militated against accepting housing assistance that was readily available and cost-free to the City.

Nor can we accept the City's suggestion that rent schedules alone explain the current distribution of Section 8 Existing certificates in Yonkers. Even if the current concentration of certificates in the Southwest were largely attributable to the greater number of apartments there that are within the program's price range (and on that point the record is unclear), rent schedules do not explain why it is that the only certificates in use outside Southwest Yonkers are held by whites.

When City officials first learned about the Section 8 Existing program, they expressed concern that it would "wrest[ ] away" the local control enjoyed under the § 23 leased housing program (in which City officials selected the buildings the tenants would live in). GX 1104.1; *see also* GX 1104.11. And early consideration was given to the prevention of its use in East Yonkers by "problem families." GX 1176.-23. The events described above make abundantly clear that the families who represented a "problem" to the City Council were minority families, and that (at the behest of the City Council) the City initially resisted participation in the program because it gave minority families the potential ability to relocate to East Yonkers. The record also strongly suggests that when it was clear this potential ability could not, in all likelihood, be realized without significant City assistance, the City intentionally withheld the assistance needed to enable the program to serve as a tool for integration, and resisted efforts to transfer the program to an agency that might do otherwise.

Even if no other evidence of discriminatory actions were available with respect to the post-Riverview period, the evidence concerning the Section 8 Existing program alone would be sufficient to satisfy plaintiffs' burden of proving that the pattern and practice of discrimination evident in previous years has continued up to (and indeed past) the filing of the present action. However, the Section 8 Existing program is by no means the only evidence available in this regard.

### C. Section 8 New Construction Housing for Senior Citizens

#### 1. The City's Actions

The City's actions with respect to the location of Section 8 new construction housing for senior citizens provide additional evidence that the pattern of previous years continued. Here, too, initial efforts by the City's planners to disperse the housing were opposed by the City Council.

In explaining the designation of East Yonkers for new construction for senior citizens, the Year I (1975) HAP noted that 97% of the City's subsidized housing was located in Southwest Yonkers, and that choosing East side sites would "minimize relocation, and offer greater selectivity in housing accommodations." C–1086 at 25,-053. The HAP also stated that:

> West Yonkers locations would be acceptable *only* if very favorable design, locational and neighborhood impact considerations could be demonstrated. Developers must be aware that solicitation for Section 8 subsidized new construction outside the East Yonkers areas must have the most compelling of design, locational and neighborhood arguments in order to be placed into consideration.

*Id.* (emphasis in original).

Three months after the Year I HAP was submitted, however, the City Council passed a resolution purporting to amend the HAP to specifically include a proposed site on Highland Avenue in Southwest Yonkers, and directing that the resolution be forwarded to HUD. GX 1112.5; 1112.9. When HUD nonetheless appeared reluctant to process the proposal, DOD Director Alphons Yost sent HUD another copy of the Council resolution "to reaffirm the intention of the City Council to recommend that [the Highland Avenue site] be approved."

GX 1112.10. Yost's letter also "reminded" HUD that the City's Year I HAP "allows for Section 8 developments in unspecified areas of West Yonkers" but omitted to mention that the HAP also stated that such sites were to be considered only upon "the most compelling of design, locational and neighborhood arguments." C–1086. Yost sent a copy of the letter to the would-be developer of the Highland Avenue site, stating that the City would immediately initiate and process a [formal] amendment to the Year I HAP and "guarantee[ing] that the Year II HAP would 'specifically include' the Highland Avenue site," as indeed it did. GX 1112.11; C–1087.

The City's strong support of the Highland Avenue site was by no means a response to "the most compelling of design, locational and neighborhood arguments" in its favor. When the developer first approached DOD Director Yost with his proposal, Yost discouraged him, explaining that it was DOD's goal to disperse subsidized housing through East Yonkers. GX 1112.1. Yost simultaneously conceded, however, that DOD "had a long way to go before that became the City policy," id., and the developer (thus alerted) successfully appealed to Mayor Martinelli for support. See, e.g., GX 1112.1; 1112.5; 1112.-11. The subsequent support came despite a highly negative review of the proposal by the City's planners, see GX 1112.3, and the site's inclusion in the Year II HAP was,

according to an internal City memorandum written by Yost, "dictated by [the] City Council." GX 1190.10.

Nor was the City Council's influence limited just to the addition of the Highland Avenue site. In that same memorandum, Yost observed that "[s]ince we seem to be lacking in support for senior citizen's developments in East Yonkers, I believe a review of other appropriate sites in West Yonkers would be appropriate." Id. Accordingly, the Year II (1976–77) HAP listed four acceptable Southwest sites and deleted the language requiring the "most compelling of arguments" before a Southwest site would be considered. C–1087. The unsurprising result has been that all of the Section 8 new construction projects for senior citizens that were built during this period (including several projects strongly criticized by the City's planners) are in Southwest Yonkers.[52]

The history of Midland Mews, a proposal rejected by the City in 1975, suggests the extreme degree to which support was in fact lacking for east side sites, and also confirms that (as in previous years) race was a factor in that lack of support.

The Midland Mews proposal, which would have provided some forty units of housing for senior citizens on Midland Avenue in East Yonkers, was presented to the City at a meeting between the developer, the architect, and City planning officials in

---

**52.** Those projects are the Lane Hill Apartments (109 units); Monastery Manor (146 units) (initially a Section 8 proposal and eventually funded under another federal program); St. Casimir's (264 units); and Kubasek-Trinity Manor (130 units). See Appendix A. On the planning objections raised to St. Casimir's and Monastery Manor, see GX 1139; 1100).

Ironically, the would-be developer of the Highland Avenue site apparently lost interest in the site after HUD's initial rebuff of his proposal. The site was proposed for development again in 1978, however, triggering another struggle between the City's planners and the City Council, with the same outcome. By 1978, when the new proposal was made, the City's planners had regained some of the territory lost in the Year II HAP changes. See Tr. 2927–28 (Arcaro). The current (i.e., Year IV HAP) no longer included a listing of Southwest sites and even specifically excluded (on grounds of over-

concentration of subsidized housing) the census tract in which the Highland Avenue site was located. C–1089. In the City's section 213(a) review of the proposal, filed with HUD in August of 1978, the City Manager urged "most strongly" that the project be disapproved as inconsistent with the City's HAP and "detrimental to the physical and financial integrity" of the area. GX 1112.17. Like his predecessor, however, the developer successfully appealed to Mayor Martinelli for support. GX 1112.19; 1112.21. In November, the City Manager wrote to HUD withdrawing—without explanation—the City's objections to the proposal. GX 1112.10. In July of 1979, the City Manager wrote to HUD again, affirming the City's support for the project, and declaring it to be consistent with the numerical goals of the City's HAP. GX 1112.25. (The project's inconsistency with the HAP's locational controls was not mentioned.) The present status of the proposal is unclear.

January of 1975. GX 1113.1. In a memorandum to the files written several days later, Lawrence Blumenthal, Deputy Development Planning Director, noted that the proposal had been well received by City planning officials:

> The housing ... is properly scaled in its juxtaposition next to single family homes. It makes a fine transition from a S–50 [single-family] to a B [business] zone. The building will require minor variances for parking—to allow ten percent parking as is customary for the Elderly rather than 150 percent as required, and a reduction in the allowable square feet per unit. Pistone believes these requests are justified.

> The Planning Branch [of DOD] and the Planning Bureau [headed by Pistone] agree that the site is well suited for housing for the Elderly vis-a-vis public transportation, shopping, recreation, etc. as well as its location in the eastern half of the city.

*Id.*

Despite the views of the City's planners, however, the Zoning Board of Appeals twice denied the necessary parking variance at meetings attended by area residents who spoke against the project.

Most of the objections raised had little to do with the number of off-street parking places provided for in the proposal. At the first session in June of 1975, when the issue finally came up for discussion at 1:00 A.M., area residents made clear that they were opposed to the entire idea of the project. GX 1113.4; GX 1197.2. One neighborhood spokesman contended, for example, that the project was simply "incongruous with the character of the neighborhood, like wearing a high hat and turtleneck sweater at a formal ball." GX 1197.2, at 53. He also contended that traffic congestion was inevitable, claiming that while a bus line was nearby, every one in a low-income area "has some kind of jalopie." *Id.* at 415; *see also* 463–68. Another spokesman raised what the City's planners have referred to as the standard litany of inadequacies (proximity to shopping, churches, etc.), *id.* at 463–66, which, judging from the planners' memo on the proposal, had little or no basis in fact. GX 1113.1; *see also* Tr. 2805–08 (Arcaro).

Comments at the second Zoning Board session similarly suggested concern with the effect of putting "low income" housing (even for senior citizens) in the area. One spokesman from the earlier meeting returned and contended that the housing would become a "tenement" and create "the seeds of a ghetto," and even predicted that "Ashburton Avenue [a heavily black area of the Southwest] will probably move up there en masse." GX 1197.3 at 568–69. Another speaker protested as a "witness for the last few years [of] what has been happening in the areas of Yonkers where the houses are being deteriorated, [and where there is] more crime." *Id.* at 584. Another also referred to Ashburton Avenue and declared that the developer wanted to "build another slum." *Id.* at 585; *see also id.* at 590. The area's ward councilman also attended the meeting but declined an invitation to speak, saying that the Corporation Counsel had advised him the variance would have to be passed by the City Council as well, and that he would then "have the opportunity to protect [his] constituents through [his] choice on the Council." *Id.* at 592.

One possible explanation for the stated concerns that "Ashburton Avenue" would move to the project may be found in the fair housing statement which the developer filed with HUD, in which he indicated that he hoped to attain a 20% minority representation in the project by attracting "[e]lderly blacks and Puerto Ricans who are now located in west Yonkers." GX 1113.2. In addition, planner Gregory Arcaro testified that concern was expressed at the Zoning Board hearing that the housing might be converted into housing for families. Tr. 2808.

In any event, the opposition of City officials likewise appears to have had little to do with planning considerations. The type of parking variance sought, but twice refused for the project, had been and would continue to be routinely granted for senior citizen projects in the Southwest. *See, e.g.,*

Tr. 2951–52 (Arcaro) (citing St. Casimir's, Father Finian Sullivan Towers, Lane Hill, and Monastery Manor as examples). Moreover, the City's planners and (at least with respect to the second variance application) the City's traffic engineer believed the number of parking spaces provided for by the plan was adequate. GX 1113.1; GX 1113.5; Tr. 2951–52 (Arcaro).

Significantly, the number of parking spaces provided by the plan was not even mentioned by the City in its § 213(a) review of the proposal. GX 1113.8. Instead, the City criticized the project on the ground that it lacked nearby shopping, was adjacent to single family homes, was of an inappropriate scale and height, and was "undesirable" for senior citizens because of an "unsightly car lot" nearby. *Id.* The City's characterization of the proposal thus is directly inconsistent with the conclusions of the City's planners as reported in Blumenthal's January memo. *Compare* GX 1113.1 *with* GX 1113.8.

Nor is there any evidence that the planners had reconsidered their earlier views. Instead, there is simply a memorandum from DOD Director Alphons Yost to planner Gregory Arcaro, written shortly after the second Zoning Board meeting, directing him to "set up whatever meetings you feel are appropriate to establish the City's position *against* this particular proposal." GX 1113.7 (emphasis added). At trial, Yost contended that the City had not become predisposed against the project, but could offer no other explanation for the directive contained in his memorandum. Tr. 10,427–28 (Yost).

### 2. *The Effect of the City's Actions.*

The City has argued that under the procedures for funding Section 8 new construction proposals, the final decision with respect to the proposals was, in any case, HUD's. In this regard, the City notes that its negative § 213(a) review for Midland Mews was not binding upon HUD, and that HUD was therefore free to fund the project despite the City's objections, but independently chose not to. Similarly, the City points out that its positive reviews for each of the various Southwest proposals submitted to HUD did not require HUD to fund those projects. In essence, the City argues that its actions were inconsequential.

The argument is unpersuasive for several reasons. First, it unreasonably assumes that the City's review had little or no effect on HUD's funding decisions. Since the very purpose of the statutorily required review is to allow local input in the decisionmaking process, it is, as a general matter, unlikely that local opposition to a project would carry little weight. *See, e.g.,* GX 1112.22. Moreover, as the City itself has emphasized, Section 8 funds were scarce, and the competition for them keen. Thus, if two or more proposals were competing for the same pool of funds (as was the case with respect to Midland Mews and the Lane Hill Apartments, a Southwest project supported by the City), it is especially unlikely that the City's support of one and opposition to the other would be inconsequential.

In addition, the argument ignores the potential effect of a City's willingness to lobby for a particular proposal. In this regard, it is particularly noteworthy that two of the Southwest projects constructed during this period were initially turned down by HUD either for lack of funds or on substantive grounds, but continued to be strongly supported by the City and were eventually approved and funded by HUD. *See, e.g.,* C–1196, C–1197, C–1206 (Monastery Manor); P–I 134–14, 134–74, 134–104 (St. Casimir's). There is no reason to believe that if Midland Mews had been similarly supported, it nonetheless would have failed to receive funding.

Finally, the City's argument ignores the effect of its actions on the likelihood that other developers would come forward with east side proposals in the future. Midland Mews was supported by the City planners; required only a parking variance that had been, and would continue to be, granted to Southwest projects; and was fully consistent with the Year I HAP's stated goal of constructing subsidized housing for senior citizens in East Yonkers. Yet, it was re-

jected by City officials after area residents had made their strong and racially influenced opposition to the project known. Although the City's negative § 213(a) review of Midland Mews sought to assure HUD that it would support a more suitable proposal, GX 1113.8, the City's actions surely made it more likely that few, if any, other proposals for east side projects would be forthcoming. *Cf.* HOUSING IV.D.2 *supra.*[53]

### D. Subsidized Housing for Families Under the HAPs for Years I Through IV

The third basic element of the City's Year I (1975–76) HAP (in addition to the Section 8 Existing Program and new construction of subsidized housing for senior citizens) called for meeting the subsidized housing needs of families through the rehabilitation of existing structures in Southwest Yonkers; no goal for new construction was designated. That approach was repeated in each of the City's next three HAPs as well. C–1087 through C–1089.

Although no explanation is offered in the HAPs for the decision to limit new construction to the construction of subsidized housing for senior citizens, the City has offered a number of reasons in support of that decision. First, the City suggests that the decision to meet family housing needs through rehabilitation was consistent both with the purposes of the HCDA (which encourages rehabilitation of existing structures) and with its own efforts to rebuild Southwest Yonkers. In addition, the economics of housing construction are said to militate in favor of new construction for senior citizen housing and rehabilitation of existing structures for families.[54] Finally, the City contends that both its own planners and HUD's Area Economist Paul Bannett determined that in view of the large number of family housing units constructed in the preceding years, and the large number of vacancies in those units, new construction of subsidized housing for families was ill-advised.

With respect to the lattermost point, however, Bannett testified that he was unaware that the vacancies in question were being artificially maintained in an effort to attract white tenants. Tr. 6091–96, 6120–21; *see* HOUSING IV.D.5 *supra.* Moreover, former City Planner Gregory Arcaro testified without contradiction that none of the City's planners construed those vacancies as a sign that there was an oversupply of family housing units on the market. Tr. 3140–43 (Arcaro). In addition, each of the City's HAPs for the years in question indeed shows a significant need for housing assistance for families in Yonkers. C–1086 through C–1089. Thus, to the extent the City is suggesting that a lack of need led to the lack of new construction for families, we find the argument unpersuasive.

None of the remaining reasons cited by the City for its decision to focus on rehabilitation instead of new construction, or a combination of the two, is implausible. However, those reasons leave the picture somewhat incomplete. As an initial matter, it is clear that in light of the extreme concentration of subsidized housing in Southwest Yonkers, and the heavily minority occupancy of that housing, any additional construction of new subsidized housing in Southwest Yonkers was precluded. Only rehabilitation could be limited to the Southwest. C–1086; *see also* HOUSING V.C.5 *supra.* Thus, the alternative facing the City was not simply a choice between new construction or rehabilitation but also one between Southwest and East Yonkers

---

**53.** And indeed, only one other east side proposal appears to have been made for Section 8 senior citizen housing. The proposal was summarily rejected by the City, ostensibly for physical planning reasons, but in fact chiefly out of concern that the developer's primary interest in the proposal was a tax deduction. *See* GX 1115.14; Tr. 2959–60 3059–63 (Arcaro).

**54.** The City suggests that the special facilities needed by senior citizens (such as ramps and scald guards on the faucets) can be more economically provided through new construction than through rehabilitation of an existing structure. New construction is also more likely to be feasible, according to the City, when the units involved are studio or one-bedroom units rather than the multi-bedroom units needed for families.

as the location for future subsidized housing for families.

In addition, although one major goal of the HCDA is indeed, as the City notes, to encourage rehabilitation of existing structures, another is to encourage dispersal of housing opportunities for minorities. *See* HOUSING V.A. *supra.* The strategy adopted in the City's HAP did little to further that latter goal, and it did even less once the Section 8 Existing Program for families had been deleted. Indeed, no other housing strategy could have been significantly more segregative.[55]

Especially in light of the City's past practice of discrimination in the selection of sites for subsidized housing, it seems unlikely that this effect was unintended. In addition, there are two other factors which further suggest that it was not. First, there is credible evidence that those who developed the Year I HAP believed that the City Council would be unwilling to support the placement of subsidized housing for families in East Yonkers, and thus chose senior citizen housing as the vehicle for addressing HUD's concern that the City promote the dispersal of subsidized housing opportunities. *See, e.g.,* Tr. 2845–46, 2855–58, 3133–38 (Arcaro); GX 1112.4; *see also* Tr. 10,447–48 (Yost).

In addition, the subsequent fate of the Section 8 Existing Program and of the HAP's stated preference for east side sites for new senior citizen housing suggests that that belief was well-founded. Indeed, in light of the City Council's demonstrated lack of support for subsidized housing in East Yonkers, even when limited to senior citizens, and its opposition to participation in the Section 8 Existing Program for families, we find it virtually impossible to conclude that the City's four-year long failure to support new construction of subsidized housing for families was entirely race-neutral. Instead, that failure seems clearly to be a continuation of the City's longstanding practice of excluding subsidized housing from East Yonkers based, at least in part, upon the race of the anticipated occupants.

### E. *The Palmer Road Site*

In 1979, for the first time since the approval of the Curran Court in 1963, the City Council approved a site for subsidized housing that is east of the Saw Mill River Parkway. Like Curran Court, the site approved on Palmer Road between Millard and Ellison Avenues was for some 45 units of senior citizen housing. The project was not a Section 8 new construction proposal. (Despite four years of listing East Yonkers as an appropriate area for Section 8 new construction for senior citizens, the City still had yet to support an east side proposal.) Instead, the Palmer Road site was proposed, along with a site on Willow Street in Southwest Yonkers, by the MHA for public housing for senior citizens. Both sites were approved by the City Council in the summer of 1979. GX 1118.34; GX 1118.45.

The site selection efforts that culminated in the approval of the Palmer Road and Willow Street sites began in December of 1978. In response to a sizable waiting list for Curran Court, the MHA resolved to look into the possibility of building additional public housing for senior citizens, noting however, that an obstacle to doing

---

**55.** The City contends that its additional designation of Census Tract 22.02 in East Yonkers as appropriate for substantial rehabilitation, and its 1978 application for that same area to be designated a "Neighborhood Strategy Area" (under a HUD program that makes funding available for new construction and rehabilitation in areas targeted by the City), are concrete examples of its efforts to provide subsidized housing opportunities for minorities in East Yonkers, and are efforts that failed only because no building owners applied for the substantial rehabilitation funds and because HUD turned down the NSA application.

However, substantial rehabilitation is unlikely to have an integrative effect on a neighborhood unless the buildings to be rehabilitated are unoccupied. In addition, in light of the City's actions with respect to the east side preference stated in HAP for new construction for senior citizens, there is no basis for assuming that the City would have supported a proposal to rehabilitate a vacant building in Census Tract 22.02 either under the general substantial rehabilitation program or the NSA program.

so was the difficulty of finding "a site in the eastern section of [the] City that would meet the approval of the local legislative body." GX 1118.2.

In March of the following year, the Board of the MHA approved an application to HUD for the reservation of 100 units of public housing. GX 1118.3. The City Council approved the application on the condition that it be limited to public housing for senior citizens, and also approved a Contract of Cooperation with the MHA that was likewise limited to senior citizen housing. GX 1118.5; 1125.2; 1227. The MHA submitted the application to HUD, indicating that no sites had yet been selected but that they would be outside existing areas of minority concentration. GX 1118.7.

The following month, in April of 1979, the MHA approved three sites for the 100 units of housing. GX 1118.8. Two of the sites—Palmer Road and Boyd Place at Bronxville Road in Northeast Yonkers—were approved unanimously. Id. The third site—Willow Street in Southwest Yonkers—was approved by a vote of four to three, with its opponents contending that the area was already "oversaturated" with subsidized housing for senior citizens. Id.; GX 1118.12. Shortly after the Boyd Place site was approved, however, the owner placed lumber on the site, and applied for building permits to construct single-family homes. GX 1118.18; 1118.20; 1118.17. Upon learning of the issuance of the permits, the MHA withdrew the site. Id.

On May 1, 1979, the Planning Board held a hearing to consider the Willow Street and Palmer Road sites. No opposition was voiced to the Willow Street site, and it was approved unanimously. GX 1118.18. The Palmer Road site, however, proved more controversial. During a lengthy, and at times heated, discussion between area residents and City officials, objections were raised with respect to the inadequacy of parking in the area, the site's distance from shopping facilities, and its location in a floodplain. Area residents insisted they were not "anti-senior-citizen" or (as Emmett Burke of the MHA suggested) "anti-public-housing", but simply concerned about the suitability of the site. Id. The Planning Board voted unanimously to defer action on the site.

Several days later, in a letter to the President of the Longvale Homeowners Association, who had spoken against the project at the Planning Board hearing, the Reverend E. Roy Burchell of the West Center Church in nearby Bronxville acknowledged the "risk" that the project might cause "the complexion of [the] community to change somewhat" by bringing in outsiders, but nonetheless urged support for the project. GX 1118.23. A copy of his letter was sent to the Planning Board. Id. On May 14, the Planning Board voted four to one to approve the site. GX 1118.26.

On June 12, the City Council approved the site as well (together with the Willow Street site), but not without a long and heated public hearing. GX 1118.32; 1118.-34. Speaking in favor of the site, Emmett Burke of the MHA called upon the City Council to break down "the invisible wall between east and west Yonkers," and argued that HUD wanted senior citizen housing to be built throughout the City and would no longer agree to building only in West Yonkers. GX 1118.32. Numerous senior citizens spoke in favor of the site as well. However, numerous East Yonkers homeowners, and ward councilman John Hanney, spoke against the site, arguing that there had been an absence of community imput in selecting the site and that other sites were available. Burke replied that other sites, including some suggested by Hanney, had in fact been considered, but that Hanney had "played games" with sites, "withdrawing them as fast as [he] suggested them." Id. Several hours after the session had opened, the Council voted nine to three, with one abstention, to approve the site. All three opposing votes, as well as the abstention, came from east side councilmembers. Id.

Within a week of the Council's vote, however, the owners of the Palmer Road site filed suit to challenge the legality of the Planning Board approval, contending that insufficient public notice had been given. Upon the advice of the City's lawyers, the

Planning Board scheduled another hearing. GX 1118.35; 1118.39.

On the day of the hearing, some seventy East Yonkers residents appeared to speak against the Palmer Road site. The residents contended that the site was unsuitable for senior citizens because of its distance from shopping and other facilities; because of the limited availability of public transportation; and because the neighborhood was noisy and unsafe. GX 1118.39; 1118.41.

Past and present MHA Board members in attendance at the meeting made clear they considered the objections pretextual. One noted that "no one ever asked about transportation for the senior citizens as long as we were building in a neighborhood that they didn't live in," and suggested that there was an "unspoken concern" that minorities would move into the project. *Id.* Another said the "heart of [the] opposition" is simply that the residents don't want public housing in their neighborhood. *Id.* Another characterized the objections as the sort of "lame excuses" always raised to subsidized housing. *Id.* One opponent explained in reply that they were "not uncompassionate people" or "aristocratic snobs," but were "just suggesting that there are alternative sites in the area that should be considered." *Id.* The Planning Board deferred action on both the Palmer Road and Willow Street sites—the latter at the request of MHA Chairman Emmett Burke, who contended that HUD was not likely to approve Willow Street unless Palmer Road was offered as well. *Id.*

A second Planning Board hearing was held the following week, at which time the Board voted to approve the Palmer Road site. A City Council hearing and re-approval followed several days later. GX 1118.-42–1118.44; 1118.48. These hearings, as well, were marked by long and heated debate about the Palmer Road site. *Id.* The issue of race, alluded to in previous hearings, arose again as Antonio Lombardi, Chairman of the Housing Committee of the Yonkers NAACP, urged the approval of Palmer Road and other sites in East Yonkers. GX 1118.42. Lombardi contended

that scattered site housing was "long past due," and suggested that the past failures to approve scattered sites reflected "a concerted effort to create segregated neighborhoods" in Yonkers. *Id.* William Gibson expressed a similar view, recounting his experiences as a member of the UDC–CAC when efforts were being made to find scattered sites for UDC Projects. "Racism and ignorance are still alive," Gibson declared, "sites have been offered and withdrawn ... offered, then withdrawn, and we are still playing the same game." *Id.*

Meanwhile, area residents continued to offer various and even (as Emmett Burke observed) contradictory objections to the site. Palmer Road was declared unsuitable by some because of its location in a floodplain, and by others (including the owner of the site and ward councilman Hanney) because of its value as a "prime building site." GX 1118.43; 1118.48. Nor did the opposition end with the Council's reapproval of the site. The owner subsequently attempted to obtain building permits for a 50–unit private development, GX 1118.50, and the Longvale Homeowners Association as well as a number of individual residents maintained a steady correspondence with HUD, protesting various aspects of the approval process and challenging the merits of the site itself. *See generally* GX 1118.

Others, however, wrote to HUD in support of the proposal, contending that the concentration of subsidized housing in Southwest Yonkers represented "racial and economic segregation ... practiced ... by the city with the aid of the federal government." GX 1118.83; 1118.85; 1118.89; 1118.99. The City Manager likewise wrote to HUD in support of the project, asking that it receive the "highest priority" for processing. GX 1118.71.

In one letter, Emmett Burke explained that "fear of public housing" had provoked opposition to Palmer Road, as it had in the past with respect to many other East Yonkers sites, and he urged HUD to assist the City "in crushing the wall that keeps public housing out of the east section" of Yonkers. GX 1118.57. In another letter written

several months later, urging HUD to approve a particular method of construction for Palmer Road, Burke reported that:

> The Justice Dept. has made a public issue of the concentration of public housing in the West section of our City. This action has made segregation an open and serious problem. This problem has existed for some years and is now a public issue. The minorities are keeping a close watch on developments on the Palmer site, and confer with us regularly.

GX 1118.115. As of the end of trial, the Palmer Road project was under construction.

The City places considerable emphasis on the approval of the Palmer Road site, contending that it proves that it was not impossible to obtain City Council approval of an East Yonkers site for subsidized housing, and that sites could be approved despite the opposition of the councilman for the ward in which the site was located.

However, the circumstances surrounding the approval of Palmer Road scarcely negate the existence of a pattern established over the course of thirty years of site selection. Nor, for several reasons, can the approval of Palmer Road be viewed either as a complete or a permanent departure from that pattern. First, in light of the proposal's status as senior citizen housing, and the evidence showing a continued pattern of discriminatory actions with respect to the Section 8 Existing Program, *see* HOUSING V.B *supra*, the approval of Palmer Road cannot be viewed as evidencing an abandonment of the pattern of racially influenced opposition to the placement of subsidized housing for families in East Yonkers. In addition, subsequent events make clear that the pattern was not, in fact, abandoned.

### F. *Actions Subsequent to the 1980 Contract Conditions*

The activity of the Justice Department mentioned in Emmett Burke's letter of August, 1980 referred to indications that a lawsuit was being contemplated against the City of Yonkers, and to the Department's involvement in HUD's decision in June of 1980 to impose conditions upon the City's receipt of its Year VI CDBG funds. The most significant of those conditions required the City "to take all actions within its control to provide for the construction of 100 newly created units" of subsidized housing for families "located outside of areas of minority concentration." GX 1140.1. The number of units represented the goal which was designated in the City's Year V HAP (the first such goal designated by the City) and which the City had made no progress toward implementing.

In the two years following the imposition of the 1980 contract conditions, the City Council failed to support a single site for subsidized housing for families. One site actively supported by the City's planners was strongly lobbied against by newly elected Mayor Gerald Loehr and opposed by the City Council. In addition, with respect to two other sites designated as likely sites for subsidized housing, actions having the effect of rendering the sites unavailable for subsidized housing were taken or attempted by the City Council. And at least with respect to one of the sites, that effect was clearly intended.

#### 1. *Salisbury Gardens*

In May of 1980, a proposal was submitted to HUD for the development of Salisbury Gardens, a Section 8 new construction project on Salisbury Road and Sadore Lane in East Yonkers. GX 1132.4. As originally proposed, the project was to consist of eighty units for senior citizens and twenty units for families; the planned number of family units was increased to forty-two in July. GX 1132.8.

The site was in a census tract specifically designated for new construction in the City's current HAP, and properly zoned for the project. GX 1132.4; 1132.8; C–1090. In addition, since the site was owned by the proposed developer, and since the developer planned to perform some of the contracting work himself, no tax abatement was required in order to make the project financially feasible. Tr. 1600 (Walsh). Moreover, as the developer's attorney pointed out to City officials, the project could be

offered in partial satisfaction of the newly imposed 1980 contract conditions. Tr. 1628–29 (Walsh).

The initial reaction from City officials was highly positive. The City Manager Engene Fox advised HUD by letter in July that the City "endorse[d] and support[ed] the proposal," and urged "expeditious approval" of the project, noting that it was in conformity with the City's HAP; that the proposed developer had "excellent reputation"; and that the project could be developed " 'as of right' without any further City approvals." GX 1132.7.

Less than a week after Fox's letter was mailed, however, HUD's Housing Division received a telephone call from a "very upset" Edward Fagan, the councilman for the ward in which the site for Salisbury Gardens was located. GX 1132.12. Fagan told HUD that the project was "in the backyard of the local democratic leader" and "next to a large and well-organized apartment building," and he asked HUD to send him a copy of the proposal, saying that he felt he would have difficulty obtaining it through the City Manager's office. *Id.*

Over the next six weeks, growing opposition to the project was expressed by area residents and City officials, and communicated to HUD. The Northeast Homeowners/Tenants Association, for example, met with Councilman Fagan and sent a letter to HUD registering their "strong objection" to the project. P–I 268–16. Mayor Loehr wrote to HUD as well, contending that the project would "adversely impact[ ] the quality of life in this established residential area." GX 1132.23. Loehr also sent a mass mailing to area residents expressing his concern about the "unacceptable burden" the project would impose on the neighborhood. GX 1132.21; 1132.25; 1132.26. Loehr's letter included

the name and address of the Area Manager of HUD and urged area residents to "express [their] concerns" to him about Salisbury Gardens. *Id.*

On September 2, the City Council held a public hearing on the project. The hearing, which was advertised by flyers urging residents to "Be there! ... Show your concern ... Stop them now!", was well-attended by area residents who spoke against the project. GX 1132.29; 1228. Various councilmembers spoke strongly against the project as well, frequently eliciting applause and cheers from the audience. GX 1228, at 45–80. Councilman Fagan, for example, declared that:

> The people in Sadore Lane don't want good works. They want results. They want to see this application turned down. They want to save their neighborhood. They don't want to flee again.

*Id.* at 75–76. East side councilmen Nicholas Longo and Michael Cipriani, both strong opponents of putting subsidized housing in East Yonkers, *see* HOUSING V.F.3 *infra,* similarly declared that the City Manager "better damn well find a way to tell HUD that we don't want this," *id.* at 70 (Longo), and urged the Mayor and every councilmember "to support and hear what the constituents of the tenth ward are saying." *Id.* at 72 (Cipriani). At the close of discussion, a resolution was unanimously adopted stating the City Council's opposition to the project, directing the City Manager to withdraw his letter of support, and directing the City Clerk to send a copy of the resolution to HUD. GX 1132.30.

HUD continued to process the project, but a virtual moritorium was placed on Section 8 funding soon after the proposal's submission, and despite extra efforts by some HUD officials to obtain funds for the project, P–I 268–30A, it was not funded.[56]

---

**56.** The City contends that the City Council's opposition to Salisbury Gardens cannot be attributed to the City since the City Manager is the officer authorized to speak for the City in section 213(a) reviews and since there is no evidence that he complied with the City Council's directive to withdraw the City's favorable section 213(a) review. In addition, the City contends that it cannot in any event be held liable for that opposition since the proposal was ulti-

mately defeated by a lack of funding rather than the City Council's opposition to it. Both contentions are without merit.

The opposition expressed to the proposal was not expressed by an isolated City official, but by formal resolution of its governing legislative body. Nor was the City Council's action inconsequential, if only in its effect on the likelihood that future proposals would be made for east

### 2. *The Neustadter Site*

A few months later, the City submitted to HUD, in partial compliance with the 1980 contract conditions, an inventory of fourteen sites that were outside of areas of minority concentration. GX 1140.9. All fourteen were east of the Saw Mill River Parkway. Most would have required a zoning change in order to be used for subsidized housing. Planning Director Pistone privately expressed the opinion that with the possible exception of a site on Trenchard Street (the School 4 site), there was virtually no chance that the necessary zoning changes would be approved. GX 1132.-45; Tr. 1642–44. (Walsh).

HUD reviewed the sites and notified the City in April of 1981 that only three sites "appeared to be free from substantial impediments to the feasible development of housing." GX 1140.23; *see also* GX 1140.-16; 1140.18; 1140.29. The three sites were the School 4 site; the Neustadter site at McLean and Central Park Avenues; and 1919 Central Park Avenue. HUD asked the City to provide within thirty days a description of the steps necessary to make the sites available for subsidized housing. GX 1140.23. That same month, the City Council voted to approve the City's Year VII CDBG application, but only after the deletion of any expressions of intent to promote the placement of subsidized housing in East Yonkers. *See* GX 1229, at 85–128.

In May of 1981, the City replied to HUD's inquiry, saying that with respect to the Neustadter site, a petition was at present before the City Council to change the zoning to allow commercial use; that the School 4 site was at present still held by the Board of Education, and that "no schedule [had] been established" for its transfer to the City; and that on November 25, 1980 (three weeks after the list of sites had been sent to HUD), the City Council had rejected a petition to change the zoning of the third site, 1919 Central Park Avenue, to high density residential use, the

result of which was that a new zoning petition could not be submitted for consideration except upon a three-quarters vote of the City Council. GX 1140.29.

Shortly after the City's May 1981 letter, the City Council approved the zone change permitting commercial use on the Neustadter site. GX 1140.43. The use of the site had been publicized as presenting a choice between a "shopping center or low-income housing," with ward councilman Cipriani publicly stating that his vote would be guided by his constituents. GX 1117.10. During the same public discussions, Mayor Loehr stated the federal government was pressing the City to develop subsidized housing in East Yonkers, that it could not at present "compel" the City to do so because of existing zoning patterns, but that in view of the litigation pending in court (a reference to the present action, which had been filed in December of 1980) he could not speak for the future. *Id.* Both Councilman Cipriani and Councilman Longo took credit in a subsequent election campaign for having blocked subsidized housing on the Neustadter site by voting for the Waldbaum's development. Tr. 7801–13 (Longo); GX 1302.10. The following year, beginning in March of 1982, efforts were made to sell School 4 for private development as well.

### 3. *School 4*

School 4 was one of seven schools closed by the Board of Education in 1976. *See* SCHOOLS IV.A.3.b *infra.* The site was zoned "M" at the time of the school's closing, permitting multi-family residential development, and in an April 1976 memorandum regarding possible re-uses of the closed schools, Planning Director Philip Pistone recommended that the school be converted into apartments. GX 1187.2. However, the Board of Education did not return the school to the City until 1982, and for the intervening six years the school remained vacant, with the cost of its annual upkeep estimated at $40,000 to $50,000.

---

side sites when Section 8 or other federal funds again became available. *Cf.* HOUSING III.C.2

and IV.C *supra.*

Tr. 7542–43 (Martinelli); *see also* SCHOOLS V.E.3 *infra.*

Between 1976 and 1979, several companies expressed interest in the school for commercial re-use. VSP Co., a video software manufacturer, offered $250,000 for the school in 1978, but was encouraged by Mayor Martinelli to purchase School 7 instead, which had been returned to the City soon after its closing in 1976. VSP Co. followed the Mayor's advice and purchased School 7 for $10,000, with the City agreeing to provide $100,000 worth of renovation. Tr. 7516–21, 12,342–43 (Martinelli). Martinelli, who had campaigned strongly against the closing of School 4, testified that he still harbored hopes at the time that the school would be reopened. Tr. 7517–18 (Martinelli).

Then, beginning in the summer of 1979, School 4 began to be discussed as a possible site for subsidized housing. A committee formed by Councilman Hanney to investigate alternative sites for the public housing scheduled for Palmer Road offered School 4 as one possibility, but the suggestion was rejected by Emmett Burke of the MHA on the ground that City Council members had expressed a "preference for private development" of the site. GX 1118.117. Soon thereafter, in September of 1979, Ward Councilman Cipriani and Twelfth Ward Councilman Longo, whose own ward ended a few yards away from School 4, petitioned for a change of zoning for the site from "M" (multi-family) to "T" (two-family houses)—a petition that was characterized by at least one Planning Board member as intended to "give the community some peace of mind." GX 1170.5. The Planning Board unanimously recommended against the change on the grounds that "multifamily residential" was the best classification for the site, and that any "downzoning" might diminish the potential sale price to the City. P–I 199–31. Nonetheless, the City Council unanimously approved the zoning change. P–I 199–35.

The effect of the change was to require any developer who sought to use the property for a purpose other than two-family homes to apply to the Zoning Board for a variance, or to the Planning Board and City Council for re-zoning. The change had no effect on commercial developers (who would have faced the same course with the original zoning in place), but it did have the effect of preventing an "as of right" development of a multi-family residential building.

In August of 1981, in response to an inquiry from HUD about the specific steps the City was taking to facilitate the development of subsidized housing, the City reported with respect to School 4 that the Board of Education was "somewhat hesitant about relinquishing property under its control while the current litigation is taking place," but that the City was "actively encouraging" the Board to do so "in an effort to allow future development of rental housing." GX 1140.43. In addition, the City reported that it had recently informed two minority developers of the nationwide set-aside of 1,500 subsidized housing units for minority contractors and "encouraged them to solicit some of these units [for] sites within the City of Yonkers." *Id.*

In a letter written two weeks earlier, however, to a minority contractor who had responded to the City's announcement, the CDA merely referred the developer to HUD for the necessary information about minority set-asides, and noted that the City had received "preapproval" of three out of fourteen sites submitted to HUD but that one was to be developed by Waldbaum's; another would require a three-quarters vote of the City Council before a zoning change could be considered; and the third was "still in the possession of the Yonkers Board of Education." GX 1140.41. No mention was made of the City's on-going "active encouragement" of the Board to release the site to make it available for subsidized housing.

Indeed, despite the City's representations to HUD that it was actively attempting to effect the expeditious transfer of the school, *see, e.g.,* GX 1140.43, Tr. 8577–80 (Miecuna), the only evidence of such efforts relate to the City's rapid response to a proposal to develop the site with luxury housing.

On March 16, 1982, a representative of a developer wrote to City Manager Sal Prezioso expressing interest in the site. GX 1170.9. Two days later, Prezioso forwarded the correspondence to Superintendent of Schools Joan Raymond, asking for a response at her "earliest convenience." GX 1170.10. Less than a week later, Raymond replied that the matter was before the Board's Facilities Committee and that she had "strongly recommended" that the Board of Education take action. GX 1170.-11. In contrast to the minority contractor who was merely advised that School 4 was still under the control of the School Board, the proposed developer of luxury housing was sent a copy of Superintendent Raymond's letter and assured by the City Manager that "[a]s soon as matters are brought to fruition, we shall be in touch with you." GX 1170.14. Three months after the developer had written to City Manager Prezioso (and six years after the school had been closed), School 4 was returned to the City. P–I 199–52.

A few days later, the City Council passed a resolution creating citizen's committees to study and recommend to the City Council the appropriate re-use for Schools 4 and 15 (the latter also an east side school closed in 1976). P–I 199–53. At a community meeting attended by newly re-elected Mayor Martinelli, Ward Councilman Cipriani appointed the School 4 committee's five members. All five were white and all five lived in the overwhelmingly white neighborhood surrounding School 4. None except Walter Forrester, who was subsequently chosen by the group as chairman, had any prior experience with development or zoning issues. Tr. 7928–29 (Cipriani).

The appointment of a citizen's committee to recommend a re-use for School 4 was, as Mayor Martinelli acknowledged at trial, unprecedented. Tr. 7546 (Martinelli). The procedure had not been used in the past for any of the other closed schools nor, appar-

ently, for any other City-owned property. The only roughly comparable instance in evidence was Mayor Martinelli's subsequent appointment, in the spring of 1983, of a citizen's committee to recommend whether a site in Southwest Yonkers should be sold to the Hudson River Association for use as a community center (with the investment of approximately $650,000 of the City's CDBG funds). There, however, Martinelli deliberately chose committee members who did not live in the immediate area so that the proposal would be evaluated objectively, and four out of five of the committee members chosen lived in East Yonkers. Tr. 7550–52; 12,352–55 (Martinelli). With respect to the School 4 committee, Mayor Martinelli stated simply that Ward Councilman Cipriani had requested that the committee consist of area residents, and that he had acceded to that request. Tr. 7551–52.[57]

The committee was given no criteria by which to evaluate proposals, nor was it advised to contact Planning Director Pistone or any other City official involved with planning or development. Nor did it do so—despite the inexperience of its members in matters relating to planning and development. Tr. 7555 (Martinelli); 8057 (Forrester). (Nor, in another departure from standard procedure, did the City Council solicit the Planning Board's views before voting on the committee's eventual recommendation. Tr. 9810 (Pistone).)

The Committee was not given a list of developers or any assistance in obtaining such a list. Instead, it was told that the City would publicize the committee's existence and arrange for developers to contact it. Tr. 7554 (Martinelli); 8056–57 (Forrester). A press release was issued announcing the existence of the committee, but no other efforts appear to have been made to find potential developers. P–I 199–53; Tr. 7931 (Cipriani).

---

**57.** At trial, Councilman Cipriani maintained that the role of the committee was merely advisory, and that he had never suggested that the Council would necessarily adhere to the community's wishes. However, his prior statements under oath decidedly suggest otherwise. At his

deposition in preparation for trial, Cipriani testified that the committee was chosen so that the decision wouldn't be in the hands of the Council, and that choosing only area residents was seen as "a neighborhood idea—like children going to school where they live." Tr. 7961–65.

Shortly after the committee was formed, two developers called to express interest in School 4. One was Melvin Weintraub from Morelite Construction, who proposed to convert the building into condominiums and construct townhouses on the school playground across the street. The other was Leon Lauterbach, who on behalf of his client Dominic Yanni, was the one who originally contacted the City Manager about the site, and who proposed to convert the school into rental units. Tr. 8052–53 (Forrester).

Some two weeks after the committee's formation, a meeting with held with Melvin Weintraub. Weintraub presented a set of renderings of the proposed project, based on blueprints of the school which he had obtained from the City, and indicated that the starting sales price for the condominiums would be $100,000 to $125,000. Tr. 8058–61 (Forrester). According to Forrester, the general reaction of the committee was that "for that kind of price, people would come in that we would like to live in the neighborhood." Tr. 8065. The committee did not discuss a selling price for the school with Weintraub. Forrester testified that the sales price was not the committee's job, that its sole function was to recommend the "best use of the property," and that the sole criterion for determining best use was "the use that would best fit the neighbors." Tr. 8062, 8071.

Another developer, Luciano Martirano, also appeared at the meeting with Weintraub, saying that he had heard about the committee and was interested in developing the property with two-family homes. An appointment was made for Martirano to come back and present a proposal, but according to Forrester, he never reappeared and never submitted a proposal. Tr. 8067–69.

Several weeks later, the committee held its second and only other meeting with a prospective developer, at which Leon Lauterbach's client, Dominic Yanni, proposed conversion of School 4 into apartments to rent at approximately $175 per room. Although the City had initially been responsive to Yanni's expression of interest in the site, he had subsequently been unable to obtain blueprints of the school from the City. As a result, his proposal was limited to an oral presentation, without accompanying sketches. Tr. 8069–70 (Forrester).

After Yanni left, the committee discussed the proposals that had been presented. According to Forrester, everyone was in favor of Weintraub's proposal for condominiums, and as a result, Forrester called Yanni the next day and told him he need not go the expense of preparing sketches of his proposal. Forrester also called Ward Councilman Cipriani and reported that the committee had selected a proposal for condominiums. Forrester explained that the committee felt that apartment dwellers might be "transient," whereas condominium owners would have a vested interest in the property and therefore care for it properly. Tr. 8071–74 (Forrester). At trial, Forrester acknowledged that he knew Yanni owned an apartment building next to School 4, and that he had had no particular experience with those apartments that led him to believe that apartments represented a threat to the stability of the neighborhood. Tr. 8076–78.

Later that month, on August 12, a meeting was held for area residents at which the committee gave its recommendation for the re-use of School 4. C–1381. The recommendation was unanimously approved, and the committee was instructed by Ward Councilman Cipriani to file a report with the City Council. Tr. 8075–77 (Forrester).

The committee filed its report, and on September 14, 1982, the City Council passed a resolution authorizing the City Manager to obtain two appraisals of the property. C–1373. On the basis of those appraisals, the City set a minimum sale price of $230,000. C–1376. The City also wrote to HUD in October reporting that it had received "firm commitments of interest" from a developer to build "moderate income condominiums" on the School 4 site and asking for leave to remove the site from the inventory of possible sites for subsidized housing that had been submitted by the "prior administration." C–1374. HUD granted the request, and Councilmen

Longo and Cipriani co-sponsored a local law that would permit the sale of School 4, without public bidding, to Morelite Construction (Weintraub's company) for $230,000. A public hearing on the sale was scheduled for December 21, 1982. C–1375; GX 1170.28.

A week before the hearing, Councilmen Longo and Cipriani sent a letter to their constituents reporting that "a problem ha[d] developed" with respect to the proposed sale of School 4. GX 1170.28; Tr. 7784–87 (Longo); 7970–71 (Cipriani). The letter explained that:

> in 1980, then City Manger Gene Fox and former Mayor Gerald Loehr recommended the School # 4 as a site for subsidized housing..... As a result of the Loehr-Fox action, the NAACP has threatened to stop the city from selling the property for any use other than low-income housing.

GX 1170.28. The letter then went on to urge residents to attend the upcoming City Council hearing, claiming that

> At this point, the Council is almost equally divided between the condominium proposal and the wishes of the NAACP. Your attendance and your opinion will be extremely helpful at the Public Hearing scheduled for 8:00 P.M.

*Id.*

The public hearing held on December 21, was so wellattended that a television monitor was set up to enable the overflow from the Council chamber to watch the proceedings from an adjoining room. The audience was heavily white, and the discussion itself, a videotape of which has been received in evidence, was emotionally charged, with expressions of concern about the effect that subsidized housing would have on the "character" of the neighborhood, and frequent exhortations by council-

members to heed the "will of the community." GX 1226; *see also* Oxman Dep. 123–29; Cola Dep. 169–71.

A number of residents, most of whom were black, opposed the sale. Those speakers described the racial segregation that existed in Yonkers, and the events leading up to the submission of the list of sites to HUD. The final speaker, who was white, spoke of how blacks had ruined neighborhoods in the Bronx, claiming that the buildings originally were "in fine shape" but had "deteriorated" when the blacks moved in. The speaker then stated that he supported the condominium proposal because he didn't want the same thing to happen in Yonkers, and closed by saying, "I'm not a good speaker ... but I think you get the idea." The audience responded with an ovation.

During the Council discussion that followed, Ward Councilman Cipriani urged the Council to support the proposal for condominiums, saying that it was a concept that his constituents had adopted, and that he would "follow it as long as [he was] an elected councilman." Cipriani contended that the issue was not one of black versus white, but then went on to claim that he had earlier supported the concept of subsidized housing for the site as long as it was limited to housing senior citizens.[58]

One Councilmember, Katherine Carksy, raised several concerns about the procedure by which the school was being sold. Carsky objected to being asked to approve the sale without having been shown the developer's proposal, and she reminded the Council that it had not long ago passed a resolution requiring public bidding for the sale of City property. In addition, she questioned Longo and Cipriani's estimate that $600,000 in annual tax revenue would be derived from the condominiums (an esti-

---

**58.** Councilmember Cipriani apparently was referring to a meeting he had sometime between late 1980 and early 1981 with Maxwell Speiser, a developer who had expressed an interest in converting School 4 into subsidized housing, and who had been brought to Ward Councilman Cipriani by Emmett Burke of the MHA. Tr. 7919–21, 7953–57 (Cipriani); Speiser Dep. 72–79. Cipriani testified at trial that the proposal

was for senior citizen housing, that he had responded favorably, and that he had held a meeting with area residents on the subject. Tr. 7919–21, 7953–57. Maxwell Speiser testified, however, that his expression of interest hadn't been limited to senior citizen housing, and that Cipriani had merely told him the site was unavailable since it was still being held by the Board of Education. Speiser Dep. 72–79.

mate which Longo and Cipriani acknowledged at trial to have been inflated by a factor of ten, Tr. 7973 (Cipriani); 7788–89 (Longo)), and she noted that the current zoning of the site was inconsistent with the proposed use. Carsky suggested that if the site were first rezoned and then bid on, a higher sales price would be realized by the City.

Councilmember Cipriani replied that

It's not a question of dollars ... It's a question of concept, as to what the neighborhood would like to see, just like ... the concept of what your neighborhood near Palmer Road would like to see.

Cipriani's statement was greeted with applause and cheers, following which, he added "we will change that zone when the concept fits the people, not before."

Councilmember Longo stated that the decision to forgo public bidding was a matter of "trust" in the developer, explaining that another developer might get the required zoning change and then change the use of the site. Longo objected to frustrating the will of the community by denying it a developer it trusted and also stated that "many of us are concerned" about not delaying the project.

Four other councilmembers, including Mayor Martinelli, likewise deferred to the "will of the community." Mayor Martinelli said that he supported the condominium proposal on the ground that people ought to "have a right ... to decide what happens to" their neighborhood. Councilmembers MacDonald and Jacono agreed that it was important for communities to be permitted to decide how sites would be used, and Councilmember Spreckman stated that she was there "as a representative of the people, to see that the people get what they want." Spreckman indicated that she supported public bidding as a general rule, but not where the community had clearly made its wishes known.

The only councilmember other than Carsky to oppose the sale was Harry Oxman, who stated that he would be against the sale until it was known what "problems" the City would have as a result of the

pending litigation. Oxman also observed that the concentration of so much subsidized housing in the Southwest had "almost annihilated" Getty Square.

At the close of the meeting, the City Council voted eleven to two to sell the site. In response to the City Council's vote, Plaintiff-intervenors applied to this Court for a preliminary injunction forbidding the sale of School 4. The City subsequently consented to the hold the sale in abeyance pending resolution of this litigation.

The City has argued that since it was under no duty to retain School 4 for possible use as a subsidized housing site, it cannot be held liable for attempting to sell it. It is well settled, however, that actions which are otherwise lawful lose that character when they are undertaken for a discriminatory purpose. *See, e.g., United States v. City of Parma, supra,* 494 F.Supp. at 1099. And in light of the historical background and sequence of events leading up to the attempted sale; the procedural irregularities and disregard of standard considerations which attended it; and the nature of the debate preceding the Council's vote, it is difficult to imagine a clearer case of an action taken for a discriminatory purpose.

The prime movers of the zone change and attempted sale of School 4 were councilmembers who made no secret of their opposition to the placement of subsidized housing (at least for families) in East Yonkers. Indeed, their own campaign literature has described them as "leading the fight" against it. GX 1301.9; 1302.10. And the record makes clear that School 4 came to be viewed as a primary battleground in that fight. The attempted sale was not a routine and race-neutral disposition of surplus property, but an effort to ensure that the site could not be used for the construction of subsidized housing in East Yonkers. As such, it reflects a clear intent on the part of City officials to continue the thirty-year pattern of discriminatory actions that has operated to exclude subsidized housing for families from East and Northwest Yonkers.[59]

59. The presence of several categories of evidence remaining in the record but not reviewed

## VI. THE EFFECT OF THE CITY'S ACTIONS ON THE RACIAL CONFIGURATION OF YONKERS

The City contends that regardless of whether its actions with respect to subsidized housing are found to have been motivated by segregative intent, it cannot be held liable for those actions since they did not significantly contribute to the extreme condition of segregation that exists in Yonkers today. The City's contention is without merit.

While the record contains apparently conflicting evidence on the question of whether the City's actions significantly exacerbated the level of minority concentration in Southwest Yonkers (the point on which the City's argument focuses), there can be no doubt that the City's actions have played a significant role in the preservation of East and Northwest Yonkers as overwhelmingly white communities.[60] Indeed, it is difficult to imagine a pattern of actions by City officials that could have done significantly more in this regard. Not one of the City's twenty-seven subsidized housing projects for families is located in any of the overwhelmingly white neighborhoods of East and Northwest Yonkers. Twenty-six are located in (or, in the case of Seven Pines, literally on the border of) Southwest Yonkers; the twenty-seventh is in Runyon Heights, a minority enclave in East Yonkers. Section 23 leased housing has likewise been largely confined to buildings located in the Southwest, and the Section 8 Existing program (which is subject to no formal geographic control by the City) was for several years limited to senior citizens, and even after its expansion to include families, appears to have been actively promoted only to Southwest Yonkers landlords.

Moreover, this is not a case in which City officials simply neglected to consider sites outside Southwest Yonkers for family housing. Instead, it is a case in which sites were repeatedly considered and then rejected after the residents of those overwhelmingly white communities made their strong objections known. It is also a case in which it was generally acknowledged, at least as early as 1966, that what was at issue in their site selections was whether the Yonkers community was "ready" to accept racial integration. *See* HOUSING III.D *supra.* As a result, it is clear that the City's actions not merely preserved but strengthened existing patterns of segregation by appearing to condone, or at least respect, the segregative sentiment that prevailed in East and Northwest Yonkers. If City officials themselves appear unable or unwilling to breach a racial barrier, it becomes all the more unlikely that individual minorities will be encouraged to try, or that individual whites will be encouraged to abandon the attitudes that have erected that barrier.[61] *Cf., e.g., Reitman v. Mulkey,* 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1947).

above should be noted. The plaintiffs have offered a considerable quantity of evidence relating to the City's alleged nonsupport of fair housing laws and principles. In addition, both the City and the plaintiffs have offered evidence on the City's alleged compliance or noncompliance with the 1980 contract conditions and subsequent "contract comments". Finally, the City has argued that it has cooperated in the Consent Decree approved by this Court between HUD and Plaintiff-intervenor and that its cooperation is an indication of its good faith and nondiscriminatory intent.

We have found nothing in that evidence which is inconsistent with the pattern of discriminatory actions reviewed above. Nor, in light of the evidentiary strength of that pattern, do we consider it necessary to review evidence that further reinforces it.

**60.** Nor has the City attempted to argue this point. Instead, it has merely suggested that circumstances beyond its control (such as the unsuitability of sites or the unavailability of funds) prevented the construction of projects in East and Northwest Yonkers. That suggestion, as our foregoing review of the evidence has made clear, is entirely at variance with the record.

**61.** There is also evidence that the effect of the City's actions in this regard was exacerbated by its decidedly less than vigorous support of fair housing laws. *See, e.g.,* Tr. 1950–95 (Trommer); 8093–8105, 8112–13 (Nargi); 10,580–83 (Yost); GX 1182.

Thus, at least with respect to the issue of the City's *liability* for its actions, the precise effect of the actions on the Southwest is largely beside the point. In light of the clear effect of those actions on the racial composition of East and Northwest Yonkers, no more is required to confirm that the actions did indeed contribute significantly to the extreme condition of segregation that exists in Yonkers today. A plaintiff need not prove, with mathematical exactness, the precise effect of discriminatory actions in order to establish the defendants' liability for those actions. *See, e.g., Armstrong v. O'Connell*, 463 F.Supp. 1295, 1309–10 (E.D.Wis.1979).

Nonetheless, it bears noting (if only to guide future consideration of appropriate remedial measures) that the evidence belies the City's contention that its actions did not significantly exacerbate the concentration of minorities in the Southwest.

The period between 1960 and 1980 was marked by striking demographic shifts in the City as a whole, and in the Southwest in particular. During those years, and particularly beginning in the mid to late 1960's, the citywide minority population increased by 325%, and 94% of that increase was concentrated in Southwest Yonkers and census tract 7 (a tract on the northern border of the Southwest, which contains the Seven Pines housing project). GX 1225.1; 1225.4; 1225.6.[62] During those same years, Southwest Yonkers also lost nearly half of its white population, resulting in a total rise in the level of minority concentration from 6.7% to 40.4%. GX 1225.1. The population of East and Northwest Yonkers, in contrast, remained overwhelmingly white. *See* HOUSING I *supra* (discussing the level of minority concentration in the various census tracts of East and Northwest Yonkers).[63]

Plaintiffs contend that this markedly increased concentration of minorities in the Southwest is, in significant part, the result of the City's placement of more than 5,000 units of subsidized housing there (compared to less than 200 units elsewhere, none of which was family housing in a white area of the City). Specifically, plaintiffs contend that the City's actions with respect to subsidized housing "stigmatized" the Southwest as a minority area, thus making it more likely that minorities would seek housing there, and more likely that whites would leave. The City, in turn, contends that the population shifts that have occurred in the Southwest are primarily attributable to the large stock of substandard (and therefore low-cost) housing there and the general trend toward suburbanization among upwardly mobile whites, with subsidized housing having no significant incremental effect.[64]

The weight of expert testimony on this point strongly favors the plaintiffs. Paul Davidoff, an expert witness in housing, who testified on behalf of the United States, and Diana Pearce, an expert witness on housing and school segregation, each testified persuasively, on the basis of their general experience and studies in their respective fields, that the City's concentration of subsidized housing in the

---

**62.** The percentage represented by the Southwest alone is 86%. GX 1225.1.

**63.** Plaintiffs have suggested that the small increase in minority population shown for East and Northwest Yonkers between 1960 and 1980 (from 2.8% to 5.8%) may in fact be smaller still due to the inclusion in intervening years of "white hispanics" in the figures for minorities. *See* fn. 6 *supra*. The City, in turn, has suggested that this occurrence may also mean that the massive decline in the white population in Southwest Yonkers during those same years was slightly less massive. However, neither party has offered evidence to show that the adjusted figures (if they could be reconstructed) would likely be significantly different.

**64.** The City also cites factors such as the failure of White Plains to provide adequate relocation housing for those displaced by urban renewal and the more liberal social service and welfare policies followed by Westchester County as compared with New York City. But these factors merely explain why more minorities may have moved to Yonkers generally, not why they moved to the Southwest in particular. The City has also cited, without elaboration, testimony offered in passing to the effect that a higher birth rate prevails among minorities. Such a factor may indeed have contributed to the rise in the Southwest's rise in minority concentration but in no respect suggests that subsidized housing development did not likewise do so.

Southwest was indeed likely to have stigmatized it as a minority area. Tr. 180–81, 258–59 (Davidoff); 8178–95 (Pearce). In further support of her view, Dr. Pearce presented a series of "microneighborhood" maps which strikingly illustrate the general increase in minority concentration that tended to follow construction of the City's subsidized housing projects. P–I 352.[65]

In addition, and perhaps most significantly, plaintiffs' position even finds support in the testimony of the City's own expert witness on urban planning. Dr. Portman initially professed disagreement with plaintiffs' experts, but offered an explanation that suggested agreement more than disagreement (namely, that total abandonment of the Southwest might have had an even greater stigmatizing effect), and then conceded, when pressed, that there was "some logic" to the view expressed by plaintiffs' experts. Tr. 10,728–35 (Portman).

We agree that particularly when account is taken of the effect of the City's actions on the racial composition of East and Northwest Yonkers, there is considerable logic to the view expressed by plaintiffs' experts. When, as here, the City's actions with respect to subsidized housing have been found to have significantly contributed to the average minority member's inability (for reasons of race as well as economics) to find housing outside of Southwest Yonkers, it begs reason to suggest that those actions played no significant part in the circumstances that caused 94% of a large citywide increase in minorities to be concentrated in and around the Southwest.

Nor is it likely that those actions played no significant part in the Southwest's simultaneous loss of nearly half its white population. GX 1225.1. Common sense suggests, and the record as a whole confirms, that if obvious actions are being taken to preserve the overwhelmingly white character of all areas of a city except one, the incentive for whites to remain in that area will be significantly diminished. Indeed, decisive support for plaintiffs' theory of stigmatization is found in the concerns repeatedly expressed or alluded to in Yonkers by minority and church leaders seeking to stop further concentration of subsidized housing in the Southwest; by white residents of East Yonkers seeking to prevent the construction of subsidized housing there; and by some City officials themselves, who sought to blunt the stigmatizing effect by trying, in large part unsuccessfully, to attract more whites to the Southwest's projects. See, e.g., HOUSING III.D, IV.B, IV.D.3, IV.D.4, and IV.D.5 supra.[66]

The only significant evidence offered by the City in rebuttal is a statistical analysis of the City's census tract data undertaken by Eric Hanushek, who testified as an expert witness in urban economics. Broadly summarized, Dr. Hanushek testified that at least when certain other likely contributing factors are also taken into account (namely, the large stock of nonsubsidized low-cost housing in the Southwest; the general minority presence there; and the trend toward suburbanization among upwardly mobile whites), it does not appear probable that subsidized housing development in Yonkers played any significant incremental role in the sharp increase in minority concentration that has occurred in the Southwest. See Tr. 9053–113.

---

**65.** The City has criticized Dr. Pearce's analysis as inconclusive on the ground that any number of other factors might have accounted for that pattern. But such a criticism is unpersuasive unless accompanied by some reason to believe that the apparent pattern is, in fact, a false one. The City has suggested no such reason, nor do we perceive any.

**66.** The City has suggested that its demonstrated difficulty in attracting whites to various of the Southwest projects is attributable to the "narrow band" effect of the upper and lower income units on § 236 projects and thus provides no evidence that the concentration of subsidized housing in the Southwest stigmatized it as a minority area. However, while there is evidence to suggest that the "narrow band" effect did decrease the pool of eligible white applicants, it is clear from the record that it was not the only source of the City's difficulties. See, e.g., Tr. 10,158–59 (Bogdanoff) (describing the "continuing hesitancy" of whites in Yonkers to move into subsidized housing).

However, there are many reasons to question the probative value and, indeed, the relevance of Dr. Hanushek's analysis, particularly when it is weighed against the evidence supporting plaintiffs' contrary contention. First, as Dr. Hanushek himself acknowledged, his conclusion was based solely on statistical probabilities derived from the City's census tract data, not from any study of the history of subsidized housing in Yonkers. Moreover, the factors analyzed by Dr. Hanushek were conceded to be overlapping and mutually reinforcing, thus complicating considerably the statistical analysis by which the probable individual contribution of each factor is derived. Tr. 9071, 9160–62. Although Dr. Hanushek nonetheless expressed confidence in the capacity of his statistical methods to derive meaningful probabilities, the mechanics of those methods did not prove sufficiently capable of articulation to allow the Court to share that confidence.

Finally, and by far most significantly, Dr. Hanushek conceded that various circumstances which could not be taken into account in his study might significantly affect the reliability of his calculations. Tr. 9133–39. And among those circumstances is the very one cited by plaintiffs as the primary basis for their contention that subsidized housing indeed contributed to the sharp rise in minority concentration in the Southwest.

The point can best be illustrated in a somewhat simplified form. Dr. Hanushek's analysis reflects, at least in significant part, a judgment that the amount of subsidized housing in the Southwest was, in comparison to the amount of other low-cost housing there, sufficiently low so as to suggest that its presence probably had no significant incremental effect on minority concentration. However, if the subsidized housing carries with it the stigma of having been adjudged to be minority housing, and therefore unsuitable for other areas of the city, the placement of that housing in the Southwest may have had a far greater influence on the resulting level of minority concentration than would otherwise be suggested by the ratio of subsidized to nonsubsidized low-cost housing in the area. Since Dr. Hanushek's analysis cannot detect, much less measure that added influence, it must assume its absence. As a result, the analysis fails to address, much less rebut, the evidence tending to show that subsidized housing *did* exert a stigmatizing influence. Instead, it merely suggests that if no particular stigma was attached to subsidized housing, it probably had no significant incremental effect on the concentration of minorities. As a result, even if the calculation of probabilities is reliable, the underlying assumption renders the analysis irrelevant to our inquiry.

One final aspect of the evidence presented during Dr. Hanushek's testimony is so misleading as to require separate, although brief, discussion. Using the figures derived from his analysis, Dr. Hanushek projected the probable racial composition of a hypothetical Yonkers in which no subsidized housing whatever had been built. That projection estimated the probable difference to be limited to a decrease of some 78 to 98 individuals among the entire Southwest population. C–1704.

For the various reasons described above (chief among them the assumption that subsidized housing carried with it no particular racial stigma), the projection is, in any event, wholly unreliable. But it is rendered especially misleading by an additional assumption, for which Dr. Hanushek offered no justification and which is totally unrealistic and unfounded—namely, that if no subsidized housing had been built in Yonkers, the same amount of housing would have remained available in the private market.

The City has since suggested that the assumption is a reasonable one since there is evidence tending to show that private-market units were removed at roughly the same rate at which subsidized housing units were built. *See* Tr. 10,730 (Portman) (discussing the figures for the 1970's). But even assuming that the City's construction of subsidized housing did not result in any significant increase in the overall density of the Southwest, it by no means follows that if no subsidized housing had been built, the

density of the Southwest is likely to have remained constant. To the contrary, the record makes clear that much of the housing stock in the Southwest was rapidly deteriorating, thus leading to a steady loss of density unless the units were repaired or replaced. In addition, the record makes equally clear that the private market was unlikely to undertake that task on any significant scale. Indeed, as the City itself has emphasized in another context, it was precisely the *absence* of private-market interest in the Southwest which made some form of federally funded urban renewal there essential, and which in turn made the construction of subsidized housing somewhere in Yonkers equally essential. Thus, the "hypothetical" Yonkers described by Dr. Hanushek is, on the basis of the record before us, so unrealistic that any conclusions that may be drawn about it are simply irrelevant to this case.

In addition, it bears emphasis that the City could, in any event, have hoped to gain little by comparing the effect of its actions with that of what its own expert witness in urban planning described as the "worst case" alternative—failing to construct any subsidized housing anywhere in the city, and thereby failing to obtain urban funds, and thus consigning Southwest Yonkers to continued and increasingly serious deterioration. Tr. 10,737 (Portman). Obviously, the only relevant comparisons to be made are with the effects of the alternatives reasonably available to the City and under circumstances reasonably likely to occur. Dr. Hanushek's analysis made no attempt at such comparisons. Indeed, he acknowledged that the limitations of the analytical methods available to him did not permit such comparisons to be made. Tr. 9214–15.

A passing attempt to compare the effect of reasonable alternatives was made in a question put to Dr. Portman about the probable effect that constructing 200 units of family housing in East Yonkers would have had on the level of minority concentration in Southwest Yonkers. But Dr. Portman's response—that, in his opinion, it would have had no significant effect—was also made in passing and is surely overbroad. Tr. 10,738 (Portman). It seems

clear that the likely effect would depend on such variables as when the housing was built, what else was put in its place in the Southwest, and what other actions were being taken to promote fair housing in East and Northwest Yonkers. Moreover, even if Dr. Portman's opinion is credited, the construction of only 200 units elsewhere was not the only alternative open to the City. Finally, as suggested at the outset of this discussion, however uncertain the effect of the alternative may have been with respect to Southwest Yonkers, its likely effect with respect to East and Northwest Yonkers is clear. As Dr. Portman himself appeared to acknowledge, even the construction of so small an amount as 200 units of family housing in East Yonkers would have been likely to have exerted a significant integrative influence on the area. Tr. 10,786–88 (Portman).

A recurrent theme in the City's arguments to the Court has been that it is under no affirmative duty to promote integration through the construction of subsidized housing. But the absence, in the abstract, of such an affirmative duty does not equal a license to discriminate in decisions relating to subsidized housing. It does not, for example, equal a license to refuse to build subsidized housing, despite a need for it, on the ground that it might result in racial integration. *See, e.g., United States v. City of Parma, supra.* Nor does it equal a license to make the *preservation* of existing patterns of segregation a factor in site selection. *See, e.g., Gautreaux v. Chicago Housing Authority, supra.*

Nor, it should be emphasized, is this a case in which the claim of segregative intent must rest merely on a failure to take, despite the opportunity and reason to do so, a *sufficient* number of actions having an integrative effect. Instead, it rests on a thirty-year practice of consistently rejecting the integrative alternative in favor of the segregative—a practice that had the unsurprising effect of perfectly preserving, and significantly exacerbating, existing patterns of racial segregation in Yonkers.

## VII. CONCLUSIONS OF LAW

It is commonplace among courts and commentators that the task of determining whether actions were taken with discriminatory intent is a difficult one. Intent has been characterized as an "elusive, subjective concept," *Hawkins v. Town of Shaw*, 461 F.2d 1171, 1172 (5th Cir.1972) (en banc) (per curiam), and particularly difficult to identify when the intent at issue is the "collective" intent of a legislative or administrative body. *See, e.g., Palmer v. Thompson*, 403 U.S. 217, 224–25, 91 S.Ct. 1940, 1944–45, 29 L.Ed.2d 438 (1971); *Hart v. Community School Board of Education, New York School District #21*, 512 F.2d 37, 50 (2d Cir.1975). The task of determining intent is further complicated by the likelihood that there may be little or no direct evidence of discriminatory intent, especially with respect to actions taken during the past few decades, due to the growing unacceptability of overtly bigoted behavior, and a growing awareness of the possible legal consequences of such behavior. *Cf. Smith v. Town of Clarkton*, 682 F.2d 1055, 1064–65 (4th Cir.1982); *Arlington Heights II, supra*, 558 F.2d at 1290; *United States v. City of Parma, supra*, 494 F.Supp. at 1054.

In some respects, the case at hand might seem to present an unusually difficult exercise in determining intent. What is at issue is not a single action, or series of actions, undertaken by a single group of individuals, but more than thirty years of subsidized housing activity, for which a sizable and changing group of City officials shared responsibility. We are aware of only two prior cases that are of even roughly comparable scope, *see United States v. City of Parma, supra; Gautreaux v. City Housing Authority, supra*, and in neither case were the challenged actions defended with the vigor and sophistication with which the City of Yonkers has defended its actions here.

For several ,reasons, however, our conclusion that plaintiffs have sustained their burden of proving a pattern and practice of discrimination is a relatively · easy one. First, as suggested at the outset of this Opinion, when the segregative ef-fect of an action is extreme, or when there is a series of actions having a consistently segregative effect, the inference is stronger that the effect of the actions was intended. *E.g., Arlington Heights I, supra*, 429 U.S. at 266, 97 S.Ct. at 563; *Washington v. Davis*, 426 U.S. 229, 241–42, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976); *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Here, the segregative effect of the actions challenged by plaintiffs has been remarkably consistent and extreme. It is, to say the least, highly unlikely that a pattern of subsidized housing which so perfectly preserved the over-whelmingly white character of East and Northwest Yonkers came about for reasons unrelated to race. *See Gautreaux v. Chicago Housing Authority, supra*, 296 F.Supp. at 910; *United States v. City of Parma, supra*, 494 F.Supp. at 1097.

In addition, despite the considerable span of time involved, and the various changes in City personnel and in the structure of the subsidized housing programs themselves, there have been several constants in the development of subsidized housing in Yonkers which strongly suggest that these segregative effects were not adventitious. One constant has been the emergence of strong community opposition following the proposal, or even the preliminary discussion, of sites for subsidized housing for families when those sites are in the heavily white areas of Yonkers—in particular, East Yonkers.

Another constant has been a political structure likely to make community opposition unusually effective. Plaintiffs have established that the operation of the City's ward system provided strong incentive for individual councilmen to defer to the views of their constituents on subsidized housing, and for the Council as a whole to defer to the views of the ward councilman. *Cf. Gautreaux v. Chicago Housing Authority, supra*, 296 F.Supp. at 913 (discussing the effect of Chicago's ward system). Plaintiffs have also established that this phenomenon was well known to the Planning Board, the CDA, the MHA, and others who worked with the City in the develop-

ment of subsidized housing. *Cf. United States v. City of Parma, supra,* 494 F.Supp. at 1096 (discussing the effect of attitudes expressed by City leaders on subordinate local officials).

A third constant has been the extreme consistency with which the sites that have prompted opposition in East Yonkers and other heavily white areas have in fact been subsequently rejected, abandoned, or otherwise opposed by City officials.

These constants strongly suggest that whatever differences in personnel or programs there may have been throughout the years, subsidized housing in Yonkers has been characterized by a common theme: racially influenced opposition to subsidized housing in certain areas of the City, and acquiescence in that opposition by City officials.[67]

The City has cited cases in which courts have cautioned against determining the nature of community opposition, or its effect on City officials, largely on the basis of the "bigoted comments of a few citizens." *Arlington Heights II, supra,* 558 F.2d at 1292; *see also Angell v. Town of Manchester,* 3 E.O.H.C. ¶ 15,398 (D.Conn.1981); *United States v. City of Birmingham,* 538 F.Supp. 819 (E.D.Mich.1982). But this is clearly not such a case. A finding that there has been sustained racially influenced community opposition to the placement of subsidized housing in certain areas of Yonkers would not be based simply on the fact that in 1958, for example, a group of citizens sent City Council members a letter in opposition to subsidized housing which expressed concern about having "to

absorb the overflow from Harlem and Puerto Rico," or that as late as 1982, a white resident of East Yonkers was met with loud applause from an overwhelmingly white audience when he spoke against subsidized housing at a City Council session, contending that blacks had ruined neighborhoods in the Bronx and that he did not want the same thing to happen in his neighborhood. Such statements form only a small part of the evidence which suggests that the community opposition in question was racially influenced.

As suggested above, among the most persuasive indications of racial influence here is the extreme consistency with which community opposition has arisen when the site proposed was in a heavily white area of the City—especially East Yonkers. Of all the many East Yonkers sites proposed or publicly discussed in the course of more than thirty years (with the exception of those in heavily black Runyon Heights), only one site appears to have prompted little or no community opposition—the site of Curran Court, a senior citizens project that has been virtually all white since opening. The uniformity of opposition to sites in overwhelmingly white East Yonkers argues strongly against a finding that the opposition was genuinely site-specific and race-neutral.[68]

Further indications of a racial aspect to the opposition include the evidence that there was longstanding and, since the mid-1960's, increasing racial polarization in Yonkers, *cf., e.g., Kennedy Park Homes Association v. City of Lackawanna,* 436

---

**67.** Although there are nominally two defendants in the housing portion of this case—the City of Yonkers and the CDA—they have mounted a collective defense, and their liability will be discussed collectively.

**68.** Nor, in the context of the record as a whole, can this uniform community opposition to subsidized housing be persuasively explained as simply race-neutral opposition to *any* increases in the area's density. In this regard, *Citizens Committee for Faraday Wood v. Lindsay,* 362 F.Supp. 651 (S.D.N.Y.1973), *aff'd,* 507 F.2d 1065 (2d Cir.1974), *cert. denied,* 421 U.S. 948, 95 S.Ct. 1679, 44 L.Ed.2d 102 (1975), upon which the City relies, is clearly distinguishable. *Faraday*

*Wood* involved opposition to a single project, not a pattern of opposition coinciding with the steady construction of unsubsidized multifamily buildings in the area. In addition, the project at issue in *Faraday Wood* was primarily middle income, an income range in which minorities are not disproportionately represented, and thus the project's opposition and subsequent abandonment were held not to warrant the careful scrutiny traditionally given to actions involving low-income housing. 507 F.2d at 1068–69; *see also United States v. City of Parma, supra,* 494 F.Supp. at 1099 n. 65. Finally, the court in *Faraday Wood* found there to be little or no other evidence that the opposition to the project was racially motivated.

F.2d 108, 113 (2d Cir.1970), *cert. denied,* 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971); *Smith v. Town of Clarkton, supra; United States v. City of Parma, supra;* the evidence that subsidized housing for senior citizens (which, unlike subsidized housing for families, tended to be heavily white) often provoked less opposition in heavily white areas, *cf., e.g., Atkins v. Robinson,* 545 F.Supp. 852, 874 (E.D.Va.1982), *aff'd,* 733 F.2d 318 (4th Cir.1984); *United States v. City of Birmingham, supra; United States v. City of Parma, supra,* 494 F.Supp. at 1091–94; *Gautreaux v. Chicago Housing Authority, supra,* 296 F.Supp. at 912; and the nature of the objections most often raised—objections based upon the "incongruity" of putting a subsidized housing project in a particular area; the belief that subsidized housing should be restricted to "slum" areas; concern about deterioration of the neighborhood and property values; and what City officials themselves disparaged as the "standard litany" of inadequacies. Such objections can be convenient substitutes for explicitly racial statements, and they have been construed as such when appearing in conjunction with other evidence of discriminatory intent. *See, e.g., Smith v. Town of Clarkton, supra; United States v. City of Birmingham, supra; United States v. City of Parma, supra.*

Finally, and most significantly, there is the testimony of the City's own officials and other on-the-scene observers. Numerous City officials—including a former mayor—and others who were directly involved in site selection acknowledged at trial that they themselves believed that much of the community opposition they encountered was racially influenced—specifically, influenced by the fear that subsidized housing would result in an "invasion" of minorities into the area.

▇▇ To be sure, the evidence does not support a finding that the community opposition was based *wholly* upon race, or that the position of *every* community opponent was based, at least in part, upon race. But such findings could rarely, if ever, be made; nor are they required here. What *is* required, and what the evidence clearly supports, is a finding that the desire to preserve existing patterns of segregation has been a significant factor in the sustained community opposition to subsidized housing in East Yonkers and other overwhelmingly white areas of the City. *See Smith v. Town of Clarkton, supra,* 682 F.2d at 1066; *United States v. City of Birmingham, supra,* 538 F.Supp. at 826.

▇▇ The evidence is equally clear that City officials consistently responded to that opposition. While a single instance of the rejection or abandonment of a proposed action following the emergence of community opposition may not create a strong inference that the decision was a response to the opposition, a *pattern* of opposition followed by rejection or abandonment is another matter, particularly when the political system controlling the decisionmaking process is shown to be hypersensitive to adverse community reaction. Here, as noted above, there is evidence of a pattern of more than thirty years' duration, and of a political system in which the ward councilman exercised unusual influence over the Council as a whole, and in which ward residents, in turn, exercised unusual influence over the ward councilman.

In addition, the record is replete with contemporaneous statements and trial testimony by City officials and other on-the-scene observers which further suggest that for more than thirty years, the site selection process for subsidized housing was dominated by the unwillingness of the City Council to approve or support a site in the face of community opposition. The single most notable, but by no means only, testimony in confirmation of the effect of community opposition was that of former Mayor Alfred Del Bello, who testified to the "tremendous pressure" put on East Yonkers councilmembers by the opponents of subsidized housing, and who stated flatly that the reason why the numerous sites selected during his administration were all in Southwest Yonkers was that they were the only sites the City Council would approve.

The City has suggested that the plaintiffs are required to prove, on a vote-by-

vote basis, that the desire to appease racially influenced community opposition was the deciding factor for a specific, identified majority of the City Council or other City agency responsible for each action at issue in the case.[69] If indeed this were the legal standard, however, the burden of proving discriminatory intent would no longer be merely difficult, but instead virtually impossible. And, in fact, it clearly is not the standard.

■■■ To the contrary, it is well established that the intent of collective actions can, and often must, be established circumstantially. *See Arlington Heights I, supra,* 429 U.S. at 266–68, 97 S.Ct. at 563–65. For, as one court observed, "[i]f proof of a civil right violation depends on an open statement by an official of an intent to discriminate, the Fourteenth Amendment offers little solace to those seeking its protection." *Dailey v. City of Lawton,* 425 F.2d 1037, 1039 (10th Cir.1970). And as the Supreme Court noted in *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979):

> The inquiry [into intent] is practical. What a legislature or any official entity is 'up to' may be plain from the results its actions achieve, or the results they avoid. Often it is made clear from what has been called, in a different context, "the give and take of the situation."

442 U.S. at 279 n. 24, 99 S.Ct. at 2296 n. 24 (citation omitted).

■■■ Here, based upon the pattern of actions taken, the political structure of the decisionmaking process, and the statements of City officials and others involved in City affairs, there can be little doubt that with respect to the selection of sites for subsidized housing, appeasement of racially influenced community opposition was an important factor for a very "significant percentage of those who were responsible for the city's conduct," *United States v. City of Birmingham, supra,* 538 F.Supp. at 828.

The City has offered various alternative explanations for the pattern of sites approved by City officials, but the explanations are plausible only if evaluated in the abstract. When applied to the record, none raises any significant doubt about the effect of community opposition on site selection.

The explanation most vigorously pressed by the City is that the concentration of sites in Southwest Yonkers reflects nothing more than a strategy to use subsidized housing to revitalize the Southwest. That explanation, however, is simply not supported by the record. With respect to the pre-Riverview period (HOUSING III *supra*) there is little in the record to suggest that there was a conscious decision to focus on the Southwest in choosing sites for subsidized housing, and much to suggest the contrary. With respect to the Riverview period, there is little to suggest that any decisions to do so were unrelated to the continuing community opposition to the placement of subsidized housing elsewhere in the City. Indeed, the sequence of events preceding site selections during this period, and the testimony of former Mayor DelBello and others, strongly suggest the contrary. With respect to the post-Riverview period (HOUSING V *supra*), the continued

---

**69.** In support, the City has cited two cases involving challenges to a single action by a single body of officials. *See United States v. City of Birmingham, supra; Robinson v. 12 Lofts Realty Co.,* 610 F.2d 1032 (2d Cir.1979). However, although both courts engaged in some vote tallying, neither in any way suggested that such a procedure was the only means of establishing the collective intent of a voting body. Nor, it should be added, did either require a showing that a *majority* of the officials were influenced by racial discrimination. In *City of Birmingham,* the court defined the intent of a city as the intent of a "significant percentage of those responsible for the City's conduct." 538 F.Supp. at 828. In *Robinson,* the court stated that a collective vote was discriminatory if *any* of the individual votes needed for a majority was based on racial considerations. 610 F.2d at 1039–40. Such formulations merely elaborate the general rule that plaintiffs must prove that discriminatory intent was indeed a factor (although not necessarily the sole or even dominant factor) in the challenged decisionmaking process, *Arlington Heights I, supra,* 429 U.S. at 265–66, 97 S.Ct. at 563. As such, those formulations are fully consistent with the approach that has been taken here.

concentration of subsidized housing in the Southwest in fact ran *counter* to at least some aspects of the stated planning strategy of the City.[70]

Nor does the record support the City's suggestion that despite the evidence of pervasive community pressures, the site selection process over the years was governed by the routine application of standard planning criteria. In addition to the strikingly predictable effect that the existence of community opposition had on the fate of proposed sites, the record reflects repeated disregard of Planning Board objections or recommendations; inconsistent application of stated planning criteria; and, in general, varying degrees of scrutiny depending upon whether the site in question was east or west of the Saw Mill River Parkway. *See Arlington Heights I, supra,* 429 U.S. at 267, 97 S.Ct. at 564.

Nor, it should be emphasized, is there any basis for doubt that City officials were fully aware that the course they were pursuing was one of segregation. The potentially segregative or integrative effect of site selections was publicly addressed at least as early as 1958; and from the mid-1960's on, the issue was regularly raised by community leaders, HUD representatives, and the City's own officials. *Cf. e.g., United States v. City of Parma, supra,* 494 F.Supp. at 1097 (segregative effect not only foreseeable, but actually foreseen).

Yet, City officials continued to accede to community opposition which they believed, according to their own testimony, to be influenced by fear that construction of subsidized housing would result in an invasion of minorities into the surrounding area. Indeed, during the "post-Riverview" period, numerous City officials not only responded to, but, in the words of the campaign literature of some, "led the fight against subsidized housing in East Yonkers." That "fight" has included, most notably, a three-year refusal to apply for Section 8 Existing Certificates for Families—a refusal this Court finds inexplicable except on the basis of fear that minorities might use the certificates to relocate to East Yonkers—and the attempted sale of School 4 (a site widely viewed as a potential site for subsidized housing in East Yonkers) under circumstances which provide a virtual compendium of the factors that courts have been charged to look for in order to detect the presence of discriminatory intent. *See Arlington Heights I, supra,* 429 U.S. at 266–68, 97 S.Ct. at 563–65.

In short, we find the unusual scope and complexity of plaintiffs' contentions to be matched by evidence of discriminatory intent that is itself unusual in its strength and abundance. Having considered the evidence in its entirety, this Court is fully persuaded that the extreme concentration of subsidized housing that exists in Southwest Yonkers today is the result of a pattern and practice of racial discrimination by City officials, pursued in response to constituent pressures to select or support only sites that would preserve existing patterns of racial segregation, and to reject or oppose sites that would threaten existing patterns of segregation. This pattern of discriminatory actions is evident as early as the first selection of sites for public housing under the National Housing Act of 1949, and it has continued, unbroken, through the attempted sale of School 4 in 1982.[71]

---

**70.** A significant portion of the City's proposed conclusions of law is devoted to a lengthy review of federal housing statutes, regulations, and HUD publications, apparently intended, at least in part, to show that a reasonable and race-neutral city could have construed national housing policy as encouraging confinement of subsidized housing to Southwest Yonkers. Since the record clearly suggests, however, that this was not in fact how subsidized housing came to be confined to the Southwest, the argument is irrelevant.

Nor is the City's review of national housing policy persuasive as an attempt to suggest that the City's actions are illegal only under recently enunciated standards. None of the materials cited by the City suggest, or can in any way be read as suggesting, that the intentional confinement of subsidized housing to particular areas of a city in order to preserve existing patterns of segregation is permissible.

**71.** Strictly speaking, the City's liability under the Fair Housing Act (the sole basis of the action brought by the United States) is limited to that portion of the pattern and practice of discrimi-

Two remaining issues merit brief discussion. One concerns the effect of HUD's involvement in the City's subsidized housing activities; the second, the City's contention that regardless of whether race had been a factor in site selection, the results would have been precisely the same.[72]

During the course of trial and in its post-trial submissions, the City has raised a variety of arguments relating to the effect of HUD's approval of the sites upon which subsidized housing has been constructed in Yonkers. In particular, the City has urged that HUD is entitled to great deference in its determination that each of the sites complied with all legal requirements, and even that HUD's approval "insulates" the City from any liability with respect to those sites.

■ However, the City has cited no case, nor are we aware of any, which has held that a site's approval by HUD creates any presumption that segregative intent was not at work in its selection.[73] Nor do we believe that such a presumption would be appropriate, at least in the present case. As an initial matter, the case before us is a pattern and practice case, the very essence of which is a recognition that the illegal basis of actions may emerge clearly only when the actions are viewed together. *See United States v. City of Parma, supra,* 494 F.Supp. at 1055 (citing cases). In such a case, any approval of individual actions necessarily must carry limited weight.[74]

In addition, the record before us does not suggest that HUD's various approvals reflected an informed and considered judgment that the City's actions were not motivated, in whole or in part, by segregative intent. Indeed, the record reflects repeated expressions of concern about the basis of the City's actions, and repeated instances in which those concerns were

nation which occurred after April 11, 1968, the effective date of the Act, *see* 42 U.S.C. § 3603(a)(1), while its liability under the Constitution (the second basis of Plaintiff-intervenors' action) is premised upon the entire pattern and practice. However, the distinction appears to have little, if any, practical effect, since the measures that will be available and appropriate to remedy the effects of the City's discrimination are not likely to vary according to whether liability runs from 1950 or from 1968.

**72.** A third issue raised by the City—the timeliness of plaintiffs' suit—can be dismissed without discussion. Although many of the actions challenged by plaintiffs occurred years ago, they are part of a continuing pattern and practice of discrimination, and as such they remain subject to suit. *See, e.g., Havens Realty Corp. v. Coleman,* 455 U.S. 363, 380–81, 102 S.Ct. 1114, 1125, 71 L.Ed.2d 214; *United States v. Parma, supra,* 661 F.2d at 573. The application of laches that has been urged by the City (limitation of plaintiffs' case to events that occurred no earlier than three years prior to the date on which suit was filed) would preclude any effective remedy for a pattern and practice of discrimination. The City's argument is without precedent and (at least on the facts of this case) wholly without merit.

**73.** All but one of the cases cited by the City are inapposite since they are limited to the review of a HUD finding that a proposed project complied with specific statutory or regulatory requirements unrelated to the intent with which a site has been selected. *See Business Association of University City v. Landrieu,* 660 F.2d 867 (3d Cir.1981); *Aertsen v. Landrieu,* 637 F.2d 12 (1st Cir.1980); *South East Chicago Commission v. HUD,* 488 F.2d 1119 (7th Cir.1973); *Croskey Street Concerned Citizens v. Romney,* 459 F.2d 109 (3d Cir.1972). Only one case cited by the City, *Jones v. Tully,* 378 F.Supp. 286 (E.D.N.Y. 1974), *aff'd,* 510 F.2d 961 (2d Cir.1975) (per curiam), also included a claim of discriminatory intent in site selection, and that case contradicts rather than supports the City's argument, since the court clearly made its own determination that there had been no discriminatory intent at work in the site selection, and in no respect suggested that the determination was based on any presumption arising from HUD's approval of the project. *See* 378 F.Supp. at 293.

**74.** The City contends that the United States has conceded the individual legality of each of the site selections and thus cannot challenge their collective legality. It is clear, however, that the United States has made no such concession. In saying that it does not contest HUD's approval of any individual sites, the United States has said no more than that it does not contend either that the sites were illegal under statutory or regulatory provisions unrelated to intent (*e.g.,* HUD's site selection criteria), or that HUD knew or should have known any of the site selections to have been influenced by segregative intent. Such a statement does not preclude the United States from arguing, or this Court from finding, that when viewed together, and in the context of the record as a whole, the segregative intent underlying the site selections (and, hence, their illegality) clearly emerges.

pursued incompletely or not at all. Moreover, there is evidence that on more than one occasion the City misrepresented to HUD the extent of its efforts to achieve at least some measure of geographic dispersal of subsidized housing in Yonkers. In light of these circumstances, and in the context of the record as a whole, HUD's actions do not negate a finding that the City has engaged in pattern and practice of housing discrimination.

■ Nor do HUD's actions "insulate" the City from liability for the consequences of that discrimination. HUD has no power to excuse discriminatory acts or to waive, on behalf of those injured by them, the right to seek a remedy. Nor is the City's duty not to discriminate defined simply as a duty to comply with HUD's orders. Thus, HUD's longstanding "failure to insist" that the City construct at least some subsidized housing for families in East Yonkers—a failure the City has repeatedly stressed—has no bearing on the City's liability for the consequences if its persistent refusal to do so is later challenged and found to have been motivated by segregative intent.[75] In the face of abundant evidence of a longstanding practice of racial discrimination in site selection for subsidized housing, the City cannot escape liability on the ground that HUD did not do more to encourage or compel the City to abandon that practice.

■ The remaining argument made by the City against entry of judgment for plaintiffs is based upon the principle that such a judgment is unwarranted if the defendant can establish that the same actions would have been taken even in the absence of a discriminatory motive. *See Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Arlington Heights I, supra,* 429 U.S. at 270 n. 21, 97 S.Ct. at 566 n. 21.[76] In this regard, the City contends that the need for improved housing and general revitalization in Southwest Yonkers was so pressing that, whether or not race was a factor in site selection, precisely the same sites would have been chosen. In support, the City points to the Community Renewal Plan prepared by Patrick Kane of KRS Associates, an outside planning consultant, and the testimony of David Portman, the City's expert witness on urban planning.

However, for many of the same reasons that this evidence failed to support the City's contention that its site selections were *in fact* unrelated to race, it likewise fails to suggest that the same sites would have been selected even if race had not been an issue. While Dr. Portman testified that an extreme concentration of subsidized housing in the Southwest would not have been unreasonable from a planning perspective, he also acknowledged that it

**75.** The City's related contention that its actions were legal because they were in compliance with HUD site selection criteria or any other regulations effective at time of site selection is similarly mistaken. Such regulations could not, and do not profess to, define the parameters of a city's duty not to discriminate in site selection, and compliance with them is not a safe harbor for those who, in fact, are found to have discriminated.

**76.** We note in passing the questionable utility of performing a separate "even if" analysis in a case such as this, involving not simply the isolated dismissal of a public employee, *cf. Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), but a discriminatory pattern and practice involving the acts and omissions of governmental entities over a significant period

of time. This concern is particularly relevant where evidence concerning the existence or absence of segregative intent has been introduced by all parties and has been considered collectively in making our determination of liability. *Cf. Diaz v. San Jose Unified School District,* 612 F.2d 411, 515 n. 1 (9th Cir.1979). To the extent that the "even if" analysis entails an examination of feasible alternatives to the segregative decisions made by the defendants or the significance of the non-racial factors allegedly relied upon in making those decisions, *see Brody-Jones v. Macchiarola,* 503 F.Supp. 1185, 1243 (E.D.N. Y.1979), we have performed such an examination in rendering our Findings of Fact. Nevertheless, we undertake a separate examination if only to underscore our conclusion that segregative intent was a motivating factor in the acts and omissions that have led to the perpetuation and aggravation of housing and school segregation in Yonkers. *See* SCHOOLS VI. *infra.*

was not the only means of responding to the needs of the area, nor even necessarily a preferable means. Such testimony scarcely suggests a strategy so compelling that it would have been pursued even if the decisionmaking process had not been influenced by the perceived need to select sites that would maintain existing patterns of segregation. Similarly, Patrick Kane's recommended plan, as reflected in the CRP, tells little about what might have happened in Yonkers if race had not been an issue in site selection since the plan itself was recommended after thorough research into past and present attitudes in Yonkers—research which Kane acknowledged to have led him to believe that there was pervasive community opposition to subsidized housing in East Yonkers, that the opposition was racially influenced, and that the prospects for approval of any site there were virtually nonexistent.

Moreover, much of the same evidence which has confirmed that this racially influenced community opposition did in fact have an effect on site selection—namely, evidence of disregard or compromise of previously stated planning objectives; failures to consult the City's Planning Bureau; the testimony of the City's Planning Director with respect to his opposition to many of the sites chosen by the City; the differing levels of scrutiny given to sites depending upon whether they were located east or west of the Saw Mill River Parkway; and inconsistent application of planning criteria—also preclude any rational finding that precisely the same sites would have been selected even if race had not been a factor. In this regard, it bears particular emphasis that the widely acknowledged negative effects (economic as well as racial) that have resulted from the concentration of subsidized housing in Southwest Yonkers did not become apparent only after the fact. Instead they were the subject of repeated warnings (often from the City's own Planning Director)

which were repeatedly ignored by City officials.

In sum, the record clearly demonstrates that race has had a chronic and pervasive influence on decisions relating to the location of subsidized housing in Yonkers. While the precise configuration of subsidized housing which would have arisen in the absence of that influence necessarily remains a matter of speculation, it is clear that "but for" that influence, a significantly different result would have obtained. *See Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 416–17, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979).

### SCHOOLS

### I. THE CLAIMS OF UNLAWFUL SCHOOL SEGREGATION

This case is similar in some respects to the many cases which have arisen since the Supreme Court's 1954 decision in *Brown v. Board of Education* declaring that state-mandated racial segregation in public schools was unlawful. In subsequent cases, when a particular public school system has been found to be racially segregated, that condition has typically arisen as a result of a variety of complex and interrelated acts and omissions, rather than the overtly discriminatory operation of a statutorily-mandated dual school system. Thus, although racially segregated school facilities mandated by statute have been outlawed in New York State since the early 1900's, N.Y.Educ. Law § 3201 (McKinney 1970), this fact is merely the beginning of our inquiry, for we must determine whether the numerous actions and omissions of the responsible City and school authorities in Yonkers have nevertheless created or maintained a segregated school system with the impermissible segregative intent proscribed by federal statute and by the Constitution.

In three significant respects, however, this case is different from the typical school desegregation case: the plaintiffs in this case have joined claims of unlawful school segregation with claims of governmental housing discrimination; [77] plaintiffs

---

77. In a number of school desegregation cases in which the issue of governmental housing discrimination has been raised, courts have noted that the relevant housing authorities were not

joined as parties to the action. *See, e.g., Higgins v. Board of Education of Grand Rapids,* 508 F.2d 779, 789 (6th Cir.1974); *Deal v. Cincinnati*

have alleged that both the City and the Board should be held liable for the intentional segregation of the Yonkers public schools; and resolution of plaintiffs' claims requires us to consider whether governmental housing discrimination is relevant to the determination of liability for school segregation.

Plaintiffs allege that the Board, by various acts and omissions, has caused the Yonkers public school system to become and remain racially segregated. Plaintiffs have sought to establish that the Board has engaged in various types of conduct which were intended to bring about and perpetuate such segregation. These segregative practices may be summarized in six major categories: (1) a pattern of segregative decisions with respect to the opening and closing of schools, and the alteration of attendance zone boundaries for racial reasons; (2) the assignment of faculty and administrative staff according to the racial composition of the students at individual schools; (3) the discriminatory classification, transportation, and other treatment of minority Special Education students; (4) the steering of minorities into vocational education programs and the subsequent screening of minorities out of such programs and into inferior general academic programs; (5) the failure to provide minority students with equal educational opportunities; and (6) the failure to adopt, for racial reasons, various desegregative school reorganization and educational reform plans. Plaintiffs allege that these acts and omissions constitute a sufficient basis for a finding of unlawful school segregation independent of any actions or omissions on the part of the City.

In response, the Board alleges that the racial imbalance that exists in many of the district's schools has been caused by social, economic and demographic factors that are beyond its control. The Board contends that the various acts and omissions noted above were not intentionally segregative (or, in some instances, not in fact segre-

gative regardless of intent) and that Board policies were essentially irrelevant in any event to the causes of racial imbalance in the schools. In addition, the Board contends that no affirmative action is constitutionally required of it to alleviate racial imbalance in the schools not caused by any intentionally segregative acts of the Board, and that adherence to its neighborhood school policy has been race-neutral in intent and is in any event an insufficient legal basis for a finding of liability.

As for the City, plaintiffs have sought to establish its liability for school segregation based on a number of factors, all of which have allegedly served to create and maintain racial imbalance in the Yonkers public schools. Plaintiffs claim that the City has intentionally confined the construction and placement of subsidized housing to Southwest Yonkers in part to confine minority students to public schools in this area of the city, and that such conduct is, standing alone, a basis for finding the City liable for the racial segregation of the schools. In addition, plaintiffs contend that the City's involvement in educational affairs—including the site selection process for newly constructed schools; the Mayor's appointment of Board members; and the City Council's budgetary control over the Board and "will of the Council" resolutions—has given the City significant influence and effective control over the Board and has been designed in part to perpetuate the racial segregation of the Yonkers public schools. Plaintiffs contend that the City's influence and control over school affairs, together with its subsidized housing practices, constitute adequate grounds for holding the City liable for the racial segregation of the schools.

The City contends that neither its housing practices nor its involvement in school affairs are a proper basis for a finding of municipal liability for the racial segregation of Yonkers public schools. The City argues that a policy of restricting the loca-

---

*Board of Education,* 369 F.2d 55, 60 n. 4 (6th Cir.1966), *cert. denied,* 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967); *Brody-Jones v. Macchiarola,* 503 F.Supp. 1185, 1236–37 n. 27 (E.D.N.Y.

1979); *Bronson v. Board of Education of the City School District of Cincinnati,* 578 F.Supp. 1091, 1104 (S.D.Ohio 1984).

tion of subsidized housing to Southwest Yonkers, whether or not violative of Title VIII and the Constitution, does not constitute legal grounds for a finding of unlawful school segregation and that, as a factual matter, its housing practices have not caused or exacerbated racial segregation in the Yonkers public schools. The City also argues that it has neither legal nor practical control over the Board of Education and thus is not responsible for the segregation of the Board-operated schools. The City has attempted to show that the City's budgetary appropriation power, the mayoral appointments to the Board, the City's involvement in school site selection, and City Council resolutions have not resulted in City control over the school district and have not been used to intentionally cause or maintain racial segregation in the Yonkers public schools.

## II. LEGAL STANDARDS

The legal standards governing the school desegregation portion of this case have evolved from the Supreme Court's historic decision in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). In *Brown*, the Supreme Court held that statutorily imposed separate school facilities for blacks and whites were unconstitutional. Since that decision, a myriad of school desegregation cases have established that less blatant forms of racial segregation in public schools are similarly unlawful. It is equally clear, however, that the mere existence of racially segregated schools does not constitute a federal constitutional or statutory violation. *Columbus Board of Education v. Penick*, 443 U.S. 449, 464, 99 S.Ct. 2941, 2949, 61 L.Ed.2d 666 (1979); *Keyes v. School District No. 1*, 413 U.S. 189, 198, 93 S.Ct. 2686, 2692, 37 L.Ed.2d 548 (1973); *Alexander v. Youngstown Board of Education*, 675 F.2d 787, 791 (6th Cir.1982); *Arthur v. Nyquist*, 573 F.2d 134, 141 (2d Cir.), *cert. denied*, 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 169 (1978). Similarly, the mere existence of *de facto* segregation does not create an obligation on the part of a school board to alleviate or rectify such segregation. *See Diaz v. San Jose Unified School District*, 733 F.2d 660, 664 (9th Cir.1984) (en banc), *cert. denied*, —— U.S. ——, 105 S.Ct. 2140, 85 L.Ed.2d 497 (1985); *Alexander v. Youngstown Board of Education*, *supra*, 675 F.2d at 791; *Parent Association of Andrew Jackson High School v. Ambach*, 598 F.2d 705, 713 (2d Cir.1979) ("If there is no *de jure* segregated school system, there is no judicially-enforceable constitutional obligation, under existing law, to take affirmative action to remedy racial imbalance."). Under current legal standards, plaintiffs have the burden of demonstrating that (1) the Yonkers public schools are racially segregated; (2) such segregation was created or maintained by the intentionally segregative conduct of governmental authorities; and (3) such conduct has affected the school system as a whole. *See Keyes v. School District No. 1*, *supra*, 413 U.S. at 205–09, 93 S.Ct. at 2695–97 (1973); *Arthur v. Nyquist, supra*, 573 F.2d at 141.

Each of these elements has been explored in prior school desegregation decisions. As for the first element, the existence of racial segregation need not be numerically absolute so long as the public schools are substantially segregated and racially identifiable. *Arthur v. Nyquist*, 415 F.Supp. 904, 912 n. 9 (W.D.N.Y.1976), *aff'd on reconsideration*, 429 F.Supp. 206 (W.D.N.Y.1977), *aff'd in part and rev'd in part on other grounds*, 573 F.2d 134 (2d Cir.), *cert. denied*, 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 169 (1978); *see also Keyes v. School District No. 1, supra*, 413 U.S. at 196, 93 S.Ct. at 2691. Blacks and hispanics are to be considered as a group in determining whether the school system is racially segregated. *See Keyes v. School District No. 1, supra*, 413 U.S. at 197–98, 93 S.Ct. at 2691–92; *Hart v. Community School Board of Education, New York School District #21*, 512 F.2d 37, 45 n. 10 (2d Cir.1975); *see also* Alioto Dep. 34; Schainker Dep. 32; Tr. 10,973–74 (Jacobson).

The second element encompasses a number of legal concepts: causation, state action and intent. As for caustion,

the conduct of school authorities need not be the sole cause of racial segregation, but such conduct cannot be of trivial or *de minimus* impact. Plaintiffs must demonstrate that the defendant's conduct has contributed in a substantial manner to the creation or perpetuation of racial segregation. *Berry v. School District of Benton Harbor,* 442 F.Supp. 1280, 1292 (W.D.Mich. 1977). In addition, the "conduct" of school authorities includes omissions as well as affirmative acts. Thus, although the mere failure to act, without more, does not form the basis for a finding of *de jure* segregation, *see Hart v. Community School Board, supra,* 512 F.2d at 48; *Brody-Jones v. Macchiarola,* 503 F.Supp. 1185, 1248 (E.D.N.Y.1979), the inaction of school authorities may be considered along with evidence of school board action in determining whether the racial segregation of the public schools has been brought about or maintained in an unlawful manner. *See Parent Association of Andrew Jackson High School v. Ambach, supra,* 598 F.2d at 714; *NAACP v. Lansing Board of Education,* 559 F.2d 1042, 1046–47 (6th Cir.), *cert. denied,* 434 U.S. 997, 98 S.Ct. 635, 54 L.Ed.2d 491 (1977); *Morgan v. Kerrigan,* 509 F.2d 580, 586 (1st Cir.1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975).

The intent requirement has been discussed previously in this Opinion. *See* HOUSING II *supra.* In applying this requirement, many of the school desegregation cases of the 1970's relied in significant part on evidence that the conduct of the relevant school authorities had a foreseeably segregative impact. Some courts went so far as to hold that a

> presumption of segregative purpose arises when plaintiffs establish that the natural, probable, and foreseeable result of public officials' action or inaction was an increase or perpetuation of public school segregation. The presumption becomes proof unless defendants affirmatively establish that their action or inaction was a consistent and resolute application of racially neutral policies.

*Oliver v. Michigan State Board of Education,* 508 F.2d 178, 182 (6th Cir.1974),

*cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975); *see United States v. Texas Education Agency,* 532 F.2d 380, 388–89 (5th Cir.), *vacated and remanded sub nom. Austin Independent School District v. United States,* 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976); *United States v. School District of Omaha,* 521 F.2d 530, 536 (8th Cir.), *cert. denied,* 423 U.S. 946, 96 S.Ct. 361, 46 L.Ed.2d 280 (1975); *see also Hart v. Community School Board, supra,* 512 F.2d at 51. While the Supreme Court, in *Dayton Board of Education v. Brinkman,* has rejected the use of such a presumption as a means of establishing segregative intent or shifting the burden of persuasion on the intent issue to the defendant, 443 U.S. 526, 536 n. 9, 99 S.Ct. 2971, 2978 n. 9, 61 L.Ed.2d 720 (1979), the Court nevertheless reaffirmed that "proof of foreseeable consequences is one type of quite relevant evidence of racially discriminatory purpose." *Id.; see also Columbus Board of Education v. Penick, supra,* 443 U.S. at 464–65, 99 S.Ct. at 2949–50 (foreseeable effect of decision is "one of the several kinds of proofs from which an inference of segregative intent may properly be drawn"); *Alexander v. Youngstown Board of Education, supra,* 675 F.2d at 792–93 (court may infer discriminatory intent from acts or policies with foreseeably segregative result; inference is permissible rather than mandatory).

In evaluating whether the decisions of school authorities were motivated by segregative intent, courts have analyzed evidence of foreseeable impact in conjunction with other evidence or surrounding circumstances in order to determine whether the challenged decision was intentionally segregative. Thus, while a presumption of intent does not automatically flow from evidence of foreseeability, an inference of intent may be appropriate where a foreseeably segregative decision is made despite the existence of less segregative alternatives which were consistent with the educational objectives or policies of school officials or were even more in keeping with these goals or policies. *See Arthur v. Ny-*

quist, *supra,* 573 F.2d at 142;[78] *United States v. Board of School Commissioners of Indianapolis,* 573 F.2d 400, 413 (7th Cir.), *cert. denied,* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978); *Penick v. Columbus Board of Education,* 429 F.Supp. 229, 240–41 (S.D.Ohio 1977), *aff'd in part and vacated in part,* 583 F.2d 787 (6th Cir. 1978), *aff'd,* 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979); *Berry v. School District of Benton Harbor,* 494 F.Supp. 118, 123 (W.D.Mich.1980). The lack of a persuasive or credible explanation for foreseeably segregative conduct of school authorities may also justify an inference that such conduct was intentionally segregative. *See United States v. Texas Education Agency,* 600 F.2d 518, 528–29 (5th Cir.1979); *Arthur v. Nyquist, supra,* 415 F.Supp. at 939–41; *Berry v. Benton Harbor, supra,* 494 F.Supp. at 123. A consistent pattern of foreseeably segregative decisions may also suggest that the resulting segregative consequences were intentional, rather than accidental or unavoidable, in nature. *See Parent Association of Andrew Jackson High School v. Ambach, supra,* 598 F.2d at 713; *United States v. Board of School Commissioners of Indianapolis, supra,* 573 F.2d at 412. In short, the Court must examine all the relevant facts and circumstances surrounding the foreseeably segregative decisions of school authorities in order to determine whether a finding of segregative intent is warranted.

As noted previously, foreseeable segregative impact is not the only evidence upon which a finding of segregative intent may properly be based. A court may also examine the historical background of decisions, the specific sequence of events leading up to such decisions, departures from normal procedural sequence or substantive criteria normally considered important by the decisionmaker; contemporaneous evidence concerning the decisionmaking process; or the testimony of decisionmakers regarding the purposes of official acts. In addition, proof that officials were responsive to the discriminatory purposes of others in making a decision may be relied upon to establish segregative intent. *See* HOUSING II *supra.* If plaintiffs are successful in establishing their *prima facie* case of intentional segregation of Yonkers public schools, the burden is

---

**78.** There is considerable disagreement among the parties regarding the continued validity of the Second Circuit's school desegregation decisions, particularly *Hart v. Community School Board* and *Arthur v. Nyquist.* In those decisions, the Second Circuit cited with approval the foreseeability test for determining the existence of segregative intent. *Arthur v. Nyquist, supra,* 573 F.2d at 143; *Hart v. Community School Board, supra,* 512 F.2d at 51. While this test was subsequently disavowed by the Supreme Court in *Dayton,* it is also clear that the Second Circuit's decisions did not rest entirely on the foreseeability presumption in upholding the district courts' respective findings of segregative intent. In *Arthur,* the Second Circuit described its decision in *Hart* as holding that "foreseeable consequences, while not specifically identifiable with intention, can provide evidence for its presence" and that "segregative intent could only be inferred in the context of an examination of alternative policies available to state officials." 573 F.2d at 142. Moreover, a careful reading of the district and circuit court opinions in *Arthur* confirms that the findings of segregative intent did not rest solely on the foreseeability presumption but on an examination of alternative courses of action, the reasons preferred for the school board's segregative conduct, and the school board's response to the known segregative impact of its policies and practices. 415

F.Supp. at 930 (failure to amend language program policy even though board was "obviously aware of its segregative impact"); 936 (school districting decision is "an example of blatant segregative intent with clear segregative results"); 939 (knowing granting of transfers for "specious or blatantly discriminatory reasons"); 940–41 (deliberate adherence to segregative optional attendance zone policy for which "[n]o rational reason" was found); 942 (adherence to segregative screening criteria for vocational schools); 946 (deliberately segregative staff assignment policy); 948–49 (failure to devise and implement desegregation plan in response to state integration order); 429 F.Supp. 206 (liability decision reaffirmed upon reconsideration in light of Supreme Court's decisions in *Austin Independent School District v. United States, Washington v. Davis,* and *Arlington Heights v. Metropolitan Housing Development Corp.*); 573 F.2d at 143–45 (affirming aforementioned findings of intent). In our view, this mode of analysis is consistent with the Supreme Court's subsequent decisions in *Dayton* and *Columbus* regarding the relevance of foreseeable segregative impact. *See Alexander v. Youngstown Board of Education, supra,* 675 F.2d at 792–93; *Berry v. School District of Benton Harbor,* 494 F.Supp. 118, 123 (W.D.Mich.1980).

then on the defendant to establish that the same segregative conduct would have occurred "even had the impermissible purpose not been considered." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 271 n. 21, 97 S.Ct. 555, 566 n. 21, 50 L.Ed.2d 450 (1977); *see Brody-Jones v. Macchiarola, supra,* 503 F.Supp. at 1238.

Third, the intentionally segregative conduct of school authorities must result in the creation or perpetuation of racial segregation throughout the school district; that is, the segregation must be systemwide. Plaintiffs need not specifically show, however, that every school or student was affected by the unlawful conduct of the defendant. Rather, plaintiffs must demonstrate that school authorities have effectuated an intentionally segregative policy in a meaningful or significant portion of the school system. Such proof creates a presumption that the racial segregation of the remaining segment of the system is not inadvertent, and places a burden of proof on the defendant to show that other segregated schools within the system are not also the result of intentionally segregative conduct. *Keyes v. School District No. 1, supra,* 413 U.S. at 208–11, 93 S.Ct. at 2697–98.

Considerable ambiguity exists as to the relevance of a school board's application of a neighborhood school assignment policy to its liability for school segregation. A number of courts have concluded that adherence to such a policy is not a *per se* violation of the Constitution. These decisions have observed that the application of such a policy is supported by a variety of nondiscriminatory considerations and therefore may generally be considered a permissible, albeit segregative, form of official action. *See Keyes v. School District No. 1, supra,* 413 U.S. at 245–48, 93 S.Ct. at 2715–17 (Powell, J., concurring in part and dissenting in part); *Spangler v. Pasadena City Board of Education,* 611 F.2d 1239, 1244–45 (9th Cir.1979) (Kennedy, J., concurring); *United States v. Texas Education Agency,* 564 F.2d 162, 168–69 & n. 9 (5th Cir.1977), *petition for rehearing denied,* 579 F.2d 910 (5th Cir.1978) (en banc), *cert.*

*denied,* 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979); *NAACP v. Lansing Board of Education, supra,* 559 F.2d at 1049; *Deal v. Cincinnati Board of Education,* 369 F.2d 55, 60 (6th Cir.1966), *cert. denied,* 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967); *Brody-Jones v. Macchiarola, supra,* 503 F.Supp. at 1247. Thus, a school district with no prior history of *de jure* segregation is not required to abandon its neighborhood school policy merely because adherence to such a policy results in the perpetuation of segregated schools. *See Diaz v. San Jose Unified School District, supra,* 733 F.2d at 664.

It is also apparent, however, that the mere invocation of the neighborhood school policy as a defense to a school desegregation lawsuit is not dispositive of the liability determination. Instead, a school board's alleged application of and adherence to a neighborhood school policy must be examined in the context of other official acts and omissions in order to determine whether the policy exists and is in fact free of segregative purpose or intent. Among the most relevant factors to consider is the extent to which the neighborhood school policy is applied in a consistent manner; for example, the use of optional or non-contiguous attendance zones or out-of-district student transfer policies has been relied upon as evidence that a neighborhood school policy is either non-existent or sufficiently marked by segregative exceptions so as to be an implausible explanation for school segregation. *See Columbus Board of Education v. Penick, supra,* 443 U.S. at 461–62 & n. 8–9, 99 S.Ct. at 2948–49 & n. 8–9; *Arthur v. Nyquist, supra,* 573 F.2d at 145 n. 21; *NAACP v. Lansing Board of Education, supra,* 559 F.2d at 1056–57; *Armstrong v. O'Connell,* 451 F.Supp. 817, 829–30 (E.D.Wis.1978); *Berry v. Benton Harbor, supra,* 442 F.Supp. at 1325–26. In rejecting the neighborhood school policy defense, courts have also relied upon a school board's selection of segregative student assignment or school construction policies where less segregative alternatives were available which could have been implemented without violating the district's neighborhood school policy.

*See Diaz v. San Jose Unified School District, supra,* 733 F.2d at 665. Finally, a number of courts have held that a school district's adherence to a neighborhood school policy is constitutionally unacceptable where discriminatory public housing practices have contributed to the racial segregation of the neighborhoods, a conclusion we will explore further in our Conclusions of Law. *See* SCHOOLS VI.B.1.c *infra.* In short, a full examination of the facts and circumstances surrounding a school board's formulation of and adherence to a neighborhood school policy is appropriate in determining whether the segregative impact of such a policy is the result of impermissibly discriminatory intent.

### III. THE YONKERS PUBLIC SCHOOL SYSTEM

The Yonkers School District and Yonkers Board of Education were established in 1881. GX 125. The Yonkers School District is coterminous with the geographic boundaries of the City of Yonkers. According to state law, the Board is an independent municipal corporation subject to the control of the New York State Board of Regents and the Commissioner of Education. N.Y. Const., Art. 5, § 4; N.Y. Educ.Law §§ 305, 2551 (McKinney 1970). The Board is an agent of the state and is charged with the responsibility of providing education for public school children in the city. The Board consists of nine members who are appointed by the Mayor for five year staggered terms of office. Among the Board's powers is the authority to hire the Superintendent of Schools, the school district's chief administrative officer.[79] The Superintendent and his or her administrative staff are often involved in the development and implementation of policies affecting school construction and closings, the setting and changing of attendance zone lines, grade structure, personnel policies, and other educational matters. The Board is ultimately responsible for determining and approving the policies of the school district with respect to the aforementioned matters.

The City of Yonkers also has specific legal powers relating to the operation of the Yonkers public schools. Under state law, the Yonkers City Council is empowered to appropriate an annual budget for the school district. The Mayor of Yonkers is also responsible under state law for appointing members of the Board of Education. City officials also have participated in the selection of sites for the construction of schools and in a variety of other educational matters. The manner in which these legal responsibilities and participating roles have in fact been exercised and the resulting impact on the Yonkers public schools will be explored further in our discussion of the City's liability for the racial segregation of the schools.

The segregation of the Yonkers public schools is best understood against the backdrop of the demographic changes occurring in the city and the Board's role in minimizing and exacerbating these trends. To a large extent, the development of the racial segregation in the Yonkers public schools has reflected the residential segregation of geographic areas surrounding these schools. We have previously described in some detail the demographic development of the city, *see* HOUSING I *supra,* and we incorporate that discussion herein. We will discuss the development of the district's school system and its increasing racial segregation in further detail as part of our findings regarding school openings and closings and school attendance zone changes. *See* SCHOOLS IV.A.1 *infra.*

As an initial matter, it is helpful to understand the geographic, structural, numerical, and other characteristics of the Yonkers public schools.[80] As of the 1980–81 school year, the Yonkers public school

---

**79.** Since 1950, the school district has had five superintendents: Stanley Wynstra (1950–68), Paul Mitchell (1968–70), Robert Alioto (1971–75), Joseph Robitaille (1975–78), and Joan Raymond (1979–present).

**80.** It is important to note that our findings with respect to the racial segregation of Yonkers public schools and our evaluation of evidence concerning the practices and policies governing the operation of these schools are based, unless

system was comprised of twenty-three elementary schools, two combined elementary/middle schools, four middle schools, and five high schools. The elementary schools consist of grades K–6, with three schools enrolling a small number of pre-kindergarten (pre-K) students as well.[81] Two schools, Emerson and Twain, contain students from grades K–8. (The elementary school portion of Twain is also referred to as School 11; the elementary portion of Emerson is also referred to as School 34). The middle school portions of these schools draw students from elementary school attendance areas other than that of their respective elementary school components. The five high schools consist of four general academic high schools and the Saunders Trades and Technical High School, a districtwide vocational and technical school in Central Yonkers. The district also operates a Career Center for high school students and post-graduate individuals, offering various occupational education programs. SB 746, at 114.[82] Most of the district's schools also enroll students who have been assigned to one of the district's Special Education programs. The attendance zone maps for the Yonkers public schools are included as Appendix B, C and D to this Opinion. *See* SB 626–628. The school zone boundaries reflect those in existence as of the 1980–81 school year.

The decline in white population in Yonkers and the simultaneous rise in minority residents has been reflected in public school enrollments as well. This phenomenon is reflected in the following table:

Yonkers Public School Student Population

| Year | White[83] | % White | Minority[84] | % Minority | Total |
|------|-----------|---------|--------------|------------|-------|
| 1967 | 25,875 | 85 | 4,421 | 15 | 36,296 |
| 1970 | 25,049 | 82 | 5,583 | 18 | 30,632 |
| 1975 | 21,514 | 72 | 8,195 | 28 | 29,709 |
| 1980 | 13,840 | 63 | 8,023 | 37 | 21,863 |

GX 64. Thus, from 1967 to 1980, the district's white student enrollment declined by over 12,000, or 47%; minority student enrollments rose by over 3,600, or 81%.

specifically noted, on the schools as they existed in 1980 when this lawsuit was commenced. Almost five years have passed since that time, during which changes in racial balance, program offerings, and educational policies or practices have occurred, some of which this Court may well be unaware of and thus cannot be reflected in these findings. Where post-1980 occurrences have been shown to be relevant insofar as they represent a definite and recognizable continuation of a previously existing policy or pattern of behavior, these occurrences have been discussed in our findings where applicable. All other post-1980 occurrences, while relevant to our formulation of remedial measures to correct the racial imbalance in the public schools, have not been relied upon in our determination of liability. *United States v. Board of School Commissioners of Indianapolis*, 474 F.2d 81, 89 (7th Cir.), *cert. denied*, 413 U.S. 920, 93 S.Ct. 3066, 37 L.Ed.2d 1041 (1973).

81. The pre-K program originated in a small number of Southwest Yonkers elementary schools, and was expanded to many of the City's elementary schools as a result of a 1973 school reorganization plan. GX 64, 114. The program was drastically curtailed as a result of the school district's 1976 budget reductions. *See* SCHOOLS IV.A.3.b *infra*. In 1980–81, the pre-K program, operated in Schools 9, 18 and 25, enrolled 90 students and was 49% minority. No allegations or evidence of unlawful segregation have been presented by plaintiffs with respect to the operation of the pre-K program.

82. In 1980–81, the Career Center enrolled 103 students and was 62% minority. GX 64. No allegation or evidence of unlawful segregation has been presented by plaintiffs with respect to the operation of the Career Center.

83. "White" includes caucasian, Indian-American, Asian-American, and any other non-"minority" students. In 1980–81, there were 352 Asian/Pacific Island Americans (1.6%), 11 American Indian/Alaskans (0.1%), and 13,477 caucasians and other nonminorities (61.6%) enrolled in Yonkers public schools. SB 752.

84. "Minority" includes black and hispanic students. *See* SCHOOLS II *supra*.

The decline in white student enrollment during the 1970's is also reflected in the non-public school enrollments during this period of time:

Yonkers Non-Public School Student Population

| Year | White | % White | Minority | % Minority | Total |
|------|-------|---------|----------|------------|-------|
| 1969 | 10,011 | 94 | 612 | 6 | 10,623 |
| 1970 | 9,291 | 93 | 706 | 7 | 9,997 |
| 1975 | 7,071 | 88 | 970 | 12 | 8,041 |
| 1980 | 6,149 | 79 | 1,654 | 21 | 7,803 |

SB 98. As these figures reflect, the non-public school white student enrollment has decreased at a slower rate than for public schools, while the non-public school minority enrollment has increased at a far more rapid rate. White student enrollment has declined by almost 4,000 students, or 39%; minority student enrollment has increased by just over 1,000 students, or 170%.

The general decline in student enrollment is reflected in attendance figures for individual public schools as well. From 1973 to 1980, only five of the district's 25 elementary schools experienced an increase in enrollment—Schools 10, 18, 19, 23 and 27, all in Southwest Yonkers. On the secondary school level, only two schools have experienced increases in student enrollment during this period—Saunders, primarily because of its 1980 relocation to the recently built Burroughs facility; and Yonkers High School, which was relocated in 1974 to a newly constructed facility and enrolls students from the School 10, 18, 19, 23 and 27 attendance zones.

■ The extent to which a school system is racially segregated can be determined by examining a number of factors: the racial composition of each school's student body, the racial composition of the school's faculty and staff, the community's and school administration's perceptions or attitudes toward the schools, and the physical characteristics of the schools. *Keyes v. School District No. 1, supra,* 413 U.S. at 196, 93 S.Ct. at 2691; *Berry v. Benton Harbor, supra,* 442 F.Supp. at 1298. An evaluation of these criteria reveals that the racially segregated nature of the Yonkers public schools is systemwide.

By 1980–81, the school year in which this suit was filed, the segregated nature of the Yonkers public schools' student enrollment was clear. The following represents the racial enrollment data for the district's twenty-five elementary schools, six middle schools and five high schools:

Elementary Schools

| School | Location | White | Minority | Total |
|--------|----------|-------|----------|-------|
| 5 | Central | 373 (90%) | 42 (10%) | 415 |
| 6 | SW | 4 (21%) | 219 (98%) | 223 |
| 8 | NE | 307 (99%) | 2 ( 1%) | 309 |
| 9 | SW | 150 (37%) | 254 (63%) | 404 |
| 10 | SW | 45 (10%) | 416 (90%) | 461 |
| 11 (Twain) | SE | 440 (96%) | 18 ( 4%) | 458 |
| 13 | SW | 503 (62%) | 307 (38%) | 810 |
| 14 | SE | 393 (96%) | 16 ( 4%) | 409 |
| 16 | NW | 235 (90%) | 27 (10%) | 262 |
| 17 | SE | 255 (98%) | 8 ( 2%) | 263 |
| 18 | SW | 177 (25%) | 519 (75%) | 696 |
| 19 | SW | 96 (19%) | 400 (81%) | 496 |
| 21 | SE | 381 (94%) | 23 ( 6%) | 404 |
| 22 | NW | 222 (90%) | 24 (10%) | 246 |
| 23 | SW | 366 (55%) | 303 (45%) | 669 |
| 25 | NW | 39 (12%) | 276 (88%) | 315 |
| 26 | NE | 249 (94%) | 15 ( 6%) | 264 |

| School | Location | White | Minority | Total |
|---|---|---|---|---|
| 27 | SW | 206 (43%) | 278 (57%) | 484 |
| 28 | NE | 257 (95%) | 14 ( 5%) | 271 |
| 29 | NE | 252 (98%) | 6 ( 2%) | 258 |
| 30 | SE | 316 (93%) | 25 ( 7%) | 341 |
| 31 | NE | 155 (79%) | 41 (21%) | 196 |
| 32 | NE | 237 (93%) | 19 ( 7%) | 256 |
| King | SW | 14 ( 2%) | 554 (98%) | 568 |
| 34 (Emerson) | NW | 223 (90%) | 25 (10%) | 248 |
| TOTAL | | 5,895 (61%) | 3,831 (39%) | 9,726 |

Middle Schools

| School | Location | White | Minority | Total |
|---|---|---|---|---|
| Emerson (7–8) | NW | 301 (63%) | 178 (37%) | 479 |
| Fermi (6–8) | SW | 134 (38%) | 221 (62%) | 355 |
| Hawthorne (7–8) | SW | 222 (31%) | 493 (69%) | 715 |
| Longfellow (6–8) | SW | 13 ( 6%) | 216 (94%) | 229 |
| Twain (7–8) | SE | 646 (96%) | 27 ( 4%) | 673 |
| Whitman (7–8) | NE | 604 (94%) | 35 ( 6%) | 639 |
| TOTAL | | 1,920 (62%) | 1,170 (38%) | 3,090 |

High Schools

| School | Location | White | Minority | Total |
|---|---|---|---|---|
| Gorton | NW | 634 (53%) | 573 (47%) | 1,207 |
| Lincoln | SE | 1,599 (98%) | 38 ( 2%) | 1,637 |
| Roosevelt | NE | 1,388 (91%) | 134 ( 9%) | 1,522 |
| Saunders | Central | 733 (84%) | 144 (16%) | 917 |
| Yonkers | SW | 875 (38%) | 1,422 (62%) | 2,297 |
| TOTAL | | 5,269 (70%) | 2,311 (30%) | 7,580 |
| SUBTOTAL, ALL SCHOOLS | | 13,084 (64%) | 7,312 (36%) | 20,396 |
| Special Education | | 666 (53%) | 583 (47%) | 1,249 |
| Pre-kindergarten | | 46 (51%) | 44 (49%) | 90 |
| Career Center | | 39 (38%) | 64 (62%) | 103 |
| TOTAL, ALL SCHOOLS | | 13,840 (63%) | 8,023 (37%) | 21,863 |

Thus, in 1980, nineteen out of twenty-five elementary schools were over 80% white or 80% minority. Almost one-half of the elementary schools' minority enrollment—1865 students, or 49%—attended five schools in West Yonkers. Three of these schools were at least 90% minority; the other two—Schools 19 and 25—were 81% and 88% minority, respectively. Over 70% of the district's white elementary school students attended schools with at least 90% white students.

Racial imbalance among the district's secondary schools, while not as stark as on the elementary school level, was nevertheless clear for the majority of these schools. The two East Yonkers middle schools, Twain and Whitman, had between them only sixty-two minorities among their 1,312 students, or 5% of the district's minority middle school enrollment; the district's three Southwest Yonkers middle schools, Fermi, Hawthorne and Longfellow, each were at least 62% minority and enrolled 79% of the district's minority middle school

students. Only one middle school—Emerson Middle School in Northwest Yonkers—can be characterized as a racially balanced school.

The district's regular high schools followed a similar pattern of racial imbalance. Lincoln and Roosevelt, the two East Yonkers High Schools, enrolled 8% of the district's minority high school students. Yonkers High School, a 62% minority school in Southwest Yonkers, enrolled 62% of the district's minority students; along with Gorton, the two West Yonkers high schools enrolled 92% of the district's regular minority high school students.

In sum, 64% of the district's white students were enrolled in schools of at least 90% white students, while 28% of the district's minority students were enrolled in schools with at least 80% minority enrollment. While some schools, such as School 13 (38% minority), School 23 (45%), School 31 (21%), and Emerson Middle School (37%) fairly reflect the racial population of Yonkers and the school population in particular (37% minority), most schools in the district are identifiably white or minority based on the factors discussed above. *Cf. Oliver v. Michigan State Board of Education, supra,* 508 F.2d at 183.

Other attributes of the Yonkers public schools also serve to delineate them as racially identifiable. The racial imbalance of the school district's faculty and administrative staff is similar to the imbalance in student enrollments in its pattern of racial imbalance at all grade levels of the school system. As set forth in more detail later in these findings, the bulk of the district's minority staff members are assigned to schools with predominantly minority student enrollments. Many of the district's predominantly white schools, on the other hand, have few, or in some cases, no minority staff. While this disproportion has been reduced somewhat in recent years, the racial imbalance is still significant. *See* SCHOOLS IV.E *infra.*

The differences in the physical facilities of Yonkers public schools also adds to the racial identifiability of the school system. As will be discussed in greater detail, the predominantly minority elementary schools are generally smaller, have less recreational space, and are generally characteristic of the minority, more urban character of Southwest Yonkers. *See* GX 1005. Middle schools with predominantly minority student bodies are significantly older, more limited in site size and recreational facilities, and similarly reflect their predominantly minority urban surroundings. Differences in the district's high school facilities, while considerably less drastic than on the elementary school level, are nevertheless detectable. *See* SCHOOLS IV.B.1 *infra.*

The community's and school officials' perceptions of the Yonkers public schools also support our finding that the Yonkers public school system as a whole is racially segregated. The racial identifiability of these schools generally reflects the demographic makeup of the communities in which these schools are situated, particularly at the elementary school level where neighborhood school assignments are largely responsible for this correlation. The evidence demonstrates that community and administrative personnel generally associate schools in Southwest Yonkers as minority schools, particularly Schools 6, 10, 18, 19, and King, which have long been considered minority schools. The only three exceptions to the general correlation of geographic location and racial identifiability are School 13, a 38% minority school located in the Southeasternmost section of Southwest Yonkers (an historically white area); School 23, a 45% minority school, located north of School 13; and School 25, an 88% minority school abutting the Hudson River in Northwest Yonkers. Even Schools 13 and 23 are identifiably minority to the extent that they border on elementary school zones for School 21 (6% minority) and School 17 (2% minority), and to the extent that the School 23 zone includes a large identifiably minority subsidized housing project (Whitney Young Houses). School 25 is located within a narrow strip of land which, along with Runyon Heights, has historically been more heavily populated by minorities than any other area out-

side of Southwest Yonkers. The school's enrollment consists in part of students from the Seven Pines subsidized housing project and abuts the School 16 (10% minority) zone, an area which has long been an identifiably white school zone.

On the secondary school level, the pattern is somewhat less consistent but nevertheless clear. Longfellow has long been considered a minority school, with Hawthorne and Fermi more recently gaining this general reputation despite the fairly even balance among white, black and hispanic students at each of these schools. The district's high schools fall within a similar pattern. Although some black community members consider Yonkers High School (62% minority) to be an integrated school, Ryer Dep. 29; see also Tr. 12,912–13 (Dodson), it is nevertheless clear to the Yonkers community that Yonkers High School and Gorton High School are the two high schools in which the vast majority of the city's minority students are enrolled. Yonkers High School receives students from the School 10, 18, 19 and King elementary school zones; Gorton receives students from the School 6, 25 and King zones and was considered a school marked by racial disturbances and minority identifiability even prior to achieving its predominantly (i.e., over 50%) minority status in 1982. Tr. 5505–06 (Minervini); see SCHOOLS IV.F.2 infra. In sum, community and school administration perceptions are consistent with the other indicia of racial segregation which exist in the Yonkers public school system.

In order to properly evaluate many of the acts and omissions of the Board with respect to student assignment policies and other enrollment-related practices, it will be necessary to refer to numerical evidence of school capacity. The available capacity data for presently operating and previously closed public schools are summarized in Appendix E to this Opinion. As these figures reflect, significant variations among the particular sources of capacity data are generally the exception rather than the rule. In analyzing the feasibility of partic-

ular courses of action, we will note these variations (for example, by giving a range of capacity figures and the source of these figures) to the extent applicable.

The Yonkers public school system has undergone many grade reorganizations throughout its history, particularly in recent years. Originally organized in a K–8, 9–12 fashion, the district gradually moved toward a more typical elementary-middle (or junior high[85])-high school structure subsequent to the creation of eight middle school attendance zones in 1938. Some facilities, such as Schools 16, 25 and 27 in West Yonkers and Schools 4, 5, 8, 11, 14, 15 and 17 in East Yonkers, continued to serve both elementary and middle school students until the 1950's and early 1960's, when additional middle schools such as Lincoln, Gorton and Whitman were constructed and expanded. By 1967–68, the district was organized primarily in a K–6, 7–9, 10–12 pattern.

Since 1967, the district's grade structure has undergone considerable change. The opening of King Intermediate School in 1969 brought about the district's first 4–6 school, and with it a number of K–3 feeder schools. By 1972, the K–5 elementary school was introduced and eventually became the district's most common grade structure when the Board adopted Superintendent Robert Alioto's 1973 school reorganization recommendations. The stated reasons for recommending implementation of a K–5, 6–8, 9–12 grade structure were the fewer discipline problems and increased opportunities for educational innovation and individualized instruction at the elementary school level, and the closer intellectual, physical, psychological and social resemblance between sixth and seventh graders than between fifth and sixth graders. Before this pattern became even nearly uniform, however, the city's fiscal crisis and change in superintendents led to a reformulation of grade structure. As part of the 1977 Phase II school reorganization proposal, Superintendent Joseph Robitaille and his staff recommended the adoption of a K–6, 7–8, 9–12 grade structure. This recommen-

---

**85.** Middle schools include grades 6–8; junior high schools include grades 7–9.

dation was based on a variety of factors: more efficient space utilization; increased teacher and parent involvement; the fiscal savings of providing education to sixth graders in elementary, rather than middle, schools; and the emotional, physical, psychological and educational features of eleven-year olds. This proposal was adopted in 1978 and was fully implemented at the elementary school level by 1980 and at the secondary school level by 1981.[86]

## IV. THE BOARD OF EDUCATION

### A. *School Openings, Closings, and Attendance Zone Changes*

#### 1. *Introduction*

The Yonkers school district has witnessed a substantial number of school openings, school closings, and attendance

zone changes during the past forty years. While each of these decisions raises its own particular issues and has had a separate racial impact, they are all similar in their more geographically limited, rather than systemwide, effect. In general, the Board's practices in these areas can be examined individually to determine the existence of segregative impact and segregative intent. Nevertheless, decisions regarding the opening or closing of a particular school have generally been accompanied by related adjustments in attendance zones or student assignments. Our discussion of Board practices will reflect this interconnection.

A summary of school openings, closings, and attendance zone changes is set forth below.

### ELEMENTARY SCHOOLS

| School | Quadrant | Opening Date | Closing Date | Attendance Zone Changes Since 1950 |
|---|---|---|---|---|
| 1 | NW | 1872 | 1954 | – |
| 2 | SW | 1891 | 1945[a] | – |
| 3 | SW | 1884 | 1976 | 1965, 1972, 1975 |
| 4 | SE | 1885 | 1976 | 1963, 1965 |
| 5 | Central | 1884 | – | 1954, 1963, 1976 |
| 6 | SW | 1889 | – | 1953, 1966, 1973 |
| 7 | SW | 1887 | 1976 | 1963 |
| 8 | NE | 1892 | – | 1951, 1952, 1954, 1973 |
| 9 | SW | 1894 | – | 1963, 1965, 1970, 1976 |
| 10 | SW | 1972 | – | – |
| 11[b] | SE | 1898 | – | 1965, 1976 |
| 12 | SW | 1898 | 1976 | 1953, 1963, 1973 |
| 13 | SW | 1901 | – | 1973, 1976 |
| 14 | SE | 1902 | – | 1952, 1976 |
| 15 | NE | 1902 | 1976 | 1951 |
| 16 | NW | 1902 | – | 1953, 1963, 1964, 1968, 1970, 1976 |
| 17 | SE | 1903 | – | 1952, 1963, 1973, 1976 |
| 18 | SW | 1904 | – | 1973, 1976 |
| 19 | SW | 1906 | – | 1965, 1972, 1975, 1976 |
| 20 | SW | 1907 | 1930[c] | – |
| 21 | SE | 1914 | – | 1963, 1976 |
| 22 | NW | 1914 | – | 1963 |
| 23 | SW | 1918 | – | 1973, 1976 |

**86.** In 1984, the school district converted seven Northeast Yonkers elementary schools into K–8 facilities following the closing of Whitman Middle School for purposes of asbestos removal. Tr. 11,598 (Guerney).

| School | Quadrant | Opening Date | Closing Date | Attendance Zone Changes Since 1950 |
|--------|----------|--------------|--------------|-----------------------------------|
| 24 | NW | 1930 | 1976 | 1954, 1963 |
| 25 | NW | 1930 | – | 1953, 1963, 1964, 1968, 1973 |
| 26 | NE | 1936 | – | 1976 |
| 27 | SW | 1930 | – | 1976 |
| 28 | NE | 1951 | – | 1976 |
| 29 | NE | 1951 | – | 1958 |
| 30 | SE | 1952 | – | 1963, 1973 |
| 31 | NE | 1953 | 1982[d] | 1976 |
| 32 | NE | 1958 | – | – |
| King | SW | 1969 | – | 1973, 1976 |
| 34[e] | NW | 1963 | – | – |

[a] Converted into Franklin Junior High School.
[b] Part of Twain facility.
[c] Converted into Longfellow Junior High School.
[d] Converted into elementary magnet school.
[e] Part of Emerson facility.

## MIDDLE AND JUNIOR HIGH SCHOOLS

| School | Quadrant | Opening Date | Closing Date | Attendance Zone Changes Since 1953 |
|--------|----------|--------------|--------------|-----------------------------------|
| Burroughs | Central | 1969 | 1978[f] | 1973, 1976 |
| Commerce | SW | 1973[g] | 1976 | – |
| Emerson | NW | 1963 | – | 1973, 1976, 1978 |
| Franklin/ Fermi | SW | 1926, 1945[h], 1974[i] | – | 1954, 1958, 1963, 1973, 1976 |
| Gorton | NW | 1954 | 1973 | 1963, 1969 |
| Hawthorne | SW | 1925 | – | 1958, 1963, 1969, 1973, 1976 |
| Lincoln | SE | 1953 | 1972 | 1963, 1969 |
| Longfellow | SW | 1930[j] | – | 1954, 1963, 1969, 1973, 1976 |
| Roosevelt | NE | 1954 | 1959 | – |
| Twain | SE | 1925, 1971[k] | – | 1953, 1963, 1973 |
| Whitman | NE | 1959 | – | 1963, 1969, 1978 |

## HIGH SCHOOLS

| School | Quadrant | Opening Date | Closing Date | Attendance Zone Changes Since 1953 |
|--------|----------|--------------|--------------|-----------------------------------|
| Commerce | SW | 1930[j] | 1974 | – |
| Gorton | NW | 1923 | – | 1963, 1973 |
| Lincoln | SE | 1957 | – | 1963, 1973 |
| Roosevelt | NE | 1926 | – | 1963, 1973 |
| Saunders | SW | 1911, 1980[f] | – | – |
| Yonkers | SW | 1927, 1945[h], 1974[i] | – | 1957, 1963, 1973 |

[f] Represents closing of Saunders Trades and Technical High School facility and relocation of Saunders to Burroughs facility.

[g] Represents relocation of Gorton Junior High School students to Commerce facility.

[h] Represents relocation of Franklin Junior High School students to School 2 facility and relocation of Yonkers High School students to Franklin facility.

[i] Represents opening of new Yonkers High School, relocation of Franklin Junior High School students to old Yonkers High School facility, and renaming of Franklin Junior High School as Fermi Middle School.

[j] Represents opening of High School of Commerce and relocation of Longfellow Junior High School to School 20 facility.

[k] Represents opening of new Twain Junior High School facility.

---

As the above tables indicate, prior to 1940 the school district had constructed twenty-five elementary and seven secondary schools. In 1940, the City's minority population was 3.3%, with most minority students residing in the School 1, 6, and 18 attendance zone areas. In addition, subsidized housing had just begun to be developed in Southwest Yonkers; the concentration of minorities in that area was the result of pre-existing demographic patterns. Beginning in 1950, after a fourteen-year hiatus in school construction, the district opened a number of new elementary and secondary schools primarily in response to the continued increase in population density in the northeastern portion of Yonkers. SB 848. This school construction was also consistent with a 1934 Columbia University study of the Yonkers School District which predicted increased population growth in East Yonkers and recommended that school construction plans be formulated accordingly. SB 10, at 210, 242–43, 248, 256. Elementary Schools 28, 29, 31 and 32 were built between 1950 and 1957 in Northeast Yonkers, an area which experienced a 64% increase in population density during this time. GX 40, at 20. Similar school construction occurred on the secondary school level as well: Lincoln and Whitman Middle Schools were opened to serve the Northeast and Southeast Yonkers communities, and Emerson Elementary/Junior High School was opened in 1963

in response to similar population increases in Northwest Yonkers. In 1954, Gorton and Roosevelt High Schools expanded to include middle school students, and in 1957 Lincoln Middle School began to enroll high school students previously attending Yonkers High School.

By 1963, the school district had constructed and opened the vast majority of its public schools. By this time, the concentration of minorities in Southwest Yonkers had increased, including significantly minority populations in the attendance zones for School 7 (23% minority in 1961), 18 (23% minority) and 19 (32% minority). Cf. GX 56 (10% elementary school districtwide average in 1961). While privately-induced segregated housing patterns had continued during this time, the City's segregative involvement in the site selection and construction of subsidized housing was not at the open and notorious level of later years, nor is there evidence establishing a direct relationship at that time between the Board's and City's activities. In short, the record suggests that the Board's school construction decisions prior to the mid-1960's were neither intentionally segregative viewing them in isolation, nor a deliberate incorporation or enhancement of publicly or privately created residential segregation in the city.

As a result of the district's construction of new school facilities, the attendance zone boundaries for existing schools began

to shrink. On the elementary school level, attendance zones for Northeast and Central East Yonkers elementary schools became smaller as five new elementary schools were opened. The 1963 opening of Emerson Elementary School caused a similar contraction of the neighboring School 16 zone. On the middle school level, this phenomenon did not arise until the 1960's, when the opening of Emerson and Burroughs Junior High Schools in 1963 and 1969, respectively, resulted in the contraction of the disproportionately minority Gorton and Longfellow zones as well as smaller reductions of the Franklin, Lincoln and Whitman zones. The 1957 opening of Lincoln High School halved the attendance zone for the disproportionately minority Yonkers High School in Southwest Yonkers, which rose from an estimated 14% to an estimated 22% minority enrollment.

The effects of this gradual contraction of school zones was accompanied by the first signs of community isolationism or separation with respect to the public schools. As the Northeast Yonkers community population expanded in the 1950's, residents bordering on the relatively well-to-do Scarsdale and Bronxville communities became identified with these non-Yonkers communities, while the Southwest Yonkers minority population slowly but steadily began to grow. The "sectional preoccupation" with respect to schools, recognized in a 1957 New York State Education Department survey of the Yonkers school system, GX 40, at 23, was consistent with community opposition to the development of subsidized housing in the East Yonkers area. *See* HOUSING III.E *supra.*

The period between 1950 and 1965 was also marked by a number of physical additions to existing school facilities. GX 644. On the elementary school level, the most significant of these additions, most of which were made to provide additional classroom space, were expansions of Schools 13 and 27 in Southwest Yonkers, and Schools 28, 29, 30, 31 and 32 in Northeast and Central East Yonkers. School 13, originally a twelve-classroom facility, add-

ed eleven classrooms in 1967 and an additional ten rooms in 1969, at a time when its minority enrollment was 5%. In 1960, School 27, at the time an approximately 2% minority school, added fifteen classrooms to its previous four-room capacity. GX 56. Additions to East Yonkers schools occurred primarily between 1955 and 1965, a pattern consistent with the population influx of those years. SB 849. On the secondary school level, the most significant additions were an expansion of Hawthorne Middle School, which encompassed the School 13 and 27 attendance zones, and Roosevelt High School, which included the School 29, 31 and 32 zones and part of the School 30 zone.

Since the mid-1960's up to the filing of this action, the district has constructed, or otherwise opened in existing facilities, six schools: School 10 and King Elementary Schools, Burroughs, Commerce and the new Twain Junior High Schools, and the new Yonkers High School. The district has also closed nine schools: six elementary schools (3, 4, 7, 12, 15, 24), two middle schools (Burroughs, Commerce), and one vocational high school (Commerce). (This excludes the closing of four school facilities—Franklin and Gorton Junior High Schools, Yonkers High School, and Saunders Trades and Technical High School—and relocation of their student bodies to other facilities bearing the same or new name.)

We note at the outset that since 1970, the Board's school openings and closings have been primarily segregative in effect. The district's two newest elementary schools both opened as racially identifiable, predominantly minority facilities—School 10 (73%) and King (57%). The two newest secondary schools also opened as predominantly or disproportionately minority schools—Commerce Middle School (53%) and the new Yonkers High School (34% in 1973 (versus 16% districtwide high school average), increasing to 57% by 1975). Of the nine schools closed since 1970, three of them were among the district's most racially balanced schools—the High School of Commerce (19%), School 24 (19%), and Burroughs Middle School (19%).[87] Two clos-

---

**87.** In 1982, the Board closed a tenth school, School 31, which at the time was a 21% minori-

ings—Schools 4 and 15—simply resulted in the transfer of virtually all-white student bodies to virtually all-white schools. Only the School 12 and Commerce Middle School closings constituted attempts to eliminate heavily racially isolated minority schools, and only the Commerce closing resulted in significantly desegregative student reassignments to predominantly white schools.

The Board has redrawn attendance zone boundaries many times during the course of the past fifty years. These changes, which have generally been formulated initially by the district's administrative staff and then approved by the Board, have been implemented for a wide variety of reasons. Several of these changes have had little or no racial implications either in their effect or their intent and thus will not be discussed further in our findings. Others have been made as part of more significant school reorganization decisions, such as school openings or closings. Only in a few instances has a series of attendance zone changes occurred which were unrelated to any school opening or closing decision— changes involving Schools 16 and 25 in Northwest Yonkers, and changes involving Schools 6, 9 and 12 in Southwest Yonkers. Nevertheless, in order to properly evaluate the school opening, closing and related attendance zone changes which have occurred, some introductory remarks are in order.

Both plaintiffs and the Board have submitted maps reflecting attendance zone boundaries for Yonkers public schools. GX. 1, 3, 5, 7, 9, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, 31, 33, 35, 37; SB 626–628. These maps reflect attendance zones for the elementary and middle school levels since 1938, and high school attendance zones since 1954, the years in which these attendance zones were formally established.

Attendance zone boundaries were first established prior to the presence of significant numbers of minorities in Yonkers. As the minority population of Southwest Yonk-

ers and the white population of East Yonkers have grown, attendance zones have been altered to reflect these demographic changes. In general, students are assigned to the school in the geographic attendance zone or district in which they live. This "neighborhood school policy" applies for elementary, middle and academic high school students; it has not and does not apply for the district's vocational-technical schools, which have enrolled students from throughout the city and have had no attendance zone boundaries. Although adherence to this policy has generally been consistent on the elementary school level, with minor variations between contiguous school zones in the same geographic quadrant of Yonkers, the testimony of Board members and other school officials reflects that the neighborhood school assignment policy is considerably more flexible on the middle school and high school level. Fareri Dep. 208; Hicks Dep. 195–97; Lester Dep. 79; Weiner Dep. 144, 282; Tr. 11,582 (Guerney).

Since the 1930's, the Yonkers School District has not generally provided subsidized transportation for students between home and school. The district does provide such transportation, in the form of contracted van or bus service or public transportation subsidies, for Special Education students (for whom transportation must be provided under state law; *see* N.Y.Educ.Law § 2554(18) (McKinney 1981)) [88] and for students attending special enrichment programs at schools outside their home attendance zone. GX 877. In addition, a number of students travel to school by using either public bus transportation or by obtaining privately-contracted bus transportation services. Most of these students are of either junior high or senior high school age: students attending Twain, Whitman and Emerson Middle Schools and all of the city's high schools have at various times used bus transportation to attend school. Similar transportation exists at the elementary

---

ty school. The Board converted the School 31 facility into a districtwide enrichment center for gifted and talented elementary school students.

**88.** In 1980–81, there were 1,249 students enrolled in Special Education programs, comprising 6% of the district's total public school enrollment.

school level for a small number of the district's twenty-five elementary schools; specifically, Schools 26, 31 and 32 in Northeast Yonkers, and School 22 in Northwest Yonkers. Gold-Marks Dep. 18; Tr. 5330–31 (Frauenfelder); Tr. 11,241 (Guerney). Prior to the filing of this lawsuit, the Yonkers PTA was responsible for obtaining and coordinating the use of privately-contracted bus transportation. Tr. 5328–29 (Frauenfelder).

There are several exceptions to the district's general attendance zone student assignment policy. First, Special Education students have, to varying degrees throughout the school district's history, been assigned to schools outside the district in which these students reside. *See* SCHOOLS IV.D *infra.* Second, the Board at various times has created options for students to attend a choice of particular schools. The most notable options have been (1) an option created in 1978 for former Burroughs Middle School students living in the old School 24 zone to attend either Whitman or Emerson Middle School; *see* SCHOOLS IV.F.3 *infra;* (2) a policy allowing Japanese-American students living in the School 25 zone to attend School 16; *see* SCHOOLS IV.A.4.a *infra;* and (3) a policy of allowing students to attend School 10 out-of-district and allowing students living in the School 10 zone to attend School 19; Tr. 13,013–14 (Dodson); Frank Dep. 279–80.

Third, students may apply on an individual basis for an out-of-district transfer from their assigned school zone to a school in another area of the district. Since 1971, the district has employed written guidelines which school officials use to determine whether such transfers should be granted. Transfer requests are evaluated on a case-by-case basis and are generally granted for educational, psychological, physical or medical reasons, or based on "extenuating circumstances." In addition,

transfers are routinely granted to any student who moves out of a school attendance zone prior to the student's last year in the school; thus, sixth, ninth and twelfth graders are permitted to stay in the school of their former residence for their last year in the school.[89] The out-of-district transfer process is flexible enough to allow for transfers not falling within any particular category, and has in one or two instances either been applied in a manner which would appear to exceed even the broad categories noted above, or has simply been circumvented. Batista Dep. 61–62 (transfer of Councilmember's child from Gorton to Roosevelt); Hicks Dep. 20–27 (transfer of black Board member's child from predominantly minority school to integrated, educationally superior school). On the record before us, however, these instances appear to constitute segregative aberrations rather than indicia of any consistent or well-established pattern of improper, racially segregative student transfers. *Cf. Arthur v. Nyquist, supra,* 415 F.Supp. at 936–39 (transfer policy allowed 2,000–4,000 white students to attend out-of-district schools, many involving transfers from predominantly black to predominantly white schools); *Berry v. Benton Harbor, supra,* 442 F.Supp. at 1312–13.

The Board's effort to demonstrate the absence of a pattern of segregative school openings, closings and attendance zone boundary changes consisted of the testimony and mathematical analysis of Dr. David Armor. Dr. Armor, a sociologist with expertise in statistical analysis, prepared a change-by-change analysis of each school boundary change beginning in 1951 for elementary schools, 1953 for middle schools, and 1957 for high schools. *See* SB 810.6–810.8.

For years prior to 1967–68, the school year in which school enrollment data by race first became available, Dr. Armor essentially reconstructed school racial enrollments by analyzing census tract data at the census block level.[90] Using this data, he

---

**89.** For an example of a segregative departure from this "last grade" policy, *see* SCHOOLS IV.F.2 *infra* (Homefield redistricting).

**90.** Two exceptions were made in this analysis to reflect the existence of actual racial student

enrollment data. One exception is for elementary school boundary changes made from 1962 to 1965: these changes are based on actual enrollment data for the 1961–62 school year, at which time an actual count of student enrollment by race was made. Tr. 11,902 (Armor). A

estimated the school age population within particular census blocks and then aggregated the number of school-age whites and minorities living in the census blocks comprising particular attendance zones. For these years, Dr. Armor analyzed the numerical and racial impact of school boundary changes by comparing the estimated racial enrollments of the affected schools the year before the change with the anticipated enrollment after the change, a number derived by adding or subtracting the estimated number of students who were rezoned.[91]

For years beginning with 1967–68, Dr. Armor analyzed the boundary changes in two ways: first, by comparing the actual racial enrollment data of the affected schools in the year before the change with the expected school enrollment after the change, a number derived by adding or subtracting the estimated number of students rezoned. Dr. Armor also analyzed those post-1967 changes by comparing pre-change actual school enrollment to the *actual* school enrollment in the year subsequent to the change. The difference between the post-change expected enrollment and post-change actual enrollment consists of demographic changes occurring during the year of the boundary change, *i.e.*, shifts in the affected school zone's school age population, and differing birth rates among incoming and graduating classes at a particular school.

Dr. Armor analyzed the segregative or desegregative effect of school attendance zone boundary changes by using two mathematical indices. One, the dissimilarity ("D") index, measured the extent to which the affected schools in any given boundary change were rendered either more or less racially imbalanced relative to each other. The second, the exposure ("E") index, mea-

sured the extent to which the students attending the schools affected by a particular boundary change experienced more or less interracial contact, that is, exposure to members of another race, as a result of the change. While the manner in which these indices were actually calculated is somewhat more intricate than our brief description suggests, the basic concept can be illustrated by an example.

Assume for simplicity a school district with two elementary schools, School A, a 0% minority school with 100 students, and School B, a 50% minority school with fifty whites and fifty minorities. If the attendance zone boundary between these two schools were redrawn in such a manner that ten white students from School A were rezoned into School B's attendance zone, while ten minority students from School B were rezoned into School A's attendance zone, thus resulting in School A having 10% minorities and School B having 40% minorities, this boundary change would be desegregative under Dr. Armor's analysis: The D index would decrease, *i.e.*, show a desegregative effect, since Schools A and B would now be more racially balanced relative to each other (10% and 40% minority) than they were before the change (0% and 50% minority); the E index would also decrease since the minorities originally in School B would now be in contact with a greater number of the available white students attending the schools in question.

Using the D and E indices, Dr. Armor concluded that of the thirty elementary school boundary changes, four were significantly [92] segregative, ten were significantly desegregative, and fifteen had no significant effect one way or the other (the opening of School 10 in 1972 was found to have had a mixed effect according to the D

---

second exception is elementary school change #15, a 1966 change whose racial effect is analyzed using 1967–68 actual racial student enrollment data. SB 810.6, at 5. Unless otherwise noted, the estimated school enrollments computed by Dr. Armor are relied upon elsewhere in these findings, with particular limitations or caveats noted where applicable.

**91.** For years prior to 1967–68, minorities included Asians and Indian Americans, since census data prior to 1970 did not distinguish between different racial minority groups. Tr. 11,864–65, 11,947 (Armor).

**92.** A segregative or desegregative effect was considered "significant" if the D or E index changed by five or more points as a result of the boundary change. Tr. 11,905 (Armor).

index: the expected change was segregative, but the actual effect was desegregative). On the secondary school level, Dr. Armor concluded that of the nineteen middle school boundary changes, three were significantly segregative, four were significantly desegregative, and eleven had no significant effect in either direction (the opening of Commerce Middle School in 1973 was found to have had a mixed effect similar to the School 10 opening). As for the five high school boundary changes, Dr. Armor's analysis found that one was significantly segregative and four had no significant effect.

 The difficulty which we have with Dr. Armor's analysis is not that it tells us too much, but that it fails to take into account a number of considerations which we consider relevant, indeed critical, to our analysis of both segregative effect and intent. The analysis, by limiting its scope to the specific schools directly involved in a particular boundary change, fails to consider the impact of particular changes on neighboring schools or on the districtwide racial balance. Whether or not the Board had any *obligation* to make boundary changes in a manner which increased districtwide racial balance, it is inaccurate and misleading to view boundary changes in isolation without consideration of the historical events preceding and reasons prompting a particular change; *see* SCHOOLS IV.A.3.a *infra* (School 1); the feasibility and relative desegregative effect of alternatives to the boundary changes actually made;[93] *see* SCHOOLS IV.F.2 *infra* (Commerce); SCHOOLS IV.A.3.c *infra* (Longfellow); the community's and school officials' perception of a particular change which, though mathematically desegregative with respect to the particular schools involved, further delineates a particular school, neighborhood or area of the city as identifiably white or minority; *see* SCHOOLS IV.A.2.b *infra* (School 10); SCHOOLS VI.F.2 *infra* (Commerce); and the effect of these perceptions on subsequent demographic patterns affecting both housing choices and school attendance decisions. The ability of a school board to both foresee and affirmatively alter the development of school racial enrollment patterns beyond the limited scope of any particular change renders a purely intraschool analysis of racial imbalance a somewhat unrealistic appraisal of the actual effects of boundary changes on the racial balance and identifiability of schools both directly and indirectly affected by a boundary change. A more searching inquiry into the Board's attendance zone changes is thus necessary in order to evaluate plaintiffs' claim that such changes were intentionally segregative.

We now turn to an analysis of specific school openings, closings and boundary changes in order to determine whether these actions may be characterized in whole or in part as intentionally segregative acts which furthered the segregation and racial identifiability of the Yonkers public schools.

### 2. *School Openings*

As we have already noted, the district has opened six schools over the fifteen years preceding the filing of this action. Three of these school openings and related attendance zone changes, involving two elementary schools (School 10 and King) and one middle school (Commerce) merit further discussion, for plaintiffs claim that these openings and related attendance zone changes represent intentionally segregative decisions by the Board and, with respect to School 10, the City, which further identified Southwest Yonkers schools as predominantly minority facilities.

### a. *Martin Luther King, Jr. Elementary School*

King Elementary School is a virtually all-black school located several blocks north of Getty Square in Southwest Yonkers. Although King has operated as a virtually all-black school throughout the mid to late 1970's, the opening of King was designed as one of the first intentionally integrative .

---

**93.** *See* Tr. 11,949 (Armor) (districtwide effect of boundary change inappropriate measure of racial impact "unless one was sort of free to bring other ones into the process").

efforts of the Yonkers School District. Several factors are relevant in examining the reasons for the Board's unsuccessful efforts to effectuate school desegregation at King and its surrounding schools: the circumstances underlying the planning and construction of an additional school in the Southwest Yonkers area, the site selected for the school, the circumstances surrounding the naming of the school, the drawing and re-drawing of King's attendance zone boundaries, alterations in the school's grade organization, and the interrelationship of these events with the conditions in surrounding elementary schools.

The construction of King was originally based on the need to accommodate the increasing student enrollment at Schools 6 (78% minority in 1967–68) and School 12 (64% minority in 1967–68), two of the district's most racially imbalanced and overcrowded elementary schools. In order to properly understand the reasons for the segregated nature of Schools 6 and 12 and the need for an additional school in that area of the city, some background is in order.

The racial identifiability of School 6 has existed for virtually as long as the district's elementary school boundaries have been in existence. School 6 is located in an area of historically heavy minority concentration in Southwest Yonkers; its attendance zone embraces the Cottage Place Gardens housing project, whose estimated minority student population during the 1950's and 1960's was equal to or greater than School 6's minority enrollment. Tr. 11,883–84, 11,-890 (Armor). By 1953, School 6 had an estimated minority enrollment of 29%, the second highest minority enrollment in the district. School 25, located directly north of School 6 along Warburton Avenue, was a comparatively white school, with an estimated 4% minority enrollment in 1953.

In 1948 and 1953, two changes were made to the attendance zone boundary between these two schools. In each instance, areas which had a lesser percentage of minority students than the School 6 zone as a whole were rezoned from School 6 to School 25. Although student enrollment data is not available for the 1948 change, School 6 had greater classroom capacity at the time. GX 644. By 1953, each school had added additional classroom space; prior to the 1953 boundary change, School 6, with eighteen classrooms, had an estimated 477 students, and School 25, with fifteen classrooms, had an estimated 409 students, and was thus at least equal to School 6 in its percentage capacity enrollment.

The first boundary change was prompted by the district's previous exclusion of the children of two black families living near the School 6/25 border, at the same time that whites living in the School 6 zone, further south from School 25 than these black families, were permitted to attend School 25. Tr. 459–63, 502–12 (Smith). In response to complaints from black parents regarding the above student assignments, the district redrew the attendance zone boundary line dividing Schools 6 and 25 so as to include both white students previously attending School 25 out-of-district as well as the two black families noted above.[94]

The segregative effect of the 1953 boundary changes to School 6's attendance zone was also relatively limited. School 6's northern boundary was contracted southward, resulting in the reassignment of an estimated twenty-seven white and five minority students (16% minority) to School 25. At the same time, School 6's eastern boundary was extended to include an estimated twenty-two white and eight minority students (27% minority) from School 12. These two changes caused School 12 to decline, in slightly desegregative fashion, from 17% to 16% minority, while School 6's minority enrollment rose slightly from 29% to 30% minority. Thus, while the 1948 boundary change between Schools 6 and 25 may be fairly characterized as emanating from an attempt to temporarily maintain

94. The children of one of the black families actually attended School 25 prior to the boundary change because of parental insistence that their children be permitted to attend the school. Tr. 460–61, 506–07 (Smith).

School 25 as a virtually all-white school, the numerical effect of these boundary changes suggests that they did relatively little to further establish either School 6 or School 25 as racially identifiable elementary schools.

From 1953 to 1969, School 6's attendance zone boundary lines remained unchanged, but the school became increasingly imbalanced in its racial enrollment. From an estimated 30% minority in 1953, the school increased to 45% minority by 1961 and 78% by 1967. White student enrollment declined from 332 (estimated) to 126 students during this fourteen-year interval, while minority enrollment at the school increased from 143 (estimated) to 225 in 1961, then more than doubled over the next six years to 453 in 1967. By the mid to late 1960's, the rapidly increasing minority enrollment led to severe overcrowding at the school.

The attendance zone boundaries between Schools 9 and 12 also were altered a number of times during the 1960's. The attendance zone for School 9, located on Fairview Street in Central West Yonkers, is located just north of the zone for School 12, a substantially more minority-populated area which encompassed the Mulford Gardens and Schlobohm subsidized housing projects. Since 1938, the boundary line separating these two schools had been located along Loehr Place, thus dividing students from Mulford Gardens between the two schools. In 1963, the district redrew the boundary between Schools 9 (15% minority) and 12 (42% minority) in a northern direction. As a result, former School 9 students living in Mulford Gardens, an estimated 28% of whom were minorities, were reassigned to School 12. Although the percentage of white students involved in the change had a slightly desegregative effect on racially identifiable School 12 (at the time the second highest percentage minority elementary school in the district), the change also resulted in the reassignment of approximately 40% of School 9's minority student population to a significantly more racially imbalanced school. To the extent that school capacities may have been a relevant factor, the available evidence suggests that such a boundary change was inadvisable.

School 9, with a capacity of approximately 560 (Phase II) to 605 (NYU Report) students, had 430 students prior to the change; the receiving School 12, with capacity for approximately 476 (Phase II) to 520 (NYU Report) students, had 458 students, or almost full capacity, prior to change.

In 1966, an estimated seventy-eight sixth grade students from School 6 (78% minority) were reassigned to School 9 (14% minority). This change was prompted by the increasingly severe overcrowding at School 6, a condition which necessitated not only the aforementioned reassignment but also the construction of additional classroom space in School 6. As a result of this reassignment of sixth grade students, School 9's minority enrollment (in absolute numbers) nearly doubled.

The overcrowding at Schools 6 and 12 led to a revision in the district's school construction plans. In 1965, the City Council adopted a school capital improvement program which provided for the construction of an elementary school on the Brandt Farm site in North Central Yonkers. Soon thereafter, however, school officials recognized that the rapidly increasing enrollments in Southwest Yonkers elementary schools and the overcrowding at Schools 6 and 12 necessitated the construction of an additional school in the Southwest Yonkers area. In April 1966, the Board changed the location of the school district's new elementary school to the Pitkin Park area on Locust Hill Avenue, virtually around the corner from School 6 and approximately four blocks from School 12. In doing so, the Board also decided to establish the new school as the school district's first intermediate (grades 4–6) school, relieving Schools 6 and 12 of their fourth, fifth, and sixth grade students. GX 434.

The site selected for the district's new school made racial integration a somewhat less than likely prospect. The site selected for the school was a heavily minority-populated area of Southwest Yonkers, approximately four blocks north of Getty Square, the downtown area of the city. In 1964 or 1965, Eugene Radko, then principal of School 6 and King's first principal, suggest-

ed to Superintendent Stanley Wynstra that the school be built at a location approximately one-quarter to one-third of a mile north of the Pitkin Park area. Tr. 4453–55 (Radko). Although the site suggested by Radko was located in the attendance zone for School 9, an approximately 17% minority (1967–68) school, Radko's suggestion was not based on racial considerations but on the greater school-age population density in that more northern area. Tr. 4455.[95] This suggestion was not pursued further by Radko or Superintendent Wynstra, and the school was constructed at the Locust Hill Avenue site, located between Schools 6 and 12.

Although the school was located in a predominantly minority area of the city, the record suggests that this was done to relieve neighboring school facilities of their steadily increasing enrollments, and not as a deliberately segregative decision to isolate or identify King as a minority school. To the contrary, in 1968, the Board decided to add the fourth, fifth and sixth grade students from School 9 to the King feeder pattern, thus adding an integrative component to the already unique intermediate grade structure of the school.

The drawing of the original boundary lines for the King school was an issue of considerable dispute at trial. According to the proffered testimony of Rabbi Abraham Klausner, a leader of the Clergy of Yonkers' Education Committee who lived in the School 16 area, the Board originally planned to draw the King attendance zone so as to include a virtually all-white three-block area of the School 16 (0% minority in 1967–68) zone which, several years earlier, had been rezoned from the School 25 (41% minority in 1967–68) zone. *See* SCHOOLS IV.A.4.a *infra.* According to Klausner, the plan to include this so-called "dogleg" area of the School 16 zone in the King feeder pattern (by including it in School 9's attendance zone) was strongly opposed by residents of the School 16 area, who did not want to be reassigned from highly regarded (and identifiably white) School 16 to King, a school which was already being perceived by community members as an educationally inferior minority school. As a result, the Board allegedly reconsidered its more expansive King attendance zone proposal and excluded the northern portion of the School 16 dogleg area. Tr. 4526–32 (Klausner proffer). The attendance zone map below depicts the portions of the School 16 attendance zone to which the above discussion refers.

**95.** No evidence was introduced regarding the feasibility of the site suggested by Radko.

Elementary School District Lines, 1969

(cross-hatched area represents "dogleg" portion
of School 16 zone)

Elementary School District Lines, 1970

(cross-hatched area represents portion of "dogleg"
included in King feeder zone)

The record, however, weighs against a finding that such segregative conduct occurred. No evidence exists of the Board's consideration of such a plan; Board member Robert Jacobson was unaware of any such proposal being suggested by the administration or considered by the Board. Tr. 10,932–37. It is thus unclear whether the proposed northern boundary adverted to by Klausner was anything more than community hearsay or a preemptive response to an anticipated but yet-to-be introduced attendance zone proposal. In any event, objective evidence weighs against the feasibility of such a proposal: in 1969 King enrolled 701 students, or 93% capacity, and by the following year, was at 102% capacity. In addition, in 1970, after community members urged the school administration to consider including a portion of the School 16 dogleg area in the School 9 zone, the district in fact reassigned students from this area to School 9, which in turn fed into King and thereby raised King's white enrollment from 43% to 51%. The rezoned area included the area surrounding North Broadway and High Street, the same area which residents of the School 9 community had urged school officials to include in the King feeder zone. See Tr. 4480–81 (Radko). This action was taken and adhered to despite the administration's acknowledgement of the "potential explosiveness" of the King situation, GX 460, and despite the fact that including more white students in the School 9 zone left King at more than full capacity. It also was consistent with other evidence of the Board's contemporaneous interest in effectuating school desegregation in other areas of Southwest Yonkers. C–352; SCHOOLS IV.A.2.b *infra*. Thus, while there is evidence suggesting that School 16 community members had voiced opposition to the possibility, never implemented, of an even greater inclusion of School 16 students into the King feeder pattern, it is simply not reasonable to conclude that the original drawing and subsequent expansion of the King attendance zone was, in light of the aforementioned circumstances, segregative conduct by the Board.

Controversy surrounded the naming of the school as well. The school was originally referred to as School 33, in keeping with the district's historic practice of naming elementary schools by number. In February 1969, the Yonkers NAACP submitted a proposal to the Board that the school be named after the recently slain Martin Luther King, Jr. GX 441. School officials were originally reluctant to adopt this proposal for fear of identifying the school as a minority school and because of a disinclination to depart from the consistent practice of naming elementary schools by number. Tr. 4541 (Radko); Tr. 5048–49 (Jacobson). However, the district's alternate proposal to name a section of the school's library after Dr. King was strongly denounced by members of the black community, with Yonkers NAACP President Reverend Serenus Churn reportedly describing the proposal as an example of "latent racism in the Board of Education." GX 442, 443, 445. The Board reconsidered and voted to name the school after Dr. King, thus creating the first non-numbered elementary school in the district. GX 444. The Board's reversal on this issue was supported and applauded by community members. GX 446, 444.

Regardless of the subsequent racial segregation which occurred at King, the record establishes that the Board planned the opening of King with the hope that the school would serve as a significant step towards correcting racial imbalance in the Southwest Yonkers public schools. Testimony of school officials and various written communications with state education officials all reveal the integrative intent of the Board and administration in the opening of King. Tr. 4063, 4089 (Sobel); Tr. 5052 (Jacobson); Tr. 5203–04 (Morris) (re Superintendent Paul Mitchell); GX 452, 915. Whether this intent was predicated on an overly optimistic assumption about the ability to attract and maintain white students at the school, the record does not reveal an optimism so unrealistic so as to be regarded as insincere or pretextual. At the time of King's opening, nearly all the students who were reassigned to the school

were introduced to a school environment significantly more racially integrated than those of the schools they previously attended.

After the opening of King in 1969, however, the efforts to establish King as a racially balanced intermediate school began to disintegrate. The actual opening of the school itself detracted from the integrated image which the Board had sought to create. The school opened in April 1969 with students coming from predominantly minority Schools 6 and 12; School 9 students did not attend King until the following school year. Tr. 4466 (Radko). The addition of three black teachers to King's faculty raised the minority faculty percentage to more than two-and-a-half times the district-wide average. In May 1970 (one month prior to the end of the school year), Eugene Radko was reassigned to predominantly white School 9 (and eventually to School 11) and was replaced as principal by Nellie Rice, who is black. This reassignment, while motivated in part by Radko's outspoken behavior concerning the setting of the northern boundary of the King feeder zone, Tr. 4492–93, 4498–99 (Radko), was also prompted by philosophical disagreements between Radko and the central administrative staff over decentralization in school management, and by Rice's excellent reputation as principal for School 9. Tr. 4540 (Radko); Schainker Dep. 111.

The following year, the Board extended the School 9 zone westward in the manner described previously, decreasing King's minority enrollment from 57% to 49%. The protests of School 9 parents did not subside. In December 1970, a petition signed by 434 parents was submitted to school officials in which parents expressed concern over King's academic and discipline problems and urged the Board to restore the School 9 and 16 attendance zones to their pre-existing status. GX 453. The Board, however, did not alter the School 9 attendance zone boundary during that or the following (1971–72) year. Shortly thereafter, white students from the School 9 area began to withdraw from the King feeder pattern, apparently either relocating or enrolling in private schools in the area:

the number of white students at King dropped from 392 in 1970–71, to 224 in 1971–72, a 43% decline. (The grade 4–6 white student enrollment at the four non-public schools in the King feeder zones (Sacred Heart, St. Michael's, Halsted, and St. Joseph's) declined only 7% (583 to 542 students) during this same interval. SB 98). As the total enrollment at King declined from 767 students in 1970 to 746 students in 1971 and 652 students in 1972, the minority enrollment rose from 49% to 70% to 78%.

The first of two segregative attendance zone changes occurred in 1972, when School 9 was eliminated as a King feeder school. As a result, School 9 third graders continued to attend School 9 the following year. Of the approximately fifty-three or fifty-four students involved, thirty-two were white and the remainder minority. One year later, the racial identifiability of King increased when the district rescinded its plan to operate King as a grade 4–6 intermediate school and converted it to a K–5 elementary school. As a result of these two changes, King's minority enrollment increased from 70% to 87%.

The decision to remove School 9's fourth graders from the King feeder zone is traceable to the timetable set forth in the district's 1973 Reorganization Plan, in which Superintendent Alioto recommended that the district's schools be organized on a K–5, 6–8, 9–12 basis. Since under the plan School 9 was scheduled to reacquire fourth and fifth grade students in 1973–74 pursuant to its conversion to a K–5 elementary school, there was apparently little reason to assign School 9 fourth graders to King in 1972 only to have them reassigned back to School 9 the following year. Although the School 9 change was made months before the introduction of the 1973 Reorganization Plan, Alioto had previously expressed his interest, as early as 1971, in converting the district's grade structure to a K–5, 6–8, 9–12 pattern as soon as possible. Tr. 10,937–38 (Jacobson); Tr. 13,054–55 (Pitruzzello). Yet, other than the conversion of School 11 and Twain Middle School into K–5 and 6–8 schools, respective-

ly, King was the only school to be reorganized in this manner prior to implementation of the 1973 reorganization plan. Unlike School 9, Schools 6 and 12, both predominantly minority schools, continued to feed students into King in 1972–73.

Several factors, however, render a finding of segregative intent in these circumstances unwarranted. Numerical evidence suggests that such intent was not present: the fourth grade School 9 students were 41% minority, as compared with 70% King; the withdrawal of the School 9 fourth graders increased the percentage minority enrollment at King by approximately 3%, an increase which, as noted above, would have occurred in any event one year later. In addition, this reassignment, even though segregative, does not explain the district's simultaneous decision to retain fifth and sixth grades from the School 9 zone at King during the 1972–73 year, even though School 9 had well over 100 students under its recommended operating capacity and thus could have accommodated such a reassignment. In addition, documentary evidence concerning conditions at King in March 1972 suggests that the retention of incoming School 9 fourth grade students the following term was based on anticipated limits on King's enrollment capacity, projected increases in fourth grade enrollments, and class size. GX 455. Such a finding would also be inconsistent with both the district's refusal to comply with the community's earlier demands to restore the School 9 and 16 boundaries to their pre-King status, as well as the district's express rejection in 1974 of a Councilman's request that school officials rezone the dogleg area of School 9 into the virtually all-white School 16 zone in which this area had previously been included, a proposal which was rejected specifically because it would have decreased the white student population at 28% minority School 9. SB 214; Tr. 13,436 (Frank).

The 1973 Reorganization Plan's conversion of King from an intermediate to an elementary school completed the transformation of King from an integrated intermediate school to another of the many identifiably minority elementary schools in Southwest Yonkers. The conversion of King from a 4–6 to a K–5 school in 1973 was segregative both as to King and as to several surrounding schools as well. King's new attendance zone was created from sections of the School 6 (97% minority) and School 12 (86% minority) zones; the newly organized King elementary school opened as an 87% minority school. Although the change had a desegregative effect on School 9 (18% to 31% minority), it simultaneously increased the already-heavily minority enrollment percentages at three neighboring schools (6, 12, 25). This change was accompanied by a similar rise in minority faculty at the school, which by 1973 had a 42% minority staff. Both student and staff minority percentages increased throughout the 1970's, reaching levels of 98% and 37% (after a high of 53% in 1975–76), respectively, in 1980. This increase in King's minority enrollment was due primarily to the 1976 school closings, *see* SCHOOLS IV.A.3.b *infra,* and the conversion of the district's elementary schools from K–5 to K–6 facilities in 1980.

■ Despite the foreseeably segregative consequences of King's conversion, however, the evidence regarding the district's conversion of King to an additional K–5 elementary school does not support an inference of segregative intent. The elementary school grade reorganization recommended in Superintendent Alioto's 1973 Reorganization Plan was not a significant source of controversy, much less racial opposition, at the time and was in and of itself a rational educational objective which was supported by school officials and community members as well. Although the conversion of King to a K–5 elementary school was contrary to the Board's earlier desire to utilize King as a desegregative catalyst in an increasingly minority area of Southwest Yonkers, the history of King clearly demonstrates the interrelationship between the 4–6 grade configuration and the district's attempt to promote racial integration in the area to the extent possible. By 1973, King, a 78% minority school with a steadily declining white enrollment, was realistically well past the point at which

meaningful integration could be successfully achieved, absent measures far beyond any of the changes previously considered by the district. Although the Board failed to persist in its prior efforts to create an integrated school in the area, the major factors underlying the increased minority identifiability of King—the site selection, the naming of the school, and the white flight caused primarily by the district's intransigence with respect to the demands of the School 9 community for a segregative reassignment of its students—cannot reasonably be construed as evidence of segregative intent by the Board. In light of the previous integrative efforts at King and the other aforementioned circumstances inconsistent with inferences of segregative intent, we are unable to conclude that the 1973 conversion of King into a K–5 elementary school was part of a consistent pattern of segregative acts by the Board from which a finding of segregative intent may properly be made.

b. *School 10*

School 10, an elementary school, is located between the Riverview I and II subsidized housing projects on Riverdale and Hawthorne Avenues in Southwest Yonkers, between Getty Square and the Hudson River. The idea for the construction of School 10 originated from the Board's desire to replace the physically inadequate School 19, located three to four blocks south of School 10. P–I 51–34, at 11. This plan was part of a more comprehensive proposal to construct a new intermediate (grades 4–6) school in the southern part of the School 3 zone, drawing students from School 3 (34% minority in 1967), 19 (68% minority) and 27 (5% minority) and thus improving the racial balance of schools in the Southwest Yonkers area. During the late 1960's, the Board received $125,000 in capital improvement funds for the planning of this intermediate school. P–I 51–48, 51–49, 51–55, 51–58.

The Board originally considered locating the new School 10 in the city's second urban renewal area, several blocks south of its present location, in order to relieve Schools 3 and 19 of their overcrowded conditions. Tr. 9335–36, 9406 (Curran). In the spring of 1967, Walter Webdale, Director of the Yonkers Urban Renewal Agency ("YURA"), met with Superintendent Wynstra and Deputy Superintendent Irving Goldberg and asked them to consider locating the school in the Riverview urban renewal area to the north, where the City was planning to construct several hundred units of subsidized housing. GX 284, 285; Webdale Dep. 201. The inclusion of the school in the City's urban renewal project was to serve as the City's statutory non-cash contribution for the Riverview urban renewal project, thus enabling the City to receive credit from the federal government towards its share of urban renewal expenditures and allowing the Board to construct a new school without a reduction in its capital improvement budget. In July 1967, the Board, in accordance with Webdale's proposal, passed a resolution requesting the City to provide a five acre site in the Riverview urban renewal area for the construction of a replacement school for School 19. GX 302. The five acre site size was in conformity with New York State Education Department standards and was communicated by Superintendent Wynstra to Webdale. GX 285; Tr. 4977 (Jacobson). The City Council also approved the proposal. C–711.

The construction of School 10 was designed as part of a self-contained neighborhood concept for the Riverview urban renewal area. With the City having made the decision (over the objections of Planning Director Philip Pistone) to make residential re-use of the City's second urban renewal area, the City began planning the construction of its new housing development. According to a March 1968 letter written by Webdale to HUD Assistant Regional Administrator for Urban Renewal Charles Horan, the school was to serve 400 families from the Riverview housing project, 540 families from Phillipse Towers (the predominantly white Mitchell-Lama middle income housing project located directly across from Riverview), and 100 families from a small area to the west of Riverview. GX 270. One year earlier, Phillipse Towers residents had expressed to

state officials their dissatisfaction with the deterioration in the neighborhood and with School 19, a school they described as "overcrowded, overburdened and dilapidated," and noted their impatience with the progress of the City's urban renewal program. GX 315. City and HUD officials hoped, however, that the construction of new housing and school facilities would result in the stabilization and rejuvenation of the then-deteriorated neighborhood. Tr. 1353–55 (Del Bello); Tr. 2267–68 (Yulish). The City hired architects to assist them in the design of the Riverview project, a design which had been developed elsewhere in the northeast area of the country. Tr. 1354–55 (Del Bello).

By 1968, YURA, led by Walter Webdale, became increasingly involved in the planning and construction of School 10. In his letter to HUD official Horan, Webdale urged HUD to approve the City's urban renewal funding application for Riverview, stating his belief that a majority of the Riverview residents would be "middle income young families." GX 270. During the remainder of that year, the original conception of the school underwent significant change. Communications from Webdale to various City and HUD officials, written between March and December of 1968, reflect that School 10 was now being planned as an additional K–3 primary school which would relieve School 19 of its overcrowding, and that School 19 would continue to enroll students from the area. GX 270, 288, 313, 314. The school's site was now specified as one acre for the school itself, with additional space for parking and outdoor recreational facilities. GX 286, 313. By the fall of 1968, Webdale began to press school officials to begin construction of the school by the following year in order to demonstrate to HUD officials the City's commitment to the urban renewal project. GX 286, 287, 314; Webdale Dep. 206–08.

In February 1969, the Board submitted preliminary site plans to Webdale. According to subsequent correspondence between City and school officials, these plans reflected the Board's understanding that the school would be located between Riverdale and Hawthorne Avenues, with a play area and fountains located between the school and Riverdale Avenue. GX 297, 300, 301. By January 1970, the Board's architect had finished the site plans for the school. These plans continued to provide for a school site, located between the two avenues, with a play area, trees, shrubs and fountains in front of the school but no other buildings separating the school's play area from Riverdale Avenue. GX 294–296; Tr. 4972, 4989 (Jacobson). At the same time, Webdale assured community members that the Riverview project would include adequate play space for the school. GX 291.

The plans of the Board's architect were consistent with the school district's planned development of the School 10 facility itself. The school was designed as the district's first "open school," a school without walls in which students would be taught in an unstructured and flexible interior environment by teachers with special training in the innovative open education instruction technique. The schools's open interior was premised on the general openness of the school's surrounding environment. While the open school concept was an untested concept in the district, school officials were enthusiastic about the school and were optimistic that the attractiveness of the open school concept, along with the juxtaposition of the school to Phillipse Towers and the proposed income quotas for Riverview tenants which were communicated to the Board,[96] would result in a racially balanced student enrollment at the school. *See generally* Alioto Dep. 10; Tr. 4776–77 (Jamieson); Tr. 5108 (Jacobson); Tr. 5205–06 (Morris) (re Superintendent Mitchell); Tr. 9836–38 (Minervini); Tr. 11,406–08 (Guerney); Tr. 11,673–74 (Leahy).

By late 1969, Webdale continued to press forward with the City's efforts to commence construction of School 10. With the

---

**96.** The Board was told that the residents of Riverview would be 20% lower, 60% middle, and 20% upper income. Tr. 5107–08, 10,940–41 (Jacobson); *see also* Tr. 11,673 (Leahy).

application for federal funds for the City's Riverview urban renewal project still pending, Webdale asked Superintendent Mitchell to send HUD officials a letter, identical to the one which Webdale had written a year-and-a-half earlier, requesting that HUD approve its federal urban renewal funds grant application. GX 317, 381. In early 1970, Webdale communicated to City Manager Thomas Groux and City Councilmember Jesse Eisen that it was "extremely important" for the City Council to approve funding for the school's construction "at the earliest possible date" and urged the City Council to take steps to secure the abandonment of surrounding streets in the area so that construction could commence by the spring. GX 292, 293.

The remainder of 1970 was occupied by further planning of Riverview and the commencement of construction of School 10. During this period, the City's plans for the Riverview housing project were undergoing significant change. As of February, neither the type of redevelopment or redeveloper for Riverview, nor the income breakdown for the housing units, had been decided, with the UDC mentioned as a possible developer. According to YURA minutes dated February 13, 1970, the stated goals of the urban renewal program continued to be to provide relocation housing for urban renewal displacees and to "encourage an influx of new people into the area who have for years been leaving." GX 334, at 2. These minutes also reflect that the housing contemplated for the school would include 300 to 400 units and that construction of the school would commence in April. Id.

In March, the Board's site plans for School 10 were submitted to the City and YURA. GX 300, 301. By that time, the UDC had been named as developer of Riverview. P-I 150–112, 150–112A.

By April, City officials had tentatively agreed with the UDC to construct four housing projects in Southwest Yonkers for 1,400 units of housing, including 850 units at Riverview, in addition to the contemporaneous development of several privately sponsored housing projects in that area. GX 1088.8. In July, a memorandum of understanding between the City and the UDC providing for 1,200 units of housing, including 800 units at Riverview, was approved by YURA and the City Council. As discussed previously, there was little public discussion or planning board consideration of these plans or the changes which had occurred. See HOUSING IV.C.2, IV.D.5 supra. School officials continued to plan to use School 10 as a means of relieving School 19 of its primary grade students, leading eventually to the closing of School 19 and the construction of a new intermediate school for Schools 3, 19 and 27. P-I 51–64 (June 1970 letter from Assistant Superintendent Gallagher to City Budget Director Casey).

At a January 1971 UDC Citizens Advisory Committee meeting, Riverview's architect discussed problems which had arisen concerning the design of the Riverview complex, particularly with respect to the location of School 10 in the center of the site and the resulting incompatability of the 400 Riverview Stage I housing units and the school's "necessary open space." GX 305. Proposed solutions included the construction of scaled or sloping apartment buildings, the conversion of the school's parking lot into a play area, and the construction of commercial units and a day care center, instead of apartments, on Riverdale Avenue. Id. In a March 1971 meeting, Webdale and City Manager Seymour Scher notified Board member Charles Curran and Acting Superintendent Gallagher of the change in plans for Riverview, including the reduced school site size and the erection of a seven-story apartment building and retail complex in front of the school on Riverdale Avenue. GX 297, 301.

Board members and school officials strongly and unanimously denounced the proposed change in plans; as Board member Jacobson described it, "the Board of Education, everyone, literally exploded." Tr. 4990; see also Tr. 9838 (Minervini). A number of alternative courses of action were considered by the school district. The Board considered taking legal action against the City and the UDC and was advised by outside counsel that the Board

would be justified in not accepting the proposed site based on YURA's alleged breach of contract. GX 300, SB 631. Board member Siragusa opposed opening the school in light of the revised plans, while Board member Curran requested that the City acquire the site originally sought by the Board in 1967. Tr. 5419–23, 9406–07. In October 1971,[97] Superintendent Alioto asked City Manager Scher to "forestall the arbitrary action" of YURA, the effect of which was described by Alioto as "cannabaliz[ing] the school site" and creating an "airshaft" school surrounded by apartment houses and devoid of adequate play space. GX 301; see also GX 303. Scher informed Alioto that the elimination of the planned play area in front of the school was a necessary cost saving measure, and that YURA had developed an alternate plan for the school site which included two play areas—one in front of the school, and the other in the rear of the school in a space which had originally been slated for parking. Scher suggested that the apartment building along Riverdale Avenue would act as a protective "barrier" between the School 10 students and the street. GX 297.

Superintendent Alioto remained unpersuaded and pursued the Board's protest with City and URA officials. In December, Alioto was informed by Scher that elimination of the proposed forty-one unit low and moderate income apartment building which was to be located in front of the school would be economically infeasible and would "financially prohibit" the entire Riverview Stage I urban renewal project, and would deprive the City of "critically needed" relocation housing. GX 299. Scher assured Alioto that plan revisions could be made to provide for 100 feet of partly covered open space in front of the school and that the proposed placement of the school and housing project "would provide an attractive open area, ... suitably landscaped" and sufficient for recreational purposes. Id.

At a December 1971 meeting of school, City, and UDC officials, Webdale (by that time employed by the UDC) suggested that the commercial units previously planned for the ground floor along Riverdale Avenue would be removed to allow for fifty-five feet of open space along Riverdale Avenue in front of the school, and that additional space along Riverdale Avenue would be provided for in the development of the Riverview Stage II housing project. GX 298. By this time, with construction of School 10 nearing completion, the Board was essentially faced with the choice of rejecting the school site as revised, thereby jeopardizing the City's urban renewal funding and leaving students in the overcrowded and physically inferior School 19 facility, or accepting the partly constructed School 10 facility despite its substantial site limitations and relieving School 19 of its overcrowding. On December 16, Alioto notified Scher that the Board, while remaining "concerned with the intrusion of this structure in front of the school building, yet being aware of their overall civic responsibility and the impact of further delays to the Urban Renewal Development," agreed to the proposed modification of the school

---

97. The reason for the seven-month gap between the March 1971 meeting and the October 1971 letter from Superintendent Alioto to City Manager Scher is not clear. According to Alioto's letter, after Board representatives objected at the March 1971 meeting to the proposed revision in plans for School 10, "reconsideration was indicated" by YURA but "[n]o further advice was received" from YURA. According to Alioto, when the Board later approached Webdale about plans which the Board had heard about "through third parties" to build additional apartments along Riverdale Avenue, "they were advised that the land had been sold to developers." GX 301. According to Scher's letter in reply, after the March 1971 meeting the City and YURA waited for a "formal reply which would indicate either active support or disapproval of this plan. The Urban Renewal Agency upon receiving no notification proceeded to sell the land to the developer who is presently constructing on site." GX 297. According to Scher, construction work on the apartment building's foundation had commenced in October 1971. GX 299. The City's agreement-by-acquiescence explanation is hard to accept in these circumstances, given the strong objections voiced by school officials during the year, the clearly significant alteration in the school site which YURA had proposed, the previously close cooperation between YURA and the Board, and Webdale's repeatedly expressed desire to proceed expeditiously with the Riverview project.

site design. GX 306. As a result, construction continued along Riverdale Avenue, with the additional apartment building almost totally obscuring School 10 from view and eliminating the originally planned outdoor play area in front of the school. By April 1972, the Board had approved a proposal by the City's architect to eliminate the fifty-five foot open space in front of School 10 and instead construct a plexiglass enclosure along Riverdale Avenue for use as a recreation area for the school. GX 309, Tr. 4991 (Jacobson) Tr. 5420–23 (Siragusa). As a result, the school was barely visible from the street, with the sign identifying School 10 placed on the back of the school building, facing Hawthorne Avenue.

The effect of these modifications to School 10's site was clearly detrimental. Superintendent Alioto recalled that the erection of the additional housing units in front of the school undermined the school's potential for drawing students to the school. Alioto Dep. 10. Board members Jacobson and Siragusa also described the school site in distinctly negative terms, a perception shared by others in the community. Tr. 4992, 5420–22. A newspaper editorial decried the City's use of the land along Riverdale Avenue for additional apartments and described the result as creating a "new ghetto school." GX 303.

The school building itself, however, was still considered an educationally positive contribution to the school district, affording school officials the opportunity to test the open school education concept in Yonkers. Tr. 5002 (Jacobson); Tr. 9838 (Minervini). As the opening of School 10 approached, school officials eagerly prepared for the opening of the district's first open school: faculty members were given special instruction in the open school teaching method, and School 6 teachers implemented an instructional program for first graders modeled after the open school method. Tr. 4823 (Jamieson); Tr. 11,636–37 (Leahy); GX 476. A number of university and foreign educators visited the school, and the 1972 NYU Report observed that the facility presented the district with "an opportunity to conceive imaginative uses not normally

afforded in existing facilities." GX 115, at 264; SB 183; Tr. 11,644–45 (Leahy).

The problems with the school's site size persisted subsequent to its opening in 1972. With the construction of Riverview I and II still ongoing around the school site, School 10 opened as a K–4 school with a 76% minority enrollment, drawing students from the bulk of School 19's former attendance zone. By that time, school officials also notified the URA and UDC that the school would be converted into a K–5 elementary school, a change which was in accordance with Superintendent Alioto's 1973 Reorganization Plan but which intensified the inadequacy of the school's already limited recreational facilities. GX 309; Tr. 11,643, 11,651 (Leahy). School officials had continued difficulty in securing adequate play space for School 10 students, with a conflict arising over the use of paved space in the rear of the school for parking rather than recreation. GX 307, 312, 322; Tr. 11,642 (Leahy). The district's ability to provide adequate play space also was limited by the steeply sloped nature of the space in the rear of the school, an area which Riverview's Program Manager suggested could be "imaginitively designed to provide an interesting play experience." GX 322. The glass-enclosed area along Riverdale Avenue was seldom used for recreational purposes in part because of the ongoing construction in front of the school, a condition which caused considerable inconvenience for School 10 students. Tr. 4784–85 (Jamieson); Tr. 4992, 4999–5000 (Jacobson); Tr. 11,643–44 (Leahy). The difficulties in securing recreational space persisted throughout the 1970's, with the two concrete spaces in front and back of the school continuing to serve as the school's only available outdoor play areas. The inadequacy of School 10's outdoor facilities was compounded by the structural limitations of the school itself, specifically, the building's low ceilings and lack of a gymnasium.

By 1973, a number of community groups and City officials expressed increasing concern over the construction of the additional 339 units of housing contemplated by the

Riverview II urban renewal project. In a letter to the Governor of New York, the Yonkers Economic Development Corporation sought to delay construction of Riverview II, with the ultimate goal of adopting an alternative use for the site and relocating the project to a "lower density area in another part of Yonkers." GX 330. The organization specifically expressed its concern over the impact of the additional housing units on population density in the area, in light of both the physical inadequacies of the school site, Riverview's proximity to numerous other subsidized housing projects in the area, and the "[d]ifficulty in renting to maintain fair racial balance." *Id.* City Councilmembers Goodfriend and Goldman sponsored a resolution requesting a nine month delay in the construction of Riverview II in order to re-evaluate the use of the site and the impact of the additional housing units on School 10's facilities. GX 275. Mayor Del Bello expressed to Webdale, and mayoral candidate Angelo Martinelli was reported to have expressed, similar concern over the Riverview II project's expected impact on population density in the area and the project's physical obstruction of School 10. GX 328, 329.

Construction of Riverview II nevertheless proceeded as previously scheduled. By that time, City officials had expressed their disappointment with the Riverview project and implicitly acknowledged the predominance of housing-related objectives and desires with respect to the project. In a May 1974 letter to UDC Director Webdale requesting alterations in the design of the Riverview parking garage, CDA Acting Director Alphons Yost stated that

> Yonkers has been most cooperative with you and your organization in the Riverview Development and, in hindsight, some of our compromises may not have been in the best interest of the City. These compromises include the partial blocking of P.S. 10 along Riverdale Avenue, to allow for more units and the deletion of open space for garage use at the corner of Prospect Street and Hawthorne Avenue. Since, these compromises were in your best interest and not

the City's, we trust you will give this request your full consideration. GX 324.

In 1975, the construction of Riverview I and II was completed. The Riverview II building was located closer to Riverview I than had originally been planned in 1971. School 10 was (and is) almost completely obscured from view, with approximately thirty feet of space along Riverdale Avenue separating the Riverview I and II apartment buildings. GX 1005. In 1975, School 10 was 83% minority, the fourth highest minority enrollment in the district, and employed an increasingly disproportionate number of minority staff.

The circumstances surrounding the planning, construction and opening of School 10 had an impact on the district's other Southwest Yonkers elementary schools, particularly School 19. As recently as June 1970, school officials continued to plan towards the eventual closing of School 19—a school with no gym, a small play area, and in need of extensive rehabilitation—and the construction of an intermediate school in the southern part of the urban renewal area to serve Schools 3, 19 and 27. P–I 51–64. By early 1972, plans to build a new intermediate school for the School 3/19/27 area had been abandoned. P–I 51–71. Thereafter, City planning officials suggested that School 19 undergo major rehabilitation rather than closing. GX 311. As a result, $250,000 in capital funds were allocated to the rehabilitation of School 19. P–I 51–87.

School officials, however, adhered to their original desire to close the school. In January 1974, in response to a request by Assistant Superintendent Anton Jungherr for input regarding the planned rehabilitation of School 19, Assistant Director of Elementary Education Joseph Guerney recommended against incurring major expenditures to rehabilitate School 19 without at least implementing some redistricting of students in the area in order to improve school utilization. Guerney noted that School 10 was 400 to 500 students under full capacity; at that time, School 3 was still overcrowded and School 19 was under-

utilized. P–I 19–27; GX 64. In February, Assistant Director of Pupil Personnel Donald Batista informed Superintendent Alioto of a recommendation, agreed upon by school officials, to close School 19 at the end of the year and transfer its students to School 10, along with a recommended transfer of School 3 students to School 27, a 12% minority school with considerable available space. GX 507. By April, these school officials reiterated their agreement that School 19 should be closed, and school officials began to investigate the cost savings of closing the school. GX 961; P–I 19–30.

The proposed closing of School 19 generated considerable opposition from the School 19 community. School 19 parents were concerned primarily with the perceived inadequacies of School 10, including its lack of adequate recreational space, the larger class sizes which would result at School 10, and a dissatisfaction with the open education program at the school. GX 961; SB 198, 608; Tr. 4768 (Jamieson). In addition, although School 10 was well under full capacity at the time, Board members concluded that the large number of housing units nearing completion at Riverview would lead to increased enrollments at the school, thus inhibiting their ability to close School 19. Tr. 5424, 5466 (Siragusa); Tr. 5512–13 (Minervini). As a result of these considerations, the deteriorating School 19 facility remained open. The following year, the overcrowding at School 3 and underutilization at School 19 led to the reassignment of approximately ninety-five students (seventy-six minorities) from the northern part of School 3 (63% minority)'s attendance zone to School 19 (82% minority). SB 615; Tr. 11,215–16 (Guerney).[98] One year later, School 3 was closed as part of the district's fiscally motivated school closings, and additional minority students

were reassigned to School 19. *See* SCHOOLS IV.A.3.b *supra.* Thus, in two years, School 19's enrollment virtually doubled (275 to 547) as the district effectively abandoned its longstanding plans to close the school. By 1976, School 10 (85% minority) and School 19 (78% minority) were two of the most predominantly minority elementary schools in the district.

The evidence concerning the planning, construction and opening of School 10 clearly demonstrates the Board's subsidiary role in the decisionmaking process and the predominance of the City's residential objectives in the development of the Riverview project. Each critical decision with respect to School 10 was resolved by adherence to the City's independent concerns rather than the school district's educational goals, all of which had a distinctly negative impact on the district's efforts to develop an attractive and integrated "open school." The strong resistance with which the various alterations to School 10 were greeted by school officials and the practical infeasibility of alternative courses of action undermine any argument that the Board's reluctant acquiescence in the City's conduct concerning the development of School 10 reflects any meaningful degree of Board control over the development of the school.

▇▇ Likewise, the evidence regarding the nature and extent of the Board's involvement in the decisions which contributed to School 10's racially segregated condition demonstrates that its actions were not designed to achieve this result. *Cf. Reed v. Rhodes,* 607 F.2d 714 at 728–30 (6th Cir. 1979); *Berry v. Benton Harbor, supra,* 442 F.Supp. at 1298–99. The undermining of the open school concept at School 10 and the resulting racial consequences for elementary schools in the area instead result-

---

**98.** The reassignment of School 3 students to School 19 rather than School 27, while segregative in its comparative impact, was based on School 19's underutilization rather than an attempt to limit minority enrollment at School 27. The suggested reassignment of School 3 students to School 27 involved a portion of the School 3 zone which was still largely white, and was made contemporaneously with the recom-. mended rejection of another proposed School 3/27 redistricting based on the appearance of gerrymandering which the latter proposal created. GX 131. One year later, when School 3 was closed, the district rezoned, from School 3 to School 27, an area with substantially greater minority concentration than the predominantly white area which had been suggested for rezoning one year earlier.

ed in significant part from decisions in which both the Board's role and educational objectives were secondary to those of the City. In light of the Board's original plans for the school and the circumstances surrounding its reluctant acquiescence in subsequent modifications to the school site, the foreseeably segregative impact of the Board's conduct on School 10's racial enrollment does not support an inference of segregative intent by the Board. We find that the plaintiffs have failed to demonstrate that the Board's site selection, planning, and opening of School 10 was motivated by segregative intent.

#### c. *Commerce Middle School*

The opening of Commerce Middle School was part of the Board's consideration of a series of school reorganization proposals prepared by the New York University School of Education. For a discussion of the Board's conduct with respect to Commerce Middle School, *see* SCHOOLS IV.F.2 *infra.*

### 3. *School Closings*

Until recently, school closings had been relatively rare in Yonkers. Between 1950 and 1973, School 1, in Runyon Heights, was the only school closed by the Board. In 1973, the High School of Commerce, one of the district's specialized occupational high schools, was closed pursuant to Superintendent Alioto's 1973 Reorganization Plan. The remainder of the school closings occurred as a result of the district's 1976 School Closing and 1977 Phase II reorganization plans. The 1976 school closings, prompted by the city's fiscal crisis, involved six elementary schools (3, 4, 7, 12, 15, 24) as well as the Commerce Middle School. The closing of Burroughs Middle School in 1978 was accompanied by the relocation of the Saunders Trades and Technical High School to the Burroughs facility, a course of action which was recommended as part of the Phase II plan, and the reassignment of Burroughs students to other middle schools in the district.

The closing of Burroughs and the High School of Commerce are significant primarily because of the other interrelated school organization changes which occurred contemporaneously. These changes are therefore discussed elsewhere in these findings. *See* SCHOOLS IV.F.2 *infra* (Commerce closing); SCHOOLS IV.F.3 *infra* (Burroughs closing). The remainder of the district's school closings—the closing of School 1 in 1954 and the 1976 school closings and related attendance zone changes—are discussed below. In addition, the Board's failure to close or implement attendance zone changes with respect to Longfellow Middle School is also discussed as part of our examination of school closings.

#### a. *School 1*

School 1, formerly the district's oldest elementary school, was located in the Runyon Heights area of Northwest Yonkers. Runyon Heights constitutes the only area of heavy minority population outside of the Southwest Yonkers area. The Runyon Heights area is bounded on the west by the Saw Mill River Parkway, on the south by Tuckahoe Road, on the east by the New York Thruway, and on the north by Curtis Road. Runyon Heights is also bounded on the north by a thin strip of land, owned by the Homefield Neighborhood Association, which effectively seals off the Runyon Heights minority community from the surrounding white neighborhood to the north. Tr. 2740–42 (Downes). To this day, Runyon Heights streets terminate in a dead-end just below this strip. In addition, the original deeds for many properties in the Homefield area contained racially restrictive covenants prohibiting the sale of such properties to non-whites. Tr. 2375 (Guzzo); Tr. 2733–35 (Downes).

Although attendance zone maps are not available for years prior to 1938, the testimony of several persons who attended School 1 during the 1930's established that students from outside the Runyon Heights area attended the school at one time. Specifically, students from the virtually all-white Homefield community, located north of Runyon Heights, as well as from largely white areas which were east, south and

west of Runyon Heights, attended School 1. These white students rendered School 1 a racially integrated facility, with white students comprising roughly one-half to two-thirds of the student body, even though Runyon Heights itself was a predominantly minority community. *See generally* Tr. 2582–85 (Mareno); 2636 (Williams); 2672–74 (McRae); 2718–22 (Downes).

The 1938 attendance map reveals that the school district drew the School 1 attendance zone boundaries so as to track precisely the aforementioned strip of land to the north and the Saw Mill River Parkway to the west, thereby reassigning students from the Homefield community to virtually all-white School 22, a Northwest Yonkers school somewhat farther away from Homefield than School 1 and located on the other side of the Saw Mill River Parkway. In addition, the southern boundary of the School 1 zone was drawn along Tuckahoe Road, thereby reassigning white students previously attending School 1 to virtually all-white School 5. The resulting School 1 attendance area was the smallest in Yonkers, even though the School 1 facility subsequently suffered from severe underutilization problems which contributed to its eventual closing. Other neutral justifications, if any, for this particular drawing of the School 1 attendance zone boundaries are absent from the record. Based on the available evidence, the original drawing of School 1's attendance zone boundaries constituted deliberate, racially motivated gerrymandering, done in a manner which carefully incorporated privately created residential segregation.

The consequences of this attenance zone change were striking. School 1 quickly became a heavily minority school, reaching an estimated 91% minority in 1950, and an estimated 99% minority at the time of its

closing in 1954. The facility was substantially underutilized; in 1950, it enrolled approximately 100 students while maintaining capacity for 240 (as of 1954). GX 2, at 3; SB 810.2. This underutilization resulted in double-grade sessions at the school, *i.e.*, the assignment of teachers to combined first and second, or third and fourth, grade classes. The first three black teachers hired by the Board were assigned to School 1, thus further identifying it as a minority school.

Simultaneously, all-white schools in areas surrounding the School 1 zone were suffering from increasing *over* crowding. School 22 in particular was beset by overutilization problems; by 1950, plans were made to build additions to the facility to relieve this condition. GX 420. In 1950, School 22's enrollment was 314 students (all white), rising to 393 by 1954; its capacity was 390 (as of 1954). School 5, less than a mile south of Runyon Heights, enrolled 630 K–6 students (all white) in 1950 and 844 K–8 students by 1954; its capacity was 960 (as of 1954). GX 2. School 8, while considerably farther from Runyon Heights than Schools 22 or 5, was severely overcrowded. The school enrolled 878 students (two minorities) in 1950; the School 8 building, however, only had capacity for 690 students (as of 1954), a condition which necessitated the use of a basement annex in a nearby housing development as classroom space. GX 423.[99] Elementary school maps indicate that particular areas in the attendance zones for each of these three schools (22, 5, 8) were closer to School 1 than to the school in whose attendance zone they were then included, a condition of which the Board was aware. SB 626; GX 423.

By 1953, efforts were made by School 1 community members to expand the School 1 zone in order to ameliorate the underutili-

---

**99.** The idea of assigning students from the School 8 zone to Runyon Heights' School 1 is not as radical as might first be imagined, despite the geographic distance between these two schools. The Grassy Sprain area in East Yonkers, for example, was approximately equidistant from Schools 1 and 8. Indeed, after School 24 was closed in 1976, students from Runyon Heights were assigned to School 31, which bor-

ders on the School 8 zone. This trip was considered by at least one Board member to be a safe route for students to travel "just down Tuckahoe Road." Tr. 9843 (Minervini). Significantly, in 1982 School 31 was converted into a specialized elementary school and the Runyon Heights area was rezoned into the School 8 attendance zone.

zation problem at the school and simultaneously relieve the overcrowding of neighboring schools as well—a suggestion which also would have had a clearly desegregative effect on School 1. Several members of the Runyon Heights community appeared before the Board in representative capacities, repeatedly urging the redistricting of School 1 to include those students previously eliminated from the School 1 zone. GX 423, 424. These efforts were consistent with the prevailing attitude of the Runyon Heights community, which favored redistricting rather than the then-apparent plans to close the school. Tr. 2610–12 (Mareno). The proposal was also clearly feasible from a capacity standpoint: at the time of its closing, School 1 had room for approximately 140 additional students, not including the potential for an even larger enrollment had the Board voted to build extensions to School 1 (as it had done with various other schools at or about that time).

These efforts proved unavailing. In March 1954, two months before the decision of the United States Supreme Court in *Brown v. Board of Education,* the Board voted to close School 1. GX 428a; SB 32. The stated reasons for the Board's decision were non-racial, namely, the desire to "provide better education at less cost to the city," an apparent reference to the elimination of double-grade classes and the closing of the underutilized school. GX 425. The Board resolution also alluded to the age of the building, noting that School 1 was built in 1872, with additions built in 1900, 1917 and 1936. SB 32. Based on subsequent events, however, it is reasonable to conclude that the desire to dismantle the district's lone majority black school also animated the Board's decision. *See* Tr. 2611 (Mareno). School 1 students were reassigned to Schools 5 and 24, with a resulting desegregative effect on the latter schools. SB 810.6, at 2 (School 5—1% to 8% minority; School 24—1% to 18% minority). When

the decision was protested and legally challenged by black parents from the School 1 community, the New York State Commissioner of Education rejected the legal challenge, relying in part on a letter from the Yonkers NAACP stating that the Board's decision was "the most realistic solution to this long-standing problem." GX 427. Superintendent Wynstra thereafter wrote to the NAACP, thanking them for their role in "clarifying our intent and action" in closing School 1. SB 803; *see also* SB 754.

■ The Board argues that the NAACP's position on the School 1 closing demonstrates the propriety of the decision.[100] The NAACP's support of the Board's decision, however, must be viewed in context. Because the Board had consistently refused to consider and implement the alternative of redrawing attendance zone lines in the Runyon Heights/Homefield area so as to maintain School 1 as an integrated facility, the NAACP as well as other groups and individuals who might have otherwise opposed the closing of School 1 were essentially faced with a Hobson's choice: support the closing of the Runyon Heights neighborhood school, even in light of the resulting burdens on black students, or oppose the closing and thus perpetuate what was at the time the only majority black school in Yonkers. Only after the Board rejected the repeated redistricting suggestions of the Runyon Heights community and decided instead to close School 1 did the NAACP support the Board's decision as "the most realistic solution to this long-standing problem." Viewed in this light, the NAACP's eventual support of the Board's decision to close School 1 cannot immunize the decision from scrutiny.

At first blush, the Board's decision to close School 1 is troubling. While School 1 students were reassigned to schools within one mile of Runyon Heights, the redistricting proposed by the School 1 community

---

**100.** In its Comments and Counter-Statements Regarding Proposed Findings of Fact by Plaintiff-Intervenors and Plaintiff, the Board goes even further, arguing that the State Commissioner's decision, based in part on the NAACP

letter, is *res judicata* as to the instant claim of intentional segregation. In light of our conclusions regarding the Board's decision to close School 1, we need not resolve this contention.

would have involved no greater, and in certain instances, a lesser travel burden for Homefield or School 5 students, who at one time made the very trip to School 1 envisioned by the suggested redistricting. The redistricting proposal also would have eliminated the problematic double-grade classes at School 1 and presumably would have avoided the need for some of the additional classroom construction at School 22 one year later. The two double classes at School 24 could also have been easily eliminated by transferring students from a neighboring school zone, for example, portions of the attendance zone for School 16 (which, at 135% capacity, was so overcrowded that the district planned to erect partitions in study halls in order to accomodate its students) could have been transferred to the neighboring School 24 zone. The closing of School 1 also deprived the Runyon Heights community of its neighborhood school, a loss which was followed by a number of subsequent reassignments of Runyon Heights students during the 1970's. Moreover, the Board's decision preserved an all-white school experience for Homefield students, consistent with the Board's deliberately segregative attendance zone boundary changes of prior years.

 The Board's decision to close School 1, however, must be viewed in context. The decision to close the school, prior to *Brown*, resulted in the elimination of the district's only predominantly minority school and the desegregation of two virtually all-white schools. It also eliminated double-grade classes at all three schools, a result which would otherwise have involved considerable redistricting of other school zones. In addition, the reassignment of students to School 1 not only would have perpetuated the all-white character of Schools 5 and 24, but also would have done nothing to eliminate the all-white character of School 22. Since portions of both the School 22 and School 5 zones had previously been eliminated from School 1's attendance zone, it is difficult to find that the district's willingness to close School 1 and reassign its minority students to two virtually all-white schools, including School 5, was done to perpetuate racial imbalance at School 22. Finally, in terms of current segregative effect, the School 1 closing has increased racial balance at other elementary schools to which Runyon Heights students have been assigned—Schools 5 and 24, when School 1 was closed; East Yonkers' School 31, after School 24 was closed in 1976; and East Yonkers' School 8, after School 31 was converted into an elementary magnet school in 1982. While the reassignment of Runyon Heights students in 1954, 1976 and 1982 has resulted in travel burdens more significant than those imposed on practically any other community in Yonkers, we do not believe that such burdens, particularly when imposed in a desegregative spirit, were impermissibly discriminatory either in purpose or in effect. *See Parent Association of Andrew Jackson High School v. Ambach, supra,* 598 F.2d at 714 n. 6 (inconvenience of transportation for minorities permissible as part of voluntary desegregation effort); *Higgins v. Board of Education of Grand Rapids,* 508 F.2d 779, 793 (6th Cir.1974). Indeed, it is not unreasonable to infer that School 1, built in 1872 and thus twelve years older than any other elementary school in operation at the time of its closing, would have been a prime candidate for closing as part of the district's 1976 School Closing plan and thus would have resulted in substantially the same student reassignments as actually occurred. In sum, we conclude that the Board's decision to close School 1 and its subsequent reassignment of Runyon Heights elementary school students do not, in light of the aforementioned circumstances, constitute intentionally segregative or discriminatory acts and do not have current segregative effects on the district's elementary schools.

### b. *1976 School Closings*

By the mid-1970's, the racial segregation of Yonkers public schools was already quite pronounced. In 1970, seven Southwest Yonkers elementary schools (3, 6, 12, 18, 19, 25, King) had disproportionately (45% to 85%) minority enrollments and enrolled 74% of the minority elementary school students in the district, while all of

East Yonkers' elementary schools were at least 95% white. By 1975, twelve Southwest Yonkers schools (3, 6, 7, 10, 12, 18, 19, 25, King, Longfellow, Commerce, Yonkers High) had predominantly (over 50%) minority student enrollments, constituting 66% of the district's minority students; seventeen schools in East and Northwest Yonkers (8, 11, 14, 15, 16, 17, 21, 22, 28, 29, 30, 32, 34, Emerson, Twain, Whitman, Lincoln) were at least 95% white. Similar racial imbalance was reflected in the school district's principal and teaching assignments as well; six of the seven black principals employed by the Board in 1975 worked in schools of at least 75% minority student enrollment.[101] At the same time, the demographic characteristics of Yonkers were undergoing similar segregative changes, including the City's addition of sixteen subsidized housing projects, all of them located in Southwest Yonkers.

The school integration policy of New York State education authorities also began to reflect considerably more flexibility in its approach to the question of school desegregation. As late as 1972, the state continued to adhere to its previously stated commitment to integrated education and its recognition of the inherent inequality of segregated schools. Recognizing the recently increasing "passions" surrounding the issue of busing, the Regents nevertheless deplored the "emotional misapprehensions" concerning the issue. The state concluded that

[u]ntil residential and occupational integration becomes a reality in this nation— the ultimate sign that skin color has lost its evil fetish—the judicious and reasonable use of motor vehicles may be in many instances the only instrument available to enable local communities to meet constitutional requirements and educational goals.

GX 909.4.

By 1974, however, the Regents stated that such transportation was appropriate where "demonstrably necessary to achieve integrated education" and that competing considerations of health and safety of children, particularly those of elementary school age, must also be recognized and respected. GX 909.5. In 1975, the state issued additional statements reaffirming and expanding upon its previous policies concerning transportation and integration. The Regents stated that, in its view, racial integration did not imply or require quantitative racial balance in all schools within a district but that serious efforts should nevertheless be made to bring about equal educational opportunity, including racial and ethnic integration. The Regents stated that "if a school district avails itself seriously and truly of available means to integrate its student population, then it should not be required to establish or maintain particular ratios of students from different ethnic origins." GX 909.6. One month later, the Regents expanded upon its previous statement. It noted the controversial nature of the use of busing as a means of achieving racial integration in schools, stating that

[w]e also understand that busing has become a source of serious argument not alone because some of its opponents may be illiberal, or racist, but also because many responsible people, black and white, do not regard the massive transportation of pupils out of their neighborhoods for purposes of achieving racial balance to be productive in the education of our children.

GX 909.7.

While it reaffirmed its commitment to the creation of integrated schools as an essential means of assuring equal opportunity for quality education, the Regents declared that such a goal was to be pursued by utilizing a number of methods, including, but not limited to, use of "judicious and reasonable transportation" of pupils. The Regents specifically noted that magnet schools, open enrollment or optional transfer plans, the closing of unneeded schools, and compensatory education programs

---

**101.** The seventh principal worked at Yonkers High School, whose 57% minority enrollment was more than double the districtwide high school average of 27%.

were also appropriate methods of achieving this goal.

At the same time, the Board was confronted with increasing demands for desegregation of the Yonkers public schools. In response to written requests by the NAACP that the Board take immediate action to remedy the racial imbalance of the schools, GX 925.1,925.5, the Board created, in October 1975, a Task Force for Quality Education ("Task Force") for the purpose of examining and proposing methods for alleviating the problem of minority isolation and insuring quality education for Yonkers public schools students. GX 925.-7; P-I 59-9; Tr. 9858-59 (Minervini). The Task Force, comprised of members of community and religious organizations and other Yonkers citizens, set as its primary goal the issuance of a report containing findings regarding and recommended solutions to, the issues of quality education and racial imbalance. The implementation of a remedial plan was tentatively scheduled to commence by September 1976.

The efforts of the Task Force, however, were quickly overshadowed. Instead, the 1975-76 school year was marked most prominently by the onset of the city's severe financial crisis. On November 13, 1975, a state of financial emergency in Yonkers was declared by New York State and an Emergency Financial Control Board ("EFCB") was established to oversee the fiscal affairs of the city and school district. In addition to implementing assorted city-imposed budgetary cutbacks totalling approximately $6 million for the 1975-76 school year, the Board was required by the EFCB to implement an additional $9.7 million in budget reductions (approximately half of the city's total budget deficit) by July 1, 1977. GX 777.

The mandated reduction of the school's budget was implemented in two stages: a $2.3 million reduction for 1975-76, and the remaining $7.4 million for 1976-77. These cutbacks were initiated in early 1976 by eliminating over 500 professional and non-professional staff positions in the district, including over 250 teaching positions. These cutbacks affected a wide array of educational programs, including the elimi-nation of the district's pre-K program and the termination of fifteen reading teachers. In addition, the district eliminated over 100 school crossing guard positions, resulting in community protests and a number of accidents involving children walking to school. SB 838-844. In December 1976, the City Council passed a resolution requesting the Task Force to delay for six months the issuance of its final report. GX 141. The Task Force complied with this request.

The second stage of budget reductions took the form of a proposal to close seven schools and eliminate additional staff positions. As a result of these cutbacks, additional educational programs were curtailed or eliminated, including the More Effective Schools program at Schools 6 and 12, the Head Start program, and the English-as-a-Second Language bilingual instruction program. GX 777, 780, 783, 787.

In March 1976, Superintendent Robitaille submitted to the Board a detailed proposal recommending the closing of six elementary schools (3,4,7,12,15,24) and one middle school (Commerce). These schools were chosen in accordance with a point system which was designed to weigh five factors—physical characteristics, special areas (*e.g.*, library, gym, cafeteria), internal characteristics (*e.g.*, class size and utilization), cost of operation, and population and enrollment (including racial balance)—in order to determine the most suitable schools for closing. The use of objective criteria was also designed to help the school administration to justify its decisions to close particular schools in anticipation of the strong community opposition which the proposal was likely to engender.

The decisions to close particular schools were in fact based on an evaluation of primarily race-neutral criteria. Most of the schools recommended for closing were severely underutilized, with several schools operating at roughly half capacity. Schools 3 and 4 were the oldest schools in the district, and, along with School 7, were in need of substantial renovation and rehabilitation. Most of the schools suffered

from a variety of physical inadequacies, such as the lack of a cafeteria (School 12) or playground space (School 7). The closing of Commerce, the only middle school closed as part of the district's 1976 school closings, was also recommended primarily because of the substantial savings realizable from staff reductions and the schools's severe underutilization and racial imbalance (77% minority, versus 28% district-wide middle school average). GX 567. In addition, an effort was made to close schools in such a manner as would allow for the reassignment of students to schools within walking distance from their homes; the Board lacked sufficient funds to provide transportation for reassigned students.

In March 1976, the Board held a series of public hearings on the administration's proposal. Not surprisingly, the anticipated resistance to particular school closings was quite forcefully expressed by community members. Similar opposition was also brought to the Board's attention in the form of numerous written protests and position papers from various community organizations and members. Opposition to the proposed closing of Schools 4 and 15, predominantly white (97% and 99%, respectively, in 1975–76) schools in East Yonkers, was particularly intense. This opposition was devoid of racial overtones; in fact, none of the contemplated reassignments of School 4 or School 15 students involved any significant degree of desegregation. Instead, the opposition to these school closings was based primarily on the loss of each community's neighborhood school and the resulting burdens involved in being reassigned to other surrounding schools in the East Yonkers area. Among the most frequently cited problems or burdens were traffic and parking difficulties at reassigned schools and safety concerns regarding children walking to their newly assigned school. Parents in the School 15 area were led by Mayor Angelo Martinelli in a group walk to demonstrate the travel burdens which would be imposed on School 15 students if the Board decided to close the school. The reassignment of School 4 students to Schools 14, 17 and 21 was also opposed because of the community's assertion that students would have to travel longer, more hazardous walking routes; complaints were made about thirty to forty-five minute travel times over hazardous and hilly terrain. Opposition was also expressed regarding the configuration of neighboring school buildings and other facility-related concerns. See SB 574–578.

Southwest Yonkers community members also opposed the closing of their neighborhood elementary schools. This opposition was based in part on the overcrowding which community members claimed would result at neighboring schools (the closing of Schools 3, 7 and 12 involved the reassignment of 1,193 students; the closing of Schools 4 and 15 entailed the reassignment of 601 students). Concerns were also expressed by the School 3 PTA regarding the racial consequences of the School 3 closing and the resulting white flight which it claimed would result if white School 3 students were reassigned to more heavily minority School 19; the PTA instead urged that School 19 be closed as the district had previously contemplated. GX 519. The Commerce PTA expressed concern that the closing of Commerce Middle School would dissipate the benefits of perceived educational improvements at the school, and asked that any redistricting of schools be done on an east-west basis in order to alleviate racial imbalance. GX 776.

Notwithstanding the community's opposition to the various school closings, on April 13, 1976 the Board approved the administration's school closing plan. GX 780. Community opposition, however, was by no means completely dissipated by the Board's decision. In particular, the strong community resistance to the two East Yonkers school closings intensified subsequent to the Board's approval of the administration's plan. Several Board members, including Anne Bocik, Robert Jacobson and Angelo Paradiso, were subjected to various forms of personal harassment (picketing and verbal threats) as a result of the Board's decision to close two East Yonkers elementary schools. Tr. 5066 (Jacobson); Tr. 5313–15 (Morris); SB 581. Mayor Martinelli commissioned a safety study for the

purpose of demonstrating the hazards of reassigning School 4 and 15 students to neighboring schools. Tr. 7635–44 (Martinelli). A sit-in was conducted at the Board of Education building in protest of the School 15 closing. Tr. 11,268 (Guerney). The School 15 community, with the help of Seelig Lester (appointed to the Board in November 1976), opened an alternative "freedom school" in the School 15 area rather than send their children to Schools 26 and 28. The Citizens Committee for Quality Education proposed the creation of a magnet program at School 15 in an attempt to secure its reopening. GX 941. Mayor Martinelli, in a written appeal to New York State Commissioner of Education Ewald Nyquist, expressed his belief that the Board's decision to close seven schools was arbitrary and capricious and should be immediately reconsidered. GX 283. Martinelli and Lester also met with Nyquist to protest the closing of School 15. Tr. 7624 (Martinelli). Legal proceedings were instituted by parents of children formerly attending School 15 and were pursued all the way to the New York Court of Appeals in an unsuccessful effort to overturn the Board's decision. SB 272. Southwest Yonkers community members also voiced objections to the Board's decision and expressed concern that the Board might reconsider its closing of East Yonkers schools without similarly considering the reopening of Southwest Yonkers schools. SB 302. Notwithstanding this persistent and uniformly negative reaction to the Board's decision, the school closings were implemented, as recommended, beginning with the 1976–77 school year.

In numerical terms, the racial effects of the 1976 school closings and student reassignments may be summarized as follows:

## SCHOOLS CLOSED

| School | Geograph. Location | No. Studts W | M | % Minority [a] |
|---|---|---|---|---|
| 3 | SW | 178 | 369 | 67% |
| 4 | SE | 317 | 7 | 2% |
| 7 | SW | 135 | 206 | 60% |
| 12 | SW | 10 | 295 | 97% |
| 15 | NE | 275 | 2 | 0% |
| 24 | NW | 205 | 50 | 20% |
| Commerce | SW | 120 | 407 | 77% [b] |

## RECEIVING SCHOOLS

| School | Geograph. Location | Estimated No. Studts [c] W | M | % Minority Before | % Minority After Expected | % Minority After Actual |
|---|---|---|---|---|---|---|
| 13 | SW | 36 | 43 | 19% | 23% | 26% |
| 19 | SW | 78 | 146 | 79% | 70% | 78% |
| 27 | SW | 47 | 200 | 15% | 43% | 52% |
| 11 | SE | 50 | 1 | 4% | 4% | 5% |
| 14 | SE | 134 | 3 | 4% | 3% | 6% |
| 17 | SE | 56 | 1 | 2% | 2% | 3% |
| 21 | SE | 73 | 2 | 2% | 2% | 4% |
| 18 | SW | 40 | 61 | 61% | 61% | 61% |
| 23 | SW | 95 | 145 | 31% | 41% | 41% |
| 9 | SW | 4 | 124 | 32% | 54% | 52% |
| 16 | NW | 66 | 3 [d] | 1% | 2% | 5% |
| King | SW | 6 | 171 | 83% | 87% | 98% |
| 26 | NE | 108 | 1 | 8% | 7% | 6 |
| 28 | NE | 172 | 1 | 2% | 1% | 2% |
| 5 | Central | 189 | 50 | 15% | 11% | 9% |
| 31 | NE | 1 | 53 [e] | 7% | 23% | 27% |
| Burroughs | Central | 46 | 73 | 15% | 21% | 26% |
| Emerson | NW | 55 | 55 | 3% | 10% | 17% |
| Fermi | SW | 11 | 68 | 48% | 52% | 56% |
| Hawthorne | SW | 7 | 57 | 50% | 53% | 54% |
| Longfellow | SW | 21 | 163 | 81% | 83% | 90% |

[a] The districtwide elementary school average in 1975–76 was 30% minority.

[b] The districtwide middle school average in 1975–76 was 28% minority.

[c] The expected enrollments are derived from district estimates based upon computations of racial enrollments for the affected shcools. Tr. 11,902 (Armor); SB 806.

[d] Reflects former School 9 students reassigned to School 16.

[e] Reflects former School 5 students reassigned to School 31.

A more detailed examination of the 1976 school closings reveals a mixture of desegregative and segregative consequences, all of which were foreseen by both the administration and the Board.

The closing of School 3 is a prime example of this mixed result. The closing of School 3 eliminated an increasingly racially identifiable school from Southwest Yonkers. The reassignment increased the racial enrollment of School 13 and, to a less favorable extent, School 27. School 27 was expected to change from 15% below the districtwide average to 13% above the districtwide average; it actually became a 52% minority school, 22% above the districtwide average. This change, however, was designed to be and was viewed by both Board officials and the Task Force as an integrative step. Tr. 9842 (Minervini); Tr. 12,926 (Dodson). On the other hand, a large number of minorities was reassigned to School 19, a physically inferior and heavily minority school.

The two school closings in East Yonkers were limited both in racial effect and desegregative intent. The closings eliminated two racially isolated (*i.e.,* over 95% white) schools and provided an opportunity for a sizable number of School 15 students to attend a somewhat more racially balanced facility. On the other hand, the closings left the vast majority of students in similarly racially imbalanced white schools. In addition, the elimination of Schools 4 and 15, both of which were underutilized facilities (80% and 70%, respectively), limited the opportunities which might otherwise have existed for future desegregation via the reassignment of minority students from educationally and physically inferior Southwest Yonkers schools.

The closing of elementary schools in Southwest Yonkers presents a similar amalgamation of positive and negative racial effects. The closing of School 7 eliminated a racially imbalanced minority school but did little to improve the racial balance of neighboring schools to which School 7 students were reassigned. School 23, which formerly had a minority enrollment almost equal to the districtwide average, became an increasingly and eventually predominantly minority school. Nevertheless, the large number of white and minority students reassigned to School 23 were afforded an opportunity to attend what was at the time a significantly more racially balanced facility. The Board failed to reassign minority students from School 7 to School 17, a 2% minority school approximately one-and-a-quarter to one-and-a-half miles from the eastern portion of the School 7 zone, rather than to School 23, slightly over one-half mile away, even though the Board simultaneously reassigned 127 (124 white) former School 4 students over one mile to School 14. The capacity and projected enrollment figures relied upon by the school administration, however, would appear to justify the Board's failure to adopt this alternative. Even without such a change, School 17 was projected to be only thirty-two students below capacity, while School 23 was projected to be 198 students below capacity.

The closing of School 12, while salutary insofar as it eliminated a highly racially imbalanced school from Southwest Yonkers, was largely segregative in its ultimate impact. Both School 9 and King became more racially imbalanced, solidifying King's identifiably minority image and tipping School 9, a previously racially balanced (32% minority) school, into predominantly minority status as well. While a fair number of black students were reassigned to School 9 and thus were provided with an opportunity to attend a more racially balanced school, a number of white students underwent the opposite experience as a consequence of being reassigned from School 9 to virtually all-white School 16. Thus, the elimination of one racially imbalanced school created or solidified the racial identifiability of three surrounding schools.

The School 24 closing was similar to the closing of School 12 in terms of its dominolike reassignment of students. The closing of this racially balanced school was of fairly negative racial consequence for School 24 students themselves, who were reassigned from a 20% minority to an 11% minority facility. It was also similar to

other school closings in the district in which racially balanced schools, including schools located in Central Yonkers which were thus particularly amenable to desegregation, were closed by the Board. *See* SCHOOLS IV.A.1 *supra.* On the other hand, a number of School 5 students from the Runyon Heights area, all but one of whom were minorities, were reassigned to School 31 in East Yonkers. Although this desegregative step deprived minority Runyon Heights students, for the second time, of their so-called neighborhood school experience by reassigning them to a school located across two major highways and roughly twice as far away as their former school, it was effectuated primarily in order to improve racial balance at School 31. Tr. 9842 (Minervini); Tr. 11,262 (Guerney).[102]

The closing of Commerce Middle School was significantly more desegregative in its racial consequences than was initially planned. The closing of Commerce eliminated a heavily racially imbalanced and educationally inferior school from Southwest Yonkers. The Commerce closing originally involved the anticipated reassignment of roughly 40% of its minority students to Longfellow, a plan which would have been segregative both for the reassigned students and for the Longfellow facility itself. The actual effect of the Commerce closing, however, was significantly more desegregative than the original enrollment projections indicated: in particular, Emerson's minority enrollment increased by ninety-two students, and Burroughs' by 117; Longfellow's minority enrollment increased by only twenty-four. These figures are consistent with the testimony of Director of Secondary Education John Guzzo and Commerce principal Patricia DiChiaro that efforts were made to reduce much of the originally anticipated segregative effect of the Commerce closing, primarily by reassigning more minority students to predominantly white Emerson and Burroughs. In fact, a comparison of the district's reassignment planning document and the dis-

trict's 1967–77 middle school attendance zone lines confirms that a significantly minority-populated portion of the originally proposed Longfellow zone, including Pine Street, Grove Street and Ravine Avenue, was eventually included in Emerson's attendance zone. *Compare* GX 567 *with* SB 627; *see also* GX 430. In addition, this comparison reveals that a minority-populated portion of the originally proposed Burroughs zone, including Grant Park, St. Joseph's Avenue, and the Burke Housing project, was also rezoned to Emerson. Thus, in reassigning Commerce students, the district succeeded in improving the racial balance at two previously heavily white middle schools—an effort whose significance was recognized by Emerson administrative staff later that year. *See* P-I 34–17.

The Commerce closing was not without segregative consequences. Minority enrollment increased at Fermi, Hawthorne, and Longfellow, all of which became or remained predominantly minority schools. In addition, as a consequence of the Commerce closing, feeder patterns from Southwest Yonkers elementary schools to middle schools were divided in a fashion unknown in any other area of the district, with students from heavily minority School 6 and King attending four middle schools. In addition, the alternative of reassigning students to either Twain (1% minority) or Whitman (2% minority) in East Yonkers was rejected because of the travel distance which would have been involved, despite the request of the Commerce PTA that students be reassigned on an east-west basis, *see* GX 776, and the fact that some students reassigned to Hawthorne, Emerson and Burroughs would now be taking public transportation to school in any event. Tr. 12,653 (DiChiaro). Enrollment and capacity figures for 1976 and 1977 suggest that reassignments to Whitman in particular would have been feasible: Whitman, with a stated capacity ranging from 1,025 (Engineering Department) to 1,200 (1976 School Closing Plan), had an anticipa-

---

**102.** The reassignment of students in this manner also demonstrates a willingness to impose considerable travel burdens when community opposition to desegregation efforts was largely absent. *See* SCHOOLS III.F.3 *infra.*

ted enrollment of 829 for 1976. GX 126. The reassignment of whites and minorities to Fermi and Hawthorne did result in a more racially integrated experience for those students. The reassignment of minorities to Fermi, however, was effectuated in spite of the opposition of Fermi parents, both white and minority, to the assignment of additional minority students to the school, opposition which was based on a concern that the school would become racially identifiable if additional minorities were assigned there. Tr. 2483–84 (Guzzo). Yet given the fact that significantly more minorities were assigned to Emerson than both Fermi and Longfellow, despite the geographic proximity and substantial underutilization of the latter two schools, it is difficult to find that the assignment of minorities to these predominantly minority schools was a deliberately segregative act. The evidence regarding the closing of Commerce is instead consistent with the testimony of Superintendent Robitaille and others that the 1976 school closings and student reassignments as whole constituted attempts to effectuate modest improvements in racial balance, with more comprehensive efforts at school desegregation to be implemented in subsequent years.

On balance, the record suggests that fiscal, rather than racial, considerations were clearly the predominant factors underlying the decisions to close particular schools. The point system used by Superintendent Robitaille and his staff illustrates the extent to which racial balance, while a factor in determining the most suitable schools for closing, was only one of many relevant factors which were considered by school officials. To be sure, desegregative measures were also implemented where possible to do so in a manner consistent with the Board's overall fiscal objectives. Indeed, both the testimony of school officials and evidence of the numerical and racial impact of the school closings and student reassignments reflect the limited yet observable desegregative steps taken by the Board. On balance, however, the inconsistent racial consequences of the 1976 school closings and student reassignments, as compared with the more consistently followed race-neutral reasons underlying those same decisions, illustrate the order of priorities which underlie the district's school closing decisions.

The Board's guarded receptivity to more desegregative alternatives to the 1976 School Closing plan is further evidence of its fiscal, rather than desegregative, priorities at the time. When confronted by school closing and reassignment alternatives encompassing a more aggressive pursuit of school desegregation, the Superintendent and his staff adhered to their initial recommendations, in some instances deliberately delaying school desegregation efforts for a future time. For example, the NAACP recommended to the Superintendent and Board that they consider closing the educationally troubled and underutilized School 6 (98% minority) and Longfellow Middle School (81% minority) and reassign their students in a desegregative manner. The NAACP also suggested the redrawing of high school attendance zone boundaries in order to alleviate increasing racial imbalance. Curtis Giddings, the Board's sole minority member, voted against the school closing plan primarily because of the plan's failure to make significant headway in eliminating racial imbalance in the district's schools. Giddings acknowledged, however, that the Board's primary concern was fiscal while his was racial, and that the plan did make some improvement in racial balance. SB 867. According to NAACP President Winston Ross and Superintendent Robitaille, the failure to adopt these proposals also reflected both the perceived infeasibility of their present implementation and the Superintendent's intention to recommend that these schools be closed as part of a future desegregation plan. Tr. 3604–06 (Ross); Tr. 4616–18 (Robitaille). Similarly, the Board's response to these suggestions acknowledged that the school closing plan was "not primarily concerned with desegregation and integration, but rather a fiscal solution to a monetary problem" and that some of the suggested alternatives would hopefully "be forthcoming." P–I 58–54.

In sum, the effect of the 1976 school closings on the racial balance of Yonkers

public schools was decidedly mixed: while some aspects were desegregative, the rejection of alternatives for avoiding increased racial imbalance and for furthering desegregation reflect the district's decision to temporarily create or perpetuate racial imbalance until a more comprehensive desegregation plan could be developed. Given the circumstances in which the school closing plan was formulated and the reasons for its implementation, the liability of the Board for creating and maintaining racial segregation in the schools more appropriately turns on the circumstances underlying its subsequent failure to rectify the known segregative consequences of the 1976 School Closing plan.

### c. *Longfellow Middle School*

The racially segregated condition of Longfellow Middle School, like the vast majority of the district's other schools, has been perpetuated primarily because of segregative omissions rather than affirmative acts: the failure either to close the school and reassign its students elsewhere, or to reassign students from other schools to Longfellow. The failure to eliminate the racial segregation at Longfellow represents the culmination of a long history of increasing racial imbalance at the facility, decreasing justification for keeping the facility open, repeated proposals to close the facility, and the repeated rejection of such proposals as the school became increasing-ly underutilized and racially segregated. The circumstances surrounding the continued racial imbalance at Longfellow is thus illustrative of the racial imbalance at many of Southwest Yonkers' public schools. Because of the particularly extensive nature of Longfellow's racial imbalance, physical inadequacy, and proposals for closing, however, we will discuss it separately in our findings.

Since 1930, the Longfellow Middle School has been located in the former School 20 elementary school building, a relatively small facility with no outdoor recreational space. Racial imbalance at Longfellow, located in the northeast section of the Southwest Yonkers area, has existed at least as far back as 1950, the year in which numerical evidence of estimated student enrollments is first available. In 1950, Longfellow's estimated minority enrollment was larger than any other junior high school in the district: the school was only 12% minority, but it also enrolled 41% of the district's junior high school minority students. SB 810.3. Since that time, the increasing racial imbalance at Longfellow has arisen partly because of the population growth in the Central West and Northwest Yonkers areas. This population growth led to the opening of several new junior high and middle schools and the repeated contraction of the Longfellow attendance zone. The effect of these school openings on Longfellow's student enrollment is reflected in the following table:

LONGFELLOW

| Date | School Opening | % Minority, Before | Expected Decrease (Increase) in Number of Longfellow Students | | % Minority, After |
|------|----------------|--------------------|-----------------|-----|----------------|
| | | | W | M | |
| 1954 | Gorton | 15% | 72 | 0 | 16% |
| 1963 | Emerson | 22% | 228 | 108 [a] | 16% |
| 1969 | Burroughs | 43% | 42 | (16) [b] | 48% |
| 1973 | Commerce | 79% | 22 | 11 | 82% |

[a] Includes estimated reassignment of seven whites and one minority to Franklin Junior High School. SB 810.7.

[b] Represents (a) estimated reassignment of ninety-three whites to Burroughs and (b) estimated reassignment of fifty-one whites and sixteen minorities from Gorton. SB 810.7.

Prior to 1963, the Longfellow attendance zone included areas of Central and Northwest Yonkers on both sides of the Saw Mill River Parkway. Until 1954, students attended both Longfellow and the Longfellow annex, located in Central Yonkers, east of the parkway. In 1954, the annex became part of the School 5 elementary/middle school facility and Gorton Junior High School was opened. From 1954 to 1963, Longfellow continued to draw students from the Runyon Heights and Homefield areas, both of which are east of the parkway and north of Tuckahoe Road. By 1960, Longfellow was 17% minority and, along with 17% minority Hawthorne, enrolled 71% of the district's middle school minority students.

The two most significant contractions of the Longfellow zone occurred when Emerson and Burroughs Junior High Schools were opened. These changes were either not significantly segregative in effect or not segregative in intent insofar as Longfellow was concerned. The 1963 redistricting of predominantly white Homefield residents from Longfellow to the newly opened Emerson facility, although responsive to residents' pressure for such a change, was based on race-neutral considerations. The construction of a new junior high school facility in Northwest Yonkers had been recommended in 1957 by the New York State Department of Education. GX 46, at 30. By 1960, the population growth in Northwest Yonkers prompted Superintendent Wynstra to recommend the acquisition of what is presently the Emerson site for the construction of a combined elementary/junior high school facility. SB 851. By 1963, Longfellow was operating at 107% to 135% capacity, whereas Emerson was operating at less than 60% capacity just after its opening.

During the remainder of the 1960's, Longfellow's total student enrollment remained relatively constant. SB 810.7; GX 64 (1963—540 students (estimated); 1967—530 students; 1969—573 students). The significant increase in Longfellow's percentage minority student enrollment from 1963 to 1969 was caused primarily by the combination of two numerically inverse trends: increasing minority population in the Longfellow attendance area, which included the Mulford Gardens and Schlobohm subsidized housing projects, and the decline in white enrollment at Longfellow during this same period. From 1963 to 1967, Longfellow's white student enrollment declined from 455 to 331, while its minority student enrollment during this same period increased from eighty-five to 199. By 1967, Longfellow was 38% minority, the most heavily minority junior high school in the district. While some of this increase

may be explained by demographic forces unrelated to conduct of the Board, it is reasonable to conclude that some portion of these changes was attributable to the educational inadequacies at the school, *see, e.g.,* GX 605, as well as the increasing minority population concentration in that area.

The opening of Central Yonkers' Burroughs Junior High School in 1969 was the result of increased overcrowding in surrounding middle and K–8 elementary schools. The need for an additional junior high school facility in Central Yonkers due to the anticipated population growth in the area was recognized as early as 1960 by Superintendent Wynstra and the Board's Buildings and Sites Committee. SB 851. By 1969, the student enrollments at five surrounding schools with junior high students (5, 8, Whitman, Gorton, Lincoln) were in excess of maximum capacity; two of these schools (Schools 5 and 8) were combined elementary/middle schools. At that time, Longfellow enrolled 676 students, with a stated capacity ranging from 650 (Phase II) to 820 (Engineering Department).

The effect of the Burroughs opening on Longfellow was racially segregative: an appreciable number of whites residing west of the Saw Mill River Parkway were reassigned to Burroughs. Those students, though they resided within approximately one mile of Longfellow, were even closer to the new and physically superior Burroughs facility. In addition, fifty-one white and sixteen minority students were reassigned from Gorton to Longfellow, thus ameliorating the segregative effect of the aforementioned reassignment. Following the Burroughs opening, both Burroughs and Longfellow were operating at approximately the same level of capacity. These factors, and the absence of evidence indicating that racial factors were considered in opening Burroughs, support a finding that the reassignment of white students from Longfel-

low to Burroughs was not deliberately segregative in whole or in part.

The most significant segregative changes in Longfellow's enrollment occurred during the three years following Burroughs' opening. During this time, Longfellow's white student enrollment dropped by 147 students, over half of its 1969 white student enrollment. Since the Board made no attendance zone changes and the schools' minority enrollment remained relatively constant during this period (289 to 302 minority students), it is reasonable to infer that many white students either relocated or enrolled in private junior high schools in the Longfellow area.[103] As noted earlier, at least some of this decline is reasonably attributable to Longfellow's recognized inadequacy as a junior high school facility and the increase in minority population in that area of the city. Indeed, by this time, discussions regarding the inadequacies of the Longfellow facility and the proposed closing of the school were evident. In 1967, the Longfellow PTA urged the Board to reassign Longfellow students to Emerson, a proposal prompted largely by the perceived inadequacies of Longfellow's indoor and outdoor facilities. GX 605. The Board's 1969 capital budget request included an allocation for the conversion of Longfellow into an elementary school. P–I 51–57. By around 1970, Board members were beginning to consider closing Longfellow based primarily on its increasing racial imbalance as well as the relative quality of educational opportunity at the school. Tr. 5440 (Siragusa). Superintendent Mitchell's plans for converting Longfellow contemplated the reassignment of Longfellow Junior High School students to the recently opened Burroughs facility. P–I 51–64.

The closing of Longfellow was considered more seriously in 1972 as part of the district's consideration of a variety of proposals for reorganizing the district's secondary schools. *See* SCHOOLS IV.F.2

---

**103.** Longfellow's white student enrollment declined 52% from 1969 to 1972. White student enrollment at Most Holy Trinity, St. Casimir's and St. Joseph's K–8 private schools, all located in Longfellow's attendance zone, experienced only a 25% decline in seventh and eighth grade white student enrollment (269 to 203 students) during the same period of time. SB 98.

*infra.* Several proposals were considered for closing Longfellow and using the facility either for a variety of other educational uses (*e.g.*, as an elementary school or alternative high school) or as a facility for adult programs, drug programs, or sheltered workshops. GX 760, at 44,945; 761, at 42,808; 762, at 42,825.

While the closing of the Longfellow facility was considered beneficial, the reassignment of its students to other schools was considered problematic. The proposal which appears to have received most serious consideration was to close Longfellow and Franklin Junior High Schools and reassign their students to the old Yonkers High School facility as soon as the new Yonkers High School facility was opened. GX 115, at 43; 761, at 42,808. Franklin, like Longfellow, had been repeatedly recognized to be a physically inadequate facility. The 1973 Reorganization Plan adopted by the Board, however, recommended only that Franklin be closed and its students reassigned to the old Yonkers High School, renamed Fermi Middle School. Although there is a dearth of direct evidence explaining why only Franklin was recommended for closing, it is reasonable to conclude that the desire to avoid opening Fermi as a racially identifiable middle school was a primary consideration. According to Board member Rosemarie Siragusa, the proposed reassignment of Longfellow students to Commerce (as part of the proposed opening of Commerce Middle School) was considered inadvisable for similar reasons. Tr. 5442–43. Second, similar concerns were expressed by white and minority Fermi parents three years later when the district proposed the closing of Commerce and the reassignment of some of its mostly minority students to Fermi. As an alternative to the proposed reassignment of Longfellow students to Fermi, Siragusa suggested to Superintendent Alioto and Board members that Longfellow students be reassigned to Twain Middle School, a recently opened 3% minority school in Southeast Yonkers. According to Siragusa, this proposal was rejected because of the long travel distances between the two schools and the perceived inability of Longfellow parents either to provide (through carpools) or to pay for the necessary transportation. Tr. 5442–45.

As a result, the Longfellow Middle School emerged virtually unaffected by the 1973 Reorganization Plan. The Commerce and Fermi Middle School openings had relatively little effect on Longfellow. Only thirty-three Longfellow students were reassigned to Commerce in 1974, a year after its opening. No students were reassigned to Fermi, which opened as a 41% minority middle school. By 1974, Longfellow was 76% minority, and had begun what was to become an uninterrupted decline in its student enrollment.

The Board's conduct since 1974 has consisted of a continued failure to implement desegregative proposals involving the Longfellow facility. As noted elsewhere in these findings, at least three specific proposals to close Longfellow were made in the mid to late 1970's. In 1976, the NAACP suggested that Longfellow be closed as part of the district's fiscally motivated school closing plan. In a letter to the Board, Yonkers NAACP President Winston Ross stated that the school's racial imbalance, age, and physical condition made Longfellow a desirable candidate for closing. GX 779. Ross also suggested that the elementary school portions of Emerson and Twain Middle Schools be closed to create additional room for the reassignment of Longfellow students. *Id.* Ross noted that the additional school closings would reduce racial imbalance and would provide additional financial resources for program enrichment and rehiring of specialized school staff. *Id.*

While the desirability of closing Longfellow was recognized by the school administration, the Board's response to Ross stated that the school closing plan was concerned primarily with fiscal, rather than desegregative, considerations and suggested that Ross' proposals would be given future consideration. P–I 58–54. Consistent with the Board's position, Superintendent Robitaille decided that, based on Longfellow's age, high racial imbalance and surrounding redevelopment in the community,

the school's closing would be recommended as part of the administration's forthcoming desegregation plan. Tr. 4631 (Robitaille).

In its 1977 Phase II Reorganization Plan, the administration recommended that the Board close Longfellow and return the facility to the City. The plan also proposed the closing of Emerson Elementary School (School 34) and the conversion of the Emerson facility into a two-year middle school.

The Board's failure to close Longfellow as recommended in Phase II is, as will be discussed further (*see* SCHOOLS IV.F.3 *infra*), difficult to explain in race-neutral terms. The school's size, age, underutilization and racial imbalance, in addition to the sizeable financial savings to be gained from the closing of a middle school, made it a prime candidate for such action. The capacity of the district's other middle schools also made Longfellow's closing a feasible alternative and a desegregative one as well. In particular, Twain Middle School (2% minority) was operating below its stated capacity; in 1978–79, the school year following Phase II's rejection, Twain Middle School was operating from 245 (Phase II) to 390 (Engineering Department) students below capacity, and thus could have absorbed a substantial portion of Longfellow's 426 students. By 1980, the conversion of the district's middle schools from grades 6–8 to 7–8 left Twain with 673 middle school students, below half its full capacity. While Twain was certainly a considerable distance from the Longfellow attendance zone, such distances or other travel-related burdens did not prevent the district from simultaneously reassigning Burroughs students an even greater distance to Whitman, in Northeast Yonkers, in the aftermath of Phase II. Tr. 2522–24 (Guzzo). Some Twain students in the northwest portion of that school's attendance zone were also travelling a considerable distance (approximately two-and-a-half miles) to attend school. Financial considerations also would not have posed a significant problem, given the state's reimburse-

ment policy with respect to transportation for purposes of desegregation and the fiscal savings to be generated by closing Longfellow.[104] In addition, the district made no efforts to consider the use of, or assist in arranging, privately-contracted transportation for Longfellow students, as it had done several times elsewhere in the district. Tr. 2521 (Guzzo). Instead, the Board kept the 89% minority school open, despite the recognized inadequacy of its facilities, its racial imbalance, and the increasing underutilization of the school.

The district also failed to adopt alternative measures for lessening racial imbalance at Longfellow, namely, reassigning former Burroughs students to the school. This proposal was suggested to the Board while the 1977 Phase II reorganization plan was still under consideration. Phase II recommended that Burroughs be converted into the new Saunders Trades and Technical High School facility and that Longfellow (as well as Fermi Middle School in Southwest Yonkers) be closed. GX 98, at 16–17. At an April 1978 Board meeting and in a May 1978 letter to Board President John Romano, the Longfellow PTA urged the Board to consider reassigning Burroughs students to Longfellow in an effort to promote greater racial balance at the school and thus prevent the closing of the school, as was recommended in Phase II. GX 679, 852. The letter stated that this proposal would enable the Board both to avoid closing the two remaining centrally located middle schools in the district (Burroughs and Longfellow) and to achieve desegregation on the middle school level without resort to busing. GX 852. Indeed, both Longfellow and Fermi were located on the same side of the Saw Mill River Parkway as the westernmost portion of the Burroughs zone, just a fraction of the distance between this area and Whitman. Longfellow also was the very school to which students from this area had been assigned prior to the opening of Burroughs

---

**104.** The total estimated ten-year cost of all transportation called for under Phase II was $400,000. GX 98, at 22. The estimated savings in operating costs from closing a single middle

school facility was approximately $100,000 per year, *id.* at 21–22; the total savings (including staff-related costs) was approximately $500,000 per year. Tr. 4679–80 (Robitaille).

in 1969. In fact, students from the School 5 and former School 24 attendance areas had never before been assigned to either Emerson (in Northwest Yonkers) or Whitman (in Northeast Yonkers); since 1938, these students had historically attended Longfellow, Burroughs or the former School 5 Middle School.[105]

With Phase II's proposal to close Longfellow and Fermi still pending, the Board voted in April 1978 to reassign Burroughs students to Emerson and Whitman Middle Schools. GX 679. Although one month later the Board unanimously expressed its disapproval of the Phase II plan, it adhered to its reassignment of Burroughs students because of the possibility that Longfellow would eventually be closed. As a result, Burroughs students were reassigned up to four miles to Whitman, prompting over 100 families from the predominantly white western portion of the former Burroughs zone to request assistance from the Board in securing privately contracted transportation to attend Whitman. GX 880; P–I 69–47.

Although the closing of Longfellow was still a subject of some discussion among school officials in 1978 and 1979, the Board continued to maintain the school in its severely underutilized and racially imbalanced condition. In May 1979, Director of Special Services Robert Dodson recommended to Superintendent Joan Raymond that the district close Longfellow and reassign its students to the nearby Fermi Middle School. Dodson noted that this proposal would eliminate the problem of Longfellow's racial imbalance and would be feasible from a capacity standpoint. GX 754. Although Dodson could not recall why this proposal was not adopted, he noted that he had heard discussions concerning the Justice Department's prelitigation investigation into this case and the resulting uncertainty which school officials harbored as to the future state of the schools. Tr. 13,212–14. It is also reasonable to infer that this particular reassignment would have been resisted, as it had been in earlier years,

because of the racial imbalance which would have resulted at Fermi, a 58% minority school which would have become 72% minority had Dodson's proposal been adopted. Consideration was apparently not given either to reassigning Longfellow students to schools in East Yonkers, or to reassigning former Burroughs students, who were now attending Whitman and Emerson, to either Longfellow or Fermi.

We recognize that the initial failure to reassign students to Longfellow or Fermi was caused primarily by the possibility that these two schools would be closed. We also recognize that the Longfellow facility's physical inadequacies made reassignments to the school a less than optimal prospect. It certainly cannot be suggested, however, that a school district can credibly justify its refusal to close an underutilized, heavily minority school based on the transportation burdens involved in reassigning its students, yet allow it to simultaneously reassign nearby white students to a newer, physically superior school over four miles away because of the possibility, never implemented, that the predominantly minority schools would eventually be closed. *Cf. NAACP v. Lansing Board of Education,* 429 F.Supp. 583, 603–04 (W.D.Mich.1976), *aff'd,* 559 F.2d 1042 (6th Cir.), *cert. denied,* 434 U.S. 997, 98 S.Ct. 635, 54 L.Ed.2d 491 (1977). The racial imbalance and severe underutilization of Longfellow and Fermi, as well as fiscal and facility-related considerations, made either the closing of Longfellow and/or Fermi *or* reassignments to Longfellow and/or Fermi superior, less segregative alternatives to the one consistently adhered to by the Board.

As of 1980, Longfellow was 94% minority, by far the district's most segregated middle school. The school was operating at 31% (Engineering Department) to 40% (Phase II) capacity, also well below any other school in the district. The school remained open despite its physical and educational inadequacies, the costliness of maintaining it in its underutilized state, and the foreseeable decline in its enrollment,

---

**105.** A notable exception was the assignment of Runyon Heights students from the School 24 zone to Emerson, an exception which was elimi- nated in 1973 because of race-related factors. *See* SCHOOLS IV.F.2 *infra.*

*see* GX 98, at 2–8—the very factors which compelled the district to close seven schools in 1976. Although the groundwork for Longfellow's racial imbalance was laid before the Board played any significant deliberately segregative role with respect to the school, the Board's conduct during the 1970's served to maintain the school's increasing racial imbalance. While neutral reasons predominated in the Board's failure to close the school in earlier years, by the late 1970's racial considerations played an increasing role in both the proposals to close the school and the failure to adopt these proposals. Based on the above, we find that the continued operation of Longfellow as a racially segregated and severely underutilized middle school was not only a foreseeable consequence of the Board's inaction but was in part the result of the Board's general unwillingness to implement desegregative measures in the Yonkers public schools. *See Berry v. Benton Harbor, supra,* 442 F.Supp. at 1308–10 (discussing failure to remedy segregation at junior high schools).

### 4. *Attendance Zone Changes*

#### a. *Schools 16 and 25*

Schools 16 and 25 are located less than one mile apart in the Northwest Yonkers area, just east of the Hudson River. School 16 is located on North Broadway and School 25 is located to the southwest on Warburton Avenue. The two schools are separated by a steep hill which, according to geological surveys and personal observation, is one of the steepest hills in Yonkers. The hill slopes from North Broadway downward to Warburton Avenue and the river. School officials testified that during the winter they must travel on fairly circuitous routes in order to avoid the hill separating the two schools. Tr. 4544–45 (Radko); Tr. 11,176–77 (Guerney).

Prior to 1953, some students attending School 25 resided in an area as far east of the school as North Broadway, at the top of the hill. At that time, few minorities lived in the School 16 or 25 areas; the estimated elementary school enrollments in 1950 were 0% minority at School 16, and 4% (thirteen students) minority at School 25. SB 810.2. Starting in the mid-1950's, an increase in the minority population residing in the School 25 area occurred. This increase was occasioned by the first boundary change, in 1953, between Schools 25 (4% minority) and 16 (0% minority); thirty-five white students were reassigned from School 25 to School 16. While this boundary change was segregative in its impact, the rezoned area was located at or near the top of the hill separating Schools 25 and 16 and thus made the trip to school for the affected students more manageable from a topographical standpoint. Such considerations were in fact expressly noted by the Board less than one year later with respect to the middle school assignment of School 25 students. GX 717. The Board also had just redrawn the School 6 attendance zone boundaries so as to include whites in the School 25 area, and percentage minority enrollments at School 16 (513 whites) and 25 (392 whites, seventeen minorities) were virtually identical at the time of the boundary change.

Minority enrollment at School 25 steadily increased over the next fifteen years, reaching 41% in 1967; School 16 remained almost totally (99%) white during this period of time. During the 1960's, three boundary changes occurred between the two schools. The effects of these changes are as follows:

| | BEFORE CHANGE | | STUDENTS REASSIGNED from 25 to 16 | | AFTER CHANGE | |
| Year | % Minority, School 25 | % Minority, School 16 | W | M | % Minority, School 25 | % Minority, School 16 |
|---|---|---|---|---|---|---|
| 1963 | 14%[a] | 0%[a] | 9 | 0 | 14% | 0% |
| 1964 | 14%[a] | 0%[a] | 23 | 9 | 13% | 2% |
| 1968 | 42% | 1% | 6 | 0 | 43% | 1% |

[a] Based on 1961–62 school enrollment data. Tr. 11,902 (Armor).

For a number of reasons, we find that these changes constitute a pattern of segregative acts by the Board sufficient to give rise to a finding of segregative intent.

The 1963 change is the most troubling. The rezoned area (Arthur Place) is located closer to Warburton Avenue (and School 25) than to North Broadway (and School 16). Thus, students living in this area had to travel even farther up and down the hill between the two schools as a result of the boundary change. While the route separating Arthur Place from Warburton Avenue is a steep and winding one, the longer route separating Arthur Place and North Broadway is also difficult to negotiate. And while the disparity in racial enrollments at the two schools was fairly small according to Dr. Armor's estimates, it is reasonable to conclude, based on the fact that these estimates were based on actual enrollment data of earlier years and that West Yonkers was undergoing a period of significant demographic change at the time, that the actual disparity was appreciably greater.

As for the 1964 boundary change, several factors persuade us that racial factors may not have been a factor in this particular change. First, the inclusion of several minorities in this change actually had a desegregative effect on both Schools 16 and 25.[106] Second, contemporaneous evidence regarding the change demonstrates that safety and convenience factors were actually considered by school officials in implementing this change. SB 638. In this particular instance, an examination of topographical and attendance zone maps does not undermine the legitimacy of these factors: the rezoned area is located closer to North Broadway than to Warburton Avenue. Third, while the district failed to reassign these students to Schools 9 (12% minority in 1961–62) or 6 (45% minority), both of which were considerably closer than School 16, capacity and school enrollment data suggests that overcrowding at Schools 6 and 9 (a condition which was soon to lead to the planning and construction of the King Intermediate School) made such a reassignment infeasible.

The 1968 boundary change involved six students from an area located closer to both Warburton Avenue and School 25 than to North Broadway and School 16. The boundary change thus required the affected students to travel a hilly and more lengthy route to School 16. The area in question also was near an area subsequently characterized by community opposition to the assignment of its students in a desegregative fashion, *see* SCHOOLS IV. A.2.a *supra*, SCHOOLS V.E.1 *infra*, suggesting that such opposition played a role in the 1968 School 16/25 boundary change.

**106.** It is unclear whether the minorities included in this boundary change included Asians. Tr. 11,947–48 (Armor). Given that the rezoned area in question is located in the southernmost portion of School 16's attendance zone, closest to increasingly minority Southwest Yonkers, it is likely that at least some of the nine estimated "minorities" reassigned to School 16 were in fact black or hispanic. In any event, our analysis does not depend on the resolution of this uncertainty.

By this time, the racial imbalance between the two schools was substantial, making the segregative impact of the boundary change clearly foreseeable.

[52] Additional evidence persuades us that the topographical considerations noted above cannot fully explain the segregative boundary changes involving Schools 25 and 16. Such considerations have often been overcome in implementing particular student assignments in Yonkers. For example, the closing of School 15 in 1976 resulted in the reassignment of students over hilly terrain to Schools 26 and 28; the closing of School 1 in 1954 resulted in students travelling up the steep hill to School 5; Japanese-American students living in the northernmost portion of the School 25 zone have been assigned to School 16. While neutral considerations justified the boundary changes and resulting travel burdens which students were forced to endure in each of these cases,[107] the frequent imposition of such travel burdens undermines the Board's argument that topographical considerations necessitated the School 16/25 boundary changes. The Board's contention is particularly unpersuasive in light of its previous inclusion of the North Broadway area of the School 16 zone—located at the top of the School 16/25 hill—in School 25's attendance zone. In addition, the fact that School 25 students must travel over the same hilly terrain to attend either Emerson or Longfellow Middle School also is inconsistent with reliance on topographical considerations to justify the boundary changes between Schools 16 and 25. See Tr. 5476 (Siragusa).

We recognize that even school administrators widely known for their commitment to school desegregation have noted the topographical features of the School 25/16 area in considering whether to implement desegregative boundary changes between the two schools. Tr. 5414–15, 5475 (Siragu-

sa) (discussion with Superintendent Mitchell); see also Tr. 11,034 (Jacobson). Yet a careful examination of the specific boundary changes which have been effectuated in the School 16/25 area, the racial impact of these changes, and the inconsistent or unpersuasive invocation of topographical considerations to explain these changes, convince this Court that the changes which occurred constituted a pattern of conduct designed to perpetuate the increasing racial imbalance between the two schools. We conclude that the evidence supports a finding that the racially imbalanced condition of Schools 25 and 16 has been caused in part by deliberately segregative conduct in the redrawing of attendance zone boundaries between these two schools.

B. *Equal Educational Opportunity*

The disparities between schools in Southwest Yonkers and elsewhere in the Yonkers School District are not only racial, but educational as well. A substantial amount of evidence in this case has focused on both the inadequacies of Southwest Yonkers schools as educational facilities and the efforts of the Board to deal with these inadequacies. An examination of several of the most significant characteristics which are relevant in determining the quality of a school's educational program firmly establishes some general conclusions which are relevant to plaintiffs' allegations of unlawful segregation and discrimination: namely, the existence of disparities in educational opportunities available at racially identifiable white and minority schools, the recognition by Board members and school officials of these disparities, the partly successful efforts of the Board and school officials to ameliorate the effects of some of these disparities, and the racially influenced failure of the Board to correct other known disparities.

---

**107.** Japanese-American students attended School 16 for the purpose of participating in English-as-a-Second-Language programs provided at the school. Frank Dep. 261–62. The closing of School 15 and reassignment of its students to Schools 26 and 28 was justified by fiscal considerations which forced the district to

undertake oftentimes burdensome and inconvenient measures in an effort to comply with state-imposed financial constraints. *See* SCHOOLS IV.A.3.b *supra*. The closing of School 1 resulted in the elimination of the district's only predominantly minority school. *See* SCHOOLS IV.A.3.a *supra*.

The quality of education provided at any school, as well as the community's and school administration's perceptions of the school, is influenced largely by a number of key school-related attributes: physical characteristics, such as building and site size, age, playground space, and the general condition of the facility; teaching and administrative staff characteristics, including their level of experience, their expectations of student ability, and their rate of turnover, or movement in and out of a particular school; student-related characteristics, including student mobility or turnover rates, size of student enrollments and school overcrowding, and disciplinary problems among students; and educational programs or curriculum, including curricular offerings and programs for the advanced, the average, and the below-average student. Each of these categories will be discussed in turn.

### 1. *Physical Characteristics*

In general, Southwest Yonkers public schools bear all the marks of the typical urban school facility, while the East and Northwest Yonkers schools are distinctly more suburban in nature. In terms of building and site size, schools in Southwest Yonkers are, as a general matter, indisputably inferior. The five most heavily minority elementary schools, Schools 6, 10, 19, 25, and King, have an average site size of 1.83 acres (range: .93–2.52); the nine most heavily white elementary schools (at least 90% white) average 4.84 acres in site size (range: 1.33–9.53). The three predominantly minority middle schools, all located in Southwest Yonkers, have an average site size of 2.4 acres (range: .8–3.8); the two East Yonkers middle schools average 9.5 acres (range: 6.8–12.2). Yonkers and Gorton High Schools in West Yonkers are 8.0 and 6.38 acres, respectively; Lincoln and Roosevelt High Schools in East Yonkers are 23.41 and 12.64 acres, respectively. GX 644.

The physical disparities in the school buildings themselves were accurately summarized in a 1977 report to the district's school facilities committee. The report, prepared by Director of Elementary Education Joseph Guerney, noted that Southwest Yonkers elementary schools generally suffered from a lack of classroom space, limited instructional areas for educational specialists (*e.g.*, music, art, reading), and inadequate cafeteria facilities. The report noted that these problems existed only "to a limited extent" in Northwest Yonkers schools and were "not apparent" in East Yonkers schools. GX 483. Similar disparities have existed, and to some extent continue to exist, at the secondary school level as well. Since 1930, Longfellow Middle School has been located in the former School 20 elementary school facility, a building which has long been recognized by school officials and parents as a physically inadequate middle school facility and has been repeatedly recommended for closing. GX 605; Tr. 12,868–69 (Dodson); SCHOOLS IV.A.3.c *supra.* Until 1974, Yonkers High School was located in the old Franklin Junior High (presently Fermi Middle School) facility; the physical inadequacies of this facility led parents to complain bitterly and even to request that the high school attendance zone boundaries be redrawn so that a more equalized distribution of physical facilities and educational opportunities could be achieved. GX 493, 494, 619. Franklin Junior High School was located in the former School 2 elementary school facility, a building whose physical inadequacies led to its closing in 1974. Hawthorne Middle School used several storage closets as classrooms during the 1970's as a result of the school's physical limitations and high student enrollments. The School 10 facility was constructed in contemplation of its use as a K–3 primary school but has since been used as a K–6 elementary school.

In terms of age, the Yonkers public schools are relatively evenly distributed between East and West Yonkers. Most of Yonkers' public schools were built long before the presence of substantial numbers of minorities and prior to the development of subsidized housing in Southwest Yonkers. By 1930, the district had constructed Schools 1–25 and School 27 and approximately one-half of the presently utilized

secondary school facilities. While Southwest Yonkers middle schools are substantially older than their East Yonkers counterparts, three of the four regular schools built since 1968 are located in the Southwest Yonkers area: King (1968), School 10 (1972), and Yonkers High School (1974). In addition, most of the district's oldest elementary schools in both East (Schools 4 and 15) and West Yonkers (Schools 3, 7, and 12) were closed in 1976. Even with equally old facilities, however, such as Southwest Yonkers' School 6 (opened in 1889) and East Yonkers' School 8 (opened in 1892), the physical condition and overall reputation of School 6 is generally considered by Board members to be inferior. Tr. 5037–38 (Jacobson); Weiner Dep. 412–14.

The most striking disparity in physical facilities is in the playground and recreational space at West and East Yonkers schools. Many of the district's newer East Yonkers schools, such as Schools 26, 28, 29, 30 and 32, all have sizable grass-covered play areas outside the school building. Several Southwest Yonkers elementary schools, on the other hand, have little or no playground space; instead, they generally contain small, cement-covered play areas in back of the school. While some of these inadequacies, such as the lack of play space at Schools 7 and 12, were eliminated in 1976 as part of the district's school closings, substantial disparities still remain, particularly at School 6, see Tr. 4610 (Robitaille), GX 475, 476, School 10, which is both surrounded by the Riverview subsidized housing project and has inadequate indoor recreational space as well, Tr. 4992 (Jacobson); Tr. 11,642–43 (Leahy), and School 19, where most of the available play area is used for parking. Tr. 13,471 (Steinberg). Longfellow and Fermi Middle Schools in Southwest Yonkers have no outdoor recreational facilities, and until 1974 Yonkers High School (then located in the Fermi facility) suffered from a similar inadequacy. Even among schools with no play space of their own, such as King (Southwest) and School 22 (Northwest), disparities exist with respect to the nearby available recreational space.

The impact of these disparities is significant. School officials recognized that adequate recreational facilities were not only important to a student's physical development but were an important ingredient in enabling students to better benefit from the instructional aspects of the educational process as well. Tr. 4610 (Robitaille). School principals testified that inadequate recreational facilities were likely to result in increased disciplinary problems at the school. See Tr. 4713–14 (Jamieson); Tr. 12,773 (Marra).

The importance of a school's physical condition to the quality of educational experiences available at the school, as well as to the students' and community's perceptions of the quality of these experiences, has been recognized by school officials both within and outside the Yonkers school system. A 1957 survey of the Yonkers Public Schools recognized that the inadequacies of a school's physical attributes and overall condition are difficult to overcome even with the leadership of competent and dedicated administrators and staff. GX 42, at 27. The study also noted the impact that such inadequacies had on students, specifically, that students perceive an indifference on the part of educational authorities as a result of poor conditions at their school. Id. at 39. This conclusion was shared by school officials as well. See GX 609.

While most of the Yonkers public schools have suffered at one time from various inadequacies in their physical condition, Southwest Yonkers schools have generally been more seriously affected in this respect. Elementary schools such as Schools 3, 6, 7, and 19 were and in some instances still are regarded as particularly inferior facilities. The various physical inadequacies at Schools 3 and 7 were recognized by various school officials, see GX 518, 524, 526, and led in part to their closing in 1976. GX 126, at 6–8. Other schools, such as Schools 6 and 19, have been repeatedly singled out as wholly inadequate facilities and have been repeatedly recommended for closing as a result. Tr. 4973 (Jacobson); Tr. 5424 (Siragusa); Tr. 5512–13 (Minervini); Tr. 11,205–07 (Guerney); GX 507.

School 19's condition was recognized as particularly inadequate, but the district refrained from expending financial resources to improve the school's condition because of the anticipated, but never effectuated, closing of that facility. P–I 19–27; Schainker Dep. 249–50. The deficiencies in physical conditions at East Yonkers schools, on the other hand, were substantially less severe in nature. *See, e.g.,* GX 454 (School 32); P–I 8–17 (School 8); Tr. 4754 (Jamieson) (comparing Schools 19 and 30).

The Board did make some attempts to eliminate some of these disparities; for example, the district closed Franklin and Commerce [108] Middle Schools, both of which had significant problems with respect to their overall physical condition and the adequacy of their physical plant. GX 559; Tr. 2472 (Guzzo); Tr. 12,645 (DiChiaro). In addition, the recent construction of King Elementary School and Yonkers High School resulted in the addition of two modern and well-equipped facilities to Southwest Yonkers. Tr. 12,901 (Dodson); SB 654. School 10's "school without walls" structure, designed specifically for an open education teaching philosophy, was considered unique and impressive from an internal structural point of view. SB 183. In addition, the fiscal limitations on the district's ability to improve or expand existing Southwest Yonkers facilities was not without impact on East Yonkers schools. *See, e.g.,* SB 573 (difficulties with expansion of Roosevelt High School). Nevertheless, the record as a whole reflects the existence of more significant deficiencies in physical conditions at many of Southwest Yonkers' elementary and middle schools. These inadequacies, along with the physical disparities noted above, have resulted in inequalities in the educational opportunities available to the many minority students attending Southwest Yonkers schools. Alioto Dep. 47–48.

### 2. *Staff*

With respect to teaching and administrative staff, plaintiffs have attempted to demonstrate the denial of equal educational opportunity to students attending disproportionately and predominantly minority schools in three ways: (1) the relative inexperience of teachers in such schools, as compared with teachers in identifiably white schools; (2) the high turnover of faculty and administrative staff in disproportionately minority schools; and (3) the low teacher expectations of student abilities in such schools.

Statistical and testimonial evidence submitted by both plaintiffs and the Board demonstrate that, in general, predominantly or disproportionately minority schools in Southwest Yonkers have been staffed by teachers with fewer years of experience than staff assigned to other schools in the district.

Plaintiffs submitted numerical evidence concerning teacher experience levels for the years 1960–76. GX 88–90, 93d. This analysis includes the experience levels for English, math, science, and social studies teachers. The analysis did not include reading or other teachers assigned to work in specially funded remedial programs, and did not include art, business, language, music, physical education, or shop teachers. Tr. 3374–75 (Sweeney). The exclusion of these teachers has its benefits and drawbacks: while it provides greater comparability in terms of the types of faculty employed systemwide, as opposed to teachers in particular remedial or other unevenly distributed programs, it consequently understates the size of a school's faculty and total years of experience of that faculty, and excludes teachers who were utilized on a full-time basis in some of these schools. To the extent that the trends highlighted in this analysis are corroborated by the testimony of school officals and by the Board's more inclusive analysis for the years 1976–80, however, plaintiffs' statistical evidence concerning teacher experience levels is in-

---

**108.** The poor conditions at Commerce were in part the reason for Superintendent Alioto's cre- ation of a special task force in 1974 to assess overall conditions at the school. GX 559.

formative. In 1961–62, schools in East and Northwest Yonkers actually had lower overall teacher experience levels. Of the ten elementary schools with less than 1% minority students, four had teacher experience levels below the districtwide average of 11.31 years, including the three schools (26, 29, 32) with the lowest averages (below six years) in the district. Of the five schools with over 20% minority enrollments, three schools (6, 7, 19) had faculties with greater than the districtwide average in experience. A similar pattern existed at the secondary school level as well. GX 88.

By 1967–68, the trend had changed somewhat: the range in teacher experience at 40% (or more) minority elementary schools was 5.61–7.88 years; similarly, the range at less than 1% minority elementary schools was 5.50–8.00 years—all below the 8.45 years districtwide average. Of the six schools with staffs averaging over ten years in experience, however, four schools (4, 16, 21, 22) were less than 4% minority (the other two were School 5 (11% minority) and School 27 (9% minority)). Experience levels at the secondary school level remained relatively even.

By 1971–72, the divergence in staff experience levels began to clearly materialize. Of the seven elementary schools with at least 40% minority enrollments, six of them were below the districtwide average (7.15 years) in teacher experience, ranging from 3.33 to 6.19 years. Of the thirteen elementary schools with under 5% minority enrollments, only two of them had below average teacher experience levels (School 21—5.31 years; School 14—6.25 years). Of the four schools with staffs averaging over ten years in experience, three schools (17, 30, 32) were virtually all-white schools in East Yonkers.

By 1973–74, this trend appeared at the high school level as well: Gorton (24% minority) and Yonkers (34% minority) had staffs averaging 5.89 and 9.22 years of experience, respectively, while Lincoln (3% minority) and Roosevelt (7% minority) had staffs averaging 11.12 and 12.15 years of experience, respectively. By 1975–76, the year in which the city's fiscal crisis resulted in substantial reductions in teaching staff, seven of the district's eight predominantly minority schools had average teacher experience levels below the 10.60 years districtwide average, including the four schools with the most inexperienced staffs in the district (Schools 6, 10, 19 and 25, ranging from 4.75–7.53 years). As in 1971–72, eleven of the district's thirteen most predominantly white (less than 5% minority) elementary schools had staffs with greater than average experience levels (ranging from 10.86–16.64 years). A similar disproportion existed at the high school level as well.[109]

The Board's analysis, SB 807, reflects two significant differences in teacher experience levels. First, it includes all instructional staff, rather than teachers in the four categories examined by plaintiffs. Second, it reflects the termination of over 250 faculty members in 1976, a disproportionate number of whom were less experienced teachers assigned to Southwest Yonkers schools, Tr. 2569 (Guzzo); Tr. 4578–79 (Robitaille); GX 774, 775, and the resulting reassignment of more experienced teachers to these schools.

While the overall teacher experience levels increased as a result of the 1976 staff terminations, the disproportion in relative staff experience continued. In 1976–77, all seven of the district's predominantly minority elementary schools had staffs with below average experience levels, with four of them maintaining staffs with under ten years average teacher experience (versus 12.3 years districtwide average). All three Southwest Yonkers middle schools had staffs with less than average experience (range: 8.3–9.8 years), while three of the other four middle schools in the district had staffs with greater than average experi-

109. Disproportion at the middle school level was generally absent during the years analyzed by plaintiffs. Even here, however, minor trends are detectable: the most inexperienced staff in 1970 and 1971 was at Gorton Junior High School (less than five years average experience), which at the time was also experiencing considerable race-related disturbances. See SCHOOLS IV.F.2 infra.

ence levels (range: 10.8–13.6 years). A similar pattern existed at the high school level as well.

By 1979–80, the relative imbalance in teacher experience levels, and resulting impact on educational opportunity, had been substantially reduced. Although the pattern at the elementary school level was similar to that of prior years—again, all seven of the district's predominantly minority elementary schools had staffs with less than the districtwide average experience—the range of average teacher experience at these schools had increased to 9.9–13.4 years (as to compared to 14.2 years districtwide average), a significant increase from the 4.75–7.53 years range of four years earlier. In addition, the imbalance in teacher experience was even smaller at the middle school level, and was essentially non-existent at the high school level. Thus, while imbalances persisted at lower grades, the marked increase in absolute experience levels at predominantly minority schools reduced the problems associated with the imbalance in experience levels of earlier years, when both imbalance and significantly greater inexperience (in absolute number of years) among teachers in Southwest Yonkers schools combined to create more significant disparities in teacher experience levels among the district's public schools.

The overall trend in teacher experience levels, a trend recognized by school officials and Board members, Tr. 4614–15 (Robitaille); Tr. 5039 (Jacobson); Alioto Dep. 48; Schainker Dep. 110; *see also* Tr. 4065 (Sobel), was caused by a variety of interrelated factors. The primary source of the disparity was the teacher transfer provisions of the district's collective bargaining agreements with the Yonkers Federation of Teacher, the teachers' union. Under these agreements, which have been in effect since 1969, teachers presently employed in the school district were afforded the right to apply for a staff vacancy, on a seniority basis, before the Board could hire additional staff from outside the district to fill the position. This provision has resulted in a general movement of more experienced teachers from West Yonkers to East Yonk-

ers schools, a trend which was established almost immediately after the implementation of the seniority transfer provision in 1969. As both Board members and teachers themselves recognized, this west to east movement was caused primarily by the generally superior reputation of East Yonkers schools, a reputation created in part by smaller class sizes, superior physical conditions, and the "easier" teaching conditions in those schools. This phenomenon was also attributed to a concomitant "burnout" among West Yonkers teachers, caused largely by the general absence of the aforementioned conditions in Southwest Yonkers schools. As a result, staff openings were created in Southwest Yonkers schools and were generally filled by newly hired teachers with less experience than other teachers in the district.

Plaintiffs do not contend, and we do not find, that experienced teachers are necessarily or inherently more capable than new teachers. Indeed, in Southwest Yonkers schools, some principals preferred to have younger teachers on their staff because of their flexibility, receptivity to change and educational innovation, and the "new blood" which these teachers brought to their respective schools. Tr. 11,636–38 (Leahy); Tr. 12,589 (DiChiaro); Tr. 13,472 (Steinberg). However, both Yonkers school officals and educational surveys performed for the school district recognized that, as a general matter, a balance of experienced and inexperienced teachers was desirable from an educational standpoint and the acknowledged lack of such a balance among the district's schools (elementary schools in particular) was a contributing factor to the inequality of educational opportunities among the district's schools. Tr. 4615 (Robitaille); Tr. 13,232 (Dodson); Alioto Dep. 47–48; GX 41, at 40; 587. While this lack of overall balance in teacher experience was ameliorated somewhat in recent years by the systemwide increase in teacher experience levels, the disparity in experience levels prior to that time served to deprive Southwest Yonkers students of a level of educational opportunity available elsewhere in the district.

And as with the teacher assignment practices which led to the disproportionate presence of minority teachers in Southwest Yonkers schools, *See* SCHOOLS IV.E *infra*, the Board did little in the early to mid-1970's to alter the often-significant disparities in teacher experience levels.

Staff turnover, particularly in certain Southwest Yonkers schools, also detracted from the quality of educational experiences provided to students. The generally more demanding conditions at Southwest Yonkers schools and the resulting eastward movement of more experienced teachers in the district served to increase the frequency with which Southwest Yonkers staff members were replaced. Specific instances of unusually high staff turnover occurred at School 10, where fourteen of the seventeen teachers originally hired by the Board in 1972 had left the school after only two years of operation. This turnover had a particularly negative impact on the quality of educational instruction at the school because of the need for, and resulting lack of, staff members who were specially trained in School 10's open education teaching methods, a factor recognized by School 10's first three principals, Tr. 4797–4803 (Jamieson); Tr. 11,633, 11,636–41 (Leahy); Tr. 13,320 (Cantor), and by the Board as well. Tr. 9838 (Minervini). The turnover among principals at School 10 was of similarly negative effect; in five years, the school was led by three different principals, each with their own distinct educational approach. Frequent turnover among principals in Southwest Yonkers schools existed in Commerce Middle School (three principals during its three-year existence) and King Elementary School (three principals in its first four years) as well.

Again, not all staff turnover was without underlying educational benefit: the determination of some Southwest Yonkers school principals to implement measures designed to eliminate staff-related educational inadequacies at particular schools contributed to the staff turnover at these schools. Schainker Dep. 83–84; Tr. 4749–51 (Jamieson). Still, the existence of generally more frequent turnover at many of the district's disproportionately minority schools detracted from the educational opportunities available at these schools, a fact which was recognized by at least one Board member, Tr. 10,983 (Jacobson), and several school principals, Tr. 4713 (Jamieson); Tr. 11,657 (Leahy); Tr. 12,975–76, 13,155 (Dodson), and which was a source of concern among community members as well. GX 547 (School 25 PTA).

Teacher expectations epitomize the manner in which intangible and unquantifiable components of the educational process can impact upon student achievement and the educational atmosphere of a school. Schainker Dep. 246, 261; Tr. 4712–13 (Jamieson). While the record, particularly the documentary record of school principal evaluations and budget requests, reflects that many of Southwest Yonkers' school staff members were concerned with and dedicated to the educational welfare of minority students, some departures from this pattern existed and were recognized by several school officials and special task forces. A number of Southwest Yonkers schools were afflicted at various times by attitudes among administrative or instructional staff that minority students were less capable of educational achievement, a condition which obviously impacted negatively on student achievement. Assistant Superintendent of Schools Stanley Schainker testified that particular problems of this sort existed at Schools 6, 18, and King elementary schools, Commerce and Longfellow Middle Schools, and Yonkers High School. Schainker Dep. 60–65, 78–82, 113–16, 143–49, 251; GX 455. The low expectations or general lack of educational atmosphere at School 6 existed primarily during the late 1960's to early 1970's, and was recognized by parents and school officials. Tr. 4329 (Barrier); Tr. 4821 (Jamieson), Tr. 5043–46 (Jacobson). The problems which Schainker noted at Commerce and Yonkers were consistent with the findings of task forces assigned to investigate educational conditions at the schools as well as the observations of community members. GX 559; Tr. 5240–42 (Morris).

Not all of the district's predominantly minority schools were similarly affected

by discriminatory staff attitudes; the administrative and instructional staff at School 10 and Hawthorne Middle School, for example, were generally depicted as being generally devoid of similarly low educational expectations of their students. In addition, the more severe problems noted above, such as those at Schools 6 and 18, were generally rectified by school officials by removing those employees considered responsible for those conditions. Schainker Dep. 72, 74, 80–81. We are unable to conclude on the record before us that the discriminatory attitudes noted above were, in light of the district's recognition of and attempts to ameliorate this problem, evidence of the district's implementation of a policy of intentional discrimination. Nevertheless, the evidence concerning teacher expectations, including the district's need to take the remedial steps described above, demonstrates an awareness of the educational problems created by segregated schools and of the adverse consequences on minority students.

### 3. *Students*

The quality of educational opportunities available to students in Yonkers public schools may also be measured in part by characteristics relating to the students themselves. One of the most troubling features of Southwest Yonkers schools is the unusually high turnover in their student populations. The high mobility of minority students in Southwest Yonkers was primarily the result of considerable demographic change in the area, caused in part by the City's urban renewal efforts and the concomitant displacement and relocation of Southwest Yonkers residents. Plaintiffs have submitted numerical evidence of districtwide student turnover for the 1975–78 period which unmistakably demonstrates the significantly higher student turnover in the district's predominantly minority schools. GX 815. This phenomenon was also the constant object of attention of principals and school officials in earlier years. School "Background Information" reports prepared by school principals highlight particularly severe instances of high student turnover: 500 students entering or leaving School 19 in 1971–72, when its total student enrollment was 669 (GX 539; Tr. 12,716 (DeFino)); 140 students entering or leaving School 10 during its first year, when the school's total enrollment was 239 students (GX 506); 184 students entering or leaving School 3 in 1974 (GX 518). *See also* GX 526 (School 7); Tr. 13,246–47 (DeFino) (School 18); GX 601 (Franklin Middle School).

The impact of the high student turnover in Southwest Yonkers schools and the district's response to it are both troubling. It is difficult to overstate the disruptive effect of such turnover and the consequences for all students involved. Many school officials recognized the negative impact which the high degree of student turnover had on the educational process at Southwest Yonkers schools. Tr. 4762–64 (Jamieson); Tr. 5040, 10,925 (Jacobson); Tr. 13,-269 (DeFino); Schainker Dep. 247–48. This phenomenon was particularly disruptive in Yonkers since much of the student turnover consisted of movement between schools within the city itself, rather than in and out of the district as a whole. Tr. 10,925 (Jacobson).

Although the demographic phenomenon of student turnover was largely beyond the school district's control, the Board did relatively little to alleviate the negative effects of student turnover. Until recently, attempts to achieve conformity among textbooks used in various elementary schools, particularily among geographically proximate Southwest Yonkers schools, were largely unsuccessful; such conformity was initiated in Southwest Yonkers schools only as late as 1978 or 1979. Tr. 4762 (Jamieson); Tr. 13,269 (DeFino); Weiner Dep. 149. In addition, while school officials encouraged relocating parents to keep their children in the school at which they began the school year, no attempts were made to more formally restrict the movement of students among schools even where transfers involved (as they often did) movement between neighboring schools, such as between Schools 3, 10, 18, 19, and King. Tr. 4762–63 (Jamieson); Tr. 13,241–42, 13,268–70 (DeFino). While these circumstances do not lead this Court to the conclusion that

the Board's failure to adequately address the problem of student turnover was racially motivated, we have little doubt that its failure to do so, even where feasible, resulted in a significant impairment of the quality of education provided to students in predominantly minority Southwest Yonkers schools.

Many Southwest Yonkers secondary schools were also characterized by a disproportionately high number of student suspensions. School officials were concerned about the disproportionately high incidence of suspensions at a number of Southwest Yonkers secondary schools and the disproportionate number of minority student suspensions throughout the district's schools, and developed a disciplinary code in order to rectify this condition. GX 59–60; Tr. 13, 166–67 (Dodson). School officials recognized that certain schools, particularly Yonkers High School, suffered from an overemphasis on disciplinary, rather than instructional, aspects of the educational process, Tr. 4638 (Robitaille), and that disciplinary problems were in part the result of inadequacies in the educational programs at these schools. GX 604 (Hawthorne); Tr. 4727–28 (Jamieson) (Schools 6, 10, 19). A related problem during the early to mid-1970's involved the inappropriate length of disciplinary sanctions imposed at several Southwest Yonkers secondary schools, a problem which prompted protests by members of the black community and instructions by Superintendent Alioto to James Barrier, his community relations consultant, to ensure that disciplinary guidelines were adhered to by school principals. Tr. 4342–44 (Barrier); GX 559.

An additional characteristic of most Southwest Yonkers schools is their generally more crowded conditions. Particularly since the 1976 closing of three of Southwest Yonkers' twelve elementary schools and the simultaneous elimination of the More Effective Schools (MES) program in which smaller classes were provided, Southwest Yonkers public schools have been significantly closer to full capacity than their East Yonkers counterparts. By the mid-1970's, the City's segregative pattern of subsidized housing site selection and construction had resulted in the addition of several § 236 family housing projects in Southwest Yonkers, contributing to the steadily increasing minority student enrollment in the area. From 1970 to 1975, minority student enrollments in Southwest Yonkers elementary schools (3, 6, 7, 9, 12, 18, 19, 23, King) increased from 2,699 to 2,927 students, despite the fact that all but one (School 19) of these schools changed from K–6 to K–5 during this period, and despite the fact that the decline in birth rates which occurred during the mid to late 1960's was beginning to have an impact on overall school enrollment. GX 126, at 2, 6. The increasing imbalance in school utilization was recognized by the Board's Task Force for Quality Education by and Superintendent Robitaille and his staff, and became one of the foundations for the administration's Phase II reorganization plan. See SCHOOLS IV.F.3 infra. As result of the Board's failure to adopt Phase II, this imbalance persisted, with notable segregative exceptions (School 6, Longfellow), up to the filing of this action.[110]

110. Plaintiffs have submitted evidence of the substantially lower reading and math achievement scores among third and sixth grade students at predominantly minority schools during the 1979–80 and 1980–81 school years. GX 91–93. This evidence, to the extent it confirms that test scores are generally lower in Southwest Yonkers schools, is not controversial. We have difficulty, however, with the purpose for which it is apparently offered, namely, to show that minority students have been denied an equal educational opportunity in Yonkers public schools. Unlike attendance zone changes or school openings, whose numerical and racial impact can fairly readily be evaluated, we have little basis, and plaintiffs have failed to provide

this Court with any, for drawing the conclusion that a verifiable correlation exists between the generally lower-than-average academic performance of minority students on achievement tests and the quality and extent of educational opportunities provided by the school district. This is not to say that the aforementioned conditions over which the Board had varying degrees of control did not have a direct and significant impact on the educational opportunities available to minority students, or that student achievement levels did not have some effect on the community's perception of the quality of education at a particular school. However, we are cognizant of the degree to which other

4. *Educational Programs and Resources*

Considerable evidence has been introduced by both plaintiffs and the Board concerning the nature, extent, and quality of educational programs and curricular offerings available to students at Southwest Yonkers schools. Briefly stated, the Board has attempted to establish that the provision of federally and locally funded and

Board-created special remedial programs at Southwest Yonkers schools is evidence both of the equality of educational opportunities in the district as well as the absence of intentionally created inequalities (to the extent that inequalities do exist). Plaintiffs have sought to establish that despite the additional resources provided by the Board, curricular inequalities nevertheless exist in Southwest Yonkers schools and

factors over which the Board lacks control, such as socioeconomic factors, have been recognized as having a significant influence on student achievement levels—a correlation recognized not only by education and sociological experts, Tr. 12,329 (Armor), but also by Yonkers school officials themselves. *See, e.g.,* GX 518, 604, 609; P–I 10–74; SB 654. In the absence of concrete and similarly persuasive evidence demonstrating the accuracy and statistically meaningful nature of the purported correlation between achievement test scores and the conduct of Yonkers school officials, we are unwilling to conclude on the basis of minority students' lower achievement test scores that such students have been denied the educational opportunities afforded other students in the district. *See Bell v. Board of Education, Akron Public Schools,* 491 F.Supp. 916, 941 (N.D.Ohio 1980), *aff'd on other grounds,* 683 F.2d 963 (6th Cir.1982).

The Board, on the other hand, also introduced evidence with respect to student achievement test scores. Dr. Armor analyzed fall 1981 and spring 1982 Metropolitan Achievement Test Series reading and math scores of fourth, sixth and eighth grade students by race and by socioeconomic status, and charted the rate of progress for these students by comparing their performance on these tests. Relying on the correlation between socioeconomic status and educational achievement, Dr. Armor then adjusted the achievement test scores for each student according to their socioeconomic level. Based on this analysis, Dr. Armor concluded that the achievement level of minority students in predominantly (over 55%) minority schools was equal to or greater than the achievement levels of minority students in racially balanced (25–55% minority) or predominantly white (under 25% minority) schools, after controlling for the socioeconomic status of all students. Tr. 11,990–12,000 (Armor); SB 810.11–810.13.

We have difficulty both with particular aspects of this analysis and with its broader implications. As an initial matter, we may assume the validity of the correlation between socioeconomic status and student achievement upon which Dr. Armor's analysis relies. We note, however, that the negative impact of certain socioeconomic factors is not entirely beyond the ability of school officials to alleviate. For example, while student mobility caused by residential relocation is a demographic phenome-

non largely unrelated to Board acts or omissions, the Board was not without some ability to limit the educationally detrimental consequences of this phenomenon. *See* SCHOOLS IV.B.3 *supra.* Thus, to the extent that reliance on the correlation between socioeconomic status and student achievement carries with it the implication that school officials are powerless to either ameliorate or exacerbate the educational consequences of certain socioeconomic variables (thus factoring them out of the analysis), the analysis is somewhat misleading.

The underlying implications of the analysis are more disturbing. Various inadequacies in educational conditions at Southwest Yonkers schools and their impact on the quality of the educational process at these schools have been recognized by Yonkers school officials themselves and have been established to this Court's satisfaction. Just as lower test scores tell us little about the extent and success of the efforts of school officials to provide meaningful and equal educational experiences to all students, we have similar difficulty accepting the notion that higher socioeconomically-controlled test scores among minority students in racially imbalanced schools necessarily compel the conclusion that tangible and intangible educational inadequacies extant in Southwest Yonkers schools somehow either did not exist or did not impact negatively upon the students at these schools. Our task as we perceive it is to determine whether the Board failed to provide equal educational opportunities for Yonkers public school students, why that failure occurred, the measures taken by the Board to alleviate the inequalities which existed, and the explanations for and the legal consequences of the Board's acts and omissions—not whether minorities may have overcome the inequalities that existed in the district, or whether the existence of higher achievement test scores among minorities in segregated schools somehow establishes the legality or educational superiority of such an environment. Assuming that the racial segregation in Yonkers public schools has been deliberately created or maintained by acts and omissions of the Board, we fail to see how superior performance on achievement tests by racially segregated minorities precludes this Court from ordering the eradication of such segregation.

that additional resources have failed to ameliorate the detrimental impact of the other inequalities in educational opportunities and resources provided by the Board.

Since the mid-1960's, the Board has annually received federal funds specifically designated for schools which have low achievement levels and are located in low-income areas. These federal programs provide eligible schools with monetary resources over and above the school's annual budgetary allotment, and have resulted in additional remediation and enrichment programs, additional staffing, and in some instances additional equipment and supplies, in predominantly minority Southwest Yonkers schools. Elementary schools have been the primary recipients of these additional resources.

During the 1960's, the primary federally funded remedial education program in Southwest Yonkers schools was Project Orbit. The purpose of Project Orbit was to provide students in eligible schools with additional remedial instruction in reading and math. Project Orbit provided eligible schools with reading and math labs, additional books and supplies, and additional staff to complement regular classroom instruction and to provide more individualized instruction to participating students. During the late 1960's, Project Orbit also provided funds for summer programs in reading and science for students in Project Orbit schools.

Project Orbit was replaced in the early 1970's by federally funded Title I programs. *See* 20 U.S.C. § 2701 *et seq.* Like Project Orbit, Title I funding resulted in additional reading and math programs and individualized instruction at schools with low-achieving, low-income students. At various times during the 1970's, Title I funds were used to establish a number of other educational programs geared toward students in Southwest Yonkers' predominantly minority schools. SB 746. For ex-

ample, a bilingual program for the district's hispanic students was provided at Schools 10, 18, and 19 and at Hawthorne Middle School (the district's most heavily hispanic middle school). Tr. 11,183–84 (Guerney).[111]

A variety of other locally funded supplementary educational programs were established at Southwest Yonkers schools during the 1960's and 1970's. The More Effective Schools (MES) program, for example, provided students at Schools 6, 10, and 12 with an opportunity to receive more individualized supplementary instruction from additional staff, until the elimination of this program in 1976 as part of the school district's budget reductions. Tr. 10,981 (Jacobson); Schainker Dep. 110; SB 653. Programs for high-achieving students were also established at a number of Southwest Yonkers schools, for example, the High and Wide program at School 18 and the AIM (Alternatives for Instructionally Motivated) program at School 10. Tr. 11,191–92 (Guerney). During the late 1960's to mid 1970's, the district established a Home With Books reading program (later called Reading Improvement Service Everwhere, or RISE) in School 7 in which volunteers from the community worked with students in an effort to improve their reading skills. The program was highly regarded by Superintendent Mitchell and was eventually extended to eleven schools in the Southwest Yonkers area. Tr. 13,347–51 (Pistone); SB 89.

The infusion of additional resources into Title I schools was not a complete panacea for all the educational and curricular difficulties which existed in Southwest Yonkers schools. A number of elementary schools still suffered from inadequacies in the quality and extent of instructional materials which were available. Tr. 13,500 (Steinberg); P–I 19–33 (School 19); GX 475, 476 (School 6), GX 526 (School 7). While these

---

**111.** Prior to receiving Title I funds in any given year, the district was required to submit a comparability report to the Title I Regional Program Office of the New York State Education Department, demonstrating that instructional materials and supplies available at Title I schools were comparable to materials and supplies at non-Title I schools. These comparability reports were reviewed and accepted by the Regional Office for the years 1976–80. Tr. 13,523–24 (Stipulation); SB 817–821.

inadequacies were not universal in nature—King Elementary School, for example, was recognized as having a wealth of quality instructional materials and supplies (Tr. 12,721 (DeFino))—a review of the numerous budgetary requests and school descriptions in evidence reflects the generally more serious and frequent nature of these particular inadequacies at Southwest Yonkers schools. The open school educational program at School 10, though designed as an innovation in educational instruction which would improve the prospects for racial integration at the school, instead was beset with a number of difficulties, including the loss of its originally planned recreational space and the frequent turnover of its instructional and administrative staff, which detracted considerably from the quality of the educational opportunities available at the school. These difficulties were not only perceived by parents in the community, who resisted the potential reassignment of their children to School 10, but were recognized by school officials as well. Tr. 4620–26 (Robitaille); Tr. 4777–84, 4788–94 (Jamieson); Tr. 5007–08 (Jacobson). In addition, the remedial programs provided at Southwest Yonkers schools did little to alleviate the inequalities in school facilities, staff experience and turnover, and student mobility, all of which impacted on the quality of educational opportunities, including special remedial programs, available at these schools. The record supports the conclusion that the Board did not deliberately fail, for partly racial reasons, either to provide remedial or other special instructional programs or to fairly allocate its programmatic resources among the district's white and minority schools. *Cf. Berry v. Benten Harbor, supra*, 442 F.Supp. at 1306. The record is also consistent, however, with the conclusion reached by Board members Jacobson and Siragusa, as well as Assistant Superintendent Schainker, that Southwest Yonkers schools were educationally inferior despite the additional programmatic resources that were infused into those facilities. Tr. 5035, 10,959–61 (Jacobson); Schainker Dep. 106–10; Siragusa Stip. ¶ 3.

The additional resources provided by the Board at Title I schools also did not cure the educational program deficiencies at West Yonkers secondary schools. Commerce and Hawthorne Middle Schools both suffered during the early to mid-1970's from inadequacies in their reading programs, a problem which a 1972 New York State Department of Education study found to exist in a number of Southwest Yonkers schools, GX 499, at 43,700 (finding "serious unevenness" in quality of reading programs, with ineffective programs at inner-city schools), and prompted Superintendent Alioto to make the improvement of reading programs and reading achievement levels the educational priority of his superintendency. The Commerce reading program was considered the worst in the district partly because of teacher ineffectiveness, GX 564; Tr. 13,312 (Cantor), and led, along with other instructional and facility-related problems, to the creation of a special task force to investigate and develop solutions for the various educational problems at the school. GX 559, 561. While some modest instructional improvements (for example, a program for gifted students) were made during Commerce's last year in operation, the school was generally regarded by school officials as an educationally troubled school throughout its brief three-year existence. Hawthorne also suffered from teacher-related inadequacies in its reading program and a lack of advance subjects available at other middle schools, two problems which contributed to the school's poor image among school officials and community members alike. Tr. 13,501–04 (Steinberg); GX 601. Once again, school officials made an effort to implement corrective measures for educational problems similar to those which had existed at Commerce. Tr. 12,687–90 (DiChiaro); GX 604. Efforts were made to improve instructional and programmatic offerings at the school, for example, the Plus Program, a remedial reading and math instructional program; an honors foreign language program; a Regents algebra course for gifted children; and Target Success, a human relations program at the

school. Tr. 12,621–23. These efforts have been followed by a notable improvement in the achievement levels at the school.

Similar disparities in educational programs have existed among the district's high schools as well. Roosevelt High School has long been considered a high school of high educational quality, with Lincoln High School in Southeast Yonkers also enjoying at one time a reputation as an academic "elite" school. Tr. 5061 (Jacobson); Tr. 10,991–92; Jungherr Dep. 8; Natella Dep. 63–64; Schainker Dep. 96–97. These reputations have developed not only as a result of the quality of the educational opportunities available at these schools but also as a consequence of the significant program inadequacies at the district's two West Yonkers high schools.

The educational problems afflicting Gorton High School, discussed elsewhere in these findings, *see* SCHOOLS IV.F.2 *infra,* stemmed in significant part from the inferiority of its non-academic, non-occupational "general" program. While the race-related disturbances of the late 1960's and early 1970's subsided by 1974 or 1975, both the causes and consequences of these disturbances have survived to a certain extent. GX 598. The district has made some modest efforts to improve the educational opportunities at the school: auto and industrial arts programs were developed as a result of the 1973 Reorganization Plan; a three-year (1973–76) National Humanities Foundation (NHF) grant expanded cultural opportunities and increased individualized instruction at the school, Tr. 13,532–35 (Richards); SB 822; and by 1978 Gorton offered the full range of Regents and advanced placement courses available at the district's East Yonkers high schools. *See* Stipulation of the Parties Concerning Course Listings at Roosevelt, Lincoln, Gorton, and Yonkers High Schools During 1978–1979 School Year. Nevertheless, the rejection of the NYU Report's more comprehensive reform proposals (proposals based in part on the inadequacy of Gorton's general program—*see* SCHOOLS IV.F.2 *infra* ) and the remaining inequality in some course offerings (particularly English and social studies electives), along with the previously discussed disparities in educationally related characteristics of the district's high schools, have resulted in the perpetuation of Gorton's comparatively less favorable status as an educational institution.

Yonkers High School has also suffered from similar inadequacies in its educational program. In the late 1960's, the inadequacy of the school's general program was protested by the Yonkers PTA and was recognized by school officials as well. GX 619, 645; Tr. 2445–46 (Guzzo). The school also suffered from a high rate of teacher absenteeism and what school officials characterized as general staff ineffectiveness. GX 621. These problems, combined with the continued use of the inadequate Linden Street facility pending the long-awaited construction and completion of the new Yonkers High School building, resulted in students receiving a generally less adequate educational experience than was available at East Yonkers high schools.

In September 1973, ninth grade students from Hawthorne and Longfellow Middle Schools were reassigned to Yonkers High School in accordance with the district's 1973 grade reorganization, thus increasing the already substantial overcrowding at the school. Because of the overcrowding and the infeasibility of transferring students to the district's other similarly overcrowded high schools (Lincoln High School in Southeast Yonkers was approximately 263 to 365 students above the capacity figure used in the NYU Report), the new Yonkers High School was opened February 1974, prior to the completion of the building's construction. Tr. 12,899–901 (Dodson).

The high school's educational problems did not disappear after the opening of the new Yonkers High School facility. In addition to the school's curricular inadequacies, the district initially encountered significant administrative difficulties with the new but unusually large facility, leading to student disturbances both inside and outside the school. GX 624–626. Emphasis was placed on maintaining discipline, with a concomitant failure to develop adequate ed-

ucational programs for students at the school. Alioto Dep. 110; Tr. 5240 (Morris). Even disciplinary order was somewhat lacking due in part to the reluctance of teachers to discipline male black students. Schainker Dep. 116–17, 252–53; Tr. 2457–58 (Guzzo); GX 637. Instructional and curricular inadequacies were recognized by several school officials as a significant problem contributing to the disruptive atmosphere at the school. *See* Alioto Dep. 50–51; Tr. 2460–61 (Guzzo); GX 627.

The curricular and administrative difficulties at Yonkers High School led to the creation of a special task force in October 1974. After working for several weeks on a full-time basis at the school in an effort to address these problems, the task force concluded that the school suffered from significant inadequacies in its organizational structure, its teaching staff and guidance department, and its instructional program. GX 637. As a result of the task force's evaluation of the school's operations, a new organizational structure was created with overall administrative responsibilities delegated to a coordinating committee comprised of the school's principal and three members of the district's central administrative staff. GX 628. Dr. Edward Vollbrecht, Director of Secondary Education and a member of the coordinating committee, also acknowledged the need to address the curricular deficiencies at the school. GX 631 ("Major problem is in course offerings not administrative organization of school."). The aforementioned difficulties were followed by a significant decrease in Yonkers High School's white student enrollment and hence an increase in its percentage minority enrollment. GX 64; *see also* GX 624.

While the initial organizational difficulties associated with the opening of the new facility subsided, other educational and curricular inadequacies persisted throughout the 1970's. During the late 1970's, the school's principal, Joseph Farmer, repeatedly noted the student management problems at the school, including disciplinary and mobility-related problems and high teacher absenteeism, the latter of which led to the use of the library as a holding facility for otherwise unsupervised classes. In addition, Farmer recognized the continuing need to improve the curricular offerings at the school, including the expansion of occupational education alternatives for students who were either uninterested in or incapable of attending Saunders. GX 632, 634, 635; *see also* Tr. 4638 (Robitaille). By 1980, at which time the school had become predominantly minority in its student enrollment and continued to be disproportionately minority in its teaching staff, the school's program offerings had improved, with occupational educational and industrial arts courses substantially comparable to those available at other high schools in the district. Nevertheless, Yonkers High School's reputation in the community has remained one of educational inferiority as compared to the district's other high schools. Hicks Dep. 59; Tr. 5308 (Frauenfelder).

5. *Integration and Educational Opportunity*

The disparities in educational opportunities provided in Yonkers public schools have had two significant race-related consequences. First, the disparities in the quality of educational programs and facilities have combined with the school system's racial imbalance to reinforce the already existing residential segregation in the city. The link between the quality of education at particular schools in Yonkers and residential housing choices is well-established: this relationship was recognized by parents, GX 203, 276, and principals, GX 551, was testified to by realtors, Tr. 2744–49 (Downes); Tr. 11,773–74 (O'Keefe), and even affected the housing choice of the 1975 Acting Superintendent of Schools. Jungherr Dep. 8. *Cf. Higgins v. Board of Education of Grand Rapids, supra,* 508 F.2d at 788. Similarly, the link between the racial identifiability of a school and the residential segregation of the surrounding neighborhood has been recognized by both courts and City officials. *See* SCHOOLS V.A, V.E. 1 *infra.* The relative inequality in educational opportunities available at Southwest Yonkers predominantly minority

schools has contributed to the identification of minority schools in Yonkers as educationally inferior schools, with the two characteristics becoming virtually inseparable. This confluence of racial identifiability and relative educational opportunity has served to reinforce the segregative demographic patterns which have evolved in the City.

Second, the equalization of educational opportunities and the alleviation of racial imbalance in Yonkers public schools were not unrelated goals. Rather, as racial imbalance worsened and educational disparities persisted, various school officials recognized that the elimination of the former was an important step in eliminating the latter. The value of racial integration was not based solely on the social and educational benefits to be derived from the physical juxtaposition of white and minority students, or the "melting pot" aspect of such integration, e.g., Tr. 4072 (Sobel); Tr. 5449-51 (Siragusa); GX 892 (1972 Operation Outreach report by Board health education employees noting existence of significant racial prejudice among students in all-white and all-black schools and absence of such prejudice at School 5 (14% minority), School 23 (17% minority), and School 24 (24% minority), three of the district's four most racially balanced elementary schools). Instead, the disparities in school facilities, student enrollments (as a percent of capacity), teacher experience levels and expectations, and secondary school curricular offerings were problems which were likely to persist absent some desegregative technique which would have helped to reduce or eliminate some or all of these disparities. Consistent with these race-related considerations, three school superintendents, the Board's Task Force for Quality Education, New York State education officials, and other Yonkers school officials concluded that the equalization of educational opportunities and the elimination of racial segregation in Yonkers public schools were interrelated goals. Tr. 2487 (Guzzo); Tr. 4065-73 (Sobel) ("had the schools been desegregated many of these conditions [disparities in physical facilities, staff experience, and curriculum completion, and lack

of interracial contact] would have been alleviated"); Tr. 4325 (Barrier) (re Superintendent Alioto); Tr. 4671-77 (Robitaille); GX 123, at 2 (same) ("quality education for all children ... cannot be accomplished without integration"); Tr. 5203 (Morris) (re Superintendent Mitchell) (recalling statements by Superintendent Mitchell that Yonkers children could not be getting equal education as long as they were segregated); Tr. 5385-90 (Tobin); Tr. 5450-52 (Siragusa) ("[S]eparate and equal ... is [not] a possibility in our particular case. I am not talking about any place anywhere else."); Tr. 12,977-78 (Dodson). It is in this light that the Board's repeated failure to implement educational and desegregative school reorganization plans must be evaluated.

### C. Vocational Education: Steering and Screening of Minority Students

Prior to 1974, the Yonkers School District operated two specialized high schools, the High School of Commerce and the Saunders Trades and Technical High School (Commerce was closed in 1974). Until 1980, Saunders was located in the Getty Square area in the heart of downtown Southwest Yonkers. Commerce was located several blocks north of Saunders, also in Southwest Yonkers. The enrollment at these schools was and is not limited by attendance zone boundaries but is districtwide; students from all over the city are permitted to attend the schools. Nevertheless, Saunders' geographic location has contributed to the fact that most of its students lived in West Yonkers. GX 645; P-I 45-156.

Saunders is generally regarded as a school for students who are interested in entering a particular trade or technical field. Although until recently the enrollment at Saunders was exclusively male, the school is currently open to members of both genders. The Saunders curriculum consists of a variety of vocational and technical course offerings, in addition to traditional academic subjects. Vocational, or industrial, courses include auto mechanics,

carpentry, electricity, machine shop and printing; technical course offerings include architectural design and technical electricity. GX 680. The Saunders program is designed to prepare students for college education as well as provide them with skills which will enable them to move directly into the labor force upon graduation.

The High School of Commerce, whose student population was largely female, offered a variety of specialized commercial or business courses, such as bookkeeping, clerical practice, office machines, and secretarial practice, as well as courses in cosmetology, dressmaking, food trades and retailing.

During the 1930's to 1950's, the reputation of Saunders and, to a lesser extent, Commerce, was unfavorable. Saunders was known as the "dumping ground" for students who were perceived to be generally less capable of performing in a normal academic program. Tr. 4965 (Jacobson); Alioto Dep. 36; Natella Dep. 10–11. A 1934 study of the Yonkers public schools by Teachers College concluded that Saunders was used as a school for academically retarded pupils who were assigned to junior high school industrial courses with the tacit understanding that they would attend Saunders. SB 12, at 235. This reputation was fairly well known by both students and school officials in Yonkers as a matter of general reputation and via complaints by black parents to school officials.

A number of plaintiffs' witnesses testified that, as black students in Yonkers during this period of time, they were encouraged by guidance counselors to enroll in the vocational programs at Saunders and Commerce. According to Dr. Henry Williams, Saunders was recommended based on its less academically demanding program and because it would make black students more readily employable, Tr. 2640–41 (Williams), an explanation which was given in support of attendance at Commerce as well. Tr. 3519–20 (Ross). In some instances, students were encouraged to attend Saunders or Commerce even though the student had expressed a preference for an academic high school program. Tr. 2675–79 (McRae); Tr. 3516–24 (Ross).

A 1959 report by the Board's Advisory Board on Vocational Education also described a process of "[p]sychological bludgeoning" of students whereby they were told that they would be left back unless they agreed to transfer to one of the district's vocational schools. GX 663, at 5; see also Natella Dep. 10–11. The report also noted that hard-to-teach students would be "unloaded" at Commerce in a similar manner. Id. at 6. A number of students were able to avoid enrollment in an undesired vocational program only after their relatives intervened on their behalf. Tr. 2679–80 (McRae); Tr. 3521–24 (Ross).

Although racial enrollment data for Saunders and Commerce is not available for years prior to 1967, the testimony at trial suggests that the schools' minority enrollment was substantial. For example, Winston Ross recalled that during the 1950's a significant number of Runyon Heights students attended Saunders or Commerce rather than the virtually all-white Roosevelt High School in East Yonkers. Tr. 3667; see also Tr. 2683–84 (McRae). Several witnesses also testified that this "steering" process was experienced by them personally and by their fellow black classmates. Tr. 2639–43 (Williams); Tr. 2683–85, 2709–10 (McRae). Dr. Williams recalled that this persistent encouragement of Saunders' trade programs to black students was at variance with the advice given to academically undistinguished white students at that time. Tr. 2651–52, 2665–67.

One Board witness, Joseph Guerney (who is white), testified that he also was encouraged by a guidance counselor to attend Saunders because of his siblings' prior attendance at the school and his family's purported financial inability to send him to college. However, other white witnesses testified that, as white students attending school at or about this time, they either did not meet with school officials prior to entering academic high school programs or were not advised to attend the non-academic high schools for reasons of, among others, prior academic achievement or family tradition. Tr. 4442 (Radko); Tr. 4966 (Jacobson). Thus, even if "steering" of

students to Saunders and Commerce was not exclusively based on a single, racial criteria, it appears from the record that black students were fairly frequently the subjects of such treatment and experienced a form of counselling not typically experienced by white students. No statistical data was introduced, and apparently is not available, concerning the number of students who were affected by this process or the extent of its disproportionate impact on blacks. However, the testimony of then-students of Yonkers public schools suggests that blacks were the more frequent recipients of such treatment.

A similar process of steering black students also occurred with respect to particular programs within individual high schools themselves. One practice involved advising or encouraging students to enroll in a high school's general, or social-civic, program, a program geared generally for non-college bound students, instead of the regular academic, or Regents, program. Again, although statistical information is not available, the testimony suggests that blacks were enrolled in greater numbers in the general, rather than the academic, program. Tr. 2622–33 (Mareno). Several witnesses recalled their experiences as black students being advised to enroll in the social-civic program at particular schools. Tr. 2595 (Mareno); Tr. 2641–43 (Williams); Tr. 4300–01 (Barrier); Peace, Jr. Stip. ¶¶ 7–9. These students were either not advised of the alternative of enrolling in the academic program, Tr. 2597–98 (Mareno), or were encouraged to take the social-civic program despite stated preferences for the academic program. Tr. 2644–65 (Williams); Tr. 4300–01 (Barrier). In one instance, black students were forced to wait in the principal's office at Roosevelt for a number of days and were encouraged to attend Gorton High School before being allowed, with the help of parental intervention, to attend classes at Roosevelt. Tr. 2724 (Downes). Once again, black students often were permitted to enroll in the academic program only after the intervention of their parents on their behalf. Tr. 2645 (Williams); Tr. 4301 (Barrier). Peace, Jr. Stip. ¶¶ 7–9. Black parents testified that their children encountered similar impediments as well. Hamilton Dep. 69–71.

Many of the aforementioned witnesses have gone on to achieve considerable success in their career endeavors. While this may, at first blush, indicate that their experiences as black students in the 1930's through 1950's were educationally inconsequential, a more persuasive inference is that their success was achieved in spite of, rather than because of, the aforementioned "steering" which they experienced as students in the Yonkers public schools. In any event, the extent of their individual achievements in no way ameliorates the discriminatory treatment to which they were subjected during this period of time.

The probative force of these practices, in terms of current segregative impact, is somewhat limited, particularly since Saunders' reputation as a "dumping ground" has been long discarded, and the High School of Commerce has since been closed. The "steering" of blacks into general and vocational programs is nevertheless relevant insofar as it is evidence of the early existence of a pattern of discriminatory treatment to which minority students have been exposed over time in the Yonkers public schools.[112]

---

**112.** While we recognize that the above practices predate the Supreme Court's decision in *Brown v. Board of Education,* the temporal remoteness of these discriminatory practices, especially in view of their subsequent segregative effect, does not undermine their legal relevance. *See Keyes v. School District No. 1, supra,* 413 U.S. at 210–11, 93 S.Ct. at 2698; *Arthur v. Nyquist, supra,* 415 F.Supp. at 913.

We reject the Board's argument, stated in general terms but with particular relevance here, that it cannot be held liable for individual acts of employees (principals, guidance counselors, teachers) as not being pursuant to official policy of the Board. Assuming that the § 1983 principles upon which the Board relies govern the liability of a school board in a school desegregation case brought under Title IV and Title VI, *cf. Rizzo v. Goode,* 423 U.S. 362, 377, 96 S.Ct. 598, 607, 46 L.Ed.2d 561 (1976) (distinguishing school desegregation cases, in which board members' and administrators' own conduct resulted in racial segregation of schools, from § 1983 police misconduct case in which discriminatory acts of police officers were not traceable to unlawful policy of high-ranking po-

The inferior reputation of Saunders and Commerce was fairly dramatically altered when, in 1958, the Board decided to establish entrance requirements for vocational programs at these schools. According to the standards eventually adopted by the Board in 1962, students were to be accepted into Saunders and Commerce up to the available capacity of the schools' facilities. In the event a particular program had more applicants than its available capacity would permit, students were to be selected based upon a ranking determined by the receiving school. This ranking was based on a student's grades, achievement and aptitude test scores (with particular emphasis on math and reading scores), and the recommendations of guidance counselors. Students who were unable to secure admission to Saunders at the ninth grade level, during which time Saunders students would participate in an exploratory program at the school, would be invited to reapply the following year.

The implementation of screening standards for Saunders and Commerce was not universally supported. Specifically, the Yonkers High School PTA expressed its concern to Superintendent Wynstra that former Saunders and Commerce students who failed to gain admission to these schools and would instead be attending Yonkers High School would be "discriminat[ed] against ... by sheer neglect" because of the lack of adequate programs at the school. GX 647. Wynstra assured concerned community members that adequate

provisions would be made for such students. GX 653.

The Saunders admission process was essentially two-tiered. Initially, guidance counselors at the district's junior high schools would solicit students who were interested in the Saunders program by taking them on a tour of the Saunders facility. Applications were then made available to students interested in applying to any of Saunders' vocational programs. After applications were submitted by interested students, guidance counselors would gather the aforementioned academic and testing information concerning each applicant. The counselor would sometimes, though not always, include a personal recommendation for the applicant. The application did not specifically indicate the applicant's race, but included the applicant's name, address, junior high school and guidance counselor's personal recommendation.

The completed application was then forwarded to Saunders for a determination as to admittance. Saunders' guidance counselors made initial recommendations regarding admissions based on the aforementioned information and, in some rare instances, personal interviews. The principal of Saunders maintained authority to make the final decision as to admissions. Students were notified of the admission decision and, if rejected from the ninth year program, were permitted to reapply the following year.

At Saunders, admission decisions were generally made along the lines noted previ-

---

lice officials), the Board's conduct is nevertheless sufficient to give rise to legal responsibility for the discriminatory operation of the school district's vocational program. The Board's liability is not predicated on a theory of *respondeat superior*. Rather, the Board specifically delegated decision-making authority to Board employees, and was aware of and acquiesced in the discriminatory consequences of their acts with respect to the operation of vocational programs in the Yonkers public schools. The Board's liability is thus not predicated on an isolated instance of unauthorized discriminatory conduct by an employee against an individual victim, *see Turpin v. Mailet,* 619 F.2d 196 (2d Cir.), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980); *Owens v. Haas,* 601 F.2d

1242 (2d Cir.), *cert. denied,* 445 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979), but on the Board's conduct in the face of a pattern of discriminatory acts and omissions over time. Particularly since this pattern was consistent with the Board's own adherence to segregative practices elsewhere in the district at that time, *see* SCHOOLS IV.A.3.a *supra,* SCHOOLS IV.E. *infra,* the Board's inaction provides an even stronger basis for holding it legally responsible for the discriminatory conduct of its employees. In addition, the continued adherence to the Saunders screening criteria during the 1970's despite an awareness of its segregative consequences was a decision for which the Board and high-ranking school administrators, not school-level employees, were primarily responsible.

ously, *i.e.*, an examination of program capacity, the number of applicants, and each student's academic qualifications and individual guidance counselor recommendations. There was also testimony that indicated that the admissions process was somewhat more flexible than it appeared on paper. Part of the evaluative process engaged in by school officials was an inquiry into an applicant's behavior. Specifically, junior high school guidance counselors were instructed that students who were considered disciplinary problems were inappropriate candidates for admission to Saunders. Tr. 13,389, 13,413–16 (Zaroff); Alioto Dep. 35; Schainker Dep. 32. In addition, some students were accepted on the basis of "special circumstances" or political influence; Angelo Paradiso, Saunders' principal from 1964 to 1973, would simply direct Saunders guidance counselors to admit such students in addition to those who had already been selected.

The objective criteria relied upon by guidance counselors at Saunders were less than well-suited to the task for which they were used. School officials relied upon a variety of standardized tests, such as the Differential Aptitude Test, the Stanford Achievement Test, and the Otis-Gamma IQ Test, which were found in 1972 and 1973 to be outdated or otherwise considered inappropriate as measuring devices of student ability. GX 517, 662. Although the use of some of these tests was discontinued in the late 1960's to early 1970's, at least one (the Stanford Achievement Test) was apparently still in use as late as the 1977–78 school year. GX 661. Notwithstanding the use of these objective screening standards, the academic capabilities of Saunders' students were by no means entirely consistent with the school's reputation as a superior educational institution. During the late 1970's, students at Saunders were recognized as suffering from serious deficiencies in both reading and math skills, a problem which was addressed by remedial instruction. Tr. 12,838–39 (Marra). And although the aforementioned screening criteria were invoked only when the number of applicants exceeded Saunders' program capacity limits, the school's favorable reputation made the admissions process a fairly competitive one. The evidence thus suggests that the criteria used for selecting applicants to Saunders were in fact relied upon in making admission decisions. GX 674 (approximately 60% of applicants accepted from 1971–73); Alioto Dep. 101–02.

The late 1960's and early 1970's were also marked by increasing dissatisfaction with the Saunders facility itself and a rapidly increasing enrollment at the now highly regarded school. The physical inadequacies of the school, by far the oldest and smallest high school in the district, had long been recognized by school officials. These inadequacies contributed to a 1968 proposal to close Saunders and Commerce and to construct a new facility for the district's occupational, vocational, and technical programs. GX 645, at 53–55, 165–67. In 1973, the district again considered proposals to close both Saunders and Commerce and to distribute their programs throughout the district's other high schools. GX 115. In March 1973, the Board decided to close Commerce and decentralize its occupational programs; on the other hand, it decided to maintain Saunders as a self-contained facility and to expand its occupational course offerings to include some of Commerce's technical programs. GX 114. By 1974, school and City officials were actively engaged in finding a suitable site for the location of a new Saunders facility.

The capacity of the Saunders facility was recognized as increasingly inadequate. The facility was considered capable of enrolling anywhere from 600 (NYU Report) to 875 (Engineering Department) students, or approximately one-half the capacity of Gorton, the district's smallest regular high school. Despite the increasing popularity of the Saunders program, no physical additions were made to the facility after 1964. GX 644; Tr. 13,408 (Zaroff). Superintendent Alioto recalled that in the early 1970's, the Saunders auditorium had been subdivided for use as additional classroom space. Alioto Dep. 101.

Saunders' limited capacity, however, did not prevent a steady increase in its student population. In 1969–70, Saunders' enrollment was 483; this figure increased steadily during the 1970's, reaching a maximum of 831 in 1975–76 and remaining above 800 students until just before the relocation of Saunders in 1980.

This increase in student enrollment during the early to mid 1970's was largely devoid of black students. While enrollment at Saunders increased by 155 students between 1971 and 1975, the number of black students rose by only two. GX 64. During this period, the disproportionately low number of blacks at Saunders became increasingly evident. In 1969–70, Saunders was 2.7% black (versus 9.1% districtwide high school average); in 1972–73, Saunders was 3.8% black (versus 11% average); by 1975–76, Saunders was 4.2% black (versus 16.1% average). This disproportion was even more noticeable when compared to the geographically proximate West Yonkers high schools: in 1972–73, Gorton and Yonkers were 21.3% and 20.3% black, respectively; by 1975–76, the schools were 25.8% and 32% black, respectively.[113]

In addition to the above screening process, two factors contributed to the disproportionately high number of whites and low number of blacks at Saunders. A large number (approximately 80%, according to Reginald Marra, principal of Saunders beginning in 1974) of Saunders' white students came from the Southwest Yonkers area, and approximately one-third came from parochial schools in that area. The return of these students to the public school system, as well as the enrollment of public school students at Saunders, was due not only to Saunders' favorable reputation but also to the undesirability of attending either Yonkers or Gorton High School, two West Yonkers high schools with con-

siderably higher percentage minority enrollments than Saunders and perceived to be educationally inferior to the district's other high schools. Gorton was also experiencing race-related disturbances at that time, an additional factor leading to the increased enrollment of white Southwest Yonkers students in the Saunders program. GX 674.

Another reason for the low minority enrollment at Saunders related to the school's prior reputation in the community. According to Robert Dodson, school principal and administrator, and Herman Keith, Yonkers NAACP President and Advisory Council for Occupational Education[114] member, minority students were reluctant to enroll at Saunders because of the school's previous reputation as a dumping ground for minority students. Tr. 8522–23 (Keith); 13,008–09 (Dodson). This problem was exacerbated by a lack (until recently) of affirmative recruitment efforts designed to attract more minority applicants to the school, and inadequacies in the procedures (again, until about 1977) for informing students of the status of their applications and for reminding rejected eighth grade applicants of the opportunity to reapply the following year. GX 665, at 40,560; P–I 75–25, at 39,199.

Saunders' identifiably white character was also evident in its faculty and administrative staff. Between 1968–69 and 1975–76, Saunders never had more than two minority faculty members and was consistently below the districtwide average minority faculty percentage. During these years, Gorton and Yonkers High Schools, the district's two West Yonkers high schools, consistently exceeded the districtwide average for minority faculty. For example, in 1974–75, at the height of Superintendent Alioto's minority faculty re-

---

113. Hispanics were not similarly represented in disproportionately low numbers. During the eight year, 1969–77 period, hispanics were represented at Saunders in a percentage equal to or greater than the districtwide high school average for six of those years. Hispanic enrollment at Saunders was disproportionately low only in comparison to hispanic enrollment at Yonkers High School.

114. The Advisory Council for Occupational Education was created pursuant to a state-imposed requirement for school districts that receive Vocational Education Act funds. The sixteen-member council consists of persons from various business and community organizations and advises the Board on policy matters relating to occupational education. P–I 75–25.

cruitment efforts, Gorton had ten minority faculty members (10.3% of its staff) and Yonkers had twenty-one (14.2%); Saunders had only two (3.6%). In each year during the 1969–76 period, Yonkers or Gorton (or both) had at least one minority principal or assistant principal; Saunders had no minority principal or assistant principal during this period of time.

School officials were aware of and concerned about the fact that Saunders, located in the most heavily minority area of the city, was becoming an increasingly white school. Superintendent Alioto recognized that the school's selection process "appeared to systematically exclude minority youngsters," Alioto Dep. 35, a conclusion reached by other school district officials as well. Schainker Dep. 32–36; Tr. 5511 (Minervini). The limited presence of minorities at Saunders was coupled with the recognized inadequacies of occupational programs at the district's regular high schools, a problem which the district slowly began to address subsequent to its rejection of the 1972 NYU Report's more far-reaching proposals.

The High School of Commerce, on the other hand, did not suffer from similar disproportionality in its minority student enrollment. Although the selection process at Commerce was governed by substantially similar admissions criteria, GX 655, 657, minority enrollment at Commerce was consistently higher than the districtwide average:

| Year | % Minority, Commerce | % Minority All High Schools |
|---|---|---|
| 1967 | 12 | 9 |
| 1970 | 14 | 12 |
| 1973 | 19 | 16 |

Although evidence concerning the Commerce admissions process is scant, it is reasonable to infer from these figures that the Saunders admissions process was considerably more competitive and was influenced to a greater extent by the student behavior-related criteria described above.

During the early 1970's, limited efforts were made to increase the availability of occupational and vocational programs to minority students. In 1973, the Board voted to close the High School of Commerce and establish a limited number of occupational programs at other high schools in the district. Other, more comprehensive proposals, such as the NYU Report's recommendation to close Saunders and decentralize vocational instruction programs throughout the district's high schools, were rejected. In addition, simultaneous attempts were made to revise the admissions criteria for Saunders. In the early 1970's, Superintendent Alioto and Assistant Superintendent Schainker met with Angelo Paradiso, Saunders' principal, to discuss the lack of minorities at Saunders and the admissions procedures being used at the school. Paradiso refused to produce admissions information requested by Schainker and, according to Alioto, defended the admissions process as being primarily responsible for the increasingly favorable reputation of the school. Alioto Dep. 36; Schainker Dep. 32–33. No changes were made in the admissions procedures, and Paradiso ultimately resigned in 1973 in part because of this dispute with Superintendent Alioto. Reginald Marra, Saunders' principal from 1974 to 1983, adhered to the admission standards used in prior years. Tr. 12,784–85, 12,821–22 (Marra).

The controversy surrounding the disproportionately low minority enrollment at Saunders reached a head in the mid-1970's. In 1976, Bertram Wallace, Director of Occupational Education, sought detailed information on the admissions process at Saunders in an effort to determine whether vocational program opportunities could be expanded. In particular, Wallace was concerned with the expansion of such opportunities so as to include more minority students. Tr. 12,825–26 (Marra). Wallace's efforts coincided with the increasing concern of minority community members regarding the low number of minority students at the school. P–I 75–25, 75–27. Wallace was successful in obtaining substantially greater federal funding for vocational education programs than had been received previously by the school district. Alioto Dep. 146. According to Reginald Marra, however, no action was requested

of or taken by him in response to Wallace's inquiries regarding minority student enrollment at Saunders. Tr. 12,825–26.

In 1977, the Advisory Council for Occupational Education appointed a committee to review admissions procedures at Saunders. The committee, comprised of Nicholas D'Angelo, a Saunders graduate and Chairman of the Advisory Council, Hector Ghimenti, executive director of the Yonkers Human Rights Commission, and Herman Keith, was given the task of reviewing Saunders' admissions procedures in part to insure that "selection be made in a fair, unbiased" manner. GX 665. The committee's report, *id.*, after noting the increasingly competitive nature of the Saunders admissions process and describing the procedures used for selection, concluded that students were selected on the basis of "merit only" with particular emphasis on reading and math scores. The report stated that applicants for the ninth grade exploratory program were rejected largely because of space limitations but that most of the rejected applicants were accepted upon reapplying the following year. No findings were made regarding the disproportionately low number of minorities at Saunders; the only recommendation which specifically referred to minority students was that greater effort be made to increase reading and math scores, particularly at Fermi and Hawthorne, two middle schools with predominantly minority student populations (56% and 53%, respectively, in 1976–77).

The Board's efforts to improve the district's vocational education program culminated in the long-recommended closing of the old Saunders facility in 1979 and the relocation of Saunders' vocational programs to the newer and larger Burroughs facility, located in Central Yonkers, in 1980. This decision resulted in increased capacity for vocational and occupational education programs and a concomitant increase in minority enrollment in these programs. In 1976, Saunders enrolled 777 students, thirty-eight (4.9%) of whom were black; in 1980, ninety-nine (10.8%) of Saunders' 917 students were black. This increase in minority enrollment also coincided with in-creased recruitment efforts by school officials, beginning in 1979, designed to encourage minority students to apply to the school. Tr. 12,749–50 (Marra).

As a result of the disproportionately low percentage of minority students at Saunders during the 1960's and 1970's, such students were enrolled in greater numbers in the district's remaining high schools. These high schools, however, were generally reluctant to assume the task of providing vocational program opportunities because of the availability of such programs at the district's vocational schools. While some expansion of vocational programs in the regular high schools did occur during the 1970's, the extent of this expansion was limited and far below that which had been previously recommended, most notably in a 1968 NYU study on Occupational Education For Youth in the City of Yonkers, GX 645, and in the 1972 NYU Report. GX 115. As a result, many students were enrolled in the so-called general program, which was neither academic nor occupational in nature. GX 645, at 17–18 (referring to general program as a "grey area" of education).

The inadequacies of the general program at Yonkers high schools have been discussed elsewhere in these findings. *See* SCHOOLS IV.B.4 *supra*. Of particular relevance here is the fact that these inadequacies have often been recognized in conjunction with recommendations to expand opportunities for students enrolled in high school general programs to receive instruction in vocational and occupational education. A 1968 study by the New York University School of Education and a 1969 Chicago-based educational consultant's Master Plan for Occupational Education both noted the failure of the general program to meet the educational needs of the non-academic pupil and the lack of adequate occupational or vocational instruction at the district's non-specialized high schools. GX 645, at 42–44; GX 646, at 30–31, 46–48. This problem was particularly evident at Gorton and Yonkers High Schools, which by 1971–72 enrolled 84% of the district's nonvocational high school mi-

nority students. Although large numbers of white students were affected by the deficiencies of the general program, the widespread nature of the program at the district's two disproportionately minority schools (Gorton, for example, was described as having 70% of its students in the general program; see GX 115, at 36), along with the apparent disproportion of minorities in the general program itself, Tr. 2445 (Guzzo), resulted in many of the district's high school minority students being deprived of academic and vocational education opportunities comparable to those provided elsewhere in the district. The inadequacies of the general program, and the disproportionate number of minority students in the two high schools most affected by these inadequacies, continued through the 1970's. Tr. 2447–54 (Guzzo); see SCHOOLS IV.B.4 supra.

The question of whether there has been unlawful discrimination in the operation of vocational programs in Yonkers public schools is a difficult one. Direct evidence of discriminatory intent is absent from the record: no evidence was presented which demonstrates that school officials established entrance requirements at Saunders in order to exclude minorities from the school; no evidence exists of any minority student being denied admission at Saunders in part because of their race. The disproportionate impact of the selection process was not as extreme as in other instances of Board conduct and was primarily felt by black students only. The use of somewhat similar admissions criteria at the former High School of Commerce was accompanied by disproportionately *high* numbers of minority students at the school. In addition, while the Saunders admissions criteria contained an element of subjectivity, the admissions process lacked more obvious prerequisites, such as regularly conducted interviews or special entrance examinations, which may have served either to discourage or to exclude minority students from applying or enrolling at the school. *Cf. Arthur v. Nyquist, supra,* 415 F.Supp. at 942–43.

Several factors, however, persuade us that a finding of unlawful segregation is warranted. The increase in the disproportionately low representation of blacks at Saunders mirrored the increasingly competitive admissions process (and thus the heightened use of educationally less than precise criteria for admission) and the steadily increasing enrollment at the school. The increasingly competitive nature of the Saunders admissions process during the early 1970's was itself caused in part by the acknowledged inferiority of educational programs at West Yonkers high schools. This condition, which had a disproportionate impact on minorities, makes the Board's failure to address the exclusion of minorities from Saunders even more troublesome: the recognized inadequacies of the general program at Yonkers and Gorton should presumably have led to at least some efforts to provide equal educational opportunities for minority students by including them in the district's vocational education program at Saunders. The school district, though aware of the systematic exclusion of minorities which resulted from the Saunders admissions process, did relatively little until the late 1970's to eliminate the discriminatory impact of the methods by which students were chosen. *Cf. Morgan v. Kerrigan, supra,* 509 F.2d at 594; *Arthur v. Nyquist, supra,* 415 F.Supp. at 942–43. While some attempts were made in 1973 to address the issue of the disproportionately low number of minorities at Saunders, these efforts were ultimately unsuccessful and abandoned and resulted in no significant change in the admissions process. The school's limited capacity also does not adequately account for the district's ability to enroll steadily increasing numbers of students, few of whom were black, at the school. Finally, the direct evidence concerning the steering of minorities into inferior educational programs prior to Saunders' transformation into a reputable vocational school supports the inference that the disproportionately low number of blacks at Saunders was in part the result of the effects of this discriminatory treatment on the desire of black students to enroll at the school.

The disproportionate impact of the Saunders selection process has recently shown a significant decline. From 1977–78 to 1980–81, the minority enrollment has increased from approximately 10% to 15.7%; during this period, the districtwide high school minority enrollment remained relatively constant—30.1% in 1977–78, and 30.5% in 1980–81. Yet while the recent efforts to recruit minority students, as well as the expanded opportunities now available to all students by virtue of the relocation of the Saunders program to newer and larger facilities in 1980, have rendered the exclusion of minorities from vocational programs less likely or foreseeable, the recent nature of these developments does not preclude our finding of discriminatory intent. *Cf. Arthur v. Nyquist, supra,* 415 F.Supp. at 941, 943. On the contrary, in 1972, Saunders' black student enrollment was 3.8%, less than one-third of the district's 11% high school average black student enrollment; as recently as 1979, the black student enrollment at Saunders was 9.8%, substantially less than the 17.7% districtwide high school average and less than one-third of the 32% average at West Yonkers high schools. While the 1977 Advisory Council report found neither discrimination nor subjectivity in the Saunders screening process as it then existed, this finding does not outweigh the significance of school administrators' earlier recognition of the systematic exclusion of minorities from Saunders and the subsequent failure, until recently, to meaningfully address this condition in a way which would result in increased enrollment of minorities at Saunders. In sum, we conclude that the racially disproportionate consequences of the Saunders admissions process, the Board's failure to address this condition, and the other circumstances surrounding this disproportionality are sufficient to support a finding of intentionally created segregation of and discrimination against minorities as of the institution of this action.

## D. *Special Education*

The history of the Yonkers school district's Special Education program is perhaps the most striking illustration of the fine line, running throughout the school desegregation portion of this case, between benign intentions and actions with unfortunate consequences, and similar actions which are also prompted by race-related factors or concerns.

Several types of Special Education classes have existed over the years for various classifications of mentally and physically handicapped children. These classes have included classes for the trainable mentally retarded (TMR); emotionally handicapped (EH); physically handicapped (PH); neurologically impaired (NI); and hearing, visual and language impaired. Tr. 4244 (Malanga); P–I 78–12. In addition, and of primary concern here, the district's Special Education program has included classes for the Educable Mentally Retarded (EMR), Emotionally Disturbed (ED), and Learning Disabled (LD).

Prior to the mid-1970's, the procedures for assigning students to Special Education classes were fairly ill-defined. *See* Schainker Dep. 10–11 (describing process as "fuzzy"). During this time period, the referral of a student for Special Education instruction originated from individual teachers operating without the aid of written guidelines. A student was referred initially to a school psychologist, who would perform an evaluation of the student. The results were then forwarded to the school principal, who would decide whether to refer the student to the district's Special Education screening committee, the Committee on the Handicapped ("COH"). After evaluating the recommended reference, the COH would decide whether the student should be enrolled in a Special Education class. If the student was assigned for Special Education instruction, the COH would designate a specific program classification for the student.

Special Education classes were assigned to schools in the district on a space-available basis, with such determinations being made in June of the preceding school year. The criterion of space availability resulted in the frequent movement of Special Education classes between schools from year to

year and also led to the placement of such classes in non-standard classroom facilities (*e.g.*, a sub-basement) within the schools themselves. Tr. 4243, 4246, 4252 (Malanga). As a result, Special Education students experienced frequent disruptions in school assignments unlike those experienced by other students in the district.

Space availability was and has been determined largely by school principals, who have frequently resisted the placement of Special Education classes in their buildings. Over the years, the stated reasons for this resistance have varied. Oftentimes, principals would indicate that they lacked the building capacity for Special Education classes, thus requiring school officials to find available space elsewhere. Tr. 4253 (Malanga). In other situations, the resistance has been more ill-defined and unrelated to any tangible impediments to the inclusion of Special Education programs: an unexplained but firm resistance to the incorporation of such programs, GX 693; an unwillingness to assume the burdens of another school's Special Education programs, GX 695, Tr. 4256–58 (Malanga); or the "inhospitable climate" in a school, emanating from the resistance of teachers and parents to Special Education programs, GX 696. Robert Dodson, the school official responsible for directing the Special Education program in the mid to late 1970's, testified that, in his opinion, resistance to the placement of Special Education programs in particular schools was often pretextual and in fact represented race-related opposition to the incorporation of such programs. Tr. 13,028–29.

The 1960's were marked by an increasingly disproportionate number of minorities in Special Education programs.[115] In 1961, elementary school Special Education classes were 22% minority, while the remaining elementary school enrollment was 10% minority. GX 56. By 1967–68, Special Education classes were 43% minority, as compared with a 14% districtwide minority student enrollment. As of 1971–72, the Special Education program was 40% minority, or double the 20% minority student enrollment districtwide.

The disproportionate number of minorities in Special Education programs was considered by school officials to be the result of discriminatory assumptions made and processes used by school district staff regarding the behavior of minority students. *See* Schainker Dep. 18–19; *see also* Alioto Dep. 117–18. School officials recalled that minority students exhibiting aggressive or "acting out" behavior often simply would be referred to the school's principal for placement in a Special Education class, a referral that would be recommended for disciplinary purposes. Tr. 5081 (Jacobson); Schainker Dep. 18. The Special Education program was perceived by school officials and community members as a "dumping ground" for blacks. Tr. 11,052, 11,081 (Jacobson); GX 690.

As a result of the district's referral process, two fairly distinct categories of Special Education students evolved, each being identifiable primarily by the enrolled students' race. Minorities were typically assigned to ED classes, while white students were assigned to EH, and later LD, classes. *See* Alioto Dep. 40; Tr. 4144, 4164 (Carman); Tr. 13,024, 13,161 (Dodson). By 1972, white students represented approxi-

---

**115.** While the United States indicated in interrogatory responses that it did not allege or seek to introduce evidence to demonstrate that any individual classification decision was the result of any individual employee's intentionally discriminatory conduct, *see* United States' Response to Yonkers Board of Education's Third Set of Interrogatories, at 61–62 (# 33, 35), this does not preclude an examination of the placement and referral process to determine whether the pattern of disproportionality adverted to in text, together with testimony and other evidence regarding the conclusions reached by school officials as to the reasons for such dispropor-

tion, demonstrates that the operation of the Special Education program was affected by an intentionally discriminatory referral process. The interrogatory response reflects a limitation on the method by which such discrimination was to be proved, not a preclusion of the government's claim or the evidence actually submitted in support. Of course, any limitation which does exist does not apply either to the NAACP or to plaintiffs' claims of discrimination in the nonreferral aspects of the Special Education program, such as the transportation of disproportionately minority Special Education classes to virtually all-white schools.

mately 75% of all students in the LD program; the ED program, on the other hand, was virtually the precise opposite, with over 70% minorities. GX 689.

Another feature of the Special Education program was the frequent placement of disproportionately minority classes in out-of-district, predominantly white schools. GX 703, at 4. As far back as the 1950's, predominantly minority Special Education classes were placed in virtually all-white schools. Tr. 2408–10 (Guzzo) (Twain Junior High School). During the 1960's, the district's first ED classes were placed in School 15, a virtually all-white elementary school in Northeast Yonkers. Tr. 4243–45 (Malanga). In 1967–68, School 15 had six minorities (2%) in its regular program and four minorities (100%) in its ED class. By 1972–72, the school enrolled three minorities (1%) in the regular program and eleven minorities (69%) in its two Special Education classes (one ED (seven students) and one LD (nine students)). GX 64, 686. A similar situation existed at Schools 16 and 4 as well. In 1967–68, School 16 enrolled no blacks and two hispanics (0.4% minority), whereas its Special Education class had nine blacks (64%). By 1971–72, the disproportion, while considerably smaller, was still quite noticeable: eight regular program minorities (2%), as compared to ten Special Education minorities (39%) (at least thirteen of the school's twenty-six Special Education students were in ED classes). GX 64, 686. In School 4's TMR classes, there were four hispanics (1%) in the regular program in 1967–68, as compared to nineteen blacks and three hispanics (20%) in Special Education classes; by 1971–72, the school had five regular program hispanics (1% minority), as compared to twenty blacks and three hispanics (24%) in Special Education classes. Although the absolute number of students placed in ED classes was relatively small, the combined effect of the disproportionate number of minorities in such classes and the frequent placement of such classes in virtually all-white schools was striking: by 1972, forty-nine of the districts sixty-three elementary school ED

students, approximately 75% of whom were minorities, attended six elementary schools (15, 16, 22, 28, 31, 32), four of which were located in East Yonkers and all of which had at least a 97% white student enrollment in regular programs. GX 64, 686, 689.

Other practices affecting Special Education students further earmarked them in a distinctly negative manner. Because school assignments were generally made without regard to a student's residence, Special Education students were often transported lengthy distances directly and even diagonally across the city. Such trips were often well over one hour in length and sometimes up to two hours long each way. GX 694, at 53,543; Tr. 4172 (Carman). These students, a disproportionate number of whom were minorities, arrived at their school earlier or later than other students and left school earlier than other students. In some instances, Special Education students entered their school through separate entrances to the building. Tr. 4245–46 (Malanga); Tr. 4292–93 (Hammer). Such students were kept in separate classrooms during the course of the school day; these classrooms were often located in secluded areas of the school such as subbasements or otherwise empty floors. Tr. 4243–52 (Malanga). Special Education students generally ate lunch and took gym classes and recesses separately from other students and often did not participate in other school activities with other students.[116] To the limited extent that Special Education students did come into contact with other students in the school, this interaction was often negative in origin. For example, at 98% white School 15, a former student recalled that the predominantly minority Special Education students were used as examples of "poor, bad behavior." Tr. 4289 (Hammer).

All of the aforementioned practices had what can fairly be described as a severely stigmatizing impact which was recognized by other students in the school, by school

---

**116.** This practice was not universally followed. At School 4, for example, Special Education students participated in art classes and assemblies. P–I 4–6.

officials, and by community members. Special Education students were perceived by other students to be "different ... and bad," Tr. 4294, 4296 (Hammer), students whom white children "were not supposed to have anything to do with in school" and who "had something wrong with them," Tr. 5196 (Morris), and who were called "retards," *id.* One principal testified that students were afraid to go to the bathroom or play in the playground because they feared the presence of ED students. Gold-Marks Dep. 40–41. Joan Malanga, a former Special Education Coordinator (1972–79) and teacher, testified that School 15 parents and community members protested the presence of her "niggers" in their school and sought to have them removed. Tr. 4248.

Even more disturbing is the degree to which the policy of assigning minority Special Education students to virtually all-white schools has contributed to stereotypical generalizations about *all* minorities, not just Special Education students themselves. Because disproportionately minority Special Education classes were often assigned to overwhelmingly white schools in which few other minority students were enrolled, the interaction of white students with minorities often consisted primarily of interaction with Special Education students. The often vivid testimony of parents, PTA members, and school officials clearly demonstrates the discriminatory generalizations which this practice engendered. PTA Council President and parent Susan Morris recalled her childrens' perception that "the terms 'nigger' and 'retards' were interchangeable," an impression which stemmed from the fact that their contact with blacks consisted basically of minority Special Education students in their school. Tr. 5196. Robert Dodson expressed his concern to other school officials that the placement of minority Special Education students in virtually all-white schools would have a negative impact on parents, teachers and students' perceptions of Southwest Yonkers students in general. Tr. 13,027. Dr. Gary

Carman, the district's Special Education Director from 1972 to 1975, similarly concluded that where "the total experience of those youngsters in that east side school as related to black children were [Special Education] kids"—children who Dr. Carman believed "had to be viewed by other children as less worthy"—then it would be "easy for me to believe that they would generalize that to all blacks." Tr. 4157. Several other witnesses testified to similar effect. *See* Tr. 5309–10 (Frauenfelder) (Council of PTA's President); Tr. 4427 (Butler) (School 22 PTA President); Tr. 5417 (Siragusa) (Council of PTA's President and Board member). The district's Special Education practices have thus had an impact beyond the particular minority students in the classes themselves. Indeed, an additional, likely consequence of the district's Special Education program practice—resistance to the desegregation of public schools—has been recognized by school officials as well. For instance, at School 32, a 7% minority school in 1980 which had disproportionate numbers of minorities in its ED classes,[117] blacks enrolled in the school's regular program have had difficulty gaining acceptance in the school as a result of the district's placement of disproportionately minority Special Education classes at the school. Tr. 4840–41 (Jamieson).

By the early 1970's, the district's discriminatory treatment of minority Special Education students was recognized with increasing frequency and concern by school officials. At a 1971 meeting of the Yonkers Commission on Human Rights, Dr. Dorothy Morrison, until 1972 the Director of Special Education, acknowledged that students, a large number of whom were minorities, were frequently assigned to Special Education classes as a result of pressure from principals and teachers to remove these students from regular classes. GX 688. Superintendent Alioto and his staff also recognized the need to address the problem of discriminatory placement of minorities in Special Education programs,

---

**117.** In 1979–80, School 32's Special Education ED classes were 42% minority; the minority students in such classes constituted 42% of the school's total minority student enrollment. GX 64; SB 812.

one characteristic of what he concluded was the worst Special Education program in the state. Alioto Dep. 38; *see also* Schainker Dep. 9–13.

In August 1972, the district hired Dr. Gary Carman, an individual with extensive training and background in special education, to direct the district's Special Education program. Dr. Carman observed that the Yonkers school district, like many other school districts around the country, was placing Special Education students in self-contained classrooms and that Special Education classes contained disproportionate numbers of minorities. He noted in particular the high representation of minorities in particular programs, such as ED classes, a phenomenon which he had observed in rural communities elsewhere. Nevertheless, Dr. Carman also testified that the Yonkers school district's Special Education program was the most inhumane he had ever seen. Tr. 4156. His conclusion, like Superintendent Alioto's, was based in part on the district's practice of assigning students to schools all over the district on a space-available basis, a practice which Dr. Carman recognized not only as lacking any particular educational justification but also as burdensome and stigmatizing to Special Education students. He also based his conclusion on the physical segregation, or failure to "mainstream," students in the schools to which they were assigned as well as the manner in which these students entered and departed from school. Tr. 4156. Dr. Carman testified that based on his experience both in New York and elsewhere, he "knew of no causes, medical causes, social causes, biological causes that could possibly account" for the disproportionate number of minorities in Yonkers' ED classes. Tr. 4144.

Although Dr. Carman indicated at trial that he found no evidence that school officials or teachers acted "with the intention of discriminating against" minorities in their operation of the Special Education program, Tr. 4224, he nevertheless recognized that racial factors played a significant role in Special Education program decisions. In a series of letters to various school officials in 1973 and 1974, Dr. Carman attributed the disproportionate minority enrollment in the district's Special Education ED classes to the "inherent racism" of white persons and "cultural differences" between minority children and the district's professional staff. He noted that prior to 1972, children were placed in ED classes in particular "because they were disrupting classroom environments, or experiencing school failure and were members of racial minorities," and that once they were so assigned, these students rarely were able either to return to regular classes or to graduate. GX 690, 691. Dr. Carman reaffirmed these findings when he recognized at trial that

I believe that white people, and I include myself, view blacks and other minorities stereotypically and the amount of racism, I personally believe it exists in most of us. I also believe it exists in most blacks. I think that is what was operating when I looked at the overrepresentation of minority children in special education.

I don't believe that the staff in the City of Yonkers said let's put this black kid in special education because he is black. I think they said let's put this kid in special education because he is disturbed, and they thought that in large part because of his black behavior.

Tr. 4,236–37.

We recognize the difficulty of the decisions which were required of school officials in their operation of the Special Education program. Placement decisions involved evaluations based primarily on a student's exhibited behavorial tendencies and thus almost inevitably called for partly subjective determinations. Nevertheless, the evidence does not suggest that the Yonkers school district's Special Education program was simply another in a series of flawed Special Education programs then in existence. As noted previously, both Dr. Carman and other school officials acknowledged that the program was unusually discriminatory in its impact and that the evaluative process, even though a difficult one, was particularly prone to unwarranted racial assumptions. Asked whether black children were difficult to control in a regu-

lar classroom environment, Carman replied that this was the case "in Yonkers. I wouldn't say difficult by nature." Tr. 4225. In addition, some of these practices, such as the transportation of minority Special Education students to largely white schools on what essentially amounted to an intact basis, are not similarly explainable on such grounds. We recognize that discriminatory practices in this area, as elsewhere in the operation of the school system, were not simply the result of racial hatred or any ill-conceived desire to subject minority children to highly stigmatizing and inferior treatment. However, the practices and decisions governing the Special Education program, however innocently arrived at, were in part the product of racially-related criteria and judgments which cannot be dismissed as educationally or legally justifiable. In short, the record demonstrates that prior to the mid-1970's, the discriminatory consequences of the school district's Special Education program were the result of decisions and actions in which impermissible racial factors played a significant part.

The district's response to Dr. Carman's initial findings consisted of basic agreement with his evaluation of the Special Education program and a concerted effort towards improvement. In November 1972, school officials conducted a three-day workshop sponsored by the state's education department at which many of the aforementioned problems were discussed. GX 692. Soon thereafter, under Dr. Carman's leadership, the district began to implement a number of recommended changes in the operation of its Special Education program. Among the most significant changes which occurred was an alteration in the location of Special Education classes. As a result of the Board's adoption of Superintendent Alioto's 1973 school reorganization proposals, the school district was divided geographically into quadrants and Special Education students were assigned whenever

possible to schools within their quadrant. GX 114, at 3; Tr. 4169–70 (Carman). Consequently, Special Education students began to experience a reduction in the distance and duration of their trip to school, and the stigmatizing effect of placing minority Special Education students in virtually all-white schools was substantially reduced.

Other changes in the operation of the Special Education program were made as well. Dr. Carman became chairman of the COH in order to give himself an opportunity to personally ensure that the decision to place minority children in Special Education classes was properly made. In addition, parental participation in the screening process was increased by making them voting members of the COH. Finally, in the fall of 1973, the district began to return Special Education students to regular classes. These students continued to receive Special Education assistance from a resource teacher, who typically would provide special instruction outside the regular classroom setting.

These changes produced fairly quick results. Although Dr. Carman was not asked to and had not conducted individual, case-by-case evaluations prior to making his recommendations for reform in order to determine the reasons for the disproportionate number of minorities in particular Special Education programs, in 1973 some ED students were returned to regular classes at his suggestion and the overwhelming majority of them remained in these classes. Tr. 4167. The number of students referred to ED classes declined from forty-two in 1972–73 to six in 1973–74. GX 691. In addition, available statistics suggest that the disproportionate number of minorities assigned to ED classes in predominantly white elementary schools also declined. For example, while the number of Special Education students in School 16 (2% minority) in 1971–72 was twenty-six,[118] ten of whom were minorities, in

---

118. GX 64 indicates that School 16 had 26 Special Education students in 1971–72. GX 686 indicates that School 16 had 13 Special Education students, all of whom were in ED classes. While this discrepancy may be due to enroll-

ment fluctuations during the course of the school year, GX 686 is nevertheless helpful insofar as it indicates the particular type of at least some of the Special Education classes at the school.

1975–76 these numbers were twenty-eight and five, respectively. At School 32 (4% minority), the number of minorities in Special Education programs, including ED classes, decreased from fourteen out of thirty-five in 1971–72, to zero out of fourteen in 1975–76. By 1975–76, approximately 11% of the ED students in predominantly white elementary schools were minorities.[119]

After Dr. Carman left the Yonkers School District in 1975, responsibility for the Special Education program was assumed by Director of Special Services Robert Dodson, a minority school administrator who had participated in the district's 1972 workshop but was not trained in special education, and Assistant Director for Special Education Joan Malanga. The next several years were marked by additional efforts in certain areas of the Special Education program and the perpetuation or reappearance of previously recognized problems with the program. Under Dodson, the district established within each school a School Pupil Review Team, or SPURT. These committees, consisting of professionals similar to those that comprised the COH, were designed to increase the referring school's role in determining whether to refer a student to a Special Education program, with the goal of reducing the number of referral determinations to be made by the COH. In addition, efforts were made to include Special Education students in extracurricular activities at their assigned schools, in keeping with Dr. Carman's efforts to mainstream such students into the schools' regular programs.

On the other hand, a number of other problems were left unaddressed, and previous patterns of disproportionality in the placement of minorities in ED classes and in virtually all-white schools reappeared. In 1976, the space availability criterion continued to be used for elementary and middle school referrals, a circumstance which Malanga noted was disruptive, burdensome and would not have been a problem had the affected students been assigned to regular, rather than Special Education, programs. GX 697. This policy also resulted in the increased incidence of assigning minority Special Education students to often-distant, predominantly white schools in which they represented a significant portion of the school's total minority student enrollment, a trend which was discernable both for Special Education students generally and ED students in particular. In 1975–76, only four elementary schools with less than 15% minority student enrollments had minority Special Education student enrollments comprising over 20% of the school's total minority student population; by 1980–81, there were nine such schools, seven of which had minority Special Education student enrollments comprising over 30% of the school's total minority student population. As for ED students, in 1975–76 approximately zero to five ED students at heavily white (less than 5% minority) elementary schools were minorities.[120] By 1979–80, approximately twenty-seven to thirty-seven ED students at heavily white (less than 11% minority) schools were minorities. SB 812. Malanga recognized this phenomenon and its stigmatizing consequences at the time but testified that the school administration reacted with "indif-

119. This number was computed by dividing the number of minority Special Education students in predominantly white schools containing ED classes (five) by the total number of Special Education students in these schools (46). SB 812. This figure may well overstate the number of students in ED classes since some schools had both ED and other types of Special Education classes, and student enrollment data for each particular class was not introduced. Nevertheless, this evidentiary gap does not significantly affect the usefulness of examining minority student enrollment in ED classes on a comparative, year-to-year basis, in order to detect particular trends over time.

120. The zero figure takes into account the possibility that minority Special Education students in schools with both an ED and an LD class were all in the LD class. Looking at those predominantly white elementary schools with ED classes *only*, the number of minority students in these schools increased from zero (out of four ED students) in 1975–76 to 27 (out of 52 ED students) in 1979–80. SB 812.

**1460**

ference" and, in one instance, assigned an ED class to heavily white School 22 despite the school's previous inhospitable reception to, and inadequate facilities for, Special Education programs. Tr. 4262–63, 4279. In 1979–80, School 22 was 9% minority (twenty-two minorities), with seven minorities in its eleven-student ED program. SB 812.

The disproportionate referral of minority students to Special Education programs, particularly ED classes, eventually became the subject of investigations by state education officials and the United States Department of Education's Office of Civil Rights. Those investigations culminated in findings reaffirming that such disproportion did in fact exist and, according to the federal investigative findings, was "the result of methods of administration which subject[ed minority ED students] to discrimination." GX 699. Donald Batista subsequently assumed responsibility for directing the Special Education program and, under his direction, the district reevaluated many of the students then assigned to ED classes. Under Batista's direction and in response to the aforementioned governmental investigations, the district compiled in September 1980 a revised procedural manual for the COH to use in operating the district's Special Education program. SB 466.

One month after the filing of this action, the United States Department of Education and the Board reached an agreement whereby the Board undertook to implement certain remedial measures relating to the operation of its Special Education program. According to the Department of Education, these procedures, if fully implemented, would ensure compliance with Title VI and the regulations thereunder. SB 479, 480.[121]

The Board, in its trial brief, contends that its decision to place black Special Education students in predominantly white schools was preferable to the more segregative alternative of placing these students in predominantly minority schools in Southwest Yonkers. In its post-trial submissions, the Board argues further that its placement of disproportionately minority Special Education classes in East Yonkers schools was justified by greater space availability at these facilities and, in any event, cannot be considered racially segregative. In our view, the Board's contention unduly minimizes the severely stigmatizing consequences of its "integrative" approach; in similar circumstances, such actions have consistently been found to be discriminatory despite their facially "integrative" consequences. *See Reed v. Rhodes*, 607 F.2d 714, 730 (6th Cir.1979), *cert. denied*, 445 U.S. 935, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980); *Armstrong v. O'Connell, supra*, 451 F.Supp. at 852; *Berry v. Benton Harbor, supra*, 442 F.Supp. at 1306. The continuation of this practice in the mid to late 1970's despite an awareness of this stigmatization and its effect on the community's perception of minority students substantially undermines any argument that the

---

**121.** The Board argues that the consensual resolution of the United States Department of Education's charges regarding the district's Special Education program should preclude inquiry into the program as it existed prior to this resolution. We agree that, with respect to the United States, the fact that the aforementioned allegations were consensually resolved cannot be relied upon by this Court as independent evidence of wrongdoing and that such resolution may eventually preclude the United States from challenging the sufficiency of the previously agreed-upon remedial measures during the remedial phase of this case. However, we adhere to our prior ruling that evidence of the Board's conduct in this area is admissible for the purposes of demonstrating segregative or discriminatory intent consistent with other evidence of discrimination or segregation in the operation of Yonkers public schools, and for the purpose of demonstrating the segregative consequences of the Board's conduct in this area. Tr. 4132–40. *See Dayton Board of Education v. Brinkman*, 443 U.S. 526, 539 n. 11, 99 S.Ct. 2971, 2980 n. 11, 61 L.Ed.2d 720 (1979); *Arthur v. Nyquist, supra*, 415 F.Supp. at 941. This conclusion is also supported by the fact that the Department of Education's findings do not address the propriety of other aspects of the district's treatment of minority Special Education students or the stigmatizing effects of such practices. We also note that the aforementioned evidentiary limitations urged by the Board are inapplicable insofar as the NAACP is concerned. Tr. 4140.

Board's integrative approach was designed for any benevolent or racially desegregative purpose, or was preferable to placing such students in predominantly minority, geographically more proximate schools. Moreover, the Board ignores the fact that desegregation of the schools to which Special Education students were assigned would have substantially avoided the stigmatizing effects of its Special Education school assignment policy. Even the retention of Special Education students at their predominantly minority neighborhood schools would have at least been consistent with the Board's regular assignment practices and would have also avoided the stigmatizing and burdensome effects of its conduct. Indeed, to the extent the district's Special Education program assignment policy contributed to racial stereotyping and resistance to desegregation and thus made community acceptance of desegregative reorganization plans more unlikely, the policy did have indirect segregative consequences on the racial composition of Yonkers public schools. Given the inconsistent and otherwise suspect application of the space availability criterion and the Board's awareness of its discriminatory consequences, we cannot accept either space availability or the absence of any racial "segregation" of minority Special Education students as sound, consistent or neutral justifications for the discriminatory manner in which the Special Education program was conducted.

The evidence as a whole supports the conclusion that the Special Education program has at various periods of time and in various ways been operated in an unlawfully discriminatory manner. The striking disproportion in minority student enrollment in Special Education classes prior to 1972, the evidence of the assumptions and attitudes which influenced the referral process, and the various ways in which Special Education students were treated once referred, are persuasive evidence that the Special Education program was operated in an impermissibly discriminatory manner. While the substantive judgments of school officials in this particular area are not easy ones either to make or to review, the unique disparities in the treatment of mi-

nority Special Education students in Yonkers' public schools—as evidenced by their disproportionate presence in such programs, as well as the other practices affecting such students and their known, avoidable and highly stigmatizing effects—make deference to educational decision-making judgments unwarranted in this situation. *Cf. Berry v. Benton Harbor, supra,* 442 F.Supp. at 1307–08 (intact busing and assignment of minority students from demolished minority school to predominantly white school not justified by fact that classes were part of state program for deprived areas, even if school district obtained additional funds as a result). *Compare Alvarado v. El Paso Independent School District,* 426 F.Supp. 575, 609, 615 (W.D.Tex.1976) (finding no liability where implementation of special education diagnostic program was not accompanied by disproportion in number of minority students in classes for mentally retarded), *aff'd,* 593 F.2d 577 (5th Cir.1979). The placement of disproportionate numbers of minority Special Education students in predominantly white schools lacked any plausible justification rooted in current educational practice and resulted in a compounding of the discriminatory manner in which Special Education students were treated. Such assignments, like the assignment of faculty and staff, were not constrained or compelled by "neighborhood school" considerations or any other topographic or demographic factor. Rather, the Board's assignment practices for Special Education students were clearly inconsistent with its general neighborhood school policy and were allowed to continue to a significant extent despite the district's awareness of the stigmatizing consequences of these practices. Although significant and partly successful efforts were made during the mid-1970's to improve several aspects of the district's Special Education program, other stigmatizing practices either resurfaced or were permitted to continue. This factor, together with the spillover effects of the district's previous discriminatory practices and their impact on school desegregation generally, demon-

strates that the historically discriminatory operation of the Special Education program continued to have discriminatory effects as of the filing of this action.

### E. *Teacher and Administrative Staff Assignments*

The racial identifiability of Southwest Yonkers public schools has developed not only with respect to students but also with respect to teachers and administrative staff. While the absolute number of minority staff members [122] and the methods by which they have been assigned have varied over time, the disproportionate representation of minority staff in schools with a disproportionate or predominant number of minority students has been a constant feature of Southwest Yonkers schools.

Prior to the late 1960's, the Yonkers school district employed few minority teachers or administrators. At least two of the first three black teachers hired by the district from 1946 to 1950 were assigned either to School 1 or School 6, the two most heavily minority schools in Yonkers at the time. Hamilton Dep. 4, 29–30; GX 985. The number of minority staff increased over the next several years; for example, by 1958, Longfellow Junior High School, which had a relatively small but disproportionately minority student enrollment, had three black teachers on its staff. Tr. 13,-004 (Dodson). By the mid-1960's, Yonkers High School, which in 1967 enrolled 36% of the district's high school minority students, had three black teachers as well. Tr. 2420 (Guzzo).

By 1967–68, the Yonkers school district employed ninety-seven minority staff members, comprising 7% of its total staff. By this time, the disproportionate representation of minority staff in disproportionately minority schools was beginning to emerge. Of the eight elementary schools with greater than 10% minority staff, four of them, including the two schools with the highest percentage of minority staff, were less than 20% non-minority schools (4, 9, 22, 32). The four elementary schools with no minority staff members, however,[123] were all schools with at most 13% minority student enrollments (11, 13, 16, 23). The seven [124] elementary schools with over 25% minority enrollments, all but one of which (School 24) was located in Southwest Yonkers, employed 40% of the district's minority elementary school staff. As for the district's junior high schools, 75% of the minority staff was assigned to the three schools, all in Southwest Yonkers, with the highest minority student enrollments in the district. The four secondary (junior and senior high) schools with minority student enrollments greater than the districtwide average employed 31% of the district's total secondary school staff, but employed 52% of the minority secondary school staff.

In the late 1960's and early 1970's, the Board, primarily under the leadership of Superintendents Mitchell and Alioto, made increased efforts to recruit minority teachers and administrators to the school district. This period was also occasioned by an alteration in the district's hiring procedures; as of 1972, hiring decisions previously made by the Personnel Department were now to be made by school principals themselves by selecting applicants from central personnel files and interviewing them for positions in their schools. GX 798. The district's increased recruitment efforts resulted in an accompanying rise in minority staff from ninety-five (1967) to 133 (1970) to 174 (1975).

---

**122.** The term "staff" is used to refer to teachers, principals, and assistant principals. GX 64; Tr. 3184–85 (Sweezy).

**123.** While GX 64 indicates that School 19 (68% minority) had zero minority faculty, this information is not relied upon since this exhibit also indicates that the total number of faculty at that school was five. GX 89 provides a more realistic and accurate indication of the size of the school's total faculty—22 members. Given that six of the seven most disproportionately minority schools in Yonkers had at least two minority staff members in 1967–68, it is unreasonable to assume that none of the School 19 staff members were minorities.

**124.** This does not include School 19. *See* fn. 123 *supra.*

At the same time, the district's procedures for assigning or transferring teachers to particular schools became more formally structured. In 1969, the Board and the Yonkers Federation of Teachers entered into their first collective bargaining agreement. This agreement, which has remained substantially the same since 1969 insofar as teacher assignment practices are concerned, affords teachers the right to transfer voluntarily to available positions in the district's other schools, with priority based on order of seniority. Thus, the hiring and assignment of new faculty has been effectively limited to filling vacancies not otherwise filled by already-employed teachers exercising their seniority rights.

The collective bargaining agreement also limits the district's ability to require teachers to transfer involuntarily. Nevertheless, the agreement reserves to the Board the power to implement such transfers "when judged to be in the best interest of the school system." GX 794, at 30; GX 795, at 32; GX 110, at 33; GX 108, at 33. Despite this residual flexibility in staff assignments and the Board's awareness of the increasing disproportion of minority teachers in minority schools during the early 1970's, this provision was rarely exercised.

At the time of the Board's initial contractual agreement with the Yonkers Federation of Teachers, the disproportion in minority staff at predominantly minority schools was becoming increasingly clear. In five elementary schools with over 50% minority student enrollments (6, 12, 19, 25, King), twenty of the district's forty-six minority elementary school teachers were employed. Two schools in particular—School 19 (83% minority) and King (57% minority) —employed 26% of the district's elementary school minority staff. In contrast, seventeen elementary schools had one or no minority staff members; eleven of these schools had at least 95% white student enrollments. On the middle school level, nineteen of the district's twenty-seven mi-

nority staff members were assigned to the three most heavily minority middle schools, all of which were located in Southwest Yonkers. A similar pattern existed at the high school level as well.

By 1972–73, this disproportion had become even more pronounced. Schools 6, 12, 19, 25 and King now employed thirty-six, or 54%, of the district's sixty-seven elementary school minority staff. The three most heavily minority middle schools [125] employed 69% of the district's middle school minority staff, a disproportion similar to that which existed at the high school level.

The extent to which the increasing disproportion in minority staff at predominantly minority schools was the result of a deliberate "role model" policy is an issue of considerable dispute. The existence of a racially based assignment policy was fairly well-established in Yonkers public schools with respect to principals, whose assignment was governed by district officials rather than by collective bargaining agreement. Both Assistant Superintendent Stanley Schainker and Board member Rosemarie Siragusa acknowledged that minority principals were deliberately assigned to schools with greater minority student enrollments. Schainker Dep. 22, 224–25; Tr. 5427–28 (Siragusa). Other Board members who disavowed the existence of a "role model" policy did so only with respect to teachers rather than principals. Tr. 9844–45 (Minervini); Tr. 10,947 (Jacobson). Both Jacobson and Joseph Guerney, Director of Elementary Education, acknowledged that district officials had control over such assignments unimpeded by the district's collective bargaining agreement with the teachers' union. Tr. 11,007; Tr. 11,517. As a result of the district's administrative staff assignment policy, all eight of the principals who were either hired or reassigned during Superintendent Alioto's tenure were placed in identifiably minority schools. GX 464; Tr. 11,007–010 (Jacob-

---

**125.** This excludes the middle school staff of the Gorton (grades 7–12) facility, which in total employed 23 minority staff members.

son); Tr. 11,521–30 (Guerney). Of the thirteen minority principals and assistant principals in Yonkers in 1974–75, nine were assigned to predominantly minority schools and two others were assigned to Yonkers High School (42% minority), the district's most heavily minority high school at that time. Prior to 1979, only one minority principal had been assigned to an identifiably white school, and this principal (Hattie Becton) was subsequently reassigned to King (90% minority at the time). GX 64; Tr. 11,008 (Jacobson). This assignment policy thus served to further establish Southwest Yonkers schools as identifiably minority schools.

The existence of a "role model" assignment policy for teachers, however, is not borne out by the weight of the evidence. The only clear evidence as to the existence of such a policy for teacher assignments was proffered by Board member Siragusa. According to Siragusa, this policy originated from Superintendent Alioto and Assistant Superintendent Schainker and was agreed to by the Board. Tr. 5427–28; Siragusa Stip. ¶¶ 2a–2c. Schainker acknowledged that the district's efforts to hire minority teachers occurred at a time when administrators "were operating under the assumption ... that minority youngsters need appropriate role models", but his testimony regarding the existence of a role model policy was concerned primarily with the district's hiring efforts with respect to administrative personnel. Schainker Dep. 22, 224–26. School principal Robert Dodson acknowledged that a segregative assignment policy was followed with respect to Special Education teachers, Tr. 13,018–19, but also testified that he was not instructed by Superintendent Alioto to assign minority teachers as role models in minority schools. Tr. 12,919. While Dodson's hiring efforts as Yonkers High School principal yielded an increase in minority staff from eight (1970–71) to twenty-one (1974–75) and were supported by Alioto, Dodson recalled that Alioto had stated that "it was very important that all students, white and black, view blacks in professional roles...." Tr. 12,919. And while Superintendent Robitaille acknowledged that the School 6 principal had sought to develop a staff with a racially "segregationist" attitude, he could not recall the existence of a general role model policy for teacher assignments and testified that such assignments, while frequently resulting in minority staff being placed in minority schools, were based on the staff member's years of experience. Tr. 4613–14. Finally, the Task Force for Quality Education's finding that there was an attempt at certain schools, such as King (53% minority faculty, 96% minority students, 1975–76), to place black teachers at predominantly minority schools, Tr. 3722 (Ross), this conclusion was drawn from an examination of statistical information and was not based on a finding that a general "role model" assignment policy existed for all Southwest Yonkers schools.

Several witnesses, including two Board members previously called as witnesses by plaintiffs, testified as to the absence of any such role model policy for teacher assignments. Board members Robert Jacobson and George Minervini disavowed the existence of such a policy, and Joseph Guerney, Director of Elementary Education, also testified to similar effect. Tr. 9844–45; Tr. 10,947; Tr. 11,235–37. In addition, three principals from Southwest Yonkers schools all testified that they neither knew of nor practiced a "role model" policy. Tr. 12,-589–90 (DiChiaro) (Commerce and Hawthorne Middle Schools); Tr. 13,243–44 (De-Fino) (Schools 18 and 19); Tr. 13,487–88 (Steinberg) (School 19 and Hawthorne Middle School). Although principals were generally encouraged to hire minority staff, the record does not establish that only Southwest Yonkers principals were encouraged to do so. Schainker Dep. 22; Tr. 13,023 (Dodson). Thus, the record supports a finding that a "role model" policy was not the reason for the disproportionate assignment of minority teachers to minority schools.

The absence of a "role model" assignment policy for teachers, however, does not compel the conclusion that the increased disproportion of minority staff at minority schools was fortuitous and unintentional. The foreseeability of the increased racial

segregation of staff members and the district's limited efforts to alleviate the imbalance together suggest that the resulting assignment of minority staff to minority schools was a practice which the Board approved of and intended to continue. The combination of the frequent exercise of transfer rights in a largely west to east direction, the resulting increase in vacancies at disproportionately minority schools, the contemporaneous affirmative efforts to hire minority staff, and the district's failure to exercise its reassignment prerogative resulted, quite obviously, in the vast majority of minority faculty being assigned to Southwest Yonkers schools and essentially made the use of any more explicit "role model" policy unnecessary. Given the school district's deliberately segregative pattern of administrative staff assignments and the racial disproportionality in teacher assignments prior to the collective bargaining agreement, it is reasonable to infer that the subsequent pattern of assigning minority teachers to disproportionately minority schools was considered desirable and was deliberately unaltered.

By 1974–75, four of the five elementary schools with over 20% minority staff were at least 80% minority (6, 12, 19, King) and had black principals, while nine of the thirteen elementary schools with no minority faculty (and a white principal) were at least 97% white (8, 11, 15, 16, 17, 21, 28, 29, 32). The secondary schools were similarly disproportionate in minority staff representation; the three middle schools with over 10% minority staff were all over 50% minority (Longfellow, Hawthorne, Commerce), and the two high schools with over 10% minority staff were the district's most heavily minority high schools (Yonkers (42% minority) and Gorton (30% minority)). These five schools employed 68% of the minority staff assigned to the district's thirteen secondary schools.

The district's affirmative hiring efforts during Superintendent Alioto's term were also accompanied by a steady flow of white teachers from Southwest to East Yonkers schools. As discussed previously, *see* SCHOOLS IV.B.2 *supra*, such transfers were induced primarily by the recognized and perceived preferability of teaching in educationally superior East Yonkers schools. Consequently, the number of minority teachers in predominantly white schools declined. None of the district's seventeen predominantly (greater than 90%) white elementary schools experienced an increase in the number of minorities on their faculty from 1971 to 1975; ten of these schools actually experienced declines in minority staff, and four others continued to employ no minority staff.

The district's staff assignment practices were marked by other discriminatory or otherwise negative features. The minority teachers who were assigned to East Yonkers schools were often Special Education teachers who were deliberately assigned to such schools because of the disproportionate number of minority students in Special Education classes. Tr. 13,018–19 (Dodson); *see also* Tr. 2408–09 (Guzzo). In addition, minority teachers who were employed in Yonkers public schools often taught non-academic subjects such as music, physical education, health, typing or home economics. GX 587 (Gorton); Tr. 2412–14, 2420 (Guzzo) (Franklin, Hawthorne, Yonkers High); Tr. 4287 (Hammer) (Whitman, Roosevelt); Tr. 13,151–52 (Dodson) (Yonkers High). The general west to east movement of teachers also resulted in the assignment of the bulk of the district's less experienced staff to heavily minority Southwest Yonkers schools. *See* SCHOOLS IV.B.2 *supra*.

While the Board was well aware of the significant racial imbalance in staff assignments, limited efforts were made to renegotiate the district's collective bargaining agreement so as to give the district more flexibility in assigning and/or transferring teachers within the school system. While some discussion of the desirability of such an effort occurred at or about the beginning of Dr. Robitaille's superintendency in 1975, Tr. 5525–26 (Minervini); Tr. 5949 (Robitaille), these efforts were not only unsuccessful and, according to the district's chief labor negotiator, eventually abandoned in negotiations with the teachers' union, Tr. 13,174–75 (Dodson), but in 1977 the Board

agreed to specific limitations on its ability to implement involuntary transfers of school teachers. *Compare* GX 795, at 32 *with* GX 110, at 33 (authorizing involuntary transfers only for health, safety, or other reasons in accordance with mutually understood past practices, or to provide students with unique educational skill or learning experience).

The Robitaille superintendency of 1975–78 was marked by a recognition of the aforementioned racial segregation of school staff, and limited efforts to rectify that condition. Superintendent Robitaille assigned to Joseph Guerney the responsibility of recruiting minority teachers for positions at East Yonkers schools and sought to assign at least one minority teacher to every public school in Yonkers. This effort was only minimally successful. The number of elementary schools with no minority staff was reduced from eleven (1975–76) to five (1978–79), and the number of minority staff in predominantly white East and Northwest Yonkers schools,[126] which had decreased from eighteen (1970–71) to nine (1974–75) during Superintendent Alioto's tenure, rose slightly to eleven (1978–79). These increases, however, were overshadowed by increased minority staff in heavily minority Southwest Yonkers schools. For example, the number of minority staff in predominantly minority Schools 6, 10, 19 and King increased from twenty-five (1974–75) to thirty-two (1978–79). This increase in minority staff at Southwest Yonkers schools occurred despite the staff terminations implemented as part of the district's fiscally induced budget reductions of the mid-1970's, layoffs which affected most severely the less experienced minority teachers in Southwest Yonkers schools. *See* SCHOOLS IV.B *supra.* For example, School 6, whose minority faculty dropped from 47% (1975–76) to 14% (1980–81), suffered a 38% loss in its faculty as a result of the 1975–76 teacher layoffs. GX 64, 75.

By the end of Dr. Robitaille's superintendency, the racial identifiability of the school district's faculty remained clear. The five elementary schools with over 15% minority staff were Schools 6 (98% minority students), 10 (87%), 19 (78%), 25 (85%) and King (97%); the five elementary schools with no minority staff were Schools 8 (3% minority students), 17 (3%), 21 (3%), 29 (2%) and 32 (7%). King Elementary School alone had more minority staff (sixteen) than all of the East Yonkers elementary schools combined (seven). GX 64. A similar pattern existed at the secondary school level as well.

As of 1980, the disproportion in minority staff at minority schools was still fairly severe. The four elementary schools with over 20% minority staff (10, 19, 25, King) had from 79% to 97% minority student enrollments and employed thirty-four of the district's seventy-six minority elementary school staff. Over half (thirty-nine of seventy-six, or 51%) of the district's minority elementary school staff were assigned to five elementary schools with at least 70% minority enrollments. Of the five schools with no minority staff, four of them had at least 93% white student enrollments (17, 21, 29, 32). The three middle schools with over 10% minority staff were Fermi (58% minority students), Longfellow (92%), and Hawthorne (64%). Although these schools employed less than half the total number of middle school staff in the district, they employed twenty-four of the thirty-nine [127] minority middle school staff. On the high school level, the two schools with over 10% minority staff were Gorton (44% minority students) and Yonkers (56%), schools which employed forty-three of the district's fifty-six minority high school staff members. The distribution of minority principals and assistant principals, while improved from

---

**126.** Schools 4, 8, 11, 14, 15, 17, 21, 22, 26, 28, 29, 30, 31, and 32.

**127.** This number actually overstates the number of minority middle school staff members in the district since it includes minority staff at the elementary school portion of the Emerson and Twain (grades K–8) facilities. Although separate staff data by race is unavailable for 1980, in 1978–79 Emerson and Twain had a total of 12 minority staff members, only eight of whom were middle school staff. GX 52.

previous years, was still imbalanced even as late as 1980. Although the district had more schools with over 90% white enrollments than schools with greater than 50% minority enrollments, six of the district's eleven minority principals and assistant principals were assigned to predominantly minority schools while only three were assigned to over-90% white schools.

In sum, the racial disproportion in minority faculty and administrative staff assignments has been a constant feature of Yonkers public schools. The clearly foreseeable and foreseen effect of the district's affirmative hiring of minorities, when combined with the collective bargaining agreement's transfer provisions and the general west to east flow of white teachers, was to sharply increase the number of minority teachers in Southwest Yonkers schools. The district made no demonstrated efforts to invoke its reassignment powers to counterbalance this phenomenon and made limited and largely unsuccessful efforts to renegotiate the contractual provisions to which it bound itself in 1969. While we recognize the practical difficulties which would have accompanied such efforts, this does not excuse the Board's failure to take any significant and lasting steps to reverse the racial disproportion which existed prior to the 1969 agreement and which was solidified and intensified during subsequent years. *See Armstrong v. Brennan,* 539 F.2d 625, 635 (7th Cir.1976), *vacated on other grounds,* 433 U.S. 672, 97 S.Ct. 2907, 53 L.Ed.2d 1044 (1977); *Morgan v. Kerrigan, supra,* 509 F.2d at 595–96; *Berry v. Benton Harbor, supra,* 442 F.Supp. at 1280, 1301. The Board's awareness of and acquiescence in the racial disproportionality of staff assignments is particularly troubling since neighborhood school policies, concern over transportation burdens, and patterns of residential segregation played no role in the formulation of staff, as opposed to student, assignment policies and practices. *See Morgan v. Hennigan,* 379 F.Supp. 410, 456 (D.Mass.), *aff'd,* 509 F.2d 580 (1st Cir.1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). The collective bargaining agreement, moreover, in no way explains the racially dispro-

portionate pattern in staff assignments which had already become evident in years prior to the effective date of the first agreement, a disproportion which was apparent to school officials when the agreement was entered into. *See Armstrong v. Brennan, supra.* Such disproportion, in an area of public school operation in which residential segregation and student assignment-related concerns are essentially irrelevant, is of particular probative value in determining whether the racial segregation of teaching and administrative staff has been unlawfully created. *See Arthur v. Nyquist, supra,* 415 F.Supp. at 945. The collective bargaining agreement restrictions also cannot explain the deliberate assignment of principals and Special Education teachers on a race-conscious basis, a policy whose purported benevolence is outweighed by constitutional concerns of race neutrality. *See Diaz v. San Jose Unified School District, supra,* 733 F.2d at 670; *Arthur v. Nyquist, supra,* 415 F.Supp. at 946. The aforementioned considerations persuade us that the assignment of disproportionate numbers of minority staff to predominantly minority Southwest Yonkers schools was in part the result of a desire to, and in fact did, create and perpetuate racial imbalance among Yonkers staff members consistent with the racial segregation of the Yonkers public schools, and had a segregative impact on those schools.

## F. Refusal to Implement Desegregative Reorganization Plans

### 1. Introduction

Plaintiffs seek to establish the segregative intent of the Board and its liability for the segregation of Yonkers public schools based in part on its persistent refusal to adopt and implement proposals for desegregating the schools. Briefly stated, plaintiffs allege that the Board's responsiveness to racially motivated community opposition to such proposals was tantamount to an impermissible official recognition or effectuation of private discriminatory desires consistent with its other discriminatory acts and omissions, and thus forms

the basis for holding the Board liable for the segregation which its conduct contributed to and maintained. Primary among the examples of such conduct is the Board's refusal to adopt the desegregative components of the 1972 NYU Report or the 1977 Phase II reorganization plan.

The nature of community opposition to, and the reasons underlying the Board's rejection of, the NYU Report proposals and the Phase II plan are best examined against the backdrop of prior desegregative efforts of the Board and school administration.

The desirability of reducing the increasingly severe racial imbalance in Yonkers public schools had been recognized well before the Board's consideration of proposals for desegregating the schools. In 1963, the New York State Commissioner of Education issued a letter to all state public school superintendents and board presidents in which he expanded upon previously articulated state policy concerning school desegregation and emphasized the necessity of insuring that racial imbalance, and its concomitant interference with the providing of equal educational opportunity, be eliminated.[128] In response, the Board issued a resolution recognizing its commitment to the stated policies of state educational authorities and noted the responsibility of the community as well as the Board in alleviating racial imbalance in the schools and in pursuing efforts in other areas, such as housing, which also would achieve this goal. GX 924. At the time, the racial segregation of the Yonkers public schools was beginning to emerge. No predominantly minority schools existed at the time; on the elementary school level,

however, the racial identifiability of School 6 (45% minority in 1961–62), 12 (41%) and 19 (32%), three elementary schools containing 47% of the district's minority elementary school children, was well-established by that time. Recognizing the state policy on segregation and the emerging racial imbalance of the schools, the Board, in 1966, notified the New York State Education Department of its interest in implementing a program to eliminate racial imbalance. GX 911.

In 1968 and 1969, the New York State Board of Regents reiterated its previously stated commitment to the elimination of racial segregation in the state's public schools. It noted the importance of eliminating racial segregation as a means of providing equal educational opportunity and stated its opposition to recently enacted state legislation prohibiting school boards from altering school boundaries or attendance zones for the purpose of eliminating racial segregation in the public schools—legislation which was subsequently declared unconstitutional. *See Lee v. Nyquist*, 318 F.Supp. 710 (1970), *aff'd*, 402 U.S. 935, 91 S.Ct. 1618, 29 L.Ed.2d 105 (1971).

The first significant recognition of the need to address the racial imbalance of Yonkers public schools occurred during the superintendency of Paul Mitchell. Mitchell expressed his concern that the racial segregation of the schools prevented students from receiving an equal education and was by all accounts deeply committed to rectifying this disparity. Tr. 4060–61 (Sobel); Tr. 4969–70 (Jacobson); Tr. 5203 (Morris); Tr. 13,136–37 (Dodson). During his brief ten-

---

**128.** The Commissioner stated that:

> The position of the Department, based on the policy of the Regents and the principals of . the Commissioner's Advisory Committee, is that the racial imbalance existing in a school in which the enrollment is wholly or predominantly Negro interferes with the achievement of equality of educational opportunity and must therefore be eliminated from the schools of New York State.
>
> If this is to be accomplished, there must be corrective action in each community where such imbalance exists. In keeping with the

principle of local control, it is the responsibility of the local school authorities in such communities to develop and implement the necessary plans. It is recognized that in some communities, residential patterns and other factors may present serious obstacles to the attainment of racially balanced schools. This does not, however, relieve the school authorities of their responsibility for doing everything within their power, consistent with the principles of sound education, to achieve an equitable balance.

GX 909.1.

ure as superintendent, some initial steps were taken in recognition of the district's increasing racial imbalance. These steps consisted primarily of the planned opening of the King Intermediate School and School 10 as racially integrated Southwest Yonkers schools; efforts to recruit minority staff; and a series of human relations workshops, conducted for teachers and administrative staff, which were designed to sensitize school personnel to the needs of minority students, particularly blacks. The workshops were also considered an initial step towards the eventual implementation of a desegregation plan for the district's schools. By this time, specific desegregation proposals began to be considered in the district. For instance, Superintendent Mitchell discussed with school principals the possibility of redrawing high school attendance zone lines on an east-west basis so as to improve racial balance in the district's high schools. Tr. 13,137–39 (Dodson).

During the 1969–70 school year, the district also sought the assistance of state education officials in addressing the problem of racial imbalance. Superintendent Mitchell met with Dr. Morton Sobel, a specialist in educational integration for the New York State Division of Intercultural Relations in Education, and secured Sobel's assistance in the district's initial integration efforts. Sobel discussed with school officials the district's proposed application for financial assistance from the state's "Racial Balance Fund" and suggested that the district establish a task force for purposes of evaluating the school district's racial imbalance and developing an integration plan. GX 914; Tr. 4059–60 (Sobel). In July 1970, two months after the Board adopted a resolution recognizing the need to address the problem of racial imbalance, GX 913, the district submitted an application for state financial aid for developing further plans for eliminating racial imbalance in addition to those steps which the district had already taken. GX 915. This application was granted and funds were provided to the district in September of 1970, just after the death of Superintendent Mitchell. GX 916.

During the spring and summer of 1970, Sobel also visited several schools in Yonkers and met with various teachers and administrators. He concluded that various educational deficiencies existed at the district's predominantly minority schools. Tr. 4072. Upon discussing these problems and proposals for desegregating the schools, however, Sobel was told by school officials that the community was opposed to desegregation of the schools. Tr. 4073, 4075. This community resistance was experienced first-hand by Sobel later that year when he returned to Yonkers to determine how the state money previously granted to the district was being used. Sobel and Susan Morris, a vice president of the Council of PTA's, both recalled that at a Council of PTA's meeting held for the purpose of discussing school desegregation issues, remarks were made which reflected community opposition to the concept of school desegregation, opposition which was based partly on the perceived decline in the quality of education which would result in predominantly white East Yonkers schools. Tr. 4076–77 (Sobel); Tr. 5209–12 (Morris). This community resistance also was reflected in discussions which Sobel had with James Gallagher, the Acting Superintendent at the time. Despite the expressed concern of state officials that its funds were not being used as planned and that the Board not wait until a permanent replacement for Superintendent Mitchell was appointed before it began to address the problem of racial imbalance, Gallagher expressed his reluctance to pursue desegregation efforts because of the interim nature of his appointment and community resistance to such efforts. Tr. 4074–75 (Sobel). As a result, efforts to develop comprehensive proposals for alleviating the increasing racial imbalance among the district's public schools were essentially discontinued.

## 2. *NYU Report*

The district's shift in priorities from racial desegregation to educational improvement characterized the early to mid-1970's. Among the most comprehensive proposals

for improving educational opportunities and reorganizing the district's schools were those set forth in a 1972 report prepared by a study team from the New York University School of Education. The NYU Report was the result of a variety of problems which Superintendent Alioto recognized upon joining the Yonkers School District in 1971. Alioto recognized the inconsistent grade organization in the schools, particularly at the elementary school level. He noted the limited accessability of occupational and vocational programs based primarily on the use of screening criteria at Saunders, the district's primary vocational education facility, and the limited availability of vocational and occupational programs at the district's regular secondary schools. In addition, he recognized the inequality of educational opportunity within the district, particularly with respect to the inadequate facilities and inexperienced teachers which characterized many of Southwest Yonkers' predominantly or disproportionately minority public schools. Finally, Alioto recognized the increasing racial imbalance in the schools and the need to address this condition.[129]

An additional element of the school district's reorganization plans involved the Gorton facility. The school had grown to be an increasingly minority facility as a result of the opening of Emerson Junior High School in 1963 and the resulting southern shift in Gorton's attendance zone boundary. During the late 1960's and early 1970's, Gorton began experiencing a series of racial disturbances caused in part by increasing student dissatisfaction with the nature and variety of educational programs at the school. Both of these conditions contributed to Gorton's reputation as a racially troubled and educationally inferior school. Black students protested the recognized inadequacies of the school's non-academic, or general, program (GX 645; *see also* Alioto Dep. 70; GX 571) and complained that they were being steered into these programs by school officials. Tr. 4305–08, 4366 (Barrier); Tr. 13009–010

(Dodson); Peace, Jr. Stip. ¶¶ 6–8. While many of the problems cited by students were addressed by the district in accordance with an agreement entered into among Gorton students and school officials, for example, improvements in Afro-American curricular offerings and the creation of secondary school Human Relations Councils, GX 568, the inadequacy of the school's general program, and complaints of steering of minority students into the program, persisted. Alioto Dep. 70; Tr. 3892–94 (Ross); Tr. 4308, 4366–67 (Barrier); GX 571. These difficulties were compounded by the mixture of both junior and senior high school students at the school, a condition which had a negative impact particularly among the junior high school students at the facility. GX 586; Tr. 10,992–93 (Jacobson); Alioto Dep. 70–71.

Gorton's negative reputation increased as the aforementioned conditions persisted. The school's unstable condition reached a peak in 1971 and 1972 when the presence of police officers in the building became a fairly common occurrence and Acting Superintendent James Gallagher moved his office to Gorton in order to deal with the disturbances at the school. Tr. 4316–20 (Barrier). At the same time, the white student enrollment at Gorton began to decline, from 1,147 students in 1970 to 938 students in 1972, partly as a result of student fears concerning the continued disturbances at the school and the academic inadequacy of the Gorton general program. GX 570, 575, 584, 591, 593, 595.

Superintendent Alioto's response to these various problems was essentially two-fold. First, Alioto hired James Barrier, a black former police officer, to serve as his Special Consultant for Community Relations. Barrier's primary responsibility was to serve as a liaison between school officials and community members, with particular emphasis on communicating the concerns of the black community to school officials and alleviating the racial tensions at Gor-

---

**129.** For discussion of Superintendent Alioto's concerns regarding the Special Education pro- gram, *see* SCHOOLS IV.D *supra.*

ton. Barrier also worked as a liaison between school officials and the police department and sought to minimize the presence of police at the school. Tr. 4314–17 (Barrier); Alioto Dep. 66.

Barrier was also instructed by Superintendent Alioto to gather information on the extent of racial imbalance in the schools. Soon after, however, Barrier was told by Alioto to cease work in this area; based on Alioto's discussions with community members and school officials, Alioto believed that it would be politically infeasible to proceed with desegregative efforts in the schools at that time. Tr. 4325–26 (Barrier). Alioto's discussion with Barrier was consistent with a viewpoint Alioto had expressed to other school officials as well. According to Board member Robert Jacobson,

> There is no question [Alioto] said it and he said it to many people. He said it could never be sold in the Yonkers community. Any kind of totally city-wide racially balanced program would be politically infeasible.

Tr. 5054. Similarly, Dr. Morton Sobel recalled that in discussing the issue of school desegregation with Superintendent Alioto, he was informed by Alioto that "there was great community resistance and that it was unfeasible to try to develop a desegregation plan and then implement it." Tr. 4079. Alioto instead supported, and discussed with City officials, an approach to school desegregation which involved the use of scattered site housing within the city. Alioto Dep. 16–17.

Second, in October 1971 Superintendent Alioto commissioned the New York University School of Education's Center for Educational Research and Field Services to perform a study of the Yonkers public schools. The study team was asked to examine the physical capacity of school buildings, grade organization patterns, and educational program offerings, and was asked to make student enrollment projections as well, all with a view towards making recommendations for improving the structure and educational programs of Yonkers public schools. GX 115, at iv. The study team was not asked to, and did not, address the

issue of racial imbalance in the schools. Tr. 13,065–66, 13,093, 13,109–15 (Pitruzzello). Members of the study team, including Dr. Philip Pitruzzello, its director, visited the schools and spoke with principals and staff prior to the preparation of their report.

In March 1972, the New York University study team issued its report, "A Study of the Yonkers Public Schools: Facilities, Demography, Organization." GX 115. The NYU Report noted the limited nature of vocational and occupational programs in the district and the educational desirability of decentralizing these programs throughout the district's high schools. The Report also noted the related inadequacies of educational offerings in particular schools, for example, the non-academic, non-vocational general program, particularly at Gorton, which provided students "with few options ... beyond the basic curriculum...." *Id.* at 36. The Report then set forth several plans for addressing these problems, each including a number of overlapping recommendations. The primary recommendations fell into three general categories:

(1) A grade reorganization to a uniform K–5, 6–8, 9–12 grade structure. Under the district's then-existing grade structure, the schools lacked a consistent pattern of grade organization, with most sixth graders attending the district's elementary schools. Elementary schools included two K–3's, two K–4's six K–5's, and twenty K–6's, along with King Intermediate (4–6) School. The four regular high schools included two 9–12 schools and two 10–12 schools. Consistent with Superintendent Alioto's expressed desire for reorganizing the district's grade structure, the NYU Report recommended that the district reassign sixth graders to middle schools and expand the high schools to include ninth grade students.

(2) A high school "variable access" plan. Under this plan, particular occupational programs would be distributed among the district's regular high schools so that each school would have a more comprehensive educational program. As part of this pro-

posal, the North Yonkers (Roosevelt and Gorton) and South Yonkers (Lincoln and Yonkers) high schools would be paired so that students at one school could attend the other school on its geographic "tier", at which particular occupational programs would be available. The Report recommended closing the High School of Commerce and distributing its occupational courses among the district's regular high schools, and converting the Saunders Trades and Technical High School into an Occupational Area Center at which students from regular high schools could receive instruction in various advanced occupational programs. As an additional, alternative component of this proposal (Plan I of the Report), the Report suggested the conversion and physical expansion of Central Yonkers' Burroughs Junior High School into a districtwide high school at which technical and health programs would be offered. *Id.* at 36-40. The Report also proposed that School 5, located within two blocks of Burroughs, be converted into a replacement middle school for Burroughs, with School 5 students being reassigned to Schools 16, 17, 22, 24, and 25. *Id.* at 43.

(3) Reorganizing the district's Northwest Yonkers secondary schools. At the time the NYU Report was issued, Gorton was a combined junior and senior high school facility, Emerson was a combined elementary and junior high school facility, and Commerce was an occupational high school. Among the NYU Report proposals were (a) the relocation of Gorton High School to Emerson and the relocation of Emerson Elementary and Junior High School to Gorton (Plans I (*id.* at 40, 46) and II (*id.* at 47)); and (b) the relocation of Gorton Junior High School students to Commerce (with Commerce's occupational programs being distributed throughout the district's other high schools) (Plan III (*id.* at 49)).

Late in 1972, the district conducted a two-day retreat for purposes of discussing the recommendations of the NYU Report. The contemporaneously prepared documents summarizing the opinions expressed at this conference reflect the controversial nature of the educational reforms proposed by the Report. GX 760-

762. Virtually every facet of the school district's grade and program structure was critically examined. A number of alternatives to the NYU Report proposals were developed and discussed. Each proposal involved a multitude of recognized advantages and disadvantages, relating to educational wisdom, fiscal and political feasibility, community acceptance, space utilization, and racial impact. From these records, it is clear that the racial effects of the various proposals was a significant factor which was considered in evaluating the recommendations of the NYU Report and the alternatives suggested by the district's own administrative staff.

Race-related concerns were frequently expressed with respect to the proposed relocation of Gorton Junior High School students to a new Commerce Middle School. Specifically, the probability that Commerce would open as a virtually all-black middle school was repeatedly recognized as a disadvantage of the proposed movement of Gorton students to that facility. While the district was committed to alleviating the unrest at Gorton by removing junior high school students from the facility, the segregative impact of transferring them to Commerce was clearly foreseen. GX 760, at 44,936 ("Commerce may become an all-black school"), 44,938 ("Commerce could be all black"), 44,939 ("Commerce becoming basically a black school"); GX 762, at 42,-820 ("Racial Distribution—all black"). As an alternative to the NYU Report's "Plan III" proposal, a task group suggested that students from Emerson could be assigned to Commerce along with Gorton Junior High School students and King sixth graders. GX 760, at 44,941. Proposals were made which contemplated the reassignment of all or part of the Emerson Junior High School student body to Commerce. GX 760, at 44,941; GX 761, at 42,808. This proposal was made for the purpose of improving the racial balance of Commerce and of West Yonkers schools in general, consistent with the widely supported elimination of the junior high school component at Gorton. *See* GX 760, at 44,939, 44,944. The proposed reassignment of Gorton High

School and graduating Emerson Junior High School students to a newly converted Emerson High School facility, along with the conversion of Gorton into the new Saunders area occupational center, was also supported as a means of improving Gorton's negative image, improving racial balance among West Yonkers schools, and expanding the facilities available for occupational education programs. *Id.*

The closing of Emerson Elementary School, although not expressly examined in this regard, would have been feasible from a capacity standpoint. In light of both the anticipated decline in elementary school enrollment and the proposed K–6 to K–5 grade reorganization, the capacity of elementary schools in the Northwest Yonkers area, such as Schools 22, 16, 24, and 5, would likely have been sufficient to accommodate the anticipated K–5 enrollment at Emerson. In 1973–74, Emerson had 458 K–5 students; Schools 22, 16, 24 and 5 had available capacity for anywhere from 483 (Phase II) to 551 (Engineering Department) students. In addition, alternatives suggested by the district's task group contemplated either the construction of a new elementary school in the Emerson area or the reassignment of Emerson students to Schools 16 and 22, with School 16 students being reassigned to Schools 9 and 25. GX 760, at 44,941. The latter portion of this proposal in particular was considered desirable in that School 25 would be "notably improved." *Id.* at 44,944.

Despite the recognized advantages of the proposal to convert Emerson, the task group also recognized that it would be problematic primarily because of the anticipated resistance of the Emerson community to the proposal. GX 760, at 44,946–47. Specifically, school officials noted that the redistricting of Emerson Elementary School students would be "politically impossible" and would cause an "uproar" because of that community's resistance to being redistricted into neighboring school zones—Schools 16, 22, and 25—two of which (Schools 16 and 22) had previously enrolled students from the Emerson area. *Id.* School officials also expressed concern regarding the travel distance which Emer-

son Middle School students would have to endure in travelling to Commerce (maps indicate that the distance between the Emerson Middle School zone and Commerce varies from approximately one-and-a-half to four miles). School officials noted that the Emerson community would also be opposed to the creation of a high school in the area. *Id.* An additional criticism of the overall thrust of the proposal was that "the Gorton 'image' and racial imbalance are too prominent in this plan." *Id.* at 44,946.

Another proposal for alleviating the Gorton situation involved the reassignment of Gorton Junior High School students to Emerson. Alioto Dep. 71; Tr. 5221 (Morris); Tr. 5430–31 (Siragusa). This proposal was considered superior to the NYU Report's recommended use of Emerson as an expanded high school in terms of the adequacy of Emerson's physical facilities, while also preserving the previously recognized benefits of relieving Gorton of its junior high school student population. This plan, however, also would have entailed the reassignment of Emerson Elementary School students to neighboring schools in Northwest Yonkers, a proposal which, as noted previously, was viewed as problematic because of likely community opposition to such a plan.

The high school variable access proposal was equally controversial. Among the stated advantages of the proposal were the expansion of occupational education opportunities for students, improvement in the school district's racial balance, and the minimization of Gorton's negative image and the concomitant increase in West Yonkers property values. GX 760, at 44,935. Among the disadvantages recognized by school officials were the transportation burdens (time, cost, distance) involved, the elimination of the Saunders self-contained concept of providing vocational and occupational education instruction in one facility, administrative and logistical difficulties, and the anticipated community opposition to the plan and its negative impact on East Yonkers property values. *Id.* at 44,936, 44,947, 44,953. A general resistance to

change on the part of the community (and Saunders and Commerce alumni in particular) was considered an impediment to successful implementation of the variable access plan. *Id.* at 44,936; GX 761, at 42,811.

In January 1973, four public hearings were held to discuss the NYU Report proposals. The recorded summaries of these hearings reveals strong community opposition to the proposals. GX 767; P–I 57–21, 57–23. Much of the opposition concerned the proposal to close Saunders and the High School of Commerce and to decentralize their vocational and occupational education programs throughout the district's regular high schools. In particular, community members expressed concern regarding the financial burdens which the decentralization of vocational and occupational programs would entail, as well as the transportation burdens which would be involved with respect to the proposed use of Saunders as an area occupational center. Similar transportation concerns were expressed with respect to the variable access component of the plan and the proposed conversion of School 5 from an elementary to middle school facility.[130] Written statements and notices of community members also reflected concern with the perceived "mass busing" called for by the Report. GX 765, 766, 769. This expression of opposition to busing was consistent with the Roosevelt High School (5% minority) community's expression of opposition two years earlier to the possibility of busing Roosevelt students to Lincoln High School (1% minority). SB 861.

Some recognition of the variable access proposal's racial implications was expressed at the hearings. One parent interpreted the proposal simply as an attempt to improve racial balance. Another Northeast Yonkers resident suggested that high schools be paired on a north-south, rather than west-east, basis, based on the perceived lesser transportation burdens of such an alternative. P–I 57–23, at 44,660. While this suggestion was not explicitly race-related, most Northeast Yonkers residents would have endured a relatively lengthy trip regardless of the direction of transportation under the variable access plan. Although one reason for this suggestion may have been the perceived disparity in the educational quality of the district's East and West Yonkers high schools, Tr. 5217–23 (Morris), another parent recognized that "[i]f we divide East and West there would be a large racial imbalance." P–I 57–23, at 44,662.

The proposed reorganization of Emerson and Gorton also provoked opposition from community members. Opposition was expressed at the hearings to any proposal for reassigning Emerson students to Gorton, with parents suggesting they would refuse to send their children to Gorton. GX 767, at 42,842. Opposition to this proposal was articulated in other ways as well. For example, a flyer entitled "SAVE EMERSON" warned that converting Emerson into a secondary school for Emerson and Gorton students would mean that *"Students who attend Gorton would, therefore, come to the [Emerson] school,"* GX 768 (emphasis in original), and that Emerson Elementary School students would be reassigned to Gorton or other schools in the area. *Id.*

The racial component of the opposition to the Emerson/Gorton reorganization proposals was recognized by several witnesses at trial. Board members recognized that racial concerns existed with respect to the proposed Gorton/Emerson redistricting, a concern which was consistent with the racially related concerns arising out of the redistricting of primarily white Homefield students to Gorton as part of the 1973 school reorganization. Tr. 5057–58 (Jacobson); Tr. 5509–10 (Minervini). PTA President Susan Morris also noted that racial opposition to the NYU Report proposals existed particularly with respect to the Northwest Yonkers redistricting proposals. Tr. 5221–22. Board member Rosemarie Siragusa supported the proposed transfer

---

130. The proposed conversion of School 5 was also criticized by school officials and community members based on the perceived physical inadequacy of the facility as a middle school. GX 760, at 44,936; 765; 769.

of Emerson and Gorton students to a new Commerce Middle School but recognized the community opposition to that proposal, opposition which was expressed in terms of the safety of Emerson students having to travel to that area of the city as well as the lower academic standards which these students would experience as a consequence of that proposal. Tr. 5430–37.

Two weeks after the last public hearing on the NYU Report, Superintendent Alioto presented his 1973 Reorganization Plan to the Board. GX 114. In general, the Plan contained the least drastic and most segregative proposals which had been suggested both in the NYU Report itself and as alternatives to the Report proposals. The Plan recommended reorganizing the school district's grade structure to a uniform K–5, 6–8, 9–12 system, along with the addition of a pre-K program in the district's elementary schools. The Plan rejected the NYU Report's variable access approach to expanding vocational and occupational education opportunities. Instead, the Plan provided for the rehabilitation of, and additions to, the district's high school facilities (including Saunders) and the placement of a limited number of additional vocational and occupational programs in each of the district's regular high schools. The Plan recommended the addition of automotive shops and commercial lab space at Gorton, the addition of five occupational facilities and rehabilitation of science labs at Roosevelt, and the addition of occupational and automotive shops at Lincoln. According to the Plan, the new Yonkers High School, scheduled to open the following year, would be designed to include space for occupational facilities. As for the district's vocational schools, the Plan recommended the closing of the High School of Commerce and the decentralization of its commercial programs throughout the district's other high schools, and the rehabilitation and expansion of the Saunders facility, including the transfer of some of Commerce's technical programs (*e.g.*, data processing, food trades, fashion design) to Saunders. According to the Plan, the purpose of the occupational education proposals was to provide academic students with an opportunity to obtain "hands on" experience previously unavailable in the district's high schools and to better prepare the non-academic student for the world of work. GX 114, at 22–23.

The 1973 Reorganization Plan also proposed two significant attendance zone boundary changes and related student reassignments. First, high school students and graduating Emerson Middle School students from the predominantly white Homefield neighborhood were reassigned from East Yonkers' Roosevelt High School (6% minority) to West Yonkers' Gorton High School (24% minority). The reassignment of Roosevelt students involved the redrawing of the attendance zone boundary dividing the Roosevelt and Gorton attendance areas. The simultaneous reassignment of Emerson graduates was in part the result of this boundary change (*i.e.*, for Emerson graduates living in the Homefield area) and in part the result of the overall conversion of the district's schools to a K–5, 6–8, 9–12 grade structure (*i.e.*, for other Emerson graduates). Second, the Plan recommended that Gorton Junior High School students be transferred to the Commerce facility. The Plan did not recommend the transfer of students from any other middle school to Commerce.

Superintendent Alioto concluded by proposing a three-year period for implementation of the reorganization plan. In March 1973, the Board approved the reorganization plan. GX 114, at 2.

As a result of the district's implementation of the 1973 Reorganization Plan rather than the NYU Report proposals, the evolving segregation of the district's schools remained substantially unaltered. No student movement between the district's regular high schools was effectuated despite the recognition that racial integration would be an advantageous result of the variable access plan. The Saunders facility remained intact despite the realization that the school's physical inadequacies and screening process was presently resulting in the inaccessibility of vocational and occupational education opportunities to many

minority students. The racially balanced High School of Commerce was closed and was replaced by a predominantly minority middle school. No desegregative reorganizations were effectuated at the elementary school level, as would have occurred under some of the NYU Report proposals.

While substantive differences between the NYU Report and the 1973 Reorganization Plan give rise to some doubt about the extent to which educational motives were responsible for the rejection of the NYU Report proposals, the 1973 Reorganization Plan itself was not devoid of educational justifiability. In issuing the Plan, Superintendent Alioto noted that, in his opinion, the NYU Report "overemphasize[d] the occupational training aspect of our instructional programs" and that he preferred instead to "focus on improvements that would affect both the academic and vocational training aspects of the Yonkers educational system." GX 114, at 10. In addition, while the closing of the High School of Commerce resulted in the loss of the district's most racially balanced (21% minority) high school, the decentralization of Commerce's technical and commercial programs was a valid educational objective which benefitted all of the district's other high schools and was in fact recommended in the NYU Report. The decision to maintain the bulk of the district's vocational programs in the Saunders facility rather than distribute them districtwide is partly a matter of educational philosophy (the self-contained vocational school versus the comprehensive high school) over which school officials may and did legitimately disagree. School officials did recognize the advantage of making these programs more accessible to a larger percentage of students, the recognized lack of minorities at Saunders, and the repeatedly acknowledged physical inadequacies of the Saunders facility. The plan, however, along with Superintendent Alioto's simultaneous efforts to alleviate the racially disproportionate impact of the Saunders screening process, *see* SCHOOLS IV.C *supra*, was designed to address each of these concerns, albeit in

more limited fashion than the NYU Report proposals.

The reasons underlying the rejection of the NYU Report proposals and adoption of the 1973 Reorganization Plan, however, go beyond those which were stated in the Plan itself. Indeed, previously expressed concerns of school officials which gave rise to the NYU Report itself are somewhat difficult to reconcile with the plan eventually adopted by the Board. Both Superintendent Alioto and Board member Robert Jacobson recognized that the 1973 Reorganization Plan, in recommending the partial duplication of occupational and vocational programs in each of the district's high schools, was more costly than the NYU Report proposals.[131] Tr. 11,074 (Jacobson); GX 114, at 36. While the district's willingness to expend more than would have been required under the NYU Report is not inherently unjustifiable, it is somewhat at odds with the prior characterization of various aspects of the NYU Report as advantageous (when costs would be lower) or disadvantageous (when costs would be higher). GX 760, at 44,935–37, 44,939, 44,945. In addition, the NYU Report proposals would have afforded substantially greater opportunity for equalizing educational opportunities for students attending the academically troubled Yonkers and Gorton High Schools, particularly for students in the schools' general programs, and would have resulted in more efficient and economical facility utilization with respect to the providing of vocational and occupational education programs. Tr. 13,060–67 (Pitruzzello); GX 760, at 44,395.

The testimony of school officials is consistent with the concerns expressed at the time of the 1973 Reorganization Plan and demonstrates that the rejection of the NYU Report proposals was substantially the result of the perceived political infeasibility of its adoption and implementation based primarily on the community's opposition to these proposals. According to Assistant Superintendent Stanley Schainker, a num-

---

**131.** The cost of the NYU Report proposals ranged from $4.0 to $7.3 million; the 1973 Re- organization Plan carried an estimated cost of $9.8 million. GX 114, at 40.

ber of City Council members, in addition to community members and Saunders' staff and alumni, opposed the NYU Report recommendations, particularly the proposed conversion of Saunders into an area occupational center and the decentralization of its vocational and occupational programs. Schainker Dep. 39–45. Both Schainker's and Superintendent Alioto's description of the extent to which political considerations were taken into account in the administration's formulation of the 1973 Reorganization Plan reflect that the rejection of the NYU Report proposals was based in significant part on the perceived inability of obtaining City Council budgetary approval of the plan. Alioto Dep. 42; Schainker Dep. 44; *see also* GX 170. Their testimony also demonstrated that political considerations influenced not only the district's proposals concerning Saunders, but also the entire reorganization plan, in that the administration concluded that its insistence on widely unpopular proposals, apart from their educational merit, would endanger all other aspects of the plan. Alioto Dep. 41–43; Schainker Dep. 40–45.

The desegregative consequences of the NYU Report proposals were recognized both as an advantage and an impediment to their implementation. The racial implications of student movement between East and West Yonkers high schools were recognized by school officials as well as community members. Community members repeatedly voiced their opposition to "mass busing" even though the NYU Report proposals entailed no mandatory or involuntary student reassignments and even though many students were currently using similar methods of transportation to attend high school. Although the interschool transportation called for under the variable access proposal was characterized as unnecessarily disruptive and burdensome and was consistent with previously expressed community opposition to non-desegregative busing, several school officials who were involved in the evaluation of the NYU Report proposals and were present at

the public hearings concluded that opposition to the student reassignment provided for under the variable access proposal was also race-related in nature. Tr. 5222–24 (Morris); Tr. 5057–58, 11,073–74 (Jacobson); Alioto Dep. 45; Schainker Dep. 100–02; *see also* Tr. 4189–91 (Carman).[132] Schools officials also acknowledged that such concerns influenced the school district's rejection of the NYU Report proposals and its adoption of the 1973 Reorganization Plan, despite the recognized educational and fiscal validity of the NYU Report proposals. Tr. 5057–58 (Jacobson); Schainker Dep. 101–02.

Other concerns, although expressed in neutral terms, also carried with them race-related implications or overtones. Concerns regarding the decreased quality of education that would have resulted from the west to east movement of students, Tr. 5220 (Morris), while normally somewhat difficult to accept as entirely race-neutral, are even less credible in the context of the variable access proposal, where voluntary interschool movement of students would have occurred for purposes of receiving instruction in occupational and vocational education courses, rather than in traditional academic subjects such as English or math where disparities in achievement levels (as measured by achievement test scores) have existed among white and minority students in Yonkers public schools.

Another reason for the rejection of the NYU Report variable access proposal was the educational disparity between East and West Yonkers schools and the consequences which school officials believed would flow from implementation of a variable access plan in light of this disparity. Superintendent Alioto recognized the possibility that implementation of the variable access plan at that time would have resulted in white flight from Yonkers public schools. According to Alioto, given the disparity in the educational quality of the district's high schools, the movement of students from East to West Yonkers schools would have resulted in the "aban-

---

**132.** This opposition to busing, in the context of a variant of the magnet school concept, also bears relevance in evaluating the sincerity of

facially race-neutral community opposition to the Phase II reorganization plan. *See* SCHOOLS IV.F.3 *infra.*

donment of the public schools by the middle class and, therefore, would be counterproductive." Alioto Dep. 46–47. This concern was particularly evident with respect to the proposed Roosevelt-Gorton tier, in view of the recognized inadequacy of Gorton's general program as well as the recent disturbances at the school. While some of the disruptiveness at Gorton was remedied by removing junior high school students from the school, it cannot be said that the administration's evaluation of the community's perception of Gorton, and the likely consequences of this perception, was unreasonable; the existing disparities in the non-curricular aspects of the educational programs at Yonkers high schools made Alioto's assessment of the likely community response to the variable access plan a realistic one.

The record as a whole persuades this Court that at the time of the adoption of the 1973 Reorganization Plan, the Board's acts and omissions were designed in part to delay any comprehensive attempt to alleviate racial imbalance until such attempts could more readily be accepted by the community. The 1973 Reorganization Plan can best be characterized in the words of its principal drafter, as a comparatively limited, non-desegregative "first step" in reorganizing the structure and equalizing the educational opportunities afforded in the Yonkers public schools. Alioto Dep. 47; see also Tr. 5058 (Jacobson). The extent to which the Board's conduct in this instance represents part of a consistent and deliberate pattern of perpetuating racial imbalance rather than a sincere effort to improve the chances of achieving successful school desegregation in future years is more meaningfully evaluated by examining the Board's subsequent encounters with proposals for desegregative reorganization of the Yonkers public schools.

The overwhelming weight of credible evidence demonstrates that the Board's decision to transfer Gorton Junior High School students to Commerce was a known segregative act. The contemporaneous statements and testimony of school officials establishes that absent the reassignment of Emerson Junior High School students to Commerce, the new Commerce Middle School was very likely to be a predominantly minority school. Tr. 5437 (Siragusa); Tr. 12,660–62 (Dodson); see also GX 760, at 44,936, 44,938, 44,939; GX 762, at 42,820. Although Superintendent Alioto testified that there was a "good opportunity to integrate" Commerce upon its opening, Alioto Dep. 73–74, this conclusion was based primarily upon the school's previous ability, as a districtwide occupational education high school, to attract a substantial white female population to the school's special technical programs and is somewhat inconsistent with his earlier recognition that his staff had concluded that Commerce would be a predominantly minority school. See id. at 70–71. In any event, this testimony is not consistent with the weight of other evidence demonstrating the administration's contemporaneous recognition that the reassignment of Gorton Junior High School students to Commerce would result in the creation of a predominantly black school.[133]

---

133. In this connection, we reject Dr. Armor's conclusion that the Commerce opening and related attendance zone changes were significantly desegregative. Dr. Armor's conclusion rests on the fact that the Commerce opening and subsequent reassignments from Hawthorne and Longfellow resulted in four schools which were more similar in terms of percentage minority enrollment (Commerce–70%, Fermi–41%, Hawthorne–59%, Longfellow–76%) than was previously the case (Gorton–54%, Fermi–40%, Hawthorne–36%, Longfellow–79%). (The Hawthorne 36% figure may have been somewhat understated due to the possible miscount of hispanics as whites. Tr. 11,944 (Armor). Even making the unlikely assumption that no demographic changes occurred during 1974, however, Hawthorne's minority enrollment prior to the Commerce opening would not have been farther from the districtwide average than its minority enrollment subsequent to the Commerce opening). First, this analysis fails to recognize the impact, in terms of community perceptions and racial identifiability, of opening an additional predominantly minority school in Southwest Yonkers—a problem which was anticipated by school officials prior to the school's opening, was noted by school officials and community members at various times subsequent to its opening, GX 556, 557; Tr. 12,647 (DiChiaro), and eventually led to its closing, Tr. 4629 (Robitaille). Second, the above percentages reflect

Commerce did in fact open in 1973 as a predominantly minority middle school, with a 53% minority enrollment (as compared to Gorton Junior High School's 41% minority enrollment the year before, and the 22% districtwide average). During Commerce Middle School's first year, the facility housed both reassigned Gorton Junior High School students as well as students still attending the High School of Commerce's occupational education programs. The middle school's attendance zone was the same as Gorton's previous junior high school boundaries.

One year later, Commerce Middle School's attendance zone boundary was expanded southward, extending as far south as the Getty Square area in the heart of Southwest Yonkers. As a result, additional students from the Longfellow and Hawthorne attendance zones were reassigned to Commerce, a decision which foreseeably aggravated the already significant racial imbalance at Commerce. GX 557. At the same time, the High School of Commerce was finally closed and its occupational programs were distributed to the district's regular high schools and to the Saunders Trades and Technical High School. Commerce's minority enrollment increased in 1974 to 70%, and subsequently increased to 77% by 1975–76, the year in which the Board decided to close the school.

The extent to which the opening of Commerce Middle School was an *intentionally* segregative act requires a more detailed inquiry into the alternatives considered and rejected by the Board. As an initial matter, we note that the decision to remove Gorton's junior high school students from the Gorton facility is not a matter of dispute. Based on the increasingly negative image of Gorton and the fact that the disturbances at the school were partly the result of the presence of junior high school students at the facility, the Board conclud-

ed that the reassignment of Gorton's junior high school students elsewhere in the district was necessary. What is disputed, however, is the manner in which these students were reassigned.

The proposed reassignment of all of Gorton's and Emerson's junior high school students to Commerce and the conversion of Emerson into a high school facility was recognized as troublesome in a number of race-neutral respects. The conversion of Emerson into a high school facility for Gorton High School and graduating Emerson Junior High School students was uniformly recognized as problematic based on the inadequacy of the Emerson facility as a high school. This proposal would also have been problematic in view of the substantial increase in the number of students who would have been enrolled at the school. While Emerson enrolled 1,296 students (618 in elementary school) in 1972–73, Emerson would have had a high school enrollment of approximately 1,400 students the following year (the enrollment at Gorton High School in 1973–74) under the aforementioned proposal. Additionally, the reassignment of Emerson Middle School students from the northernmost portions of the Emerson zone would have entailed a travel burden, in terms of both distance and terrain, which would have been among the most burdensome in the district. SB 627; GX 760, at 44,946. (The additional travel distance for students reassigned from Gorton to Commerce was relatively small in comparison). Finally, it is unlikely that community opposition to the closing of Emerson Elementary School and the reassignment of its students to neighboring schools was related to race. Portions of the Emerson Elementary School zone had previously been included in the attendance zones for Schools 22 and 16, both of which were still virtually all-white (99% and 97%, respectively) in 1972–73. Schools 5 and 24 also were predominantly

that each school (other than already heavily minority Longfellow) became more, rather than less, racially imbalanced when compared to the 22% minority districtwide average enrollment. Third, Dr. Armor acknowledged that because of the intraschool focus of his analysis, that is, how schools' racial enrollments changed rela-

tive to each other, his analysis would have yielded an even greater desegregative effect had fewer whites been involved in the above reassignments and had each of the aforementioned schools thus emerged with minority enrollments of 70%, 65%, 65%, and 76%, respectively. Tr. 12,101–03.

white (14% and 24% minority, respectively) and relatively free of the educational inadequacies of many Southwest Yonkers elementary schools; reassignment to either of these schools was thus unlikely to engender significant race-related opposition. Only to the extent that reassignment of Emerson students to School 25 (63% minority) was anticipated would a significant potential have existed for race-related community opposition to the closing of Emerson Elementary School.

The difficulties which attended the above proposal, however, do not similarly explain the Board's refusal to implement other feasible alternatives to the creation of an additional racially imbalanced middle school in Southwest Yonkers. The proposed reassignment of a portion of Emerson's 8% minority junior high school student population to Commerce would have substantially reduced the segregative effect of the Commerce opening and would have obviated any need to redraw the Longfellow or Hawthorne attendance zones so as to assign additional students to the underutilized Commerce facility. Under this proposal, the Emerson facility could have continued to operate as a combined elementary/junior high school facility and thus would have avoided the substantial community opposition either to closing the elementary school or to converting Emerson into a high school facility. This proposal also would have avoided the capacity and facility-related difficulties of converting Emerson into a high school facility; Gorton could have continued to serve, as it in fact did, as the Northwest Yonkers high school. Travel-related burdens of Emerson students reassigned to Commerce could also have been minimized by reassigning only those students living in the southernmost portion of the Emerson Junior High School zone. The distance which such students would have had to travel to attend school at Commerce would have been considerably less than that travelled by many of East Yonkers' Whitman, Burroughs and Twain junior high school students at that time. In light of the above, it is reasonable to infer that race-related concerns of the community contributed to the failure to implement this proposal. Tr. 5221–22 (Morris); Tr. 5509–10 (Minervini); see also Tr. 5057 (Jacobson).

The decision to reassign Gorton students to Commerce, rather than Emerson, is also difficult to credibly explain without regard to the obvious racial consequences of such a decision. While Emerson may have been considered inadequate as a high school facility for an increasing number of students, we are not similarly convinced that this facility would have been inadequate as a middle school for a lesser number of students. The school was originally designed to be convertible into a junior high school facility, SB 851, was recognized as a beautiful and spacious facility by at least one Board member, Tr. 5431 (Siragusa), and was considered an "excellent junior high school facility" by members of the Gorton community as well. GX 605 (1967 letter to Board). The repeated proposals, made by school officials and community members alike, to close Emerson Elementary School and convert Emerson into an exclusively middle school facility also suggest that the 1973 proposal to reassign Gorton students to Emerson was feasible. See, e.g., GX 98, at 16 (1977 Phase II proposal), 750 (1977 proposal by Director of Pupil Personnel Jerry Frank), 779 (1976 proposal by Yonkers NAACP President Winston Ross). We are thus not persuaded that Emerson was unsuitable as a middle school facility and thus unable to accommodate the reassignment of Gorton students to that school.

The alternative of reassigning Gorton students to Emerson was also feasible from a capacity standpoint. From 1967 to 1972, the Emerson facility housed over 1,300 students every year, reaching a high of 1,394 students (699 elementary, 695 junior high) in 1967. Under the aforementioned reorganization proposal, Emerson's enrollment would have decreased from 1,286 to approximately 1,000 students (the combined middle school enrollment at Emerson and Commerce for 1973–74), with a probability of further decreases in future years due to anticipated overall declines in student enrollment. GX 115, at 125. To the extent that Emerson would neverthe-

less have been overcrowded as a result of the reassignment of Gorton Junior High School students, some of this overflow could have been fairly easily eliminated by reassigning some Gorton students to the nearby, recently opened Burroughs Middle School facility, whose enrollment had declined from 1,143 (1970–71) to 731 (1972–73).

The district's desire to avoid the additional "tensions" which the proposed reassignment of Gorton students to Emerson might have created, Alioto Dep. 71, is not inconsistent with the conclusion that racial concerns were a factor in the Board's failure to adopt this proposal. On the contrary, a number of subsequent incidents which occurred at Emerson confirm the existence of such concerns and their recognition by school officials. During the year in which the Board approved the 1973 Reorganization Plan, over one-third of the fifty-four minority students at Emerson Middle School were transferred to Burroughs in response to race-related concerns of the Emerson community regarding the presence of minority students at the school. According to Superintendent Alioto and James Barrier, this transfer was effectuated for the purpose of insuring the safety of minority students who had been enrolled at the school in light of altercations which had occurred between students at the school and the Emerson community's opposition to the attendance of minority students at Emerson. Tr. 4333–38 (Barrier); [134] Alioto Dep. 67–68. While these minority students were assigned to predominantly white Burroughs Middle School (9% minority) in Central Yonkers, the segregative nature of the reassignment insofar as Emerson was concerned was consistent both with the school district's recognition of race-related resistance to any significant integration of Emerson students with minorities from the West Yonkers area, and with the race-related tensions which arose at Emerson three years later when minority students from Commerce were reassigned there. Tr. 2562–65 (Guzzo).

Superintendent Alioto's testimony that the reassignment of Gorton students to a separate facility was designed to provide them with an improved educational opportunity is not a persuasive explanation for the segregative opening of Commerce. First, this explanation is troublesome in light of the anticipated predominantly minority nature of the school and the attendant educational problems which typically existed at such schools—problems which Alioto recognized with respect to other Southwest Yonkers schools, Alioto Dep. 47–49, and which were quick to materialize at Commerce itself. GX 559, 561. Second, the primary reason underlying the removal of Gorton Junior High School students from the Gorton facility was the undesirable mixture of junior and senior high school students in the same school; the reassignment of Gorton students to Emerson would not have resulted in a similar problem. Third, there is little evidence to suggest that Gorton students would not have received an improved educational experience at Emerson. Finally, Alioto's explanation does not dispel the otherwise persuasive showing that racial considerations were a significant impediment to the reassignment of Gorton students in any desegregative fashion.

---

**134.** As Barrier described it, he received

[c]alls from parents, white parents. It is amazing how if you hold a position as special assistant or special consultant people somehow or another, I mean, just assume that you're white. So they told me a number of things about what was happening, I mean, and what those monsters were doing up there.

Tr. 4334. In describing a subsequent meeting at Emerson attended by hundreds of community members, Barrier recalled that the topic of discussion was

what can we do to bring back, I mean, our old Emerson High School to what it used to be.

Now, I don't know what it used to be, I mean, at the time before we had not had black students, that many black students, I mean, to have involvement.

Tr. 4336. According to Barrier, Runyon Heights minority students told him

that on their way home, I mean, people tried to run them off the road ... everyday, I mean, there was somebody attempting to run them over, I mean, on the highway when they were on their way home, and I think the black students themselves had fear, I mean, that they were going to be hurt.

Tr. 4338.

The Board's reliance upon two educational report recommendations in adopting the proposal to move Gorton students to Commerce does not compel a contrary conclusion. The NYU Report itself regarded the plan in which this particular proposal was contained (Plan III) as the "least desirable" plan because of its inconsistency with the educationally-related proposals suggested elsewhere in the report. GX 115, at 52. More significantly, neither this report nor the 1969 Master Plan for Occupational Education, GX 646, considered the racial impact of such a proposal, the potential community opposition to such a proposal and the reasons therefor, or the Board's reasons for implementing this proposal as against feasible alternatives.

█ In sum, we find that racial factors played a significant role in the Board's segregative opening of Commerce Middle School. *Cf. NAACP v. Lansing Board of Education, supra,* 559 F.2d at 1055–56; *Arthur v. Nyquist, supra,* 415 F.Supp. at 934–36. The opening of the Commerce Middle School certainly did not reverse, and indeed the reasonable inference is that it reinforced, the image of Southwest Yonkers schools as inferior and predominantly minority schools, particularly in the minds of Northwest Yonkers residents whose children avoided attending school with the former Gorton Junior High School students for several years longer than would otherwise have been the case. The opening of Commerce Middle School was consistent with other segregative actions—the rezoning of white students from School 1 to School 22; the transfer of Runyon Heights students from Emerson to Burroughs; the pattern of segregative attendance zone changes between Schools 16 and 25—which preserved for many years the ability of Northwest Yonkers students to attend virtually all-white public schools.

The Board's decision to redistrict the Homefield neighborhood is not inconsistent with our findings with respect to both the segregative opening of Commerce and the rejection of the NYU Report's variable access proposal. The stated reasons for the Homefield redistricting related to improving educational and program coordination and alleviating overcapacity at Roosevelt. GX 744; SB 167. The overcapacity explanation is confirmed by numerical evidence: in 1972–73 Roosevelt had 1,901 students and was thus surpassing its recommended capacity; Gorton, on the other hand, had only 945 high school students and substantial space as a result of the reassignment of its junior high school students to Commerce. Other evidence suggests that the redistricting was also designed as a desegregative measure. A school administration task group recommended a similar redistricting proposal as an alternative to the NYU Report, an alternative which was considered advantageous from a desegregative perspective. GX 760, at 44,941, 44,944, 44,-948 (redistricting Roosevelt students to West Yonkers schools "gets more whites into the districts. The only way to save the west side of the city from turning entirely black ...."). Two school officials similarly recalled that the Homefield redistricting was implemented in order to improve the racial balance at Gorton. Tr. 2535 (Guzzo); Tr. 9839–40 (Minervini).

The Homefield redistricting, however, was not fully implemented the following year. Although the boundary lines for North Yonkers high schools were redrawn in 1973, the district allowed some students to continue attending Roosevelt the following year. Thus, while seventy-two students from the Homefield area attended Gorton in 1973–74, thereby reducing the racial imbalance between North Yonkers' high schools, sixty students continued to attend Roosevelt, and thirty-seven of them attended despite the district's normal policy of permitting only "last grade" students—here, seniors at Roosevelt High School—to continue attending their former school in the aftermath of a school zone change. Tr. 13,444–45, 13,450–51 (Frank). While no direct evidence was offered to explain the district's reasons for this policy departure, community members had strongly opposed the redistricting, citing a variety of concerns including transportation burdens, disparities in educational quality, and the types of students who attended Gorton.

GX 191, 575, 579.[135] Several school officials also acknowledged that residents of the Homefield community had expressed what they considered to be partly race-related concerns regarding this redistricting plan. Tr. 5060-61 (Jacobson); Tr. 9839-40 (Minervini); see also Tr. 4421 (Butler). Thus, although the effect of this policy departure was relatively short-lived—only eleven or twelve students with Homefield addresses[136] have attended Roosevelt rather than Gorton since 1973 (Tr. 13,444-48 (Frank)), the delayed implementation of this reassignment is consistent with the Board's contemporaneous rejection of all other desegregative, more comprehensive reorganization proposals for Yonkers public schools.

### 3. Phase II

The Board's most serious consideration of a proposal to desegregate the Yonkers public schools began in 1977 when Superintendent Robitaille's administration introduced the "Phase II" reorganization plan. This plan was designed to address the many problems, including racial imbalance, that remained largely unresolved after the implementation of the district's fiscally motivated school closings of the previous year. In order to properly evaluate the reasons for the Board's failure to adopt the desegregative aspects of Phase II, and the nature of the community opposition allegedly responsible therefor, a detailed description of Phase II is in order.

The Phase II plan was designed to address a variety of problems afflicting the Yonkers public schools: financial constraints resulting from the fiscal crisis of the prior years; a continuing decline in student enrollment within the district, due primarily to the declining birth rate of the last several years and the loss of students to private and parochial schools; the resulting underutilization of school facilities within the district; and racial imbalance throughout the school district.

The plan's recognition of the multifaceted problems affecting the school district mirrored the recommendations of the Task Force for Quality Education which, in June 1977, issued its final report. The report recognized the racial segregation of many of the district's schools and attributed this fact to "segregated housing patterns, socioeconomic deprivation, and systematic racism," GX 938, at 2, the last of which referred to societal attitudes. Tr. 8518 (Keith). The Task Force urged the Board to consider the school district's fiscal, enrollment and racial problems "not as separate problems, but symptoms of the ailment of a troubled school district." GX 938, at 7. The methods recommended for reducing racial imbalance included redrawn attendance zone lines, school closings (including the use of district-provided transportation for reassigned students), feeder schools (so that elementary school students could all attend the same middle and high school), specialized high schools, human relations workshops, and increased hiring of minority faculty and staff. Id. at 7-11.

The brief history of the Task Force was marked by events which presaged the overwhelming community opposition to Phase II. The initial announcement of the committee's formation excluded any mention of integration based on a determination by Task Force members that its inclusion would arouse community hostility towards the Task Force's efforts. Tr. 3695 (Ross). The Task Force held numerous public meetings during December 1976 and the early months of 1977 despite similar concerns regarding the community opposition which such meetings might engender. Tr. 3748-

---

135. This opposition also was manifested in the form of false addresses being used by reassigned Homefield students in order to avoid attending Gorton High School, as well as the use of psychological reasons as a basis for requesting an out-of-district transfer back to Roosevelt. These practices were fairly limited, Tr. 4420 (Butler) (about 20 students); Jungherr Dep. 8-9 (five to 20 students), and prompted the district to seek legal advice in an attempt to prevent the improper use of false addresses by Homefield students, GX 574; Tr. 13,462-63 (Frank), and thus do not constitute independent evidence of Board acquiescence in segregative community opposition to the Homefield redistricting.

136. This number does not include Homefield students who used false addresses in order to attend Roosevelt rather than Gorton. Tr. 13,463 (Frank); see fn. 135 supra.

50 (Ross). At these meetings, the anticipated resistance materialized. In addition to expressions of community opposition to busing, GX 935, East Yonkers community members expressed concern that the transfer of West Yonkers students to their schools would lead to a decline in educational standards and student achievement and would create disciplinary problems in their schools. Tr. 3613 (Ross, Task Force member); Tr. 5381–82 (Tobin, Task Force member); Tr. 12,978–80 (Dodson). Written concerns were also expressed to school officials that the Task Force was unduly concerned with racial imbalance and not sufficiently interested in improving the overall quality of education in Yonkers public schools. P–I 59–43, 59–44. In general, the work of the Task Force was greeted with less enthusiasm and support as time progressed, due primarily to the school district's fiscal emergency, *see* SCHOOLS IV. A.3.b *supra*, and changes in Board personnel, *see* SCHOOLS V.C *infra*. Upon issuing its report in June 1977, the Task Force was discharged.

In August 1977, Superintendent Robitaille and his administrative staff issued the "Phase II School Reorganization" plan. GX 98. Phase II incorporated some of the Task Force's recommendations [137] and, like the Task Force's Report, recognized the interrelationship between the school district's fiscal, enrollment, utilization and racial problems. The plan's recommendations included:

(1) a reorganization of the district's schools from a K–5, 6–8, 9–12 to a K–6, 7–8, 9–12 grade structure, (*i.e.*, moving sixth graders back into the elementary schools), a proposal designed in part to better utilize the district's school facilities;

(2) the closing of three of the school district's seven middle schools (Longfellow, Fermi, Burroughs) and the concomitant elimination of the K–6 portion of the Emerson Elementary/Middle School—recommendations made possible by the proposed grade reorganization described above;

(3) the relocation of the Saunders Trades and Technical High School to the Burroughs Middle School facility, a proposal prompted by the physical inadequacies of the Saunders facility and the infeasibility of constructing a new Saunders facility;

(4) the closing of School 6 (98% minority), with a concomitant northward expansion of its attendance zone and reassignment of its students to underutilized elementary schools for purposes of improving racial balance; and

(5) the Yonkers Plan for school desegregation.

The Yonkers Plan was based on the significant imbalance in racial enrollments and in school utilization. Superintendent Robitaille and his staff acknowledged that the district's general policy of assigning students on a "neighborhood school" basis had resulted in the racial imbalance of many of the district's elementary schools. The plan also noted the degree of flexibility inherent in the neighborhood school concept, stating that the concept was not definable by school capacity, by the size of a school's student population, by the geographic area served by a school, by the student's ability to go home for lunch, or even by the distance between the school and the student's home. In addition, the plan emphasized the inefficiency of the district's facility and staff underutilization and the fiscal consequences of these conditions.[138] GX 98, at 24–27.

137. Phase II did not include Task Force recommendations concerning special high school programs. It did, however, recommend the closing and relocation of Saunders, a recommendation which, as noted in text, *infra*, the Board eventually adopted and implemented.

138. The report stated:
 Sometimes one defines the neighborhood school as that area currently being served by a particular elementary school, but that raises several interesting points. At one time this city was served by a handful of schools; as the population increased, additional schools were built. When that happened, district lines changed, generally without fuss for one had a new building to attend. During the 1950's and 1960's district lines were in constant state of flux as schools were built to take care of the increase in school population. Now that the reverse is true, should not the reverse happen and district lines be modified when unneeded schools are removed from use?

Under the Yonkers Plan, elementary and middle school attendance zones were to be redrawn so that each school would have a maximum of fifty-five to sixty students per grade, or approximately 500 students per elementary school; the size of each school's attendance zone would thus be determined by the relative population density surrounding each school. Students residing inside a redrawn school attendance zone boundary would be assigned to the school contained within that boundary. Students residing outside the redrawn boundary would be transported by the district to another school so as to positively affect the racial balance of the receiving school. *Id.* at 28. The plan noted that under state law, the state would reimburse the City for 90% of the costs incurred in transporting elementary and middle school students assigned to schools more than one-and-a-half miles from home. *Id.* The anticipated result of the plan was more effective utilization of school facilities through the substantial elimination of over-utilized and underutilized schools, and the reduction of racial imbalance among elementary and, through feeder patterns, middle and senior high schools as well. The plan recommended that the district obtain professional consulting and computer assistance in order to designate specific students for reassignment. *Id.* The plan did estimate, however, that 20% or less of Yonkers' elementary public school students would be directly affected by the transportation plan. *Id.* at 28, 31.

The financial benefits of the Phase II plan were considerable. Phase II contemplated substantial savings in addition to those achieved through the school budget reductions of the prior year. According to the Phase II proposal, the 1976 closing of seven schools would save the City an esti-

mated $17,500,000 over a ten year period. The proposed closing of Saunders and conversion of Burroughs into the district's vocational school entailed estimated expenditures totalling $2,500,000, or $17,500,000 less than the cost of constructing a new Saunders facility. According to the plan, the remainder of the Phase II proposals would result in net savings of $28,650,750 over a ten year span, stemming primarily from the recommended school closings and resulting consolidation of educational staff. Transportation costs arising out of the Yonkers Plan were estimated at $400,000 per year, 90% of which would be reimbursed by the state the following year. GX 98, at 22. These financial benefits were virtually unquestioned by the Board and were not a source of significant controversy during the consideration of Phase II. Tr. 11,764 (O'Keefe).

The several months between the August 1977 issuance of Phase II and the March 1978 public hearings on the report were marked by what can best be characterized as overwhelming community opposition to the plan. Among the several recommendations included in the Phase II report, the Yonkers Plan was clearly the primary object of attention. The manner in which community sentiment was expressed was multifaceted—a flyer proclaiming opposition to the proposed busing of minority students into East Yonkers schools and East Yonkers students into Southwest Yonkers schools (GX 903); letters warning that Phase II would lead to white flight from East Yonkers neighborhoods (GX 832, 838) ); a boycott of the schools in protest of the busing aspect of Phase II (GX 845); and written reports of various community groups (SB 659 (November 1977 report of Lincoln Park Taxpayers Association); SB

My point is simple and that is there is no precise definition of a neighborhood school in this country nor in this city. There is a considerable variance in size, number of classes, geographic area, distance from school, and even in cost of operation. For example, under our present setup we could have 35 children in a particular grade; that would cost us two teachers. In another nearby school we could have 55 children in the same grade and that would cost us two teachers. In the latter school we are educating 20 additional children for next to nothing! The same is true of operational costs; at the present time we have a principal and a secretary serving a school of around 300 pupils and in other school of 700 pupils we have a principal and a secretary. Obviously, one costs us much more.

GX 98, at 27.

734 (March 1978 report of Taxpayers Organization of North East Yonkers); SB 759 (January 1978 position paper of Yonkers Federation of Teachers); GX 838 (January 1978 letter of Lincoln Park Taxpayers Association President); GX 842 (February 1978 position paper of Yonkers NAACP)). Virtually all of these reports expressed strong disapproval of the Phase II plan for reasons similar to some of those expressed at the public hearings held in March 1978, including the loss of neighborhood schools and the attendant burdens of such a loss; the lack of any improvement in the quality of education as a result of the plan; and the failure to present alternatives to the busing proposal. *Cf.* GX 842 (Yonkers NAACP position paper explaining its decision to file complaint with United States Department of Health, Education and Welfare concerning racial segregation of Yonkers public schools). These reports urged the Board to consider alternatives to Phase II, including magnet schools, open enrollment plans, and voluntary busing. SB 734, at 13; *see also* SB 660, at 2 (May 1978 position paper of Citizens Committee for Quality Education). Other written expressions of opinion, however, reflected race-related opposition to the Phase II plan. GX 832 (letter to Superintendent Robitaille expressing concern that busing " 'blacks & hispanics' into our east side schools" would be detrimental to neighborhood and suggesting that Task Force be renamed " 'Racist Force us' to take our children and go!"); GX 838 (letter stating that community group was "unalterably opposed" to "compulsory (non-voluntary) busing for racial purposes as an end in itself"); GX 903 (flyer protesting busing of East Yonkers students and busing of "the black children (3,000 in number) to our neighborhood schools"); *see also* GX 616 (letter expressing opposition to busing students into Emerson Middle School).

Community members also expressed uncertainty about which students would be affected by the transportation element of the Phase II plan. Tr. 11,273–74 (Guerney). Superintendent Robitaille made efforts to alleviate this concern; specifically, he attended meetings in East Yonkers at which he explained that, based on school utilization and enrollment patterns, the transportation envisioned under the Yonkers plan would involve primarily west to east busing. Tr. 5908–09 (Robitaille); P–I 69–24. These efforts were consistent with the description of the plan's effects as reported by the Yonkers daily newspaper. GX 831.

In spite of the community's initial reaction to Phase II, the plan remained unaltered from the time of its submission to the Board to the public hearings the following spring. The Phase II plan received little formal consideration by the Board during this time. In October 1977, the Board hired an architect for the purpose of developing plans for the widely supported conversion of Burroughs into the new Saunders vocational school. SB 868. The Board held one public meeting early in 1978 to discuss the Phase II plan. Tr. 5903 (Robitaille). In January 1978, the Yonkers NAACP filed a formal complaint with the United States Department of Health, Education and Welfare regarding the racial segregation of the Yonkers public schools. SB 758; Tr. 3957–58 (Ross). The NAACP was subsequently associated by some community members with the busing proposal contained in the administration's Phase II plan. GX 845, 903. In March, Board members James O'Keefe and Seelig Lester attended a conference in Albany at which they discussed the Buffalo school district's desegregation program with Buffalo's school superintendent. Tr. 13,660 (Lester); SB 612.

During the months preceding the public hearings on Phase II, the plan's lack of detail regarding the students who would be reassigned under the Yonkers Plan was discussed by school officials. Joseph Guerney, Director of Elementary Education, attempted to determine which students would be directly affected by the Yonkers Plan through the use of a pin map, an effort which proved unsuccessful. Tr. 11,312–13 (Guerney). Although several Board members recalled that they asked Superintendent Robitaille to provide greater detail concerning this aspect the plan, Tr. 11,740 (O'Keefe); Tr. 13,581–82 (Lester), neither

the Board nor the administration employed an outside consultant to assist in developing the desired level of specificity despite Guerney's recommendation that an outside consultant be retained and the Phase II plan's own recognition that such assistance would eventually be necessary to implement the plan. Tr. 11,329–30 (Guerney); GX 98, at 28. The testimony of Seelig Lester suggests that Board members disagreed with Superintendent Robitaille over whether greater specificity would, as a tactical matter, increase or decrease the chances for generating community support for the plan. Tr. 13,616–17. The Board eventually decided to leave the plan as it was in the hopes of generating community support conditioned on greater specificity, rather than pursue efforts to develop greater specificity prior to the public hearings on Phase II.

In March 1978, the Board [139] conducted four public hearings on Phase II at secondary schools in each of the city's four geographic quadrants. GX 943.1, 943.2, 945.2. While opposition to the plan was nearly universal, the nature of the opposition was somewhat more divergent. The hearing at Fermi Middle School in Southwest Yonkers was marked by substantial opposition to several aspects of Phase II, including the proposed closing of Fermi and School 34 (Emerson Elementary School) as well as the proposed K–5 to K–6 grade reorganization. Most of the discussion, however, consisted of almost unanimous opposition to the Yonkers Plan as a means of desegrating the Yonkers public schools. Three reasons predominated: the disproportionate burden on West Yonkers students which individuals perceived to be a consequence of the plan and its related school closing proposals (GX 945.2, at 7, 8, 32); [140] a resistance to the plan's implicit recommendation that the quality of education for Southwest Yonkers students be improved

by busing them to predominantly white East Yonkers schools rather than by improving West Yonkers schools themselves (id. at 5, 14); and opposition to the assignment of students away from their neighborhood schools (id. at 4, 14, 28). Several persons suggested the use of magnet schools as an alternative to the plan's busing proposal. Id. at 9, 11, 32.

The hearing at Lincoln High School in East Yonkers was considerably more acrimonious. Much of the opposition was focused on the proposed use of busing. Numerous community members and spokespersons for various community organizations cited a variety of objections to the busing proposal, including the perception that busing would not result in an improvement in the quality of education; safety and time considerations regarding the transportation of students to and from school; and the plan's potential for interfering with a student's ability to participate in extracurricular activities or to attend after-school religious classes. A number of speakers also suggested, and criticized the Phase II plan for failing to consider, alternative methods for achieving school desegregation, such as magnet schools, open enrollment or voluntary transfer plans. Several speakers warned that the implementation of the busing proposal would lead to white flight from East Yonkers schools and that they personally would refuse to allow their children to be bused to school. Several school officials also recalled hearing comments expressing the concern that the plan would result in Yonkers becoming "another Bronx," referring to the community deterioration and slumlike conditions associated with the increased minority population in New York City's northernmost borough, located just south of Yonkers. Tr. 2491–93 (Guzzo); Tr. 11,794 (O'Keefe); Lester Dep. 62–63; see HOUSING IV.B supra. [141]

---

**139.** By March 1978, the Board, with one exception (Robert Jacobson), consisted of persons appointed by Mayor Martinelli. Two months later, Jacobson, who was generally supportive of the district's desegregative efforts, was replaced by Robert Weiner, Mayor Martinelli's former campaign manager. See SCHOOLS V.C infra.

**140.** This opposition was consistent with previous expressions of Southwest Yonkers community opposition to Phase II. P–I 60–25.

**141.** Although the transcript of the Lincoln High School hearing does not include comments referring to the Bronx, the consistent testimony of three witnesses on this point does support the

Some of the opposition to Phase II was expressed in considerably more racially hostile form. This sentiment was most often evident in the audience's treatment of the small number of speakers who spoke in favor of the plan. The Chairman of the Yonkers Human Rights Commission was booed and shouted at throughout his presentation; upon mentioning *Brown v. Board of Education,* and the need for integration in the Yonkers public schools, he was booed, shouted at and was unable to complete his statement. GX 943.2, at 11–12. An elderly black woman, upon mentioning the prospect of busing from West to East Yonkers and the idea that children should learn from one another, was booed and shouted at to such an extent that the hearing was adjourned. *Id.* at 27–28. The President of the Yonkers Council of PTAs was booed when she stated that "[t]his is the first time I can ever say that I am ashamed that I am white." *Id.* at 45.

Other opponents of the plan also expressed what can fairly be described as attitudes with racial overtones. One speaker physically cut a miniature American flag (conduct which provoked an angry rebuke from Board member John Romano, who was present at the hearing) in an effort to show that "[o]ur flag has been torn apart," alluding to the "minority flag which refuses to get into the main web of our country, our system, just like all other minorities had to do." *Id.* at 22–23. Another person spoke against the busing of School 30 students in Southeast Yonkers to other schools and noted the willingness to accept children from other areas "but with some reservations as to the total effect on the quality of education" at the school. *Id.* at

10. This opposition to the proposed reassignment of minority students to East Yonkers schools was consistent with other, more racially explicit expressions of similar sentiment at the time. *See* page 445 supra.[142]

Not surprisingly, no explicit racial epithets were used by persons making public statements at the hearing. *See Hart v. Community School Board, supra,* 512 F.2d at 50. However, several witnesses testified that they heard community members make specific racial slurs both inside and outside the hearing room, including comments referring specifically to the possibility of minority students attending East Yonkers schools. Tr. 1003 (Iannacone) (comments included "they are going to send blacks, and they are going to send niggers and they are going to send spicks out here"); 12,990–93 (Dodson) (characterizing audience comments, including "We don't want those children", as "disgusting"); *see also* Roshkind Dep. 34, 65–66. In sum, there is substantial credible evidence that a significant amount of community opposition to Phase II, as articulated in the public record and within the hearing of several witnesses at trial, was racial in nature.

As noted previously, much community opposition to Phase II was expressed in terms of opposition to "busing." Given the history preceding the Phase II proposal, opposition to busing was understandable. The Yonkers School District had ceased to provide subsidized transportation in the 1930's; thus, unlike many other cities in the country faced with the problem of racial imbalance, Yonkers was not a commu-

finding that such concerns were expressed either at the Lincoln hearing (the transcript of which is incomplete; GX 943.2, at 41), at another hearing, or at other fora during the time the Phase II plan was being considered by the Board.

**142.** This opposition to the reassignment of minority students to East Yonkers schools is not inconsistent with community sentiment expressed at the time of the 1976 school closings. The relatively greater receptivity to having additional students attend East Yonkers schools was clearly understandable at the time of the 1976

school closings in light of the considerably more drastic and undesirable alternative of having one's own school closed as a result of the district's budget cutbacks, and the possibility that assignment of additional students to East Yonkers schools would enable community members to succeed in their efforts to reopen the schools. Tr. 11,753–54 (O'Keefe). In addition, as already discussed in text, after the 1976 school closings were implemented, the Task Force began to encounter community opposition to the prospect of reassigning Southwest Yonkers minority students to East Yonkers schools.

nity in which busing was a widespread and traditionally used form of free transportation. While the use of both public and privately-contracted bus transportation at the secondary school level has been a frequently used method of travelling to school in Yonkers, the use of buses has been relatively infrequent on the elementary school level. Even in these instances, the nature and extent of such transportation has been relatively modest in comparison to some of the transportation which was contemplated under Phase II. Many of the concerns expressed regarding the proposed busing of elementary school students were similar to those expressed by East Yonkers community members who protested the 1976 closing of Schools 4 and 15, where racial concerns were not a factor in the community's opposition to the Board's school closings and student reassignments. The fact that the 1976 school closings were so adamantly opposed, while not a complete explanation of the community opposition to Phase II, is nevertheless evidence of the sincerity of the community's belief in the neighborhood school concept and of the concerns which were expressed regarding the potential loss of neighborhood schools.

Several other factors, however, persuade this Court that opposition to busing was partially pretextual in nature. First, several of the suggested alternatives to the Phase II plan also would have required transportation of students outside of their neighborhood school zone, suggesting that at least some of the race-neutral concerns which were expressed concerning the Yonkers plan were pretextual. A number of perceived problems with the Phase II plan, such as the infringement on a student's ability to participate in extracurricular activities, the time and distance aspects involved in attending a school outside of one's neighborhood, and the perceived lack of improvement in the quality of education, would have also existed under the "voluntary" busing or open enrollment plans suggested by some community and Board members.

The support expressed for desegregative alternatives to Phase II also was somewhat inconsistent with the community's previous attitude towards similar proposals in the district. The school district's initial efforts in 1970 to address the problem of racial imbalance were greeted by community resistance to the prospect of school desegregation. *See* SCHOOLS IV.F.1, IV.F.2 *supra*. The high school variable access plan recommended in the 1972 NYU Report, involving the creation of specific occupational and vocational programs at each of the district's high schools, was strongly opposed by community members in part for reasons similar to those expressed with respect to Phase II. Such opposition suggests not only that the prospect of voluntary transportation was in fact not regarded as desirable or acceptable but also that the community's endorsement of magnet schools or open enrollment plans was not entirely sincere. The community's reaction to the efforts of the Task Force was also indicative of its unreceptive attitude toward school desegregation. Although the Task Force was responsible for exploring, and in fact recommended, a wide variety of methods for desegregating the schools, the Task Force, like the NYU Report proposals, was instead equated by some with "busing", an issue which became a primary focal point of community discussion. Tr. 3612–13 (Ross); Tr. 8363 (Keith); P–I 59–36, 59–43, 59–47A.

More importantly, the aforementioned race-neutral concerns about bus transportation also cannot satisfactorily explain the East Yonkers community's opposition to west to east transportation of predominantly minority students. While such sentiment was not the universally held position of East Yonkers citizens—some receptivity to the enrollment of minority students in East Yonkers schools was expressed—the frequent expression of such opposition both prior to and during the consideration of Phase II cannot be ignored. Such opposition, moreover, was consistent with the strong, longstanding community opposition to the location of subsidized housing in East Yonkers described previously in our findings. In sum, while some of the concerns expressed regarding busing were sincerely held and non-racial in origin, we also

find that a significant amount of opposition to busing was pretextual and represented race-related opposition to the Phase II plan.

The testimony of Board members also demonstrates that community opposition was, in significant part, based on race. Although Board members generally recognized the loss of neighborhood schools as an important component of community opposition, racially influenced community opposition to Phase II was also recognized as a significant element of the community's resistance to the plan. Robert Jacobson, a past member of the Board who attended the Phase II hearings and met several times with Board members, stated that the Board believed, and that he was convinced, that the "basis of the community reaction—was racism." Tr. 5063. Quentin Hicks, the Board's only minority member at the time of the Phase II proposal, testified to his conclusion that community members, whites and minorities alike, were opposed to racial integration in any form and that "[b]lack children must learn in black schools," a conclusion which was consistent with his observations concerning community reaction to the Phase II plan. Hicks Dep. 67–70, 145–46, 217; SB 815, at 30. Even Board members who testified that they did not believe race was a significant factor in community opposition to Phase II nevertheless acknowledged that at least some of the community opposition was racially based. Tr. 11,741–42, 11,794 (O'Keefe); Tr. 13,668 (Lester).

The testimony of other school officials similarly reflects that community opposition to Phase II was racially influenced. John Guzzo, Director of Secondary Education, recalled the community's resistance to the assignment of West Yonkers students to East Yonkers schools, and stated that he was "ashamed" at the comments he heard at the Lincoln High School hearing. Tr. 2488–92. Robert Dodson, Director of Special Services, also perceived community resistance to west to east busing based on comments and remarks he heard expressed at the Phase II hearings. Although he

acknowledged that much of the publicly articulated opposition was based on an unwillingness to be bused from one's neighborhood school—a concept whose existence he questioned—much of the undercurrent at these hearings, including references to "those children" and comments which he characterized as "disgusting," convinced him that the public was generally unreceptive to relieving racial imbalance in the schools. Tr. 12,978–93. Dodson concluded that racial opposition to Phase II was substantially responsible for the Board's rejection of the plan. Tr. 13,144. The observations of Audrey Roshkind, at the time a Council of PTA's officer and subsequently a Board member, and Dominick Iannacone, former City Councilmember, led them to draw similar conclusions. Roshkind Dep. 69–74 (race was a factor in Phase II community opposition, partly based on fear of west to east busing); Tr. 1557–63 (Iannacone) (majority of Phase II community opposition racially based and similar to community opposition to subsidized housing).

Dr. David Armor, the Board's expert witness, testified that, based on his examination of the Phase II hearing transcripts and tapes, the community opposition to Phase II was similar to the Los Angeles community's opposition to mandatory desegregation, opposition which he had concluded, after a detailed study of Los Angeles citizens,[143] was based on sincerely held, nonracial factors. Tr. 11,954–79. We have a number of difficulties with this analysis and with the conclusion reached by Dr. Armor based on this analysis, namely, that community opposition to Phase II was predominantly not racially motivated. Tr. 11,-983. Dr. Armor's conclusion was based on what he concluded was substantial community support for the assignment of minority students to East Yonkers schools; the testimony of school officials, oral and written statements made both inside and outside the Phase II hearings, and the treatment of pro-Phase II speakers at the Lincoln hearing itself significantly undercut the validity

143. The study involved the direct questioning of 1,600 to 1,800 parents in order to determine both their stated reasons for opposing various

desegregation plans and the sincerity of their responses. Tr. 11,956–57 (Armor).

of this factual premise. In addition, the substantial differences between the two communities compared by Dr. Armor, for example, the geographical size of the district (and resulting incremental burdens imposed by busing),[144] further limit the usefulness of this comparison in determining the nature of community opposition to Phase II. Thus, responses which may well have had a genuine basis in fact in Los Angeles may well have been inapposite, or at least less plausible, with respect to Yonkers. Similarly, community opposition based on a fear of creating "another Bronx," while meaningless in a comparison of the Los Angeles and Yonkers communities' reaction to desegregation plans, take on particular meaning in the context of this case. This distinction becomes even more significant in light of the prior history of partly pretextual opposition to subsidized housing in areas of the Yonkers community substantially by those most vocally opposed to Phase II—a factor which Dr. Armor conceded would be relevant in evaluating the sincerity of opposition to mandatory busing. Tr. 12,539. Finally, Dr. Armor's analysis did not take into consideration more privately-expressed sentiments and school officials' perceptions of community attitudes, both of which are of importance in determining the nature of community to Phase II.

Two of the proposals contained in Phase II were eventually adopted and implemented by the Board. First, in an April 1978 meeting held shortly after the public hearings on Phase II, the Board considered a resolution to relocate the Saunders Trades and Technical High School to the Burroughs facility. Over the objections of community members who claimed that the Board's separate consideration of this Phase II proposal was a "political move" and an attempt at "evading the integration issue," the Board unanimously adopted the resolution. GX 679. Burroughs was

closed at the end of the 1977–78 school year, and Saunders was relocated to the Burroughs facility after the 1979–80 school year. Second, the Board eventually adopted a grade reorganization proposal similar to the one contained in Phase II.[145] In 1980, the district's schools were converted into K–6 elementary, 7–8 middle (except for Longfellow and Fermi, both of which continued to enroll sixth graders), and 9–12 high schools.

The Board's treatment of the desegregative components of Phase II, however, consisted of unanimous disapproval of the plan. In a May 1978 workshop meeting attended by Board members and Superintendent Robitaille, the various reasons for community and Board opposition to Phase II were discussed. SB 815, 816.1, 816.2. The opposition of Board members was based primarily on criticisms already expressed by the community, namely, the opposition to busing as a means of achieving greater racial balance and the associated problems presented by the transportation of students away from their neighborhood schools. The Board's concern with busing centered around Phase II's reliance on mandatory, rather than voluntary, means of achieving desegregation. Board members cited the widespread community opposition to mandatory busing, including the opposition of minorities, as well as its potential for encouraging further declines in enrollment, or white flight, from the schools, as the primary reasons for the plan's infeasibility. Several Board members, however, also commented on the somewhat illogical nature of community opposition to the use of such transportation *per se.* SB 815, at 21 (O'Keefe) ("the busing issue ... I find hard to understand, because I ride around this city, particularly as I ride around other communities throughout this nation, and wonder why all these yellow buses are running around. If

**144.** The City of Los Angeles is approximately 250 square miles; Yonkers is approximately 21 square miles. Tr. 12,536 (Armor).

**145.** The Board's approval of this reorganization followed the recommendation of Superintendent Raymond's Curriculum Advisory Committee and was consistent with the grade reorganization proposal set forth in Phase II. GX 87a; P–I 45–173.

there is something so immoral and dirty and bad about putting a child on a bus and sending him to school, I have to ask the question to those people who would suggest that busing somehow by very essences is immoral, bad."); 27 (Lester) ("please stop using words like 'forced busing' ... everyplace in the State of New York, young people are forced to ride on buses to get to school—not for purposes of integration—not for purposes of correcting racial imbalance, for purposes of getting to school.").[146]

Virtually every Board member also expressed preferences for other, voluntary methods of desegregation, most notably, the use of magnet schools and open enrollment plans. The educational virtues of magnet school programs were cited as the primary advantages of such plans. The discussion also reflected the Board members' perception that the process of school desegregation would have to be a slow and gradual one; the Board's discussion of magnet school programs focused on their recommended utility primarily at the high school level. *Id.* at 14 (Paradiso), 28 (Lester), 34–35 (Romano); *see also id.* at 30 (Hicks). Superintendent Robitaille noted that the magnet school alternatives contemplated by the Board would also entail transportation of students out of their neighborhood school zones, and that integration efforts which focused first on the high school level were particularly inadvisable. *Id.* at 30–31.

The Board's recognition of race-related resistance to school desegregation was limited primarily to the concerns expressed by Southwest Yonkers community members. Anne Bocik stated that minority students and administrators from minority schools "said that they would like to be with their own." *Id.* at 9. Quentin Hicks related that black parents had expressed concern about having their children transported out of their neighborhood to "roam in the white jungle on that bus" and stated that "as long as I'm on the school board I'll make sure it doesn't happen." *Id.* at 30.

On the whole, the thrust of the workshop discussion consisted of the Board's recognition of the community's unwillingness to countenance an involuntarily-imposed desegregation proposal, such as Phase II, and one which did not carry with it any perceived improvement in the quality of education.[147] No final recommendations or resolutions were arrived at by the Board prior to the meeting's adjournment. None of the desegregative aspects of the Phase II plan was formally voted on, either at that meeting or at anytime thereafter.

The most immediate causes for the Board's failure to adopt Phase II thus consisted of a recognition of the infeasibility of its implementation over the strong objections of the community and a disagreement with the administration's choice of school desegregation methods. The Board workshop meeting and the trial record reflect the Board's recognition of the strong community opposition to Phase II, opposition which largely coincided with that of the Board members themselves. Several Board members also acknowledged the importance of community sentiment in formulating their position on Phase II and in developing an alternative to Phase II's desegregative proposals. Tr. 11,770–71 (O'Keefe); GX 843, at 2 (Paradiso); SB 815, at 17, 19 (Spencer); Weiner Dep. 73, 309; *see also* Tr. 5065–66, 10,965–66 (Jacobson). Indeed, the possible recurrence of the threats and personal harassment which several Board members had experienced in

---

146. For an example of the pretextual nature of opposition to "forced busing", *see* Weiner Dep. 395–400. Weiner recognized that the hypothetical assignment of students three miles from their homes due to uneven population distribution was unobjectionable. In such a situation, students could choose from a variety of transportation options, including taking a bus; according to Weiner, such a plan would not involve "forced busing". However, when such assignments involve integrative objectives, Weiner characterized the use of buses to transport students to school in this situation as "forced busing".

147. Concerns as to the time involved in busing students to school played relatively little role in the Board's consideration of the plan. Superintendent Robitaille and his staff had concluded that the use of transportation, rather than walking, would have shortened the time required for many students to travel to school. Tr. 4698–99.

the aftermath of the 1976 school closings placed considerable pressure on the Board during its consideration of Phase II. Tr. 5313–15 (Frauenfelder); Tr. 5065–66 (Jacobson). The overall conclusion of the Board was that a voluntary desegregation plan would be more acceptable to the community and more likely to achieve the Board's stated desegregative goal.

The initial failure to implement an alternative desegregation plan was also due primarily to a conflict between Superintendent Robitaille, who claimed that magnet schools were an inadequate and ineffective means of achieving school desegregation and involved fiscal burdens which would be problematic for the district, and Board members, who stated a belief in the efficacy of such desegregative methods. Thus, in the aftermath of the Phase II hearings and the Board workshop, Superintendent Robitaille continued to favor adoption of the Phase II plan up to the time of his departure from the school district in June 1978. Tr. 4700 (Robitaille). During this time, however, school officials were also instructed by Superintendent Robitaille to investigate the use of magnet schools in other cities. These officials eventually submitted a report to Interim Superintendent John Humphrey subsequent to Dr. Robitaille's departure from the school district. Tr. 13,195–96, 13,276–77 (Dodson).

Superintendent Robitaille's departure from the district prompted an extensive search by the Board for a replacement. In the wake of Phase II's demise, the Board's stated objective was to hire an individual who was not committed to any particular desegregative method, such as Superintendent Robitaille's perceived commitment to busing, but was willing to consider a variety of approaches to the school desegregation issue. Tr. 13,079–81, 13,126–27 (Pitruzzello). After approximately nine months, the Board hired Dr. Joan Raymond, an assistant superintendent from Chicago who had been involved in integrating the faculty of the Chicago public schools, as the new Superintendent of Schools, a post she presently occupies.

The nature and extent of the Board's responsiveness to community opposition to school desegregation is discernible most clearly from the Board's acts and omissions between the time of Phase II's rejection in mid-1978 and the institution of this lawsuit two-and-a-half years later. Although Superintendent Robitaille's departure and the Board's search for a new superintendent hindered to some degree the district's ability to develop and implement desegregative school reforms, the Board, during the interim superintendency of John Humphrey (who was also a candidate for the Superintendent's position) and the superintendency of Joan Raymond, did virtually nothing either to implement any of the desegregative proposals suggested in Phase II or to develop and implement any of the desegregative alternatives suggested by the Board and community members. The failure to close either School 6 or Longfellow Middle School resulted in the perpetuation of virtually all-minority schools (99% and 90% minority, respectively, in 1978–79) even though both schools were significantly underutilized, regarded as educationally inferior and physically inadequate, and had been recommended for closing on several prior occasions. Financial considerations also clearly justified the proposed school closings; the closing of a middle school in particular would have resulted in estimated savings of approximately $100,000 per year in operating costs, or approximately $500,-000 per year in total costs. GX 98, at 22; Tr. 4679–80 (Robitaille).

We recognize that the decision to close a school is an unpopular one and that opposition to such school closings was expressed at at least one West Yonkers Phase II hearing. Yet the Board's failure to pursue such measures was in marked contrast to the Board's willingness, just two years earlier, to implement similarly cost-effective school closing proposals over substantial and similarly vigorous community opposition. While the Board was relatively steadfast in its decision to close schools in 1976 despite the strident protests of the affected communities regarding the loss of their neighborhood schools, the Board, faced with considerably less race-neutral opposition to Phase II, acted in a substantially

more acquiescent fashion despite the school district's previously acknowledged commitment to rectifying the segregative conditions left unresolved by the 1976 school closings, its prior recognition that desegregation of the public schools was an important step towards equalization of educational opportunities in the district, and the financial consequences of the Board's inaction. A primary difference between the 1976 school closings and several Phase II proposals was the clearly desegregative impact of the contemplated reassignments from heavily minority schools, a factor which appears to have increased, rather than decreased, the Board's reluctance to close admittedly underutilized and physically inferior schools. It is reasonable to conclude that the Board's persistence in failing to implement any proposal for desegregating the schools was based in part on its awareness of community opposition to the desegregative reassignment of Southwest Yonkers students which the Phase II proposals would have likely entailed.[148]

Similarly, the Board's professed enthusiasm for magnet school or open enrollment programs as desegregative alternatives to Phase II was followed by a marked absence of implementation efforts. No magnet school, open enrollment, or other voluntary desegregation plan was adopted at

any time prior to the institution of this lawsuit.[119] Seelig Lester, although a self-acknowledged proponent of magnet schools who had previously helped create such schools as a deputy superintendent of schools in New York City, failed to make any such proposals and in fact opposed an open access proposal for the Yonkers high schools in 1980. Tr. 13,677. A proposal for an open enrollment plan received no response and was not pursued. Tr. 13,186–87 (Dodson). An oft-repeated suggestion that the district close Longfellow, made again in May 1979 by Robert Dodson to Superintendent Raymond, was not adopted. GX 754. As late as the summer of 1980, community opposition to racial integration was perceived as an obstacle to school desegregation efforts in Yonkers. Tr. 13,143 (Dodson). In short, despite indications that the Board recognized the need to address and remedy the racial segregation of the school district, the Board's conduct during the two-and-a-half years subsequent to the Phase II hearings and the three-and-a-half year period following the plan's introduction, constitutes a pattern of inaction with respect to school desegregation quite inconsistent with the affirmative measures taken in the face of community opposition to the fiscally motivated school closings and budgetary cutbacks of 1976.[150]

**148.** As discussed earlier, community opposition to closing Fermi or Longfellow was also based on the perceived disproportion in transportation-related burdens which would have resulted and the suggested alternative of reassigning other middle school students to these schools. The Board's inaction with respect to both rationales is discussed in text *infra.*

**149.** In August 1980, the Board adopted a high school open access plan for purposes of improving racial balance. P–I 60–46A. In view of the subsequent failure of the district to implement this plan and this Court's exclusion of post-complaint evidence concerning the reasons for this failure, we need not consider whether the Board's initial adoption of this plan constitutes evidence of meaningful efforts to address the problem of racial imbalance.

**150.** The Board has proffered evidence concerning the implementation of a number of magnet school programs during the last three years as evidence of the sincerity of its desegregative intentions at the time of Phase II. *See* Court

Exhibit A, September 19, 1984. As noted previously, it is this Court's judgment that events arising subsequent to the institution of this lawsuit are generally best dealt with at the remedial phase absent a showing that post-complaint conduct constitutes the continuation of an identifiable pattern of action or inaction which commenced prior to the filing of this lawsuit. *See* fn. 80 *supra.* In this particular instance, we fail to see how the implementation of these programs, over four years after the Board's consideration of Phase II, is directly traceable to a pattern of pre-1980 conduct such that it should be presently considered as relevant to liability. Among the most significant intervening events occurring between the Board's rejection of Phase II and the subsequent creation of magnet schools are the institution of this action in 1980 and the rejection of a high school integration plan in 1981—events which in our opinion weigh against our finding that a meaningful connection exists between the rejection of Phase II and the implementation of these magnet school programs.

Other circumstances suggest that the nature of the Board's responsiveness to community opposition was partly race-related. The Board was aware of the considerable amount of west to east busing contemplated under Phase II and thus could reasonably foresee that Phase II was not likely to result in any significant dismantling of the neighborhood school concept, as feared by East Yonkers community members. *See* page 1496 *infra*. The Board's purported reliance on this expression of East Yonkers community opposition is thus difficult to reconcile with the predictable consequences of both the Phase II plan as a whole or some of its more limited desegregative aspects. While Southwest Yonkers residents also expressed considerable opposition to Phase II, this opposition was based not only on the potential loss of neighborhood schools but also on the perceived disproportionate burdens which would be imposed by the plan; there is little evidence, however, to suggest that the Board's failure to adopt Phase II was based in any significant part on this concern. Instead, evidence of the Board's recognition of Southwest Yonkers community opposition was more directly related to race-related considerations, considerations which cannot be relied upon as neutral reasons for failing to adopt all or part of Phase II.

The perceived absence of an improvement in the quality of education also cannot explain the Board's treatment of Phase II in light of its rejection of that plan coupled with its subsequent inaction. We have little doubt that part of the community's opposition to Phase II was based on the educational inequality between East and West Yonkers schools; apart from race-related factors, students in East Yonkers would have had little reason to express enthusiasm for attending what were widely regarded by both community members and school officials as educationally inferior schools. The Board's rejection of Phase II and its subsequent inaction, however, does not reflect a legitimate, race-neutral recognition of the educational concerns of either East or West Yonkers residents. The substantial west to east movement of students provided for under Phase II would likely have improved educational opportunities for those students previously attending smaller, more crowded and educationally inferior schools. The magnet school programs so frequently mentioned as preferable, more educationally valuable desegregative tools were noticeably absent in the years following the Board's consideration of Phase II. Other alternatives suggested by community members, such as open enrollment or voluntary transfer plans, not only were not approved or implemented but also would have presumably failed to avoid the perceived educational deficiencies of the Phase II transportation plan. The Board's failure to implement either all or part of Phase II, or any alternative plan which would have been consistent with the legitimate educational concerns of the community, undermines the credibility of the aforementioned race-neutral explanation for the Board's perpetuation of racial imbalance in the Yonkers public schools.

The Phase II plan's self-acknowledged lack of specificity does not adequately and credibly explain the Board's refusal to adopt Phase II. The community's expression of concerns regarding who would be affected by the plan does lend credence to the nonracial aspect of community opposition to Phase II: if the question of whether someone would be directly affected by the plan was considered relevant or important in determining one's reaction to the plan, such a concern would suggest that opposition was premised in part on being bused out of one's neighborhood school zone, rather than having others bused into one's school. In addition, although the plan expressly called for the closing of Southwest Yonkers' School 6, Longfellow Middle School and Fermi Middle School, and thus contemplated at least some west to east busing, the relative underutilization of East Yonkers school facilities and the retention of sixth graders in elementary school (as recommended in Phase II) are factors whose effect may not have been easily predictable by community members.

The community's expression of specificity concerns, however, does not explain the

Board's conduct with respect to Phase II. While the significance of enrollment and utilization data may not have been so easily discerned by community members, the Board was certainly aware of what was likely to be the predominantly west to east direction of student movement under Phase II. The Board recognized as a general matter that Southwest Yonkers schools were relatively crowded and that three of them were recommended for closing, while East Yonkers schools were relatively underutilized and none were recommended for closing. Tr. 11,790–91 (O'Keefe). Joseph Guerney had estimated that approximately 1,800 to 2,000 students would have been bused under the Yonkers Plan, and that the closing of School 6 (with its expanded boundary) alone would have accounted for at least 300 of those students. Tr. 11,296–97; GX 82, 83. Student enrollment and school capacity data for the following (1978–79) school year also reveals the extent to which transportation would have been in a predominantly west to east (or to a more limited extent, southwest to northwest) direction. Using the Phase II report's capacity figures, the three most underutilized elementary schools in the district (approximately 50% of capacity) were all at least 93% white schools, two in Northeast Yonkers (26, 32) and one in Northwest Yonkers (22). Of the next seven most underutilized schools (50–60% capacity), five (8, 17, 28, 29, 31) were in East Yonkers, one (34) was in Northwest Yonkers, and the only school in Southwest Yonkers operating below 60% capacity—99% minority School 6—was recommended for closing and thus likely would have been a source of west to east busing. Of the thirteen most underutilized schools (at or below 70% of capacity), only two (16, 25) were in or near Southwest Yonkers; of the six most fully utilized (at least 80%) schools, all were in Southwest Yonkers, and five of them were over 40% minority. (The exception was School 13, a 32% minority school in the southeasternmost portion of Southwest Yonkers). Thus, although the precise quantification and identification of students who would have been directly affected by the Yonkers Plan is not revealed by the above data, the overall trend is fairly clear.

The allegedly uncertain effect of retaining sixth graders at the elementary school level also does not credibly explain the Board's purported specificity-based rejection of Phase II. The likely effect of the proposed grade reorganization is consistent with the conclusion that most busing would have been in a west to east direction. Six Northeast Yonkers elementary schools (8, 26, 28, 29, 31, 32), all of which were under 60% capacity, were already K–6 elementary schools and thus would have been unaffected by the grade reorganization. In addition, the retention of sixth graders at the elementary school level would have affected Southwest as well as Southeast Yonkers elementary schools: Southeast Yonkers elementary schools had an average of sixty-eight fifth grade students (12% of their average capacity) in 1977–78 who would have remained at these schools under the Phase II plan; Southwest Yonkers elementary schools (not including School 6) had an average of eighty-one fifth grade students, also 12% of their average capacity.

Any perceived lack of specificity became a clearly subsidiary concern subsequent to the public hearings on Phase II. The issue of specificity was virtually absent from both the Phase II public hearings and the Board's May 1978 workshop meeting and was simply not pursued when community opposition to Phase II became clear. The Board's failure to resolve the specificity issue subsequent to the public hearings on Phase II, along with the far more frequent expression of substantive objections to the Phase II plan, persuade us that the Board's rejection of Phase II was not attributable in any significant way to the plan's lack of specificity.

The Board's failure to implement all or part of Phase II's desegregative proposals, or any alternatives to these proposals, is in many respects consistent with the Board's previous failure to implement desegregative reorganization proposals and the district's recognition of the community's resistance to school desegregation. Begin-

ning in 1970, the record discloses an awareness by school officials of the community's opposition to desegregation and a concomitant failure by school officials to adopt and implement educationally and fiscally sound proposals which would have helped rectify the recognized racial imbalance in the district. While the initial failure to pursue or implement desegregative school reorganization proposals was premised on the purported infeasibility of their present implementation, the refusal to implement such proposals in the late 1970's occurred in temporal and factual context which renders a finding of deliberate perpetuation of racial segregation appropriate: the increased racial imbalance among the district's schools; the increasingly visible racial opposition to correcting this condition; the increased demands for desegregative action; an increasing realization that such action was an important ingredient in eliminating disparities in educational opportunities in the district; a community increasingly afflicted by segregative governmental housing practices animated by community opposition to the presence of subsidized housing in areas outside of Southwest Yonkers; and the failure to address the problem of racial imbalance in the schools in any meaningful fashion in the years following the rejection of Phase II in a manner consistent with the Board's stated reasons for rejecting the plan. In our view, the record makes clear that the initial reluctance to implement desegregative school reorganization plans evolved into a persistent failure to adopt measures to correct recognized educational and racial imbalances in the district in part because of their desegregative consequences. From the foregoing, we find the Board's failure to meaningfully address the problem of racial imbalance subsequent to its consideration of Phase II is more readily explainable as a reflection of the community's resistance to desegregation rather than the race-neutral concerns of the community.

The only desegregative student reassignment made by the Board in the aftermath of Phase II involved the reassignment of predominantly minority Runyon Heights students to Whitman Middle School (5% minority) in Northeast Yonkers. This reassignment occurred as a consequence of the Board's decision to convert Burroughs Middle School into the new Saunders facility. The reassignment of Runyon Heights students had been anticipated by NAACP member Herman Keith, among others, before the Phase II hearings, in light of the strong community support for the relocation of Saunders to Burroughs. At a February 1978 meeting of the Advisory Council for Occupational Education, Keith (a member of the Council) expressed his concern that this reassignment would be burdensome for Runyon Heights students and urged that the Saunders proposal not be treated separately from the remainder of the Phase II Plan. GX 432. As Keith had anticipated, the Board eventually approved the Saunders proposal but rejected all of the desegregative components of the Phase II plan. Burroughs students were reassigned to Whitman and Emerson Middle Schools, with the Runyon Heights community included in the new Whitman zone.

The actual effect of reassigning of Runyon Heights students to Whitman was considerably smaller than attendance zone maps might suggest. Parents from the Runyon Heights community expressed concerns about the cost and inconvenience of attending Whitman and urged school officials to allow students from this area to attend Emerson Middle School (32% minority) instead. Tr. 11,733–34 (O'Keefe). The district, however, adhered to its original decision to reassign such students to Whitman; students who still wished to attend Emerson were permitted to apply for an out-of-district transfer in accordance with the district's general attendance policy. GX 734; Frank Dep. 244–48. As a result, minority enrollment at Whitman increased from twenty-three students in 1977 to only thirty-seven students in 1978; although twenty-four minorities who attended Burroughs in 1977 as seventh graders were reassigned to Whitman and Emerson, Whitman's eighth grade minority enrollment in 1978 was only four students greater than its seventh grade minority enrollment during the preceding year. GX 53, 64. With

the simultaneous reassignment of over 300 white students from Burroughs to Whitman, Whitman remained a 5% minority school in 1978.

The reassignment of Runyon Heights students was part of a more comprehensive reassignment of students living in the western portion of the Burroughs zone. This reassignment of Burroughs students began in 1977, prior to the development and consideration of the Phase II plan but in anticipation of the soon-to-be-proposed conversion of Burroughs into the new Saunders. First, the district reassigned Burroughs ninth graders to Roosevelt High School. GX 847; SB 810.7. Second, the district decided to eliminate the sixth grade at Burroughs: sixth graders living in the Burroughs zone attended their respective elementary schools (5, 8, 31, 32), and approximately eighty-five students residing west of the Saw Mill River Parkway in the former School 24 zone were scheduled to attend Emerson Middle School. GX 743, 750, 847; Frank Dep. 242, 269–70. Third, the district decided to reassign Burroughs' current sixth graders, approximately sixty-nine in number, to Emerson. GX 743. Thus, Burroughs was converted from a grade 6–9 junior high school in 1976–77 to a grade 7–8 middle school in 1977–78.

When Burroughs was closed as anticipated in 1978, parents from the former School 24 zone expressed conflicting preferences as to which middle school they wanted their children to attend the following year. Some parents, including members of the Runyon Heights community, wanted their children to attend Emerson (32% minority) in nearby Northwest Yonkers; other parents, residing in the westernmost portion of the former School 24 zone, asked to have their children assigned to Whitman (5% minority), located a considerably farther distance away in Northeast Yonkers on the other side of the Saw Mill River Parkway. The former group was concerned about the cost and inconvenience of having students travel over four miles to Whitman; the latter group expressed their desire that their children be permitted to attend Whitman along with the rest of their School 5 classmates who resided east of the park-

way. Tr. 2502–04 (Guzzo); Frank Dep. 244–48.

The new middle school boundary line was redrawn along the parkway, thus including the westernmost portion of the former School 24 zone in Emerson's attendance zone. At the same time, the Board granted an option to approximately sixty-five or seventy students, some of whom resided in the westernmost portion of the Burroughs zone, to attend Whitman rather than Emerson. GX 734; Tr. 2577–78 (Guzzo); Frank Dep. 258–59. While the option was expressly granted for 1978 only, a majority of the students in this area have continued to attend Whitman by obtaining out-of-district transfers to the school. GX 734; Frank Dep. 244–48, 258–59. These students also have generally continued their secondary school education at Roosevelt High School (9% minority in 1980) in Northeast Yonkers, rather than at Gorton High School (47% minority in 1980) in Northwest Yonkers. Frank Dep. 258–59.

While the option to attend Whitman rather than Emerson was segregative in its impact, racial considerations do not appear to have been a factor in the district's initial decision to grant the option. John Guzzo testified that the granting of this option was readily permitted because of the wide disparity in available capacity at the two facilities at that time. Tr. 2577. His testimony is supported by the numerical evidence of student enrollments at the two schools: in 1977–78, Emerson had 784 students, or 92% of its middle school capacity; Whitman had 480 students, or 40% (Phase II) to 47% (Engineering Department) of its capacity. The following year, a significant disparity still existed: Emerson was operating at 102% capacity, while Whitman was operating at 68% to 80% capacity.

On the other hand, neither the assignment of Burroughs students to Whitman, nor the Whitman/Emerson option, can be satisfactorily reconciled with other student assignment alternatives rejected by the Board. The willingness to assign former Burroughs students over four miles to Whitman undermines the extent to which

travel and distance concerns can satisfactorily explain the Board's persistent refusal to reassign other students in a similar fashion for desegregative purposes. These concerns are particularly unpersuasive with respect to the reassignment of students from some of Southwest Yonkers' more underutilized and physically inadequate facilities—for example, School 6 and Longfellow, which were recommended for closing in Phase II—for whom subsidized transportation would have been provided. The district's willingness to assign middle school students considerable distances from their homes primarily where such assignments bore no desegregative consequences is inconsistent with its failure to do so in circumstances where both racial and educational factors made such assignments advisable. The granting of options to attend Whitman rather than Emerson also does not explain the failure to consider transferring Burroughs students to Longfellow or Fermi, two predominantly minority and severely underutilized middle schools in Southwest Yonkers. *See* SCHOOLS IV. A.3.c *supra.* Any desegregative effect which resulted from reassigning Runyon Heights students to Emerson or Whitman was thus clearly outweighed by the segregative reassignment of other Burroughs students to these two schools.

As a result of the Board's refusal to adopt any of the desegregative proposals of Phase II, the school district's acknowledged facility underutilization, educational inequality, and racial imbalance continued. By 1980, the district's schools, now organized primarily on a K–6, 7–8, 9–12 basis, were still operating at significantly disproportionate capacities. On the elementary school level, three schools were operating at less than 50% capacity—Schools 26, 31 and 32, all of which were predominantly white schools located in Northeast Yonkers. Of the next seven most underutilized schools (all below 60% capacity), four were at least 95% white schools in East Yonkers (8, 17, 28, 29), two were 90% white schools in Northwest Yonkers (22, 34), and the seventh was School 6, a 98% minority school which remained open despite its recognized physical inadequacies, severe underutilization and racial imbalance. In contrast, of the six most fully utilized elementary school facilities in the district (over 80% capacity), all of them were in Southwest Yonkers, and four of them were predominantly minority schools (10, 18, 27, King). (The other two were School 13 (38% minority) and School 23 (45% minority)). On the middle school level, the pattern was reversed: by far the two most fully utilized facilities were Emerson (94% capacity) and Twain (89% capacity), both of which served predominantly white neighborhoods which were closer to the severely underutilized and predominantly minority Longfellow school. Twain, a 4% minority school, also served neighborhoods which were roughly equidistant to the underutilized Fermi Middle School (62% minority) in Southwest Yonkers.

The costliness of such underutilization was not, and indeed cannot be, seriously disputed. The school district administration had recognized, and the Board was aware, that each elementary school closing would have resulted in savings of approximately $200,000 to $250,000 per year; as noted previously, each middle school closing would have saved approximately $500,-000 per year, including $100,000 per year in operating costs. Tr. 4679–80 (Robitaille); Tr. 11,605 (Guerney); GX 98, at 21–22; *see also* Fareri Dep. 157–60. Given the acknowledged fiscal instability of the City and school district and the projected decreases in future student enrollment, at least some efforts to redress this condition would normally have been expected. While fiscal imprudency or inefficient management and operation of a school system is not necessarily indicative of improper intent, the present record persuasively demonstrates departures from previously followed neutral considerations and a failure to rectify recognized educational and fiscal problems primarily where racial consequences were also present. The failure to adopt either Phase II or any desegregative portion of, or alternative to, the Phase II plan, or to remedy the recognized educational and school utilization disparities within the school system, thus transcends

mere inefficiency or lack of sound educational judgment. The record demonstrates that racial factors were responsible in significant part for the Board's failure to alleviate the segregated condition of Yonkers public schools.

In sum, this Court concludes that racially related factors were in part responsible for the community opposition to Phase II and for the Board's subsequent failure to implement either this plan or any other desegregation proposal. We are fully mindful of the controversial nature of busing, the many responsible authorities who have propounded both its virtues and its shortcomings, and even legislative expressions regarding busing as an integrative tool of last resort. It is not the function of this Court to deal at this stage of the proceedings with this difficult sociopolitical and educational conflict. It is our duty, however, to determine whether the Board's conduct under the facts and circumstances of this case reflected what it perceived to be the partly racially influenced concerns or attitudes of others. Based on our review of the recorded and documented expressions of community opposition to Phase II; the testimony of Board members and other school officials regarding the nature, both actual and perceived, of community opposition to Phase II; the objectively favorable financial and utilization-related benefits of the plan; the Board's failure to meaningfully respond to and implement the alternatives suggested by the community and by Board members themselves; the previous circumstances leading up to the Board's failure to implement Phase II or any other desegregative alternative, including the integration-related pronouncements of state education authorities; the Board's inconsistent treatment of busing for non-integrative purposes; and the inconsistency or unpersuasiveness of other proffered explanations for the Board's inaction, we find that the Board's failure to implement a desegregation plan for the Yonkers public schools was prompted in part by the community's racial resistance to school desegregation. The legal consequences of the Board's failure to desegregate the Yonkers public schools is a separate issue which is discussed below in our Conclusions of Law.

## V. THE CITY

The operation of the Yonkers public school system is the legal responsibility of the Board of Education. In practical terms, however, the present condition of Yonkers public schools cannot be understood without examining the manner in which the City of Yonkers, through its elected officials, has been involved in educational affairs. A 1957 New York State Education Department study of the Yonkers public schools concluded that "[t]he people of Yonkers in actual fact have two boards of education operating their schools. The city council and manager constitute one board and the legally designated board of education the other." GX 45, at 17. The City's role in the operation of the school system and the racial consequences of the City's policies and practices concerning both housing and schools, are the subjects of the remainder of our findings.

### A. Interrelationship Between Housing Practices and School Segregation

The impact of the City's housing practices has not been limited to the perpetuation and exacerbation of residential segregation in Yonkers. Rather, the City's pattern of confining subsidized housing to Southwest Yonkers and its persistent refusal to locate such housing in other areas of the city has contributed to the perpetuation of school segregation as well.

As with the impact of the City's site selection practices on residential segregation in Yonkers, the evidence suggests that the segregative impact of the City's housing practices on the schools was not purely inadvertent, unknowing or unavoidable. While the City is not responsible for the formulation of attendance zones or student assignment policies, it cannot credibly deny its awareness of the Board's adherence to a neighborhood school policy and the segregative impact of its housing practices on the schools in light of this fact. *E.g.*, Tr. 1100 (Yulish); Tr. 2884–85, 3097–99 (Arca-

ro); GX 385. On the contrary, the City persisted in its failure to pursue desegregative housing practices, such as scattered site housing, despite the suggestions of school officials and others that such practices were necessary to avoid the segregative impact of the City's geographically confined subsidized housing practices on Southwest Yonkers schools. Alioto Dep. 16–18; Tr. 4323–26 (Barrier); *see also* Tr. 13,150 (Dodson); GX 272, GX 1094.50 (1970 letter from homeowners' association to City Council and Mayor stating that "[t]he continuance of minority racial concentration in this or any other area can lead to a busing situation in the immediate future which all of us wish to avoid."); C–352. Indeed, the evidence demonstrates more directly that the City's aversion to the desegregative development of subsidized housing in Yonkers was based in part on community opposition to the racial impact which such housing would have had on the East and Northwest Yonkers community, including its schools. Tr. 986 (Iannacone); P–I 106–26 (GX 1063.13); *see also* HOUSING VII *supra;* SCHOOLS V.E.1 *infra.* The City's segregative housing practices also were adhered to despite an awareness that these practices would result in the enrollment of additional students in physically inadequate Southwest Yonkers schools (*e.g.,* GX 198, 272, 385, 1095.9; P–I 110–9; SCHOOLS IV.A.2.b *supra* ), a condition which resulted in districtwide disparities in school facility utilization and eventually led to the school district administration's formulation of the Phase II plan. That the Board failed to minimize or eliminate the impact of the City's housing practices on the schools in no way negates the fact that, as a factual matter, the City's housing practices contributed to the perpetuation and aggravation of residential segregation and the resulting segregation of the schools. The above evidence, together with the evidence of the City's intentional perpetuation of residential segregation, demonstrates that the City not only was aware of the overall impact of its subsidized housing practices on Yonkers public schools but also intended to preserve the racially segregative impact of these practices on the schools.

In addition to the testimony of the City's expert, Dr. Eric Hanushek, regarding the impact of the City's housing practices on minority residential patterns, the Board's expert, Dr. Armor, analyzed the impact of these practices on Yonkers public schools. Dr. Armor's analysis was designed to determine what the racial composition of particular schools would have been had particular subsidized housing projects not been built. Dr. Armor calculated the number of students (by race) in specific subsidized housing projects and in the school to which these students were assigned. He then recalculated the minority enrollment in the school by hypothetically removing the subsidized housing project and placing a vacant tract of land in its stead, thus reducing the school's enrollment by the number of students residing in the housing project.

Dr. Armor found that the removal of two subsidized housing projects in 1950 would have had no "significant" (5% or more) impact on the minority enrollment in the schools to which these students were assigned. He found that the removal of four projects in 1960 would have had no significant impact on the affected schools for two projects, and a segregative impact (*i.e.,* a greater percentage minority student enrollment) for the other two projects (Schlobohm and Schools 6 and 12, and Mulford Gardens and School 12). He found that the removal of eight projects in 1970 would have had no significant impact on the affected schools for seven projects and a segregative impact for one project (Phillipse Towers and School 19). Finally, he found that the removal of nine projects in 1980 would have had no significant impact on the affected schools for seven projects and a desegregative impact for two projects (Schools 7 and 19). Based on the above analysis, Dr. Armor concluded that the placement of subsidized housing in Southwest Yonkers did not cause the Southwest Yonkers schools to become increasingly segregated. Tr. 11,882–900.

Like Dr. Hanushek's analysis, Dr. Armor's analysis unduly minimizes the confirmatory impact which the City's government-sponsored housing practices had on

the already developing private residential segregation in the city and on the segregation of the schools. Even though the analysis established that minority population growth in subsidized housing projects was generally not more rapid than in their surrounding neighborhoods, it disregards the extent to which the City's geographically uniform selection of subsidized housing sites and the concomitant increase in the absolute number of minority students in particular schools both were likely to cause whites to leave the surrounding neighborhoods and discouraged whites from moving into those neighborhoods. Tr. 8211 (Pearce). In addition, Dr. Armor acknowledged that the obvious impact of the City's housing practices was to preserve the racial segregation of Southwest Yonkers schools in comparison to East and Northwest Yonkers schools. Dr. Armor recognized that schools in these latter two areas would have had significantly greater minority student enrollments if subsidized housing projects with rent-ups similar to those which existed in Yonkers had been located in these areas. Tr. 11,900–01. In light of the above and our previous discussion of the segregative impact of the City's site selection practices, *see* HOUSING VI *supra,* we find that the evidence persuasively demonstrates that the City's housing practices were responsible in significant part for perpetuating and exacerbating the systemwide racial segregation of Yonkers public schools. *See also Arthur v. Nyquist, supra,* 415 F.Supp. at 968; *cf. Armstrong v. O'Connell,* 463 F.Supp. 1295, 1304 (E.D.Wis.1979) (rejecting analysis by Dr. Armor of segregative impact of school board's discriminatory acts since analysis "assumes that ... no other neutral and nondiscriminatory actions would have been taken", ignores psychological effects of discriminatory acts, and fails to consider that discriminatory conduct "may have an effect beyond that felt by the persons, or in the schools or districts of immediate impact").

With respect to the impact of school segregation on housing patterns, Dr. Armor also questioned the extent to which the racial composition of a school, apart from the racial composition of the surrounding neighborhood, was a significant factor in causing residential segregation. Tr. 12,-156–57. Dr. Pearce, on the other hand, testified that the racial composition of a school was an important factor in shaping residential relocation and housing choices. Tr. 8211, 8307–08.

While the precise quantification of the impact of school segregation on housing patterns is an elusive task, the interrelationship between the racial composition of schools and the impact on residential segregation has been repeatedly recognized by courts examining the causes and effects of school segregation. *See Columbus Board of Education v. Penick, supra,* 443 U.S. at 465 n. 13, 99 S.Ct. at 2950 n. 13; *Keyes v. School District No. 1, supra,* 413 U.S. at 202, 93 S.Ct. at 2694; *United States v. Board of School Commissioners of Indianapolis, supra,* 573 F.2d at 408–09 n. 20; *NAACP v. Lansing Board of Education, supra,* 559 F.2d at 1049 n. 9; *Armstrong v. O'Connell, supra,* 463 F.Supp. at 1307; *Evans v. Buchanan,* 393 F.Supp. 428, 436–37 (D.Del.), *aff'd,* 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975); *Hart v. Community School Board of Brooklyn, New York School District #21,* 383 F.Supp. 699, 706 (E.D.N.Y.1974), *aff'd,* 512 F.2d 37 (2d Cir.1975). As the courts noted in *Arthur v. Nyquist,* if school desegregation suits "have shown anything, they have demonstrated convincingly, in the words of Judge Weinstein, that '[h]ousing and school patterns feed on each other. The segregated schools discourage middle class whites from moving into the area and the segregated housing patterns lead to segregated schools.' *Hart v. Community School Board, supra,* 383 F.Supp. at 706." 415 F.Supp. at 968 (footnote omitted). Also probative of this phenomenon is the direct evidence indicating that City officials in Yonkers were aware of and in some instances attempted to accommodate the segregative consequences of this interrelationship through the alteration of school attendance zone lines. *See* SCHOOLS V.E.1 *infra.* We find that the racial segregation of Yonkers public schools, as in many other

communities, has contributed to the residential segregation of the City both in deterring relocation to and in encouraging relocation from areas with racially imbalanced minority schools.

To be sure, demographic residential patterns and perceptions regarding the quality of schools are also important factors in determining individual housing choices. *See* SCHOOLS IV.B.5 *supra.* Yet in a community such as Yonkers, where patterns of racial segregation closely parallel disparities in the educational quality of schools, it is unrealistic and impracticable to separate the impact of the racial composition of the schools on housing patterns from the community's perceptions regarding the relative educational opportunities available in Yonkers public schools. And to the extent that housing choices in Yonkers have been based on demographic features, the City's discriminatory housing practices have, as already noted, contributed to the segregative demographic patterns upon which such housing choices were based. It is this contribution to, perpetuation of, and enhancement of the school-housing spiral—the placement of subsidized housing virtually exclusively in Southwest Yonkers, the direct impact of this practice on residential and school segregation in the city, and the resulting impact on private housing and school choices, leading to further segregation—for which the city bears substantial responsibility.

## B. *Budgetary Control*

The Yonkers School District is, by virtue of state law, fiscally dependent on the City of Yonkers.[151] Under state law, the Board must prepare each year an itemized budget of its estimated expenditures for the following fiscal year. In Yonkers, this budget is prepared initially by the Superintendent of Schools and his or her staff and consists of a line-by-line itemization of specific expenditures. The bulk of the school district's budget typically consists of expenditures for salaries and employee benefits for instructional staff; building mainte-nance and utilities; debt service payments for school construction and rehabilitation, and educational program and curricular development expenses.

Once the Board adopts the budget, it is submitted to the City Manager, who is responsible for reviewing budget requests for all City departments. The City Manager reviews the budget on a line-by-line basis in order to determine its overall reasonableness. The budget is then submitted to the City Council's budget committee, at which time a line-by-line review is again performed. The City Council also holds public hearings on the school district's budget request, as with other City department budgets. State law provides that the City Council may increase, diminish or reject any item in the budget other than fixed costs for which the City is liable. Once the City appropriates a specific dollar amount for the total school district budget, the Board is permitted to spend the allocated funds for any educational purpose. Since the bulk of the school budget consists of fixed costs, or "mandated" expenses, such as personnel costs, reductions in the Board's budget request typically affect educational programs and services. Tr. 5025 (Jacobson).

Apart from the Board's annual budget appropriation, the Board has also utilized the "special estimate" procedure as a means of receiving additional operating funds. The special estimate is a specific request for additional funds from the City to be used for a specific purpose, such as school construction and rehabilitation, specific educational programs such as summer school and adult education, or educational materials and equipment. The special estimate is either approved or disapproved by the City Council, a process which effectively results in a line-by-line review of school district budgetary needs. The procedure is thus an additional means by which City budgetary control over educational affairs may be exercised, a fact which prompted

---

**151.** Yonkers is one of five school districts in New York State which is fiscally dependent on the city in which it is located; the others are the New York City, Buffalo, Rochester, and Syracuse school districts. N.Y.Educ.Law § 2576 (McKinney 1981).

the New York State Education Department to recommend that the use of the procedure be eliminated. GX 45, at 20. While the City Council has in fact used the special estimate procedure in at least one instance to attempt to influence educational policy decisions of the Board, GX 194 (return of special estimate in 1954 based on Board's decisions regarding Schools 1 and 2), the record as a whole reflects consistent City approval of special estimate requests. *E.g.*, GX 177, 348, 349, 404. The special estimate thus represents a means for the City to exercise greater control over school affairs which has in practice been generally uncontroversial.

The Board, like other City departments, also receives appropriations from the City for capital expenditures. Until the mid-1960's, the Board received capital funds by submitting individual special appropriation requests for capital items directly to the Common Council (as the City Council was formerly known). Since 1964, the capital budget process has been significantly more elaborate. Capital expenditure requests for the Board and all City departments now take the form of five-year Capital Improvement Program budget requests. The Board's capital budgets, which typically include requests for school construction, rehabilitation or expansion and the purchase of equipment, are submitted to the City's Capital Improvement Projects Committee, which collects and reviews capital expenditure requests for all City departments. Pursuant to City law (Local Law 12), the Board's capital budget request is submitted to the City's Planning Board for further examination in light of the City's Master Plan. The Planning Board then makes a budget allocation to the Board, a decision which is reviewable by the City Council.

Although the Board is an independent body under state law, the impact of this budgetary scheme has been to vest in the City considerable influence and indirect control over school affairs. Although former Mayor Alfred Del Bello (1970–74) and former City Manager Charles Curran (1952–63) testified that school budgets were subjected to less scrutiny than budgets of regular municipal departments, the

fiscal dependency of the Board has nevertheless been accompanied by an indirect but increasing municipal role in determining how educational decisions are made by school officials. A 1934 Columbia University study team noted that "[i]n actual practice, the placing of responsibility for the school budget in the hands of the [City] operates to center control of the educational program in the general municipal authority." SB 10, at 2. Although state law permits the Board to spend its lump sum budget allocation as it sees fit, the report noted that the contention that the Board thus maintains full control over educational programs "seems scarcely to be justified in the light of the actions taken by the board of education in an attempt to balance its budget." *Id.* at 3. A 1957 New York State Education Department report echoed these findings, noting that although under state law the Board is solely responsible for the educational function in Yonkers, the City, largely because of its fiscal control over the school district, in fact has "two boards of education operating [its] schools." GX 45, at 17. The report observed that "Yonkers school officers have failed to do all they know needs to be done because of confusion of responsibility and a legal inability to provide the needed money" and recommended that state law be changed to give the Board greater fiscal independence and responsibility over school affairs. *Id.* at 13–14.

The City's budgetary influence over school affairs has continued throughout the 1970's. School officials have repeatedly recognized that the school district's fiscal dependency has in fact resulted in a politicization of educational affairs. For example, the school district's evaluation of the 1972 NYU Report proposals regarding the high schools occupational education programs was affected substantially by what school officials perceived to be the political infeasibility of their implementation. The district's responsiveness to these political concerns contributed to the rejection of the report's variable access proposal in favor of a more costly but more educationally limited reform. In this connec-

tion, Assistant Superintendent Stanley Schainker accurately noted that

> I think everyone here probably knows that the Yonkers School Board, in essence, or the school district was fiscally dependent upon the City of Yonkers and decisions made by the city manager, city council, mayor, et cetera, so it wasn't as if, you know, we had the ability to raise our own money that we needed to do what we talked about doing. We, in essence, had to convince another series of people, most of whom were elected by the community, and to the extent that the community resisted the idea, any idea, it seems to me that that would have some impact upon the people who owed election to those same individuals.

Schainker Dep. 42–43. Similarly, Superintendent Alioto recognized generally that

> [O]bviously any major expenditure level would require the consent of the City Council so in putting together, for example, the NYU report one would have to consider that we were treating with equity all parts of the City that would touch on all City Council geographic areas because the Council did not have a history of supporting—let me put it another way. They sort of had a policy of jealously guarding. If their pothole wasn't getting fixed, nobody's would and I think that had to be a major consideration in putting together a package for reform or change.

Alioto Dep. 42.

The impact of the Board's fiscal dependency was observable in a number of instances during the 1970's. School officials both expressly and implicitly acknowledged the effect of the City's budgetary control over educational decisionmaking and the gradual attempt by City officials to exercise greater control over school affairs largely by virtue of their economic relationship with the Board. This phenomenon was manifested in a number of ways; for example, Board member Charles Curran's perception that the City Manager was attempting to take over the Board, GX 157; the Mayor's creation of a Citizen's Budget Advisory Committee to supplement the City's own budgetary review process—a committee which engaged in a detailed analysis of the Board's budget requests and a questioning of the Board's educational needs and goals, GX 167, 168; the City budget director's critical assessment of the Board's occupational education budget requests, GX 351; Superintendent Alioto being assigned the responsibility of improving City/Board cooperation as his sole priority for 1975, GX 128. While this scrutiny of educational funding is not inherently unjustifiable and was generally resisted by school officials, the fact remains that the City's indirect but significant role in shaping the educational programs in Yonkers public schools gave it significant influence over school affairs and in some instances impeded the Board's practical ability to effectuate educational reforms.

The clearest example of the negative impact of the Board's fiscal dependency occurred in 1976 when the City's fiscal crisis resulted in sizable reductions in the school district's budget. The school district bore a significant share of the City's budget cutbacks, with the Board receiving 9.1% less than its annual budget request, a decrease of approximately $6 million. GX 160, 207; Tr. 5161–63 (Morris). The 1976–77 school year was marked by further cuts in the school district's budget amounting to over $9 million as a result of the state's imposition of fiscal restraints on the city. These budget cutbacks had a significant disruptive impact on educational programs in the city, with Southwest Yonkers schools suffering from particularly severe reductions in staff and specialized or remedial educational programs. *See* SCHOOLS IV. A.3.b, IV.B.2 *supra.*

The influence of the City's budgetary power on school affairs was overshadowed by other concerns during the Board's consideration of the Phase II plan. Financial considerations with respect to the City's budgetary influence over school affairs played a relatively insignificant role in the Board's evaluation of the plan; the recommended school closings and primarily state-subsidized transportation would have resulted in net reductions in fiscal expenditures. Thus, to the extent that fiscal mat-

ters were at all relevant to Phase II, such concerns related primarily to the relative fiscal merit of the plan and its financial feasibility rather than a concern that the City's budgetary control over the Board would preclude its successful implementation. While City Council members and the Mayor publicly expressed opposition to the plan, the financial considerations noted above effectively minimized the issue of budgetary approval in the Board's consideration of Phase II.

While the City's budgetary influence and indirect control over educational affairs has impeded the Board's ability to exercise its responsibility for operating the Yonkers public schools in a truly independent manner, the record does not demonstrate that the detrimental impact of the Board's fiscal dependency has been the result of budgetary actions by the City intended to perpetuate the racial segregation of the Yonkers public schools. This conclusion, however, is more a consequence of the Board's own inaction rather than any absence of segregative intent on the part of the City: because of the Board's independent failure to put forth any significant desegregative school reorganization proposal requiring the City's budgetary approval, we are unable to and need not determine whether the City would or would not have acted in a manner consistent with its actions relating to subsidized housing, mayoral appointments, or other areas of school affairs. While the school district's rejection of the 1972 NYU Report was influenced by the perceived infeasibility of obtaining City Council approval, the City was essentially never afforded an opportunity to formally indicate its budgetary approval or disapproval of the plan. Although the effect of the City's 1976 budget cutbacks on the school district, and Southwest Yonkers public schools in particular, was severe, the fiscal considerations underlying this action dispel any argument that racial factors played any role in the City's action. Finally, the City's willingness to fund school desegregation plans—a telling indication of its segregative or desegregative intent (*Arthur v. Nyquist, supra,* 573 F.2d at 145)—was not tested by virtue of the Board's refusal to adopt any such plans prior to the filing of this lawsuit.

### C. *Mayoral Appointment of School Board Members*

In addition to the City's budgetary control over the Yonkers School District, the Mayor plays a significant role in educational affairs through the power of appointment. Under the New York State law, the Mayor of Yonkers is empowered to appoint members of the Board for five-year terms of office. Once appointed, Board members are subject to removal only for a refusal to serve or neglect of duties. N.Y.Educ.Law § 2553(3), (8) (McKinney 1981). The Mayor has generally maintained little personal contact with his appointees subsequent to their appointment to the Board. Tr. 11,729 (O'Keefe); Tr. 13,577 (Lester).

Prior to the terms of Angelo Martinelli, Yonkers' Mayor from 1974–79 and 1982 to the present time, many Board members served more than one term and were frequently reappointed by mayors other than those who initially appointed them to the Board. Over the twenty-five years prior to Mayor Martinelli's terms of office, twenty-two of the Board's thirty-three trustees were reappointed by a successor mayor. SB 486. In contrast, not a single Board member who was serving at the time of Martinelli's 1973 election as Mayor was reappointed. *Id.*

Mayor Martinelli's election to office was followed by increased efforts to obtain greater influence over educational matters. The Mayor's initial efforts took a number of forms. Soon after his election, Mayor Martinelli spoke to Superintendent Alioto and the Board in executive session and indicated his interest in obtaining influence over Board personnel decisions relating to the hiring of non-teaching staff such as custodians and groundskeepers. Mayor Martinelli's request provoked strong protests from school officials and Board members. Mayor Martinelli responded by emphasizing his power over Board appointments and his intention to exercise it in a manner which would make the Board more

responsive to his educational goals. Tr. 5028–29 (Jacobson); Alioto Dep. 27–29; Jungherr Dep. 7–9.

The Mayor also sought to influence matters relating to student assignments. In April 1974, the Mayor requested that students from a small predominantly white area of the School 3 (60% minority) attendance zone be reassigned to School 27 (12% minority). Donald Batista, the school district's Assistant Director of Pupil Personnel, recommended that the request be rejected, noting that the impact on student enrollment was negligible and that "[t]here is potential for a greater community reaction since it appears that the district line is being gerrymandered." SB 206. As a result, the district line remained unchanged. Tr. 13,433–36 (Frank). During his tenure as Mayor, Martinelli also urged the Board to convert the school system into a K–8, 9–12 grade structure, thus returning sixth, seventh and eighth grade students to elementary schools. This proposal was rejected by the Board. Tr. 5089 (Jacobson).

In March 1974, the Mayor made his first Board appointment, naming Angelo Paradiso to the Board. Paradiso, the principal of Saunders Trades and Technical High School from 1964 to 1973, had resigned his post in 1973 after a dispute with Superintendent Alioto concerning the Saunders screening process and Paradiso's unwillingness to address the problem of the disproportionately low number of minorities at the school. Paradiso was a strong advocate of the self-contained vocational school, rather than the comprehensive high school concept, an educational philosophy shared by Mayor Martinelli but which was slowly coming under increased scrutiny by school officials. GX 1018; Tr. 7676 (Martinelli). Later that year, Mayor Martinelli appointed Paradiso to the City's Saunders site selection committee, a committee established independently of the Board's committee to examine alternatives for the relocation of the school. GX 660.

Mayor Martinelli's second appointment was Curtis Giddings. Giddings, who is black, was chosen to replace Wiley Hammond, a retired school administrator, who was also black. Prior to his appointment, Giddings was a teacher, guidance counselor, and administrator in the New York City public school system. C–1424.

Mayor Martinelli's 1975 Board appointment were significantly more controversial. On May 1, 1975, the Mayor appointed Anne Bocik and Morton Wekstein to the Board. GX 251. Like Paradiso, Bocik, a former Yonkers public school teacher and elementary school principal (Schools 18 and 24), had retired one year earlier under pressure from Superintendent Alioto's administration. According to Assistant Superintendent Stanley Schainker, Bocik's retirement was prompted by unfavorable job evaluations based on her performance as principal of School 18. This evaluation was based on her ineffectiveness in planning as well as her use of racial slurs and other racially insensitive behavior toward minority students. Bocik's treatment of minority students in this manner was recalled by several administrators and school teachers in the district. Tr. 4377 (Barrier); Tr. 5530–36 (Davis); Schainker Dep. 64–67; Gold-Marks Dep. 59–60, 104. Soon after her retirement from the district, State Senator John Flynn wrote to Mayor Martinelli, recommending that Bocik be appointed to the Board based on her educational experience and her ethnic (Slavic) background. C–1405. Former City Councilman Nicholas Benyo, leader of Yonkers' United Slavonian American League, also urged her appointment based on her ethnic background. Tr. 7669–70, 12,369 (Martinelli). Prior to her appointment, Board president George Minervini advised Mayor Martinelli not to appoint Bocik to the Board. Although Mayor Martinelli knew of Bocik's retirement from the school district, Martinelli testified that Minervini gave no explanation for his advice and that Martinelli did not request any. Tr. 7667–70.

Morton Wekstein was Mayor Martinelli's personal attorney. At the time of his appointment to the Board, Wekstein's law partner was representing a number of school administrators who had been considered ineffective by Superintendent Alioto.

The appointment of Bocik and Wekstein to the Board was met with widespread protests and denunciations from various segments of the community. Representatives of the minority community publicly criticized the Bocik appointment based on her racially discriminatory behavior and filed a complaint with the New York State Education Department regarding the appointment. GX 226, at 46,049; Tr. 3554 (Ross). Wekstein's appointment was questioned because of his alleged conflict of interest. GX 226, at 46,048; 251. In a press release, Superintendent Alioto stated that in selecting "an ex-principal who was requested by me to retire early" and an attorney from a firm which represented the Mayor himself as well as school district employees with grievances against the district, Mayor Martinelli was attempting to make "good his pledge to take over the Board of Education in retaliation for my persistent refusal to provide him with Board of Education jobs on which to build his political career." GX 136. Board president Robert Jacobson similarly decried the "definitely political nature" of the appointments. GX 136,224. Upon being personally confronted about the Bocik appointment in particular, Mayor Martinelli defended his decision based on her ethnic background. Gold-Marks Dep. 63–65; see also Tr. 3554–55 (Ross). While Bocik served her full five-year term, Wekstein resigned less than one year later based on his anticipated legal representation of Mayor Martinelli's brother, a longstanding client and owner of the Yonkers Home News and Times, in a lawsuit involving the City Council's designation of an official newspaper. C–1408.

Two significant school-related events occurred between the Mayor's 1975 and 1976 appointments to the Board. First, in response to the concerns expressed by the Yonkers NAACP over the increasing racial imbalance in Yonkers public schools, the Board, led by Board president George Minervini, established the Task Force for Quality Education. Minervini appointed Winston Ross and Herman Keith of the Yonkers NAACP to serve as members of the ten-member Task Force. Second, the Board adopted a controversial and strongly opposed plan to close seven schools in order to comply with budget cutbacks imposed by the City as a result of its fiscal crisis. Along with most of the East Yonkers community, Mayor Martinelli actively opposed the closing of Schools 4 and 15 in East Yonkers and participated in vigorous efforts to reverse the decision. See SCHOOLS IV.A.3.b supra.

By this time, Mayor Martinelli's efforts to gain control over educational affairs through his Board appointments were increasingly recognized by Board members and school administrators alike. Retiring Assistant Superintendent Stanley Schainker noted that he was "deeply concerned about the increasing efforts of some to politicize the schools for their own personal aggrandizement" and stated his belief that "those efforts already have had a negative impact upon the operations of the Board of Education." GX 130. Other school officials similarly indicated that Mayor Martinelli had expressed his intent to exercise his appointment power in a manner which would give him control over the Board. Alioto Dep. 29; Tr. 11,083–85 (Jacobson); GX 224.

In the aftermath of Wekstein's resignation, Winston Ross wrote to Mayor Martinelli, requesting that he consider appointing a hispanic to the Board. GX 241. Mayor Martinelli responded by emphasizing that his appointment would be "based on the quality of the individual irregardless of racial background", GX 242, a position somewhat inconsistent with his recent ethnically-motivated appointment of Anne Bocik and his subsequent appointment of John Romano to the Board. In April 1976, Mayor Martinelli appointed James O'Keefe to the Board. O'Keefe, a realtor from Northeast Yonkers, was strongly opposed to the closing of School 15 and led the Taxpayers of North East Yonkers organization in their public opposition to the school closing. Upon being appointed to the Board, O'Keefe, like Martinelli, continued to press for a reversal of the Board's decision to close the school. GX 187; SB 867.

As in 1975, the Mayor's 1976 Board appointments were controversial. In May 1976, the terms of George Minervini and Rosemarie Siragusa were scheduled to expire. One month earlier, Minervini, who had been instrumental in establishing the Task Force for Quality Education, appointed Siragusa to the Task Force. GX 931. Both Minervini and Siragusa were generally regarded as two of the Board's strongest advocates of school desegregation in Yonkers. Siragusa, like Minervini, also had voted to close Schools 4 and 15, and had declined to accept the Mayor's invitation to participate in a "walk" in protest of School 15's proposed closing. GX 134, 255. The Council of PTA's recommended their reappointment, with Council of PTA's officer Audrey Roshkind recalling the "tremendous job" which Minervini had done as a Board member. Roshkind Dep. 140; Tr. 5296–97 (Frauenfelder). The Yonkers NAACP also recommended that both trustees be reappointed to the Board. Tr. 3634–35 (Ross). Superintendent Robitaille, who had replaced Superintendent Alioto in December 1975, took the unusual step of personally recommending that the Mayor reappoint Dr. Minervini so that Minervini, the Board president who Robitaille described as an "exceptional individual," could lead the district "in a very difficult time." Tr. 4657–58. This recommendation was echoed by the endorsement of the Clergy of Yonkers as well. Tr. 4530 (Klausner proffer). Both Minervini and Siragusa expressed to Mayor Martinelli their interest in continuing to serve as Board members.

Mayor Martinelli reappointed neither Minervini nor Siragusa to the Board. Although Mayor Martinelli testified that his decision to replace Dr. Minervini, a friend of the Mayor's, was ultimately made because of his membership on the Board which had previously agreed to add a job security clause to the teachers' contract, Tr. 12,372, Martinelli, in earlier testimony, expressed doubts that this factor influenced his decision. Tr. 7672–73. Mayor Martinelli's refusal to even consider reappointing Siragusa was based not only on their disagreement on educational matters but also on her participation in political campaigns in which she opposed Martinelli's election as Mayor. Tr. 12,373–74 (Martinelli). While Mayor Martinelli denied that Minervini and Siragusa's position on busing was a factor in his decision not to reappoint them to the Board, Martinelli also acknowledged that by the time of the Phase II proposal the following year, he routinely asked Board candidates about their position on busing and that their response "probably weighed very heavily with me." Tr. 12,411–12. Given the increased community awareness of school desegregation as an issue which the Board and school administrators were beginning to address, the identification of the Task Force's efforts by some community members as supportive of "busing," the Mayor's own acknowledgement that busing became an issue of considerable importance in his appointment process, and the Mayor's subsequent appointments to the Board, we have difficulty concluding that Mayor Martinelli's refusal to reappoint either Minervini or Siragusa was not influenced by their generally well-known commitment to addressing the problem of racial imbalance in the Yonkers public schools and thus their potential willingness to utilize busing as a method of doing so.

To replace Minervini and Siragusa, Mayor Martinelli appointed Joseph Spencer and John Romano to the Board. Spencer was a member (and later Chairman) of the Yonkers Conservative Party who supported the Mayor in his previous election campaigns but who had no prior particular involvement in educational matters. Spencer Dep. 21–23; Tr. 7674–75 (Martinelli). Romano, an attorney, was supported by the Congress of Italian-American Organizations and had helped pass state legislation enabling the City to use air rights for educational purposes, a technique which Mayor Martinelli had proposed in 1974 with respect to the Saunders Trades and Technical High School. Tr. 7676, 12,373 (Martinelli). Soon after their appointment to the Board, Spencer and Romano voted against applying for state funding of the Board's Task Force for Quality Education. P–I 59–24.

Mayor Martinelli's next Board appointment was made earlier than scheduled. The Board's decision to close Schools 4 and 15 was followed by vigorous efforts to overturn the decision. In addition to instituting legal proceedings and engaging in various forms of public protest, the East Yonkers community also participated in two particular courses of action. First, members of the Board were subjected to repeated harassment and verbal abuse, with several trustees experiencing picketing of their businesses or homes. In September 1976, Board member Ian (Doug) Smith, a target of this harassment, resigned from the Board. In his letter of resignation to Mayor Martinelli, Smith urged the Mayor to appoint an independent-minded trustee in order to ensure a balance in educational philosophies on the Board; in a letter appearing in the Herald Statesman, Smith also bemoaned the "political machinations behind this personal harassment" which led to his resignation. GX 162, 200. Smith's resignation was greeted with regret by community members and expressions of concern that the Mayor would respond by appointing a replacement who would enable him to gain control of the Board. GX 163, 261. At a Board meeting held immediately after Smith's resignation, Mayor Martinelli urged the Board to table a resolution calling for the return of the recently closed schools to the City. The Board, with non-Martinelli appointees Jacobson and Katherine Carsky dissenting, tabled the resolution. GX 187.

During the fall of 1976, the Northeast Yonkers community also established an alternative private school in response to the closing of School 15, action which prompted a lawsuit by the Board. One individual actively involved in opposing the School 15 closing and establishing the alternative school was Seelig Lester. Lester, an experienced educator who served previously as deputy superintendent of the New York City public schools, was a strong advocate not only of reopening School 15 but also of the self-contained vocational school—two positions known and shared by Mayor Martinelli. Tr. 7670–71, 12,406–07 (Martinelli);

Lester Dep. 16–18. In November 1976, Dr. Lester was appointed to the Board. GX 262. In May 1978, during the Board's consideration of Phase II, Lester became the first Board member to be reappointed by Mayor Martinelli.

Mayor Martinelli's 1977 appointment to the Board, Dorothy DeRuve, was uncontroversial yet consistent with the nature of his prior and subsequent Board appointments. In May, Katherine Carsky's term as a Board member expired. Carsky, who had voted to close Schools 4 and 15 and opposed the delay in returning the schools to the City, had expressed to Mayor Martinelli her interest in continuing to serve on the Board. GX 205. Carsky was also supportive of the desegregative efforts of the Task Force for Quality Education. Tr. 3583–84 (Ross); see also Tr. 4663 (Robitaille). Mayor Martinelli instead appointed Dorothy DeRuve, a dental assistant from Northwest Yonkers, to the Board. Although the record fails to disclose whether Mayor Martinelli specifically inquired about DeRuve's position on busing, DeRuve opposed Phase II primarily because of the "assigned transportation" element of the plan. SB 815, at 6–9. In light of the Mayor's reliance on opposition to busing as a significant criterion in making his later Board appointments and the simultaneous and well-publicized efforts of the school district in the spring and summer of 1977 to formulate proposals for desegregating the schools, it is reasonable to infer that these considerations played some role in the Mayor's 1977 Board appointment.

In April 1978, just after the public hearings on Phase II, Curtis Giddings, the Board's only black member, resigned from the Board after moving out of Yonkers. Yonkers NAACP President Winston Ross wrote to Mayor Martinelli, requesting that he appoint a black to replace Giddings. Ross specifically recommended former Yonkers NAACP President Herman Keith based on his "sincere enthusiastic interest" in the welfare of minority students. GX 238. Mayor Martinelli flatly rejected this recommendation based on Keith's previously expressed opposition to the Mayor's poli-

cies, and urged Ross to submit recommendations for persons "who at the very least have taken a neutral position with regards to the policies and programs which I espouse." GX 239. At the same time, Vice Mayor Arthur Freddolino introduced three resolutions in the City Council requesting that Mayor Martinelli not appoint new Board members until their position on busing was made public and that the Board not vote on Phase II until the Board's three new appointees were named by the Mayor. GX 143. Mayor Martinelli also had expressed his own opposition to the Phase II plan, opposition not only based on his firm stance against "forced busing" but also reflecting his belief that only three of the district's twenty-five elementary schools and one of the district's seven middle schools were racially isolated. Tr. 7650–54 (Martinelli). *Cf.* GX 64; SCHOOLS IV. A.3.b *supra.*

Mayor Martinelli's three Board appointments in April and May of 1978 were consistent with these criteria and his own personal opposition to Phase II. In April, Mayor Martinelli appointed Quentin Hicks, who is black, to replace Curtis Giddings. Hicks, a Republican Party district leader, had been active in the past in the Warburton Ashburton Ravine Project Area Committee (a group which advocated the use of scattered site housing in Yonkers) and had become known to Mayor Martinelli through their contemporaneous service on the committee. Tr. 7665–66 (Martinelli); Hicks Dep. 37. The Hicks appointment, however, was immediately protested by members of the black community who believed that Hicks was not representative of their interests. Tr. 3647–51 (Ross); Tr. 8373 (Keith). Although Mayor Martinelli denied knowledge of Hicks' educational philosophy, Hicks' opposition to busing was consistent with the selection criteria used by Mayor Martinelli at the time and was publicly articulated by Hicks at the time of his appointment to the Board. Hicks Dep. 49. As became clear the following month, Hicks' opposition to Phase II was based not only on opposition to busing but also on his conclusion that both white and black community members were opposed to racial

integration of the public schools. *See* SCHOOLS IV.F.3 *supra.* One year later, Hicks was reappointed to the Board by Mayor Martinelli. In 1981, Mayor Martinelli acknowledged to Herman Keith that his appointment of Hicks to the Board had been an embarrassment to the black community. Tr. 7665–66 (Martinelli); Tr. 8374–75 (Keith).

In May 1978, Mayor Martinelli made two appointments to the Board. First, the Mayor reappointed Seelig Lester to the Board, an appointment which was consistent with his past qualifications as well as his opposition to the Phase II plan. Second, Mayor Martinelli chose Robert Weiner to fill the seat vacated by Robert Jacobson. By that time, Jacobson, an active Board member who was generally supportive of the Phase II plan, had concluded that Mayor Martinelli's decision to replace Board members Minervini and Siragusa had effectively thwarted any possibility that Phase II would be adopted by the Board. Tr. 11,139 (Jacobson). Although Jacobson did not discuss with Mayor Martinelli the possibility of being reappointed to the Board, Jacobson had already concluded that his reappointment was unlikely and that he probably would not have continued to serve in any event. Tr. 4963, 11,135, 11,146. Weiner, Mayor Martinelli's former campaign manager, had asked the Mayor a number of times to consider appointing him to the Board. Weiner Dep. 54–56. Weiner, a known opponent of busing, was selected by Mayor Martinelli based on their mutual opposition to the Phase II plan. Tr. 7677 (Martinelli); Weiner Dep. 86. In May 1978, the Board, now comprised solely of Mayor Martinelli's appointees, held a special workshop meeting at which Board members expressed their unanimous opposition to Phase II. *See* SCHOOLS IV.F.3 *supra.*

The Mayor's final two appointments were relatively uncontroversial but not devoid of overtly political design. After appointing Joseph Sayegh, a doctor of medical research who had worked since 1962 on the Mayor's Community Relations Committee, the Mayor, in the midst of a re-election campaign in which the Board appointment

process was a frequently debated issue, appointed Arthur Natella to the Board. Natella, a retired Yonkers school principal from Southeast Yonkers, was appointed by Mayor Martinelli on the day of a mayoral debate in Natella's home community in an effort to deflate the criticism of the Mayor's previous Board appointments and to garner the support of the community. Subsequent to his electoral defeat in November 1979, the Mayor issued his State of the City address. In addition to commending the quality of the school district's new Superintendent and Board trustees, Mayor Martinelli emphasized that "we now have a Board of Education fully committed to neighborhood schools which is of critical importance to neighborhood stability in this city!" GX 848b.

After the City's new mayor, Gerald Loehr, took office, the Board appointment process was changed. Since 1980, candidates for Board appointment have been recommended by a blue ribbon panel consisting of twelve to fifteen members appointed by the mayor. The panel chooses a small number of qualified candidates and submits their selections to the mayor. By the time this lawsuit was commenced in December 1980, the Board had failed to develop and implement any desegregative portion of or alternative to the Phase II plan and continued to retain the previously closed and unused School 4 facility. Mayor Martinelli, re-elected in 1981, has reappointed all Board members whose terms have expired since that time and thus has not reappointed any new members to the Board.

The Mayor's appointments to the Board reflect in clear and unambiguous terms the politicization of educational affairs in Yonkers. The record demonstrates that Mayor Martinelli's Board appointment power was utilized in a manner which would enable him to obtain indirect but significant influence over school affairs, influence which he had been initially unsuccessful in obtaining more directly. While Board members were generally free of outside influence from the Mayor subsequent to their appointment, the conduct of Board members was generally consistent with the Mayor's in-

tentions and objectives in appointing them to the Board. Even when his earlier appointees (*i.e.*, Paradiso and Bocik) occasionally disagreed with his positions, such as the 1976 proposal to close seven schools which Mayor Martinelli adamantly opposed, the subsequent conduct of these trustees (in voting to delay returning the closed schools to the City and in opposing Phase II) and of Mayor Martinelli's subsequent appointments to the Board was indicative of the Mayor's successful exertion of considerable influence over educational affairs in Yonkers.

Mayor Martinelli's appointments to the Board went beyond the mere exercise of ordinary political discretion. Beginning in 1976, mayoral Board appointments also became more directly related to Board members' views on matters concerning school desegregation. While the isolated appointment of a busing opponent or the single, unwitting appointment of a trustee with less than admirable views concerning minorities or school desegregation is perhaps an insufficient basis for inferring impermissibly discriminatory intent, *see Arthur v. Nyquist, supra*, 415 F.Supp. at 959 (Mayor's appointment of single trustee based on trustee's opposition to busing insufficient evidence of discriminatory intent), this is not such a case. Here there is a pattern of appointments, reappointments, and failures to appoint over time, with the consistent result of impeding the efforts of the school district to address the racial imbalance of the schools. In addition, the appointment of Board members must be viewed not in isolation but in conjunction with other contemporaneous occurrences in the city. The increasing efforts to establish a Board firmly committed to neighborhood schools dovetailed neatly with the City's most concentrated development of family-populated subsidized housing projects in Southwest Yonkers at or about the beginning of Mayor Martinelli's first term, and the subsequent resistance to the development of subsidized housing in East Yonkers during the remainder of Mayor Martinelli's terms in office. The two patterns were of a piece: the City's segre-

gative housing practices and the Mayor's appointment of individuals opposed to "busing" contributed significantly to the confinement of minorities in Southwest Yonkers and the Board's failure to undo the segregative effects of these and other practices on the schools. And in a city where the segregated condition of "neighborhood schools" is in part the product of official municipal design, the commitment to the neighborhood school system by the head of that same municipality can hardly be considered race-neutral. *Cf. Arthur v. Nyquist, supra,* 415 F.Supp. at 968–69 (school board's adherence to neighborhood school policy not race-neutral where city officials have engaged in segregative public housing practices).

## D. *School Site Selection*

The City has also played a significant role in the selection of sites for new schools. This participation originates from the City's legal responsibility for appropriating funds for the acquisition of land and the construction of school facilities. The Board initiates the site selection process by deciding whether to build a new school and where it wants the school to be built. The City's Planning Bureau assists in the site selection process by analyzing demographic patterns and making land use recommendations. Once the Board selects a particular site, it must submit its request to the City Council, which has final authority to approve or reject the site. The City retains legal title to land acquired by the City Council and designated for educational use. However, once the land is so designated, the City has no legal power to dispose of the property until the Board votes to return the school to the City. N.Y.Educ.Law § 2556 (9)(McKinney 1981); Tr. 8922 (Curran).

In actual practice, the City's involvement in school site selection decisions has been considerable. While only three site selection decisions have been made since 1967— School 10, Yonkers High School, and the new Saunders Trades and Technical High School—City officials played a central role in each of them. The extent of the City's involvement, its impact on the site selection and school construction process, and its effect on racial imbalance will be examined for each of these schools.

### 1. *Yonkers High School*

Yonkers High School has served as the district's high school for Southwest Yonkers students since its inception in 1927. The school also enrolled students from Southeast Yonkers until 1957, when the Lincoln facility in Southeast Yonkers took on a high school component. In 1944, Yonkers High School was relocated to the former Franklin Junior High School facility on Linden Street in Southwest Yonkers, and Franklin students were relocated to the former School 2 elementary school facility just two blocks away. Although the relocations were originally implemented as temporary war-time measures, the schools remained in their respective locations for the next three decades.

Over the years, these two facilities were increasingly recognized by school officials and community members as physically inadequate for their respective student bodies. By the mid–1960's, school officials actively began to consider the selection of a site for the construction of a new Yonkers High School. The Board investigated eleven potential sites, with major consideration given to the Leake and Watts property, the Sutherland-Pelton Park site, the Sullivan Oval, and War Memorial Park. In December 1967, the Board requested that the City acquire land located at Sullivan Oval for the construction of the school. The Sullivan Oval site, located in a predominantly white residential section of Southwest Yonkers, consisted of park land and recreational facilities. The site was selected based on an examination of eight factors: location, area, topography, procurement, acquisition costs, development costs, community, and safety and access. Sullivan Oval's larger site size, lower acquisition and development costs, and the absence of any relocation burdens on community members were the primary factors underlying the Board's recommendation. P–I 46–53.

The Board's selection of the Sullivan Oval site provoked immediate and widespread controversy in the community. A large number of community organizations and city residents and the Westchester County Department of Parks, Recreation and Conservation opposed the selection of the Sullivan Oval site primarily because of its alleged impact on the availability of already scarce park space for recreational use by community members. The Parks Department and several City Council members suggested War Memorial Park as an alternative site, while other community members suggested the Sutherland-Pelton site. GX 278; P–I 46–38, 46–40. War Memorial Park is located just northeast of Getty Square in the heart of Southwest Yonkers, and the Sutherland-Pelton site is located on McLean Avenue in the southernmost portion of Southwest Yonkers. Both areas contained greater concentrations of minority residents than the Sullivan Oval site. Tr. 5183, 5253 (Morris); SB 742.3. On the other hand, the PTA's of Southwest Yonkers' Schools 3, 18 and 27, Longfellow Junior High School and Yonkers High School urged City Manager Frederick Adler to support the acquisition of the Sullivan Oval site based primarily on the already protracted use of what community members and school officials recognized was a physically confining and inadequate school facility, as well as the continued use of the former School 2 facility for Franklin Junior High School students. GX 278.6, 278.7, 278.8, 278.10, 278.13. In the spring of 1968, the City Council rejected the Sullivan Oval site. Tr. 5185 (Morris); P–I 46–60, 46–63.

The remainder of the year and the next was filled with continued controversy surrounding the site selection for the new Yonkers High School. Community members and school and City officials continued to debate the site selection issue along the lines noted above, with a general division of opinion along "recreational use" versus "educational use" lines. P–I 46–75, 46–85, 46–87. The Board was also asked by Southwest Yonkers residents, PTA members and the Yonkers High School Redevelopment Committee to redistrict the city's high schools so as to provide for a more equitable distribution of "physical facilities and educational opportunities." GX 493, 494. The Board did not implement this suggestion but continued to adhere to its selection of Sullivan Oval as the site for the new Yonkers High School. Finally, in 1970 the City Council reversed its position and approved the construction of the new Yonkers High School on the Sullivan Oval site. Tr. 1255, 1408–09 (Del Bello); GX 1093.8, 1094.20. Construction of the new school commenced thereafter and the school opened in February 1974, with Franklin Junior High School students relocated to the old Yonkers High School facility the following year.

While the assignment of Southwest Yonkers high school students to the inferior Linden Street facility was an unfortunate circumstance, the record is devoid of evidence which demonstrates either that the City's role in selecting a new site for Yonkers High School is evidence of its control over the Board or that the City's or Board's role in selecting the site was at all affected by racial considerations. While the 1968–69 delay in selecting a site for the school was the result of the City Council's rejection of the Sullivan Oval site, this delay was influenced by non-frivolous concerns unrelated to racial or even educational factors. In addition, the Board adhered to its original site selection despite strong opposition to its decision and the City's initial rejection of the Sullivan Oval site. The site was eventually approved by the City and was the most predominantly white of the three sites under active consideration by the Board. While Yonkers High School is presently racially imbalanced (62% minority) as compared to the district's other high schools (47%, 2%, and 9% minority), we find that this condition was not deliberately caused by the conduct of the City or the Board in selecting the site for the new school.

### 2. Saunders Trades and Technical High School

Until 1980 the Saunders Trades and Technical High School, the district's voca-

tional school, was located in the Getty Square area in downtown Southwest Yonkers. The school was significantly smaller than the district's other high schools and had long been recognized as a physically inadequate facility. GX 43, at 31–32 (1957 New York State Education Department study recommending replacement of Saunders facility). As the school's reputation improved during the late 1960's and early 1970's, attention turned to either rehabilitating and expanding the Saunders facility or finding a new location for the school. In 1973, the school district rejected the NYU Report proposal to close the school and decentralize its programs throughout the district's regular high schools. The Board instead adopted a plan to rehabilitate and expand Saunders and to augment its occupational course offerings. *See* SCHOOLS IV.F.2 *supra*.

In the spring of 1974, a Board study concluded that the cost of constructing a new facility was not substantially greater than the cost of rehabilitating and expanding the existing Saunders facility. C–1403. As a result, school and City officials began to investigate the possibility of either rehabilitating Saunders or constructing a new facility. P–I 45–53, 45–55, 45–56, 45–71, 45–72. The City retained a consulting firm to perform a study, to be completed by September 1, of the possible construction of a new facility. P–I 45–72. In October, after the Board requested that the City expedite the completion of the study, the City established its own committee to investigate the various alternative courses of action with respect to Saunders. P–I 45–72, 45–73; Jungherr Dep. 28–30. In January 1975, Mayor Martinelli also suggested the formation of a joint committee, composed of City and school officials, to pursue the Saunders investigation. GX 155; C–1403; Tr. 12,364–66 (Martinelli). The Board instead formed its own committee, with school officials also meeting with the City's committee to discuss possible locations for a new Saunders facility. P–I 45–79; Jungherr Dep. 32–35.

From the outset, City officials, led by Mayor Martinelli, were in favor of building a new Saunders on the existing site. At the time, the City was developing plans to build a new civic center in an area partly occupied by Saunders. Mayor Martinelli advocated the construction of the civic center over the new Saunders facility, a plan which would allow the City to build the school at a greatly reduced cost by selling the air rights over the school, as provided for under state law, to the developers of the civic center. In January 1975, the CDA also recommended the construction of the new Saunders on its existing site based on a variety of economic and space-related considerations. GX 660, at 49,083–86.

At the same time, the Board conducted its own investigation into possible locations for a new Saunders. In a series of meetings held in early 1975, the Board's committee discussed a number of sites, eventually narrowing the selection to the Cook Field site in New York City, War Memorial Field in Southwest Yonkers, and Pelton Field, also in Southwest Yonkers. *Id.* at 49,080. The existing site was considered inappropriate because of site size limitations, but the committee recognized the importance of considering the use of air rights to finance construction of the school. *Id.* at 49,080, 49,082, 49,087, 49,089–90. By March 1975, the committee was considering the War Memorial site and a site at Yonkers and Midland Avenues in Southeast Yonkers. *Id.* at 49,071. (The committee briefly considered the Burroughs Middle School as well. *Id.* at 49,071, 49,073.) At a March 31 joint meeting of the City and Board committees, Mayor Martinelli spoke in favor of the War Memorial Park site and the existing site. *Id.* at 49,068. One day later, the Board's committee recommended the acquisition of the Yonkers Avenue site. P–I 45–107.

The Board's recommendation was adamantly opposed by the City. Mayor Martinelli and Alphons Yost, acting director of the CDA, spoke with school officials and strongly urged them to consider selecting a site in downtown Southwest Yonkers. School officials continued to believe that the Yonkers Avenue site was the best location for the new Saunders. However, school officials were also cognizant of the

Mayor's position and the realization that City approval was necessary to obtain a site for the construction of a new Saunders facility. As a result, the Board reconsidered its earlier decision and recommended that the new school be built on the existing site. Jungherr Dep. 55–59; Alioto Dep. 84–86.

The construction of the new Saunders never materialized. The city's 1975 fiscal crisis necessitated drastic reductions in the school district's budget and effectively terminated the district's plans either to build a new Saunders or to renovate the existing facility. GX 126, at 5. By late 1976, after the district's school closings and other budgetary cutbacks, "rumors" began circulating concerning the possible relocation of Saunders to the Burroughs Middle School facility in Central Yonkers. P–I 75–25, at 39,251. By the spring of 1977, studies were conducted regarding the feasibility of such a relocation, and in June 1977 the Advisory Council for Occupational Education recommended that the Saunders school be relocated to Burroughs. P–I 75–27, at 42,995–96. This recommendation became part of the administration's 1977 Phase II plan, was fairly widely supported by community members, and was adopted by the Board in April 1978. *See* SCHOOLS IV.F.3 *supra*.

While evidence concerning the Saunders site selection process illustrates the City's influence over school site selection, the City's predominance in the site selection process was limited in its ultimate impact. To be sure, the Board's acquiescence in the City's site preference is evidence of its recognition that its fiscal dependence on the City had to be considered in making decisions as to the location of Saunders. As with the new Yonkers High School, however, the Board ultimately selected and obtained, after some delay, a site other than that which was initially recommended by the City and chose a site based on a variety of factors, none of which related in any measurable way to race. The new Yonkers High School was located in the most predominantly white location under active consideration, and Saunders was relocated to the new, physically superior Bur-

roughs facility in Central Yonkers. Although the Board's selection of the Burroughs site was prompted largely by financial constraints which essentially precluded the City-supported construction of a new facility on the existing site, GX 98, at 16–17, the Saunders site selection process eventually resulted in a practical solution which was widely supported by community members, school administrators and the Board. The selection of a new site for Saunders was also largely devoid of racial considerations of either a desegregative or a segregative nature. In sum, the Saunders site selection is illustrative not only of the City's effective control over this aspect of school affairs but also of the absence of racial considerations throughout the Saunders site selection process.

### E. *Other City Involvement In School Affairs*

The City's involvement in school district affairs has been manifested in a number of other ways. Three particular forms of involvement are discussed below.

#### 1. *Attendance Zone Changes*

On a number of occasions, City officials have proposed alterations in school attendance zone boundaries. While earlier proposals were relatively free of racial significance, a number of proposed changes during the 1970's were consistent in their potentially segregative impact on the district's schools.

A number of City Council resolutions during the late 1960's to mid-1970's dealt with the redrawing of school attendance zone boundaries. *E.g.*, GX 363, 389, 395. For example, in 1969 Councilmember Del Bello introduced a City Council resolution requesting that the Board consider altering a junior high school boundary line so as to reassign students in the northeast corner of the virtually all-white Burroughs (5% minority) zone to virtually all-white Whitman (2% minority). The resolution also requested the City Manager to examine the feasibility of contracting for bus transportation for the affected students if a change

in district lines was not possible. GX 363. The resolution was referred to the Superintendent and Board, and the district line remained unchanged. GX 364.

In April 1974, Mayor Martinelli requested that a small predominantly white area of the School 3 (60% minority) attendance zone be reassigned to School 27 (12% minority). Donald Batista, the district's Assistant Director of Pupil Personnel, recommended that the request be rejected, noting that the impact on student enrollment was negligible and that "[t]here is potential for a greater community reaction since it appears that the district line is being gerrymandered." GX 131, SB 206. As a result, the district line remained unchanged. GX 364.

In August 1974, Council member Walsh requested that the school district rezone the predominantly white dogleg portion of the School 9 (28% minority) zone into School 16's (3% minority) attendance area. According to an analysis prepared at the time by Jerry Frank, the school district's court liaison, the reason for the change was to enable parents in the area "to avoid School 9." SB 214. The analysis noted that the proposed change, which involved thirty-seven students, would not affect the "social mix" at School 16 but would decrease School 9's white student population. *Id.;* Tr. 13,433–36 (Frank). This proposal was not adopted by the district.

During the district's implementation of the 1976 school closings, Alphons Yost, the Director of the City's Department of Development, suggested that the district alter the boundary separating School 9 (30% minority) and 16 (1% minority) so as to include the dogleg portion of the School 9 zone in School 16's attendance zone. This proposal, involving from eighty-three to 122 students, was prompted by a landlord's difficulty in renting apartments in that area because of the racial composition of School 9. GX 144, 383; Tr. 2885–89, 3100–05 (Arcaro); Tr. 10,371 (Yost).[152] This proposal was not adopted by the district.

Although the Board's consistent refusal to implement City-proposed attendance zone changes obviated their potential segregative impact on the schools, the evidence of such proposals is nevertheless illuminating insofar as the City is concerned. These proposals demonstrate the City's awareness of the interrelationship between residential housing choices and the racial imbalance of the schools, a correlation which we have discussed previously in our findings. *See* SCHOOLS V.A. *supra.* More important, the efforts of various City officials to accomodate the segregative impact of this interrelationship is additional evidence of the City's segregative intent with respect to public schools as well as subsidized housing.

### 2. *City Council Resolutions*

City officials have also used the procedure of passing non-binding City Council resolutions to express their opinion regarding educational matters. Over the years, these resolutions have addressed a variety of school-related issues, such as the addition, site selection, construction, opening, closing, and redistricting of schools, the need to arrange bus transportation for students in particular areas, and the timing of Board decisionmaking. *E.g.,* GX 141, 266, 359, 360, 362, 369, 379, 389, 390, 391, 395, 398, 425, 974.

---

**152.** Evidence concerning this proposal illustrates clearly the City's awareness of the impact of a school's racial composition on residential housing choices. In a memo describing a meeting with Superintendent Robitaille, the City's Department of Development Administrator Alphons Yost stated that

Discussion centered on the North Broadway area of Yonkers and the perception which residents have of Schools 6, 9, 12, 16, 25, and King. Contact with residents in the area indicates that this perception is greatly influenced by the racial composition of the school. Residents use this perception in choosing whether to live within a school district. Of the six districts discussed, residents have stated that P.S. 16 [2% minority] has the best reputation. GX 144. When asked if any City officials at the meeting questioned this phenomenon, Gregory Arcaro, the Planning Department's Senior Planner, stated that "there was no disputing of that as an operative dynamic in the housing market." Tr. 2888.

The impact which such resolutions have had on school affairs has been relatively modest. The nature of the school district's response to City Council resolutions has depended on whether the resolution at issue is perceived to be the expression of serious and genuine concern regarding a particular educational matter or merely political "posturing" by the City Council or the resolution's sponsor. Tr. 1267 (Del Bello). A number of City Council resolutions, such as ones expressing opposition to the closing of School 31 and requesting the Task Force for Quality Education to delay the issuance of its report, were followed by Board actions consistent with the City Council's desires, GX 141; Tr. 1263–64 (Del Bello), and a 1969 resolution regarding the need for additional schools in Northwest and East Yonkers was responded to in some detail by Superintendent Mitchell. GX 398. In most cases, however, City Council resolutions have been given little or no serious consideration by the Board or have been specifically rejected. Tr. 1410 (Del Bello); Tr. 8947 (Curran); Tr. 10,952, 11,032 (Jacobson). For example, a 1954 resolution requesting the Board to reconsider its decision to close the virtually all-black School 1 was unsuccessful in achieving its goal, and a 1971 resolution requesting the Board to rescind salary increases given to top school administrators was expressly rejected by the Board. C–1400. Thus, while City Council resolutions are indicative of the City's interest in and attempts to influence school affairs, there is an absence of concrete proof that these resolutions were a consistently successful means by which the City exercised any measurable degree of control over the Board.

### 3. School 4

The interrelationship between the City and the Board, and its effect on housing and school segregation, is illustrated with unmistakable clarity by the treatment accorded School 4. School 4, an elementary school on Trenchard Street in Southeast Yonkers, was one of seven schools closed by the Board in April 1976 as part of its fiscally motivated budget reductions. We have already discussed the City's actions with respect to the School 4 facility subsequent to its closing in 1976. See HOUSING VF3 supra. In this section of our findings, we focus specifically on the circumstances surrounding the Board's retention of the School 4 facility.

School 4 was one of seven schools which the Board closed in April 1976: Schools 3, 7, and 12 and Commerce Middle School in Southwest Yonkers, Schools 4 and 15 in East Yonkers, and School 24 in Northwest Yonkers. State law provides that once a school facility is no longer needed for educational purposes, the Board "shall notify the common council of such fact ... and such common council ... may then sell or dispose of such property in the manner in which other real property owned by the city may be sold or disposed of...." N.Y. Educ.Law § 2556(9) (McKinney 1981). Immediately after the Board's decision to close the schools in 1976, City officials began to consider alternative plans for utilizing the school facilities in contemplation of the Board's returning these properties to the City. GX 1187.1, 1187.2.

As discussed previously in our findings, the 1976 school closings generated enormous community opposition, especially in neighborhoods previously served by Schools 4 and 15. During the summer of 1976, community members continued to voice their objections to the school closings and urged the Board to reconsider its decision to close the schools. P–I 58–71, 58–74. Mayor Martinelli was also actively involved in seeking to reopen Schools 4 and 15; with respect to School 4, Martinelli recommended that the Board reopen the facility as a K–8 school. Tr. 7543–45 (Martinelli). These efforts to reopen Schools 4 and 15 were unsuccessful, and the 1976–77 school year commenced with students from the closed schools reassigned to other schools in the surrounding neighborhoods.

Community opposition to the closing of Schools 4 and 15, however, did not subside. This opposition was expressed in a variety of forms: personal harassment of individual Board members; the creation of an alter-

native school in the School 15 community; the Mayor's commissioning of a traffic engineer to study the reassignment of former School 4 and 15 students; the institution of legal proceedings in New York State courts; and repeated expressions of opposition at Board meetings. *See* SCHOOLS IV.A.3.b *supra.* At a September 1976 Board meeting attended by Mayor Martinelli, a number of speakers, including the Mayor, urged the Board to reject a resolution to return all seven schools to the City. As a result of these "repeated requests," the Board voted to table the resolution. GX 187.

The Board's subsequent disposition of most of the closed schools was relatively uneventful. School 7 and Commerce Middle School were returned to the City later in 1976. Tr. 12,341, 12,348 (Martinelli). School 7 was sold in 1978 to a commercial buyer originally interested in acquiring the School 4 property, and Commerce was used as the City's Community Center. School 24 was retained by the Board for its own use in accordance with the 1976 School Closing plan adopted by the Board, and was subsequently converted into a warehouse facility for the school district.

Schools 3 and 12 were not immediately returned to the City. At the time of its closing, School 3 was in poor physical condition and in need of extensive rehabilitation. GX 126, at 6. In 1977, City officials entered into discussions with Eugene Smilovic concerning the possibility of establishing a religious school in the School 3 facility. GX 1170.2; P–I 199–7 to –9, 119–14 to –17. After this proposal failed to materialize, the school facility was used by the Spanish Community Progress Foundation on a rent-free basis. Sometime in 1980, the Board returned the school to the City. Tr. 12,338–39 (Martinelli).[153] The facility was sold in 1981 to a developer interested in establishing a senior citizen housing project (The Hamilton Apartments).

School 12, a small elementary school facility located in a physically deteriorating commercial neighborhood in Southwest Yonkers, remained unused for several years after its closing in 1976. In a July 1977 application to the New York State Preservation League, City Manager Vincent Castaldo recommended that the facility be used for housing as well as commercial use, or as a community services facility. P–I 77–9. However, no proposals for commercial use of School 12 were made to the City. The school was eventually leased by the Yonkers Community Action Program ("YCAP") and was sold to YCAP in September 1982 for a nominal consideration. C–1623; Tr. 12,346 (Martinelli). Although it is not clear when School 12 was actually returned to the City, the YCAP had possessory rights to the facility for some period prior to its sale. Tr. 12,346. In any event, the circumstances surrounding the return of School 12 to the City were neither unusual nor controversial.

School 15 was considered for a number of potential reuses prior to the Board's decision to return the facility to the City in June 1982. In 1976, while City officials and community members engaged in vigorous efforts to reopen School 15, Planning Director Pistone suggested the possibility of converting the facility into a nursing home in the event it was returned to the City. GX 1187.2. This use was also proposed in the City's 1977 application to the New York State Preservation League. P–I 77–9. By 1979, City officials were considering a proposal to convert the school facility into residential condominiums. P–I 199–22, 199–23. In 1980, Superintendent Raymond unsuccessfully sought funds to rehabilitate the school in order to establish teacher training and enrichment programs there. GX 279a; P–I 45–173; Tr. 11,814–15 (O'Keefe). School 15 was returned to the City in 1982 and a citizen's committee was established by the City Council to recommend a use for the School 15 site. In late 1983 and mid–1984, the City Council approved the committee's preliminary reports recommending that single-family

---

**153.** The Board had previously approved a proposal by Superintendent Raymond, never implemented, to transfer adult education programs to the school. P–I 45–173.

homes be built on the School 15 site. Tr. 7796–97 (Longo).

The fate of School 4, on the other hand, was the focus of considerably greater attention. Although community efforts to reopen the school eventually subsided during the 1977–78 school year, the Board did not return the school to the City for disposition. Despite the City's precarious fiscal condition and the drastic budgetary cutbacks implemented by the Board in 1976, the Board retained the vacant School 4 facility, incurring expenses of approximately $40,000 to $50,000 a year to maintain the facility in a non-operative state. Tr. 7542–43 (Martinelli). By the late 1970's the Board had apparently abandoned any serious plans to either reopen the school or use the facility for other educational purposes. Instead, by 1979 School 4 began to be mentioned as a potential site for Section 8 subsidized housing units, while the Board continued to hold onto the property while making no educational use of the School 4 facility.

The City also exhibited little interest in either disposing of the facility or implementing some productive use. Subsequent to its closing in 1976, School 4 was recommended or otherwise under consideration for a variety of residential and commercial uses. P–I 199–6, 199–18. Such proposals, however, were generally resisted because of the possibility that City officials and community members would eventually persuade the Board to reverse its decision to close the school. Tr. 7517 (Martinelli). In 1978, VSP Co., a video and software production center, expressed an interest in acquiring the School 4 facility. The City dissuaded VSP from acquiring School 4 and instead sold the School 7 facility to VSP for a considerably lower consideration.

During 1979, by which time the efforts to reopen School 4 had subsided, School 4 began to be mentioned as a potential site for Section 8 subsidized housing. GX 1118.41, 1118.117; Tr. 7953–57 (Cipriani). In 1980, School 4 was included as one of fourteen possible housing sites submitted by the City to HUD, and was one of three sites which HUD subsequently found to be suitable for the development of subsidized housing. P–I 199–37, 199–40. However, as discussed previously in our findings, the City's actions with respect to the facility were clearly inconsistent both with any serious limitations on its ability to utilize the School 4 facility as it deemed appropriate and with any sincere intent to secure its return for purposes of developing subsidized housing at that site. *See* HOUSING VF3 *supra*. As late as May 1981, City Manager Eugene Fox notified HUD that no schedule had been set for the return of School 4 to the City. GX 1140.29. In August 1981, Fox notified HUD that the City was still "continu[ing] to work towards effecting the transfer of Public School 4" from the Board in order to allow for its future use as subsidized housing. GX 1140.43; Tr. 8577–80 (Schiffman). As of the end of the year, however, the Board continued to retain the school in what was almost a six year period of inactivity. Tr. 7789 (Longo).

In early 1982, Acting City Manager Theodore Garofalo was notified of a developer's interest in converting the School 4 facility into condominiums. GX 1170.7–1170.8. On March 16, the developer expressed similar interest to his successor, Sal Prezioso. GX 1170.9. Two days later, the Board and Superintendent Raymond were notified by Prezioso that a developer was interested in purchasing School 4 and converting it into "luxury-type housing". GX 1170.10. Within days, Superintendent Raymond informed Prezioso that the Board was reviewing the matter and that she had strongly recommended that the Board take some action with respect to the "unused" School 4 and 15 facilities. GX 1170.11. Three months later, the Board, now indicating that it had no plans to reopen the school or use the facility for any other educational function, returned the school to the City. P–I 199–52. Subsequently, the City proceeded toward the sale of the property to a private residential developer. An all-white citizen's committee from the School 4 area was appointed by Councilmember Cipriani to evaluate re-use proposals; the committee, unguided by City planning officials or criteria, met with three

developers and recommended Morelite Construction Company, a condominium builder; and the City Council, without prior public bidding and after an acrimonious public hearing at which the community expressed strong approval of the condominium proposal and strong opposition to the possibility of developing subsidized housing at the site, voted to sell School 4 to Morelite. *See* HOUSING V.F.3 *supra.*

The City's involvement in the treatment of School 4 is illustrative of the subtle manner in which the City, assisted by the inaction of the Board, succeeded in its perpetuation of racial segregation in Yonkers. While there is little evidence of overt attempts to direct Board conduct through express communication or resolution discouraging the return of School 4 to the City, the simultaneous actions of the City and Board speak for themselves. Unlike its treatment of the other schools closed in 1976, which were either returned that year to the City, put to other educational use, or were initially unable to attract interested developers or buyers, School 4 remained in limbo to the clear financial detriment of the City, while the City engaged in a series of acts designed to impede the use of School 4 as a site for subsidized housing. Like the mayoral appointment process or the City Council's budgetary control over the school district, the City's conduct in this instance

is not credibly justifiable simply by reference to state law. Instead, the Board's retention of School 4 is illustrative primarily of the manner in which the City, by its acts and omissions, utilized its relationship with the Board to successfully avoid the development of subsidized housing in East Yonkers. The sequence of events surrounding the City's treatment of the inoperative School 4 facility constitutes persuasive evidence of the City's discriminatory intent and its perpetuation of residential, and consequently school, segregation in Yonkers.

## VI. CONCLUSIONS OF LAW

### A. *Jurisdiction*

■■■■■ In the school-related portion of this case, the United States seeks to enforce the provisions of Title IV, Title VI and regulations thereunder, the fourteenth amendment, and contractual assurances made by the Board in consideration of its continuing receipt of federal financial assistance. Complaint ¶ 1. Jurisdiction is alleged to be proper under 28 U.S.C. § 1345, 42 U.S.C. § 2000c-6, and 42 U.S.C. § 2000d-1. *Id.* ¶ 2. The NAACP alleges violations of Title VI, 42 U.S.C. § 1981 *et seq.*, the thirteenth and fourteenth amendments, and New York State law.[154] Com-

---

**154.** The NAACP's claim of unlawful school segregation is not cognizable as a violation of the thirteenth amendment. *See Alma Society, Inc. v. Mellon,* 601 F.2d 1225, 1236–38 (2d Cir.1979), *cert. denied,* 444 U.S. 995, 100 S.Ct. 531, 62 L.Ed.2d 426 (1980); *Parent Association of Andrew Jackson High School v. Ambach, supra,* 598 F.2d at 715. The NAACP's fourteenth amendment claim is cognizable as an alleged violation of 42 U.S.C. § 1983. *See Turpin v. Mailet,* 591 F.2d 426, 427 (2d Cir.1979) (en banc) (per curium), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980). Finally, the clear weight of legal authority suggests that both the NAACP and the United States are empowered to sue to enforce the provisions of Title VI. *See Guardians Association v. Civil Service Commission,* 463 U.S. 582, 103 S.Ct. 3221, 3227–28, 77 L.Ed.2d 866 (1983) (White, J., joined by Rehnquist, J.); 3244–45 (Marshall, J.); 3250 (Stevens, J., joined by Brennan, J., and Blackmun, J.) (holding that provisions of Title VI may be enforced in a private action against recipients of federal funds); *Brown v. Califano,* 627 F.2d 1221, 1232

n. 67 (D.C.Cir.1980) (Attorney General has authority to initiate Title VI enforcement actions); *United States v. Marion County School District,* 625 F.2d 607, 609–17 (5th Cir.1980) (same), *cert. denied,* 451 U.S. 910, 101 S.Ct. 1980, 68 L.Ed.2d 298 (1981).

In its complaint, the NAACP also requests that this Court exercise pendent jurisdiction over its allegation that the defendants' conduct violates state law and grant equitable relief for such violation. *See* Complaint ¶¶ 3, 4; p. 11. The NAACP's state law claim has not been specifically addressed or pursued subsequent to the filing of its complaint except as noted herein. The Supreme Court also has recently held that federal courts are barred from awarding injunctive relief against state officials for violations of state law, and that this principle applies to state law claims brought into federal court under pendent jurisdiction. *See Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). This Court therefore lacks jurisdiction to adjudicate the NAACP's state law claim.

plaint ¶ 20; p. 11. Jurisdiction is alleged to be proper under 28 U.S.C. § 1343(3) and (4). *Id.* ¶ 3.

### 1. *The Board of Education*

The Board argues that the United States lacks standing and that this Court lacks jurisdiction over the United States' claims under either (1) Title IV, because the NAACP (the private complaining party) was able to initiate and maintain legal proceedings on its own behalf, or (2) Title VI, because the United States Department of Education did not attempt to secure voluntary compliance from the Yonkers School District prior to the initiation of this lawsuit, in accordance with applicable regulations. These contentions have been rejected in a previous Opinion of this Court. *See United States v. Yonkers Board of Education,* 80 Civ. 6761, slip op. at 1–2 (S.D. N.Y. Mar. 12, 1982). Accordingly, this Court has jurisdiction pursuant to the aforementioned statutes over the claims of the United States alleging unlawful school segregation by the Board. The Court also has jurisdiction, pursuant to 28 U.S.C. § 1343(3) and (4), over the NAACP's claims of unlawful school segregation brought pursuant to § 1983 and Title VI.

### 2. *The City*

The City argues that the claims of the United States alleging unlawful school segregation by the City must be dismissed. Specifically, the City contends that the four enumerated bases for the United States' claim of school segregation—Title IV, Title VI, the fourteenth amendment, and contractual assurances by the Board—cannot properly serve as a basis for maintaining the school-related portion of this case against the City.

The United States concedes that its Title VI claim is asserted solely against the Board, and not the City. *See United States v. Yonkers Board of Education,* 518 F.Supp. 191, 201 (S.D.N.Y.1981). In addition, the United States does not contend that its contractual claim is asserted against the City.

As for the remaining grounds, the City contends that the United States lacks standing to assert *Bivens*-type claims directly under the fourteenth amendment, *see id.* at 201, and that no statute authorizes the United States to assert alleged violations of the fourteenth amendment. Therefore, the City argues, this Court lacks subject matter jurisdiction over the government's constitutional claim.

The City also argues that Title IV authorizes the Attorney General to initiate proceedings only against a "school board" and not against an entity such as the City of Yonkers, and that the government's allegations of unlawful school segregation by the City are therefore not cognizable under Title IV. According to the City, its lack of control over Board conduct and its lack of responsibility for the operation of the Yonkers public schools preclude the United States from asserting a claim of unlawful school segregation against the City pursuant to Title IV.

▉ As for the constitutional claim, several circuit courts have held that the United States lacks standing under the Constitution to assert the constitutional claims of others. *See United States v. Philadelphia,* 644 F.2d 187 (3d Cir.1980) (challenging city police department practices); *United States v. Mattson,* 600 F.2d 1295 (9th Cir.1979) (challenging conditions in state mental hospital); *United States v. School District of Ferndale,* 577 F.2d 1339, 1345–46 (6th Cir.1978) (school desegregation suit brought under Equal Educational Opportunities Act); *United States v. Solomon,* 563 F.2d 1121 (4th Cir.1977) (challenging conditions in state mental hospital); [155] *see also Estelle v. Justice,* 426 U.S. 925, 96 S.Ct. 2637, 49 L.Ed.2d 380 (1976) (Rehnquist, J., joined by Burger,

---

**155.** While *Mattson* and *Solomon* were followed by congressional authorization of suits by the Attorney General challenging conditions of state mental hospitals, 42 U.S.C. § 1997, this subsequent development does not undermine and to a certain extent reinforces the conclusion that the United States lacks standing to bring suit directly under the Constitution absent statutory authorization to do so. *See* page 1524 *infra* (discussing *Ferndale* ).

C.J., and Powell, J., dissenting from denial of petition for writ of certiorari) (suggesting, in suit challenging state prison conditions, that United States lacks inherent standing to assert constitutional claims of others). *Cf. Halderman v. Pennhurst State School and Hospital,* 612 F.2d 84, 90–92 (3d Cir.1979) (en banc) (allowing United States to intervene in already-commenced § 1983 suit but not deciding issue of governmental standing to initiate suit directly under Constitution), *rev'd on other grounds,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). While the first three decisions cited above relied primarily on the absence of congressional authorization of the type of lawsuit initiated by the United States, the existence of Title IV does not necessarily compel the conclusion that the United States has standing to institute school desegregation cases directly under the Constitution as well. Indeed, the *Ferndale* decision is astute in its recognition that to permit the government to assert constitutional claims in school desegregation cases by suing directly under the Constitution would allow it to circumvent Title IV's procedural prerequisites to the assertion of equal protection violations in school desegregation cases. 577 F.2d at 1345–46. Accordingly, the existence of statutory authorization to initiate school desegregation cases would appear to reinforce, rather than undermine, the conclusion that the United States lacks standing directly under the Constitution to assert the constitutional claims of others.

It is equally clear, however, that Title IV authorizes the United States to enforce the equal protection guarantee of the fourteenth amendment. *See Brown v. Califano,* 627 F.2d 1221, 1232 n. 67 (D.C.Cir.1980) ("[T]he Department of Justice has standing to enforce the guarantees of equal protection, as embodied in Title IV"); *United States v. School District of Ferndale, supra,* 577 F.2d at 1346 n. 12 ("Of course, there is nothing to prevent the Attorney General from asserting violations of the EEOA and the fourteenth amendment in

the same complaint where relief is sought under both the EEOA and Title IV.") (emphasis deleted). This conclusion is supported by the language of the statute itself, *see* 42 U.S.C. § 2000c–6(a) ("Whenever the Attorney General receives a complaint ... that ... children ... are being deprived by a school board of the equal protection of the laws, ... the Attorney General is authorized ... to institute for or in the name of the United States a civil action ...."), and has been implicitly recognized in prior school desegregation suits brought by the United States. *See e.g., United States v. Texas Education Agency,* 467 F.2d 848, 853 (5th Cir.1972) (en banc) (suit brought by United States under Title IV; court found equal protection violation); *United States v. School District 151 of Cook County,* 404 F.2d 1125, 1127–28 (7th Cir. 1968) (same), *cert. denied,* 402 U.S. 943, 91 S.Ct. 1610, 29 L.Ed.2d 111 (1971); *see also United States v. Massachusetts Maritime Academy,* 762 F.2d 142, 148 (1st Cir.1985). Thus, the United States has standing to enforce the equal protection clause of the fourteenth amendment by virtue of the express statutory authorization provided by Title IV.

The remaining novel issue, then, is whether Title IV authorizes a suit by the United States against a municipal entity such as the City of Yonkers.[156] In this regard, we note that the language of the statute is not as limited as the City suggests. While referring to the government's receipt of a complaint that a "school board" is denying students the equal protection of the laws and the government's obligation to provide pre-litigation notice to the appropriate "school board" of such a complaint, the statute also authorizes the Attorney General to institute a civil action "against such parties and for such relief as may be appropriate." 42 U.S.C. § 2000c–6(a). Thus, while Title IV enumerates procedural prerequisites to government-initiated school desegregation suits, nothing in

---

**156.** In the only other directly comparable decision involving municipal liability for school segregation, the claims were asserted by private litigants under § 1983 and the fourteenth amendment. *See Arthur v. Nyquist, supra,* 415 F.Supp. at 909.

the statute expressly precludes the United States from initiating such suits against parties other than school boards so long as these prerequisites have been satisfied. In addition, the statute permits the government to implead "such additional parties as are or become necessary to the grant of effective relief hereunder," thus permitting the City to be properly included as a party to any remedial proceedings insofar as both the United States and the NAACP are concerned. *Cf. Plaquemines Parish School Board v. United States,* 415 F.2d 817 (5th Cir.1969) (permitting addition of Commission Council to school desegregation case pursuant to Title IV in order to prevent council from transferring school property). Finally, it is clear that this Court has jurisdiction over the NAACP's constitutional claim, brought pursuant to § 1983, of unlawful school segregation by the City under 28 U.S.C. § 1343 and thus the City is in any event a proper party to the liability phase of this lawsuit. *See Arthur v. Nyquist, supra.* Since allegations of intentional school segregation against parties other than school boards may be made by private litigants, we see little policy justification for more narrowly circumscribing the scope of potential parties who may be included as defendants in school desegregation cases initiated by the government under Title IV, particularly since the statute expressly contemplates the impleading of additional parties by the government for purposes of implementing remedial measures.

The Sixth Circuit's interpretation of a similar provision contained in the Equal Educational Opportunities Act of 1974, 20 U.S.C. § 1701 *et seq.* ("EEOA"), supports our conclusion that the City may be included as a defendant in the school desegregation portion of this case pursuant to Title IV. In *United States v. School District of Ferndale, supra,* the Sixth Circuit upheld the Attorney General's authority to include state officials in a school desegregation action brought pursuant to the EEOA. That statute, like Title IV, authorizes the Attorney General to institute enforcement proceedings "against such parties, and for such relief, as may be appropriate." In

*Ferndale,* the district court held that the state defendants (the State of Michigan, the Governor, the Michigan State Board of Education, and the Michigan Superintendent of Public Instruction) were not subject to suit under the EEOA because they were not the "educational agency" which had allegedly denied individuals the right to equal educational opportunity. The court noted that the EEOA, unlike Title IV, does not authorize the Attorney General to implead additional parties for purposes of granting relief for the statutory violations of educational agencies. 400 F.Supp. 1122, 1138–39. The Sixth Circuit reversed, finding that the indirect assistance provided by the state defendants through their financial support of the local school district and their potential involvement in future remedial phases rendered them "appropriate" parties to the litigation. 577 F.2d at 1347–48. While the legal relationship between the state and local defendants in *Ferndale* and the City and school officials in Yonkers is not precisely analogous, the City's budgetary and other indirect involvement in school affairs and the more expansive provisions of Title IV provide an appropriate basis for permitting the government to include the City as a party to its Title IV enforcement action.

We recognize that federalism and separation of powers principles have, in other circumstances, been recognized as relevant in determining the government's power to challenge the allegedly unconstitutional conduct of local governmental entities. *See United States v. City of Philadelphia, supra,* 644 F.2d at 199–203; *United States v. Mattson, supra,* 600 F.2d at 1300–01; *United States v. Solomon, supra,* 563 F.2d at 1128–29. The separation of powers concern of these decisions, however, was articulated as a reason for refusing to grant the United States standing to sue directly under the Constitution to challenge the allegedly unlawful operation of a state governmental entity. As noted previously, this holding was based primarily on the absence of any congressional authorization for the type of lawsuit initiated by the government, a circumstance which is not present

in the instant case. The separation of powers concern of these decisions is thus inapposite in the circumstances of the instant case.

 As for federalism concerns, we are unable to find any authority suggesting that the principle of federalism may serve as a legitimate impediment to the initiation of school desegregation suits against any and all parties who have contributed to the allegedly unlawful condition with the requisite intent. Indeed, we fail to see how the initiation of a school desegregation suit against a municipality is any more intrusive as a matter of federal-state relations than the initiation of such a suit against a school board, a suit which has never been considered to be inconsistent with our federal system of government. In this connection, we reject the City's reliance on the Board's responsibility under state law for the operation of the Yonkers public schools as a reason for precluding the government from proceeding against the City for the City's allegedly unlawful role in creating or maintaining the racial segregation of these schools. In light of the allegations of City involvement in school affairs and intentional housing discrimination, the City's separate legal status under state law cannot properly serve as a limit on the scope of congressionally granted governmental authority under Title IV to enforce federal constitutional guarantees against state and local governmental authorities whose acts and omissions create or substantially contribute to school segregation.

The Supreme Court's recognition of the importance of federalism principles in the development of federal constitutional jurisprudence is not inconsistent with this conclusion. Three decisions in particular have become particularly noteworthy in their recognition of federalism principles as a limit on the authority of federal courts to intervene in the operations of state and local government entities. *See National League of Cities v. Usery,* 426 U.S. 833, 96

S.Ct. 2465, 49 L.Ed.2d 245 (1976); *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). None of these decisions, however, suggest that municipal liability in the circumstances of the instant case would violate these federalism principles.

The *Younger* doctrine, setting limits on the extent to which federal courts may interfere with ongoing state judicial proceedings, is premised on the legitimate interest of the states in enforcing its own laws. 401 U.S. at 44–45, 51–52, 91 S.Ct. at 750–51, 754. *Rizzo* extended this principle to the executive branch of state and local governments, holding that a federal court injunction ordering a local police department to implement a variety of prophylactic procedures designed to minimize misconduct by its employees violated federalism principles by unduly interfering in the internal affairs and operations of a police department whose policies and practices were not shown to be unlawfully discriminatory. 423 U.S. at 377–80, 96 S.Ct. at 607–8. Neither case suggests that a local governmental entity whose policies and practices are shown to be intentionally discriminatory and result in the racial segregation of its housing and schools may not be held liable for such conduct in federal court, with appropriate remedies commensurate with the constitutional or statutory violation. Unlike a state's interest in enforcing state law or a police department's interest in developing its own operational procedures free of intensive federal supervision,[157] the City's alleged violation of Title VIII, along with its allegedly segregative conduct affecting Yonkers public schools, cannot lay similar claim to federal judicial deference based on the desire to avoid interference with the legitimate operations of state and local governmental entities. The government in this case does not seek to disrupt or obtain federal judicial

---

**157.** The *Rizzo* decision also was based on the absence of any proof that the defendant municipal authorities had played any affirmative role in the deprivation of constitutional rights by police department employees, a necessary pre-

requisite to municipal liability under § 1983. 423 U.S. at 373–77, 96 S.Ct. at 605–07. The City does not contend that its housing and school-related policies and practices are an insufficient predicate for liability in this respect.

supervision over the workings of a judicial, legislative or executive agency which has engaged in the legitimate and lawful exercise of its state authority; instead, it seeks to hold a municipality liable for its implementation of discriminatory policies and practices in violation of federal constitutional and statutory rights. As noted previously, the government's claims against the City are difficult to distinguish, as a matter of federalism, from its claims against the Board; we find it inappropriate to create federalism-based obstacles to the government's initiation of either type of lawsuit.

As for *Usery*, the Supreme Court has recently overruled the *Usery* decision. *See Garcia v. San Antonio Metropolitan Transit Authority*, — U.S. —, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). We also note that the *Usery* decision, which held that certain areas of state governmental activity are constitutionally immune from federal regulatory power, in no way contemplated similar protection from the federal government's authority to enforce the substantive provisions of the fourteenth amendment. *See Hunter v. Underwood*, — U.S. —, 105 S.Ct. 1916, 1923, 85 L.Ed.2d 222 (1985); *Monell v. Department of Social Services*, 436 U.S. 658, 690 n. 54, 98 S.Ct. 2018, 2035 n. 54, 56 L.Ed.2d 611 (1978); *Fitzpatrick v. Bitzer*, 427 U.S. 445, 453 n. 9, 96 S.Ct. 2666, 2670 n. 9, 49 L.Ed.2d 614 (1976).

In conclusion, we hold that the United States has the authority under Title IV to assert its claim of unlawful school segregation by the City of Yonkers, and that this Court has jurisdiction over the government's claim of unlawful school segregation by the City pursuant to 28 U.S.C. § 1345 and 42 U.S.C. § 2000c-6. This Court also has jurisdiction over the NAACP's claim of unlawful school segregation by the City pursuant to 28 U.S.C. § 1343(3) and (4).

## B. *Liability*

As noted at the outset of this Opinion, this case is not simply another in a long line of school desegregation cases. Few cases have involved tangible inequalities in educational opportunity, as we have discussed this term, which have so closely paralleled and become intimately bound up with racial imbalance. Few cases have arisen in a political setting in which school board policy was as subject to municipal influence as in Yonkers. No case has ever previously been brought in which a court was asked to determine the liability of state actors for both housing and school segregation. And no case has ever considered the legal ramifications of the confluence of these unique and important considerations. We must therefore examine closely each of these considerations, together with the other acts and omissions of the school board, in order to determine whether legal responsibility for the racial segregation of Yonkers public schools may properly be placed with the Board or the City, or both.

### 1. *The Board of Education*

### a. *Independent Conduct of School Authorities*

The record has demonstrated an absence of any consistent pattern of segregative school openings or closings or racial gerrymandering of attendance lines which have had systemwide segregative impact. Individual, deliberately segregative school opening, closing, and attendance zone decisions, however, have occurred. The consistent impact of these decisions—the setting and adherence to School 1's original attendance zone boundaries (1938 to 1954), the events leading up to attendance zone boundary changes between Schools 6 and 25 (1948), the pattern of segregative changes to the attendance zone boundary separating Schools 16 and 25 (1953–68), the reassignment of minority Runyon Heights students from Emerson to Burroughs (1973), the opening of Commerce Middle School (1973)—was to avoid the assignment either of Northwest Yonkers white students to disproportionately minority schools or of minority students to disproportionately white Northwest Yonkers schools. While most of these decisions were followed by subsequent developments

with respect to the particular school or group of students which were desegregative in varying degrees—the closing of School 1 (1954), the redrawing of the School 6/25 attendance zone boundary (1948), the reassignment of Runyon Heights students from Burroughs to Whitman (1978), the closing of Commerce Middle School (1976)—these decisions nevertheless have reinforced the racial imbalance between Southwest and Northwest Yonkers schools and thus contributed to the racial identifiability of these areas.

The segregated condition of many Southwest Yonkers schools (elementary schools in particular) cannot be similarly traced to affirmative, intentionally segregative changes in attendance zones or student assignment decisions. The Board, however, has not completely eschewed segregative decisionmaking in other areas of school operations affecting Yonkers public schools. In four areas, the Board has engaged in unlawfully discriminatory acts and omissions, all of which have had systemwide impact and have served to perpetuate racial segregation in public schools and discriminatory attitudes in the Yonkers community. Thus, while the Board's perpetuation of school segregation in Yonkers was not overt or explicitly proclaimed, the Board has affirmatively contributed to an appreciable degree to this condition.

■ One area in which the Board has exhibited segregative intent with current segregative impact is in the assignment of faculty and administrative staff. The intentional segregation of school faculty is an important factor in evaluating whether a school board has acted with segregative intent in the operation of its school system as a whole. *See Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 18, 91 S.Ct. 1267, 1277, 28 L.Ed.2d 554 (1971); *Diaz v. San Jose Unified School District, supra,* 733 F.2d at 670; *Reed v. Rhodes, supra,* 607 F.2d at 725; *Oliver v. Michigan State Board of Education, supra,* 508 F.2d at 185; *Arthur v. Nyquist, supra,* 415 F.Supp. at 945. While such segregation does not establish a *prima facie* case of intentional segregation of students, *see Columbus Board of Education v. Penick, supra,* 443 U.S. at 536 n. 9, 99 S.Ct. at 2978 n. 9, it is nevertheless a significant indication of school board intent in general. In addition, while the segregation of faculty is not necessarily a substantial or significant causal factor in the perpetuation or exacerbation of school segregation, *see Diaz v. San Jose Unified School District,* 518 F.Supp. 622, 641 (N.D. Cal.1981), *rev'd on other grounds,* 733 F.2d 660, 670 (9th Cir.1984) (en banc), *cert. denied,* —— U.S. ——, 105 S.Ct. 2140, 85 L.Ed.2d 497 (1985); *Alexander v. Youngstown Board of Education,* 454 F.Supp. 985, 1072 (N.D.Ohio 1978), *aff'd,* 675 F.2d 787 (6th Cir.1982); *Higgins v. Board of Education of Grand Rapids,* 395 F.Supp. 444, 478–79 (W.D.Mich.1973), *aff'd,* 508 F.2d 779 (6th Cir.1974), such segregation frequently has been found to be a significant contributor to school segregation. *See Reed v. Rhodes, supra,* 607 F.2d at 725; *NAACP v. Lansing Board of Education, supra,* 559 F.2d at 1052; *Morgan v. Kerrigan, supra,* 509 F.2d at 597–98; *Armstrong v. O'Connell, supra,* 463 F.Supp. at 1306–07.

■ The Board's staff assignment practices are significant both as a matter of intent and segregative impact. The assignment of disproportionate numbers of minority staff to disproportionately minority schools in Southwest Yonkers served as a clear indication that racial segregation was acceptable even where residential segregation and transportation concerns did not impede the implementation of race-neutral assignment policies. While the mathematical extent of staff segregation in Yonkers public schools was not overwhelming, the Board's assignment policies had an appreciable impact on the schools, with their most segregative impact occurring during the period of most intensive subsidized housing development in Southwest Yonkers. *Cf. Diaz v. San Jose Unified School District, supra,* 518 F.Supp. at 641 (insignificant segregative impact found where faculty segregation exceeded 15% minority staff in any one school in only two instances). The segregation of staff not only impacted upon Southwest and East Yonkers schools

in a racially segregative fashion, but also was exacerbated by the relative inexperience of minority staff members and by the assignment of minority Special Education teachers to predominantly white schools. *Cf. Morgan v. Kerrigan, supra,* 509 F.2d at 596; *Berry v. Benton Harbor, supra,* 442 F.Supp. at 1301–02. The district's belated and limited efforts to rectify this condition did not eliminate the segregative impact of its previous assignment practices. Like the City's confinement of subsidized housing to Southwest Yonkers, the Board's staff assignment practices are most significant by virtue of the confirmatory impact which they had on racial segregation in Yonkers public schools as a whole.

The Board's vocational education program has also been affected by the discriminatory practices over the years. The steering of minority students into such programs, followed by the continued adherence to knowingly segregative screening policies, both operated to deprive minorities (particularly blacks) of equal educational opportunities on the secondary school level. As with staff assignments, school authorities were for many years relatively unresponsive to the acknowledged disproportion in minority enrollment in vocational programs and did relatively little to overcome the previously created disincentives for enrolling in these programs. As a consequence, minority students were disproportionately affected by inadequacies in the secondary school curriculum at Gorton and Yonkers High Schools, a condition which also existed for several years.

The district's operation of its Special Education program, while not "segregative" in and of itself, was nevertheless marked by discriminatory treatment of minority students which served to reinforce community opposition to desegregation. Minority students not only were assigned in disproportionate numbers to such classes but also were accorded treatment entirely inconsistent with the Board's general neighborhood school policy. While the district made concerted efforts to rectify discriminatory aspects of the program, the impact of its prior practices, along with other unremedied practices, continued up to the filing of this lawsuit. The operation of the Special Education program reinforced discriminatory community attitudes toward minorities in a manner consistent with the City's implicit recognition of and responsiveness to similar attitudes in its development of subsidized housing policies. *Cf. United States v. Texas Education Agency, supra,* 600 F.2d at 526–27 (foreseeable and unforseen segregative impact of intentionally discriminatory act constitutes part of constitutional violation); *Arthur v. Nyquist, supra,* 415 F.Supp. at 929 (discussing significance of school board conduct which contributes to discriminatory attitudes of white community members).

The Board's student assignment practices on the secondary school level were also marked in some instances by segregative intent. While the Board closed Commerce in 1976 and reassigned some of its minority students to Emerson, this action was taken only after the Board's deliberately segregative opening of Commerce three years earlier. In addition, the district maintained the Longfellow and Fermi facilities in an underutilized and racially imbalanced condition despite the availability of additional space at physically superior, predominantly white East Yonkers schools and the proximity of white East Yonkers middle school students to these two Southwest Yonkers schools. The frequently mentioned possibility of effectuating desegregation among the district's high schools was acted upon only in 1973 (the Homefield redistricting) despite the acknowledged limited relevance of neighborhood school policy considerations in determining secondary school student assignments.

The Board's rejection of desegregative school reorganization proposals is also relevant to the liability determination. Under similar circumstances, The Supreme Court has held that

The question of whether a rescission of previous board action is in and of itself a violation of appellants' constitutional rights is inextricably bound up with the question of whether the Board was under a constitutional duty to take the ac-

tion which it initially took.... If the Board was not under such a duty, then the rescission of the initial action in and of itself cannot be a constitutional violation. If the Board was under such a duty, then the rescission becomes a part of the cumulative violation, and it is not necessary to ascertain whether the rescission *ipso facto* is an independent violation of the Constitution.

*Dayton Board of Education v. Brinkman,* 433 U.S. 406, 414, 97 S.Ct. 2766, 2772, 53 L.Ed.2d 851 (1977) (*quoting Brinkman v. Gilligan,* 503 F.2d 684, 697 (6th Cir. 1974)).[158] Other courts have similarly noted that the rejection of integrative proposals, while not unlawful by itself, is evidence of segregative intent which, along with other evidence of intent, can form the basis for a finding of unlawful school segregation. *Armstrong v. Brennan, supra,* 539 F.2d at 636 ("In finding discriminatory intent, the District Court could properly consider, together with other evidence, defendants' refusal to adopt integration proposals [citations omitted], even though that refusal alone would not prove the requisite intent."), *vacated on other grounds,* 433 U.S. 672, 97 S.Ct. 2907, 53 L.Ed.2d 1044 (1977)[159]; *Oliver v. Michigan State Board of Education, supra,* 508 F.2d at 186 (revocation of desegregation plan "in light of the prior cumulative constitutional violation by the school authorities, is further evidence of the Board's racially segregative purpose").

Consistent with the above principles, the rejection of or failure to implement school desegregation plans has been the basis for a finding of unlawful segregation in two general contexts. First, the failure to implement school desegregation plans, particularly when in response to racially motivated community opposition, has been deemed unlawful where the state has previously been found to have operated a dual school system. *See Swann v. Charlotte-Mecklenburg Board of Education, supra,* 402 U.S. at 13, 91 S.Ct. at 1274; *Green v. County School Board,* 391 U.S. 430, 437–38 (1968); *Cooper v. Aaron,* 358 U.S. 1, 15–16, 78 S.Ct. 1401, 1408, 3 L.Ed.2d 5 (1958). In such cases, a school board is under a legal obligation to eliminate the segregative effects of prior *de jure* segregation, and courts have held that community resistance to the performance of such an obligation cannot justify a failure to remedy school segregation. *See, e.g., United States v. Scotland Neck City Board of Education,* 407 U.S. 484, 491, 92 S.Ct. 2214, 2218, 33 L.Ed.2d 75 (1972); *Monroe v. Board of Commissioners of Jackson,* 391 U.S. 450, 459, 88 S.Ct. 1700, 1705, 20 L.Ed.2d 733 (1968).

Second, the refusal to implement desegregation plans has been held to constitute a basis for a finding of unlawful school segregation where this refusal has been combined with other affirmative acts of segregation. In the principal cases in which such findings have been made, the respective school boards were also found to have engaged in a number of other acts involving student assignment policies which were clearly consistent, in terms of segregative intent, with the refusal to desegregate. *See Arthur v. Nyquist, supra,* 573 F.2d at 144–45 (redistricting of high school, language transfer policy, districting of junior high school, use of optional attendance zone areas, discriminatory vocational school admission policy, and racially dis-

---

**158.** While *Dayton* involved the rescission of a previous school board's resolutions acknowledging responsibility for creating segregative racial patterns and calling for various types of remedial measures, we see no constitutionally relevant distinction between such conduct and a school board's refusal to implement a desegregation proposal in the first instance such that the latter decision could be considered any less an indication of segregative intent.

**159.** Although *Armstrong* was vacated and remanded by the Supreme Court, the Court's decision was based on the "unexplained hiatus" between the lower court's findings and conclusions regarding segregative intent, and on the need for the lower courts to evaluate the Supreme Court's decision in *Dayton Board of Education v. Brinkman* (rendered two days earlier) in formulating a remedial plan. *Brennan v. Armstrong,* 433 U.S. 672, 672–73, 97 S.Ct. 2907, 2907, 53 L.Ed.2d 1044 (1977); *see NAACP v. Lansing Board of Education, supra,* 559 F.2d at 1047–48 & n. 6. We do not interpret this subsequent development as undermining the legal principles for which *Armstrong* is cited in text.

criminatory staff recruiting and assignment); *Armstrong v. Brennan, supra,* 539 F.2d at 629–32 (pattern of segregative boundary changes, intact busing, open transfer policy, and faculty segregation); *Morgan v. Kerrigan, supra,* 509 F.2d at 586–98 (segregative reassignments and use of portable classrooms in response to overcrowding, use of segregative feeder patterns and transfer options, open enrollment and controlled transfer policies, discrimination in staff assignment and promotion, and segregative redistricting); *Oliver v. Michigan State Board of Education, supra,* 508 F.2d at 185–86 (segregative attendance zone policy, school construction and siting policy, staff assignment policy, conscious neglect of opportunities to decrease segregation, lack of minority staff); *United States v. School District 151, supra,* 404 F.2d at 1131–32 (segregative transfer policy, boundary changes, busing policy, and faculty assignments, affecting three of district's six schools).

In our view, the Yonkers Board of Education's refusal to adopt desegregative school reorganization proposals does not fall precisely within either category of cases. The Board has not failed to fulfill an obligation to dismantle a dual school system; nor has it engaged in what, standing alone, could fairly be characterized as a significant number of affirmative acts of intentional segregation in the area of student assignments, particularly on the elementary school level. This fact, however, does not end our inquiry into the legal significance of the Board's failure to adopt desegregative reorganization plans for Yonkers public schools. In our opinion, two other critical factors must be examined before this issue can be properly resolved.

### b. *Denial of Equal Educational Opportunity*

■ The Yonkers public schools not only are racially segregated, but also are unequal in the quality of educational opportunity afforded to students in these schools. As a factual matter, the existence of such disparities has clearly worked to the disadvantage of minority students, who for many years have received their educational instruction in generally inferior facilities, from generally less experienced staff, in generally more overcrowded and unstable conditions. On the secondary school level, minority students were generally more likely to be deprived of the full benefits of the district's academic and vocational programs.

The significance of the disparities in educational opportunity in Yonkers public schools lies, for these purposes, not in the manner of their creation but in the reasons underlying their perpetuation. Disparities in the quality of school facilities, the scope of curricular offerings, staff experience, or student enrollment and turnover, were not created by discriminatory allocations of funds or other resources; some disparities existed well before the presence of significant numbers of minorities in the city. *Cf. Bell v. Board of Education, Akron Public Schools,* 491 F.Supp. 916, 941 (N.D.Ohio 1980), *aff'd,* 683 F.2d 963 (6th Cir.1982); *Berry v. Benton Harbor, supra,* 442 F.Supp. at 1306. At the same time, however, the Board's more recent conduct served to perpetuate many of these inequalities, thus depriving many minority students of an educational experience comparable to that available at other public schools in Yonkers. Such a condition was not simply a foreseeable result of the Board's segregative policies and practices. *Cf. NAACP v. Lansing Board of Education, supra,* 429 F.Supp. at 602–04; *Oliver v. Kalamazoo Board of Education,* 368 F.Supp. 143, 174–75 (E.D.Mich.1973) (school board found liable where result of board's school construction and boundary policy was that "old schools were left to Blacks"), *aff'd,* 508 F.2d 178 (6th Cir.1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). Rather, this is a case in which school authorities essentially acknowledged the disparities in educational opportunity in the district and the fact that some form of desegregative school reorganization would be necessary to alleviate these disparities. The district did implement some measures to address these inequalities, such as closing old, racially imbalanced schools in Southwest Yonkers

(1976), the consequent rise in staff experience in those schools, and improvements in secondary school curriculum. However, the district repeatedly refused to implement more comprehensive desegregative measures to correct these disparities—the failure to proceed with desegregation efforts in the early 1970's, the rejection of the NYU Report proposals, and the refusal to adopt any of the Task Force or Phase II desegregation proposals or any alternative to these proposals—partly because of the desegregative consequences which such proposals would have entailed. This racially influenced failure to implement desegregative school reorganization proposals resulted in the perpetuation of the remaining educational inequalities among the district's schools.

The identifiability of schools as "minority" and "white" based on educational and physical disparities has been considered an indication of unlawful segregation in cases involving state-mandated dual school systems, *see Swann v. Charlotte-Mecklenburg Board of Education, supra,* 402 U.S. at 18, 91 S.Ct. at 1277, and in cases in which school authorities have otherwise been responsible for creating unlawfully segregated schools by their own discriminatory conduct, *see Oliver v. Michigan State Board of Education, supra,* 508 F.2d at 185; *Berry v. Benton Harbor, supra,* 442 F.Supp. at 1302. While the disproportionate expenditure or allocation of resources to benefit white schools rather than minority schools is one obvious basis for a finding of intentional discrimination in the provision of educational opportunity, *see Berry v. Benton Harbor, supra,* 442 F.Supp. at 1306, we believe that these disparities have legal significance here as well. The denial of educational opportunities in Yonkers has transcended the lack of the "melting pot" effect of racial integration; it has instead been characterized by tangible inequalities in the quality of education similar to those which characterized the inherently unequal segregated schools proscribed in *Brown* and its progeny. In this case, although the City's intentional housing discrimination contributed substantially to the continued confinement of minorities in educationally inferior schools, the school board also knowingly maintained and perpetuated considerable inequality in educational opportunity in the schools, its failure to rectify this condition being partly attributable to its refusal to implement reorganization proposals such as the NYU Report proposals (or suggested alternatives), the Task Force proposals, Phase II, or any desegregative alternative to these plans. In our view, the significant disparities in educational opportunity described in our factual findings and the circumstances surrounding their perpetuation are important factors in determining whether the Board is legally responsible for perpetuating the segregated condition of Yonkers public schools.[160]

### c. *Subsidized Housing Discrimination*

The manner in which the racial segregation of Yonkers public schools has developed requires us to examine the relevance of a city's discriminatory housing practices to the liability of school authorities for school segregation. *Cf. Arthur v. Nyquist, supra,* 573 F.2d at 145 n. 22 (expressly declining to determine relevance of public housing descrimination in school desegregation case); *Hart v. Community School Board, supra,* 512 F.2d at 56 (city, state and federal housing authorities held not liable on the merits for housing policies); *Brody-Jones v. Macchiarola, supra,* 503 F.Supp. at 1236–37 & n. 27 (absence of findings regarding governmental housing practices; court noted that housing authority was not a party to litigation). While we

---

160. We note that a duty to alleviate racial segregation in public schools had been imposed at one time as a matter of state law where such segregation denies minority students equal educational opportunities. *See People v. San Diego Unified School District,* 19 Cal.App.3d 252, 96 Cal.Rptr. 658 (1971). The California appellate court based this duty on the previous judicially-established state law principle that school boards are required to take reasonably feasible steps to alleviate racial imbalance in schools regardless of its cause. *Id.* 96 Cal.Rptr. at 665–66. As our discussion in text makes clear, the Board's liability in this case is based on a considerably different legal foundation.

do not decide this case on an entirely clean slate, the collective wisdom of the courts with respect to this issue has yet to result in a consistent legal principle capable of definitive application to the unique circumstances of this case.

Several earlier school desegregation cases discussed the relevance of public housing discrimination in the context of determining the constitutionality of school board adherence to a neighborhood school policy. These cases generally held that a school board's application of a neighborhood school student assignment policy was constitutionally unacceptable where discriminatory public housing practices had contributed to the racial segregation of the neighborhoods. *See United States v. Texas Education Agency, supra,* 467 F.2d at 863–64 n. 22 ("When the segregated housing patterns are the result of 'state action', we are faced with *double* discrimination.") (emphasis in original); *Arthur v. Nyquist, supra,* 415 F.Supp. at 968–69 ("Given the purposeful residential segregation in the City of Buffalo, the School Board's 'neighborhood school policy' was not, and could not be, racially neutral."); *Oliver v. Kalamazoo Board of Education, supra,* 368 F.Supp. at 183 ("The school board should not be heard to plead that its neighborhood school policy was racially neutral when in fact 'state action under the color of law' produced or helped to produce the segregated neighborhoods in the first place."). *But see Deal v. Cincinnati Board of Education, supra,* 369 F.2d at 60 n. 4 (evidence of public and private housing discrimination properly excluded from school desegregation case against school board).

More recently, courts have expressed some reservations as to the legal validity of this conclusion. Starting with the opinion of three Supreme Court Justices in *Austin Independent School District v. United States,* 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976), and continuing with a series of Sixth Circuit rulings, recent school desegregation decisions have suggested that school officials cannot be held liable for racial imbalance in the schools which results from the discriminatory housing practices of other governmental actors. *See Austin, supra,* 429 U.S. at 994, 97 S.Ct. at 519 (Powell, J., concurring, joined by Burger, C.J., and Rehnquist, J.) ("The principal cause of racial and ethnic imbalance in urban public schools across the country—North and South—is the imbalance in residential patterns. Such residential patterns are typically beyond the control of school authorities. For example, discrimination in housing—whether public or private—cannot be attributed to school authorities. Economic pressures and voluntary preferences are the primary determinants of residential patterns.") (footnote omitted); *Bell v. Board of Education, Akron Public Schools,* 683 F.2d 963, 968 (6th Cir.1982) ("Under [the argument that a school board otherwise innocent of segregative intent is liable for the discriminatory housing practices of other governmental agencies] the discriminatory conduct of the FHA in making housing loans and local housing authorities in the construction and rental of public housing is attributable to school boards. Such a proposal places too heavy a burden on the schools to remedy wrongs for which they are no more or less responsible than the plaintiffs, the courts, the churches, the Congress or other institutions. Plaintiffs do not suggest how the schools, after a finding of liability, would go about remedying this problem or what kind of order a federal court could enter that might as a practical matter have a chance of changing the fact that black and white families live in separate neighborhoods in most towns and cities."); *Higgins v. Board of Education of Grand Rapids, supra,* 508 F.2d at 788–89 ("In *Deal* ..., this Court decided that discrimination by other than school authorities cannot be relied upon as the sole basis for showing a violation by the school board."); *Bronson v. Board of Education of the City School District of Cincinnati,* 578 F.Supp. 1091, 1104–05 (S.D.Ohio 1984) (citing *Bell* and *Deal*); *see also Jenkins v. Missouri,* No. 77–0420–CV–W–4, slip op. at 42, (W.D.Mo. June 5, 1984) (denying interdistrict school desegregation remedy).

In addition, some of the earlier precedents discussed previously have either lost some of their precedential weight or are factually distinguishable from this case. The *Texas Education Agency* decision also held that a school board's assignment of students and implementation of school site selection and construction policies based on segregated housing patterns, whether publicly or privately caused, is unconstitutional; a subsequent decision in that litigation more explicitly equating adherence to a neighborhood school policy in a residentially segregated district with segregative intent was vacated by the Supreme Court in *Austin*. 429 U.S. at 991–92 n. 1, 97 S.Ct. at 517 n. 1. *Arthur v. Nyquist*, decided prior to *Austin*, involved evidence of a host of school board acts and omissions which were designed to perpetuate and enhance segregation in the schools. In the instant case, the record contains substantially less (or no) evidence of many of the classic segregative student assignment techniques—optional or noncontiguous attendance zones; segregative out-of-district transfer policies; a pattern of segregative school openings, closings, or racial gerrymandering of attendance lines—some of which were found to exist to a significant degree in *Arthur*.

The legal relevance of public housing discrimination to school segregation, however, has not been definitively resolved. A number of cases decided prior to *Austin* expressly or implicitly declined the opportunity to examine the relevance *vel non* of public housing discrimination in a school desegregation case. *See Milliken v. Bradley*, 418 U.S. 717, 728 n. 7, 94 S.Ct. 3112, 3119 n. 7, 41 L.Ed.2d 1069 (1974); *Swann v. Charlotte-Mecklenburg Board of Education, supra*, 402 U.S. at 23, 91 S.Ct. at 1279; *Arthur v. Nyquist, supra*, 573 F.2d at 145 n. 22; *see also Oliver v. Michigan State Board of Education, supra*, 508 F.2d at 183–85 (affirming lower court finding of segregative intent on other grounds). Even the Sixth Circuit's decisions are premised on the notion that housing discrimination cannot serve as a basis for finding school board liability for school segregation in the absence of any evidence that school officials themselves have engaged in intentionally segregative conduct, a circumstance *not* present here. *Bell v. Board of Education, Akron Public Schools, supra*, 683 F.2d at 968; *Higgins v. Board of Education of Grand Rapids, supra*, 508 F.2d at 788. Since *Austin*, only one case, decided less than two months after the Supreme Court's 1979 *Columbus* and *Dayton* school desegregation decisions, has reaffirmed the principles enunciated in *Arthur* and *Oliver*. *See Reed v. Rhodes*, 607 F.2d 714, 730 (6th Cir.1979), *cert. denied*, 445 U.S. 935, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980). In *Reed*, however, the court's finding of segregative intent was based not simply on the school board's adherence to a neighborhood school student assignment policy despite the existence of public housing discrimination, but on the school board's willing and repeated construction of schools to service public housing projects which the board knew from the outset would be racially identifiable. *Id.* at 729–30; *see also Oliver v. Kalamazoo Board of Education, supra*, 368 F.Supp. at 171–72 (school board's cooperation with real estate developers in constructing school for private housing development in previously undeveloped area of city constituted intentional promotion and creation of residential and school segregation). If any trend in the law can be discerned, it consists of an increasing focus on whether some meaningful connection exists between the policies of public housing officials and the policies of school board officials. *See Reed v. Rhodes, supra; Bronson v. Board of Education, supra*, 578 F.Supp. at 1104–05; *Brody-Jones v. Macchiarola, supra*, 503 F.Supp. at 1236–37 n. 27 (absence of findings regarding governmental housing practices "does not preclude consideration of the extent to which defendant school officials by their actions and inaction may deliberately have sought to build upon and enhance the effects of existing residential segregation").

A number of factors convince us that the existence of subsidized housing discrimination in Yonkers must be accorded legal relevance in determining whether

school authorities may be held legally accountable for the segregation of Yonkers public schools. Of primary significance is the fact that the City has been found liable, under relevant legal standards, for intentionally maintaining and exacerbating racial segregation in Yonkers. This determination reflects the fact that a state actor in Yonkers has been found to have unlawfully contributed to a condition of racial segregation in the community's housing, with a segregative impact on its public schools, while another state actor in Yonkers has largely failed to alleviate (and in some ways has exacerbated) the racial segregation of that same community's schools. It is undisputable that a hypothetical single state agency which controls the operation of, and engages in the racial segregation of, both housing and schools—by confining for racial reasons the city's subsidized housing to one section of the city, while simultaneously adhering to a neighborhood school policy of student assignment—can be held liable for such conduct. It is inconceivable that state action may be fractionalized such that two state agencies could be permitted to collectively engage in precisely the same conduct, yet avoid legal accountability for the identical result. It is this principle which we believe underlies the earlier cases involving the relevance of public housing segregation to school board liability: where school officials knowingly adhere to a segregative student assignment policy which is consistent with city officials' unlawfully segregative conduct in housing, such a policy cannot, as a legal matter, be considered race-neutral. To hold otherwise would advance no significant constitutional principle of equality or non-discrimination, and would simply lend credence to a legal doctrine which permitted school segregation to withstand constitutional scrutiny solely by virtue of the two-pronged nature of the state action which intentionally contributed to, perpetuated, and enhanced this condition.

 The relevance of subsidized housing discrimination in Yonkers to school board liability is highlighted by the process by which school segregation was effectively insured. Even acknowledging that the

Board and City are separate actors under state law, the manner in which mayoral appointments to the Board were made in Yonkers rendered this legal separation an artificial and constitutionally insignificant one. These appointments not only reflected a pattern of decisionmaking by a municipal authority consistent with the discriminatory practices of other municipal officials; through these appointments, the City and Board also created a consistency between housing and school policies which the Board had previously resisted. The record also persuasively undermines any argument that this consistency between the City's confinement of subsidized housing to Southwest Yonkers and the school board's failure to implement any significant desegregative school reforms was coincidental; rather, the combination of the City's housing policies, the mayoral appointment of Board members and the subsequent inaction of the Board amounted to an interrelated governmental effort to preserve the integrity of "neighborhood schools" whose racial segregation was governmentally sanctioned and steadfastly maintained. In our view, liability for school segregation cannot properly rest on artificial distinctions between "City" and "Board" conduct which do not reflect the practical interrelationship between the policies of these state actors. Where a city official exercises power over school board appointments as a means of furthering the city's segregative objectives and discouraging comprehensive reform, it would be anomalous to hold simultaneously that a school board's effectuation of these objectives is irrelevant in determining its liability for resulting school segregation.

The Board's failure to act is also not merely an unadorned "omission" which alone cannot ordinarily support a finding of unlawful segregation. *Cf. Hart v. Community School Board, supra,* 512 F.2d at 48 ("We assume that mere inaction, without any affirmative action by the school authorities, allowing a racially imbalanced school to continue, would amount only to *de facto* rather than *de jure* segregation."). Apart from the Board's other acts and

omissions which perpetuated racial segregation in various aspects of the school district's operation, the Board's failure to adopt Phase II[161] or any other substitute or alternative plan was a failure to act emanating from a pattern of mayoral appointments of Board members who would be considerably less inclined to act to undo the segregative impact of prior housing and school policies. The Board's conscious neglect of the racial imbalance of the Yonkers public schools was thus not an isolated, race-neutral failure to alleviate segregation, but instead solidified the segregative impact of the official acts and omissions of housing and school authorities preceding it.

The interconnection between mayoral appointments to the Board and the Board's subsequent failure to remedy the racial imbalance in the schools is made strikingly apparent by comparing the Board's conduct prior and subsequent to the district's most concerted examination and consideration of the problem of school segregation. Prior to Mayor Martinelli's complete replacement of incumbent Board members in 1978, school officials had rejected, ignored or resisted virtually all of the City's frequently segregative initiatives: the request to reconsider the closing of School 1; the site selection for the new Yonkers High School; changes in plans for the construction of School 10; proposed attendance zone boundary changes during the mid-1970's; the proposed conversion of the school system to a K–8, 9–12 grade structure. As Mayor Martinelli appointed new members to the Board, school district affairs gradually became increasingly more in tune with the City's own objectives: the tabling of a school board resolution to return closed school facilities to the City; the re-

jection of Phase II; the failure to implement any alternative proposal for alleviating the racial imbalance of the schools. The Board's refusal to take steps to desegregate the schools not only reflected the opposition of a community which had for years played a similar role in causing and sustaining the City's discriminatory housing practices, but also was consistent with the Mayor's acknowledged preference for neighborhood schools, whose segregated condition had been maintained and exacerbated by such practices. In these circumstances, we conclude that it is reasonable and proper to hold the Board jointly liable with the City for perpetuating the racial imbalance of Yonkers public schools.

The Board's reliance on its neighborhood school policy cannot properly immunize its resulting perpetuation of racial segregation in Yonkers public schools. The Board's increasingly rigid adherence to the policy is inconsistent with both racial and non-racial considerations. Prior to the 1960's, the concept of neighborhood schools did not preclude substantial crosstown or out-of-neighborhood assignment of students, not only on the secondary school level but also on the elementary school level (the most notable examples being the segregative reassignment of white students from Schools 1 and 25 to virtually all-white Northwest Yonkers schools). The more steadfast application of the policy has instead paralleled the increased development of subsidized housing in Southwest Yonkers and has persisted despite the fact that relative school utilization, fiscal instability, and disparities in educational opportunity, in addition to racial imbalance, would have been expected to lead to at least some

161. Our conclusions with respect to the Board's failure to adopt Phase II are not inconsistent with cases holding that no constitutional duty exists to transport students in order to achieve school desegregation. *See Keyes v. School District No. 1, supra,* 413 U.S. at 242, 93 S.Ct. at 2714 (Powell, J., concurring in part and dissenting in part); *Deal v. Cincinnati Board of Education, supra,* 369 F.2d at 61. First, these cases hold that school boards are not required to bus students *solely* to alleviate racial imbalance. *See Keyes v. School District No. 1, supra,* 413 U.S. at 242, 93 S.Ct. at 2714; *Deal v. Cincinnati*

*Board of Education, supra,* 369 F.2d at 61. While Phase II was primarily intended for this purpose, fiscal, utilization-related, and educational aspects of the plan were also present. Second, our decision is not predicated solely on the Board's rejection of Phase II; it is based both on the failure to implement Phase II, any desegregative component of Phase II, or any desegregative alternative to Phase II, as well as on the circumstances which led to the racial imbalance in Yonkers public schools prior to the development of Phase II.

significant alteration of student assignment patterns. The policy also did not preclude the district from assigning Special Education students in a manner entirely inconsistent with neighborhood schooling, *see Armstrong v. Brennan, supra,* 539 F.2d at 636–37, and was of considerably less import on the secondary school level. And as noted above, the existence of intentional housing discrimination which contributed to the confinement of minorities to Southwest Yonkers, together with the Board's application of an educational philosophy consistent with this practice, detracts significantly from the claim of race-neutrality.[162]

◼◼◼◼ The Board's recognition that "white flight" from the public schools was a likely consequence of Phase II's adoption, even if accurate, is not a legally acceptable explanation for its actions and omissions. White flight may in certain circumstances be a proper consideration in devising and implementing a voluntary desegregation plan. *See Parent Association of Andrew Jackson High School v. Ambach, supra,* 598 F.2d at 719–20; *Higgins v. Board of Education of Grand Rapids, supra,* 508 F.2d at 794. Yet the Board's refusal to adopt Phase II or to give serious consideration, either prior to or subsequent to Phase II, to any other significant desegregation proposal, belies any legitimate consideration of such consequences as an explanation for its inaction. The Board's refusal to implement Phase II or any alternative

plan resulted in the perpetuation of racial imbalance and educational inequalities of which the Board was long aware and had only begun to confront in any meaningful fashion at the time of the 1976 fiscal crisis. While the late 1960's and early 1970's were marked by some efforts to alleviate the increasing racial imbalance in the schools, the segregative decisions made both at that time and afterward suggest that the white flight concern was advanced primarily in order to justify or explain the district's deliberate perpetuation of segregation rather than as a legitimate consideration in devising means by which to more effectively promote desegregation. *See id.* at 720; *Brody-Jones v. Macchiarola, supra,* 503 F.Supp. at 1242. The possibility of white flight cannot be invoked in an effort to avoid or abandon efforts to desegregate schools whose racial imbalance is the result of prior unlawful acts. *See Hart v. Community School Board, supra,* 383 F.Supp. at 742–43. We find its invocation equally untenable here, where the Board's own prior acts and omissions—its assignment of minority Special Education students to predominantly white schools, its assignment of minority staff to predominantly minority schools, the continued disparities in educational opportunity at identifiably minority and white schools, and the rejection of the NYU Report proposals—served to foster and encourage such attitudes. *See Arthur v. Nyquist, supra,* 415 F.Supp. at 929.

---

**162.** Both *Bell* and the *Austin* concurrence expressed reservations regarding the relevance of public housing discrimination to school board liability based on the remedial difficulties in holding otherwise. In *Bell,* however, the court expressed concern regarding the manner in which school authorities "would go about remedying this problem or what kind of order a federal court could enter that might as a practical matter have a chance of changing the fact that black and white families live in separate neighborhoods." 683 F.2d at 968. *Bell* thus emphasizes the importance of the City's presence in the instant case: remedial measures for the City's housing discrimination will indeed be designed to alleviate residential segregation in the city, and the development of school-related remedial measures in conjunction with such relief is certainly a realistic task. *Cf. United States v. Board of School Commissioners of Indi-*

*anapolis, supra; Arthur v. Nyquist, supra.* In *Austin,* the concurring opinion's reservations were expressed in the context of its discussion of the overbroad nature of the remedial measures ordered by the lower court. 429 U.S. at 994, 97 S.Ct. at 519. While we are fully mindful of the carefully circumscribed authority of federal courts to order relief for unlawful school segregation commensurate with the constitutional violation, we do not believe that our determination that the school board unlawfully failed to alleviate school segregation is inherently not susceptible to appropriate remedial action. Neither *Bell* nor *Austin* involved a judicial determination that city authorities had engaged in unlawful housing *and* school segregation. In any event, we deal here only with questions of liability; the nature and scope of any remedial action awaits the further stages of this litigation.

Based on all of the above considerations, we hold that the Board's failure to implement measures for alleviating system-wide school segregation, in the context of the totality of all of its actions and omissions, is sufficient to render it legally responsible for the perpetuation of racial segregation in Yonkers public schools. All significant plans to effectuate systemwide desegregative school reorganizations and/or equalize educational opportunities in Yonkers met with disapproval or resistance: the efforts of state education authorities in the early 1970's; the 1972 NYU Report proposals; the 1976–77 Task Force recommendations; the 1977 Phase II plan. Although the district was not without desegregative initiatives—for example, the planned opening of School 10 and King, and school closings in 1976 which resulted in the elimination of a number of racially isolated schools and the reassignment of some students in a desegregative manner (to Schools 13, 27, 31, Emerson and Burroughs)—even these measures were recognized merely as initial steps toward a more comprehensive alleviation of racial imbalance in Yonkers public schools. The Board's failure to implement any such plan, its knowing perpetuation of inequalities in educational opportunity, and its other acts of intentional discrimination, were consistent with the principal segregative motive underlying the City's housing policies and practices: the general confinement of minorities to Southwest Yonkers.

The Board has likewise failed to satisfactorily establish that its segregative acts and omissions would have occurred "even if" racial considerations had been ignored. Indeed, certain features of school district operations, such as the steering of minorities, the Special Education program, and the assignment of teachers and administrative personnel, would certainly have been different had racial factors not played the primary role which they actually did. At least some of the inequalities in educational opportunity discussed in our findings would surely have been remedied (or remedied more quickly) had desegregation not been one of the likely consequences of such action. To the extent the Board's persistent refusal to implement desegregative reorganization plans can even be evaluated on an "even if" basis, we are persuaded that, as with the City's consistently segregative subsidized housing site selections, a different pattern of decisionmaking would have occurred had the Board's awareness of and responsiveness to racially influenced community opposition not been present.

In conclusion, we hold that the Board is liable for the racial segregation of Yonkers public schools.

### 2. The City

The liability of a municipal entity for the racial segregation of a state-created school system turns on the resolution of two questions: first, whether such an entity may ever be subject to such liability; and second, under what circumstances such liability may be imposed.

The Second Circuit's decision in *Arthur v. Nyquist* answers the first question in the affirmative and sheds light on the second. In *Arthur*, the district court held the City of Buffalo's Common Council liable for the racial segregation of the Buffalo public schools based on the Common Council's opposition to school integration and its role in causing and maintaining segregated housing conditions. As for its opposition to school integration, the court found that the Common Council had demonstrated its segregative intent in three ways. First, the Council adopted an ordinance barring the use of portable classrooms after the Board had agreed to purchase them in an effort to increase the capacity of white schools and thereafter reassign minority students to these schools. Second, the Council refused to provide funds for the implementation of a desegregative middle school program developed by the Board. Third, the Council insisted on limiting the number of blacks at a high school whose acquisition from the city's Catholic Diocese was under consideration by the Council. 415 F.Supp. at 953–55. The court also found that the Common Council and city housing authorities had helped cause or

maintain residential segregation through its urban renewal program, in which dislocated black families were relocated in a geographically limited, minority populated area of the city. The court held that the Common Council's segregative conduct with respect to housing constituted a separate and independent ground for holding it liable for the segregation of the Buffalo public schools. *Id.* at 969.

The Court of Appeals affirmed the district court's determination of municipal liability solely on the ground that the Common Council "aided the Board [in resisting the State's order to integrate] by systematically denying funding to programs which would have encouraged integration." 573 F.2d at 145. The court did not examine the other school-related bases for the Common Council's liability and expressly declined to reach the issue of the relevance of the municipality's role in furthering housing segregation. *Id.* at 145 & n. 22. Thus, although the holdings of the district court and the Court of Appeals differ with respect to the circumstances under which a municipal entity may be held liable for school segregation, both decisions recognize that a city may be held liable for the racial segregation of state-created public schools.

In support of its argument that the City is not a proper defendant in the school desegregation portion of this case, the City cites *Greenhouse v. Greco,* 617 F.2d 408 (5th Cir.1980), and *United Black Firefighters of Norfolk v. Hirst,* 604 F.2d 844 (4th Cir.1979), for the proposition that the City's mere exercise of political influence over the Board is insufficient to render it liable for the segregation of the Yonkers public schools.

In *Greenhouse,* the Fifth Circuit held that the district court did not abuse its discretion by dismissing the Diocese of Alexandria (a church district encompassing twenty-nine counties of the State of Louisiana) and the diocesan bishop and school superintendent from a parochial school desegregation case. Significant differences exist, however, between the church district in *Greenhouse* and the City of Yonkers and their respective relationships with the school systems at issue in each case. The

diocese and bishop had no legal relationship with or legal authority over any of the church corporations which, like the Yonkers Board of Education, were directly responsible for the operation of the diocesan parochial schools. Thus, "[a]ny and all assistance rendered to each school by the Bishop and/or the Diocese [wa]s entirely voluntary", and each church corporation was "subject to the bishop's authority only by virtue of religious obedience to canon law." *Id.* at 411, 414. According to the court,

> The weight wielded by the bishop consists of moral persuasion backed by possible religious sanctions. He simply does not have the legal power traditionally found in civil government, nor does he have the legal standing to carry out any integration decrees which may eventually be issued by a federal court. It is apparent that only the individual church corporations may respond in this regard.

*Id.* at 414 (footnote deleted). In Yonkers, the legal relationship between the City and Board is significantly different. Despite their legal autonomy under state law, the City is legally responsible for allocating funds to the school district, for appointing school board members, and for retaining legal title to property designated for educational use. More importantly, the City may indeed be called upon to respond to school desegregation decrees issued by a federal court. *See Arthur v. Nyquist,* 712 F.2d 809 (2d Cir.1983) (ordering city to appropriate additional funds to school board to enable board to implement school desegregation plan), *cert. denied, Griffin v. Board of Education of City of Buffalo, New York,* 466 U.S. 936, 104 S. Ct. 1907, 80 L.Ed.2d 456 (1984); *see also United States v. Board of School Commissioners of Indianapolis, supra* (restraining city housing authority from developing public housing projects in city as part of interdistrict school desegregation remedy). Finally, the City's capacity to significantly affect the racial composition of the City of Yonkers and the Yonkers public schools by virtue of its subsidized housing policies and practices and its involvement in school-related affairs far ex-

ceeds the practical capacity of the diocesan defendants in *Greenhouse* to have similarly affected the racial composition of the diocesan parochial schools. Thus, the concerns expressed by the Fifth Circuit in *Greenhouse* are simply not apposite in determining the liability *vel non* of the City of Yonkers in this case.

*Hirst* is more easily distinguished. In *Hirst*, an employment discrimination case brought by city fire department employees against various city departments and officials, the court dismissed plaintiffs' claim against the mayor and the City Council based on the absence of any allegation that these defendants could "control, or interfere with, the employment practices of the police department." 604 F.2d at 846. The court also noted that plaintiffs' "assertion that the City Council creates laws affecting the Fire Department with no statement of how any such action discriminated against the plaintiffs" was insufficient to state a claim under the applicable civil rights statutes. *Id.* Not only are such allegations present in the instant case, but the evidence itself convincingly establishes both City involvement in school affairs and intentionally discriminatory conduct affecting both housing and schools. The allegations and evidence in this case thus establish far more than the mere exercise of political influence over the Board which the City contends is insufficient to render it liable for the segregation of Yonkers public schools.

In sum, we conclude that the City of Yonkers is a proper party to the school desegregation portion of this case and may be held liable for the racial segregation of Yonkers public schools. *See Arthur v. Nyquist, supra; see also United States v. Board of School Commissioners of Indianapolis, supra.* This conclusion is fully consistent with the decisions of the district and circuit courts in *Arthur v. Nyquist*, with the reasons stated in our discussion of jurisdiction over the claims asserted against the City, *see* SCHOOLS VI.A.2 *supra*, and, as noted below, with Supreme

Court decisions involving school desegregation.[163] We thus turn to the second question posed earlier: under what circumstances may a municipal entity be held liable for the segregation of public schools.

As noted above, the Court of Appeals in *Arthur v. Nyquist* relied solely on the Buffalo Common Council's budget-related conduct in upholding its liability for the segregation of the Buffalo public schools, without discussing or expressly declining to determine the relevance of other forms of municipal activity to the liability determination. This conclusion, however, is only the beginning of our inquiry. While the Court of Appeals relied only on the Common Council's budget-related conduct in holding it liable for the segregation of the Buffalo public schools, we do not read its decision as precluding reliance on other forms of municipal conduct, including but not limited to those discussed by the district court, which also demonstrate an intent to cause or maintain school segregation. Just as a school board can effectuate school segregation through a variety of methods, so too can a city exhibit segregative intent and cause segregation in its schools in a variety of ways. We see little reason to restrict the scope of our inquiry to budgetary matters without also examining whether the City's other actions and omissions involving housing, Board appointments, school site selection, and other involvement in school affairs were characterized by the segregative intent, and achieved the segregative result, proscribed by the Court of Appeals in *Arthur*.

The relevance of a municipal entity's discriminatory housing policies or practices to school segregation has been explored in another context. In *United States v. Board of School Commissioners of Indianapolis*, 573 F.2d 400 (7th Cir.), *cert. denied*, 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978), the Seventh Circuit held that the discriminatory housing practices of a municipal housing authority could provide a basis for ordering interdistrict relief for

---

**163.** The impact of the Supreme Court's school desegregation precedents on both of the questions posed above is discussed at pages 1540–1541 *infra*.

school segregation. The court recognized that segregative housing practices are causally related to school segregation, and that Justice Stewart's concurring opinion in *Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), and the district court's decision in *Evans v. Buchanan,* 393 F.Supp. 428 (D.Del.), *aff'd mem.,* 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975), both supported the imposition of an interdistrict school desegregation remedy where governmental authorities had engaged in segregative public housing practices. The court concluded that the Housing Authority of the City of Indianapolis' policy of confining public housing projects within the boundaries of the Indianapolis Public School District, if found to be discriminatory in intent and segregative in its interdistrict effect, would support the implementation of an interdistrict school desegregation remedy involving the City of Indianapolis and its surrounding suburban school districts. *Id.* at 408–10. On remand, the district court found that discriminatory intent existed, and as part of its interdistrict remedy, ordered the housing authority to refrain from developing any new low-rent public housing projects within the boundaries of the Indianapolis school district. 456 F.Supp. 183, 192 (S.D.Ind. 1978); 419 F.Supp. 180, 186 (S.D.Ind.1975). The Seventh Circuit upheld these findings and approved the relevant aspects of the district court's interdistrict remedy. 637 F.2d 1101, 1108–11, 1114, 1117 (7th Cir.), *cert. denied,* 449 U.S. 838, 101 S.Ct. 114, 66 L.Ed.2d 45 (1980).

The *Indianapolis* litigation is obviously not dispositive of the issue before this Court: it deals only with the predicate for imposing interdistrict relief for school segregation and thus neither authorizes nor precludes the imposition of municipal liability and the fashioning of "school-specific" relief [164] for the segregation of a city's public schools. Nevertheless, the *Indianapolis* litigation is relevant insofar as it recognizes the causal relationship between a city's housing practices and their impact on the city's schools, and supports the conclusion that city housing authorities can be held legally accountable in a school desegregation suit for discriminatory housing practices which contribute to the segregation of schools. The ordering of purely housing-related relief against the Indianapolis city housing authorities is consistent with the general principle of fashioning a remedy which is commensurate with the nature and extent of the violation; since the city's only involvement in causing or maintaining segregated schools was through its unlawful public housing practices, the remedy ordered consisted only of prohibitions against the continuation of such practices. This issue of remedy, however, does little to undermine the support for the principle of holding a city responsible for the school-related consequences of its segregative public housing practices. In the instant case, where the inquiry is purely *intra* district in scope, the reliance on unlawful municipal housing practices as a basis for assigning legal responsibility for school segregation is certainly no less appropriate than in *Indianapolis.* We conclude that the *Indianapolis* litigation and the district court's decision in *Arthur* both support the relevance of a city's segregative public housing practices in determining whether the city may properly be held liable for the segregation of the city's public schools.

While the Supreme Court has not addressed either the question of whether a city may ever be held liable for segregation in schools or the relevance of a city's housing or other practices to such a determination, we believe that the principles enumerated in *Indianapolis* and *Arthur* are con-

---

**164.** By "school-specific" relief, we refer to remedial measures other than those dealing solely with the City's construction, development or location of subsidized housing; for example, ordering the City to fund the cost of implementing a desegregation decree involving the implementation of desegregative educational programs. *See Arthur v. Nyquist, supra,* 712 F.2d at 813. In the *Indianapolis* litigation, the cost of implementing the interdistrict school desegregation plan was borne entirely by the state. 677 F.2d 1185 (7th Cir.), *cert. denied,* 459 U.S. 1086, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982). The issue of allocating the cost of remedying racial segregation within the Indianapolis school district was not before the court. *Id.* at 1186 n. 1, 1188 n. 3.

sistent with the Supreme Court's school desegregation precedents. In *Swann v. Charlotte-Mecklenburg Board of Education,* the Supreme Court cautioned against using school desegregation cases "to achieve broader purposes lying beyond the jurisdiction of school authorities." 402 U.S. at 22, 91 S.Ct. at 1279. In *Austin Independent School District v. United States,* three Justices, concurring in the remand of a school desegregation suit for reconsideration in light of *Washington v. Davis,* noted in a similar vein that the principal cause of school segregation is racially imbalanced residential patterns and that "discrimination in housing—whether public or private—cannot be attributed to school authorities." 429 U.S. at 994, 97 S.Ct. at 519. Neither case, however, intimates that a *city* cannot be held liable where its *own* intentionally segregative housing practices result in the segregation of schools. In *Swann,* the Court specifically declined to resolve the issue of "whether a showing that school segregation is a consequence of other types of state action, without any discriminatory action by school authorities, is a constitutional violation requiring remedial action by a school desegregation decree," *id.* 402 U.S. at 23, 91 S.Ct. at 1279, thus leaving open the question not only of school board liability for the intentional discriminatory acts and omissions of others, but also of city liability for school segregation caused by the city's own intentionally discriminatory conduct. And in *Austin,* the concurring opinion spoke only of the liability of school authorities for the discriminatory housing policies of others; once again, the Court did not address the liability of governmental bodies, city or school, for their *own* discriminatory conduct. Indeed, if any trend can be discerned from the Court's school desegregation cases, it is that the discriminatory practices of governmental housing authorities may, in certain circumstances, be relevant to a determination of the causes of and remedies for school segregation. *See Evans v. Buchanan,* 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975), *summarily aff'g* 393 F.Supp. 428 (D.Del.1975); *Milliken v. Bradley, supra,* 418 U.S. at 755, 94 S.Ct. at 3132 (Stewart, J., concurring). The Supreme Court's school desegregation cases thus do not at all evince disapproval of, and indeed tend to support, holding municipal authorities liable when such authorities, by their own conduct, have intentionally contributed to the racial segregation of state-created public schools. These decisions also are consistent with the conclusion that a city's housing practices are relevant in making this determination.

We need not decide whether the district court's alternative holding in *Arthur*—that a city's discriminatory housing practices *alone* form an independent basis for a finding of city liability for school segregation—is a correct statement of the law regarding school segregation.[165] We believe that the housing-related practices of City authorities, along with the various other methods by which City officials have influenced school district operations and thereby contributed to its racial segregation, are all relevant in determining whether the City's acts and omissions as a whole have resulted in the intentional creation or aggravation of racial segregation in the Yonkers public schools. The Supreme Court's school desegregation decisions have one common guiding principle: where governmental authorities, through various acts and omissions, intentionally create or maintain racially segregated schools, such authorities may be held legally responsible for correcting this condition. In our view, these principles of intentional state action, causation and segregative impact, rather than the artificial fragmentation of responsibility for public schools based on state-created legal subdivisions of governmental authority, are more constitutionally relevant criteria for assessing the liability of

---

**165.** Similarly, we need not resolve the question whether the City's involvement in, and indirect control over, the operation of Yonkers public schools constituted a degree of control which renders the City "equally culpable with school officials for the actual operation of the [school] system," *see* NAACP Proposed Findings of Fact and Conclusions of Law, at 41, or is otherwise an independent basis for imputing liability for school segregation to the City.

city authorities for the segregated condition of the public schools located within their borders. The conduct of the City is no less "state action" than the conduct of the Board. We thus reject the contention that the Board's state-delegated responsibility for the operation of the Yonkers public schools somehow shields other governmental authorities from being held legally accountable when such authorities engage in intentionally segregative conduct with respect to these schools.

In this case, the City's housing practices are an important part of its overall intentionally segregative conduct. The City's confinement of subsidized housing virtually exclusively to Southwest Yonkers not only violated Title VIII and the equal protection clause but also had a clear impact on Yonkers public schools. The persistent and deliberate refusal to develop subsidized housing outside of Southwest Yonkers had clearly segregative consequences not only for residential conditions in the city; in light of the school district's historic neighborhood school policy, the perpetuation and exacerbation of racial imbalance in the school district was a natural, probable and actually foreseen consequence of the City's discriminatory housing practices as well. *See Columbus Board of Education v. Penick, supra,* 443 U.S. at 464–65, 99 S.Ct. 2949–50. Indeed, the unavoidable realization that opposition to a more geographically dispersed distribution of subsidized housing was related in part to the impact of such a housing policy on the community's schools, together with the City's own attempts to alter school attendance zone boundaries in a segregative manner, support our conclusion that the City's segregative intent was not limited to residential patterns in Yonkers. Just as a school board's alteration of attendance zone boundaries in a segregative manner may support a finding of intentional segregation of schools, *see id.* at 462; *Reed v. Rhodes, supra,* 607 F.2d at 734; *NAACP v. Lansing Board of Education, supra,* 559 F.2d at 1049–51, similar proposals by City officials, especially when clearly based on racial considerations, also are probative of segregative intent. We recognize that the

Board had sole legal authority to implement student reassignments or educational programs designed to reduce the racial segregation of the public schools and thus ameliorate the segregative impact of the City's housing practices. Yet the Board's failure to do so, as well as its other segregative acts and omissions, do not properly relieve the City from legal responsibility for the fact that its own discriminatory housing practices contributed substantially to the systemwide perpetuation and exacerbation of racial segregation in both housing and schools. *Cf. Arthur v. Nyquist, supra,* 415 F.Supp. at 969. The City's housing practices provide a strong basis for holding the City legally responsible for the racial segregation of the Yonkers public schools.

Although the geographic proximity of the Riverview project and School 10 provides a visually unambiguous example of the interrelationship between housing and schools, the basis for the City's liability for the segregation of School 10 and surrounding schools is no different than the basis for its liability for school segregation systemwide. Unlike the Board's opening of School 10, one of only two elementary schools opened by the Board since 1965, Riverview represented for the City one segment of a consistent and longstanding pattern of segregative subsidized housing development in Yonkers. And unlike the intent of the Board, for which the planning of School 10 represented part of a series of initial efforts to remedy racial imbalance in Southwest Yonkers schools, the City's development of Riverview, along with other subsidized housing projects planned contemporaneously with it, represented the most concentrated portion of a pattern of subsidized housing development which was motivated at least in part by an intent to exclude minorities from East and Northwest Yonkers. Thus, regardless of whether some City officials may have at one time shared the Board's optimistic expectation that School 10 itself would be racially integrated, the City's conduct with respect to Riverview and School 10 can be viewed properly only as part of prior, contempora-

neous, and subsequent housing practices which intentionally preserved racial segregation throughout the City as a whole.

■ The mayoral appointment of Board members is also relevant evidence of overall municipal intent to maintain the racial segregation of Yonkers public schools. The relevance of such conduct was implicitly acknowledged in *Arthur*, in which the district court examined a mayoral appointment to the Buffalo Board of Education but concluded that the appointment of a single opponent of busing was insufficient evidence of discriminatory intent. *Arthur v. Nyquist, supra*, 415 F.Supp. at 959; *cf. United States v. City of Birmingham*, 538 F.Supp. 819, 826 (E.D.Mich.1982) (recall of City Commissioners who supported proposed integrated low-income housing project and appointment of replacements by City Commissioners who opposed project constitutes evidence of city's discriminatory intent in interfering with development of housing project), *aff'd*, 727 F.2d 560, 564–65 (6th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). As noted previously, we find that the mayoral pattern of Board appointments—the failure to reappoint Board members known for their commitment to school desegregation, the appointment and reappointment of individuals in a manner consistent with the Mayor's commitment to neighborhood schools, and the resulting perpetuation of the racial segregation which the City itself had deliberately contributed to and maintained—is sufficient in the circumstances of this case to support a finding of segregative intent with a resulting systemwide segregative impact on Yonkers public schools.

The independent legal status of the City and Board and the limited nature of the mayoral statutory appointment power does not, in our view, preclude a finding of municipal liability for school segregation based in part on mayoral appointments to the board. While a city's legal responsibility for the perpetuation of segregated schools cannot appropriately rest simply upon the imposition of vicarious liability for the independent acts and omissions of school officials who are responsible for and

capable of changing this condition, to view the conduct of the Yonkers Board of Education independently of the circumstances and manner in which its members were selected would be to artificially separate city powers, policies and practices from educational affairs in a manner wholly inconsistent with the reality of public education in Yonkers. Although state law expressly provides for mayoral appointments and budgetary control, as well as the "independent" status of the Board, it in no way contemplates the deliberate perpetuation of racial segregation in housing and schools by those officials charged with the responsibility for administering these respective areas of activity. Of course, continued attempts to dominate or control Board members subsequent to their appointments might constitute additional persuasive evidence of improper motive. The absence of evidence of such occurrences in this case, however, does not diminish the relevance of the City's more subtle, yet significant, segregative influence over educational affairs. Indeed, a contrary rule would permit a municipality bent on perpetuating racial segregation to achieve immunity from federal remedial measures merely by allocating responsibilities to separate governmental agencies which nevertheless act for similar purposes. The combination of the City's segregative housing practices and mayoral appointments together have served to perpetuate racial segregation in Yonkers public schools and constitute sufficient grounds for a finding of municipal liability.

We are cognizant that this area of municipal activity, more so than any other, involves an inquiry into politically-related affairs and activities which does not easily lend itself to review by the federal judiciary. In *Mayor v. Educational Equality League*, 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974), the Supreme Court cautioned against judicial interference in the discretionary appointment processes of local elected officials. In *Mayor*, plaintiffs alleged that the Mayor of Philadelphia's predominantly white appointments to a school board nominating panel constituted

a violation of the equal protection clause. Plaintiffs sought an injunction barring the most recently selected panel from submitting nominees for board membership to the Mayor, and an order directing the Mayor to appoint a panel "fairly representative of the racial composition of the school community." *Id.* at 609, 94 S.Ct. at 1328. The Supreme Court dismissed the claim, holding that plaintiffs' proof of racial discrimination was not sufficiently reliable. According to the Court, an ambiguous statement by the Mayor about the racial composition of the 1969 board (rather than the 1971 panel), a Deputy Mayor's unawareness of certain black organizations in the city, and racial composition percentage comparisons which were considered meaningless based on the small size of the sample and the inappropriateness of using the population at large in making the comparisons, constituted evidence which was "too fragmentary and speculative" to support a claim of racial discrimination. *Id.* at 621, 94 S.Ct. at 1333. The Court also expressed its concern that "judicial oversight of discretionary appointments may interfere with the ability of an elected official to respond to the mandate of his constituency" and that such oversight raised "delicate issues of federal-state relationships ... made particularly complex by the interplay of the Equal Protection Clause of the Fourteenth Amendment, with its special regard for the status of the rights of minority groups and for the role of the Federal Government in protecting those rights." *Id.* at 615, 94 S.Ct. at 1331; *see also James v. Wallace,* 533 F.2d 963 (5th Cir.1976) (rejecting claim of discriminatory appointments by Governor of Alabama to state boards and commissions based on inadequacy of statistical evidence and discretionary nature of appointments). Because of the absence of reliable proof of racial discrimination, the Court did not resolve these constitutional concerns. 415 U.S. at 616, 94 S.Ct. at 1331.

■■■ While a constitutional challenge directed solely at the mayoral appointment process would present problems similar to those raised in *Mayor* and *James,* the instant case does not rest on such grounds. We do not find that the evidence of mayo-

ral Board appointments itself establishes a constitutional violation requiring remedial relief in the form of new appointments or changes in appointment procedures. This is not a case in which this Court is effectively asked to order the Mayor "to exercise his discretion in a particular way." 415 U.S. at 615, 94 S.Ct. at 1331 (*quoting Carter v. Jury Commission of Greene County,* 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970) (challenging state governor's alleged discriminatory exclusion of blacks in discretionary appointments to county jury commission)). Rather, the evidence concerning mayoral appointments to the Board is relevant and significant in this case insofar as it provides circumstantial evidence of a pattern of decisionmaking consistent with other municipal acts and omissions designed in part to perpetuate the segregated condition of housing and schools in Yonkers. To the extent that this segregation was caused in part by housing practices influenced by racially motivated community opposition to nondiscriminatory policies of subsidized housing site selection and construction, the Mayor's responsibility for responding to the concerns of this same community cannot reasonably preclude judicial examination of mayoral appointments to the school board. Moreover, the evidentiary pitfalls inherent in drawing conclusions about the racial composition of governmental boards or commissions from statistically limited and inapposite numerical evidence of disproportionate racial impact are not present here, where the extensive testimony of witnesses, the contemporaneous statements, perceptions and impressions of city and school officials and community members, and the more recent actions of the Board which have been consistent both with the Mayor's efforts to exercise greater control over school affairs and with the City's segregative housing practices, all provide a more than adequate supply of relevant information from which conclusions regarding intent and impact may be drawn.

The task of examining the motivations or reasons underlying the conduct of state and local governmental authorities is an

admittedly delicate one, particularly where the decisionmaking process involves the exercise of discretion by locally elected officials. Yet the sensitive and elusive nature of this inquiry is inherent in the multitude of school desegregation cases which federal courts have been called upon to decide over the past decade. To ignore the circumstances surrounding the mayoral appointments to the Board in this case would be to immunize from review a single but significant aspect of official decisionmaking which has collectively resulted not simply in a disproportionately low representation of minority ethnic groups on a particular governmental body, but in the city-wide racial segregation of public housing and public schools. Where discretionary mayoral appointments are neither examined in isolation nor challenged as impermissible in and of themselves, but are one aspect of an overall pattern of consistently segregative conduct occurring over several decades, the arguments for federal judicial noninterference in determining the causes and consequences of this exercise of official decisionmaking power become increasingly untenable. We conclude that an examination of the manner in which Board appointments were made in Yonkers is appropriate under the circumstances described above and that such appointments, along with other segregative practices of the City and other evidence of involvement in educational affairs, constitute a sufficient basis for holding the City legally responsible for the racial segregation of Yonkers public schools.[166]

Not all of the City's school-related conduct was segregative in its ultimate impact. Indeed, the legal relationships which gave the City its most direct control over school affairs were generally not accompanied by racially segregative consequences to Yonkers public schools. The City's involvement in the site selection for Yonkers High School and Saunders Trades and Technical High School, while illustrative of the City's somewhat successful efforts to influence school district decisionmaking, eventually resulted in the selection of sites which were preferred by the Board and were not racially segregative. Similarly, the City Council's budgetary power vested the City with considerable control over educational matters; this control, however, was not actually exercised in a manner which resulted in the perpetuation of racial segregation in Yonkers public schools. *Cf. Arthur v. Nyquist, supra,* 573 F.2d at 145. Nevertheless, the City's acts and omissions need not have been uniformly segregative in order to establish its liability for the segregation for which some of its conduct is responsible. *See Arthur v. Nyquist, supra,* 415 F.Supp. at 913. Whether direct or indirect, the City's housing practices, the mayoral appointment of Board members, and other City involvement in school affairs are more than adequate evidence of the City's intentional perpetuation and exacerbation of racial segregation in Yonkers public schools. We therefore hold that the City is liable for the racial segregation of Yonkers public schools.

## CONCLUSION

Having found the defendants liable, it is appropriate that the remedy phase of these proceedings be addressed.

---

**166.** The City also contends that judicial scrutiny of mayoral appointments involves an inquiry into individual attitudes and beliefs which are protected by the first amendment and thus cannot be the basis for a finding of unlawful discrimination. This argument misperceives the relevance of mayoral appointments in this case. Our function is not to determine whether the Mayor or his appointees' personal beliefs are unlawful, or whether an act of appointment itself was a violation of the Constitution. We have instead focused on the reasons underlying the appointments, the circumstances in which the appointments were made, and the consequences of the appointments on the Yonkers school system in order to determine whether evidence concerning the mayoral appointment of Board members constitutes evidence of an intent to influence and control educational affairs in a manner consistent with other municipal conduct affecting Yonkers public schools. It is this intent, the other acts and omissions of governmental authorities which were consistent with this intent, and the resulting impact of such acts and omissions on Yonkers public schools, which together form the basis for our finding of unlawful school segregation. *See also United States v. Yonkers Board of Education, supra,* 518 F.Supp. at 200.

The Court will hold a scheduling conference on December 18, 1985 at 9:45 A.M.

SO ORDERED.

APPENDIX A

CITY OF YONKERS

SUBSIDIZED HOUSING SITES

| | Project | Type | Number of Units | Approved | Opened |
|---|---|---|---|---|---|
| 1. | Mulford Gardens (Emmett Burke Gardens) | Family | 550 | 1938 | 1940 |
| 2. | Cottage Place Gardens | Family | 250 | 1942 | 1949 |
| 3. | Schlobohm Houses | Family | 413 | 1950 | 1953 |
| 4. | Sunset Green | Family | 70 | 1957 | 1960 |
| 5. | Sunnyside Manor | Family | 121 | 1957 | 1964 |
| 6. | Loehr Court | Senior Citizen | 108 | 1958 | 1962 |
| 7. | Hall Court | Family | 48 | 1958 | 1962 |
| 8. | Calgano Homes | Family | 278 | 1958 | 1964 |
| 9. | Walsh Houses | Senior Citizen | 300 | 1961 | 1967 |
| 10. | Phillipse Towers | Family | 544 | 1962 | 1964 |
| 11. | Kristensen Houses | Senior Citizen | 32 | 1963 | 1967 |
| 12. | Curran Court | Senior Citizen | 186 | 1963 | 1967 |
| 13. | Jefferson Terrace | Family | 64 | 1968 | 1971 |
| 14. | Highland Terrace | Family | 96 | 1968 | 1969 |
| 15. | Messiah Baptist | Family | 130 | 1970 | 1972 |
| 16. | Flynn Manor | Senior Citizen | 140 | 1970 | 1971 |
| 17. | 10 Orchard St. | Family | 8 | 1970 | 1971 |
| 18. | Riverview I | Family | 454 | 1970 | 1975 |
| 19. | Riverview II | Family | 343 | 1970 | 1975 |
| 20. | Frazier Homes | Family | 21 | 1970 | 1973 |
| 21. | The Dorado | Family | 188 | 1970 | 1973 |
| 22. | Whitney Young Manor | Family | 195 | 1970 | 1974 |
| 23. | Waverly Arms | Family | 28 | 1970 | 1972 |
| 24. | Fr. Finian Sullivan Towers | Senior Citizen | 150 | 1970* | 1975 |
| 25. | 164–170 Buena Vista Ave. | Family | 12 | 1971 | 1971 |
| 26. | Seven Pines | Family | 300 | 1971 | 1974 |
| 27. | Cromwell Towers | Family | 317 | 1971 | 1974 |
| 28. | Jackson Terrace | Family | 181 | 1971 | 1973 |
| 29. | Parkledge | Family | 310 | 1972 | 1975 |
| 30. | Lane Hill Apts. | Senior Citizen | 109 | 1976 | 1980 |
| 31. | Margaret Hughes Housing | Senior Citizen | 101 | 1977 | 1980 |
| 32. | 28 Lamartine Terr. | Mixed | 82 | 1977 | 1979 |
| 33. | 557 So. Broadway | Mixed | 14 | 1977 | 1979 |
| 34. | St. Casimir's | Senior Citizen | 264 | 1978 | 1980 |
| 35. | 182 N. Broadway | Family | 62 | 1979 | 1981 |
| 36. | Kubasek-Trinity Manor | Senior Citizen | 130 | 1979 | 1981 |
| 37. | Monastery Manor | Senior Citizen | 146 | 1979 | 1982 |
| 38. | Post Street Apts. | Family | 55 | 1980 | 1981 |

*Preliminary approval; final approval given in October 1973.

Source: GX 1225.52; 1099.9; 1099.11; C–1700.

APPENDIX B

MAP
OF THE
CITY OF YONKERS
ELEMENTARY SCHOOL DISTRICT LINES

APPENDIX C

MAP
OF THE
CITY OF YONKERS
MIDDLE SCHOOL DISTRICT LINES

APPENDIX D

MAP
-OF THE-
CITY OF YONKERS
HIGH SCHOOL DISTRICT LINES

## APPENDIX E

Engineering Department figures are derived from the Board of Education's 1981 "Annual School Profiles" (GX 81) and the administration's 1977 Phase II plan (GX 98). These figures are based on the square footage of space available. GX 71; GX 98, at 14.

New York University Report figures are derived from a 1972 New York University School of Education report containing various school reorganization proposals for the Yonkers public schools. Except as otherwise noted below, elementary school capacity is based on a "realistic operating capacity" of 90% of a school's theoretical student capacity; middle school capacity is based on a "realistic operating capacity" of 80% of a school's theoretical student capacity, and high school capacity is based on a "realistic operating capacity" of 80–85% of a school's theoretical student capacity.

The 1976 School Closing Plan and 1977 Phase II figures are derived from two school reorganization plans developed by Superintendent Joseph Robitaille and his staff. Elementary school capacity figures were derived by multiplying the number of available classrooms by a 28-student-per-classroom average, with allowance being made for special classroom uses in a particular school, e.g., Special Education instruction, funded educational program laboratories, and pre-K programs. GX 126. Secondary school capacity figures are based on a variety of program-related factors. GX 98, at 13. Differences between 1976 School Closing Plan and Phase II capacity figures (apparently attributable to changes in space utilization, e.g., for special programs) are noted where applicable.

| | | School Capacity | | |
| | | Engineering Department (1977, 1981) | NYU Report (1972) | 1977 Phase II (1976 School Closing) Plans |
| Elementary Schools | | | | |
|---|---|---|---|---|
| 1 | (closed 1954) | 240[a] | – | – |
| 2 | (converted 1945) | – | – | – |
| 3 | (closed 1976) | – | 661 | 672 |
| 4 | (closed 1976) | – | 500 | 504 |
| 5 | – | 750 | 743[b] | 672 |
| 6 | – | 460 | 497 | 420 |
| 7 | (closed 1976) | – | 661 | 560 |
| 8 | – | 550 | 581 | 560 |
| 9 | – | 604 | 605 | 560 |
| 10 | – | 725 | – | 532 (504) |
| 11 | (Twain) | 650 | 639 | 644 (728) |
| 12 | (closed 1976) | – | 520 | 476 |
| 13 | – | 900 | 887 | 756 (859) |
| 14 | – | 553 | 580 | 588 (616) |
| 15 | (closed 1976) | – | 320 | 448 |
| 16 | – | 475 | 473 | 448 |
| 17 | – | 425 | 394 | 476 (448) |
| 18 | – | 900 | 875 | 868 (840) |
| 19 | – | 650 | 635 | 672 |
| 20 | (converted 1938) | – | – | – |
| 21 | – | 475 | 529 | 532 |
| 22 | – | 450 | 450 | 504 |
| 23 | – | 850 | 634 | 756 (840) |
| 24 | (closed 1976) | – | 371 | 420 |
| 25 | – | 650 | 659 | 532 |
| 26 | – | 655 | 527 | 616 |
| 27 | – | 525 | 558 | 560 (504) |
| 28 | – | 490 | 450 | 560 |
| 29 | – | 550 | 504 | 560 (588) |
| 30 | – | 500 | 580 | 560 |
| 31 | – | 450 | 423 | 448 |
| 32 | – | 675 | 477 | 644 (672) |

| Elementary Schools | Engineering Department (1977, 1981) | NYU Report (1972) | 1977 Phase II (1976 School Closing) Plans |
|---|---|---|---|
| King | 750 | – | 644 |
| 34 (Emerson) | 375 | – | 448 (588) |

[a] This figure is derived from a 1954 building utilization report. GX 2, at 3.
[b] This figure is based on an 80% realistic operating capacity. GX 115, at 43.

School Capacity

| Middle Schools | Engineering Department (1977, 1981) | NYU Report (1972) | 1977 Phase II (1976 School Closing) Plans |
|---|---|---|---|
| Burroughs (converted 1978) | 1,100 | 1,233 [c] | 1,100 |
| Commerce (closed 1976) | — | 720 | 1,000 |
| Emerson | 850 | 1,414 [d] | 850 (650) |
| Fermi | 1,200 | 1,280 | 1,000 |
| Franklin (closed 1974) | — | — | — |
| Hawthorne | 1,375 | 1,398 | 1,200 |
| Longfellow | 820 | — | 650 |
| Twain | 1,595 | 1,313 | 1,450 |
| Whitman | 1,025 | 1,105 | 1,200 |

| High Schools | | | |
|---|---|---|---|
| Commerce (converted 1973) | — | — | — |
| Gorton [e] | 1,405 | 1,296–1,377 | 1,650 |
| Lincoln [f] | 1,945 | 1,631–1,733 | 2,100 |
| Roosevelt [g] | 1,975 | 1,723–1,830 | 2,000 |
| Saunders (old) [h] (closed 1978) | 875 | 600 [c] | 750 |
| Yonkers | 2,525 | 2,576–2,737 | 2,800 |

[c] This figure is based on an 85% realistic operating capacity. GX 115, at 3.
[d] This figure includes School 34 (Emerson Elementary School) capacity.
[e] Auto and industrial arts shops were added in 1975. GX 644.
[f] Two classrooms and an auto shop were added in 1975. GX 644.
[g] Sixteen classrooms, a music room and an auto shop were added in 1976. GX 644.
[h] Saunders is presently located in the former Burroughs facility.